Philip R. Forlenza
David W. Dykhouse
Erik Haas
Sarah E. Zgliniec
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
pforlenza@pbwt.com
dwdykhouse@pbwt.com
ehaas@pbwt.com
sezgliniec@pbwt.com

**U8 CIV 9464**

*Attorneys for Ambac Assurance Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMBAC ASSURANCE CORPORATION,    :

        Plaintiff,    :

     - against -    :

EMC MORTGAGE CORPORATON,    :

        Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 08 Civ. _____

**COMPLAINT**

Plaintiff Ambac Assurance Corporation ("Ambac"), by and through its attorneys, Patterson Belknap Webb & Tyler LLP, for its complaint against Defendant EMC Mortgage Corporation ("EMC"), hereby alleges as follows:

## NATURE OF THE ACTION

1.    EMC, upon information and belief acting at all times at the behest and under the control of its parent, The Bear Stearns Companies Inc. ("Bear Stearns"), leveraged its reputation and dominance in mortgage finance to fuel and finance the origination of mortgage

loans that it is now apparent that borrowers could not afford, by sponsoring transactions known as "securitizations" that created a market for the defective loans. The securitizations involved the sale of mortgage loans to trusts, which in turn issued to investors securities that were to be paid down by the promised cash flows from the mortgage loans. To induce investors to purchase, and bond insurers like Ambac to insure, these securities, EMC made specific representations about the key attributes of the loans, represented that the loans were *not* originated through improper means (*e.g.*, fraud, error, omission, misrepresentation, gross negligence, or similar occurrence), and agreed to accept the risk of loss in the event its representations and warranties turned out to be untrue. In a risk allocation arrangement typical in commercial transactions between sophisticated parties, EMC assured Ambac in explicitly worded contractual terms that Ambac need not be concerned about the risk that the loans would not conform to EMC's representations. Rather, pursuant to the agreements between the parties, EMC assumed the risk of the inaccuracy of its representations and warranties, while Ambac assumed the risk that pools of mortgage loans *conforming to EMC's representations* would not perform as expected. But after profiting handsomely from sponsoring these securitizations, EMC now seeks to walk away from its explicit contractual representations and commitments as pervasive origination failures – and thus EMC's pervasive breaches – come to light. This action is required to address that wrong.

    2.   Specifically, this contract action arises from EMC's extraordinary and material breach of the unambiguous terms and fundamental premise of its agreements with Ambac governing four separate mortgage-backed securities transactions: the SACO I Trust Series 2005-10, 2006-2, and 2006-8 Transactions (collectively, the "SACO Transactions"), and the Bear Stearns Second Lien Trust 2007-1 Transaction (the "BSSLT Transaction" and, collectively with the SACO Transactions, the "Transactions").

2

3.      EMC induced Ambac to issue four financial-guaranty insurance policies covering payments due on certain mortgage-backed securities issued in the Transactions by, among other things, (1) making numerous express representations and warranties concerning the key attributes of the mortgage loans that backed the securities and the practices of the entities that made those loans; (2) agreeing to cure, repurchase, or provide adequate substitutes for mortgage loans that did not comply with those representations and warranties; (3) agreeing to reimburse and indemnify Ambac for any and all losses caused by breaches of those representations and warranties; and (4) agreeing to reimburse Ambac for expenses incurred in connection with enforcing and preserving its rights under the agreements.

4.      After observing initial signs of performance deterioration in the SACO Transactions, Ambac conducted a review of the documentation pertaining to 695 defaulted loans for compliance with EMC's representations and warranties. Having discovered widespread breaches of representations and warranties in almost 80% of the loans examined, with an aggregate principal balance of approximately $40.8 million across all the Transactions, Ambac asked EMC to comply with its contractual obligations to cure, repurchase, or provide substitutes for the non-compliant loans. In disregard of its contractual obligations, EMC refused and continues to refuse to do so with respect to all but a small handful of loans. Ambac brings this action, in the first instance, to recover for EMC's breaches of its contractual commitments as to the specific loans identified as non-compliant and to recover its expenses in enforcing its contractual remedies afforded by the agreements governing the Transactions.

5.      In addition, and more significantly, this action is required to address the broader harm suffered by Ambac as a result of the pervasive nature of EMC's breaches. These pervasive breaches, that have only recently come to light, fundamentally undermine the parties'

3

bargain and constitute a material breach of their agreements, which entitles Ambac to recover from EMC all of the claim payments that Ambac has made and will make on its policies – not merely the damages associated with the individual loans that EMC has refused to repurchase to date.

6.     The pervasive nature of EMC's breaches was recently demonstrated not only by the extraordinarily high incidence of breaches identified in the defaulted loans, but by a study of a random sample of an additional 1486 loans with an aggregate principal balance of approximately $86.9 million across all four Transactions. The results of that review were remarkable. Of these 1486 loans, 1332, over 89%, breached one or more of the representations and warranties that EMC had made to Ambac. The most prevalent and troubling of the breaches identified by Ambac across all four Transactions involve (1) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines.

7.     Loss and delinquency patterns experienced by these Transactions in the last several months have been consistent with these recent revelations. The loans that EMC securitized have defaulted at an extraordinary rate, depriving the Transactions of the cash flows required to pay down the respective securities and, thereby, requiring Ambac to make significant payments with respect to its insurance policies. The three SACO Transactions have together suffered more than $313.7 million in losses, resulting in $78.8 million in claims paid by Ambac. And, barely 19 months removed from closing, the BSSLT Transaction alone already has suffered more than $321.4 million in losses, resulting in $52.6 million in claims paid by Ambac (of which $25.8 million was paid by Ambac in October 2008).

4

8.     The dramatically poor loan performance corroborates Ambac's findings that the *entire pool* of loans that EMC securitized in each Transaction is plagued by rampant fraud and an abdication of sound mortgage-origination and underwriting practices.

9.     But, as noted, to induce Ambac to participate in the Transactions, EMC expressly represented and warranted that such fraud and failings did not exist, and assumed all risk of loss in the event that these representations and warranties proved untrue. EMC also represented and warranted that filings made with the Securities and Exchange Commission regarding the Transactions did not contain any material misstatement or omission. EMC's representations and warranties simply were and are not true. And, when faced with the evidence of such fraud and other failings, EMC has reneged on its contractual obligations to cure, repurchase, or provide substitutes for the non-compliant loans.

10.     EMC's representations and warranties relating to the loan attributes and origination practices (and acceptance of the risk of loss if not true) were essential consideration and prerequisites for Ambac's issuance of its insurance policies. EMC's commitment to cure, repurchase, or substitute individual non-compliant loans was not intended to be an alternative to EMC's obligation to make accurate and truthful representations and warranties. The contemplated and bargained-for agreement called for EMC to transfer to the trusts loans that complied with its representations and warranties in exchange for Ambac's irrevocable insurance policies. As recent loan-file review has demonstrated, EMC gutted this bargain and materially breached each of the parties' agreements by transferring to the trusts mortgage-loan portfolios that were replete with loans that did not comply with EMC's clear and unambiguous representations.

5

11. EMC's material breaches of the parties' agreements have inflicted and are inflicting tremendous harm on Ambac. In addition to the hundreds of millions of dollars in claims that Ambac has paid and will pay, EMC's flagrant and willful breaches, and its refusal to cover a risk of loss that it expressly assumed, have significantly damaged Ambac's capital position, reputation, and credit rating. Ambac is entitled to be made whole and to be placed in the position that it would have been in had it never entered into any of the Transactions.

## THE PARTIES

12. Ambac is a Wisconsin corporation with its principal place of business at One State Street Plaza, New York, New York 10004.

