UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AMBAC ASSURANCE CORPORATION,        :

              Plaintiff,     :

                        :   08 Civ. 9464 (RMB)(THK)

      -against-          :

                        :   **REPORT AND RECOMMENDATION**

EMC MORTGAGE CORPORATION,           :

            Defendant.     :
------------------------------------X

**TO: HON. RICHARD M. BERMAN, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

This action is one of many that is based on mortgage-backed securities that were fundamentally flawed. The mortgage loans underlying the securities at issue here were dependent upon rising housing prices and on the ability to refinance before rates reset. In 2006 and 2007, when housing prices were no longer rising, but declining, and individual borrowers' ability to refinance was collapsing as well, record numbers of mortgages subsequently went into default almost immediately. The present case is one of many consequences of the global financial crisis that ensued.

Currently before the Court is a motion by Plaintiff Ambac Assurance Corporation ("Ambac"), for leave to amend the Complaint to add ten additional defendants, one new plaintiff, and four additional causes of action. For the reasons stated below, the Court recommends that the motion be granted in part and denied in

part.[1]

## BACKGROUND

On November 5, 2008, Plaintiff filed its Complaint, which contained five causes of action, all based on breach of contract, against its sole contractual counter-party, Defendant EMC Mortgage Corporation ("EMC").

Plaintiff's claims arise out of four separate mortgage-backed securities transactions entered into with EMC that closed between 2005 and 2007: SACO I Trust Series 2005-10, 2006-2, and 2006-8 Transactions ("SACO Transactions"), and the Bear Stearns Second Lien Trust 2007-1 Transaction (collectively "the Transactions").(See Complaint ("Compl.") ¶¶ 31-57.)    The Transactions began with the purchase of over 49,500 residential mortgages loans ("Mortgage Loans"), which, in turn, served as collateral for the issuance of approximately $2.7 billion in publicly-offered, mortgage-backed securities ("Notes").  In each Transaction, EMC aggregated the Mortgage Loans and sold the resulting loan pools to a trust entity ("Trust"), which, in turn, issued debt securities of varying seniority, whose payments to investors were dependent upon, or "backed by," the cash flows

---

[1] Although a motion to amend may, under certain circumstances, be decided by a magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(A), because this opinion is case-dispositive with respect to certain claims, it is being issued as a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

received from the mortgage payments on the pooled loans.

Acting as lead underwriter and designating its employees as the deal managers to broker the EMC-sponsored securities offerings, Bear, Stearns & Co. Inc. ("Bear Stearns"): (1) worked with EMC to structure the Transactions; (2) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the Transactions; (3) purchased the mortgaged-backed securities issued in the Transactions on a firm commitment basis, pursuant to written agreements with the applicable depositors; and (4) offered and sold the Notes to investors. (See Am. Compl. ¶ 60.) Bear Stearns trading division also made the decisions on the volume of securitizations to effectuate, and, likewise, the volume of loans to acquire. (See id.) In addition, Bear Stearns executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed by EMC in relation to the securitized loans. (See id.)

In an effort to make its offerings more enticing to investors, EMC contracted with Ambac to provide insurance policies protecting the Noteholders. In particular, Ambac issued four financial guaranty insurance policies covering payments due on certain of the mortgage-backed securities issued in the Transactions. Thus, to the extent that the Trusts were unable to make payments to the Noteholders, because of interruptions to the anticipated cash flows

3

from the mortgage loans, Ambac was contractually obligated to make such payments to the Trusts who, in turn, would make the required payments to the Noteholders.

Ambac alleges that EMC induced it to issue these insurance policies, by EMC: (1) making numerous express representations and warranties regarding the key attributes of the mortgage loans that backed the securities and the practices of the entities that made those loans; (2) agreeing to cure, repurchase, or provide adequate substitutes for mortgage loans that did not comply with those representations and warranties; (3) agreeing to reimburse and indemnify Ambac for any, and all, losses caused by breaches of those representations and warranties; and (4) agreeing to reimburse Ambac for expenses incurred in connection with enforcing and preserving its rights under the agreements.  (See Am. Compl. ¶ 3.)

In late 2007, after observing initial signs of performance deterioration in the SACO Transactions, Ambac made requests of EMC to comply with its contractual obligations to cure, repurchase, or provide substitutes for the non-compliant loans.  (See id. ¶ 79.) EMC refused to do so.  (See id. ¶ 80.)  By the spring of 2008, Bear Stearns had collapsed, contributing to a global financial crisis. Bear Stearns and its affiliates were acquired by JP Morgan Chase & Co. for $10 per share, which included a $29 billion non-recourse loan from the American taxpayers.  After taking control of Bear

4

Stearns' operation in March 2008, JP Morgan Securities Inc. ("JP Morgan") implemented a moratorium on the repurchase of breaching loans from securities.   In particular, with the moratorium in place, JP Morgan began: (1) cancelling the repurchase of a large volumes of loans that Bear Stearns had, allegedly, previously determined should be repurchased; and (2) denying subsequent demands by investors and insurers to repurchase breaching loans from the Bear Stearns' securitizations.   (<u>See</u> <u>id</u>. ¶ 206.)   Ambac was one such insurer.

In its original Complaint, Ambac sued to recover for EMC's purported breaches of its contractual commitments to cure, repurchase, or substitute the specific loans identified as non-compliant, and to recover its expenses in enforcing its contractual remedies afforded by the agreements governing the Transactions. (<u>See</u> <u>id</u>. ¶ 94.)   In addition, having conducted an expanded study of a random sample of 1,486 loans across all four Transactions, Ambac further alleged that over 89% of the loans reviewed breached the contractual representations and warranties made to Ambac by EMC (<u>see</u> <u>id</u>. ¶ 82), including, most significantly, misrepresentations about: (1) the borrower's income, employment, assets, and intentions to occupy the purchased property; and (2) the loan originators' failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines (<u>see</u>

5

id. ¶ 77).

Plaintiff now claims that documents revealed during pretrial discovery show that EMC not only breached its contractual agreements with Ambac, but that EMC acted in conjunction with Bear Stearns (and, by extension, JP Morgan) in a fraudulent multi-billion dollar scheme. According to Ambac, documents recovered from Bear Stearns's files, and admissions obtained through depositions of its executives, show that Bear Stearns knew its representations that the mortgage loans would be actively vetted and monitored to ensure quality were false, and that it deliberately altered its due diligence and quality-control policies for the purpose of increasing the volume of mortgage loans available to sell to investors. (See Memorandum of Law in Support of Ambac's Motion for Leave to Amend, dated July 28, 2010 ("Ambac Mem."), at 6-10.) Ambac further alleges that it can now explain EMC's refusal to repurchase defective loans: deliberate interference by JP Morgan — JP Morgan intentionally interfered with Ambac's attempts to enforce its contractual remedy regarding EMC's repurchases of breaching loans. (See id. at 11-13.)

Based on this new discovery, Ambac seeks leave to amend its Complaint to add as defendants, Bear Stearns, as well as ten high-ranking individual executives of Bear Stearns ("Individual Defendants"). (See Proposed First Amended Complaint ("Am.

Compl."), attached as Ex. 1 to Declaration of Erik Haas in Support of Plaintiff's Motion for Leave to Amend the Complaint ("Haas Aff."), ¶¶ 38-49.)  In addition, Ambac seeks to add the following additional causes of action: (1) fraudulent inducement; (2) securities fraud in violation of the Securities Exchange Act of 1934 ("Securities Exchange Act"); (3) violations of Section 20 of the Securities Exchange Act, against the individual defendants as control persons; and (4) (against JP Morgan only) tortious interference with contract. (See id. ¶¶ 309-353.)  Finally, Ambac seeks to add as a co-plaintiff the Segregated Account of Ambac ("Segregated Account").  (See id. ¶¶ 33-36.)

Defendants oppose the motion, arguing that Ambac runs afoul of both Federal Rules of Civil Procedure 16(b) and 15(a).  In particular, EMC argues that: (1) Ambac did not act with diligence in seeking to amend the Complaint (see Memorandum of Law in Opposition to Ambac's Motion for Leave to Amend, dated Aug. 23, 2010 ("EMC Mem."), at 15-17); (2) the proposed untimely amendment would prejudice EMC (see id. at 17-19); and (3) the proposed new claims are futile (see id. at 19-35).  Ambac also argues that the Segregated Account is not a proper plaintiff in this case. (See id. at 35-36.)

Oral argument on the motion was held on October 4, 2010.

**DISCUSSION**

I. <u>Legal Standard on Amendment of Pleadings</u>

Normally, leave to amend pleadings is evaluated under Federal Rule of Civil Procedure Rule 15(a) ("Rule 15(a)"), which provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend should be granted unless there is "any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment. . . ." <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); <u>accord</u> <u>Holmes v. Grubman</u>, 568 F.3d 329, 334-35 (2d Cir. 2009); <u>Commander Oil Corp. v. Barlo Equip. Corp.</u>, 215 F.3d 321, 333 (2d Cir. 2000); <u>Block v. First Blood Assocs.</u>, 988 F.2d 344, 350 (2d Cir. 1993). The "grant or denial of an opportunity to amend is within the discretion of the District Court." <u>Foman</u>, 371 U.S. at 182, 83 S. Ct. at 230; <u>accord</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 330, 91 S. Ct. 795, 802 (1971).

However, once a scheduling order has been entered in an action, which sets a deadline for amending a complaint, both Federal Rule of Civil Procedure 16(b) ("Rules 16(b)") and Rule 15(a) govern motions for leave to amend. <u>See</u> <u>Holmes</u>, 568 F.3d at

8

334-35; <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 236, 339 (2d Cir. 2000). Rule 16(b) provides that a district court shall enter a scheduling order in an action that limits the time to, <u>inter alia</u>, join other parties or amend the pleadings. Rule 16(b)(1)'s deadline for amendments offers "a measure of certainty to pretrial proceedings, ensuring that 'at some point, both the parties and the pleadings will be fixed.'" <u>Parker</u>, 204 F.3d at 339-40 (quoting Rule 16(b) Advisory Committee Notes).

Under Rule 16(b), a scheduling order "shall not be modified except upon a showing of good cause...." Thus, as the Second Circuit has noted, "'if we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.'" <u>Id.</u> at 340 (quoting <u>Sosa v. Airprint Sys., Inc.</u>, 133 F.3d 1417, 1419 (11th Cir. 1998)) (<u>per curiam</u>); <u>accord Apollo Theater Found., Inc. v. W. Inter. Syndication</u>, No. 02 Civ. 10037 (DLC), 2005 WL 1041141, at *19 (S.D.N.Y. May 5, 2005) (citation omitted).

It follows that a court retains the discretion to deny a party's motion to amend its pleadings if, absent a showing of good cause, the motion is made after the time provided for in a scheduling order. <u>See NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.</u>, 262 F. Supp. 2d 134, 150 (S.D.N.Y. 2003). Good cause in this

9

context has been interpreted to mean that scheduling deadlines could not be met despite a moving party's diligence. See Holmes, 568 F.3d at 335; Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003) (determining that a finding of good cause under Rule 16(b) turns on the diligence of the party seeking to amend); Parker, 204 F.3d at 340 (same). Moreover, while the absence of prejudice to a nonmoving party is relevant to whether leave to amend should be granted under Rule 15(a), it does not fulfill the good cause requirement of Rule 16(b). See Carnrite v. Granada Hosp. Grp., Inc., 175 F.R.D. 439, 446 (W.D.N.Y.1997).

## II. Application to Ambac's Motion

This case was commenced on November 5, 2008. The initial Case Management Plan was entered on December 10, 2008, and it provided for joinder of additional parties and amended pleadings by January 30, 2009. All pretrial discovery was to be completed by June 1, 2009. As Ambac's motion to amend was filed on August 4, 2010, after the amendment deadline had passed, the proposed amendment is governed by the requirements of both Rules 15(a) and 16(b).

Because of the complexity of this case, an enormous amount of pretrial discovery has been undertaken in relation to the four securitization transactions in issue, involving over 49,000 residential mortgage loans. Millions of electronic documents have been exchanged, and fifteen party witnesses, in addition to over

10

thirty non-party witnesses, have been deposed.  Thus, there has been a need to amend the discovery deadlines in the Case Management Plan a number of times.  The last deadline for completion of fact discovery was August 6, 2010, and the expert discovery deadline was December 3, 2010.  Once Ambac advised EMC and the Court that it intended to file a motion to amend the Complaint, the parties agreed, and the Court approved, a suspension of depositions until the motion was decided.  It is, thus, apparent that, whether or not Ambac's motion to amend is granted, there will be a need to further amend the Case Management Plan.

