UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
AMBAC ASSURANCE CORPORATION,            :

              Plaintiff,            :

                             :   08 Civ. 9464 (RMB)(THK)

                             :

        -against-            :   **REPORT AND RECOMMENDATION**

EMC MORTGAGE CORPORATION,                :

             Defendant.            :
-----------------------------------X

TO: HON. RICHARD M. BERMAN, United States District Judge.
FROM: THEODORE H. KATZ, United States Magistrate Judge.

    This action is one of many that is based on mortgage-backed securities that were fundamentally flawed.  The mortgage loans underlying the securities at issue here were dependent upon rising housing prices and on the ability to refinance before rates reset. In 2006 and 2007, when housing prices were no longer rising, but declining, and individual borrowers' ability to refinance was collapsing as well, record numbers of mortgages subsequently went into default almost immediately.  The present case is one of many consequences of the global financial crisis that ensued.

    Currently before the Court is a motion by Plaintiff Ambac Assurance Corporation ("Ambac"), for leave to amend the Complaint to add ten additional defendants, one new plaintiff, and four additional causes of action.  For the reasons stated below, the Court recommends that the motion be granted in part and denied in

part.[1]

**BACKGROUND**

On November 5, 2008, Plaintiff filed its Complaint, which contained five causes of action, all based on breach of contract, against its sole contractual counter-party, Defendant EMC Mortgage Corporation ("EMC").

Plaintiff's claims arise out of four separate mortgage-backed securities transactions entered into with EMC that closed between 2005 and 2007: SACO I Trust Series 2005-10, 2006-2, and 2006-8 Transactions ("SACO Transactions"), and the Bear Stearns Second Lien Trust 2007-1 Transaction (collectively "the Transactions").(See Complaint ("Compl.") ¶¶ 31-57.)   The Transactions began with the purchase of over 49,500 residential mortgages loans ("Mortgage Loans"), which, in turn, served as collateral for the issuance of approximately $2.7 billion in publicly-offered, mortgage-backed securities ("Notes").   In each Transaction, EMC aggregated the Mortgage Loans and sold the resulting loan pools to a trust entity ("Trust"), which, in turn, issued debt securities of varying seniority, whose payments to investors were dependent upon, or "backed by," the cash flows

---

[1] Although a motion to amend may, under certain circumstances, be decided by a magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(A), because this opinion is case-dispositive with respect to certain claims, it is being issued as a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

received from the mortgage payments on the pooled loans.

Acting as lead underwriter and designating its employees as the deal managers to broker the EMC-sponsored securities offerings, Bear, Stearns & Co. Inc. ("Bear Stearns"): (1) worked with EMC to structure the Transactions; (2) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the Transactions; (3) purchased the mortgaged-backed securities issued in the Transactions on a firm commitment basis, pursuant to written agreements with the applicable depositors; and (4) offered and sold the Notes to investors. (See Am. Compl. ¶ 60.) Bear Stearns trading division also made the decisions on the volume of securitizations to effectuate, and, likewise, the volume of loans to acquire. (See id.)   In addition, Bear Stearns executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed by EMC in relation to the securitized loans. (See id.)

In an effort to make its offerings more enticing to investors, EMC contracted with Ambac to provide insurance policies protecting the Noteholders.   In particular, Ambac issued four financial guaranty insurance policies covering payments due on certain of the mortgage-backed securities issued in the Transactions.   Thus, to the extent that the Trusts were unable to make payments to the Noteholders, because of interruptions to the anticipated cash flows

3

from the mortgage loans, Ambac was contractually obligated to make such payments to the Trusts who, in turn, would make the required payments to the Noteholders.

Ambac alleges that EMC induced it to issue these insurance policies, by EMC: (1) making numerous express representations and warranties regarding the key attributes of the mortgage loans that backed the securities and the practices of the entities that made those loans; (2) agreeing to cure, repurchase, or provide adequate substitutes for mortgage loans that did not comply with those representations and warranties; (3) agreeing to reimburse and indemnify Ambac for any, and all, losses caused by breaches of those representations and warranties; and (4) agreeing to reimburse Ambac for expenses incurred in connection with enforcing and preserving its rights under the agreements. (See Am. Compl. ¶ 3.)

In late 2007, after observing initial signs of performance deterioration in the SACO Transactions, Ambac made requests of EMC to comply with its contractual obligations to cure, repurchase, or provide substitutes for the non-compliant loans. (See id. ¶ 79.) EMC refused to do so. (See id. ¶ 80.) By the spring of 2008, Bear Stearns had collapsed, contributing to a global financial crisis. Bear Stearns and its affiliates were acquired by JP Morgan Chase & Co. for $10 per share, which included a $29 billion non-recourse loan from the American taxpayers. After taking control of Bear

4

Stearns' operation in March 2008, JP Morgan Securities Inc. ("JP Morgan") implemented a moratorium on the repurchase of breaching loans from securities.   In particular, with the moratorium in place, JP Morgan began: (1) cancelling the repurchase of a large volumes of loans that Bear Stearns had, allegedly, previously determined should be repurchased; and (2) denying subsequent demands by investors and insurers to repurchase breaching loans from the Bear Stearns' securitizations.   (See id. ¶ 206.)   Ambac was one such insurer.

In its original Complaint, Ambac sued to recover for EMC's purported breaches of its contractual commitments to cure, repurchase, or substitute the specific loans identified as non-compliant, and to recover its expenses in enforcing its contractual remedies afforded by the agreements governing the Transactions. (See id. ¶ 94.)   In addition, having conducted an expanded study of a random sample of 1,486 loans across all four Transactions, Ambac further alleged that over 89% of the loans reviewed breached the contractual representations and warranties made to Ambac by EMC (see id. ¶ 82), including, most significantly, misrepresentations about: (1) the borrower's income, employment, assets, and intentions to occupy the purchased property; and (2) the loan originators' failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines (see

5

id. ¶ 77).

Plaintiff now claims that documents revealed during pretrial discovery show that EMC not only breached its contractual agreements with Ambac, but that EMC acted in conjunction with Bear Stearns (and, by extension, JP Morgan) in a fraudulent multi-billion dollar scheme. According to Ambac, documents recovered from Bear Stearns's files, and admissions obtained through depositions of its executives, show that Bear Stearns knew its representations that the mortgage loans would be actively vetted and monitored to ensure quality were false, and that it deliberately altered its due diligence and quality-control policies for the purpose of increasing the volume of mortgage loans available to sell to investors. (See Memorandum of Law in Support of Ambac's Motion for Leave to Amend, dated July 28, 2010 ("Ambac Mem."), at 6-10.) Ambac further alleges that it can now explain EMC's refusal to repurchase defective loans: deliberate interference by JP Morgan — JP Morgan intentionally interfered with Ambac's attempts to enforce its contractual remedy regarding EMC's repurchases of breaching loans. (See id. at 11-13.)

