UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :

AMBAC ASSURANCE CORPORATION,       :    Index No. 08 Civ. 9464 (RMB) (THK)
                                           :

                      Plaintiff,       :

                                         :

     -against-                     :

                                       :

EMC MORTGAGE CORPORATION,        :

                                       :

                    Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**DEFENDANT EMC MORTGAGE CORPORATION'S OBJECTIONS TO
JUDGE THEODORE H. KATZ'S DECEMBER 16, 2010
REPORT AND RECOMMENDATION ON AMBAC'S MOTION FOR
<u>LEAVE TO FILE AN AMENDED COMPLAINT</u>**


**GREENBERG TRAURIG, LLP**
Richard A. Edlin
Eric N. Whitney
Anastasia A. Angelova
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9280
Facsimile:  (212) 801-6400

**KELLEY DRYE & WARREN LLP**
John M. Callagy
William A. Escobar
Nicholas J. Panarella
Alison L. MacGregor
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Defendant
EMC Mortgage Corporation*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

OBJECTIONS.................................................................................................................... 3

    1.    Plaintiff's Motion to Amend Fails to Meet the Requirements of Rules
        15 and 16..................................................................................................................3

        (a)    Ambac Has No Excuse for Missing or Seeking to Extend the
               Court-Ordered Deadline to File an Amendment Complaint...................... 4

        (b)    Ambac's Motion After Extensive Delay Is a Litigation Tactic ................. 8

        (c)    EMC Will Be Prejudiced by the Filing of the Amended Complaint ........ 10

    2.    The Recommendation to Allow a Fraudulent Inducement Claim That
        Is Futile Should be Rejected ................................................................................12

        (a)    Section 7 of the MLPA ............................................................................. 14

        (b)    Section 2.04(j) of the I&Is ........................................................................ 15

        (c)    Section 6.11 of the I&Is - Merger Clause ................................................. 18

        (d)    Section 6.10 of the I&Is - Limited Liability ............................................. 19

        (e)    The Certificate Guarantee Insurance Policies........................................... 20

    3.    The Recommendation Permitting Joinder of Bear Stearns Will Destroy
        Diversity and Should Be Rejected .......................................................................23

CONCLUSION................................................................................................................. 25

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
  98 F.3d 13 (2d Cir. 1996).................................................................................. 12

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*,
  No. 07 Civ. 11078, 2009 WL 2033048 (S.D.N.Y. July 13, 2009)........................ 18

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
  165 F. Supp. 2d 615 (S.D.N.Y. 2001)............................................................ 18, 23

*Enzo Biochem, Inc. v. Applera Corp.*, 243 F.R.D. 45 (D. Conn. 2007)........................ 7

*In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22 (E.D.N.Y. 2004) .................................24

*Gualandi v. Adams*, 385 F.3d 236 (2d Cir. 2004).......................................................... 4

*Hodge v. Perilli,* No. 06-cv-2480, 2010 WL 3932368 (S.D.N.Y. Sept. 30, 2010)........................ 4

*In re Enron Corp. Sec. Litig.*,
  No. 04 Civ. 1367, 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005) .....................................21-22

*In re Wireless Tel. Serv. Antitrust Litig.*,
  No. 02 Civ. 2637, 2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004).......................................10-11

*JPMorgan Chase Bank v. Liberty Mut. Ins. Co.,* 189 F. Supp. 2d 24 (S.D.N.Y. 2002)............... 12

*Kant v. Columbia Univ.*,
  No. 08 Civ. 7476, 2010 WL 807442 (S.D.N.Y. Mar. 9, 2010)................................................ 7

*LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*,
  No. 01 Civ. 4389, 2002 WL 31729632 (S.D.N.Y. Dec. 5, 2002) ......................................... 21

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171 (2d Cir. 2007) ............................ 17

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  No. 01-cv-7689, 2005 WL 832050 (S.D.N.Y. Apr. 12, 2005) .............................................. 17

*Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*,
  No. 99 Civ. 2952, 2002 WL 31812710 (S.D.N.Y. Dec. 12, 2002).........................................10

*Momentum Luggage & Leisure Bags v. Jansport, Inc.*,
  No. 00 Civ. 7909, 2001 WL 58000 (S.D.N.Y. Jan. 23, 2001)............................................... 24

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
No. 08-cv-5023, 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010)................................. 8

*Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61 (S.D.N.Y. 2000)............................ 10

*Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*,
No. 07 Civ 3494, 2007 WL 2044656 (S.D.N.Y. July 17, 2007)................................. 21

*SEC v. Aragon Capital Mgmt., L.L.C.*,
No. 07 Civ. 919 (FM), 2010 WL 4456302 (S.D.N.Y. Oct. 28, 2010) ................................ 7-8

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
No. 05 Civ. 3749, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009)........................................ 4, 7

*Telecom. Int'l Am. Ltd. v. AT&T Cor*p., 280 F.3d 175 (2d Cir. 2001)................................21

## State Cases

*Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985) ........................................ 20

*First Bank of Americas v. Motor Car Funding, Inc.*,
257 A.D. 2d 287, 690 N.Y.S.2d 17 (1st Dep't 1999) ............................................ 17

*Gen. Trading Co. v. A&D Food Corp.*, 292 A.D.2d 266, 738 N.Y.S.2d 845 (1st Dep't 2002).... 20

*Levine v. Am. Int'l Group*, 16 A.D.3d 250, 792 N.Y.S. 2d 35 (1st Dep't 2005) .......................... 22

*MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
No. 601324/08, 2010 WL 2347014 (N.Y. Sup. Ct. Apr. 9, 2010)........................................ 20

*Pramco III, LLC v. Partners Trust Bank*,
No. 2006/02318, 2007 WL 1574479 (N. Y. Sup. Ct. May 31, 2007).................................... 22

*Raven Elevator Corp. v. Finkelstein*, 223 A.D.2d 378, 636 N.Y.S.2d 292 (1st Dep't 1996) ....... 20

*RGH Liquidation Trust v. Deloitte & Touche LLP*,
47 A.D.3d 516, 851 N.Y.S.2d 31 (1st Dep't 2008) .............................................. 22

## Federal Statutes

28 U.S.C. § 636(b)(1)(A).................................................................................................. 4

28 U.S.C. § 636(b)(1)(B) ................................................................................................. 3

28 U.S.C. § 1367(b) ...................................................................................................... 23

## **Federal Rules**

Fed. R. Civ. P. 15 ............................................................................................. *passim*

Fed. R. Civ. P. 16 ..................................................................................................2, 3

Fed. R. Civ. P. 19 ...................................................................................................23

Fed. R. Civ. P. 20 ...................................................................................................23

Fed. R. Civ. P. 21 ...................................................................................................24

Fed. R. Civ. P. 72(a) ............................................................................................... 4

Defendant EMC Mortgage Corporation ("EMC") respectfully submits its objections to the Report and Recommendation by the Honorable Theodore H. Katz, United States Magistrate Judge, dated December 16, 2010 (the "Report"), Dkt. No. 100, insofar as it permits Plaintiff Ambac Assurance Corporation ("Ambac") to amend its Complaint to add a fraudulent inducement claim against Defendant EMC and a proposed new defendant, Bear Stearns & Co. ("Bear Stearns").