13. Upon information and belief, EMC is organized under the laws of the State of Delaware and its principal place of business is at 2780 Lake Vista Drive, Lewisville, Texas 75067. Upon information and belief, Defendant EMC is, or was at all relevant times herein, a wholly owned subsidiary of Bear Stearns.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

15. This Court has personal jurisdiction over EMC, and venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Ambac's claims occurred, and EMC is currently subject to personal jurisdiction, in the Southern District of New York. Further, in its Insurance and Indemnity Agreement ("I&I Agreement") with Ambac for each Transaction, EMC irrevocably submitted to the "non-exclusive jurisdiction of the United States District Court for the Southern District of

6

New York."[1]  In addition, in each I&I Agreement, EMC "waive[d] and agree[d] not to assert by

way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it

is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is

brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or

that the related documents or the subject matter thereof may not be litigated in or by such

courts."[2]

## BACKGROUND

### A.     The Bear Stearns Securitization "Machine"

16.     This action arises from EMC's breaches of the representations and

warranties that it made in connection with the securitization of mortgage loans in four separate

Transactions that EMC sponsored in December 2005, January 2006, September 2006, and April

2007. A securitization involves the pooling and sale of mortgage loans to a trust, which issues

debt securities of varying seniority with payments dependent on, or "backed" by, the cash flow

from the pooled loans.  That is, the cash flow received from the mortgage loans is to be used to

pay down the securities issued by the trust.

17.     At the time the Transactions at issue in this litigation were consummated,

Bear Stearns had long been a leader in all facets of mortgage-loan securitization, at or near the

top of the charts for issuance and underwriting of mortgage-backed securities for 17 years

running.[3]  Through its well-engineered network of affiliates, Bear Stearns controlled every step

---

[1] *See, e.g.*, I&I Agreement § 6.05(a) (for each Transaction).

[2] *Id.*

[3] *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006, *available at:*
http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725
(ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 Bear Stearns
Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one

in the mortgage-loan-securitization chain: from the origination and servicing of loans that provided the cash flow for the mortgage-backed securities; to the "warehouse" or temporary financing of large pools of "whole loans" pending their pooling and securitization into mortgage-backed securities; to the underwriting and distribution of the mortgage-backed securities that provided permanent financing to EMC with respect to the mortgage loans; to the management of hedge funds that it caused to buy the mortgage-backed securities.

18.    EMC played a crucial role within the Bear Stearns securitization machine. Bear Stearns established EMC in 1990 as its mortgage-banking arm to facilitate the purchase and servicing of mortgage loans as a complement to Bear Stearns's own loan originations.[4]  Since its inception, EMC has contributed greatly to Bear Stearns's rise to the very top of the mortgage-finance industry by purchasing over $200 billion in residential whole loans and servicing rights.[5] Bear Stearns, through EMC and other subsidiaries, thus acted both as an "originator" and an "aggregator" of an enormous volume of residential mortgage loans, "with the ultimate strategy of securitization into an array of Bear Stearns'[s] securitizations."[6]  EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it securitized.  In its role as aggregator, EMC prescribed loan origination standards and approved the underwriting guidelines of a large number of mortgage lenders that constituted its vast originator network, and whose loan origination activities it thus helped finance.

---

underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market").

[4] *See* SACO 2006-8 Transaction Prospectus Supplement, dated September 15, 2006 ("2006-8 ProSupp"), at 32.

[5] *Id.*

[6] *Id.*

8

19. Another Bear Stearns affiliate frequently acted as lead underwriter for the EMC-sponsored securities offerings. And, frequently, it was a Bear Stearns's affiliate that purchased or retained a financial interest in a portion of the securities issued in these transactions to repackage into securities known as "collateralized debt obligations" ("CDOs"). Finally, Bear Stearns also provided financial research for residential mortgage-backed securities and related structured products that it created and sold. As Bear Stearns reported to Thompson Financial in 2006, "Our vertically integrated franchise allows us to access every step of the mortgage process, including origination, securitization, distribution and servicing."

20. The product of this machine was a successful and extraordinarily profitable enterprise, which further solidified and enhanced Bear Stearns's sterling reputation and tremendous sway in all areas of mortgage finance. Bear Stearns recorded gains and earned fees at every step in this chain: (i) loan-origination fees, (ii) servicing fees, (iii) gains on sale of the mortgages to the securitization trusts, (iv) fees from underwriting mortgage-backed securities, (v) gains and fees from CDOs into which these securities were repackaged, (vi) gains and fees from trading in these securities and interests in the CDOs into which they were placed, and (vii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by Bear Stearns that ultimately were backed by residential mortgage loans.

21. From 2003 to 2006, Bear Stearns's revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization machine.[7] Consistently, the volume of EMC's securitizations grew markedly over the same

---

[7] Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (Nov. 30, 2006); Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

9

period. In 2003, EMC securitized 86,000 loans valued at approximately $20 billion. That number nearly tripled in 2004 to 230,000 loans, valued at $48 billion.[8] In 2005, the number jumped to 389,000 loans, valued at nearly $75 billion.[9] And in 2006, EMC securitized over 345,000 loans valued at $69 billion.[10] All told, from 2003 to 2007, EMC purchased and securitized more than one-million mortgage loans originally valued in excess of $212 billion.[11] For 2006, Bear Stearns's overall securitization volume rose to $113 billion from $95 billion in fiscal 2005, amounting to 11% of the overall U.S. mortgage-securities market.[12]

22.     Critical to Bear Stearns's perpetuation of this successful enterprise was an increasing supply of mortgage loans. As investor demand for mortgage-backed securities created and sold by Bear Stearns grew (due to their higher yield relative to other securities and their erroneously-perceived relative safety), so did the need for ever-increasing numbers of loans to securitize. With a corporate objective of increasing origination and securitization volume in this investor-driven market, Bear Stearns affiliates and the lenders it funded actively expanded the use of, "stated income," "no ratio," and "no-doc" loans that required less (or no) documentation to corroborate the borrowers' and brokers' representations. Bear Stearns also frequently provided lenders warehouse lines of credit to generate, to EMC's specifications, the ever-increasing volume of loans for EMC to purchase and securitize.

23.     In addition, to keep the pipeline full, EMC added second-lien loans and home-equity lines of credit ("HELOCs") to its portfolio of mortgage products, many of which

---

[8] 2006-8 ProSupp at 32.

[9] *Id.*

[10] BSSLT Transaction Prospectus Supplement ("BSSLT ProSupp") at 33.

[11] *Id.*

[12] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2007.

were also made on a "low doc" or "no doc" basis. HELOCs, which are the type of loans

securitized in the SACO 2006-8 Transaction, as well as a portion of the BSSLT Transaction,

provide to the borrower a revolving line of credit that is generally secured by a second-lien

mortgage. EMC's HELOC business began in 2005 with over 9,300 loans valued at more than

$509 million and grew to more than 18,000 loans valued at over $1.2 billion by the end of

2006.[13] The growth in its second-lien business was meteoric, with volume skyrocketing from

approximately 15,000 loans valued at approximately $660 million at the end of 2004 to

approximately 116,500 loans valued at approximately $6.7 billion at the end of 2006.[14] Many of

these second-lien loans were "sub-prime" mortgage loans, which are generally issued to

borrowers with limited incomes or FICO credit scores below 580 (on a scale that ranges from

300 to 850). Others were "Alt-A" loans, which were made to borrowers with much stronger

credit scores, and were also represented by EMC as having been originated pursuant to sound

underwriting practices; representations that recently have been demonstrated false with respect to

many loans.

              24.     Indeed, many of these products had been in use in residential mortgage

lending for some time, and were not at the time considered problematic in and of themselves.

But, what only very recently has come to light is that EMC's expanded securitization of these

products was accompanied by a marked decline in the standards followed to originate the

products, which, as discussed in detail below, directly contravened EMC's contemporaneous

representations concerning the underwriting practices that had been followed.

---

[13] BSSLT ProSupp at 33.

[14] *Id.*

11

25.     The other key to the Bear Stearns securitization machine was investor demand for its mortgage-backed securities. Bear Stearns generated this demand by convincing investors that the securities it sold were a safe and profitable investment, despite the fact that, unbeknownst to Ambac and the market at large, those securities were backed by unjustifiably risky loans. It did so in several ways. First, Bear Stearns touted its experience, expertise, analytic prowess, and sales and distribution channels. Second, EMC represented that it had conducted due diligence of the mortgage-loan pools it securitized to ensure the integrity of their origination and to confirm the accuracy of their terms.[15]  Third, EMC made numerous express representations and warranties about the risk attributes of the loans it was securitizing to the investors and insurers of those transactions, and agreed to repurchase those loans if the representations and warranties proved untrue. Bear Stearns thus assured purchasers and insurers of these securities that EMC would stand behind the securities it marketed. Finally, EMC obtained financial-guaranty insurance policies to provide investors with greater comfort and to enhance the marketability of the securities. Under the terms of the agreements governing these insurance policies, discussed below, EMC assumed the risk that the loans did not conform to its representations and warranties, while the insurers agreed to assume the risk that loan pools *conforming to EMC's representations* did not perform as anticipated.