Ambac argues that it was diligent in seeking to amend the Complaint.  It contends, with some justification, that the deadline in the Case Management Plan for amending the Complaint was not realistic, as virtually no pretrial discovery had even been undertaken by January 30, 2009, a deadline set only one month earlier.  Indeed, EMC's motion to dismiss was not denied until March 16, 2009, at which point pretrial discovery began in earnest.

Ambac argues that it was only by means of pretrial discovery that it became "privy to the inner workings of Bear Stearns's securitization machine and the private communications among those that kept it running."  (Ambac Mem. at 5.)  Therefore, while the original Complaint was based solely on contractual claims, discovery provided a sound basis for asserting claims of fraudulent

11

inducement, securities fraud, and tortious interference with contract. According to Ambac, what it learned in discovery provided support for the claims in the proposed amended complaint that: (1) while it was touting its due diligence policies in order to induce Ambac to insure the Transactions, Bear Stearns was actually weakening and dispensing with due diligence procedures to screen out defective loans; (2) in order to transfer defective loans from its inventory to securitization, Bear Stearns dropped its Early Payment Default Policy, that delayed securitization for a period of time, during which fraudulent or defective loans would reveal themselves; (3) Bear Stearns ignored the advice of its due-diligence firms not to securitize particular loans, and deleted communications with those firms to eliminate an audit trail; (4) Bear Stearns touted its quality-control and loan repurchase processes aimed at discovering and removing breaching loans from the securitized pools, while its actual processes were devoted almost exclusively to identifying loans that could lead to its own losses, while concealing the breaching loans from the securitization trusts and Ambac; (5) Bear Stearns falsified critical information on the loans being securitized, knowing that many of the loans were seriously defective. Finally, Ambac contends that it learned in discovery that once JP Morgan acquired Bear Stearns, it deliberately interfered with Bear Stearns's

12

obligation to repurchase defective loans.

Ambac cites to deposition testimony, emails, and other documents that provide the purported basis for it proposed claims. And, "while it anticipated [when it filed the Complaint] that EMC and Bear Stearns had engaged in fraud in connection with the Transactions, . . . [i]n order to plead common law and securities fraud claims with the requisite 'particularized knowledge' — both as to the fraudulent conduct and scienter — far more is required that simply being able to (as EMC's counsel put it) 'identify parties and claims.'" (Ambac Mem. at 16.)

In addition to challenging the substantive plausibility of Plaintiff's proposed claims, and arguing the prejudice it will experience if the Complaint is amended at this point in the litigation, EMC argues that Ambac cannot satisfy the "good cause" requirement of Rule 16(b) because it has not been diligent in seeking to amend the Complaint. EMC contends that early in the litigation Ambac's counsel indicated that "there was more than a whiff of fraud" in the Transactions, yet Ambac adhered to only its contract claims until well into the discovery period and long after the deadline for amending the Complaint. Indeed, when EMC sought certain discovery from Ambac, because it construed allegations in the Complaint to suggest fraud, Ambac argued that the discovery was improper because it was merely asserting contract claims.

13

Moreover, although EMC produced virtually all of the documents Ambac now relies upon for its proposed amendment in the nine months subsequent to the deadline for amending the Complaint, according to EMC, Ambac waited another nine months to pursue the amendment. And, even though the Case Management Plan was amended five times, and the parties submitted monthly progress reports to the Court, in none of those reports did Ambac even suggest that it was contemplating amending the Complaint. EMC characterizes Ambac's conduct as "strategic and "tactical pleading," (EMC Mem. at 7), pursued in bad faith.

Although EMC has made a forceful argument regarding Ambac's lack of diligence, and it would have been far preferable for Ambac to amend the Complaint earlier in the litigation, for the reasons that follow the Court concludes that Ambac has satisfied the requirements of Rule 16(b).

First, it was unrealistic to expect Ambac to meet the amendment deadline at a time when little or no discovery had taken place. The most common reason that parties seek and are granted leave to amend their complaints is to conform the complaint to evidence obtained in discovery. Cf. Friedl v. City of New York, 210 F.3d 79, 88 (2d Cir. 2000) ("[T]here has been no showing of . . . undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts . . ."); Cnty. of

14

<u>Washington v. Cntys. of Warren & Washington Indus. Dev. Agency</u>, 2
Fed. Appx. 71, 2001 WL 96566, at *3 (2d Cir. Jan. 3, 2001) ("No
newly discovered facts motivated these proposed amendments; in
fact, plaintiff had been aware of the factual underpinnings of
these claims since the outset of this litigation . . . ."); <u>SEC v.
Aragon Capital Mgmt., LLC</u>, No. 07 Civ. 919 (FM), 2010 WL 4456302,
at *5 (S.D.N.Y. Oct. 28, 2010) (permitting amendment after deadline
where it was reasonable to delay asserting certain amendments until
after depositions had been taken, and denying amendment where it
was "not premised on any new facts that [plaintiff] was able to
unearth or confirm during the course of discovery"); <u>Broadhurst
Invs., LP v. Bank of New York Mellon</u>, No. 09 Civ. 1154 (PKC), 2010
WL 3154840, at *2 (S.D.N.Y. Aug. 2, 2010) (denying leave to amend
after deadline had passed and case was on eve of completion of
discovery, noting "[t]his is not a circumstance where unforeseen
events or new information gave rise to the need to further amend");
<u>Nycomed U.S. Inc. v. Glenmark Generics Ltd.</u>, No. 08-CV-5023
(CBA)(RLM), 2010 WL 1257803, at *11, (E.D.N.Y. Mar. 26, 2010)
(finding good cause for amendment after deadline for amendments and
discovery had passed, where plaintiff "did not acquire the
information underlying the proposed amendment until after the
expiration of the deadline"; fact that plaintiff did not move until
three and one-half months after deadline was "entirely

15

understandable" and "does not qualify as 'extremely belated'"); Sokol Holdings, Inc. v. BMB Munai, Inc., No. 05 Civ. 3749 (KMW)(DCF), 2009 WL 3467756, at *3, 6 (S.D.N.Y. Oct. 28, 2009) (denying untimely motion to file third amended complaint, where proposed amendments did not involve any newly discovered evidence, plaintiffs could have asserted their proposed claims at the outset of the case, the case was four and one-half years old, and substantial motion practice and discovery had been completed).

Second, the Court can discern no tactical advantage to Ambac's timing of its motion to amend. After all, Ambac is the Plaintiff in this action, and it has a strong interest in the Court's reaching the merits of its claims as promptly as possible.

Third, given the nature of two of the proposed claims, for fraudulent inducement and securities fraud, one of which is governed by the Private Securities Litigation Reform Act ("PSLRA"), there is a heightened pleading standard. See Fed. R. Civ. P. 9(b) ("In alleging fraud . . . a party must state with particularity the circumstances constituting fraud."); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 2504 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's

16

intention "to deceive, manipulate, or defraud.") (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12, 96 S. Ct. 1375 (1976)); ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) ("Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud. Under the PSLRA, the complaint must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); Quaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990) ("To pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation.").   Indeed, under the PSLRA, the pleading standard is even higher than the stringent "plausibility" standard that now governs complaints. See W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp., 344 Fed. Appx. 717, 721 (2d Cir. 2009) ("Although plaintiffs' allegations that [defendant] was reckless are arguably "plausible" under the general pleading standards established by the Supreme Court in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the PSLRA requires

in this litigation context more than mere plausibility.  Instead, the allegations must create an inference "at least as compelling as any opposing inference one could draw from the facts alleged.") (quoting Tellabs, 551 U.S. at 324, 127 S. Ct. at 2510).  Thus, although EMC correctly points out that Ambac suggested the presence of fraud in its dealings with EMC early in the litigation, it was prudent of Ambac to delay asserting such a claim until it had the evidence to properly plead it in the Complaint.

EMC argues that, even accepting Ambac's argument that it did not have the documents it has used to support its fraud claims by the amendment deadline, "Ambac waited almost a year in some cases, and in no case less than six months, after it obtained the relevant discovery in the form of documents that Ambac claims 'speak for themselves' before making its motion." (EMC Mem. at 12.)  More specifically, EMC contends that of the twenty-one documents used to support the fraud claims in the proposed amended complaint, all but one of the seventeen produced by EMC were in Ambac's possession by December 14, 2009.  And, four key EMC witnesses were deposed by February 2010.  Yet, the motion was not filed until August 2010.

However, when placed in perspective, Ambac's delay was not excessive.  This not a case where all of the pretrial discovery has been completed and the case is otherwise ready for dispositive motions or trial.  Cf. Grochowski v. Phoenix Const., 318 F.3d 80,

18

96 (2d Cir. 2003) ("The plaintiffs delayed more than one year before seeking to amend their complaint. Furthermore, when the motion was filed, discovery had been completed and a summary judgment motion was pending. On this record we cannot say that the district court abused its discretion in denying the plaintiffs' motion to amend."). Numerous depositions remain to be taken and the parties are still haggling over documentary discovery. In addition, even by EMC's reckoning, most of the documents Ambac relies upon in support of its proposed claims were produced to Ambac in the nine-month period following the expiration of the amendment deadline. Moreover, millions of documents were produced to Ambac in that period, and Ambac reasonably asserts that reviewing and digesting them has taken a great deal of time.

Finally, in the months following the document production, into the spring of 2010, the documents were used to depose key witnesses in order to secure an explanation, or achieve an understanding, of EMC's and Bear Stearns' conduct, and the depositions provide further support for Ambac's proposed claims. In June 2010, only a few months after some of the depositions had been taken, Ambac advised EMC and the Court that it intended to amend the Complaint, and the briefing of the motion went on through the summer.

In sum, while it would have been preferable for Ambac to amend the Complaint earlier in the litigation, in light of the enormous

19

amount of discovery that continues to be produced in this case, the
heightened pleading standard for fraud claims, the evidence secured
in discovery that forms the basis for the proposed amendments,  and
the absence of any tactical advantage obtained as a result of the
delay, the Court concludes that there was good cause for Ambac's
failure to seek to amend the Complaint within the deadline set in
the Case Management Plan.

There remains the question, however, of whether Ambac's
proposed amendments satisfy the requirements of Rule 15(a).

II. <u>Undue Delay and Prejudice</u>

Having rejected EMC's argument that Ambac did not act
diligently, it follows that there can be no undue delay.  In any
event, delay alone, in the absence of bad faith or prejudice, does
not provide a basis for denying a motion to amend.  <u>See</u> <u>AEP Energy</u>
<u>Servs. Gas Holding Co.</u>, __ F.3d __, 2010 WL 4261227, at *22 (2d
Cir. Oct. 29, 2010) ("The rule in this Circuit has been to allow a
party to amend its pleadings in the absence of a showing by the
nonmovant of prejudice or bad faith.") (quoting <u>Block v. First</u>
<u>Blood Assocs.</u>, 988 F.2d 344, 350 (2d Cir. 1993)); <u>State Teachers</u>
<u>Ret. Bd. v. Fluor Corp.</u>, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere
delay, however, absent a showing of bad faith or undue prejudice,
does not provide a basis for a district court to deny the right to
amend.).

20

Prejudice, however, is one of the most important factors to consider in addressing a motion to amend.   See AEP, 2010 WL 4261227, at *22.   An amendment may be prejudicial when "it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." Id.; see also Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) (" In gauging prejudice, we consider, among other factors, whether an amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute.") (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)); Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) (same).   Nevertheless, since most amendments entail additional discovery and some delay, those factors alone do not give rise to prejudice. See Bridgeport Music, Inc. v. Universal Music Grp., Inc., 248 F.R.D. 408, 414 (S.D.N.Y. 2008) ("Even assuming that additional discovery would impose costs on . . . the current defendants, allegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.") (internal quotation marks omitted).   "The type of prejudice that warrants denial of leave to amend is usually such that it puts [the opposing party] at an unfair disadvantage, such as the addition of a new

21

claim on the eve of trial." <u>Nycomed</u>, 2010 WL 1257803, at *12 (internal quotation marks omitted). <u>See also</u> <u>Monahan</u>, 214 F.3d at 284 ("[W]e will be most hesitant to allow amendment where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim."); <u>Ansam Assocs., Inc. v. Cola Petrol., Ltd.</u>, 760 F.2d 442, 446 (2d Cir. 1985) ("Moreover, permitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment.").