Based on this new discovery, Ambac seeks leave to amend its Complaint to add as defendants, Bear Stearns, as well as ten high-ranking individual executives of Bear Stearns ("Individual Defendants"). (See Proposed First Amended Complaint ("Am.

Compl."), attached as Ex. 1 to Declaration of Erik Haas in Support of Plaintiff's Motion for Leave to Amend the Complaint ("Haas Aff."), ¶¶ 38-49.)  In addition, Ambac seeks to add the following additional causes of action: (1) fraudulent inducement; (2) securities fraud in violation of the Securities Exchange Act of 1934 ("Securities Exchange Act"); (3) violations of Section 20 of the Securities Exchange Act, against the individual defendants as control persons; and (4) (against JP Morgan only) tortious interference with contract. (See id. ¶¶ 309-353.)  Finally, Ambac seeks to add as a co-plaintiff the Segregated Account of Ambac ("Segregated Account"). (See id. ¶¶ 33-36.)

Defendants oppose the motion, arguing that Ambac runs afoul of both Federal Rules of Civil Procedure 16(b) and 15(a).  In particular, EMC argues that: (1) Ambac did not act with diligence in seeking to amend the Complaint (see Memorandum of Law in Opposition to Ambac's Motion for Leave to Amend, dated Aug. 23, 2010 ("EMC Mem."), at 15-17); (2) the proposed untimely amendment would prejudice EMC (see id. at 17-19); and (3) the proposed new claims are futile (see id. at 19-35).  Ambac also argues that the Segregated Account is not a proper plaintiff in this case. (See id. at 35-36.)

Oral argument on the motion was held on October 4, 2010.

**DISCUSSION**

I. Legal Standard on Amendment of Pleadings

Normally, leave to amend pleadings is evaluated under Federal
Rule of Civil Procedure Rule 15(a) ("Rule 15(a)"), which provides
that leave to amend "shall be freely given when justice so
requires." Fed. R. Civ. P. 15(a). Leave to amend should be
granted unless there is "any apparent or declared reason — such as
undue delay, bad faith or dilatory motive on the part of the
movant, repeated failure to cure deficiencies by amendments
previously allowed, undue prejudice to the opposing party by virtue
of allowance of the amendment, [or] futility of the amendment. . .
." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962);
accord Holmes v. Grubman, 568 F.3d 329, 334-35 (2d Cir. 2009);
Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 333 (2d
Cir. 2000); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d
Cir. 1993). The "grant or denial of an opportunity to amend is
within the discretion of the District Court." Foman, 371 U.S. at
182, 83 S. Ct. at 230; accord Zenith Radio Corp. v. Hazeltine
Research, Inc., 401 U.S. 321, 330, 91 S. Ct. 795, 802 (1971).

However, once a scheduling order has been entered in an
action, which sets a deadline for amending a complaint, both
Federal Rule of Civil Procedure 16(b) ("Rules 16(b)") and Rule
15(a) govern motions for leave to amend. See Holmes, 568 F.3d at

8

334-35; <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 236, 339 (2d Cir. 2000). Rule 16(b) provides that a district court shall enter a scheduling order in an action that limits the time to, <u>inter alia</u>, join other parties or amend the pleadings. Rule 16(b)(1)'s deadline for amendments offers "a measure of certainty to pretrial proceedings, ensuring that 'at some point, both the parties and the pleadings will be fixed.'" <u>Parker</u>, 204 F.3d at 339-40 (quoting Rule 16(b) Advisory Committee Notes).

Under Rule 16(b), a scheduling order "shall not be modified except upon a showing of good cause...." Thus, as the Second Circuit has noted, "'if we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.'" <u>Id.</u> at 340 (quoting <u>Sosa v. Airprint Sys., Inc.</u>, 133 F.3d 1417, 1419 (11th Cir. 1998)) (<u>per curiam</u>); <u>accord Apollo Theater Found., Inc. v. W. Inter. Syndication</u>, No. 02 Civ. 10037 (DLC), 2005 WL 1041141, at *19 (S.D.N.Y. May 5, 2005) (citation omitted).

It follows that a court retains the discretion to deny a party's motion to amend its pleadings if, absent a showing of good cause, the motion is made after the time provided for in a scheduling order. <u>See</u> <u>NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.</u>, 262 F. Supp. 2d 134, 150 (S.D.N.Y. 2003). Good cause in this

9

context has been interpreted to mean that scheduling deadlines could not be met despite a moving party's diligence. See Holmes, 568 F.3d at 335; Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003) (determining that a finding of good cause under Rule 16(b) turns on the diligence of the party seeking to amend); Parker, 204 F.3d at 340 (same). Moreover, while the absence of prejudice to a nonmoving party is relevant to whether leave to amend should be granted under Rule 15(a), it does not fulfill the good cause requirement of Rule 16(b). See Carnrite v. Granada Hosp. Grp., Inc., 175 F.R.D. 439, 446 (W.D.N.Y.1997).

II. Application to Ambac's Motion

This case was commenced on November 5, 2008. The initial Case Management Plan was entered on December 10, 2008, and it provided for joinder of additional parties and amended pleadings by January 30, 2009. All pretrial discovery was to be completed by June 1, 2009. As Ambac's motion to amend was filed on August 4, 2010, after the amendment deadline had passed, the proposed amendment is governed by the requirements of both Rules 15(a) and 16(b).

Because of the complexity of this case, an enormous amount of pretrial discovery has been undertaken in relation to the four securitization transactions in issue, involving over 49,000 residential mortgage loans. Millions of electronic documents have been exchanged, and fifteen party witnesses, in addition to over

10

thirty non-party witnesses, have been deposed. Thus, there has been a need to amend the discovery deadlines in the Case Management Plan a number of times. The last deadline for completion of fact discovery was August 6, 2010, and the expert discovery deadline was December 3, 2010. Once Ambac advised EMC and the Court that it intended to file a motion to amend the Complaint, the parties agreed, and the Court approved, a suspension of depositions until the motion was decided. It is, thus, apparent that, whether or not Ambac's motion to amend is granted, there will be a need to further amend the Case Management Plan.

Ambac argues that it was diligent in seeking to amend the Complaint. It contends, with some justification, that the deadline in the Case Management Plan for amending the Complaint was not realistic, as virtually no pretrial discovery had even been undertaken by January 30, 2009, a deadline set only one month earlier. Indeed, EMC's motion to dismiss was not denied until March 16, 2009, at which point pretrial discovery began in earnest.