## PRELIMINARY STATEMENT

EMC in large measure urges the Court to adopt the Report. The Report properly recommends that Ambac not be permitted to amend the Complaint to add federal securities law claims, a tortious interference claim, and ten additional defendants and an additional plaintiff.[1] However, the Report's recommendation that Ambac be permitted to bring a new claim for fraudulent inducement against EMC and a new party is based on a misapplication of the law in three respects. *First*, the proposed amendment is improper under Federal Rules of Civil Procedure 15 and 16 because Ambac has failed to demonstrate the requisite good cause and sufficient diligence, and the prejudice to EMC of this eleventh hour amendment is significant and undue. *Second*, the proposed amendment is futile because Ambac's fraud claim is entirely

---

[1] Though the Report correctly concluded that Ambac was not equitably subrogated to the rights of the Noteholders to assert a federal securities law claim against EMC under the specific facts of this case, the Report erred in rejecting EMC's assertion that Ambac was not entitled to equitable subrogation because it had "negotiated specific, different subrogation rights in a contract and failed to reserve the asserted rights." Report, at 39. EMC objects to this holding as incorrect and contrary to New York law. *See* EMC's Memorandum of Law in Opposition to Ambac's Motion to File Amended Complaint at 23.

duplicative of its contract claim.  *Third*, the proposed amendment, which seeks the permissive joinder of a non-required party, would destroy subject matter jurisdiction and waste countless hours of this Court's (and the Parties') time and should not replace a proper motion for dismissal of this action if Plaintiff is set on not proceeding before this Court. These errors should be corrected.

With respect to the requirements of Rules 15 and 16, Judge Katz acknowledged that "EMC has made a forceful argument regarding Ambac's lack of diligence, and it would have been far more preferable for Ambac to amend the Complaint earlier in the litigation."  Report, at 14.  In recommending that the Court allow amendment nonetheless, Judge Katz stopped short of implementing the logical conclusion to his observation, which would have simply been the rejection of the fraud claim at this late date.  In so doing, he rewards Ambac's tactical decision to wait to seek to amend until well after the close of document discovery, and drastically underestimates the severe prejudice to EMC which this late amendment creates.

Even Ambac now acknowledges the enormous effort required to engage in the additional discovery its proposed amendment requires.  Document discovery will have to be reopened, and the new fraud-related discovery is obviously much broader than the contract-related discovery that has occurred to date.  Ambac concedes that it will take at least six months to complete the additional discovery, while EMC believes even that estimate is ambitious.  In an effort to downplay this clear prejudice to EMC, Ambac in its motion papers and argument represented that it would need little if any additional discovery.   In the wake of the Report, however, Ambac has revealed that it too would seek "substantial" additional discovery of EMC and Bear Stearns, along with other third parties.

This is especially egregious given that Ambac's proposed fraud claims are duplicative of its contract claims against EMC and thus futile as a matter of law.  At bottom, Ambac's proposed

new claim alleges that EMC fraudulently induced it into insuring the securitized transactions by misrepresenting (1) the quality of the underlying mortgage loans and (ii) its business operations with respect to quality control over those loans.  But what the Report misapprehends is that the parties - both highly sophisticated institutions involved in billions of dollars worth of structured finance transactions - expressly disavowed any oral or non-contractual understandings underpinning the alleged fraud claim, and simultaneously made all written business information provided to Ambac by EMC the subject of express contractual warranties.  Permitting the amendment in this fashion would deprive EMC of the benefit of its bargain with Ambac, which restricted the claims Ambac could bring to only those which arise out of its contract with EMC. For this reason as well, the fraud claim should be rejected along with the other claims.

Finally, even if the Court is inclined to permit the fraud claim, under any circumstances the joinder of Bear Stearns should not be allowed as it eliminates the diversity jurisdiction of the Court and would waste the entire effort of the Parties and the Court over the past two-plus years. If Ambac no longer wants to proceed before this Court, it should be required to seek leave to dismiss this action.  Absent that, it simply makes no sense to allow permissive joinder of a non-required party if the effect is to cause dismissal of the very litigation to which the party would be added.

## OBJECTIONS

### 1.    Plaintiff's Motion to Amend Fails to Meet the Requirements of Rules 15 and 16

Judge Katz erroneously concluded that Ambac satisfied the requirements of Rules 15 and 16.[2]   Report, at 10-25.  Despite acknowledging that EMC's argument to the contrary was

---

[2]  Judge Katz submitted his Report and Recommendation without an order pursuant to 28 U.S.C. § 636(b)(1)(B), which would carry a *de novo* review standard.  The standard of review is not

"forceful," Judge Katz nevertheless excused Ambac's failure to move to amend its Complaint until eighteen months *after* the Court-ordered deadline to do so set forth in this Court's Scheduling Order. *Id.* at 14. Ambac gave up any claim to good cause when it took possession of the very information and documents it relies upon for the proposed Amended Complaint, but delayed even alerting the Court and EMC to its intention to amend while simultaneously shielding itself from fraud-related discovery. This is a litigation tactic pure and simple. Ambac's deliberate decision to wait to seek to amend until two years into the litigation should be rejected.