---

[15] In numerous filings with the Securities and Exchange Commission in connection with the issuance of mortgage-backed securities backed by those loans, EMC indicated that it conducted due diligence of those loans. *See, e.g.*, SACO 2006-8 Transaction ProSupp at 32.

26.    Bear Stearns thus continued to expand its loan generation[16] to fuel its

securitizations and, at the same time, reassured the market that it would maintain the "quality" of

its securitizations.  In late 2005, Bear Stearns told investors:

> [O]ur [origination and] conduit business . . . saw a
> significant increase in origination volume over the course
> of the year and that's important not only because it secures
> a direct pipeline of product for securitization and thereby
> allows us to maintain and increase share, but also it has a
> lot to do with the quality of the product that we're able to
> put out in the nonagency space.[17]

27.    But Bear Stearns did not take steps to ensure the "quality of the product."

Quite to the contrary, as has recently become clear, Bear Stearns pushed for increased loan

volumes at the expense of underwriting standards.[18]  As a consequence, it turns out that, as has

recently been learned, EMC's inventory of mortgage loans was replete with loans (i) originated

by fraud, material misrepresentations, or omissions and (ii) underwritten without regard to

prudent standards or the fundamental principles of mortgage lending, which require a good-faith

assessment of the borrower's ability and willingness to repay the loan.

---

[16] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006 (Bear Stearns significantly expanded captive origination volumes in 2006, more than doubling 2005 levels).

[17] Bear Stearns Investor Conference Call regarding Q4 2005 Earnings, Dec. 15, 2005.

[18] *See Bear Naked Lenders*, WALL ST. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management, but let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade."); *see also* Michael Corkery, *Fraud Seen as Driver in Wave of Foreclosures-Atlanta Ring Scams Bear Stearns, Getting $6.8 Million in Loans*, WALL ST. J., Dec. 21, 2007, at A1 ("During its first full year of business in 2006, Bear Stearns Residential Mortgage originated 19,715 mortgages for a combined $4.37 billion, according to data compiled by the Federal Reserve and analyzed by The Wall Street Journal.  Bear Stearns Residential Mortgage rejected about 13% of applications, compared with an average denial rate of 29% nationally, according to the Fed data.").

28.     The truth is now apparent. The Bear Stearns securitization machine was a

house of cards, supported not by real value and sound practices but by Bear Stearns's appetite for

loans and disregard as to the risks those loans presented. As has only recently come to light,

Bear Stearns's expanded acceptance and financing of "no doc" and "low doc" loan products

corresponded with a marked and dangerous decline in the rigor and discipline with which Bear

Stearns and the mortgage lenders it financed approached loan origination and underwriting. It is

now apparent that mortgage loans were extended in staggering volume to borrowers who simply

could not pay, or had no intention of paying, the amounts due. And rather than conducting the

rigorous due diligence it touted as the hallmark of its model, Bear Stearns sacrificed review and

rigor for volume and profit. With the collapse of the housing market, the borrowers' inability to

pay no longer could be concealed by providing refinancing based on inflated home valuations.

The Bear Stearns engine ground to a halt, and the losses mounted.

29.     EMC's inventory of mortgage loans thus was replete with loans originated

by fraud or underwritten pursuant to imprudent or non-existent standards. Despite their

representations regarding the integrity of due diligence it conducted, upon information and

belief, Bear Stearns and EMC instructed the third-party due-diligence firms they hired to vet

these loans to look the other way. In fact, one of the more prominent of these due-diligence

firms instructed its employees never to mention the word "fraud."[19]

30.     In short, EMC and Bear Stearns knowingly or recklessly sold tens of

billons of dollars of such loans – a harrowing percentage of which are now defaulted – into

securitization trusts such as the trusts created as part of each of the Transactions. These practices

---

[19] PAUL MUOLO & MATHEW PADILLA, CHAIN OF BLAME: HOW WALL STREET CAUSED THE MORTGAGE
AND CREDIT CRISIS 232-33 (2008).

14

have substantially contributed not only to the demise of Bear Stearns and the mortgage lenders it funded, but also to the extraordinary collapse of the residential-housing market and the resultant turmoil currently gripping financial markets all over the world.

## THE TRANSACTIONS

**A.      The 2005-10 Transaction**

31.     As the Sponsor/Seller in the SACO 2005-10 Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, pooled and securitized approximately 13,172 sub-prime residential mortgage loans, which EMC had previously purchased from numerous mortgage-loan originators, with an aggregate principal balance of approximately $626,731,100. These loans served as collateral for the issuance of more than $574 million in publicly offered mortgage-backed securities.[20.]

32.     The SACO 2005-10 Transaction closed on December 30, 2005 and was effectuated through the following series of agreements executed by EMC and its affiliates that governed, among other things, the rights and obligations of the various parties with respect to the mortgage loans and the securities that resulted from their securitization.

33.     EMC, acting as Seller, sold and assigned its entire interest in the mortgage loans to its affiliate Bear Stearns Asset Backed Securities I LLC ("BSABS I") pursuant to a Mortgage Loan Purchase Agreement dated as of December 30, 2005 (the "2005-10 MLPA"). Under the 2005-10 MLPA, EMC made numerous detailed representations and warranties concerning the mortgage loans.

34.     BSABS I, in turn, sold its interest in the mortgage loans to the SACO I Trust 2005-10 (the "2005-10 Trust") pursuant to a Pooling and Servicing Agreement dated as of

---

[20] Additional mortgage-backed securities issued in the 2005-10 Transaction were not offered to the public.

15

December 1, 2005 (the "2005-10 PSA"). The 2005-10 Trust then issued various classes of mortgage-backed securities, the most senior of which were registered with the U.S. Securities and Exchange Commission ("SEC") and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and Prospectus Supplement. In order to enhance the marketability of the securities and its return on the Transaction, EMC sought to obtain a financial-guaranty insurance policy from Ambac.

35.     As an inducement to issue the policy, EMC entered into an Insurance and Indemnity Agreement with Ambac, dated as of December 30, 2005 (the "2005-10 I&I Agreement"), whereby, among other things, EMC made numerous representations and warranties to Ambac with respect to the SACO 2005-10 Transaction, including that the representations and warranties that it had made in the 2005-10 MLPA were true and correct in all material respects, and agreed to indemnify Ambac in the event that EMC's representations and warranties proved to be untrue. The other parties to the 2005-10 I&I Agreement are BSABS I, the 2005-10 Trust, LaSalle Bank National Association ("LaSalle"), as Master Servicer and Securities Administrator, and Citibank N.A. ("Citibank"), as Trustee.

36.     In connection with its solicitation of Ambac's insurance policy, EMC provided to Ambac, in the form of a "tape," certain key information regarding the loans proposed for securitization. The tape contained numerous fields of information about each loan in the pool, including appraised value, loan-to-value ratio, debt-to-income ratio, FICO score, and occupancy type. EMC was aware that the information contained in this tape would be one of the key pieces of information used by Ambac to evaluate and model the risk of the proposed transaction and determine levels of structural protections known as "credit enhancement."

16

37.     As a further inducement to Ambac to provide insurance, EMC assured

Ambac that it had conducted extensive due diligence on the loans that it had acquired for

securitization. EMC stated that it generally conducted due diligence on 100% of the loans that it

acquired through its "flow" channel – that is, loans originated by EMC's network of third-party

originators, but funded by EMC itself. With respect to previously originated loans that EMC

acquired from third parties through its "bulk" channel, EMC stated that its degree of due

diligence varied based on the type of borrower, but that EMC conducted due diligence on 100%

of the sub-prime and "Alt-B" loans it acquired through this bulk channel. An e-mail dated

December 13, 2005 from Cheryl Glory, Managing Director of Mortgage Finance at Bear, Stearns

& Co., to Ervin Pilku of Ambac said just that:

> For the SACO 2005-10 deal, Group I is our bulk purchases and Group II
> is the flow. Our diligence for flow is generally 100%, with a minimum
> of 20% for a repeat well known seller such as SunTrust. . . . [F]low
> diligence includes credit, appraisal and compliance for the sample size.
> Bulk diligence is 100% for subprime and Alt B with a minimum 20% for
> prime Alt A. Bulk diligence would also include credit, appraisal and
> compliance for the sample.