As discussed, regrettably, a substantial amount of pretrial discovery remains to be completed, and, as yet, there has been no dispositive motion. The Court, therefore, does not perceive the timing of the motion to amend as posing an unfair disadvantage to EMC or the proposed new parties.

EMC argues, however, that it will be prejudiced because the amendments will require it to go back and search an enormous number of documents and data bases, that it has already searched, in order to determine whether there are documents that were not previously produced that are relevant to the new fraud claims. Moreover, with the addition of ten new defendants, each of them is entitled to review the discovery that has been produced and seek additional discovery from parties and non-parties. In theory, each of them would have the right, as well, to reopen the many depositions that

22

have already been taken.   This additional discovery will add enormous cost to an already staggeringly expensive litigation.

Ambac responds that "[a]ny incremental discovery regarding fraud that EMC truly needs — which it has yet to identify — cannot be substantial and would have been required regardless of when Ambac sought to add its new claims." (Ambac Reply Mem. at 2.)   In response to EMC's argument that it withheld fraud-related discovery that EMC sought earlier in the case, Ambac argues that, while it initially objected, it ended up producing all of the requested "reliance" discovery for the transactions in issue, and merely withheld such discovery for unrelated transactions.   Ambac argues that fraud issues have already been the subject of significant discovery because even the contract claims in the original Complaint include allegations that EMC breached "no fraud" representations and warranties in the written agreements. Moreover, the Complaint had allegations about the Bear Stearns "securitization machine," including widespread breaches and fraud in the loans underlying the EMC transactions that Ambac insured.

In response, EMC's Answer raised issues about Ambac's knowledge and reliance, and, thus, "the discovery process was structured to capture information relevant to fraud and EMC's potential defenses thereto. . . ." (Ambac Reply Mem. at 10.) Ambac has committed to refraining from issuing to EMC any but a small

23

number of new document requests, primarily from the files of the newly-named defendants whose files were not produced in earlier discovery. Ambac also states that it will not seek to re-depose any EMC witnesses as a result of the amendments.

The Court suspects that the truth lies somewhere between the parties' positions on additional burden and expense. On the document side, the Court does not anticipate unnecessary duplication of discovery efforts to date, or the need for huge amounts of additional discovery. It is highly unlikely that EMC will need to re-review millions of documents, when virtually all documents relevant to the transactions have been reviewed and produced. It is difficult to believe that there are documents that might relate to fraudulent inducement with respect to the transactions in issue, that were withheld because they were not relevant to the contract claims, which involved allegations of breaches of warranties and representations. See United States ex rel. Mar. Admin. v. Cont'l Illinois Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.").

The addition of ten new defendants, however, would present a greater challenge. The new defendants would be subject to discovery requests. It is, also, likely that there would be a need

to reopen certain depositions, at least, to supplement testimony that was secured.  Most importantly, a real consequence of adding new defendants would be delay.  The new defendants would need to respond to the Complaint, perhaps with dispositive motions.  They would also require time to review the vast quantities of documents and deposition testimony produced in discovery.  This is not a prospect the Court relishes.  However, in light of the Court's determination, <u>infra</u>, that the motion to amend to add securities claims should be denied as futile, there can be no control person liability.  Thus, the potential delay and prejudice resulting from adding new individual defendants disappears.

In the end, weighing all of the facts described above, the Court concludes that EMC has not demonstrated sufficient prejudice to preclude the amendment of the Complaint.

Finally, there is no evidence of bad faith on the part of Ambac in filing the motion to amend.  The Court, therefore, turns to the issue of futility.

III. <u>Futility</u>

EMC asserts that Ambac's motion should be denied because the proposed amendments are futile.  "A proposed amendment to a pleading [is] futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  <u>Oneida Indian Nation v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003), <u>rev'd on other grounds</u>,

25

544 U.S. 197, 125 S. Ct. 1478 (2005); see also Lucente v. IBM
Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. Town
of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir.
2002)); Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir.
1990).

A.   Rule 12(b)(6) Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court
"must accept as true all of the factual allegations set out in
[the] plaintiff's complaint, draw inferences from those allegations
in the light most favorable to [the] plaintiff, and construe the
complaint liberally." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir.
2007) (quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001));
see also Weixel v. Bd. of Educ., 287 F.3d 138, 145 (2d Cir. 2002).

The Supreme Court's decision in Bell Atl. Corp. v. Twombly,
550 U.S. 544, 127 S. Ct. 1955 (2007), adds a "plausibility
standard," in evaluating the sufficiency of a complaint, which is
guided by "[t]wo working principles." Ashcroft v. Iqbal, ___ U.S.
____, 129 S. Ct. 1937, 1949 (2009); see also Harris v. Mills, 572
F.3d 66, 72 (2d Cir. 2009); Bilello v. J.P. Morgan Chase Ret. Plan,
No. 07 Civ. 7379 (DLC), 2009 WL 2461005, at *5-6 (S.D.N.Y. Aug. 12,
2009). "First, the tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to legal
conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."
Iqbal, 129 S. Ct. at 1949; see also Harris, 372 F.3d at 72.
"Second, only a complaint that states a plausible claim for relief
survives a motion to dismiss," and "[d]etermining whether a
complaint states a plausible claim for relief will . . . be a
context-specific task that requires the reviewing court to draw on
its judicial experience and common sense." Iqbal, 129 S. Ct. at
1950.

For plaintiffs to survive a motion to dismiss, their complaint
must "contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'" Id. at
1949 (quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1973-74).
"Facial plausibility" exists when a "plaintiff pleads factual
content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged." Id. (citing
Twombly, 550 U.S. at 556, 127 S. Ct. at 1965); see also Green v.
Beer, No. 06 Civ. 4156 (KMW) (JCF), 2009 WL 3401256, at *3
(S.D.N.Y. Oct. 22, 2009).[2]

B.   Ambac's Proposed Claims

EMC asserts that Ambac's following proposed claims are futile:

---

[2] As noted, there is even a higher standard that must be
satisfied to plead common law fraud and securities fraud claims.
However, EMC's opposition to the amendments is not premised on
the absence of specificity as regards the fraud claims.

(1) its securities fraud claim under Section 10(b) of the Securities Exchange Act, as well as its corresponding Section 20 "control persons" claim; (2) its fraudulent inducement claim; and (3) its tortious interference with contract claim (asserted against only JP Morgan). The Court will address each of these claims in turn.

### 1. Ambac's Section 10(b) Claim

"To state a cause of action under Section 10(b) or Rule 10b-5 plaintiffs must prove that [the defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." In re IBM Corporate Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998) (citing In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir. 1993) and Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir. 1992)); see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). It is well-settled law that the availability of a private civil remedy for violations of Section 10(b) of the Securities Exchange Act, or Rule 10b-5 thereunder, is limited to purchasers and sellers of securities. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749, 95 S. Ct. 1917, 1932 (1975); accord Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York, 464 F.3d 255, 261 (2d Cir. 2006).

It is clear from the record — and neither party disputes this fact — that Ambac did not purchase (or sell) any of the debt securities at issue here.  Both parties agree that the Noteholders were the purchasers of the Notes.  Therefore, the Noteholders, exclusively, by virtue of their status as purchasers of securities, have standing to pursue claims for securities fraud and related damages.  Ambac, which is neither a purchaser nor a seller of securities, therefore, does not have standing to bring securities fraud claims under Section 10(b) or Rule 10(b)(5).

Moreover, Ambac does not obtain such standing by virtue of its status as a guarantor of an asset-backed note.  See <u>MBIA Ins. Corp. v. Spiegel Holdings, Inc.</u>, No. 03 Civ. 10097 (GEL), 2004 WL 1944452, at *4 (S.D.N.Y. Aug. 31, 2004) (concluding that MBIA was not a <u>de facto</u> purchaser of notes by virtue of its obligation to make payments to noteholders in the event of a payment default by the special purpose entity created to securitize certain credit card receivables of its parent).

a.  <u>Contractual Subrogation</u>

To locate standing to assert federal securities law claims against EMC, Ambac contends that it is, by contract, "subrogated to the rights of the Note Purchasers."  (Am. Compl. ¶ 322.)

Contractual subrogation rights are necessarily defined by

29

contract.  See Am. Hardware Mut. Ins. Co. v. Fire Equip. Sales &
Serv., Inc., No. 01 Civ. 416 (HBS), 2004 WL 1563087, at *6
(W.D.N.Y. June 9, 2004) (holding that "conventional subrogation,
including subrogation pursuant to an insurance policy, requires the
existence of a valid contractual relationship to assign the
rights").  Ambac relies on three Transaction Documents for the
source of its contractual subrogation rights: (1) the Indentures in
two Transactions; (2) the Policies in all four Transactions; and
(3) the Prospectus Supplements in all four Transactions.

These transaction documents make clear that Ambac is, indeed,
subrogated to certain of the rights of the Noteholders to receive
payments from the Trusts, but only to the extent of Ambac's
advances, and only insofar as those rights and recoveries are
available to the Trusts to extend to the Noteholders —
specifically, the right to receive payments of principal and
interest from sources available to the Trusts.  (See, e.g., SACO
2006-8 Indenture) (stating that "The Issuing Entity and the
Indenture Trustee acknowledge that (i) to the extent [Ambac] makes
payments under the Policy on account of principal of, or interest
on, the [Notes], [Ambac] will be fully subrogated to the rights of
such [Noteholders] to receive such principal and interest from the
[Trust], and (ii) [Ambac] shall be paid such principal and interest
but only from the sources and in the manner provided herein and in

30

the [I&I Agreement.]").

The "Holders' rights of payment on the Insured Obligations to the extent of the insurance distributions so made," are the only rights of the Noteholders controlled by the Trust, and to which Ambac is subrogated.   (See SACO 2006-8 Policy, at *1.)   See Spiegel, 2004 WL 1944452, at *5 (granting motion to dismiss a claim that language in subrogation provision, to the effect that "[u]pon the occurrence of an Insurance Agreement Pay Out Event, the Insurer has the right to... avail itself of any other remedies available under the Series 2000-A Indenture Supplement," conferred standing upon MBIA to bring securities fraud claims as subrogee of the noteholder).

In response, Ambac cites to a recent California case addressing a similar question: whether a monoline insurer was subrogated to the rights of investors to bring securities fraud claims against securitization sponsors and underwriters, MBIA Ins. Corp. v. IndyMac ABS, Inc., LASC Case No. BC422358, at *7-9 (Cal. Sup. Ct. Aug. 3, 2010) (holding that the issue of the alleged contractual subrogation rights could not be resolved at the pleading stage).   In that case, the contractual assignment of "the rights of the recipient," relied upon by the court, was extremely broad:

31

> The Insurer shall, to the extent it makes any payment with respect to the Notes, become subrogated to the rights of the recipient of such payments <u>to the extent of such payments</u>.

Id. at 7. (emphasis in original).[3]  Here, by contrast, the transfer of the rights of the Noteholders is far more narrow.  In particular, the transfer is expressly confined to the Noteholders' rights "to receive principal and interest from the trust," "to receive distributions on the [Notes]," and "to payment on the Insured Obligations [the Notes]."

Indeed, the terms of the Notes themselves expressly limit the Noteholder's recovery to obtaining principal and interest from the Trusts, omitting any reference to extra-contractual claims for securities fraud (or any other torts for that matter).  (See, e.g.,

---

[3] In its correspondence with the Court after its motion had been submitted, Ambac proffered a recent opinion from a California state court.  See MBIA Ins. Corp. v. Bank of Am. Corp., No. BC 417572, at *7-8 (Super. Ct. Cal. May 17, 2010) (interpreting language stating that MBIA is "fully subrogated to the rights of the Noteholders to receive... principal and interest from the Mortgage Loans of the related Loan Group" and declining to reach a conclusion, as a matter of law, as to the alleged contractual subrogation right).  There was very little discussion of the contractual subrogation issue in the case.  Remarking that the district court in Spiegel had "found the policy language clear and unambiguous," the Bank of America court held only that it could not "say that the contractual language is clear and ambiguous," and determined that "the reach and meaning of the subrogation provisions necessitates consideration of evidence."  Id. at 7.  The court did not hold that the subrogation rights extend to federal securities law claims.  In any event, the Bank of America case was not decided under New York law and is not controlling upon this Court.