Ambac argues that it was only by means of pretrial discovery that it became "privy to the inner workings of Bear Stearns's securitization machine and the private communications among those that kept it running." (Ambac Mem. at 5.) Therefore, while the original Complaint was based solely on contractual claims, discovery provided a sound basis for asserting claims of fraudulent

11

inducement, securities fraud, and tortious interference with contract. According to Ambac, what it learned in discovery provided support for the claims in the proposed amended complaint that: (1) while it was touting its due diligence policies in order to induce Ambac to insure the Transactions, Bear Stearns was actually weakening and dispensing with due diligence procedures to screen out defective loans; (2) in order to transfer defective loans from its inventory to securitization, Bear Stearns dropped its Early Payment Default Policy, that delayed securitization for a period of time, during which fraudulent or defective loans would reveal themselves; (3) Bear Stearns ignored the advice of its due-diligence firms not to securitize particular loans, and deleted communications with those firms to eliminate an audit trail; (4) Bear Stearns touted its quality-control and loan repurchase processes aimed at discovering and removing breaching loans from the securitized pools, while its actual processes were devoted almost exclusively to identifying loans that could lead to its own losses, while concealing the breaching loans from the securitization trusts and Ambac; (5) Bear Stearns falsified critical information on the loans being securitized, knowing that many of the loans were seriously defective. Finally, Ambac contends that it learned in discovery that once JP Morgan acquired Bear Stearns, it deliberately interfered with Bear Stearns's

12

obligation to repurchase defective loans.

Ambac cites to deposition testimony, emails, and other documents that provide the purported basis for it proposed claims. And, "while it anticipated [when it filed the Complaint] that EMC and Bear Stearns had engaged in fraud in connection with the Transactions, . . . [i]n order to plead common law and securities fraud claims with the requisite 'particularized knowledge' — both as to the fraudulent conduct and scienter — far more is required that simply being able to (as EMC's counsel put it) 'identify parties and claims.'" (Ambac Mem. at 16.)

In addition to challenging the substantive plausibility of Plaintiff's proposed claims, and arguing the prejudice it will experience if the Complaint is amended at this point in the litigation, EMC argues that Ambac cannot satisfy the "good cause" requirement of Rule 16(b) because it has not been diligent in seeking to amend the Complaint.  EMC contends that early in the litigation Ambac's counsel indicated that "there was more than a whiff of fraud" in the Transactions, yet Ambac adhered to only its contract claims until well into the discovery period and long after the deadline for amending the Complaint.  Indeed, when EMC sought certain discovery from Ambac, because it construed allegations in the Complaint to suggest fraud, Ambac argued that the discovery was improper because it was merely asserting contract claims.

13

Moreover, although EMC produced virtually all of the documents Ambac now relies upon for its proposed amendment in the nine months subsequent to the deadline for amending the Complaint, according to EMC, Ambac waited another nine months to pursue the amendment. And, even though the Case Management Plan was amended five times, and the parties submitted monthly progress reports to the Court, in none of those reports did Ambac even suggest that it was contemplating amending the Complaint. EMC characterizes Ambac's conduct as "strategic and "tactical pleading," (EMC Mem. at 7), pursued in bad faith.

Although EMC has made a forceful argument regarding Ambac's lack of diligence, and it would have been far preferable for Ambac to amend the Complaint earlier in the litigation, for the reasons that follow the Court concludes that Ambac has satisfied the requirements of Rule 16(b).

First, it was unrealistic to expect Ambac to meet the amendment deadline at a time when little or no discovery had taken place. The most common reason that parties seek and are granted leave to amend their complaints is to conform the complaint to evidence obtained in discovery. Cf. Friedl v. City of New York, 210 F.3d 79, 88 (2d Cir. 2000) ("[T]here has been no showing of . . . undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts . . ."); Cnty. of

14

Washington v. Cntys. of Warren & Washington Indus. Dev. Agency, 2 Fed. Appx. 71, 2001 WL 96566, at *3 (2d Cir. Jan. 3, 2001) ("No newly discovered facts motivated these proposed amendments; in fact, plaintiff had been aware of the factual underpinnings of these claims since the outset of this litigation . . . ."); SEC v. Aragon Capital Mgmt., LLC, No. 07 Civ. 919 (FM), 2010 WL 4456302, at *5 (S.D.N.Y. Oct. 28, 2010) (permitting amendment after deadline where it was reasonable to delay asserting certain amendments until after depositions had been taken, and denying amendment where it was "not premised on any new facts that [plaintiff] was able to unearth or confirm during the course of discovery"); Broadhurst Invs., LP v. Bank of New York Mellon, No. 09 Civ. 1154 (PKC), 2010 WL 3154840, at *2 (S.D.N.Y. Aug. 2, 2010) (denying leave to amend after deadline had passed and case was on eve of completion of discovery, noting "[t]his is not a circumstance where unforeseen events or new information gave rise to the need to further amend"); Nycomed U.S. Inc. v. Glenmark Generics Ltd., No. 08-CV-5023 (CBA)(RLM), 2010 WL 1257803, at *11, (E.D.N.Y. Mar. 26, 2010) (finding good cause for amendment after deadline for amendments and discovery had passed, where plaintiff "did not acquire the information underlying the proposed amendment until after the expiration of the deadline"; fact that plaintiff did not move until three and one-half months after deadline was "entirely

15

understandable" and "does not qualify as 'extremely belated'"); Sokol Holdings, Inc. v. BMB Munai, Inc., No. 05 Civ. 3749 (KMW)(DCF), 2009 WL 3467756, at *3, 6 (S.D.N.Y. Oct. 28, 2009) (denying untimely motion to file third amended complaint, where proposed amendments did not involve any newly discovered evidence, plaintiffs could have asserted their proposed claims at the outset of the case, the case was four and one-half years old, and substantial motion practice and discovery had been completed).

Second, the Court can discern no tactical advantage to Ambac's timing of its motion to amend. After all, Ambac is the Plaintiff in this action, and it has a strong interest in the Court's reaching the merits of its claims as promptly as possible.

Third, given the nature of two of the proposed claims, for fraudulent inducement and securities fraud, one of which is governed by the Private Securities Litigation Reform Act ("PSLRA"), there is a heightened pleading standard. See Fed. R. Civ. P. 9(b) ("In alleging fraud . . . a party must state with particularity the circumstances constituting fraud."); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 2504 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's

16

intention "to deceive, manipulate, or defraud.") (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12, 96 S. Ct. 1375 (1976)); ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) ("Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud. Under the PSLRA, the complaint must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); Quaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990) ("To pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation.").  Indeed, under the PSLRA, the pleading standard is even higher than the stringent "plausibility" standard that now governs complaints. See W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp., 344 Fed. Appx. 717, 721 (2d Cir. 2009) ("Although plaintiffs' allegations that [defendant] was reckless are arguably "plausible" under the general pleading standards established by the Supreme Court in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the PSLRA requires

17

in this litigation context more than mere plausibility.  Instead, the allegations must create an inference "at least as compelling as any opposing inference one could draw from the facts alleged.") (quoting Tellabs, 551 U.S. at 324, 127 S. Ct. at 2510).  Thus, although EMC correctly points out that Ambac suggested the presence of fraud in its dealings with EMC early in the litigation, it was prudent of Ambac to delay asserting such a claim until it had the evidence to properly plead it in the Complaint.