### (a)   Ambac Has No Excuse for Missing or Seeking to Extend the Court-Ordered Deadline to File an Amendment Complaint

This Court's December 10, 2008 Scheduling Order required Ambac to move to amend by January 30, 2009. Report, at 10. By its own admission, Ambac believed it had grounds to assert fraud claims well prior to the Court-ordered deadline. Ambac revealed in its brief on the motion to amend that it had more than a "whiff of fraud" and that it believed in 2008 "that EMC and Bear Stearns had engaged in fraud in connection with the Transactions, and . . . possessed the requisite scienter." Memorandum of Law in Support of Plaintiff Ambac Assurance

---

entirely settled, but the weight of recent authority applies the "clearly erroneous or contrary to law" standard to the review of a motion to amend. *Hodge v. Perilli,* No. 06 cv 2480, 2010 WL 3932368, at *3 (S.D.N.Y. Sept. 30, 2010); *see Sokol Holdings, Inc. v. BMB Munai, Inc.,* No. 05 cv 3749, 2009 WL 3467756, at *4 (S.D.N.Y. Oct. 28, 2009); *see also* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *Gualandi v. Adams*, 385 F.3d 236, 240 (2d Cir. 2004). In any event, we respectfully submit that under either standard, the recommendations to which EMC objects should not be adopted.

Corporation's Motion For Leave to File Amended Complaint ("Ambac Mem.") at 2, 16. Nevertheless, Ambac allowed the Court-ordered deadline to expire without objection or comment.

During the course of discovery, the Parties made numerous court appearances, provided detailed status updates to the Court, and successfully requested that the Court modify the Scheduling Order five separate times.  Docket Nos. 25, 32, 37, 52 and 55.  Yet not once during that time did Ambac ever alert the Court or EMC that it intended to amend its Complaint or seek to extend the deadline for doing so.

The Haas Declaration, the sole evidentiary support for Ambac's belated request to amend, demonstrates that Ambac possessed for up to a year prior to seeking to amend all of the key evidence that it asserts it needed to support its new claims.  Ambac relies on a total of twenty-one documents attached to the Haas Declaration that it claims it had to obtain in discovery to substantiate its proposed claims.  Of the seventeen of those documents produced by EMC, however, all but one were in Ambac's possession by December 14, 2009, nearly eight months before it filed its motion.[3]  To the extent that Ambac wished to question EMC witnesses about these documents, it had ample opportunity to and in fact largely did so at the Rule 30(b)(6) depositions of EMC witnesses, the last of which took place in February 2010.

Perhaps the best example of Ambac's unexcused delay is provided by the e-mail prominently quoted in the very first paragraph of the proposed Amended Complaint and multiple

---

[3]  *See* Declaration of Eric N. Whitney in Support of Defendant EMC Mortgage Corporation's Opposition to Plaintiff Ambac Assurance Corporation's Motion for Leave to Amend the Complaint, dated August 23, 2010 ("Whitney Decl."), Exhibit 32, for a chart detailing the date of production of the EMC and third party documents attached to the Haas Declaration.

times thereafter in which a Bear Stearns trading analyst used an inflammatory phrase that Ambac alleges was a reference to one of the SACO deals.  If this document "speaks for itself" as Ambac has contended with respect to this and virtually every document to which EMC's witnesses have supplied interpretations differing from Ambac's (Haggerty Dep. Tr., at 305:8; Glory Dep. Tr., at 226:9-226:10, Whitney Decl., Exs. 14B; 31), then there was no justification for Ambac to wait an additional eight months after receiving the email in discovery to seek leave to add claims supposedly premised upon this and similar documents.[4]

---

[4]  Ambac also cannot belatedly claim that it was surprised to find in discovery EMC's due diligence practices.  Haas Decl., Exs. 7-8.  Documents regarding due diligence were produced to Ambac on June 30, 2009 and December 14, 2009, respectively, and were the subjects of examination of EMC 30(b)(6) deponents between December 2009 and early February 2010. More importantly, documents produced from Ambac's own files reveal that EMC's due diligence protocols were specifically disclosed to Ambac and discussed internally at Ambac contemporaneously with the transactions at issue.  Whitney Decl. ¶¶ 26-30.  This is hardly a new issue to Ambac.  Similarly, Ambac's new proposed "allegations" regarding inaccuracies in the data tapes with respect to loan-to-value ratio, occupancy status, FICO score, appraised value, and/or debt-to-income ratio, see Proposed Am. Compl. ¶¶ 99-101; Ambac Mem. at 11, were likewise expressly made in the original Complaint.  Compl. ¶ 36.

Ambac also complains about EMC's policies and practices for reviewing loans for securitization breaches, its outgoing repurchase claims to sellers on potentially defective loans, its settlement of repurchase claims against sellers and its analyses and decisions regarding its obligation and ability to remit funds recovered on securitized loans to the trusts and the timing of it doing so.  Haas Decl., Exs. 13-14, 24-26.  Yet relevant documents regarding these claims were

Under Rule 15, where a plaintiff has knowledge of the facts underlying a cause of action and fails to allege that cause of action in a timely manner, no legitimate reason for delay exists. *See Kant v. Columbia Univ.*, No. 08 Civ. 7476, 2010 WL 807442, at *7 (S.D.N.Y. Mar. 9, 2010) (plaintiff's change in theory of the case, first asserted ten months after his original complaint was filed "strongly suggest[ed] bad faith," and court could deny leave to amend under Rule 15); *Enzo Biochem, Inc. v. Applera Corp.,* 243 F.R.D. 45, 49 (D. Conn. 2007) (denying leave to amend under Rule 15 and observing that moving party had "conceptualized" the basis for the amendment a year and a half prior to moving to amend).

Similarly, under Rule 16, where, as here, a party is aware of the facts necessary to amend its pleading prior to expiration of a deadline but fails to do so, it lacks diligence. *Sokol Holdings, Inc. v. BMB Munai, Inc., No. 05 Civ. 3749*, 2009 WL 3467756 at **3, 6 (S.D.N.Y. Oct. 28, 2009) (denying leave to amend where plaintiffs could have asserted new claims at beginning of the case as well as other points during litigation; parties engaged in "substantial" discovery before plaintiffs sought to add new claims; and plaintiffs never requested the Court extend scheduling deadlines and waited more than a year after the deadline had passed).   A party aware that it will be seeking to amend its complaint has even more reason to move with as much speed as possible so that the prejudice of delay and expense on the nonmoving party, as well as on the Court, is minimized to the maximum extent.  Ambac's efforts in this regard fall far short of the Rule 16 standard for any party.[5]

---

in Ambac's possession by December 2009.  Whitney Decl. ¶ 31.  The Court need only rely on Ambac's own admissions as to its delay to deny Ambac's motion.