38.     Relying on EMC's representations and warranties, covenants and

indemnities contained in and encompassed by the 2005-10 I&I Agreement, 2005-10 MLPA, and

2005-10 PSA, Ambac issued Certificate Guaranty Insurance Policy No. AB0961BE (the "2005-

10 Policy"). Under the 2005-10 Policy, Ambac agreed to insure certain payments of interest and

principal with respect to the most senior, or investment-grade, classes of the securities issued in

the SACO 2005-10 Transaction (the "2005-10 Insured Certificates").

**B.      The 2006-2 Transaction**

39.     Shortly after securing the insurance policy for the SACO 2005-10

Transaction, EMC sought to have Ambac insure the SACO 2006-2 Transaction.

17

40.     The SACO 2006-2 Transaction closed on January 30, 2006 and was effectuated in a manner virtually identical to the SACO 2005-10 transaction. EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, pooled approximately 13,261 sub-prime mortgage loans, with an aggregate principal balance of approximately $704,481,804, that were secured by junior liens on one-to-four-family residential properties. These loans in turn served as collateral for the issuance of more than $645 million in publicly offered mortgage-backed securities.[21] EMC had previously acquired these loans from numerous originators. The SACO 2006-2 Transaction was effectuated through the following series of agreements.

41.     EMC, acting as Seller, sold and assigned its entire interest in the mortgage loans to BSABS I pursuant to a Mortgage Loan Purchase Agreement dated as of January 30, 2006 ("2006-2 MLPA"). BSABS I, in turn, sold its interest in the mortgage loans to the SACO I Trust 2006-2 (the "2006-2 Trust") pursuant to a Pooling and Servicing Agreement dated as of January 1, 2006 (the "2006-2 PSA").[22] The 2006-2 Trust then issued various classes of mortgage-backed securities, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and Prospectus Supplement.

42.     As in the case of the SACO 2005-10 Transaction, EMC, to induce Ambac to issue a financial-guaranty insurance policy, entered into an Insurance and Indemnity Agreement with Ambac, dated as of January 30, 2006 (the "2006-2 I&I Agreement"), to which

---

[21] Additional mortgage-backed securities issued in the 2006-2 Transaction were not offered to the public.

[22] For convenience of reference, the 2005-10 PSA and 2006-2 PSA are hereinafter referred to collectively as the PSAs, and each individually as a PSA.

18

BSABS I, the 2006-2 Trust, LaSalle, and Citibank are also parties, and the terms of which are virtually identical to those of the 2005-10 I&I Agreement.

43.     Relying on EMC's representations and warranties, covenants and indemnities contained in and encompassed by the 2006-2 I&I Agreement, 2006-2 MLPA, and 2006-2 PSA, and having recently received assurances from EMC regarding its due-diligence practices, Ambac issued Certificate Guaranty Insurance Policy No. AB0971BE and Certificate Guaranty Insurance Policy No. AB0972BE (collectively, the "2006-2 Policy"). Under the 2006-2 Policy, Ambac agreed to insure certain payments of interest and principal with respect to the most senior, or investment-grade, classes of the securities issued in the SACO 2006-2 Transaction for the benefit of the holders of those securities (the "2006-2 Insured Certificates").

## C.     The 2006-8 Transaction

44.     A few months after securing the insurance policies for the SACO 2006-2 Transaction, EMC again sought a financial-guaranty insurance policy from Ambac for another of EMC's deals. Prior to that solicitation, however, EMC held an investor conference in May 2006 at which EMC personnel discussed EMC's loan-acquisition, due-diligence and servicing practices for the benefit of investors in EMC-sponsored securities and other interested parties, such as Ambac. At that conference, EMC circulated presentation materials dated May 11, 2006 that touted EMC's superior due-diligence practices, including the size and experience of its due-diligence team. These materials also asserted that EMC performed extensive due diligence on the mortgage loans it acquired. Specifically, the materials stated that EMC performed data-comparison, fraud, appraisal, credit, and compliance review on 100% of the sub-prime loans and 20% of the Alt-A loans acquired through its "flow" acquisition channel, with the remaining 80% of the Alt-A loans acquired through the flow channel being reviewed for data comparison, fraud,

19

and appraisal. EMC asserted that, in its bulk-acquisition channel, 100% of the sub-prime loans and 20-100% of the Alt-A loans were reviewed for credit, compliance, appraisal, and data comparison.

45.     The presentation materials further describe the strength of the processes followed by EMC in evaluating and monitoring the mortgage lenders from which it acquired loans, including approval of each seller's underwriting guidelines. In addition, the materials describe a stringent, post-acquisition quality-control process at EMC that included re-verification of, among other things, borrower assets, credit reports, employment, occupancy, and appraisal.

46.     On September 15, 2006, in consummating the 2006-8 Transaction, EMC pooled 5,282 HELOCs, with an aggregate principal balance of approximately $361,200,413, that were secured primarily by second-lien positions on one-to-four-family residential properties. These loans in turn served as collateral for the issuance of approximately $356 million in publicly offered mortgage-backed securities.[23]  In completing the SACO 2006-8 Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, securitized these HELOCs in much the same manner as it securitized the mortgage loans involved in the two previous deals.

47.     EMC, acting as Seller, sold and assigned its entire interest in the Mortgage Loans to BSABS I pursuant to a Mortgage Loan Purchase Agreement dated as of September 15, 2006 (the "2006-8 MLPA"). BSABS I, in turn, sold its interest in the HELOCs to the SACO I Trust 2006-8 (the "2006-8 Trust") pursuant to a Sale and Servicing Agreement dated as of September 15, 2006 (the "2006-8 SSA").

---

[23]  Additional mortgage-backed securities issued in the 2006-8 Transaction were not offered to the public.

48.     As part of the 2006-8 Transaction, an Indenture dated as of September 15, 2006, was entered into by and among the 2006-8 Trust, LaSalle, and Citibank, as Indenture Trustee, and provided for, among other things, the issuance of SACO I Trust 2006-8 Mortgage-Backed Notes, Series 2006-8 representing the indebtedness of the 2006-8 Trust, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and Prospectus Supplement.

49.     As an inducement to Ambac to issue its insurance policy, EMC, BSABS I, the 2006-8 Trust, LaSalle, and Citibank entered into an Insurance and Indemnity Agreement with Ambac, dated as of September 15, 2006 (the "2006-8 I&I Agreement"), whereby EMC made numerous representations and warranties and undertook certain obligations in consideration for Ambac's issuance of its insurance policy.[24] The 2006-8 I&I Agreement contains substantially the same terms and conditions as the I&I Agreements in the two previous Transactions.

50.     Relying on EMC's representations and warranties, covenants and indemnities contained in and encompassed by the 2006-8 I&I Agreement, 2006-8 MLPA, and 2006-8 SSA, Ambac issued Certificate Guaranty Insurance Policy No. AB1020BE (the "2006-8 Policy"). Under the 2006-8 Policy, Ambac agreed to insure certain interest and principal payments with respect to, and for the benefit of the holders of, the most senior, or investment-grade, class of securities issued in the SACO 2006-8 Transaction, the Class A Notes (the "2006-8 Insured Notes").

**D.     The BSSLT Transaction**

51.     Finally, not long after securing an insurance policy for the SACO 2006-8 Transaction, EMC sought to obtain an insurance policy from Ambac for the BSSLT Transaction.

_____

[24] *See* 2006-8 I&I Agreement at 2, fourth full recital.

21

In its efforts to secure a policy from Ambac and to assure Ambac that EMC was thoroughly vetting the loans it was acquiring, including those that it proposed to securitize in the BSSLT Transaction, EMC provided Ambac with its most recent investor-conference materials, dated March 13, 2007, which contained substantially the same assurances as the materials dated May 11, 2006. EMC also provided Ambac with copies of its recently "tightened" underwriting guidelines to further support its assertions that it thoroughly controlled and vetted its loan-acquisition channels and the loans it was buying. Finally, EMC provided Ambac with summary results of due diligence performed by EMC with respect to the loans proposed for securitization, which appeared on their face to be in line with expectations and therefore not indicative of problems with the larger pool.