Form of Class A Notes, Ex. A-1 to Indenture) (stating that the insured Notes are "LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST AS PROVIDED IN THE INDENTURE REFERRED TO BELOW" and confirming that "THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE") (emphasis in original).

Significantly, all of the agreements embodied in the Transaction Documents are exclusively between Ambac and the Trusts. Ambac has not entered into any agreements with the Noteholders directly. This absence of privity of contract with the Noteholders further establishes that the exclusive sources of contractual subrogation available to Ambac are through its agreements with the Trusts only.

Unlike the Noteholders, however, the Trusts lack standing to assert federal securities law claims against EMC.[4]   Moreover, contrary to Plaintiff's assertion that potential recoveries on the Noteholders' securities law claims are sources available to the Trusts, nowhere in the Transaction Documents (or anywhere else for that matter) are the Trusts (or Ambac) granted the right to pursue securities law claims on behalf of the Noteholders.   Absent a specific and express assignment of such claims in an agreement

_____

[4] Neither party contests that the Trusts are neither purchasers nor sellers of the securities, and, therefore, lack standing to bring § 10(b) claims.

33

between the purchaser of securities and the purported assignee, this Court will not imply an assignment of the Noteholders' independent securities law claims to the Trusts — and, in turn, to Ambac. See Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 17-18 (2d Cir. 1997) ("In order to make a valid assignment, the owner must manifest an intention to make the assignee the owner of the claim.") (citations and internal quotation marks omitted); see also W.R. Huff Asset Mgmt. v. Deloitte & Touche LLP, 549 F.3d 100, 108 (2d Cir. 2008) (holding that "an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor does not confer standing to sue in the holder's own right because a power-of-attorney does not transfer an ownership interest in the claim") (citing Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 277, 128 S. Ct. 2531, 2537 (2008)).

In short, the exclusive claims available to the Trusts, to which they may subrogate Ambac, are those rights that they are specifically empowered to enforce on behalf of the Noteholders pursuant to the Indentures — namely, the right to receive payment of principal and interest from the underlying mortgage loans.

### b. Equitable Subrogation

In the alternative, Ambac contends that it is entitled to equitable subrogation, irrespective of whether the Noteholders are

34

the named "insureds" under the insurance policies at issue here. (See Reply Memorandum of Law in Support of Ambac's Motion for Leave to Amend, dated Sept. 14, 2010 ("Ambac Reply Mem."), at 16.) The Court does not find Ambac's argument persuasive.

Unlike contractual subrogation, where the subrogee's rights are defined in an express agreement between the insurer-subrogee and the insured-subrogor, the equitable subrogation rights of an insurer "[do] not arise from, nor [are] dependent upon, statute or the terms of a contract of insurance." Allstate Ins. Co. v. Mazzola, 175 F.3d 255, 259 (2d Cir. 1999) (quoting Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992)); see also Federal Ins. Co. v. Arthur Andersen & Co., 75 N.Y.2d 366, 372, 553 N.Y.S.2d 291 (1990). Those rights, which accrue upon payment of the loss, are based upon the principle that, in equity, an insurer, who has been compelled under its policy to pay a loss, ought, in fairness, to be reimbursed by the party that caused the loss. See Allstate, 175 F.3d at 258; see also Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 581, 626 N.Y.S.2d 994 (1995). New York courts have consistently held that equitable subrogation is to be "liberally applied for the protection of those who are its natural beneficiaries — insurers that have been compelled by contract to pay the loss caused by the negligence of another." Winkelmann, 85 N.Y.2d at 581 (citing Ocean Acc. & Guar. Corp. v. Hooker

35

Electrochemical Co., 240 N.Y. 37, 47 (1925)); see also Federal, 75
N.Y.2d at 372.

The rights of an insurer as equitable subrogee against a
third-party, however, are derivative and limited to such rights as
the insured would have had against such third-party for its default
or wrongdoing.  See Allstate, 175 F.3d at 258 (quoting Great Am.
Ins. Co. v. United States, 575 F.2d 1031, 1034 (2d Cir. 1978)); In
re Marine Sulphur Queen, 460 F.2d 89, 102 (2d Cir.), cert denied,
409 U.S. 982 (1972) (holding that the subrogee takes "exactly the
same remedies" that the injured party would have had — "the Flotsam
with jetsam") (quotation marks omitted); see also NYP Holdings,
Inc. v. McClier Corp., 65 A.D.3d 186, 189, 881 N.Y.S.2d 407, 410
(1st Dep't 2009) (holding that the doctrine of equitable
subrogation allows insurers to "stand in the shoes" of their
insured to seek indemnification by pursuing any claims that the
insured may have had against third-parties legally responsible for
the loss) (citing Blue Cross & Blue Shield of N.J., Inc. v. Philip
Morris USA Inc., 3 N.Y.3d 200, 206, 785 N.Y.S.2d 399, 403 (2004);
Winkelmann, 85 N.Y.2d at 581).  In other words, the insurer can
recover on a particular claim only if the insured could have
recovered on that same claim.

Here, the "insureds" were the Trusts.  As discussed above,
however, the Trusts were not the purchasers (or sellers) of the

Notes and, therefore, do not have standing to bring Section 10(b) claims, nor has such standing been assigned to the Trusts by the Noteholders. Thus, allowing Ambac to invoke equitable subrogation to sue for securities fraud damages would allow Ambac to assert claims against EMC that the Trusts themselves lack standing to pursue. In other words, because the Trusts cannot recover on alleged violations of Section 10(b), Ambac, "standing in the shoes" of the Trusts, is, similarly, unable to assert such claims.

In its correspondence with the Court, Ambac cites to a 1987 case, Continental Ins. Co. v. Daewoo Shipbuilding & Heavy Mach. Ltd., No. 86 Civ. 5255 (RLC), 1987 WL 16163, at *2-4 (S.D.N.Y. Aug. 21, 1987), for the general proposition that an insurer is equitably subrogated to the rights of the parties to whom the insurance benefits are ultimately paid, even if the subrogor is not the insured, but its payments are passed through the named insured.

The Continental case does not reflect New York law on equitable subrogation, and, in any event, Ambac construes its holding too broadly. Continental involved an action by the legal liability underwriters of a shipowner, against a shipbuilder, to recover the value of cargo that was lost when water leaked into two holds of the ship. The insurer of the shipowner paid the shipowner's obligation to the cargo-owners and then looked to the shipbuilders for indemnification. Although there did exist

37

agreements-to-arbitrate in the contract between the shipowner and the shipbuilder, by standing in the shoes of the cargo-owners, who were the beneficiaries of the insurance, the insurer was subrogated-out of the arbitration agreement, because the cargo-owners had not agreed to arbitrate their claims.

As the court in Continental recognized, maritime law is distinct.  Continental, 1987 WL 16163 at *2 ("Subrogation is vital... because it enables carriers and merchants... to keep the ships sailing.") (citing G. Gilmore & C. Black, Jr., The Law of Admiralty § 2-17 (2d ed. 1975) ("[I]t is this doctrine perhaps more than any other that explains the great practical importance of marine insurance in the maritime law world.")).  Moreover, contrary to Plaintiff's overly-broad characterization, Continental principally concerns the scope and enforceability of arbitration agreements; specifically, the case anticipates a line of cases identifying instances where estoppel will bind two parties to arbitration, where one party is not, in fact, a signatory to a contract.  See Adelphia Recovery Trust v. Bank of Am., No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at *8 (S.D.N.Y. July 8, 2009) (collecting cases) (stating that the Second Circuit recognizes that estoppel will bind parties to arbitration, where one party is not a signatory, in two instances: (1) where "a party is bound after it has knowingly exploited an agreement containing the arbitration

38

clause for its direct benefit;" and (2) "where there is a close relationship between the entities involved... and the signatory's claim against the non-signatory are intimately found in and intertwined with the underlying contract obligations") (citations and internal quotation marks omitted).

Continental's application of subrogation to arbitration clauses in maritime agreements has no bearing on New York subrogation law, so as to allow insurers to assert federal securities law claims derived from non-insureds, who received payment passed through the insured. Ambac is able to be made whole directly by the party who is alleged to have caused the loss - EMC, by pursuing a number of different direct contract and fraud claims. There is no need or authority for this Court, acting in equity, to extend a single case's holding relating to subrogation in the context of maritime law and arbitration clauses, to allow Ambac, under New York law, to also pursue a federal securities fraud claim that the insured Trusts could not pursue.

Finally, EMC argues that "equitable subrogation is not available where the party asserting the subrogation right negotiated specific, different subrogation rights in a contract and failed to reserve the asserted rights" (EMC Mem. at 23), and cites, in support of this proposition, J & B Schoenfeld, Fur Merch., Inc. v. Albany Ins. Co., 109 A.D.2d 370, 373, 492 N.Y.S.2d 38, 41 (1st

Dep't 1985) ("While the right of subrogation is not dependent on contract but arises by operation of law when payment has been made, where the right of an insurer to subrogation is expressly provided for in the policy, its rights must be governed by the terms of the policy."). This is, undeniably, true in other jurisdictions. See, e.g., Knight v. Alefosio, 158 Cal. App. 3d 718, 724 (Cal. Ct. App. 1984) ("The doctrine of subrogation cannot be invoked to override the contract of the parties.  It is not applicable where... its enforcement would be inconsistent with the terms of the contract, or where the contract, either expressly or by implication, forbids its application.") (quotation marks and citations omitted); see also Allied Mut. Ins. Co. v. Heiken, 675 N.W.2d 820, 825 n. 2 (Iowa 2004) ("The insurer's right to subrogation attaches by operation of law upon payment of the loss based on principles of equity. However, such subrogation rights would be subject to any subrogation terms found in the contract of insurance.").  The rationale here is that "to hold otherwise... would permit the party to rewrite the contract to the detriment of the other contracting party." See, e.g., Bank of Am., at *8. (citations omitted).  This is not the law in New York, however.

Under New York law, as long as a contract does not specifically bar an insurer's right of equitable subrogation, an insurer has the right, as an equitable subrogee, to bring a lawsuit

40

against third-party tortfeasors.  In particular, New York courts
have held that it makes no difference whether the "[parties]
intended a contractual subrogation of [the insured's] rights
against [a third-party] defendant... as long as there is no
language in the agreement... which could be construed as barring
[the insurer's] claim as equitable subrogee." <u>Federal</u>, 75 N.Y.2d
at 371; <u>accord</u> <u>Winkelmann</u>, 626 N.Y.S.2d at 997 n. 1; <u>see also</u> <u>Brown</u>
<u>v. Bellamy</u>, 170 A.D.2d 876, 878-79, 566 N.Y.S.2d 703, 704 (3rd
Dep't 1991) ("Unlike contractual subrogation, where the subrogee's
rights are defined in an express agreement, the rights of... [an]
equitable subrogee arise independently of any contract."); <u>Niemann</u>
<u>v. Luca</u>, 645 N.Y.S.2d 401, 402-03 (N.Y. Sup. Ct. 1996) (explaining
that, "unlike contractual subrogation,... the right of an insurer
to recover from third persons legally responsible for the loss is
equitable in nature and <u>arises independently</u> of any contract")
(emphasis added).

Thus, in light of New York case law, this Court rejects EMC's
contention that "having negotiated and agreed to the limited
subrogation rights defined by the transaction documents, common law
subrogation is unavailable to Ambac to override the contracts."
(EMC Mem. at 23.)  Rather, we agree that equitable subrogation is
potentially available to Ambac, but conclude, in applying this
equitable concept to the facts of this case, that the equitable

41

subrogation doctrine, as set forth by New York courts, is not so expansive as to give Ambac the right, as an equitable subrogee, to allege federal securities fraud claims on behalf of third-parties who are not signatories to, or the insureds under, the underlying insurance agreements.  Ambac stands in the shoes of the Trusts, and the Trusts do not have standing to pursue securities fraud claims against EMC or Bear Stearns.  Thus, neither does Ambac.

Accordingly, because it would be futile to allow Ambac's proposed securities law claim, premised on equitable and contractual subrogation, Ambac's motion for leave to amend the Complaint to pursue a Section 10(b) securities fraud claim should be denied.