EMC argues that, even accepting Ambac's argument that it did not have the documents it has used to support its fraud claims by the amendment deadline, "Ambac waited almost a year in some cases, and in no case less than six months, after it obtained the relevant discovery in the form of documents that Ambac claims 'speak for themselves' before making its motion." (EMC Mem. at 12.)  More specifically, EMC contends that of the twenty-one documents used to support the fraud claims in the proposed amended complaint, all but one of the seventeen produced by EMC were in Ambac's possession by December 14, 2009.  And, four key EMC witnesses were deposed by February 2010.  Yet, the motion was not filed until August 2010.

However, when placed in perspective, Ambac's delay was not excessive.  This not a case where all of the pretrial discovery has been completed and the case is otherwise ready for dispositive motions or trial.  Cf. Grochowski v. Phoenix Const., 318 F.3d 80,

18

96 (2d Cir. 2003) ("The plaintiffs delayed more than one year before seeking to amend their complaint. Furthermore, when the motion was filed, discovery had been completed and a summary judgment motion was pending. On this record we cannot say that the district court abused its discretion in denying the plaintiffs' motion to amend."). Numerous depositions remain to be taken and the parties are still haggling over documentary discovery. In addition, even by EMC's reckoning, most of the documents Ambac relies upon in support of its proposed claims were produced to Ambac in the nine-month period following the expiration of the amendment deadline. Moreover, millions of documents were produced to Ambac in that period, and Ambac reasonably asserts that reviewing and digesting them has taken a great deal of time.

Finally, in the months following the document production, into the spring of 2010, the documents were used to depose key witnesses in order to secure an explanation, or achieve an understanding, of EMC's and Bear Stearns' conduct, and the depositions provide further support for Ambac's proposed claims. In June 2010, only a few months after some of the depositions had been taken, Ambac advised EMC and the Court that it intended to amend the Complaint, and the briefing of the motion went on through the summer.

In sum, while it would have been preferable for Ambac to amend the Complaint earlier in the litigation, in light of the enormous

19

amount of discovery that continues to be produced in this case, the heightened pleading standard for fraud claims, the evidence secured in discovery that forms the basis for the proposed amendments, and the absence of any tactical advantage obtained as a result of the delay, the Court concludes that there was good cause for Ambac's failure to seek to amend the Complaint within the deadline set in the Case Management Plan.

There remains the question, however, of whether Ambac's proposed amendments satisfy the requirements of Rule 15(a).

II. Undue Delay and Prejudice

Having rejected EMC's argument that Ambac did not act diligently, it follows that there can be no undue delay. In any event, delay alone, in the absence of bad faith or prejudice, does not provide a basis for denying a motion to amend. See AEP Energy Servs. Gas Holding Co., __ F.3d __, 2010 WL 4261227, at *22 (2d Cir. Oct. 29, 2010) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.") (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)); State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.).

20

Prejudice, however, is one of the most important factors to consider in addressing a motion to amend. See AEP, 2010 WL 4261227, at *22. An amendment may be prejudicial when "it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." Id.; see also Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) (" In gauging prejudice, we consider, among other factors, whether an amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute.") (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)); Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) (same). Nevertheless, since most amendments entail additional discovery and some delay, those factors alone do not give rise to prejudice. See Bridgeport Music, Inc. v. Universal Music Grp., Inc., 248 F.R.D. 408, 414 (S.D.N.Y. 2008) ("Even assuming that additional discovery would impose costs on . . . the current defendants, allegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.") (internal quotation marks omitted). "The type of prejudice that warrants denial of leave to amend is usually such that it puts [the opposing party] at an unfair disadvantage, such as the addition of a new

21

claim on the eve of trial." <u>Nycomed</u>, 2010 WL 1257803, at *12 (internal quotation marks omitted). <u>See also</u> <u>Monahan</u>, 214 F.3d at 284 ("[W]e will be most hesitant to allow amendment where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim."); <u>Ansam Assocs., Inc. v. Cola Petrol., Ltd.</u>, 760 F.2d 442, 446 (2d Cir. 1985) ("Moreover, permitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment.").

As discussed, regrettably, a substantial amount of pretrial discovery remains to be completed, and, as yet, there has been no dispositive motion.  The Court, therefore, does not perceive the timing of the motion to amend as posing an unfair disadvantage to EMC or the proposed new parties.

EMC argues, however, that it will be prejudiced because the amendments will require it to go back and search an enormous number of documents and data bases, that it has already searched, in order to determine whether there are documents that were not previously produced that are relevant to the new fraud claims.  Moreover, with the addition of ten new defendants, each of them is entitled to review the discovery that has been produced and seek additional discovery from parties and non-parties. In theory, each of them would have the right, as well, to reopen the many depositions that

22

have already been taken.   This additional discovery will add enormous cost to an already staggeringly expensive litigation.

Ambac responds that "[a]ny incremental discovery regarding fraud that EMC truly needs — which it has yet to identify — cannot be substantial and would have been required regardless of when Ambac sought to add its new claims." (Ambac Reply Mem. at 2.)   In response to EMC's argument that it withheld fraud-related discovery that EMC sought earlier in the case, Ambac argues that, while it initially objected, it ended up producing all of the requested "reliance" discovery for the transactions in issue, and merely withheld such discovery for unrelated transactions.   Ambac argues that fraud issues have already been the subject of significant discovery because even the contract claims in the original Complaint include allegations that EMC breached "no fraud" representations and warranties in the written agreements. Moreover, the Complaint had allegations about the Bear Stearns "securitization machine," including widespread breaches and fraud in the loans underlying the EMC transactions that Ambac insured.

In response, EMC's Answer raised issues about Ambac's knowledge and reliance, and, thus, "the discovery process was structured to capture information relevant to fraud and EMC's potential defenses thereto. . . ." (Ambac Reply Mem. at 10.)   Ambac has committed to refraining from issuing to EMC any but a small

23

number of new document requests, primarily from the files of the newly-named defendants whose files were not produced in earlier discovery.  Ambac also states that it will not seek to re-depose any EMC witnesses as a result of the amendments.

The Court suspects that the truth lies somewhere between the parties' positions on additional burden and expense.  On the document side, the Court does not anticipate unnecessary duplication of discovery efforts to date, or the need for huge amounts of additional discovery.  It is highly unlikely that EMC will need to re-review millions of documents, when virtually all documents relevant to the transactions have been reviewed and produced.  It is difficult to believe that there are documents that might relate to fraudulent inducement with respect to the transactions in issue, that were withheld because they were not relevant to the contract claims, which involved allegations of breaches of warranties and representations.  See United States ex rel. Mar. Admin. v. Cont'l Illinois Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.").