[5]  The cases cited in the Report (at 15-16) where courts allowed an amendment despite some period of delay are easily distinguishable.  In *SEC v. Aragon Capital Management, LLC*, No. 07

**(b)**   **Ambac's Motion After Extensive Delay Is a Litigation Tactic**

The Report concludes that Ambac has a "strong interest" in this Court reaching the merits "as promptly as possible" and, therefore, recommends that this Court find that the litigation tactics that would require denial of the motion to amend are not present.   Report, at 16. However, Plaintiff's conduct both before and after the issuance of the Report establishes that this conclusion is wrong.

For example, promptly after the Report was issued, Plaintiff informed Judge Katz that it does not have a "strong interest" in prompt litigation.   Indeed, Plaintiff has no interest in continuing litigation before this Court.   When EMC alerted Judge Katz that the addition of Bear Stearns as a party to this case would destroy diversity jurisdiction and require dismissal of the case, Plaintiff's counsel admitted that this exact outcome was "top of mind" when they were

---

Civ. 919, 2010 WL 4456302, at *5 (S.D.N.Y. Oct. 28, 2010), the Court found it reasonable for the SEC to amend its complaint to assert a theory of aiding and abetting soon after the Commission had the opportunity to depose the defendants.   That is a far cry from Ambac's attempt here to add entirely new claims long after they were in a position to do so.   Indeed, the Court in *Aragon* denied that part of the motion relating to certain claims "not premised on any new facts."   *Id.*   Similarly, in *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *11 (E.D.N.Y. Mar. 26, 2010), the Court excused a delay of three months following the deadline to amend the complaint, as opposed to the eighteen-month delay at issue here.   Moreover, in that case *both* sides had attempted to amend the pleadings after the deadline. *Id.*

preparing the motion to amend.  1/5/11 Transcript at 45:7.[6]  That the amendment would destroy diversity jurisdiction was, apparently, entirely "contemplated" by Plaintiff.  *Id* at 45:6.  It is difficult to think of clearer evidence of litigation tactics that should result in denial of the motion to amend.

Along the same lines, Judge Katz based his recommendation on the understanding that, in connection with any amendment, "Ambac committed to refraining from issuing to EMC any but a small number of new document requests, primarily from the files of the newly-named defendants whose files were not produced in earlier discovery."  Report, at 23-24.  Since the Report was issued, however, Ambac has reneged on this commitment.  As soon as EMC further outlined the basic contours of discovery it would need to defend against this new claim, which EMC consistently has said would be required, Plaintiff insisted that it would need "commensurate discovery."  1/5/11 Transcript at 36:12-13.  Judge Katz immediately recognized this as "inconsistent" with the Plaintiff's prior discovery commitments.  *Id.* at 36:14-15.  This is, however, consistent with the type of litigation tactics that should be the basis for denial of the motion to amend.

In addition, by deliberately omitting a fraud claim from its original Complaint, Ambac successfully shielded itself from fraud-related discovery.  Indeed, counsel for Ambac expressly acknowledged in multiple discovery conferences with EMC that it had circumscribed its claims for the express purpose of avoiding discovery into matters not strictly relevant to a breach of warranty case.  Whitney Decl. ¶¶ 2, 39; Ex. 30 (chart detailing Ambac's statements about the narrow scope of its discovery responses).   Now, after more than two years of litigation and the

---

[6]  The 1/5/11 transcript is Exhibit A to the accompanying Whitney Declaration, executed on January 14, 2011 ("Jan. 14, 2011 Whitney Decl.").

close of document discovery, Ambac has changed its strategy.  This is the sort of dilatory litigation tactic that courts routinely reject on motions to amend the pleadings.  *See Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*, No. 99 Civ. 2952, 2002 WL 31812710, at *5 (S.D.N.Y. Dec. 12, 2002) (denying motion to amend where timing was "consistent with a prior tactical decision not to assert claims" and holding that "[t]his type of strategic pleading is not encouraged even under the liberal standard of Rule 15"), Whitney Decl., Ex. 38; *Oneida Indian Nation v. County of Oneida,* 199 F.R.D. 61, 80 (S.D.N.Y. 2000) ("A finding that a party is seeking leave to amend solely to gain a tactical advantage . . . supports a finding that such an amendment is made in bad faith.").

Although Ambac claims that it would not be tactically advantaged by the filing of the amended complaint, this is nonsense.  Ambac plainly perceives an advantage to the amended pleading, otherwise it would not be seeking leave to file it in the first place.  For whatever reason Ambac may have, relating to perceived defects in its contractual claims, or failure of proofs, seeking that perceived advantage is the essence of tactics and should be rejected this far into this case.

### (c)    <u>EMC Will Be Prejudiced by the Filing of the Amended Complaint</u>

EMC is entitled to whatever discovery is reasonably required to allow it to present a full defense to all claims asserted against it, and certainly to a fraud claim if one is permitted.  That discovery necessarily goes far beyond what is required to defend a contract claim, as Ambac's knowledge, experience, and ability to be fraudulently induced would all be critical elements to EMC's defense.  They are the very areas Ambac essentially shielded from discovery since the outset of the case.  EMC will have to reinvest in its previous discovery; review millions of pages of new documents; and seek additional discovery from Ambac and third parties related to fraud-related defenses.  The resulting burden on EMC will be substantial.  *See, e.g.*, *In re Wireless Tel.*

*Serv. Antitrust Litig.*, No. 02 Civ. 2637, 2004 WL 2244502, at *4 (S.D.N.Y. Oct. 6, 2004) (internal quotation omitted), Whitney Decl., Ex. 43 ("An amendment causes undue prejudice [to a defendant] where it would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute[.]'").

In an effort to overcome the force of this argument, Ambac represented to Judge Katz, on multiple occasions, that any additional discovery, and certainly Ambac's discovery, based on the proposed new claims would be minimal, "fit[ting] seamlessly into the discovery the parties have already been conducting."  Ambac Mem. at 23; *see also* Ambac's Reply Memorandum of Law in Support of Motion for Leave to Amend at 11 ("Any fraud-related discovery that remains to be done will be modest and manageable . . . ."); 10/4/10 Transcript at 60:11-12 annexed as Ex. B to the Jan 14, 2011 Whitney Decl. ("we have all of our evidence, 90 percent of it, on fraud and scienter").  Having prevailed on this issue, Ambac has now completely changed its tune.  In a discovery conference just days ago before Judge Katz, Ambac disclosed that if EMC was allowed to pursue the additional discovery it has consistently said would be necessary, Ambac too would seek substantial additional discovery.[7]

In relying on Ambac's disavowed assertion that it would not seek this discovery, the Report severely underestimates the significant burden on EMC of allowing this belated amendment.  With the benefit of now knowing Ambac's true position, this Court should revisit Judge Katz's finding and reverse it.