52.     In effectuating the BSSLT Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, pooled approximately 5,173 HELOCs, with an aggregate principal balance of approximately $351,881,948, that were secured primarily by second-lien positions on residential properties. These loans in turn served as collateral for the issuance of more than $348 million in publicly offered mortgage-backed securities ("Group I Notes").[25]  In addition, EMC, upon information and belief acting at all times at the direction and under the control of Bear Stearns, pooled approximately 12,621 conventional mortgage loans, with an aggregate principal balance of approximately $838,903,950, that were secured by second-lien mortgages on single-family homes. These loans in turn served as collateral for the issuance of $776,623,000 in publicly offered mortgage-backed securities ("Group II and III Notes"). The BSSLT Transaction was effectuated through the following series of agreements.

---

[25] Additional mortgage-backed securities issued in the BSSLT Transaction were not offered to the public.

53.     EMC, acting as Seller, sold and assigned its entire interest in the Group I

HELOCs, Group II Mortgage Loans, and Group III Mortgage Loans to its affiliate BSABS I

pursuant to a Mortgage Loan Purchase Agreement dated as of April 30, 2007 (the "BSSLT

MLPA").[26] BSABS I, in turn, sold its interest in the Group I HELOCs, Group II Mortgage

Loans, and Group III Mortgage Loans to the BSSLT 2007-1 Trust (the "BSSLT Trust")[27]

pursuant to a Sale and Servicing Agreement dated as of April 30, 2007 (the "BSSLT SSA").[28]

54.     As part of the BSSLT Transaction, an Indenture dated as of April 30, 2007

was entered into by and among the BSSLT Trust, LaSalle, and Citibank, as Indenture Trustee,

and provided for, among other things, the issuance of BSSLT Trust 2007-1 Mortgage-Backed

Notes, Series 2007-1 representing the indebtedness of the BSSLT Trust, the most senior of which

were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co.

by means of the related Prospectus and Prospectus Supplement.

55.     As in the case of each of the three prior Transactions, as an inducement to

Ambac to issue its insurance policy, EMC, BSABS I, the BSSLT Trust, LaSalle, and Citibank

entered into an Insurance and Indemnity Agreement with Ambac, dated as of April 30, 2007 (the

"BSSLT I&I Agreement"),[29] the terms of which are substantially the same as the I&I

Agreements in the prior three Transactions.

---

[26] For convenience of reference, the 2005-10 MLPA, 2006-2 MLPA, 2006-8 MLPA, and BSSLT MLPA are hereinafter referred to collectively as the MLPAs, and each individually as an MLPA.

[27] For convenience of reference, the 2005-10 Trust, 2006-2 Trust, 2006-8 Trust, and BSSLT Trust are hereinafter referred to collectively as the Trusts, and each individually as a Trust.

[28] For convenience of reference, the 2006-8 SSA and BSSLT SSA are hereinafter referred to collectively as the SSAs, and each individually as an SSA.

[29] For convenience of reference, the 2005-10 I&I Agreement, 2006-2 I&I Agreement, 2006-8 I&I Agreement, and BSSLT I&I Agreement are hereinafter referred to collectively as the I&I Agreements, and each individually as an I&I Agreement.

56.     Relying on EMC's representations and warranties, covenants and indemnities contained in and encompassed by the BSSLT I&I Agreement, BSSLT MLPA, and BSSLT SSA, Ambac issued the Certificate Guaranty Insurance Policy No. AB1075BE (the "BSSLT Policy").[30] Under the BSSLT Policy, Ambac agreed to insure certain payments of interest and principal with respect to, and for the benefit of, the holders of the most senior classes of Notes issued in the BSSLT Transaction (the "BSSLT Insured Notes").[31]

57.     The BSSLT Transaction closed on April 30, 2007.

## AMBAC'S RIGHTS UNDER THE TRANSACTION DOCUMENTS

### A.     EMC's Representations and Warranties Are the Cornerstone of the Transactions

58.     Under the deal documents, the principal and interest payments from the loans[32] were to provide the cash flow necessary to make the monthly principal and interest payments due on the Notes. Ambac's insurance policies required it to make payments to insured Noteholders to the extent there was a shortfall of cash flow available from the loans, once the protection provided by subordinated classes of securities and other credit enhancement was eroded. The ability to evaluate the risk of the Transactions and adequacy of structural protections therefore depended on the ability to assess and control for the risk of default on the securitized loans. Certain default risk – *e.g.*, due to changes in interest rates, changes in borrowers' creditworthiness over time, adverse macroeconomic developments, and geographic concentration – is not subject to the control of the originator or sponsor, is measurable and

---

[30] For convenience of reference, the 2005-10 Policy, 2006-2 Policy, 2006-8 Policy, and BSSLT Policy are hereinafter referred to collectively as the Policies, and each individually as a Policy.

[31] For convenience of reference, the 2005-10 Insured Certificates, 2006-2 Insured Certificates, 2006-8 Insured Notes, and BSSLT Insured Notes are hereinafter referred to collectively as the Notes.

[32] For convenience of reference, the HELOCs and conventional mortgage loans, as the case may be, involved in these four Transactions are hereinafter referred to simply as the "loans."

24

quantifiable to an acceptable degree, and is the type of risk that Ambac knowingly assumes when it insures these types of transactions in exchange for a premium. Other default risk – *e.g.*, due to misrepresented loan attributes, fraud or abject failures in origination and underwriting practices – depends directly on the controls, protocols, and practices of the originators and sponsor, and is not reasonably measurable or quantifiable by their counterparties. Consequently, from the perspective of the Noteholders (or the Insurer standing in their shoes), the key provisions of the deal documents were those that allocated to EMC the risk of loss due to such misrepresentations, fraud or failures.

59. The provisions of the principal deal documents that allocated to EMC such risk of loss are EMC's representations and warranties regarding, among other things, the origination, underwriting, servicing, and other key attributes of the loans, and are found in Section 7 of the respective MLPAs. As demonstrated by their number, scope, and particularity, the representations and warranties were designed to convey absolute confidence that EMC was standing behind the quality of the loans and, specifically, accepting the risk of loss should any of the loans be found to have been included in the Transactions in violation of any representation or warranty.

60. Among its extensive representations and warranties in the SACO 2005-10 and SACO 2006-2 Transactions, EMC represented and warranted as to each mortgage loan that:

> MLPA § 7(a): "The information set forth in the Mortgage Loan Schedule on the Closing Date is complete, true and correct."
>
> MLPA § 7(h): "Each loan at the time it was made complied in all material respects with applicable local, state and federal laws, including but not limited to, all applicable anti-predatory lending laws."

25

MLPA § 7(q): ". . . [I]mmediately prior to the Cut-off Date, there was no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and there was no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the related Mortgage Loan Seller has not waived any default, breach, violation or event of acceleration."

MLPA § 7(s): "At the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan, and the appraisal is in a form acceptable to Fannie Mae or Freddie Mac."

MLPA § 7(t): "The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage including, the establishment, maintenance and servicing of the escrow accounts and escrow payments, if any, since origination, have been conducted in all respects in accordance with the terms of Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or Fannie Mae/Freddie Mac standards, in accordance with proper, prudent and customary practices in the mortgage origination and servicing business . . . . "

MLPA § 7(dd): "Each Mortgage Loan at the time of origination was underwritten in general in accordance with guidelines not inconsistent with the guidelines set forth in the Prospectus Supplement and generally accepted credit underwriting guidelines."

MLPA § 7(ee): "No error, omission, misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of either Mortgage Loan Seller or the related Originator."

61.     In addition to representations and warranties that are virtually identical to those referenced above, EMC also made the following additional representations and warranties with respect to the loans contained in the SACO 2006-8 Transaction:

MLPA § 7(d): "No HELOC had a Combined Loan to Value Ratio at the time of origination of more than 100%."

26

MLPA § 7(j): " . . . No fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a HELOC has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the HELOC."