### 2.   Ambac's Section 20 Claim

Ambac seeks to add a claim under Section 20(a) of the Securities Exchange Act against "control persons" of Bear Stearns and EMC, in connection with their involvement in the alleged Section 10(b) violations.  In order to properly allege a control person claim pursuant to Section 20(a), Ambac must establish: (1) "a primary violation by a controlled person;" (2) "control of the primary violator by the targeted defendant;" and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated."   In re Beacon Assocs.

42

Litig., No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *17 (S.D.N.Y. Oct. 5, 2010). Hence, if Ambac cannot raise a primary violation, then it cannot raise a Section 20 claim.

Because Ambac does not have standing to assert a primary violation of Section 10(b) and Rule 10b-5, this Court finds that any Section 20 claim asserted by Ambac would be futile. Accordingly, leave to amend the Complaint to pursue this claim should be denied. The dismissal of this claim further requires that the proposed amendment to add ten new "control person" defendants be denied.

### 3. Ambac's Fraudulent Inducement Claim

Ambac also claims that it was fraudulently induced to enter into the I&I Agreement by virtue of various misrepresentations made to it by EMC and Bear Stearns. (See Am. Compl. ¶¶ 309-16.) Ambac contends that it was induced to participate in the Bear Stearns securitizations on the basis of various allegedly materially false and misleading pre-contractual disclosures, including representations regarding EMC's underwriting, due diligence, quality control, seller monitoring, and repurchase practices. (See id. ¶¶ 88-128.) Ambac also alleges that EMC and Bear Stearns failed to disclose various problems with, and changes to, EMC's underwriting, due diligence, and quality control practices that

43

rendered EMC's prior disclosures even more misleading and inaccurate. (See id. ¶¶ 129-88.) In response, EMC argues that Ambac should not be allowed to pursue its fraudulent inducement claim, because it is duplicative of its various contract claims. We disagree.

Under New York law, a fraudulent inducement claim is not considered duplicative where the defendant makes misrepresentations and omissions of present facts, collateral to the contract, that induced the plaintiff to enter into the contract. See First Bank of Ams. v. Motor Car Funding, Inc., 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty."); Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89 (1986) (holding that "a promise [not contained in the written agreement] made with a preconceived and undisclosed intention of not performing it... constitutes a misrepresentation" for purposes of a fraud in the inducement cause of action) (quoting Sabo v. Delman, 164 N.Y.S.2d 714, 716 (1957)) (internal quotation marks omitted); see also Stewart v. Jackson & Nash, 976 F.2d 86, 88-89 (2d Cir. 1992) (recognizing that New York law has long distinguished between a

44

promisory statement of what will be done in the future that gives rise only to a breach of contract cause of action, and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement).

EMC advances several additional arguments as to why Ambac's fraudulent inducement claim must fail.

### a.   Warranty Clause

Section 2.04 of the I&I Agreement warranted the truthfulness of all of the information provided to Ambac about each of the securitizations, both prior to contracting, as well as in the initial offerings:

> § 2.04(j) <u>Accuracy of Information</u>. No information supplied by the Seller contained in the Company Documents to which it is a party nor other material information relating to the operations of the Seller or the financial condition of the Seller, as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic format by the Seller contains any statement of material fact which was untrue or misleading in any material respect when made.  The Seller does not have any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Seller.  Since the furnishing of the Company Documents, there has been no change nor any development or event involving a prospective change known to the Seller that would render any Company Documents untrue or misleading in any respect.

> § 2.04(k) <u>Compliance with Securities Laws</u>...  The Company Information in the Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading...

45

EMC argues that Ambac cannot pursue its fraudulent inducement claim, and is limited only to its contract claims, because these "no-fraud" warranties contained in the I&I Agreements "necessarily cover all of the pre-contractual representations allegedly made by EMC," that form the "exclusive basis for Ambac's fraudulent inducement claim." (EMC Mem. at 29.) In other words, EMC argues that Ambac is "limited to recovery under the contract because its contract claims address all of the general representations and warranties concerning the truthfulness of the same information by which Ambac claims it was induced to insure each securitization, as well as loan level representations and warranties that provide contractual remedies for each securitized loan." (Id. at 31.)

New York law is clear, however, that a fraud claim is not "rendered redundant by the fact that... alleged misrepresentations breached the warranties made by [a defendant]." First Bank, 257 A.D.2d at 292, 690 N.Y.S.2d at 21 (holding that "a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim," because "[a] warranty is not a promise of performance, but a statement of present fact."); MBIA Ins. Co. v. Residential Funding Co., LLC, No. 603552/08 (BJF), 2009 WL 5178337, at *4 (N.Y. Sup. Ct. Dec. 22, 2009) ("However, the fraud cause of action survives here, because it is premised on allegations that RFC misrepresented various statistics and other

46

existing facts about the underlying mortgage loans that RFC contributed to the mortgage loans pools. This cannot be characterized merely as an insincere promise of future performance. The alleged fraud is that RFC intentionally misrepresented material existing facts about the credit risks of the underlying mortgage loans so that they would appear to satisfy RFC's contractual representations and warranties, inducing MBIA to issue the [Financial Guaranty Insurance] Policies.") (citation omitted); see also Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007) ("A plaintiff may elect to sue in fraud on the basis of misrepresentations that breach express warranties. Such cause of action enjoys a longstanding pedigree in New York.").

In First Bank, for example, a case factually on point with this case, the agreement "contain[ed] warranties to the effect that the loans would comply with certain underwriting guidelines," while the pre-contractual representations, by contrast, involved "the quality of the collateral, the individual borrower's credit history and the amount of the borrower's loan payments." First Bank, 257 A.D.2d at 290, 60 N.Y.S.2d at 19. The Appellate Division held that the fraud claim was not redundant of the breach of contract claim, because the plaintiff's fraud claim was premised on allegations that defendants misrepresented various pertinent facts about the individual loans that plaintiff purchased under a loan agreement —

47

misrepresentations that could not be characterized as insincere promises of future performance. See First Bank, 257 A.D.2d at 292, 60 N.Y.S.2d at 21.

Here, the I&I Agreements, similarly, contain warranties to the effect that each loan was underwritten in accordance with appropriate guidelines; was originated in accordance with proper, prudent, and customary practices in the industry; and contained no error, omission, misrepresentation, or fraud. The alleged pre-contractual misrepresentations, on the other hand, concern, primarily, implementation of due diligence (see Am. Compl. ¶¶ 130-46); failure to disclose policies and procedures to increase loan flow irrespective of quality (see id. ¶¶ 147-57); and failure to disclose Bear Stearns's internal, allegedly highly-negative assessments of the quality of the loans in the securitization pools (see id. ¶¶ 181-87).

Narrowly interpreting the holding in First Bank, some New York courts have allowed fraud claims to be asserted where the alleged misrepresentations breached a general warranty, but where, at the same time, the misrepresentations also concerned additional matters that were not specifically addressed by that general warranty. Compare Wright v. Selle, 27 A.D.3d 1065, 1068, 811 N.Y.S.2d 525 (4th Dep't 2006) (upholding a fraudulent inducement claim and observing that "plaintiff was under no contractual duty to perform

48

the work for the amount of the estimate," because the contract referred only to payment for time and materials) and M & A Oasis, Inc. v. MTM Assocs., L.R., 307 A.D.2d 872, 873, 764 N.Y.S.2d 9 (1st Dep't 2003) (holding that the misrepresentation supporting the fraudulent inducement claim — that the transaction would be for cash — was extraneous to the representations made in the contract documents) with Pramco III, LLC v. Partners Trust Bank, No. 2006/02318 (KRF), 2007 WL 1574479, at *1 (N.Y. Sup. Ct. May 31, 2007) (dismissing motion to reargue the motion to amend where plaintiff failed to allege any misrepresentation "extraneous to that contained (and made) in the Terms of Sale Memorandum itself, which was understood by all parties from the outset to become a part of the contract documents once the bid was accepted") and In re Enron Corp. Sec. Litig., No. 04 Civ. 1367, 1495, 1498 (NRB), 2005 WL 356985, at *11 (S.D.N.Y. Feb 15, 2005) (affirming bankruptcy court's dismissal of fraudulent inducement claim where loan agreement "specifically envisioned the remedies that should be available" in the event that Enron's financial health was not accurately depicted in its financial statements).

Other courts, however, have allowed a fraud claim to be based on misrepresentations that were incorporated verbatim in a warranty. See, e.g., MBIA Ins. Corp. v. Royal Bank of Canada, No. 12238/09 (ADS), 2010 WL 3294302, at *33 (N.Y. Sup. Ct. Aug. 19,

2010) (denying a motion to dismiss a claim for fraudulent inducement where MBIA sought and received contractual warranties upon which it relied to contract); see also In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 314 (E.D.N.Y. 2002) (stating that "[i]t simply cannot be the case that any statement no matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract").

The warranties set forth here, in §§ 2.04(j) and (k) of the I&I Agreements, obviously do not "specifically address" the alleged pre-contractual misrepresentations alleged in the First Amended Complaint. Rather, the warranties merely state, in very general terms, that "[n]o information supplied by [EMC]... contains any statement of material fact which was untrue or misleading in any material respect when made" and that "[EMC] does not have any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change." Absent is any specific and express reference to, for instance, implementation of due diligence; policies and procedures to increase loan flow; or failures to disclose negative assessments of the quality of the loans in the securitization pools. As such, the misrepresentations supporting Ambac's fraudulent inducement claim are extraneous to the contract documents and Ambac, therefore, is not limited to

50

recovery solely under the contract, by virtue of the two "no-fraud" warranties.

Moreover, contrary to what EMC suggests in citing to Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 165 F. Supp. 2d 615, 622-23 (S.D.N.Y. 2001), there is no question that Ambac was justified in accepting these written representations as not fraudulent and was under no obligation, as a sophisticated investor involved in a multi-million dollar transaction, to conduct an independent inquiry as to their veracity. See DDJ Mgmt. LLC v. Rhone Grp. L.L.C., 905 N.Y.S.2d 118, 122 (2010) (dismissing a motion to dismiss a claim that lenders were not justified in relying upon borrower's allegedly misleading financial statements prior to making commercial loan); see also JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 408 (S.D.N.Y. 2004) (applying New York law and concluding that "a duty to inquire" is not "necessarily triggered as a soon as [plaintiff-lender] has the slightest hints of any possibility of falsehood").

Finally, EMC contends that, under New York law, a fraud claim will not lie if it "arises out of the same facts" as plaintiff's breach of contract claim. (See EMC Mem. at 30.)  This misstates the law.  New York courts have consistently allowed a plaintiff, who was induced to enter into a transaction because a defendant misrepresented material facts, to state a claim for fraud, even

51

though the same facts, also, give rise to the plaintiff's breach of contract claim. <u>See, e.g.</u>, <u>Royal Bank of Canada</u>, 2010 WL 3294302, at *29 (finding misrepresentations regarding the quality of certain collateral and its AAA credit rating to be "collateral, constituted misrepresentations of present facts and may form the basis for a fraud cause of action even though they also provide a basis for Plaintiffs' breach of contract claims."); <u>RKB Enters. Inc. v. Ernst & Young</u>, 182 A.D.2d 971, 972, 582 N.Y.S.2d 814 (3rd Dep't 1992) ("A party fraudulently induced to enter into a contract may join a cause of action for fraud with one for breach of the same contract.") (collecting New York cases); <u>see also</u> <u>Merrill Lynch</u>, 500 F.3d at 184 ("As to the duplication charge, the New York Court of Appeals has allowed a fraud claim to proceed in tandem with a contract claim where the seller misrepresented facts as to the present condition of his property, even though those facts were warranted in the parties' contract.") (citations omitted); <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996) (noting that, under New York law, parallel fraud and contract claims may be brought if the plaintiff points to a fraudulent misrepresentation that is collateral, or extraneous to, the contract).

        b.   Merger Clause

Section 6.11 of the I&I Agreement contains the following merger clause:

> 6.11 <u>Entire Agreement</u>. This Insurance Agreement and the Policy set forth the entire agreement between the parties with respect to the subject matter hereof and thereof, and this Insurance Agreement supersedes and replaces any agreement or understanding that may have existed between the parties prior to the date hereof and in respect of such subject matter.

EMC contends that this merger clause precludes Ambac's claim for fraudulent inducement. This argument is without merit.