The addition of ten new defendants, however, would present a greater challenge.  The new defendants would be subject to discovery requests.  It is, also, likely that there would be a need

24

to reopen certain depositions, at least, to supplement testimony
that was secured.  Most importantly, a real consequence of adding
new defendants would be delay.  The new defendants would need to
respond to the Complaint, perhaps with dispositive motions.  They
would also require time to review the vast quantities of documents
and deposition testimony produced in discovery.  This is not a
prospect the Court relishes.  However, in light of the Court's
determination, <u>infra</u>, that the motion to amend to add securities
claims should be denied as futile, there can be no control person
liability.  Thus, the potential delay and prejudice resulting from
adding new individual defendants disappears.

In the end, weighing all of the facts described above, the
Court concludes that EMC has not demonstrated sufficient prejudice
to preclude the amendment of the Complaint.

Finally, there is no evidence of bad faith on the part of
Ambac in filing the motion to amend.  The Court, therefore, turns
to the issue of futility.

III. <u>Futility</u>

EMC asserts that Ambac's motion should be denied because the
proposed amendments are futile.  "A proposed amendment to a
pleading [is] futile if it could not withstand a motion to dismiss
pursuant to Rule 12(b)(6)."  <u>Oneida Indian Nation v. City of
Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003), <u>rev'd on other grounds</u>,

25

544 U.S. 197, 125 S. Ct. 1478 (2005); see also Lucente v. IBM
Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. Town
of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir.
2002)); Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir.
1990).

A.   Rule 12(b)(6) Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court
"must accept as true all of the factual allegations set out in
[the] plaintiff's complaint, draw inferences from those allegations
in the light most favorable to [the] plaintiff, and construe the
complaint liberally." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir.
2007) (quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001));
see also Weixel v. Bd. of Educ., 287 F.3d 138, 145 (2d Cir. 2002).

The Supreme Court's decision in Bell Atl. Corp. v. Twombly,
550 U.S. 544, 127 S. Ct. 1955 (2007), adds a "plausibility
standard," in evaluating the sufficiency of a complaint, which is
guided by "[t]wo working principles." Ashcroft v. Iqbal, ___ U.S.
___, 129 S. Ct. 1937, 1949 (2009); see also Harris v. Mills, 572
F.3d 66, 72 (2d Cir. 2009); Bilello v. J.P. Morgan Chase Ret. Plan,
No. 07 Civ. 7379 (DLC), 2009 WL 2461005, at *5-6 (S.D.N.Y. Aug. 12,
2009). "First, the tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to legal
conclusions. Threadbare recitals of the elements of a cause of

26

action, supported by mere conclusory statements, do not suffice."
Iqbal, 129 S. Ct. at 1949; see also Harris, 372 F.3d at 72.
"Second, only a complaint that states a plausible claim for relief
survives a motion to dismiss," and "[d]etermining whether a
complaint states a plausible claim for relief will . . . be a
context-specific task that requires the reviewing court to draw on
its judicial experience and common sense." Iqbal, 129 S. Ct. at
1950.

For plaintiffs to survive a motion to dismiss, their complaint
must "contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'" Id. at
1949 (quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1973-74).
"Facial plausibility" exists when a "plaintiff pleads factual
content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged." Id. (citing
Twombly, 550 U.S. at 556, 127 S. Ct. at 1965); see also Green v.
Beer, No. 06 Civ. 4156 (KMW) (JCF), 2009 WL 3401256, at *3
(S.D.N.Y. Oct. 22, 2009).[2]

B.   Ambac's Proposed Claims

EMC asserts that Ambac's following proposed claims are futile:

_____

[2] As noted, there is even a higher standard that must be
satisfied to plead common law fraud and securities fraud claims.
However, EMC's opposition to the amendments is not premised on
the absence of specificity as regards the fraud claims.

(1) its securities fraud claim under Section 10(b) of the
Securities Exchange Act, as well as its corresponding Section 20
"control persons" claim; (2) its fraudulent inducement claim; and
(3) its tortious interference with contract claim (asserted against
only JP Morgan).  The Court will address each of these claims in
turn.

### 1.  Ambac's Section 10(b) Claim

"To state a cause of action under Section 10(b) or Rule 10b-5
plaintiffs must prove that [the defendants] (1) made misstatements
or omissions of material fact; (2) with scienter; (3) in connection
with the purchase or sale of securities; (4) upon which plaintiffs
relied; and (5) that plaintiffs' reliance was the proximate cause
of their injury."  In re IBM Corporate Sec. Litig., 163 F.3d 102,
106 (2d Cir. 1998) (citing In re Time Warner Inc. Sec. Litig., 9
F.3d 259, 264 (2d Cir. 1993) and Burke v. Jacoby, 981 F.2d 1372,
1378 (2d Cir. 1992)); see also Kalnit v. Eichler, 264 F.3d 131, 138
(2d Cir. 2001).  It is well-settled law that the availability of a
private civil remedy for violations of Section 10(b) of the
Securities Exchange Act, or Rule 10b-5 thereunder, is limited to
purchasers and sellers of securities.  See Blue Chip Stamps v.
Manor Drug Stores, 421 U.S. 723, 749, 95 S. Ct. 1917, 1932 (1975);
accord Klein & Co. Futures, Inc. v. Bd. of Trade of City of New
York, 464 F.3d 255, 261 (2d Cir. 2006).

It is clear from the record — and neither party disputes this fact — that Ambac did not purchase (or sell) any of the debt securities at issue here.  Both parties agree that the Noteholders were the purchasers of the Notes.  Therefore, the Noteholders, exclusively, by virtue of their status as purchasers of securities, have standing to pursue claims for securities fraud and related damages.  Ambac, which is neither a purchaser nor a seller of securities, therefore, does not have standing to bring securities fraud claims under Section 10(b) or Rule 10(b)(5).

Moreover, Ambac does not obtain such standing by virtue of its status as a guarantor of an asset-backed note.  See <u>MBIA Ins. Corp. v. Spiegel Holdings, Inc.</u>, No. 03 Civ. 10097 (GEL), 2004 WL 1944452, at *4 (S.D.N.Y. Aug. 31, 2004) (concluding that MBIA was not a <u>de facto</u> purchaser of notes by virtue of its obligation to make payments to noteholders in the event of a payment default by the special purpose entity created to securitize certain credit card receivables of its parent).

a.   <u>Contractual Subrogation</u>

To locate standing to assert federal securities law claims against EMC, Ambac contends that it is, by contract, "subrogated to the rights of the Note Purchasers."  (Am. Compl. ¶ 322.)