---

[7]  1/5/11 Transcript at 34:13-36:15 annexed as Ex. A to the Jan. 14, 2011 Whitney Decl.

2.    **The Recommendation to Allow a Fraudulent Inducement Claim That Is Futile Should be Rejected**

Ambac's proposed fraud claim alleges that EMC misrepresented its business operations concerning the underlying securitization transactions and the nature of the loans themselves. That fraud claim, however, is futile because Ambac expressly agreed in the relevant contracts that its sole remedy for such misrepresentations would be contractual.   To the extent Ambac seeks to rely on oral misrepresentations, such a claim is extinguished by a merger clause.  To the extent Ambac alleges that EMC provided it with false and misleading information concerning the loans themselves, that claim is fully covered by at least 43 specific loan-level warranties and representations, the breach of any of which yields a contract claim not a fraud claim.  It is these contractual provisions which provide the sole remedy for Ambac's proposed fraud claim that the Report overlooked.

Under well-established New York law and the specific provisions of the relevant agreements, Ambac's sole remedy for alleged misrepresentations concerning the transactions at issue is contractual and cannot be recast as a fraud claim.  New York law requires that a fraud claim, raised in a case that stems from breach of contract, be "sufficiently distinct" from the breach of contract claim. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citation omitted); *see also JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,* 189 F. Supp. 2d 24, 26 (S.D.N.Y. 2002) ("New York law does not permit a contracting party to lightly evade its contractual obligations by simply crying 'fraud.'").  Here, the Parties' contracts expressly disavow any extra-contractual understandings and expressly warrant the accuracy of any business information provided by EMC to Ambac.   As such, there cannot be any representations collateral to the contract.

Judge Rakoff's decision in *Liberty Mutual* is especially apt.  There, the court held in circumstances analogous to those on this motion, that "New York law will not permit a sophisticated party that, in negotiating a contract, has expressly disclaimed reliance on specific oral representations extrinsic to the contract to thereafter claim that the fraudulence of these representations is a defense to contractual performance."  189 F. Supp. 2d at 26 (citation omitted).[8]

Here, specifically, Section 6.11 of the Insurance and Indemnity Agreements ("I&Is") disclaims any understandings between the Parties other than those contained in the agreements. At the same time, Section 2.04 of the I&Is pulls any material business information provided by EMC to Ambac into an express representation and warranty, specifying among other things that "[n]o information supplied by [EMC] contained in the Company Documents to which it is a party nor other material information relating to the operations of [EMC] or the financial condition of [EMC] . . . furnished to [Ambac] . . . contains any statement of material fact which was untrue or misleading in any material respect when made."   I&Is § 2.04(j), Whitney Decl., Ex. 4.   In addition, the Mortgage Loan Purchase Agreements ("MLPAs"), incorporated by reference in the I&Is, contains more than 43 express loan-level representations and warranties in Section 7 and additional representations and warranties regarding EMC and its business in Section 8.  Finally, the Certificate Guarantee Insurance Policies issued by Ambac are absolutely

---

[8]  This is not a case, as Ambac presumably may argue, where there is a "'mere general recitation that a guarantee is 'absolute and unconditional.'"  *Liberty Mutual,* 189 F. Supp. 2d at 27 (citation omitted).  To the contrary, this is a case where there is "'a clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim.'"  *Id.*  (citation omitted).

irrevocable, even in the face of alleged fraud on the part of EMC.  These provisions, taken together, completely foreclose the possibility of any claims distinct from the Parties' contracts.

While acknowledging that courts have differed in finding whether and when a fraud claim can be based on a breach of contractual warranties (Report, at 49), the Report correctly states that the determinative factor under New York law is whether the alleged misrepresentations "are extraneous to the contract."  Report, at 50.  However, the Report errs in concluding that certain alleged pre-contractual statements were not expressly covered by the representations and warranties.  EMC's alleged representations to Ambac regarding its "implementation of due diligence; policies and procedures to increase loan flow"; and other business practices are exactly the matters expressly warranted by EMC in the transaction documents.  Likewise, EMC's alleged "failures to disclose negative assessments of the quality of the loans in the securitization pools" and other matters are expressly covered by those same provisions, which, *inter alia*, warrant that EMC had not failed to disclose any material facts that would render another statement untrue.  In holding that the warranties in these agreements do not "specifically address" the alleged pre-contractual representations (Report, at 50), and that "EMC does not point to any specific recitals contained in [the transaction documents] that are inconsistent with Ambac's assertion of a fraudulent inducement claim" (Report, at 56), the Report overlooks the following provisions:

      **(a)**      <u>**Section 7 of the MLPA**</u>

The 43 loan-level representations made in Section 7 of the MLPA address both the loans in the transaction (*see* SACO 2006-08 MLPA § 7(a)) and the operations EMC implemented to insure the quality of the loans (*see, e.g.*, *id.* at §§ 7 (n), (y), (jj)).  For instance, they provide that the "information set forth in the Mortgage Loan Schedule on the Closing Date is complete, true and accurate;" that each loan "complied in all material respects" with applicable laws; each

Mortgaged property was the subject of an appraisal that conformed with certain requirements and was in a form acceptable to Fannie Mae or Freddie Mac; and that each Mortgage Loan was "underwritten in general accordance with" and "not inconsistent with" certain guidelines.[9]

**(b)     Section 2.04(j) of the I&Is**

To the extent that an alleged misrepresentation was not covered by one of the foregoing specific representations and warranties, Ambac itself asserts in its Proposed Amended Complaint that *all* the information provided to it by EMC in connection with the transactions, including precontractual representations, is covered by section 2.04(j) of the I&Is.  Ambac specifically alleges that EMC warranted "the truthfulness of the information it provided to Ambac about each of the Transactions" both prior to contracting and in the Offering Documents.[10]   Prop. Am.

---

[9] Specifically:

> §7(a):  The information set forth in the Mortgage Loan Schedule on the Closing Date is complete, true and correct.

> §7(n):  Each loan at the time it was made complied in all material respects with applicable local, state and federal laws, including but not limited to, all applicable anti-predatory lending laws.