62.   Finally, in the BSSLT Transaction, EMC represented and warranted as to each loan that:

MLPA § 7(a): "[T]he information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects."

MLPA § 7(c): "[E]ach Mortgage Loan at the time it was made complied in all material respects with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable predatory, abusive and fair lending laws; and each Mortgage Loan has been serviced in all material respects in accordance with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable anti-predatory lending laws and the terms of the related Mortgage Note, the Mortgage and other loan documents."

MLPA § 7(d): "[T]here is no monetary default existing under any Mortgage or the related Mortgage Note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration; and neither the Seller, any of its affiliates nor any servicer of any related Mortgage Loan has taken any action to waive any default, breach or event of acceleration . . . ."

MLPA § 7(n): "[A]t the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan and, the appraisal is in a form acceptable to Fannie Mae or FHLMC."

MLPA § 7(r): "[T]he information set forth in Schedule A of the Prospectus Supplement with respect to the Mortgage Loans is true and correct in all material respects."

27

MLPA § 7(t): "[E]ach Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator."

63.    To further assure the deal participants that the loans that EMC was selling

to the Trust complied with these and other representations and warranties, EMC also committed

in the MLPAs that, should any of its representations and warranties prove untrue, EMC would

cure the breach(es) or remove the breaching loan(s) from the pool. To this end, Section 7 of the

MLPA for the SACO 2006-8 Transaction[33] provides, in pertinent part, as follows:

> Upon discovery or receipt of notice . . . of a breach of any representation or warranty of [EMC] set forth in this Section 7 which materially and adversely affects the value of the interests of the [parties, including Ambac,] in any of the HELOCs . . . or which adversely affects the interests of the Note Insurer within 90 days . . . [EMC] will (i) cure such breach in all material respects, (ii) purchase the affected HELOC at the applicable Purchase Price, or (iii) if within two years of the Closing Date, substitute a qualifying Substitute HELOC in exchange for such HELOC.

64.    Section 7 of the MLPA for the SACO 2005-10 and SACO 2006-2

Transactions similarly provides, in pertinent part, as follows:

> Upon discovery or receipt of notice . . . of a breach of any representation or warranty of [EMC] set forth in this Section 7 which materially and adversely affects the value of the interests of the [parties, including Ambac,] in any of the Mortgage Loans . . . within 90 days . . . [EMC] will (i) cure such breach in all material respects, (ii) purchase the affected Mortgage Loan at the applicable Purchase Price, or (iii) if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan in exchange for such Mortgage Loan.

---

[33] Section 7 of the BSSLT MLPA includes a substantially identical provision.

65.   The PSAs and SSAs relating to the Transactions, as applicable, contain corresponding and virtually identical remedial provisions.[34]

66.   The parties intended these contractual remedies to address the inadvertent inclusion in the Transactions by EMC of the aberrant non-complying loan; they were not designed to be applied to a large percentage of the loan pool for wholesale failures to comply with the express representations and warranties that EMC made in the Transaction documents. EMC thwarted the contractual intent both by selling to the Trusts a large volume of non-compliant loans and, thereafter, by refusing to comply with the contractual remedy.

**B.   EMC Induced Ambac to Issue Insurance Policies for the Transactions
by Extending to Ambac Its Representations and Warranties**

67.   To further assure investors regarding the performance of the Notes in the deals and to facilitate their sale in order to keep the Bear Stearns machine humming, EMC sought and obtained from Ambac a financial-guaranty insurance policy for each Transaction. Under the Policies, Ambac guaranteed payment on certain senior classes of Notes issued by the Trusts. EMC sought the Policies to enhance the marketability of the securities and its expected return on the securitizations.

68.   EMC induced Ambac to issue the Policies by, among other things, extending to Ambac the representations and warranties that EMC had made in the operative Transaction documents (*i.e.*, the MLPAs, PSAs, and SSAs), making additional disclosures to Ambac beyond those in the operative documents, providing broader representations and warranties, and affording Ambac even greater remedies for breaches of those commitments than those EMC had extended to the Trusts and Noteholders in the operative documents. EMC's

---

[34] *See* Section 2.03 of the PSAs and SSAs.

disclosures and representations and warranties to Ambac conveyed EMC's blanket commitment

that the loans that EMC had sold to the Trusts conformed to EMC's representations and

warranties and were not tainted by fraud, error, omission, misrepresentation, negligence, or

similar occurrence in their origination or underwriting. In providing this commitment, EMC

assured Ambac that EMC would bear the risk of loss in the event that any of its disclosures,

representations, or warranties proved inaccurate.

69.     EMC's broad representations and warranties, and its commitment to bear

the risk of their inaccuracy, are clearly and unambiguously stated in the I&I Agreements. First,

the I&I Agreements explicitly extend to Ambac the numerous representations and warranties that

EMC made in the MLPAs:

> I&I Agreement § 2.04(1): *Company Documents*. The
> representations and warranties of the Seller [EMC] contained in
> the Company Documents[35] to which it is a party are true and
> correct in all material respects and the Seller [EMC] hereby makes
> each such representation and warranty to, and for the benefit of,
> the Insurer [Ambac] as if the same were set forth in full herein.[36]

70.     Second, the I&I Agreements provide that Ambac is a third-party

beneficiary of the underlying transaction documents, with all rights afforded thereunder,

including the representations, warranties, and covenants that EMC made in the key operative

documents:

> I&I Agreement § 2.05(j): *Third-Party Beneficiary*. The Seller
> [EMC] agrees that the Insurer [Ambac] shall have all rights of a
> third-party beneficiary in respect of the Company Documents and

---

[35] The I&I Agreements for all of the Transactions define "Company Documents" to include, among other things, the I&I, the MLPA, and the SSA or PSA, as applicable.

[36] The language in Section 2.04(l) is identical in each of the I&I Agreements.

hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer.[37]

71.     Third, the I&I Agreement for each Transaction adds for Ambac's benefit

new representations and warranties not found in the underlying transaction documents, including

EMC's promise as to the truthfulness of the information it provided to Ambac about each of the

Transactions:

> I&I Agreement § 2.04(j): *Accuracy of Information.* No information supplied by the Seller [EMC] contained in the Company Documents to which it is a party nor other material information relating to the operations of the Seller or the financial condition of the Seller, as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic format by the Seller contains any statement of material fact which was untrue or misleading in any material respect when made. The Seller does not have any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Seller. Since the furnishing of the Company Documents, there has been no change nor any development or event involving a prospective change known to the Seller that would render any of the Company Documents untrue or misleading in any material respect.[38]
>
> I&I Agreement § 2.04 (k): *Compliance with Securities Laws. . . .* The Company Information[39] in the Offering Documents[40] do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading . . . .[41]

---

[37] 2006-8 I&I Agreement § 2.05(j). Section 2.05(j) of the I&I Agreements for the other Transactions includes virtually identical language.

[38] The language in Section 2.04(j) is identical in each of the I&I Agreements for all the Transactions.

[39] The I&I Agreements for all of the Transactions define "Company Information" as "all information with respect to the Offering Documents other than the Insurer Information and the Underwriter Information."

[40] The I&I Agreements in all of the Transactions define "Offering Documents" to include the Free Writing Prospectus, the Prospectus Supplement, the Base Prospectus, and any document with respect to the insured notes or certificates (as the case may be) that makes reference to the policies approved by Ambac.

[41] The language in Section 2.04(k) is identical in each of the I&I Agreements.

31

72.     EMC's assurances to Ambac in Section 2.04(k) of the I&I Agreements are

significant. The Prospectus and Prospectus Supplement used to market the Notes to investors in

connection with each Transaction, for example, contained disclosures pertaining to the loan

characteristics, the underwriting and due diligence conducted, and the risks associated with the

Transactions. In making this representation about the Offering Documents, which was material

and incremental to the representations and warranties made in the MLPAs, EMC sought to

provide further comfort to Ambac about the accuracy and completeness of the total mix of

information about the Transactions made available by EMC. In so doing, EMC again assumed

the risk that the disclosures misstated or omitted material facts. In fact, as discussed below, the

Disclosure Documents contained false and misleading information in that they materially

misrepresented key loan metrics on a pool-wide basis and the origination, underwriting, and due

diligence performed on the loans, and contained material omissions because they failed to

disclose the abysmal origination, underwriting and due-diligence practices and procedures that

account for the incredible incidence of fraud and gross underwriting failings plaguing these

loans.