Under New York law, merger clauses generally do not bar claims for fraudulent inducement, unless the clause specifically addresses the very conduct complained of in the fraud allegation. <u>See</u> <u>Danann</u> <u>Realty Corp. v. Harris</u>, 5 N.Y.2d 317, 324-26, 184 N.Y.S.2d 599, 601-02 (1959); <u>accord</u> <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.</u>, 404 F.3d 566, 575-76 (2d Cir. 2005). In particular, where a "contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance upon those representations." <u>Mfrs. Hanover Trust Co. v. Yanakas</u>, 7 F.3d 310, 315 (2d Cir. 1993) (citing New York case law); <u>accord</u> <u>Royal Bank of Canada</u>, 2010 WL 3294302, at *30.

For a contract term to be sufficiently specific under this standard, there need not exist a "precise identity between the

53

misrepresentation and the particular disclaimer." <u>Grumman Allied</u>
<u>Indus., Inc. v. Rohr Indus., Inc.</u>, 748 F.2d 729, 735 (2d Cir.
1984). Rather, "[t]he <u>Danann</u> rule operates where the substance of
the disclaimer provisions track the substance of the alleged
misrepresentations, notwithstanding semantical discrepancies." <u>Id</u>;
<u>see also</u> <u>Internet Law Library, Inc. v. Southridge Capital Mgmt.,</u>
<u>LLC</u>, No. 01 Civ. 6600 (RLC), 2005 WL 3370542, at *4 (S.D.N.Y. Dec.
12, 2005) ("The disclaimer in question appears at the end of
warranties and representations section of the agreement and
reiterates that no warranties or representations shall be made
other than those in the immediately preceding section. That is, by
nature, a general disclaimer; it lacks the specificity to meet the
standard the Second Circuit has applied under New York law. New
York law requires more than a generalized boilerplate exclusion, a
disclaimer must speak directly to the matter at issue in order to
preclude a claim of fraud in the inducement.") (footnotes,
quotation marks, and citations omitted);

Here, the merger clause contained in paragraph 6.11 of the I&I
Agreements is general — it contains the standard boilerplate that
typifies a general merger clause and does not contain any express
references to the specific subject of EMC's representations. While
it does state that the I&I Agreement "supersedes and replaces any
agreement or understanding that may have existed between the

54

parties prior to the date hereof and in respect of such subject matter," this contractual language differs from the specific clauses that have been found to preclude fraud claims under New York law. See, e.g., Danann, 184 N.Y.S.2d at 601 (rejecting a claim for fraudulent inducement where the merger clause contained a statement that the seller-defendant had "not made and does not make any representations as to the physical condition, rents, leases, expenses, operation, or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that no such representations have been made..."); see also Getty Petrol. Corp. v. Delorio, 194 A.D.2d 762, 763, 599 N.Y.S.2d 829, 829 (2nd Dep't 1993) ("Here, the merger clauses contained in the agreements clearly provided that Getty did not, in any way, represent or warrant the fitness of the premises for the use contemplated by the lessee and it was the lessee's obligation to make the premises fit at its sole cost and expense.").

EMC cites to a recent case in the Southern District of New York for the proposition that a merger clause precludes a fraud action, where the merger clause "was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract." CDO Plus Master

Fund Ltd. v. Wachovia Bank, N.A., No. 07 Civ. 11078 (LTS) (AJP), 2009 WL 2033048, at *5 (S.D.N.Y. July 13, 2009) (citations omitted).  In that case, the court concluded that the fraud claim was "inconsistent with other specific recitals in the contract," because the basis of the fraud claim was an allegation that the defendant-bank Wachovia affirmed that it would not ask for more collateral, where the bank's ability to demand such credit support, and the conditions under which it could do so, were plainly disclosed in the contract.  Id. at *2.

Here, by contrast, EMC offers only the general and conclusory statement that various "representations, warranties, and covenants from the defendant in favor of the plaintiff" preclude Ambac's fraud claim.  (EMC Mem. at 28.)  EMC does not point to any specific recitals contained in the I&I Agreements (or in any other Transaction Documents for that matter) that are inconsistent with Ambac's assertion of a fraudulent inducement claim.  CDO Plus Master Fund, therefore, is inapposite.

### c.   Limited Liability Clause

Section 6.10 of the I&I Agreement contains the following limited liability waiver:

> 6.10 Limited Liability.  No recourse under any Company Document or the Underwriting Agreement shall be had against, and no personal liability shall attach to, any officer, employee, director, affiliate, or shareholder of any party

hereto, as such, by the enforcement of any legal or equitable
proceeding, by virtue of any statute or otherwise in respect
of any of the Company Documents or the Underwriting Agreement,
the Class A Notes or the Policy, it being expressly agreed and
understood that each Company Document and the Underwriting
Agreement is _solely a corporate obligation of each party
hereto_, and that _any and all personal liability_, either at
common law or in equity, or by statute or constitution, of
every such officer, employee, director, affiliate or
shareholder for _breaches of any party hereto_ of any
obligations under any Company Document or the Underwriting
Agreement is hereby expressly waived as a condition of and in
consideration for the execution and delivery of this Insurance
Agreement. (emphasis added).

EMC argues that Ambac cannot assert tort claims against Bear
Stearns and the Individual Defendants because Ambac and EMC
shielded their affiliates, officers, and directors "from any such
liability" through this limited liability provision included in the
I&I Agreements.   (EMC Mem. at 31-32.)    This argument is also
without merit.

Section 6.10 specifically deals with potential vicarious
liability claims "under any Company Document or the Underwriting
Agreement... it being expressly agreed and understood that each
Company Document and the Underwriting Agreement is _solely a
corporate obligation of each party hereto_, and that _any and all
personal liability_... for _breaches of any party hereto_ of any
obligations under any Company Document or the Underwriting
Agreement is hereby expressly waived." By its plain terms, it does
not limit liability for fraud or intentional torts committed by

57

affiliates, officers, and directors, and, in particular, it does not expressly provide protection for pre-contractual representations that, when made, were known to be materially false or misleading. See Gross v. Sweet, 49 N.Y.2d 102, 107, 424 N.Y.S.2d 365 (1979) ("[U]nless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability.").

Moreover, under New York law, a party may not invoke the existence of an agreement to insulate itself from intentional wrongdoing — such as that alleged in this action. See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384-85, 461 N.Y.S.2d 746 (1983) ("[A]n exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts ... [and] an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.") (internal citations omitted); see also Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd., No. 00 Civ. 9214 (RWS), 2003 WL 1751780, at *9 (S.D.N.Y. Apr. 1, 2003) (holding that "an

58

exculpatory clause, no matter how expansive its terms, cannot insulate a contracting party from its own fraud").

Accordingly, we conclude that, just as EMC has not shielded itself from any liability other than for breaches of contract, the limited liability provision in the I&I Agreements in no way shields Bear Stearns and the Individual Defendants from claims sounding in fraud and intentional tort.  As to the Individual Defendants, however, this is of no moment because, as discussed, the Section 20 claims against them are not viable.

### d.  Waiver-Upon-Payment Clause

Finally, as part of the Transaction Documents, the Certificate Guarantee Insurance Policies state that Ambac agrees to "unconditionally and irrevocably... pay... that portion of the Insured Amounts which shall become Due for Payment but shall be unpaid by reason of Nonpayment."   (See SACO I Trust 2006-8 Insurance Policy.)  The Policies further state that Ambac "waives and agrees not to assert any and all rights and defenses, to the extent such rights and defenses may be available to Ambac, to avoid payment of its obligations under this Policy in accordance with the express provisions hereof."   (Id.)   EMC argues that Ambac's fraudulent inducement claim is barred by these unconditional guarantees.  We disagree.

59

Nothing sought by Ambac in connection with its fraud claims is an attempt to avoid payment of insurance claims under the Policy, or would otherwise impair its obligations to insure the Noteholders. Ambac has paid out on the claims such that — as both parties concede — the Noteholders have not, and will not, suffer any out-of-pocket damages with respect to non-payment of principal and interest on the Notes. In executing the Policies, Ambac, therefore, can in no way be said to have waived its right to assert the fraud claims that it now seeks to include in its proposed First Amended Complaint.

For all the reasons set forth above, Ambac's fraudulent inducement claim, as pled, is sufficient to survive a motion to dismiss. Accordingly, this Court recommends that Ambac be granted leave to amend the Complaint to add its claim for fraudulent inducement.

### 4.   Ambac's Tortious Interference Claim

Finally, Ambac contends that JP Morgan tortiously interfered with EMC's contractual duty to repurchase breaching loans. Under New York law, a party asserting tortious interference with contract must establish: (1) "the existence of a valid contract between the plaintiff and a third party;" (2) the "defendant's knowledge of the contract;" (3) the "defendant's intentional procurement of the

third-party's breach of the contract without justification;" (4)

"actual breach of the contract;" and (5) "damages resulting

therefrom." <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401 (2d

Cir. 2006) (quoting <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88

N.Y.2d 413, 424, 646 N.Y.S.2d 76 (1996)).  "The interference must

be intentional, not merely negligent or incidental to some other

lawful purpose." <u>Alvord & Swift v. Stewart M. Muller Constr. Co.</u>,

46 N.Y.2d 276, 281, 413 N.Y.S.2d 309, 312 (1978).

The New York Court of Appeals has carved out, however, an

important defense to this tort — the economic-interest defense —

which states that where a third-party has an economic interest in

an entity and interferes with an existing contractual relationship

between the plaintiff and that entity, such interference is

considered privileged. <u>See</u> <u>Foster v. Churchill</u>, 87 N.Y.2d 744,

750-51, 642 N.Y.S.2d 583 (1996) (holding that "procuring the breach

of a contract in the exercise of equal or superior right is acting

with just cause or excuse and is justification for what would

otherwise be an actionable wrong") (quoting <u>Felsen v. Sol Café Mfg.</u>

<u>Corp.</u>, 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610 (1969) (stating that

defendant was "privileged to attempt to protect" its "existing

economic interest... when it 'interfered' with plaintiff's

contract...")).  Under New York law, it is clear that "[t]he

imposition of liability in spite of a defense of economic interest

61

requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." Id.; accord White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 283 (2d Cir. 2002); see also Felsen, 24 N.Y.2d at 687. What is less clear, however, is what constitutes the "equal or superior right" sufficient to trigger the defense.

New York courts are in agreement that a concrete, pre-existing economic interest, such as a high level of stock ownership, will support a defense to tortious interference. See Foster, 87 N.Y.2d at 751 (applying the defense where defendant owned 25% of the company at issue); Felsen, 24 N.Y.2d at 686 (applying the defense where defendant was the sole stockholder in the company at issue); see also Multi-Juice S.A. v. Snapple Beverage Corp., No. 02 Civ. 4635 (RPP), 2003 WL 1961636, at *5 (S.D.N.Y. Apr. 25, 2003) (holding that, because "Mistic was its wholly-owned subsidiary..., Snapple could not tortiously interfere with the distribution agreement") (citing Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156, 157, 554 N.Y.S.2d 867, 869 (1st Dep't 1990) (stating that a corporate parent has the right to interfere with the contract of its subsidiary)). But, some courts have interpreted the defense more broadly than this. See, e.g., Record Club of Am., Inc. v. United Artists Records, Inc., 611 F. Supp. 211, 217 (S.D.N.Y. 1985) ("[U]nder New York law, one who has a financial interest in the

business of another is privileged to interfere with a contract between the other and a third-party if his purpose is to protect his own interest and if he does not employ improper means.") (emphasis added).

It is clear, however, that JP Morgan, as an affiliate of EMC, is entitled to the protections of the economic-interest defense. See MTI/The Image Grp., Inc. v. Fox Studios E., Inc., 262 A.D.2d 20, 23-24, 690 N.Y.S.2d 576 (1st Dep't 1999) ("It was also error not to dismiss the third cause of action, for tortious interference with contractual relations... since all the named companies are affiliated with Morning Studio, either as parent or sister companies[.]") (emphasis added); accord Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc., No. 107 Civ. 567 (FJS) (DRH), 2009 WL 1514912, at *7 (N.D.N.Y. June 1, 2009). Moreover, Ambac has alleged nothing in its First Amended Complaint to suggest that JP Morgan acted with any motivation beyond its own economic interest in refusing to repurchase loans, which it had settled with the originators.