Contractual subrogation rights are necessarily defined by

29

contract.  See Am. Hardware Mut. Ins. Co. v. Fire Equip. Sales &
Serv., Inc., No. 01 Civ. 416 (HBS), 2004 WL 1563087, at *6
(W.D.N.Y. June 9, 2004) (holding that "conventional subrogation,
including subrogation pursuant to an insurance policy, requires the
existence of a valid contractual relationship to assign the
rights").  Ambac relies on three Transaction Documents for the
source of its contractual subrogation rights: (1) the Indentures in
two Transactions; (2) the Policies in all four Transactions; and
(3) the Prospectus Supplements in all four Transactions.

These transaction documents make clear that Ambac is, indeed,
subrogated to certain of the rights of the Noteholders to receive
payments from the Trusts, but only to the extent of Ambac's
advances, and only insofar as those rights and recoveries are
available to the Trusts to extend to the Noteholders —
specifically, the right to receive payments of principal and
interest from sources available to the Trusts.  (See, e.g., SACO
2006-8 Indenture) (stating that "The Issuing Entity and the
Indenture Trustee acknowledge that (i) to the extent [Ambac] makes
payments under the Policy on account of principal of, or interest
on, the [Notes], [Ambac] will be fully subrogated to the rights of
such [Noteholders] to receive such principal and interest from the
[Trust], and (ii) [Ambac] shall be paid such principal and interest
but only from the sources and in the manner provided herein and in

30

the [I&I Agreement.]").

The "Holders' rights of payment on the Insured Obligations to the extent of the insurance distributions so made," are the only rights of the Noteholders controlled by the Trust, and to which Ambac is subrogated. (See SACO 2006-8 Policy, at *1.) See Spiegel, 2004 WL 1944452, at *5 (granting motion to dismiss a claim that language in subrogation provision, to the effect that "[u]pon the occurrence of an Insurance Agreement Pay Out Event, the Insurer has the right to... avail itself of any other remedies available under the Series 2000-A Indenture Supplement," conferred standing upon MBIA to bring securities fraud claims as subrogee of the noteholder).

In response, Ambac cites to a recent California case addressing a similar question: whether a monoline insurer was subrogated to the rights of investors to bring securities fraud claims against securitization sponsors and underwriters, MBIA Ins. Corp. v. IndyMac ABS, Inc., LASC Case No. BC422358, at *7-9 (Cal. Sup. Ct. Aug. 3, 2010) (holding that the issue of the alleged contractual subrogation rights could not be resolved at the pleading stage). In that case, the contractual assignment of "the rights of the recipient," relied upon by the court, was extremely broad:

31

> The Insurer shall, to the extent it makes any payment with respect to the Notes, become subrogated to the rights of the recipient of such payments <u>to the extent of such payments</u>.

<u>Id</u>. at 7. (emphasis in original).[3] Here, by contrast, the transfer of the rights of the Noteholders is far more narrow. In particular, the transfer is expressly confined to the Noteholders' rights "to receive principal and interest from the trust," "to receive distributions on the [Notes]," and "to payment on the Insured Obligations [the Notes]."

Indeed, the terms of the Notes themselves expressly limit the Noteholder's recovery to obtaining principal and interest from the Trusts, omitting any reference to extra-contractual claims for securities fraud (or any other torts for that matter). (<u>See, e.g.</u>,

---

[3] In its correspondence with the Court after its motion had been submitted, Ambac proffered a recent opinion from a California state court. <u>See</u> <u>MBIA Ins. Corp. v. Bank of Am. Corp.</u>, No. BC 417572, at *7-8 (Super. Ct. Cal. May 17, 2010) (interpreting language stating that MBIA is "fully subrogated to the rights of the Noteholders to receive... principal and interest from the Mortgage Loans of the related Loan Group" and declining to reach a conclusion, as a matter of law, as to the alleged contractual subrogation right). There was very little discussion of the contractual subrogation issue in the case. Remarking that the district court in <u>Spiegel</u> had "found the policy language clear and unambiguous," the <u>Bank of America</u> court held only that it could not "say that the contractual language is clear and ambiguous," and determined that "the reach and meaning of the subrogation provisions necessitates consideration of evidence." <u>Id</u>. at 7. The court did not hold that the subrogation rights extend to federal securities law claims. In any event, the <u>Bank of America</u> case was not decided under New York law and is not controlling upon this Court.

Form of Class A Notes, Ex. A-1 to Indenture) (stating that the insured Notes are "LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST AS PROVIDED IN THE INDENTURE REFERRED TO BELOW" and confirming that "THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE") (emphasis in original).

Significantly, all of the agreements embodied in the Transaction Documents are exclusively between Ambac and the Trusts. Ambac has not entered into any agreements with the Noteholders directly. This absence of privity of contract with the Noteholders further establishes that the exclusive sources of contractual subrogation available to Ambac are through its agreements with the Trusts only.

Unlike the Noteholders, however, the Trusts lack standing to assert federal securities law claims against EMC.[4]   Moreover, contrary to Plaintiff's assertion that potential recoveries on the Noteholders' securities law claims are sources available to the Trusts, nowhere in the Transaction Documents (or anywhere else for that matter) are the Trusts (or Ambac) granted the right to pursue securities law claims on behalf of the Noteholders.   Absent a specific and express assignment of such claims in an agreement

---

[4] Neither party contests that the Trusts are neither purchasers nor sellers of the securities, and, therefore, lack standing to bring § 10(b) claims.

between the purchaser of securities and the purported assignee, this Court will not imply an assignment of the Noteholders' independent securities law claims to the Trusts — and, in turn, to Ambac.  See Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 17-18 (2d Cir. 1997) ("In order to make a valid assignment, the owner must manifest an intention to make the assignee the owner of the claim.") (citations and internal quotation marks omitted); see also W.R. Huff Asset Mgmt. v. Deloitte & Touche LLP, 549 F.3d 100, 108 (2d Cir. 2008) (holding that "an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor does not confer standing to sue in the holder's own right because a power-of-attorney does not transfer an ownership interest in the claim") (citing Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 277, 128 S. Ct. 2531, 2537 (2008)).

In short, the exclusive claims available to the Trusts, to which they may subrogate Ambac, are those rights that they are specifically empowered to enforce on behalf of the Noteholders pursuant to the Indentures — namely, the right to receive payment of principal and interest from the underlying mortgage loans.

b.   Equitable Subrogation

In the alternative, Ambac contends that it is entitled to equitable subrogation, irrespective of whether the Noteholders are

34

the named "insureds" under the insurance policies at issue here.
(See Reply Memorandum of Law in Support of Ambac's Motion for Leave
to Amend, dated Sept. 14, 2010 ("Ambac Reply Mem."), at 16.)  The
Court does not find Ambac's argument persuasive.