> §7(y):  At the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan and, the appraisal is in a form acceptable to Fannie Mae or Freddie Mac.

> §7(jj):  Each Mortgage Loan at the time of origination was underwritten in general accordance with guidelines not inconsistent with the guidelines set forth in the Prospectus Supplement and generally accepted credit underwriting guidelines.

Whitney Decl., Ex. 3.

[10] The relevant sections of the I&Is provide:

> §2.04(j) <u>Accuracy of Information</u>.   No information supplied by the Seller contained in the Company Documents to which it is a party nor other material information relating to the operations of the Seller or the financial condition of the Seller, as amended, supplemented or superseded, furnished to the Insurer in

Comp. ¶ 262; *see also* ¶ 263 (Ambac expressly alleging that Section 2.04 of the I&Is covered the "*total mix of information* about the Transactions made available to EMC") (emphasis added).

In light of Ambac's express assertion that these provisions warrant *all* of the information provided to it by EMC in connection with the transactions - both prior to contracting and in the Company Documents[11] - there cannot be any other pre-contractual representations allegedly made by EMC to support Ambac's fraudulent inducement claim.  In other words, according to Ambac, *any* misrepresentation of *any* kind made by EMC in connection with the transactions would violate § 2.04(j) and (k).  Therefore, by the express terms of the transaction documents, Ambac's alleged misrepresentations are not collateral to, but necessarily are included in the

---

writing or in electronic format by the Seller contains any statement of material fact which was untrue or misleading in any material respect when made.  The Seller does not have any knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Seller.  Since the furnishing of the Company Documents, there has been no change nor any development or event involving a prospective change known to the Seller that would render any Company Documents untrue or misleading in any respect.

§2.04(k) <u>Compliance with Securities Laws</u>… The Company Information in the Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading….

Whitney Decl., Ex. 4.

[11]   The Company Documents are defined in the I&Is as the "Insurance Agreement, the Certificates, the Notes, the Indenture, the Trust Agreement, the Mortgage Loan Purchase Agreement, the Sale and Servicing Agreement, the Administration Agreement, any Subsequent Mortgage Loan Purchase Agreement, any Subsequent Transfer Instrument and any Custodial Agreement."  SACO 2006-8 I&I Agreement § 1.01, Whitney Decl., Ex. 4.

agreements.  Accordingly, the Report erred in allowing Ambac to expand its alleged breach of contract claims to also support a fraud claim.

We respectfully submit that the Report's reliance on *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 690 N.Y.S.2d 17 (1st Dep't 1999), misconstrues the holding of *First Bank* in a fundamental way.  In *First Bank*, the plaintiff based its breach of contract claims upon the: (1) failure to provide the plaintiff with the contractually-required title documents, and (2) breach of the contractual loan buy-back procedure.  *Id*. at 290, 690 N.Y.S.2d at 20.  The plaintiff's fraud claim, however, went beyond these provisions alleging that "defendants misrepresented various pertinent facts about the individual loans that plaintiff purchased under the Agreement."  *Id*. at 291, 690 N.Y.S.2d at 21.  Therefore, although the contract in *First Bank* contained warranties that covered the subject matter that were the basis for the alleged fraud, those representations and warranties were not the basis of plaintiff's contract claims.  *Id*.  Here, unlike in *First Bank*, Ambac has specifically alleged a cause of action for an alleged breach of ***these very provisions*** of the I&Is and MLPA agreements ***which also are the very basis*** for its fraud claim.  Therefore, the Report incorrectly relied on *First Bank* in concluding that the misrepresentations alleged by Ambac were collateral to the contract when, in fact, these very same alleged misrepresentations were the basis for the breach of contract claim.

Similarly, the Report's reliance on the Second Circuit's decision in *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), is misplaced.  As shown by the District Court's decision in that case, the purchase agreement contained a limited remedies provision that carved out an exception allowing the parties to bring "claims of, or causes of action arising from, fraud."  No. 01 cv 7689, 2005 WL 832050, *3 (S.D.N.Y. April 12, 2005).   Far from agreeing to any similar carve-out, the Parties here expressly created a contractual remedy, through the representations and warranties, for the alleged misrepresentations at issue.  Where a sophisticated

party such as Ambac - which had participated in no less than 300 similar transactions - negotiates for a specific remedy which would be completely inconsistent with a fraud-based remedy, it should be held to its bargain.

      **(c)**      **Section 6.11 of the I&Is - Merger Clause**

The merger clause in Section 6.11 of the I&Is provides that the Insurance Agreement and policy "set forth the entire agreement between the parties" and "supersedes and replaces" any prior agreement or understanding between the Parties.[12]   In doing so, the merger clause precludes an action for fraud for alleged precontractual misrepresentations precisely because such representations are superseded and replaced by the express terms of the contract.  *See CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2009 WL 2033048, at *5 (S.D.N.Y. July 13, 2009) (citations omitted) (fraud claims dismissed where agreement contained merger clause and disclaimer inconsistent with the fraud claim and plaintiff was a sophisticated investor), Whitney Decl., Ex. 52.   Where, as here, an "agreement includes extensive representations, warranties and covenants" from the defendant in favor of the plaintiff, and the agreement is "the product of extensive negotiation and review" by a sophisticated investor, the plaintiff is precluded from bringing a fraud claim.  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 622-23 (S.D.N.Y. 2001).

---

[12]  Section 6.11 provides in full as follows:

> <u>Entire Agreement</u>.  This Insurance Agreement and the Policy set forth the entire agreement between the parties with respect to the subject matter hereof and thereof, and this Insurance Agreement supersedes and replaces any agreement or understanding that may have existed between the parties prior to the date hereof and in respect of such subject matter.

Whitney Decl., Ex. 4.

**(d)   Section 6.10 of the I&Is - Limited Liability**

Section 6.10 of the I&Is prohibits Ambac from bringing claims against Bear Stearns and makes clear that the Parties intended to protect their affiliates, officers and directors from liability.[13]

As a party to the I&Is, Ambac affirmatively disclaimed recourse for any representations not made by EMC or covered by contract and we respectfully submit that there is no way to read the language of Section 6.10 in any common sense way without torturing the language to try to reach a contrary meaning.   Ambac and EMC expressly shielded their respective officers, directors, and affiliates from claims of any kind for breaches under the Company Documents, confirming that they were exclusively corporate obligations.   The Report errs in recommending that Ambac be allowed to circumvent those contractual limitations of liability by alleging that Bear Stearns fraudulently induced Ambac to enter into the I&Is and issue the Insurance Policies.