73.     Lastly, the I&I Agreements afford Ambac broad remedies to address

breaches by EMC of its representations and warranties and other contractual commitments:

> ***Loan level cure, repurchase, and substitution:*** In Section 5.02 of
> the I&I Agreements, EMC agreed that upon the occurrence of an
> "Event of Default,"[42] Ambac may "take whatever action at law or
> in equity as may appear necessary or desirable in its judgment to
> collect the amounts, if any, then due under this Insurance

---

[42] An "Event of Default" is defined under Section 5.01(a) of the I&I Agreements as occurring when,
among other things, "[a]ny representation or warranty made by the Depositor, the Issuing Entity,
the Master Servicer or the Seller hereunder or under the Company Documents, or in any certificate
furnished hereunder or under the Company Documents, shall prove to be untrue or incomplete in any
material respect."

Agreement . . . or to enforce performance and observance of any obligation, agreement or covenant of . . . [EMC] under Company Documents."[43]

***Reimbursement:*** In Section 3.03(b) of the I&I Agreements, EMC agreed to reimburse Ambac for "any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses ("Reimbursable Expenses") in connection with . . . the enforcement, defense or preservation of any rights in respect of any of the Company Documents . . . ."[44]

***Payment and indemnification:*** Pursuant to Section 3.04(a) of the I&I Agreements, EMC also agreed to pay and indemnify Ambac for any claims, losses, or demands arising out of or relating to, among other things, any breach of a representation or warranty made by EMC. In particular, Section 3.04(a) of the I&I Agreements states that EMC agrees to indemnify Ambac for, among other things, any and all losses, claims, demands, damages, costs, or expenses by reason of "the breach by the . . . Seller [EMC] of any representation, warranty or covenant under any of the Company Documents" or "any untrue statement or alleged untrue statement of a material fact contained in any Offering Document or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading . . . ."[45]

***Other remedies available at law and equity:*** While other parties to the Transactions are limited to the remedies set forth in the MLPA and SSA or PSA, as applicable, Ambac is not. Section 5.02(b) of the I&I Agreements provides that any and all remedies at law and in equity – including those available in the Company Documents – are available to Ambac on a non-exclusive and cumulative basis.

74.     The representations, warranties, and remedies that EMC provided to

Ambac in the deal documents for each Transaction were fundamental consideration for Ambac's

agreement to issue the Policies. Ambac insisted on these provisions because its decision of

---

[43] The language in Section 5.02 is identical in each of the I&I Agreements.

[44] The language in Section 3.03(b) is identical in each of the I&I Agreements.

[45] The language in Section 3.04(a) is identical in each of the I&I Agreements.

33

whether to provide insurance depended on the accuracy of the information that EMC had

provided. The stated agreement was that Ambac was to assume the risk that the loans in the pool

would default subject to – *and only to the extent that* – the information that EMC represented and

warranted concerning those loans was correct and complete. EMC assumed the risk that the

information was incorrect or misleading. This risk allocation was the bargain the parties struck,

and the bargain EMC has now gutted.

## C.   EMC's Material Breaches

75.   The loans that EMC sold to the Trusts in these Transactions have failed

miserably. An unprecedented percentage of the loans either have been written off as total losses

or are severely delinquent. As reflected in the following table, as of September 30, 2008, the

Transactions have experienced cumulative losses of more than $591.2 million in the aggregate:

| Transaction | Cumulative Losses | % of Loans Severely Delinquent or Charged Off |
|---|---|---|
| SACO 2005-10 | $74.4 million | 26.91% |
| SACO 2006-2 | $170.8 million | 33.16% |
| SACO 2006-8 | $68.5 million | 33.67% |
| BSSLT | $321.4 million | 41.66% |

These losses have resulting in Ambac's claim payments to the insured Noteholders of more than

$132.6 million in the aggregate.

76.   When the SACO Transactions first began showing signs of potential

performance deterioration, a review was conducted of the loan files created during the

origination of 695 delinquent loans in the SACO Transactions. Across those three Transactions,

the review demonstrated breaches of EMC's representations and warranties in a remarkable 78%,

or 526 loans with an aggregate principal balance of approximately $40.8 million.

34

77.     These loans contained one or, in most cases, more than one defect that

constituted a breach of one or more of the numerous representations and warranties made by

EMC in the applicable MLPA and materially altered the loans' risk profile.  These defects

include:

- rampant fraud, primarily involving misrepresentation of the
  borrower's income, assets, employment, or intent to occupy the
  property as the borrower's residence (rather than as an investment),
  and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her liabilities,
  including multiple other mortgage loans taken out to purchase
  additional investment property;

- inflated and fraudulent appraisals; and,

- pervasive violations of the loan originators' own underwriting
  guidelines and prudent mortgage-lending practices, including loans
  made to borrowers (i) who made unreasonable claims as to their
  income, (ii) with multiple, unverified social-security numbers, (iii)
  with debt-to-income and loan-to-value ratios above the allowed
  maximums, or (v) with relationships to the applicable originator or
  other non-arm's-length relationships.

78.     Each of these breaches adversely affected Ambac's interests, or materially

and adversely affected Ambac's interests in the identified loan.  Loans subject to fraud, that were

not originated and underwritten pursuant to prudent and proper practices, or the key attributes of

which are otherwise misrepresented are markedly more risky and therefore less valuable than

loans not suffering from such shortcomings.

79.     Consequently, by letters dated April 25, 2008 and May 23, 2008, Ambac

gave notice to EMC of the particular breaches that Ambac had discovered with respect to

approximately 330 and 196 loans, respectively, across the three SACO Transactions.  Upon

receipt of such notice, EMC became obligated under the applicable MLPAs and PSAs/SSAs to

35

cure, repurchase, or provide substitute loans for the affected loans within 90 days. The letters

further reserved any and all rights to assert additional claims or demands with respect to

indemnification, reimbursement, breaches, and other claims.

80.     On July 21, 2008, EMC responded in writing to Ambac's April 25, 2008

letters by disputing the breaches with respect to the overwhelming majority of loans noticed by

Ambac. EMC agreed to repurchase only 12 of the 330 total loans identified in Ambac's April 25,

2008 letters. EMC refused to cure, repurchase, or provide a substitute loan for any of the other

loans. On August 20, 2008, EMC responded in writing to Ambac's May 23, 2008 letters by

refusing to repurchase *any* of the 196 loans identified by Ambac in those letters. [46]

81.     Given the rampant breaches with respect to these already-defaulted loans,

Ambac recently undertook a further, and more expansive, review of the loans included in all four

Transactions. This review has included an analysis of approximately 2,400 additional loans to

date, of which approximately 365-380 from each Transaction were selected at random, thereby

constituting a representative sample of the loans in the Transaction pools for statistical purposes.

The randomly selected loans from each Transaction included both defaulted loans and loans still

current in payments. The remaining approximately 920 of the analyzed loans were selected from

the charged-off population.

82.     The results of this expanded review were shocking.

---

[46] EMC claimed that 16 of the loans that it refused to cure, repurchase or provide a substitute for were
either previously repurchased by EMC, paid in full, or were part of another security not insured by
Ambac. Notwithstanding Ambac's request for substantiation of this assertion, EMC has thus far not
provided any support for it.

(a)     Of the sample of 372 randomly selected loans in the SACO 2005-10

Transaction, Ambac has identified breaches of representations and

warranties in 336 loans, or 90%.

(b)     Of the sample of 369 randomly selected loans in the SACO 2006-2

Transaction, Ambac has identified breaches of representations and

warranties in 337 loans, or 91%.

(c)     Of the sample of 379 randomly selected loans in the SACO 2006-8

Transaction, Ambac has identified breaches of representations and

warranties in 334 loans, or 88%.

(d)     Of the sample of 366 randomly selected loans in the BSSLT Transaction,

Ambac has identified breaches of representations and warranties in 325

loans, or  88%.

83.     The analysis described above demonstrates with a high degree of certainty

that breaches of representations and warranties exist in a comparable percentage of loans *in the
total loan pool* in each Transaction.