Ambac contends that "[a]fter acquiring Bear Stearns..., JP Morgan deliberately frustrated investors' and insurers' rights in the Bear Stearns securitizations to avoid bringing into its consolidated financial statements Bear Stearns' massive exposure related to its securitizations. Most significantly, JP Morgan

implemented a bad-faith strategy to reject without justification insurers' and investors' demands for the repurchase of breaching loans from the Bear Stearns securitizations." (Am. Compl. ¶ 205.) This amounts to nothing more than "a formulaic recitation of the elements of [the] cause of action" and does not suffice to survive a motion for judgment on the pleadings. Twombly, 550 U.S. at 555, 127 S. Ct. at 1964-65.

In claims for tortious interference that have survived motions to dismiss, plaintiffs have, at a minimum, alleged some fact, above and beyond intentional interference, that would permit a court to infer the requisite tortious conduct. Compare Reed Constr. Data Inc. v. McGraw-Hill Co., Inc., No. 09 Civ. 8578 (RWS), 2010 WL 3835196, at *7-8 (S.D.N.Y. Sept. 14, 2010) (denying motion to dismiss where plaintiff's amended complaint alleged facts showing that employees in MHC's "Competitive Intelligence" unit hired several contractors to subscribe to plaintiff's service by posing as customers of plaintiff, and that defendant then used this unauthorized access to share information with its sales agents and to manipulate that information to create misleading and favorable comparisons for use in competition with plaintiff for customer accounts) with Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp., No. 07 Civ. 6233 (MAT), 2010 WL 3258389, at *6 (W.D.N.Y. Aug. 17, 2010) (dismissing tortious interference claim because

64

plaintiff's amended complaint contained the simple allegation that
the defendant "intentionally and maliciously procured, or
participated in the procurement of, the breach of the
[Distribution] Agreement]," which the court held amounted "to
nothing more than a formulaic recitation of the elements of the
cause of action") (citations and internal quotation marks omitted)
and Medtech Prod. Inc. v. Ranic, LLC, 596 F. Supp. 2d 778, 797-98
(S.D.N.Y. 2008) (dismissing tortious interference claim because
plaintiff's second amended complaint did not allege any facts
establishing that defendant's procurement of the breach of contract
was done without justification).

     To factually support its tortious interference claim, Ambac
argues that "Bear Stearns' securitization breach team knew full-
well that JP Morgan's 'liberal interpretations' were contrived" and
cites, as evidence, an email from EMC's Securitization Breach Team
to the Project Manager of EMC Residential Mortgage, in which an
individual from the Breach Team writes that he has "just not gotten
[his] mind around" the concept that "missing certain significant
docs is not a security breach issue." (Am. Compl. ¶ 209.) At
best, this email — the sole factual evidence adduced by Ambac to
support its contention that the Breach Team knew full-well that the
repurchase determinations were "contrived" — is indicative of
internal disagreement among competing divisions as to the proper

65

protocols to be used in analyzing certain complex financial instruments.

To further establish malicious intent and fraudulent manipulation of accounting reserves, Ambac next points to the fact that JP Morgan was rejecting Ambac's, and other insurers' and investors' repurchase demands, while, at the same time, "making increasing numbers of repurchase demands arising from EMC's alleged breaches of its representations and warranties pertaining to the loans in the Transactions." (Am. Compl. ¶ 211.) Although Ambac argues that this is compelling evidence of JP Morgan's evident "duplicity," Ambac fails to address the obvious alternative explanation that different breach rates might apply to different loan pools. See Iqbal, 129 S. Ct. at 1951 (stating that where there is an "'obvious alternative explanation'" that is more likely, the plaintiff's cause of action is not plausible and must be dismissed) (quoting Twombly, 550 U.S. at 567); see also Arar v. Ashcroft, 585 F.3d 559, 617 (2d Cir.2009) (en banc) (concluding that allegations "become implausible when the court's commonsense credits far more likely inferences from the available fact").

Anticipating this objection, Ambac contends that such "duplicity also is patent from the repurchase demands [JP Morgan] made against the suppliers of the loans in the Bear Stearns securitizations pertaining to the very same loans that were

submitted for repurchase from EMC." (Id. ¶ 212.) In particular, Ambac asserts that the "conflicting and incompatible positions that JP Morgan assert on EMC's behalf exemplifies its bad faith strategy to reject legitimate repurchase demands by financial guarantors in order to mask any exposure to those claims on its financial statements — while at the same time attempting to generate recoveries from the entities that originated and sold EMC the allegedly defective loans." (Id. ¶ 213.)

To support this assertion, however, Ambac basically points to the facts of a different case, Syncora Guarantee, Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106 (PAC) (S.D.N.Y.). (See id. ¶ 212.) In Syncora, JP Morgan issued a repurchase demand on EMC's behalf to Greenpoint — an entity that sold loans to EMC prior to securitization — asserting the same exact breaches identified by Syncora — another insurer of Bear Stearns securitizations — as constituting breaches of Greenpoint's representations and warranties under its agreement with EMC. Based on what is alleged in the First Amended Complaint, however, these are not the facts present in this case as they relate to JP Morgan.

Here, JP Morgan is not alleged to have issued repurchase demands on EMC's behalf to any other loan originator in connection with the securitized loans underlying the Transactions — let alone is JP Morgan purported to have done so by asserting, in an effort

67

to recover, the same exact breaches identified by Ambac as constituting violations of its agreement with EMC.[5]   Rather, JP Morgan simply refused to repurchase mortgage loans that it did not reasonably believe were covered under Section 7 of the Mortgage Loan Purchase Agreements or Section 2.03 of the Pooling and Servicing Agreements or Sale and Servicing Agreements.

Finally, assuming that Ambac could succeed in establishing that JP Morgan directed EMC to reject Ambac's repurchase claims specifically in order to limit JP Morgan's financial exposure to Bear Stearns, and to reduce its consolidated reserves for repurchases, Ambac has failed to explain why such actions could not merely be viewed as JP Morgan exercising its right to attempt to protect its "existing economic interest."   Indeed, to the extent that JP Morgan did interfere with EMC's contractual duty to repurchase breaching loans from Ambac, it is entirely plausible to view JP Morgan's actions, not as without any legitimate purpose, as Ambac alleges (see Am. Compl. ¶ 341), but, rather, as having a perfectly proper business justification — specifically, the rejection of illegitimate repurchase demands to reduce, or

---

[5] The First Amended Complaint, however, does allege three separate instances where Bear Stearns refused to repurchase what Ambac contends Bear Stearns "already knew were breaching loans, having itself previously submitted repurchase claims on those same loans against the suppliers of the loans."   (Am. Compl. ¶ 293.)

eliminate, exposure to such claims on its consolidated financial statements.

In sum, because JP Morgan has an economic interest in protecting the financial well-being of an affiliate and Ambac has not pled a set of facts here, which, even if accepted as true, can be viewed as sufficient to support the claim that JP Morgan acted with malice, or employed a fraudulent or illegal means, in refusing to repurchase loans underlying the Transaction, we are unable to draw the reasonable inference that JP Morgan is liable for the intentional misconduct alleged.  As such, Ambac fails to state a plausible claim for relief sufficient to survive a motion to dismiss, pursuant to Rule 12(b)(6).  Any claim for tortious interference with contract by Ambac would, therefore, be futile.

Accordingly, this Court recommends that Ambac's motion to leave to amend the Complaint to pursue this claim should be denied.

IV.   Segregated Account Is Not a Proper Plaintiff

On March 24, 2010, the Wisconsin Office of the Commissioner of Insurance approved the creation of the Segregated Account of Ambac. (See Ambac Aff. ¶ 62.)  Various insurance policies, including those at issue in this litigation, were placed in the Segregated Account. That same day, at the request of the Commissioner, the State of Wisconsin Circuit Court for Dane County placed the Segregated

Account into rehabilitation under Wisconsin Statutes ¶¶ 645.31 and 645.32.  (See id.)   As a consequence of these events, Ambac contends that it should now be allowed to add the Segregated Account as a proper plaintiff in this lawsuit.   In particular, Ambac argues that New York courts have long "recognized that enabling legislation [such as this Wisconsin statute] can confer standing to sue."  (Ambac Reply Mem. at 24.)

The cases to which Ambac cites in support of its claim deal more with constitutional standing, rooted in Article III's case-or-controversy requirement, and the elements that must be shown in order to obtain such standing.  (See, e.g., id.) (citing Fulton v. Goord, 591 F.3d 37, 41 (2d Cir. 2009) (noting that "injury-in-fact" means "an invasion of a legally protected interest" and holding that "[t]he legally protected interest may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing") (internal quotation marks and citations omitted)).  These cases shed no light on the question of whether a non-party can enforce rights under a contract absent terms that expressly allow for enforcement by non-parties.  As Ambac argues, New York law holds that a non-party to an agreement does not have separate standing to bring claims under that agreement, unless it is apparent that this was the intention of the parties to the contract.  (See EMC Mem. at 35-36) (citing Premium

70

Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) ("A
non-party to a contract governed by New York law lacks standing to
enforce the agreement in the absence of terms that clearly evidence
an intent to permit enforcement by the third-party in question.")).

This is not a situation, where, for example, a trustee, in a
bankruptcy proceeding, seeks to enforce the obligations owed to a
debtor-corporation, where the trustee stands in the shoes of the
corporation and has the authority to manage the corporation's
assets in a manner that achieves the highest rate of return on
those assets.  Ambac does not contend that the Segregated Account
stands in the shoes of Ambac.   Instead, it seeks to add the
Segregated Account as an additional plaintiff, without any
explanation or discussion of where this authority is derived from.

Ambac states that "Wisconsin Statute § 645.33(4) expressly
grants the Wisconsin Commissioner of Insurance the right to bring
lawsuits on behalf of segregated accounts in rehabilitation" (Ambac
Reply Mem. at 24), and quotes the following statutory provision:

> If the rehabilitator finds that there has been criminal or
> tortious conduct or breach of any contractual or fiduciary
> obligation detrimental to the insurer by any person, the
> rehabilitator may pursue all appropriate legal remedies on
> behalf of the insurer.

Wis. Stat. § 645.33(4).  Ambac cites to no cases, however, where
this particular provision has been invoked to support the joinder

71

of a segregated account in a separate ongoing litigation — in Wisconsin, or in any other state — and our independent review of applicable federal and state case law reveals none.

Moreover, in quoting the provision, Ambac omits the heading immediately preceding the excerpted text, which reads: "Pursuit of insurer's claims against insiders." Id. (emphasis added). A plain reading of the entire paragraph would, thus, suggest that the purpose of this provision is to allow the rehabilitator to pursue actions against insiders, and that the insiders against whom the rehabilitator may take action refers not to the insiders of outside counter-parties with whom the insurer contracts, such as Bear Stearns or EMC, but to the corporate insiders of the insurer itself.

But, even assuming for the moment that the rehabilitator is empowered under this statute to assert the claims at issue in this lawsuit on behalf of the Segregated Account, the rehabilitator has not sought such relief here. Moreover, Ambac has not argued that it has been authorized by the rehabilitator to join the Segregated Account as a real party in interest. In addition, as noted above, Ambac does not seek to substitute the Segregated Account in its place. Rather, it seeks to have both it, and the Segregated Account, pursue the same claims in the same case. (See Ambac. Mem. at 14) ("[B]oth Ambac and the Segregated Account are proper

plaintiffs" in this lawsuit.).  This is unnecessary.  Even under the terms of the statute, the financial guaranty insurance policies at issue here are still the property of Ambac.  See Wis. Stat. § 611.24(3)(f) ("Assets allocated to segregated accounts are the property of the corporation, which is not and shall not hold itself out to be a trustee of the assets.").  Indeed, in a separate Wisconsin state court proceeding, Ambac itself argued that "a segregated account is not a separate legal entity." (Ambac's Brief in Opposition to Motion to Modify Temporary Injunctive Order and to Intervene, dated June 11, 2010, at 8, attached as Ex. 34 to Declaration of Eric N. Whitney in Support of EMC's Opposition to Ambac's Motion for Leave to Amend the Complaint) (citing Wis. Stat. § 611.24 cmt) ("The basic idea behind segregated accounts is that different operations can be kept independent without formally creating a separate corporation.  A segregated account is in some respects like a 'corporation within a corporation.'").  Thus, based on the limited authority provided by Ambac in its motion, it does not appear that the addition of the Segregated Account in the present action is either necessary or authorized.

Accordingly, Ambac's motion for leave to amend the Complaint to add the Segregated Account as an additional plaintiff should be denied.