Unlike contractual subrogation, where the subrogee's rights
are defined in an express agreement between the insurer-subrogee
and the insured-subrogor, the equitable subrogation rights of an
insurer "[do] not arise from, nor [are] dependent upon, statute or
the terms of a contract of insurance."  Allstate Ins. Co. v.
Mazzola, 175 F.3d 255, 259 (2d Cir. 1999) (quoting Gibbs v.
Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992)); see also
Federal Ins. Co. v. Arthur Andersen & Co., 75 N.Y.2d 366, 372, 553
N.Y.S.2d 291 (1990).  Those rights, which accrue upon payment of
the loss, are based upon the principle that, in equity, an insurer,
who has been compelled under its policy to pay a loss, ought, in
fairness, to be reimbursed by the party that caused the loss.  See
Allstate, 175 F.3d at 258; see also Winkelmann v. Excelsior Ins.
Co., 85 N.Y.2d 577, 581, 626 N.Y.S.2d 994 (1995).  New York courts
have consistently held that equitable subrogation is to be
"liberally applied for the protection of those who are its natural
beneficiaries — insurers that have been compelled by contract to
pay the loss caused by the negligence of another."  Winkelmann, 85
N.Y.2d at 581 (citing Ocean Acc. & Guar. Corp. v. Hooker

35

Electrochemical Co., 240 N.Y. 37, 47 (1925)); see also Federal, 75
N.Y.2d at 372.

The rights of an insurer as equitable subrogee against a
third-party, however, are derivative and limited to such rights as
the insured would have had against such third-party for its default
or wrongdoing.  See Allstate, 175 F.3d at 258 (quoting Great Am.
Ins. Co. v. United States, 575 F.2d 1031, 1034 (2d Cir. 1978)); In
re Marine Sulphur Queen, 460 F.2d 89, 102 (2d Cir.), cert denied,
409 U.S. 982 (1972) (holding that the subrogee takes "exactly the
same remedies" that the injured party would have had — "the Flotsam
with jetsam") (quotation marks omitted); see also NYP Holdings,
Inc. v. McClier Corp., 65 A.D.3d 186, 189, 881 N.Y.S.2d 407, 410
(1st Dep't 2009) (holding that the doctrine of equitable
subrogation allows insurers to "stand in the shoes" of their
insured to seek indemnification by pursuing any claims that the
insured may have had against third-parties legally responsible for
the loss) (citing Blue Cross & Blue Shield of N.J., Inc. v. Philip
Morris USA Inc., 3 N.Y.3d 200, 206, 785 N.Y.S.2d 399, 403 (2004);
Winkelmann, 85 N.Y.2d at 581).  In other words, the insurer can
recover on a particular claim only if the insured could have
recovered on that same claim.

Here, the "insureds" were the Trusts.  As discussed above,
however, the Trusts were not the purchasers (or sellers) of the

36

Notes and, therefore, do not have standing to bring Section 10(b) claims, nor has such standing been assigned to the Trusts by the Noteholders. Thus, allowing Ambac to invoke equitable subrogation to sue for securities fraud damages would allow Ambac to assert claims against EMC that the Trusts themselves lack standing to pursue. In other words, because the Trusts cannot recover on alleged violations of Section 10(b), Ambac, "standing in the shoes" of the Trusts, is, similarly, unable to assert such claims.

In its correspondence with the Court, Ambac cites to a 1987 case, Continental Ins. Co. v. Daewoo Shipbuilding & Heavy Mach. Ltd., No. 86 Civ. 5255 (RLC), 1987 WL 16163, at *2-4 (S.D.N.Y. Aug. 21, 1987), for the general proposition that an insurer is equitably subrogated to the rights of the parties to whom the insurance benefits are ultimately paid, even if the subrogor is not the insured, but its payments are passed through the named insured.

The Continental case does not reflect New York law on equitable subrogation, and, in any event, Ambac construes its holding too broadly. Continental involved an action by the legal liability underwriters of a shipowner, against a shipbuilder, to recover the value of cargo that was lost when water leaked into two holds of the ship. The insurer of the shipowner paid the shipowner's obligation to the cargo-owners and then looked to the shipbuilders for indemnification. Although there did exist

37

agreements-to-arbitrate in the contract between the shipowner and the shipbuilder, by standing in the shoes of the cargo-owners, who were the beneficiaries of the insurance, the insurer was subrogated-out of the arbitration agreement, because the cargo-owners had not agreed to arbitrate their claims.

As the court in Continental recognized, maritime law is distinct.   Continental, 1987 WL 16163 at *2 ("Subrogation is vital... because it enables carriers and merchants... to keep the ships sailing.") (citing G. Gilmore & C. Black, Jr., The Law of Admiralty § 2-17 (2d ed. 1975) ("[I]t is this doctrine perhaps more than any other that explains the great practical importance of marine insurance in the maritime law world.")).  Moreover, contrary to Plaintiff's overly-broad characterization, Continental principally concerns the scope and enforceability of arbitration agreements; specifically, the case anticipates a line of cases identifying instances where estoppel will bind two parties to arbitration, where one party is not, in fact, a signatory to a contract. See Adelphia Recovery Trust v. Bank of Am., No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at *8 (S.D.N.Y. July 8, 2009) (collecting cases) (stating that the Second Circuit recognizes that estoppel will bind parties to arbitration, where one party is not a signatory, in two instances: (1) where "a party is bound after it has knowingly exploited an agreement containing the arbitration

38

clause for its direct benefit;" and (2) "where there is a close relationship between the entities involved... and the signatory's claim against the non-signatory are intimately found in and intertwined with the underlying contract obligations") (citations and internal quotation marks omitted).

Continental's application of subrogation to arbitration clauses in maritime agreements has no bearing on New York subrogation law, so as to allow insurers to assert federal securities law claims derived from non-insureds, who received payment passed through the insured. Ambac is able to be made whole directly by the party who is alleged to have caused the loss - EMC, by pursuing a number of different direct contract and fraud claims. There is no need or authority for this Court, acting in equity, to extend a single case's holding relating to subrogation in the context of maritime law and arbitration clauses, to allow Ambac, under New York law, to also pursue a federal securities fraud claim that the insured Trusts could not pursue.