---

[13]     6.10   _Limited Liability_.   **No recourse** under any Company Document or the Underwriting Agreement shall be had against, **and no personal liability shall attach to, any officer, employee, director, affiliate or shareholder of any party hereto**, as such, by the enforcement of **any** assessment or by **any** legal or equitable proceeding, by virtue of **any** statute or otherwise in respect of any of the Company Documents or the Underwriting Agreement, the Class A Notes or the Policy, **it being expressly agreed and understood that each Company Document and the Underwriting Agreement is solely a corporate obligation of each party hereto**, and that any and all personal liability, either at common law or in equity, or by statute or constitution, of every such officer, employee, director, affiliate or shareholder for breaches of any party hereto of any obligations under any Company Document or the Underwriting Agreement **is hereby expressly waived as a condition of and in consideration for** the execution and delivery of this Insurance Agreement.

SACO 2006-8 I&I Agreement § 6.10 (emphasis added), Whitney Decl., Ex. 4.

**(e)      The Certificate Guarantee Insurance Policies**

In the "unconditional and irrevocable" guarantees made in the Certificate Guarantee Insurance Policies, Ambac "waive[d] and agree[d] not to assert any and all rights and defenses, to the extent such rights and defenses may be available to Ambac." *See* SACO I Trust 2006-8 Insurance Policy, Whitney, Decl., Ex. 5. The Report appears to have misapprehended the significance of this waiver, relying instead on Ambac's statement (with which EMC disagrees) that it is not attempting to avoid payment of insurance claims under the policy. Report, at 60. Whether true or not, that misses the point: this provision acts as a clear waiver of Ambac's right to bring a fraud claim outside of the contemplated contractual remedies for the alleged misrepresentations. *See, e.g.*, *MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 601324/08, 2010 WL 2347014, at **3, 5 (N.Y. Sup. Ct. Apr. 9, 2010) (dismissing claim for fraudulent inducement where Financial Guaranty Insurance Policy was "unconditional" and "irrevocable" and plaintiffs had waived defenses to payment), Whitney Decl., Ex. 60.[14]

---

[14]  *See also Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 312  (1985) (fraud claim dismissed where agreement was "'absolute and unconditional' . . . 'irrespective of (i) any lack of validity of the [underlying agreement] or any other agreement or instrument relating thereto,' or 'any other circumstance which might otherwise constitute a defense' to the guarantee"); *Gen. Trading Co. v. A&D Food Corp.*, 292 A.D.2d 266, 267, 738 N.Y.S.2d 845, 845 (1st Dep't 2002) ("[t]he guarantee, which states that it is absolute and unconditional and that the guarantors waive the right to interpose any defenses, effectively waived the defenses of fraud in the inducement . . . defendants would now raise"); *Raven Elevator Corp. v. Finkelstein*, 223 A.D.2d 378, 378, 636 N.Y.S.2d 292, 293 (1st Dep't 1996) ("absolute and unconditional disclaimer and waiver contained in the personal guarantee which specifically precluded the

*      *      *

As set forth above, the alleged misrepresentations were, in fact, expressly covered by the contractual representations and warranties, thus barring Ambac's fraudulent inducement claim. *See Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *7 (S.D.N.Y. July 17, 2007) (*citing Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)) (dismissing fraud claim based on "subjects covered in the representations and warranties" and finding that "to the extent that there was a misrepresentation or omission in connection with those contractual representations and commitments, then that conduct must be pleaded as a breach of contract claim"); *LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389, 2002 WL 31729632, at *12 (S.D.N.Y. Dec. 5, 2002) (explaining that it is "well established in New York that where a fraud claim is 'premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie").

The Report erroneously concluded that the agreement must contain a verbatim reference to the particular alleged misrepresentation in order to bar a fraud claim. Report, at 50.  There is simply no legal requirement of the kind.  Given the broad range of information exchanged by these sophisticated parties entering into these complex business transactions, as a practical matter such a rule would render it impossible for parties effectively to contract away subsequent fraud claims and leave one party at the mercy of another's clever pleading construction.  This is why it is not the law.  *See In re Enron Corp. Sec. Litig.*, No. 04 Civ. 1367, 1495, 1498, 2005 WL

---

guarantor from raising any defenses or counterclaims relating to the underlying debt" barred fraud in the inducement claim).

356985, at *11 (S.D.N.Y. Feb. 15, 2005) (affirming bankruptcy court's dismissal of fraudulent inducement claim where the misrepresentations did not go beyond the representations set forth in the loan agreement); *see also  Pramco III, LLC v. Partners Trust Bank*, No. 2006/02318, 2007 WL 1574479, at *3 (N. Y. Sup. Ct. May 31, 2007) (denying motion to amend complaint to include a fraudulent inducement claim where alleged misrepresentation was nothing more than "the contractual warranty itself, and accordingly cannot be extraneous to the contract and cannot support an independent fraud claim").  In fact, enforcing such a rule would elevate form over substance completely, and in this case deprive EMC of the protections of its agreement with Ambac for no reason whatsoever.

To the extent trial courts have demanded a more stringent standard, and in doing so have disregarded the parties' clear intent in the contract, they have run afoul of well-established, longstanding, and controlling New York precedent.  *See RGH Liquidation Trust v. Deloitte & Touche LLP*, 47 A.D.3d 516, 517, 851 N.Y.S.2d 31, 32 (1st Dep't 2008) (affirming dismissal of fraud claims as duplicative of its breach of contract claim, where they were "based on alleged fraudulent misrepresentations related to defendants' obligations under their agreements"); *Levine v. Am. Int'l Group*, 16 A.D.3d 250, 251, 792 N.Y.S.2d 35, 36 (1st Dep't 2005) ("a cause of action for fraud arising out of a contractual relationship may be maintained only where the plaintiff alleges a breach of duty separate from, or in addition to, a breach of the contract").

Where, as here, sophisticated parties, both highly experienced in complex mortgage-backed securitization transactions, have agreed, after extensive negotiations, to specific representations and warranties; catch-all representations and warranties intended - as Ambac concedes - to cover specifically all information provided to it by EMC in connection with the transactions; a merger clause that expressly disavows non-contractual representations; and limitations of liability and waiver provisions, the Parties should be held to their bargain.  *See*

*Emergent Capital Inv. Mgmt.,* 165 F. Supp. 2d at 622-23 ("Even if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract").