84.     By variously dated letters listed in the below table, Ambac notified EMC

of breaches with specificity and detail. EMC has not yet responded to these subsequent notices,

but Ambac anticipates that EMC will be as unwilling to comply with its contractual obligations

to cure, repurchase, or substitute for these loans as it was with respect to Ambac's April 25, 2008

and May 23, 2008 notices. The following table reflects, by Transaction, the total number of

loans with respect to which Ambac has notified EMC to date of breaches of EMC's

representations and warranties contained in the MLPAs:

37

| Number of Loans in Breach | Notification Date |
|---|---|
| **SACO 2005-10** | |
| 182 | April 25, 2008 |
| 3 | May 23, 2008 |
| 258 | September 16, 2008 |
| 30 | September 18, 2008 |
| 48 | October 20, 2008 |
| **SACO 2006-2** | |
| 118 | April 25, 2008 |
| 108 | May 23, 2008 |
| 337 | October 1, 2008 |
| **SACO 2006-8** | |
| 30 | April 25, 2008 |
| 85 | May 23, 2008 |
| 84 | August 28, 2008 |
| 13 | October 1, 2008 |
| **BSSLT** | |
| 391 | October 21, 2008 |
| 238 | October 23, 2008 |

85.     Contrary to EMC's assurance in Section 2.04(k) of the I&I Agreements,

moreover, the Offering Documents that EMC prepared to market the Notes that Ambac insured

(and the same documents that EMC filed with the SEC) did not adequately or accurately disclose

the true attributes of the loans (*e.g.*, the weighted average combined loan-to-value ratio,

occupancy status, or debt-to-income ratio), the level of fraud and underwriting failings

permeating the EMC loan pools, the grossly deficient origination and underwriting practices of

the originators of these loans, or EMC's due-diligence practices.

86.     The pervasive breaches of EMC's representations and warranties, revealed

by the loan-file reviews and supported by the dismal loan performance in all four of the

Transactions, pierce the very heart of the bargain struck by the parties.  As has only recently

38

become clear, EMC did not sell to the Trusts the contemplated portfolio of loans with the represented attributes. Rather, EMC transferred pools where the overwhelming majority of loans did not bear any resemblance to the loans EMC expressly represented would comprise the pools. In doing so, EMC induced Ambac into insuring each successive Transaction based upon materially false and misleading information about that Transaction *and* the ones preceding it. EMC's conduct has greatly harmed Ambac, its capital position, stock price, reputation, and credit rating, by requiring Ambac to pay out tens of millions of dollars in claim payments to date, and hundreds of millions of dollars in the future, to cover the defaults caused by these non-compliant loans.

87.     EMC's deliberate frustration of the contractual cure-repurchase-or-substitution remedy, which was designed to address the inadvertent and sporadic breach, further compounds the harm. By what amounts to a wholesale rejection of Ambac's repurchase demands contained in the April 25, 2008 and May 23, 2008 letters, EMC has made clear that it has no intention of honoring its contractual obligations. In its detailed responses to these letters, EMC takes positions that are wholly contrary to its representations contained in the Transaction documents.

88.     EMC's conduct constitutes a breach of each of the I&I Agreements as a whole and entitles Ambac to be (i) returned to the position it would have been in had it not entered into the I&I Agreements and issued its Policies and (ii) compensated for the incremental harm incurred as a result of its participation in each of the Transactions. At the very least, this relief requires the payment to Ambac by EMC of all claim payments made to date and all future claim payments under the respective Policies.

## FIRST CAUSE OF ACTION

### (Breach of Representations and Warranties)

89.     Plaintiff realleges and incorporates by reference paragraphs 1 through 88 of this Complaint.

90.     The I&I Agreement in each Transaction is a valid and binding agreement between Ambac and EMC.

91.     Ambac has performed all of its obligations under the I&I Agreements.

92.     EMC has materially breached its representations and warranties under Section 7 of the MLPAs and Section 2.04 of the I&I Agreements.

93.     Ambac has been damaged and will continue to be damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of Repurchase Obligation)

94.     Plaintiff realleges and incorporates by reference paragraphs 1 through 93 of this Complaint.

95.     EMC has materially breached its obligations under Section 7 of the MLPAs and Section 2.03 of the PSAs or SSAs, as applicable, by refusing to cure, repurchase, or provide substitutes for the loans that breached EMC's representations and warranties and with respect to which notice of breach has been provided by Ambac to EMC by letters dated April 25, 2008 and May 23, 2008.

96.     Ambac has been damaged and will continue to be damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Material Breach of Each of the I&I Agreements)

97.     Plaintiff realleges and incorporates by reference paragraphs 1 through 96 of this Complaint.

98.     EMC induced Ambac to enter into the I&I Agreements and to issue the Policies by making extensive representations and warranties concerning the loans that EMC caused to be sold to the Trusts, and by agreeing to broad remedies for breaches of those representations and warranties.

99.     EMC's representations and warranties were material to Ambac's decision to insure each of the Transactions, and Ambac was induced thereby to enter into each I&I Agreement and perform its obligations thereunder.

100.     EMC has materially breached the I&I Agreements, and the loan-by-loan cure-repurchase-or-substitution remedy is both inadequate to address the magnitude and pervasiveness of the breaches identified and is being frustrated by EMC's wholesale failure to comply with it.

101.     Ambac has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Indemnification)

102.     Plaintiff realleges and incorporates by reference paragraphs 1 through 101 of this Complaint.

103.     Pursuant to Section 3.04(a) of the I&I Agreements, Ambac is entitled to be indemnified for any and all claims, losses, liabilities, demands, damages, costs, or expenses of

41

any nature arising out of or relating to the transactions contemplated by the Company Documents by reason of, among other things, a breach by EMC of any of the representations, warranties, or covenants contained in the Company Documents.

104.    EMC has breached numerous representations, warranties, and covenants that have caused Ambac to pay claims and incur losses, costs, and expenses, and will continue to cause Ambac to pay claims and incur losses, costs, and expenses.

## FIFTH CAUSE OF ACTION

### (Attorneys' fees and costs)

105.    Plaintiff realleges and incorporates by reference paragraphs 1 through 104 of this Complaint.

106.    Pursuant to Section 3.03(b) of the I&I Agreements, EMC agreed to reimburse Ambac for any and all charges, fees, costs, and expenses paid or incurred in connection with, among other things, enforcing, defending, or preserving Ambac's rights under the Company Documents.

107.    Ambac has incurred numerous expenses, including attorneys' fees and expert fees, in order to enforce, defend, and preserve its rights under the relevant agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

A.    For an award of compensatory, consequential, and/or rescissory damages, including all of Ambac's claims payments made and to be made in the future, and any other present and future damages to be proven at trial, for EMC's willful, wanton, and malicious material breaches of its contracts with Ambac;

B.    For an order compelling EMC to comply with its obligations under MLPA § 7, SSA § 2.03, and PSA § 2.03, as applicable, in each

42

Transaction to cure, repurchase, or substitute the loans that breach its representations and warranties;

C.    For an award of compensatory damages for EMC's material breach of its representations and warranties under MLPA § 7 and I&I Agreement § 2.04 in each Transaction and its obligation to cure, repurchase, or substitute the loans that breach its representations and warranties pursuant to the remedial provisions of MLPA § 7, SSA § 2.03, and PSA § 2.03, as applicable in each Transaction, in an amount to be proven at trial;

D.    For an order of indemnification for the claim payments and other losses and expenses Ambac has paid or will pay in the future that were caused by EMC's breaches of its representations, warranties, or covenants, pursuant to I&I Agreement § 3.04(a) in each Transaction;

E.    For an order awarding reimbursement of Ambac's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the Operative Documents pursuant to I&I Agreement § 3.03(b) in each Transaction.

F.    For an order of prejudgment interest; and,

G.    For an Order awarding Ambac such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          November 5, 2008

Respectfully Submitted,

Phillip R. Forlenza
David W. Dykhouse
Erik Haas
Sarah E. Zgliniec
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
pforlenza@pbwt.com
dwdykhouse@pbwt.com
ehaas@pbwt.com
sezgliniec@pbwt.com

43

*Of Counsel:*
Kevin J. Doyle
Jean Kim

*Attorneys for Ambac Assurance Corporation*

44