V. Motion to Seal

Ambac served its Motion to Amend, together with the proposed First Amended Complaint and other supporting papers, on July 28, 2010. The Court allowed Ambac to defer filing the Motion to Amend so that EMC could review the materials and move to seal any information deemed confidential pursuant to the Protective Order in this case. Presently before the Court is a motion by EMC to permanently seal the Haas Declaration and the exhibits to the declaration.[6] For the reasons stated below, the motion is denied.

A.  Background

The Haas Declaration has 37 exhibits. Exhibit 1 is the proposed First Amended Complaint. Of the 36 other exhibits of relevance here, 17 are internal EMC documents and two of those (Exhibits 13 and 14) contain private borrower information; one is a third-party document; and seven are short excerpts of transcripts from depositions that have been designated as confidential under a Protective Order, which contains specific provisions detailing how

_____

[6] At the same time, EMC also sought conditional sealing of Ambac's Proposed Amended Complaint, Ambac's Memorandum of Law, and the Haas Declaration until, and unless, the Court granted leave to file the Amended Complaint. The Court chose to keep those documents under seal pending its decision on the motion to amend. Having granted Ambac's motion in part, and, by necessity, having discussed those documents in the Court's decision, there now exists a public interest in viewing those documents and no reason to keep them under seal. Accordingly, the documents will be unsealed.

confidential information is to be handled in this action.   (See Protective Order, dated Dec. 19, 2008 ("Order"), at § 2(a)-(c).)

EMC contends that all but the first of these exhibits to the Haas Declaration should be permanently sealed, as the information contained in these exhibits is proprietary and confidential, and that there exists no public interest in viewing them.  In response, Ambac argues that its moving papers are judicial documents, which are afforded a strong presumption of public access.   Moreover, Ambac claims that EMC has failed to establish the confidentiality of the documentary evidence or to provide a countervailing reason as to why the judicial documents should be sealed.

B.   The Standard for Sealing Documents

There is a strong presumption of public access to "judicial documents."   In re Parmalat Sec. Lit., 258 F.R.D. 236, 243 (S.D.N.Y. 2009); In re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting SEC v. The Street.com, 273 F.3d 222, 231 (2d Cir. 2001)).   In addition to the common law presumption of public access, courts have identified a similar, more demanding, presumption arising from the First Amendment.  See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006); Gambale v. Deutshe Bank AG, 377 F.3d 133, 139 (2d Cir. 2004); see also Hartford Courant Co. v. Pellegrino, 380

F.3d 83, 93 (2d Cir. 2004) (The First Amendment's "qualified right of access to judicial documents" is "a necessary corollary of the capacity to attend the relevant proceedings.").

The Second Circuit has set forth a three-step process for evaluating applications to seal litigation documents, or otherwise keep them from public view.  First, the court must determine whether the documents at issue are judicial documents.  Lugosch, 435 F.3d at 119.  In order to be designated a judicial document, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process."  Id. (quoting United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995)).  A "presumption of access" attaches to any item that constitutes a "judicial document."  Id.

Second, in the case of judicial documents, the court must determine the weight of the presumption of access, which is "governed by the role of the material at issue in the exercise of the Article III judicial power and the resultant value of such information to those monitoring the federal courts."  Id. at 119 (quoting United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995)).  "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."  Id.

Finally, after the court has determined the weight of the presumption of access, "the court must balance competing considerations against it." Id. at 120 (citation omitted). Competing considerations include, but are not limited to, "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." Id.

C.   Application

EMC contends that the exhibits at issue here are not judicial documents and that, as a result, it need only make a baseline showing of good cause in order to justify keeping the documents under seal. (See EMC Memorandum of Law in Support of its Motion to Seal Ambac Assurance Corporation's Motion for Leave to Amend its Complaint ("EMC Sealing Mem."), at 5.) In particular, EMC argues that the exhibits are: (1) "deposition testimony that, unlike in a summary judgment setting, does not have to be closely scrutinized on the merits by the Court; and (2) documents exchanged in discovery, which are not judicial documents unless they too form the basis of evaluating a substantive motion." (Id. at 6.)   We disagree.

EMC is incorrect when it argues that the exhibits to the Haas Declaration are not judicial documents because they have not been submitted as a basis for judicial decision-making. Ambac's motion

77

to amend could not be decided solely on the pleadings.   Here,
where Ambac argues that it acted diligently in seeking to amend the
Complaint, after securing in discovery the documents and deposition
testimony that are the exhibits to the Haas declaration, and EMC
points to those same documents in arguing that the motion is
untimely and Ambac was not diligent, the exhibits are clearly
relevant to the Court's resolution of the motion and, hence, have
been considered by the Court.   In other words, these exhibits are
"relevant to the performance of the judicial function and useful to
the  judicial  process,"  and,  as  such,  they  are  properly
characterized as "judicial documents."   Lugosch, 435 F.3d at 110.

Having determined that the exhibits to the Haas Declaration
are judicial documents, this Court must afford such documents a
"presumption  of  public  access"  and  "balance  competing
considerations against it."   Lugosch, 435 F.3d at 120 (quotation
marks and citations omitted).   EMC asserts, as a countervailing
interest,  that  the  documents  contain  "trade  secrets  and
confidential business information," and, in the case of internal
investigations performed by, or at the insistence of EMC (and/or
Bear Stearns), that the public has no interest in reviewing such
documents because it is in the public's own interest to encourage
companies to engage in detailed internal audits and evaluation of
their operations — activities that would be discouraged were these

types of documents not sealed.  We disagree.

With one limited exception, containing borrowers' personal information (e.g., names, home addresses, and account numbers) — information that Ambac concedes should be redacted before its papers are filed — EMC has failed to identify any information in the exhibits to the Haas Declaration that is a trade secret and confidential.

EMC's assertions that "business documents are secret or that their disclosure might result in adverse publicity, does not automatically warrant a protective order." Parmalat, 258 F.R.D. at 244 ("The party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test."); accord Blum v. Schlegel, 150 F.R.D. 38, 41 (W.D.N.Y. 1993).  Moreover, it is not enough to assert that the documents, at one time, contained non-public information — EMC must show that there is information contained in these exhibits that "is non-public information that is material to [its business] today." Salomon Smith Barney, Inc. v. HBO & Co., No. 98 Civ. 8721 (LAK), 2001 WL 225040, at *2-3 (S.D.N.Y. Mar. 7, 2001) ("At the end of the day, Bear's argument reduces to the proposition that the documents should be afforded

confidential treatment because the documents at one time were not public. But the argument is circular and without merit. Moreover, a reading of the documents makes abundantly clear that Bear's real concern is the possibility of public embarrassment.").[7]

EMC has failed to make such a showing here. Having reviewed each of the exhibits to the Haas Declaration, the Court finds nothing which, if revealed today, would result in an injury to EMC sufficiently serious to warrant protection. In particular, EMC has failed to explain how disclosure of its policies and practices with regard to securitizing mortgages, from 2005 through 2007 "would reveal business information that is sufficiently valuable and

---

[7] EMC's papers, similarly, acknowledge that the real concern here is "the possibility of public embarrassment" on behalf of the individual defendants and the scrutiny they could be subjected to if named defendants in a securities fraud suit. (See, e.g., EMC Sealing Mem. at 7, claiming that were the First Amended Complaint to be publicly filed, "the [ten proposed individual defendants] are likely to be subject to public embarrassment, questioning from their employers, families, and regulators,... and media attention"). As an initial matter, Plaintiff seeks to add the individual defendants merely because they are "control persons" of the corporation, not because of any allegations of personal wrongdoing. Morever, top executives of public companies at the heart of the country's financial network, cannot realistically expect to be saved from the embarrassment of public scrutiny and litigation claims. Indeed, given Bear Stearns's implosion and its centrality to the financial meltdown, there is little about Bear Stearns at this point that has not been the subject of government scrutiny and media attention. In any event, the Court has determined that the individual defendants are not proper parties in this action and, thus, any concern with regulatory scrutiny as a result of being named a defendant in a securities fraud action is academic.

secret that it could cause competitors to harm them now." <u>Parmalat</u>, 258 F.R.D. at 257 (concluding that defendants had failed to explain "why the seven-year-old information concerning its marketing strategy has any continued value to the firm today " and refusing to seal internal audit reports where the disclosing party's "showings of the value of the documents and resulting potential harm to the firm from the documents' disclosure [were] conclusory and unilluminating"); <u>see also</u> <u>Salomon Smith Barney</u>, 2001 WL 225040, at *3 ("[I]mplicit in the notion of confidential business information is something beyond the mere fact that the particular datum has not previously been made available to the public.  If that were the criterion, the question whether the executive dining room serves bottled or tap water would be subject to confidential treatment whenever that fact was not previously a matter of public record.").  Indeed, such policies at EMC and other large financial institutions have become the subject of much public discussion, as they have been identified as contributing to the financial crisis the world finds itself in today and, more specifically, to Bear Stearns's demise as a viable, independent company.  In addition, since EMC's and Bear Stearns's practices are, in large part, the basis of Ambac's Complaint, there is no reasonable way this case could proceed if those policies and practices were to remain confidential.

81

In an attempt to reduce its burden of proof in maintaining the confidentiality of the documents, EMC argues that the Protective Order in this case "does not allow either the Parties or the public to apply for relief from the requirements of the Order, therefore the Parties' reliance on the confidentiality of pre-trial proceedings is justifiable." (EMC Sealing Mem. at 10.) This "reliance" argument is not persuasive.

Although the Protective Order allows EMC and Ambac to mark documents as "Confidential," if challenged, the burden remains on the party designating a given document as "Confidential" to prove good cause for that designation. (See Order ¶ 3(a).) ("Notwithstanding any provisions of this Order, in the event of a disagreement as to whether materials properly have been and designated CONFIDENTIAL, the party asserting that the materials are entitled to such confidentiality designation shall have the burden of proving that the information at issue is entitled to the protection of this Order.")

In cases involving similar provisions, courts have generally concluded that the parties cannot reasonably rely on the materials at issue remaining confidential pursuant to the protective order. See, e.g., Lugosch, 435 F.3d at 126 (finding it "difficult to see" how a party could reasonably rely on a confidentiality order, which stated that it "shall not prevent anyone from applying to the Court

for relief therefrom"); <u>Gambale</u>, 377 F.3d at 142 n. 7 ("[P]rotective orders that are on their face temporary or limited may not justify reliance by the parties. Indeed, in such circumstances reliance may be unreasonable."); <u>Allen v. City of New York</u>, 420 F. Supp. 2d 295, 300-01 (S.D.N.Y. 2006) (finding reliance unreasonable where protective order permitted plaintiffs to challenge defendants' confidentiality designations, and where such challenge triggered obligation on the part of defendants to show good cause); <u>Diversified Grp., Inc. v. Daugerdas</u>, 217 F.R.D. 152, 160 (S.D.N.Y. 2003) (finding that "the parties' alleged reliance on the [Protective] Order [was] insufficient to outweigh the strong presumption in favor of public access," where the Order allowed "any party or interested member of the public" to challenge, "at any time," the sealing of documents); <u>In Re Application of Akron Beacon Journal</u>, No. 94 Civ. 1402 (CSH), 1995 WL 234710, at *15 (S.D.N.Y. Apr. 20, 1995) (finding production of documents not made in reliance on protective order where order preserved right of parties to challenge confidentiality designations).

Furthermore, the Protective Order here does not limit the Court, or the public's right, to view judicial documents, irrespective of whether a party has stamped them "Confidential." Indeed, the District Court (Hon. Richard M. Berman) found as much when it struck a provision in the order that would have allowed the

unrestricted filing under seal of materials marked "Confidential" (See Order ¶ 5(c)), and instead wrote: "[t]he Court retains discretion whether to afford confidential treatment to any Confidential Document or information contained in any Confidential Document submitted to the Court in connection with any motion application, or procedure that may result in an Order and/or decision by the Court." (Id. at 8.)

Accordingly, for all the reasons set forth above, Ambac's motion to seal the exhibits to the Haas Declaration is denied. The documents filed in support of, and in opposition to, Ambac's motion to amend shall be unsealed and filed.

CONCLUSION

For the reasons set forth above, the Court recommends that Ambac's motion to amend the Complaint be granted with respect to its fraudulent inducement claim, and denied with respect to its claims under Sections 10 and 20 of the Securities Exchange Act. The Court further recommends that the motion to add ten individual defendants, and the Segregated Account as a plaintiff, be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be

84

filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

_____

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: December 16, 2010
       New York, New York