Finally, EMC argues that "equitable subrogation is not available where the party asserting the subrogation right negotiated specific, different subrogation rights in a contract and failed to reserve the asserted rights" (EMC Mem. at 23), and cites, in support of this proposition, J & B Schoenfeld, Fur Merch., Inc. v. Albany Ins. Co., 109 A.D.2d 370, 373, 492 N.Y.S.2d 38, 41 (1st

39

Dep't 1985) ("While the right of subrogation is not dependent on contract but arises by operation of law when payment has been made, where the right of an insurer to subrogation is expressly provided for in the policy, its rights must be governed by the terms of the policy."). This is, undeniably, true in other jurisdictions. <u>See, e.g.</u>, <u>Knight v. Alefosio</u>, 158 Cal. App. 3d 718, 724 (Cal. Ct. App. 1984) ("The doctrine of subrogation cannot be invoked to override the contract of the parties.  It is not applicable where... its enforcement would be inconsistent with the terms of the contract, or where the contract, either expressly or by implication, forbids its application.") (quotation marks and citations omitted); <u>see also</u> <u>Allied Mut. Ins. Co. v. Heiken</u>, 675 N.W.2d 820, 825 n. 2 (Iowa 2004) ("The insurer's right to subrogation attaches by operation of law upon payment of the loss based on principles of equity. However, such subrogation rights would be subject to any subrogation terms found in the contract of insurance.").  The rationale here is that "to hold otherwise... would permit the party to rewrite the contract to the detriment of the other contracting party." <u>See, e.g.</u>, <u>Bank of Am.</u>, at *8. (citations omitted).  This is not the law in New York, however.

Under New York law, as long as a contract does not specifically bar an insurer's right of equitable subrogation, an insurer has the right, as an equitable subrogee, to bring a lawsuit

40

against third-party tortfeasors.  In particular, New York courts have held that it makes no difference whether the "[parties] intended a contractual subrogation of [the insured's] rights against [a third-party] defendant... as long as there is no language in the agreement... which could be construed as barring [the insurer's] claim as equitable subrogee." Federal, 75 N.Y.2d at 371; accord Winkelmann, 626 N.Y.S.2d at 997 n. 1; see also Brown v. Bellamy, 170 A.D.2d 876, 878-79, 566 N.Y.S.2d 703, 704 (3rd Dep't 1991) ("Unlike contractual subrogation, where the subrogee's rights are defined in an express agreement, the rights of... [an] equitable subrogee arise independently of any contract."); Niemann v. Luca, 645 N.Y.S.2d 401, 402-03 (N.Y. Sup. Ct. 1996) (explaining that, "unlike contractual subrogation,... the right of an insurer to recover from third persons legally responsible for the loss is equitable in nature and arises independently of any contract") (emphasis added).

Thus, in light of New York case law, this Court rejects EMC's contention that "having negotiated and agreed to the limited subrogation rights defined by the transaction documents, common law subrogation is unavailable to Ambac to override the contracts." (EMC Mem. at 23.)  Rather, we agree that equitable subrogation is potentially available to Ambac, but conclude, in applying this equitable concept to the facts of this case, that the equitable

41

subrogation doctrine, as set forth by New York courts, is not so expansive as to give Ambac the right, as an equitable subrogee, to allege federal securities fraud claims on behalf of third-parties who are not signatories to, or the insureds under, the underlying insurance agreements.  Ambac stands in the shoes of the Trusts, and the Trusts do not have standing to pursue securities fraud claims against EMC or Bear Stearns.  Thus, neither does Ambac.

Accordingly, because it would be futile to allow Ambac's proposed securities law claim, premised on equitable and contractual subrogation, Ambac's motion for leave to amend the Complaint to pursue a Section 10(b) securities fraud claim should be denied.

### 2.   Ambac's Section 20 Claim

Ambac seeks to add a claim under Section 20(a) of the Securities Exchange Act against "control persons" of Bear Stearns and EMC, in connection with their involvement in the alleged Section 10(b) violations.  In order to properly allege a control person claim pursuant to Section 20(a), Ambac must establish: (1) "a primary violation by a controlled person;" (2) "control of the primary violator by the targeted defendant;" and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated."   In re Beacon Assocs.

42

Litig., No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *17 (S.D.N.Y. Oct. 5, 2010). Hence, if Ambac cannot raise a primary violation, then it cannot raise a Section 20 claim.

Because Ambac does not have standing to assert a primary violation of Section 10(b) and Rule 10b-5, this Court finds that any Section 20 claim asserted by Ambac would be futile. Accordingly, leave to amend the Complaint to pursue this claim should be denied. The dismissal of this claim further requires that the proposed amendment to add ten new "control person" defendants be denied.

### 3. Ambac's Fraudulent Inducement Claim

Ambac also claims that it was fraudulently induced to enter into the I&I Agreement by virtue of various misrepresentations made to it by EMC and Bear Stearns. (See Am. Compl. ¶¶ 309-16.) Ambac contends that it was induced to participate in the Bear Stearns securitizations on the basis of various allegedly materially false and misleading pre-contractual disclosures, including representations regarding EMC's underwriting, due diligence, quality control, seller monitoring, and repurchase practices. (See id. ¶¶ 88-128.) Ambac also alleges that EMC and Bear Stearns failed to disclose various problems with, and changes to, EMC's underwriting, due diligence, and quality control practices that

43

rendered EMC's prior disclosures even more misleading and inaccurate. (<u>See</u> <u>id</u>. ¶¶ 129-88.) In response, EMC argues that Ambac should not be allowed to pursue its fraudulent inducement claim, because it is duplicative of its various contract claims. We disagree.

Under New York law, a fraudulent inducement claim is not considered duplicative where the defendant makes misrepresentations and omissions of present facts, collateral to the contract, that induced the plaintiff to enter into the contract. <u>See</u> <u>First Bank of Ams. v. Motor Car Funding, Inc.</u>, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty."); <u>Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.</u>, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89 (1986) (holding that "a promise [not contained in the written agreement] made with a preconceived and undisclosed intention of not performing it... constitutes a misrepresentation" for purposes of a fraud in the inducement cause of action) (quoting <u>Sabo v. Delman</u>, 164 N.Y.S.2d 714, 716 (1957)) (internal quotation marks omitted); <u>see also</u> <u>Stewart v. Jackson & Nash</u>, 976 F.2d 86, 88-89 (2d Cir. 1992) (recognizing that New York law has long distinguished between a

44

promisory statement of what will be done in the future that gives rise only to a breach of contract cause of action, and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement).

EMC advances several additional arguments as to why Ambac's fraudulent inducement claim must fail.

a.   Warranty Clause

Section 2.04 of the I&I Agreement warranted the truthfulness of all of the information provided to Ambac about each of the securitizations, both prior to contracting, as well as in the initial offerings:

§ 2.04(j) Accuracy of Information. No information supplied by the Seller contained in the Company Documents to which it is a party nor other material information relating to the operations of the Seller or the financial condition of the Seller, as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic format by the Seller contains any statement of material fact which was untrue or misleading in any material respect when made.  The Seller does not have any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Seller.   Since the furnishing of the Company Documents, there has been no change nor any development or event involving a prospective change known to the Seller that would render any Company Documents untrue or misleading in any respect.

§ 2.04(k) Compliance with Securities Laws...   The Company Information in the Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading...

45