The Parties intended to and did enter into a comprehensive set of contracts which defined their rights and liabilities.  As part of the deal, Ambac entered into a merger clause in which it expressly disclaimed its reliance on any oral statements made by EMC whatsoever, including those prior to the signing of the contracts at issue.  Having agreed to this framework, Ambac should not be allowed to avoid those contractual limitations, nor should the Court stretch the law to benefit one party at the expense of another.

**3.    The Recommendation Permitting Joinder of Bear Stearns Will Destroy Diversity and Should Be Rejected**

Ambac should not be given leave to add Bear Stearns as a defendant because doing so would destroy this Court's jurisdiction.   Because both Ambac and Bear Stearns are headquartered in New York and are thus New York residents, adding Bear Stearns as a defendant would result in a failure of complete diversity.  *See* 28 U.S.C. § 1367(b) (no supplemental jurisdiction over defendants made parties under Rules 19 or 20).  The Report did not address, and appears to have overlooked, the jurisdiction-destroying effect of permitting an amendment to add Bear Stearns which is not a necessary party.[15]

It makes absolutely no sense to permit Ambac a discretionary amendment where the sole effect will be to deprive the Court of subject matter jurisdiction and require dismissal of the action.   The discretion afforded by, and principles underlying, both Rules 15 and 21 do not

---

[15]  On January 5, 2011 EMC filed a Motion to Reconsider the Report on the basis of this issue. The motion is pending before Judge Katz.

authorize or warrant it.  Considerations of judicial economy, the limits of judicial resources, and the prejudice to EMC resulting from dismissal of a two-year litigation weigh against permitting Ambac to join Bear Stearns as an additional defendant and effectively send this heavily litigated action off to state court, where the Parties will have to start anew before a new court unfamiliar with the extensive litigation that has occurred here.

In addition to Rule 15, Federal Rule of Civil Procedure 21 empowers the Court to drop any party "to an action [that] presents problems of judicial administration over which the court, rather than the parties and their counsel, should maintain control at every stage of the action." *Momentum Luggage & Leisure Bags v. Jansport, Inc.,* No. 00 Civ. 7909, 2001 WL 58000, at * 2 (S.D.N.Y. Jan. 23, 2001*); see* Fed. R. Civ. P. 21 ("[o]n motion or on its own, the court may at any time, on just terms, add or drop a party").  "[I]n adding or eliminating parties [under Rule 21], courts must consider judicial economy . . ., as well as how the amendment would affect the use of judicial resources, the impact the amendment would have on the judicial system, and the impact the amendment would have on each of the parties already named in the action." *Momentum Luggage*, 2001 WL 58000, at * 2 (denying motion to amend complaint to join additional defendants where joinder would result in delay of discovery and trial of action).

Ambac chose this forum.  Abandoning the current litigation to proceed before a tribunal unfamiliar with the facts involved in this complex action, will not only result in prejudice to EMC, who will "be forced to incur significant expenses to relitigate threshold issues," *In re "Agent Orange" Prod. Liab. Litig.,* 220 F.R.D. 22, 26 (E.D.N.Y. 2004), but will also clearly be a waste of the substantial judicial resources already expended by this Court in the last two years. Such a result squanders the benefits to the parties of a Court that is intimately familiar with the issues involved in this action, having presided over numerous discovery disputes and conferences, and having issued more than thirty-five orders or decisions.  Permitting Ambac to

24

amend its Complaint to join Bear Stearns as an additional defendant "would be an unfair burden on the judicial system" due to the resulting loss of federal diversity jurisdiction and commencement of a "new state action burdening a state court with serious issues of law and fact." *Id.* at 26 (denying plaintiff's motion to amend complaint to add additional defendant where joinder "would arguably defeat federal jurisdiction").

Given the gravity of dismissing this action, the resulting prejudice to EMC, and the obvious waste of judicial resources, EMC respectfully requests that the Court reject the recommendation to permit joinder of Bear Stearns.

## **CONCLUSION**

For all the foregoing reasons, that Report should be adopted except to the extent objected to herein.

Dated: New York, New York
       January 14, 2011

                                          Respectfully Submitted,

**KELLEY DRYE & WARREN LLP**       **GREENBERG TRAURIG, LLP**
John M. Callagy                                By:
William A. Escobar                              /s/ Richard A. Edlin
Nicholas J. Panarella                        Richard A. Edlin
Alison L. MacGregor                        Eric N. Whitney
101 Park Avenue                             Anastasia A. Angelova
New York, New York 10178                 MetLife Building
Telephone: (212) 808-7800               200 Park Avenue
Facsimile: (212) 808-7897                New York, New York 10166
jcallagy@kelleydrye.com                 Telephone: (212) 801-9280
wescobar@kelleydrye.com                Facsimile:  (212) 801-6400
npanarella@kelleydrye.com              EdlinR@gtlaw.com
amacgregor@kelleydrye.com            WhitneyE@gtlaw.com
                                       AngelovaA@gtlaw.com

                                       *Attorneys for Defendant*
                                       *EMC Mortgage Corporation*

## CERTIFICATE OF SERVICE

I, Lauren C. Harrison, counsel for Defendant EMC Mortgage Corporation, certify that on the 14th day of January, 2011, I caused to be served the accompanying Defendant EMC Mortgage Corporation's Objections to Judge Theodore H. Katz's December 16, 2010 Report and Recommendation on Ambac's Motion for Leave to File an Amended Complaint and The Declaration of Eric N. Whitney in Support of Defendant EMC Mortgage Corporation's Objections to Judge Theodore H. Katz's December 16, 2010 Report and Recommendation on Ambac's Motion for Leave to File an Amended Complaint upon counsel for Plaintiff, pursuant to agreement by the parties, by electronic mail to the following addresses:

> Philip R. Forlenza (prforlenza@pbwt.com)
> Erik Haas (ehaas@pbwt.com)
> Niraj J. Parekh (njparekh@pbwt.com)
> Sarah Levin Goodstine (sgoodstine@pbwt.com)
> Nico Commandeur (ncommandeur@pbwt.com)
> PATTERSON BELKNAP WEBB & TYLER LLP
> 1133 Avenue of the Americas
> New York, NY 10036-6710
> Tel.: (212) 336-2000
> Fax: (212) 336-2222

Lauren C. Harrison