# Exhibit 1

Philip R. Forlenza
Erik Haas
Karla G. Sanchez
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
prforlenza@pbwt.com
ehaas@pbwt.com

*Attorneys for Ambac Assurance Corporation
and the Segregated Account of Ambac Assurance Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| AMBAC ASSURANCE CORPORATION and THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION, | : | Index No. 08 Civ. 9464 (RMB) (THK) |
| Plaintiffs, | : |  |
| - against - | : | **FIRST AMENDED COMPLAINT** |
| EMC MORTGAGE CORPORATION, BEAR, STEARNS & CO. INC. (now known as J.P. MORGAN SECURITIES INC.), JAMES E. CAYNE, ALAN C. GREENBERG, WARREN J. SPECTOR, ALAN D. SCHWARTZ, THOMAS MARANO, JEFFREY MAYER, MICHAEL NIERENBERG, JEFFREY L. VERSCHLEISER, BARON SILVERSTEIN, and MARY HAGGERTY, | : |  |
| Defendants. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

4106355v.1

NATURE OF THE ACTION ..................................................................................................1

I.    THE PARTIES..............................................................................................................18

      A.    PLAINTIFFS ......................................................................................................18

      B.    THE "BEAR STEARNS" DEFENDANTS ...............................................................19

      C.    THE INDIVIDUAL DEFENDANTS ........................................................................20

II.   JURISDICTION AND VENUE.....................................................................................22

III.  BACKGROUND ...........................................................................................................23

      A.    THE BEAR STEARNS MORTGAGE LOAN
            SECURITIZATION "MACHINE" .........................................................................23

            1.    Bear Stearns Controlled Every Aspect of the
                  Securitization Process ...........................................................................24

            2.    Bear Stearns Churned Out Securitizations by
                  Sacrificing Loan Quality........................................................................29

            3.    The Individual Defendants Drove Bear Stearns'
                  Securitization Machine to Assume Inordinate Risk
                  for Personal Gain ...................................................................................33

      B.    BEAR STEARNS MADE MATERIALLY FALSE AND
            MISLEADING DISCLOSURES TO INDUCE
            PARTICIPATION IN ITS SECURITIZATIONS ........................................................39

            1.    Bear Stearns Made Materially False and Misleading
                  Statements in Its Marketing Presentations and Deal
                  Correspondence......................................................................................40

            2.    Bear Stearns Disseminated Materially False and
                  Misleading Mortgage-Loan Tapes .........................................................45

            3.    Bear Stearns Disseminated Materially False and
                  Misleading Data Concerning the Historical
                  Performance of Its Earlier Securitizations .............................................47

            4.    Bear Stearns Knowingly Supplied Materially False
                  and Misleading Information to Secure Rating
                  Agency Ratings......................................................................................48

            5.    Bear Stearns Made Materially False and Misleading
                  Representations and Disclosures in the Offering
                  Documents to Market and Sell the Notes ...............................................53

      C.    BEAR STEARNS FAILED TO DISCLOSE AND
            AFFIRMATIVELY CONCEALED MATERIAL FACTS TO
            INDUCE PARTICIPATION IN ITS SECURITIZATIONS.................................................60

            1.    Bear Stearns Knowingly Conducted and Concealed
                  "Bad Due Diligence" .............................................................................60

i

2.  Bear Stearns Covertly Implemented Policies to Securitize Defective Loans ........................................................71

3.  Bear Stearns' Quality Control and Repurchase Practices Furthered Its Scheme to the Detriment of the Securitizations ................................................................76

4.  The Sheer Magnitude of Defective Loans Bear Stearns Securitized Overwhelmed Its Quality Control and Repurchase Protocols ...........................................81

5.  Bear Stearns Failed to Disclose That Its Counsel and Outside Auditors Found Its Claims Practices Contravened Its Contractual Provisions, Investors' Expectations, and Industry Standards ......................................82

6.  Bear Stearns Made Accommodations to Sellers to Conceal the Volume of Defective Loans and Maintain the Flow of Loans from Those Sellers ........................85

7.  Bear Stearns Did Not Disclose that It Was Clearing Out Its Inventory by Securitizing Defective Loans While Concealing Its True Assessment of the Securitized Loans ................................................................88

D.  EVEN AS IT REVIEWED BREACHING LOANS IN 2007, BEAR STEARNS STILL FAILED TO GIVE "PROMPT NOTICE" OF THE SECURITIZATION BREACHES ............................................93

E.  BEAR STEARNS THREATENED THE RATING AGENCIES TO AVOID DOWNGRADES THAT REFLECTED THE TRUE VALUE OF ITS SECURITIES ..................................................99

F.  AFTER THE MERGER WITH JP MORGAN, BEAR STEARNS IMPLEMENTED POLICIES TO REJECT WHOLESALE ITS REPURCHASE OBLIGATIONS TO MANIPULATE ITS ACCOUNTING RESERVES ....................................100

IV.  BEAR STEARNS FRAUDULENTLY INDUCED AMBAC AND INVESTORS TO PARTICIPATE IN THE TRANSACTIONS ..............................................................................107

V.  BEAR STEARNS' EXPRESS REPRESENTATIONS, WARRANTIES, AND CONTRACTUAL COVENANTS WERE A MATERIAL INDUCEMENT TO AMBAC TO PARTICIPATE IN THE TRANSACTIONS AND ISSUE ITS INSURANCE POLICIES ..............................................................112

A.  THE TRANSACTION DOCUMENTS ................................................112

1.  The SACO 2005-10 Transaction ............................................112

2.  The SACO 2006-2 Transaction ............................................114

4106355v.1

          3.    The SACO 2006-8 Transaction .............................................................116

          4.    The BSSLT 2007-1 Transaction ...........................................................118

    B.    EMC'S EXPRESS REPRESENTATIONS AND
          WARRANTIES THAT EFFECTUATED THE PARTIES'
          BARGAINED-FOR RISK ALLOCATION ...............................................................120

          1.    Loan-Level Representations and Warranties...........................................121

          2.    Transactional-Level Representations and
                Warranties.............................................................................................123

    C.    EMC'S CONTRACTUAL COVENANTS REINFORCING
          THE PARTIES' BARGAINED-FOR RISK ALLOCATION............................................126

          1.    EMC's Promise to Give Prompt Notice of Breaches...............................126

          2.    EMC's Promise to Repurchase or Cure Breaching
                Loans Within 90 Days ...........................................................................128

    D.    THE BROAD LEGAL AND EQUITABLE REMEDIES
          RESERVED AND AFFORDED TO AMBAC UNDER THE
          TRANSACTION DOCUMENTS...........................................................................129

          1.    Ambac's Express Right to Pursue Any and All
                Remedies at "Law or Equity" ................................................................129

          2.    Ambac's Contractual Rights to Indemnification and
                Reimbursement .....................................................................................131

          3.    Ambac's Subrogation Rights .................................................................131

VI.    EMC'S PERVASIVE BREACHES OF ITS
        REPRESENTATIONS AND WARRANTIES...............................................................133

    A.    AMBAC'S LOAN-LEVEL REVIEW UNCOVERED
          PERVASIVE BREACHES...................................................................................133

    B.    BEAR STEARNS' INTERNAL DOCUMENTS AND
          ADMISSIONS CONTRADICT ITS REJECTION NOTICES
          TO AMBAC AND REVEAL BEAR STEARNS' BAD FAITH...........................................136

    C.    AMBAC'S DISCOVERY OF BORROWERS AND OTHER
          THIRD PARTIES VALIDATES THE BREACHES
          IDENTIFIED IN ITS REPURCHASE NOTICES ..........................................................141

VII.    HARM SUFFERED BY AMBAC AND NOTE
        PURCHASERS..........................................................................................................144

FIRST CAUSE OF ACTION ...........................................................................................147

SECOND CAUSE OF ACTION .......................................................................................148

THIRD CAUSE OF ACTION ..........................................................................................149

FOURTH CAUSE OF ACTION .......................................................................................150

iii

FIFTH CAUSE OF ACTION ........................................................................................150

SIXTH CAUSE OF ACTION ........................................................................................151

SEVENTH CAUSE OF ACTION ...................................................................................152

EIGHTH CAUSE OF ACTION ......................................................................................153

NINTH CAUSE OF ACTION.........................................................................................153

PRAYER FOR RELIEF ................................................................................................155

4106355v.1

Plaintiffs Ambac Assurance Corporation ("Ambac") and the Segregated Account
of Ambac Assurance Corporation (the "Segregated Account," collectively with Ambac,
"Plaintiffs"), by their attorneys, Patterson Belknap Webb & Tyler LLP, for their complaint
against defendants EMC Mortgage Corporation ("EMC"), Bear, Stearns & Co. Inc. ("Bear,
Stearns & Co.," now known as J.P. Morgan Securities Inc., "JP Morgan," and together with
EMC, "Bear Stearns"), and James E. Cayne, Alan C. Greenberg, Warren J. Spector, Alan D.
Schwartz, Thomas Marano, Jeffrey Mayer, Michael Nierenberg, Jeffrey L. Verschleiser, Baron
Silverstein, and Mary Haggerty (the "Individual Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.    In mid-2006, Bear Stearns induced investors to purchase, and Ambac as a
financial guarantor to insure, securities that were backed by a pool of mortgage loans that – in
the words of the Bear Stearns deal manager – was a "SACK OF SHIT."[1]  Within the walls of its
sparkling new office tower, Bear Stearns executives knew this derogatory and distasteful
characterization aptly described the transaction.  Indeed, Bear Stearns had deliberately and
secretly altered its policies and neglected its controls to increase the volume of mortgage loans
available for its "securitizations" made in patent disregard for the borrowers' ability to repay
those loans.  After the market collapse exposed its scheme to sell defective loans to investors
through these transactions, Bear Stearns implemented an across-the-board strategy to disregard
its contractual promises to disclose and repurchase defective loans.  In what amounts to flagrant
accounting fraud, Bear Stearns' improper strategy was designed to avoid and has avoided
recognition of its vast off-balance sheet exposure relating to its contractual repurchase

---

[1] Email from Nicholas Smith (Bear, Stearns & Co. Vice President and Deal Manager) to Keith Lind
(Bear, Stearns & Co. Managing Director, Trading), dated August 11, 2006, EMC-AMB 004377399-400
(referring to SACO 2006-8 Transaction as a "SACK OF SHIT [2006-]8" and stating "I hope your [sic]
making a lot of money off of this trade.").

obligations – thereby enabling its senior executives to continue to reap tens of millions of dollars in compensation following the taxpayer-financed acquisition by JPMorgan Chase & Co.

2.     The securitization transactions at issue here involved the sale by EMC of pools of mortgage loans to trusts, which in turn issued to investors securities that were to be paid down by the promised cash flows from the mortgage loans. As the underwriter and deal manager for the securitizations, Bear, Stearns & Co. solicited rating agencies such as Standard & Poor's and Moody's to rate, bond insurers like Ambac to insure, and investors to purchase the mortgage-backed securities. Bear, Stearns & Co. and EMC acted in concert – under the common control of their parent The Bear Stearns Companies, Inc. – to dupe Ambac and investors to participate in their securitizations. (Thus, the two affiliates are referred together herein as "Bear Stearns" unless clarification is required.)

3.     Specifically, this action arises from Bear Stearns' fraudulent inducement of Ambac and investors to participate in four securitizations, and EMC's extraordinary and material breach of the unambiguous terms and fundamental premise of its agreements governing those transactions, executed between December 2005 and April 2007: the SACO I Trust Series ("SACO") 2005-10, 2006-2, and 2006-8 Transactions, and the Bear Stearns Second Lien Trust ("BSSLT") 2007-1 Transaction (collectively, the "Transactions").

4.     In order to induce Ambac's participation, Bear Stearns made representations to Ambac *in advance of the closing* of the Transactions regarding, among other things, (i) the "due diligence" purportedly conducted to prevent defective mortgage loans from entering the securitizations, (ii) the "quality control" processes purportedly implemented to weed out the aberrant defective loan that slipped through the diligence into the securitized pools, (iii) the protocols Bear Stearns purportedly would follow to "repurchase" any defective loan from the

2

securitizations, and (iv) the "seller monitoring" protocols Bear Stearns purportedly followed to prevent the securitization of loans from suppliers of bad loans. In the parties' agreements *executed in connection with closing*, EMC then made numerous express contractual representations and warranties concerning key attributes of the mortgage loans that backed the securities and the practices of the entities that made those loans, including that the loans were *not* originated through improper means (*e.g.*, fraud or underwriter negligence). EMC also contractually agreed to (a) provide "prompt" notification to Ambac and other deal participants of any loan found to breach its representations and warranties, (b) cure, repurchase, or provide adequate substitutes for breaching loans within 90 days thereafter, and (c) indemnify and reimburse Ambac for any losses caused by such breaches.

5.    Bear Stearns knew full well that these representations, going to the very premise of the securitizations, were false and misleading when made. As discovery of Bear Stearns' files and depositions of its employees have revealed, Bear Stearns secretly adopted certain practices and policies, and abandoned others, to (i) increase its transaction volume by quickly securitizing defective loans before they defaulted, (ii) conceal from Ambac and others the defective loans so it could keep churning out its securitizations, (iii) obtain a double-recovery on the defective loans it securitized, (iv) disregard its obligations to repurchase defective loans, and (v) profit on Ambac's harm.

6.    More specifically, Bear Stearns intentionally implemented certain "due diligence" protocols and rejected others to allow it to securitize loans made to borrowers with no ability to repay their loans. To start, Bear Stearns utilized due diligence firms to re-underwrite loans for its securitizations that *it knew* were not screening out loans that were defective and likely to default. As Bear, Stearns & Co. Senior Managing Director Jeffrey Verschleiser stated in no uncertain

3

terms to fellow Senior Managing Director Michael Nierenberg in March 2006, "[we] are wasting way too much money on Bad Due Diligence."[2] Almost exactly one year later nothing had changed, and in March 2007, Verschleiser reiterated with respect to the *same* due diligence firm that "[w]e are just burning money hiring them."[3] Despite this recognition, Bear Stearns did not change firms or enhance the diligence protocols. Thus, as one of its due diligence consultants frankly admitted, "[a]bout 75 percent of the time, loans that should have been rejected were still put into the pool and sold."[4]

7.     Moreover, even while criticizing its due diligence firms for failing to adequately detect defective loans, Bear Stearns routinely overrode their conclusions that loans should not be purchased for securitizations, and went ahead and purchased and securitized those loans (up to *65% of the time in the third quarter of 2006* according to one firm's report).[5] Bear Stearns ignored the proposals made by the head of its due diligence department in May 2005 to track the override decisions, and instead took the opposite tack, adopting an internal policy that directed its due diligence managers to delete the communications with its due diligence firms leading to its final loan purchase decisions, thereby eliminating the audit trail.[6] Further still, Bear Stearns elected *not* to implement "significant" changes to its due diligence protocols designed to detect

---

[2] Email from Defendant Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director) to Defendant Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director), among others, dated March 23, 2006, EMC-AMB 001542438-439.

[3] Email from Defendant Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director) to Defendant Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director), among others, dated March 15, 2007, EMC-AMB 005446200.

[4] Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio, dated May 27, 2008, http://www.npr.org/templates/story/story.php?storyId=90840958.

[5] Internal Report produced by Clayton Holdings, Inc., CLAY-AMBAC 0001770-80 at 1777 (showing a 65% override rate for EMC and 56% override rate for Bear Stearns in the third quarter of 2006).

[6] 4/21/2010 Mongelluzzo Deposition Tr. at 167-76; 2/3/2010 Rule 30(b)(6) Haggerty Deposition Tr. at 318-19.

4

and reject risky loans.[7]  In March 2007, for example, the same head of due diligence made a

proposal "to completely revamp how we do due diligence," which he conceded was the *same*

general proposal he made in May 2005, *but that was never implemented.*[8]  This was not

happenstance. Bear Stearns disregarded loan quality to appease its trading desk's ever-

increasing demand for loans to securitize.  In fact, Bear, Stearns & Co. Senior Managing

Director Mary Haggerty issued a directive in early 2005 to *reduce* the due diligence "in order to

make us more competitive on bids with larger sub-prime sellers."[9]

8.      In full recognition that its due diligence protocols did not screen out defective

loans and were merely a facade maintained for marketing purposes, Bear Stearns' trading desk

needed to quickly transfer the toxic loans from its inventory and into securitizations before the

loans defaulted. So as early as 2005, Bear Stearns quietly revised its protocols to allow it to

securitize loans before the expiration of the thirty- to ninety-day period following the acquisition

of the loans by EMC, referred to as the "early payment default" or "EPD" period.  Bear Stearns

previously held loans in inventory during the EPD period because, as Bear Stearns' Managing

Director Baron Silverstein recently acknowledged, loans that miss a payment shortly after the

loan origination (*i.e.*, within the EPD period) raise "red flags" that the loans never should have

been issued in the first instance.[10]  The revised policy enhanced Bear Stearns' earnings by

increasing the volume of loans it sold into the securitizations – but materially increased the

---

[7] 6/4/2010 Silverstein Deposition Tr. at 178.

[8] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) to Defendant Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) and Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated March 6, 2007, EMC-AMB 001431086.

[9] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) conveying instructions from Defendant Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to reduce due diligence, dated February 11, 2005, EMC-AMB 001718713-14.

[10] 6/4/2010 Silverstein Deposition Tr. at 192.

4106355v.1

riskiness of loans sold to the securitizations. Nonetheless, as its executives uniformly conceded, Bear Stearns never once disclosed the changes in its due diligence and securitization policies to investors or financial guarantors such as Ambac.[11]

9.      And it gets worse. Not satisfied with the increased fees from the securitizations, Bear Stearns executed a scheme to double its recovery on the defective loans. Thus, when the defective loans it purchased and then sold into securitizations stopped performing during the EPD period, Bear Stearns confidentially (i) made claims against the suppliers from which it purchased the loans (i.e., the "originators" of those loans) for the amount due on the loans, (ii) settled the claims at deep discounts, (iii) pocketed the recoveries, and (iv) left the defective loans in the securitizations. Bear Stearns did not tell the securitization participants that it made and settled claims against the suppliers. Nor did it review the loans for breaches of EMC's representations and warranties in response to the "red flags" raised by the EPDs. Bear Stearns thus profited doubly on defective loans it sold into securitizations. Indeed, the increase in loan volume from the securitization of defective loans proved so substantial, and the recoveries secured on those defective loans proved so lucrative that, by the end of 2005, the Bear Stearns' trading desk mandated that all loans were to be securitized before the EPD period expired.[12]

10.     Bear Stearns also concealed that its "quality control" and "repurchase" processes were *not* devoted to flushing out and removing breaching loans from the securitized pools, as Bear Stearns had represented. Rather, the processes were dedicated to securing recoveries against the suppliers of its toxic loans. That is, the quality control and repurchase departments'

---

[11] *See* Section III.C.2, below.

[12] Email from Chris Scott (Bear, Stearns & Co. Senior Managing Director, Trading) to, among others, Robert Durden (Bear, Stearns & Co. Deal Manager) and Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated January 3, 2006, EMC-AMB 001385832-833; 12/11/2009 Rule 30(b)(6) Durden Deposition Tr. at 272-73.

4106355v.1

resources were focused virtually exclusively on (i) identifying grounds for Bear Stearns to make

claims against the suppliers of the loans it securitized, and (ii) settling the claims at a discount –

without ever notifying the securitization participants of the defective loans it identified or the

funds it received.  In other words, the quality control department that Bear Stearns touted to

Ambac and investors did not provide them with the represented benefits.

11.     The secret settlement of the claims on the securitized loans was a win-win for

Bear Stearns and its suppliers, but a loss for the securitizations.  It was a win for the suppliers in

that they settled in confidence all claims with respect to the defective loans at a fraction of the

full amount that would have been due had the loans been repurchased from the securitization.

Conversely, if they did not comply with Bear Stearns' repurchase demands, Bear Stearns cut off

the financing it extended for the origination of additional defective loans.[13]  The secret settlement

was a win for Bear Stearns, which (i) reinforced its relations with the suppliers that it depended

on to provide the precious fodder for future securitizations by settling at the discounted amount,

and (ii) pocketed the recovery from the suppliers.  It was a loss to the securitization participants,

which were not notified of the defective loans in the securitizations and did not receive the

benefit from the repurchase of defective loans from the securitizations.

12.     Ironically, Bear Stearns' scheme worked so well – and resulted in the

securitization of so many loans made to borrowers that could not repay – that its quality control

---

[13] Bear Stearns extended financing to its suppliers that it knew – from its due diligence and quality control
processes – were originating defective loans, but cut-off that financing if the supplier defaulted on its
settlement agreement with Bear Stearns. *See* Letter from Stephen Golden (EMC Residential Mortgage
Corp. President) to SouthStar Funding LLC, dated April 9, 2007, EMC-AMCB1 57571-72;  Email from
Paul Friedman (Bear, Stearns & Co. Senior Managing Director, Fixed Income) to Defendant Jeffrey
Mayer (Bear, Stearns & Co. Senior Managing Director and Co-Head of Fixed Income), dated April 18,
2007, EMC-AMB 012043282-283.  By agreeing to finance and purchase loans from suppliers of
defective loans, Bear Stearns effectively engaged in the origination of defective loans.

and repurchase processes were soon overwhelmed.[14] By late 2005, Bear Stearns' internal audit department caught wind of the "significant backlog for collecting from and submitting claims to sellers," which it then tracked from October 2005 through January 2007.[15] Yet Bear Stearns did not disclose that its lauded repurchase protocols were overwhelmed and were not providing any benefit to the securitizations, and that it was not evaluating whether the defective loans it identified complied with EMC's representations and warranties to the securitization participants.

13.     By mid-2006, Bear Stearns' repurchase claims against the suppliers of the loans had risen to alarming levels, prompting warnings from its external auditors and counsel. In a report dated August 31, 2006, the audit firm PriceWaterhouseCoopers advised Bear Stearns that its failure to promptly evaluate whether the defaulting loans breached EMC's representations and warranties to the securitization participants was contrary to "common industry practices, the expectation of investors and . . . the provisions in the [deal documents]."[16] Shortly thereafter, Bear Stearns' internal counsel advised Bear Stearns' management that it was breaching its contractual obligations by failing to contribute to the securitizations the proceeds it recovered pertaining to the loans in the securitizations.[17] Bear Stearns did not disclose to Ambac either of the findings.

14.     Instead of making the requisite disclosures and undertaking the appropriate cures, in 2006 Bear Stearns implemented measures to obscure the magnitude of defective loans in its securitizations, and maintain its flow of loans from the suppliers of the defective loans. Thus,

---

[14] 4/26/2010 Golden Deposition Tr. at 119; *see* Section III.C.4, below.

[15] Bear Stearns Internal Audit Report, dated February 28, 2006, EMC-AMB 001496305-11 at p. 2; *see* Section III.C.4, below.

[16] *See* "UPB Break Repurchase Project – August 31, 2006," EMC-AMB 006803201-77 at 233

[17] *See* 2/3/2010 Rule 30(b)(6) Haggerty Deposition Tr. at 456-57; 4/26/2010 Golden Deposition Tr. at 39-40.

4106355v.1

Bear Stearns quickly moved to reduce the outstanding claims – to the detriment of the securitizations – by (i) settling the claims at a fraction of the dollar, (ii) waiving the claims entirely, or (iii) deferring (and potentially avoiding) the claims by extending the EPD period for securitized loans that defaulted during the initial EPD period, but then resumed payments.[18] Demonstrating the impropriety of its measures, Bear Stearns explicitly directed its employees *not* to extend the EPD period for loans in Bear Stearns' inventory, *i.e.*, not to apply the same rule for loans in its own inventory that it secretly adopted for the securitized loans. According to its Senior Managing Director, Bear Stearns adopted this dual standard because it knew loans that experienced an initial EPD were likely to default again and the "trading desk didn't want to own loans in inventory that had an EPD."[19] Bear Stearns' undisclosed policy thus imposed a risk on the securitizations that its own trading desk would not accept.

15. As a result of these covert measures, Bear Stearns was able to quickly address the backlog of claims, without disclosing or analyzing whether the loans on which it submitted claims breached EMC's representations and warranties to the securitizations. By January 2007, the Bear Stearns internal audit department reported that in 2006 it had resolved "$1.7 billion of claims, an increase of over 227% from the previous year," and that "$2.5 billion in claims were filed, reflecting an increase of 78% from the prior year."[20] The "majority" of the claims pertained to loans with EPDs, *i.e.*, the loans that Bear Stearns acquired without conducting the represented due diligence and conveyed to the securitizations before they defaulted.[21]

---

[18] *See* Section III.C.6, below.

[19] 4/26/2010 Golden Deposition Tr. at 152-53.

[20] Bear Stearns Internal Audit Department Escalation Memorandum, dated February 26, 2007, EMC-AMB 010858610-613 at 611.

[21] 4/26/2010 Golden Deposition Tr. at 120-21.

9

16.     As Bear Stearns made concessions to compete for an ever dwindling supply of loans, the magnitude of the defective loans aggregated for its securitizations was starkly evident to the "deal managers" responsible for disclosing the material information concerning the Transactions to potential participants. Thus, the Bear Stearns Vice President who acted as the deal manager for the SACO 2006-8 Transaction referred to the deal in correspondence with the trading desk as a "shit breather" and a "SACK OF SHIT."[22] Needless to say, Bear Stearns neglected to mention to Ambac or investors its internal assessments and derogatory characterizations, and did not terminate its securitization.

17.     Bear Stearns elected instead to continue to mischaracterize and securitize. Indeed, in early 2007, Bear Stearns publicly purported to "tighten" standards (to adopt policies that should have been in place all along) to buy time while it attempted to clear out its inventory of defective loans. For example, Bear Stearns downgraded certain suppliers of its loans to "suspended" or "terminated" status pursuant to its touted "seller monitoring" protocols, but then directed its quality control personnel *to stop conducting reviews of those originators' loans* so it could move the loans out of its inventory and into its securitizations.[23] And, if these loans were not securitized and left in inventory, the traders went on tirades, demanding "to know why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????"[24] Indeed, simultaneous with its hard sell to Ambac regarding its purported efforts to improve

---

[22] Remarkably, when his counsel attempted to elicit testimony to explain away these egregious characterizations, the best the Vice President could say is that "shit breather" was a "term of endearment." 6/2/2010 Smith Deposition Tr. at 211-12.

[23] 5/20/2010 Serrano Deposition Tr. at 180-184 (testifying that, over his objections, the President of EMC Residential Corporation, and others, directed the quality control department to stop the review of the suspended and terminated sellers).

[24] Email from Keith Lind (Bear, Stearns & Co. Managing Director, Trading) to Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated May 8, 2007, EMC-AMB 002283474-476.

10

underwriting standards of the loans in the BSSLT 2007-1 Transaction executed in April 2007,
the Bear Stearns analyst working on the deal more accurately described the deal in internal
correspondence as a "going out of business sale."[25] Another called it a "DOG".[26] Both were
accurate, yet undisclosed, internal perspectives. Indeed, one of the largest sources of loans in the
BSSLT 2007-1 Transaction was SouthStar Funding LLC, an originator that Bear Stearns
suspended before the Transaction closed, but stopped its quality control review on those loans so
it could move them into the deal.

18.     Bear Stearns' material misrepresentations and omissions, and false
representations and warranties, induced investors to purchase and Ambac to insure securities
issued in the Transactions from December 2005 to April 2007.

19.     What happened next is now – in small part – well known: With real estate prices
in decline, Bear Stearns and other lenders no longer could extend additional financing to
borrowers with no ability to pay so that borrowers could flip their properties to pay off their
loans or refinance their loans before they defaulted. The loans that never should have been
issued and securitized thus began to default in record numbers. As a result, in the latter part of
2007, the public saw the beginnings of the crisis unfold.

20.     In addition to the recently-revealed internal policies and practices that precipitated
the Transactions, what was not known until the discovery in this matter was Bear Stearns' (and
thereafter JP Morgan's) deliberate misconduct to conceal and avoid accountability for their
fraudulent conduct and contractual commitments after the Transactions closed. To start, in late

---

[25] Email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Keith Lind (Bear,
Stearns & Co. Managing Director, Trading), dated April 5, 2007, EMC-AMB 002075468.

[26] Email from John Tokarczyk (Bear, Stearns & Co. Associate Director) to Jeffrey Maggard (Bear,
Stearns & Co. Managing Director and Deal Manager on the BSSLT 2007-1 Transaction), dated April 30,
2007, EMC-AMB 001469603-604 ("LETS CLOSE THIS DOG").

11

2007, as the rating agencies began to adjust their ratings of Bear Stearns' mortgage-backed securities, Bear Stearns senior executives – including Senior Managing Director Thomas Marano – attempted to prop up those ratings with threats to withhold "every fee" due to the rating agencies that downgraded the Bear Stearns securities.[27] Bear Stearns then implemented a policy to conceal the defective loans it identified and thwart the repurchase demands made by Ambac and other securitization participants upon discovery of breaches of EMC's representations and warranties.

21.    Despite being advised by its outside auditors and counsel in mid-2006 to review the defective loans it identified for breaches of EMC's representations and warranties, it was not until late 2007, when it could no longer stifle the concern regarding its securities, that Bear Stearns adopted a policy to undertake such review. The belated implementation prompted its Quality Control Director to note that Bear Stearns was for the first time "fully honoring [its] obligations to pro-actively review defective loans for potential PSA [or, securitization] breach."[28] But Bear Stearns did *not* thereafter comply with its obligations to provide notice of the breaches it identified, despite direct inquiries and proffers made by Ambac and other securitization participants.

22.    By late 2007, Ambac began observing initial signs of performance deterioration in the Transactions, and requested from Bear Stearns the loan files for 695 non-performing loans,

---

[27] Email from Defendant Thomas Marano (Bear, Stearns & Co. Senior Managing Director) to Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated October 17, 2007, EMC-AMB 001424910-911.

[28] Email from Leslie Rodriguez (EMC Residential Corporation Managing Director) to Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims), dated September 14, 2007, EMC-AMB 006870106-110 at 108. *See also* Email from Fernando Serrano (EMC Mortgage Corporation, Quality Control Manager), dated September 12, 2007 attaching EMC Securitization Breach Quality Control Review protocol, EMC-AMB 011688246-249 at 248 ("Effective in September 2007, all Quality Control Channels . . . are providing to the Securitization Breach team a monthly reporting of all defective loans. This will ensure that going forward all defective loans are reviewed for a securitization breach concurrent with the QC review.").

12

which were drawn from each of the SACO Transactions. Ambac reviewed the loan files for compliance with EMC's representations and warranties and discovered widespread breaches of representations and warranties in almost 80% of the loans examined, with an aggregate principal balance of approximately $40.8 million across all the Transactions. Ambac provided EMC with its findings and asked EMC to comply with its contractual obligations to cure or repurchase the non-compliant loans. In disregard of its contractual obligations, EMC refused and continues to refuse to do so, even though Bear Stearns itself had identified widespread breaches *in the very same loan sample.*[29]

23.     Indeed, unbeknownst to Ambac until the discovery in this case, Bear Stearns engaged a consultant to preemptively review the same loan files Ambac requested in late 2007. After an iterative review process between Bear Stearns and its consulting firm to whittle down the breach rate, they still concluded that *56% of the loans* were defective.[30] In breach of its clear contractual obligations, Bear Stearns did not advise Ambac of its conclusions or provide Ambac or any other securitization participant with "prompt notice" of the breaches identified as it was required to do. Bear Stearns instead adopted a strategy to reject as a matter of course Ambac and other insurers' repurchase demands, regardless of Bear Stearns' own findings.

24.     Knowing that its fraudulent and breaching conduct was resulting and would result in grave harm to Ambac, Bear Stearns then implemented a trading strategy to profit from Ambac's potential demise by "shorting" banks with large exposure to Ambac-insured securities. (The "shorts" were bets the banks' shares or holdings would decrease in value as Ambac incurred additional harm.) In late 2007, Bear Stearns Senior Managing Director Jeffrey

---

[29] EMC "agreed" to repurchase just nine loans out of the sample reviewed, but has not done so.

[30] Loan Disposition Summary (AMB0710) prepared by Clayton Services, Inc. for Bear Stearns, dated November 16, 2007, CLAY-AMBAC 019669.

Verschleiser boasted that "[a]t the end of October, while presenting to the risk committee on our business I told them that a *few financial guarantors were vulnerable* to potential write downs in the CDO and MBS market and *we should be short* a multiple of 10 of the shorts I had put on . . . In less than three weeks we made approximately $55 million on just these two trades."[31] Bolstered by this success, Bear Stearns carried this trading strategy into 2008. On February 17, 2008, a Bear Stearns trader told colleagues and Defendant Verschleiser, "*I am positive fgic is done and ambac is not far behind.*"[32] The next day, in the same email chain, the trader again wrote to Defendant Verschleiser to clarify which banks had large exposures to Ambac, asking "*who else has big fgic or abk [Ambac] exposures besides soc gen?*"[33] As it was "shorting" the banks holding Ambac-insured securities, Bear Stearns continued to conceal the defects it discovered and deny Ambac's requests repurchase demands relating to collateral that back the securities issued in the Transaction. This strategy was reinforced when, in early 2008, Bear Stearns merged with and was renamed as JP Morgan.

25.      Having donned the JP Morgan mantel, and with its liabilities now consolidated into the JP Morgan Chase & Co. financials, Bear Stearns continued and expanded the improper strategy to deny insurers' repurchase demands – even in those instances that JP Morgan itself concluded the loans breached EMC's representations and warranties. JP Morgan did so to understate the accounting reserves it was required to accrue and disclose in its financial statements to reflect the liability inherited from Bear Stearns for repurchase obligations associated with defective loans. Thus, *within just days* of assuming control of Bear Stearns'

---

[31] Email from Defendant Verschleiser, dated November 20, 2007, EMC-AMB 009600760-63.

[32] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), dated February 17, 2008, EMC-AMB 012117052-063.

[33] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), to Defendant Verschleiser, among others, dated February 18, 2008, EMC-AMB 012117048-051.

repurchase review process, a JP Morgan Executive Director, with no prior knowledge of the deals, rejected half of Bear Stearns' breach findings, and in one stroke magically eliminated up to $14 million in liabilities, reducing the accounting reserves for those loans by almost 50%.[34]

26.     Moreover, even though Bear Stearns refused to repurchase breaching loans, the same JP Morgan executive demanded that suppliers repurchase *from* EMC the *same* loans, for the *same* reasons that financial guarantors had requested EMC to repurchase.[35] The duplicity is patent and the motivation clear: JP Morgan adopted a strategy to deliberately and systematically deny the financial guarantors' legitimate repurchase demands to avoid bringing onto its financial statements its off-balance sheet exposure and, in doing so, effectively engaged in accounting fraud.

27.     The senior management of Bear Stearns (now JP Morgan) allowed the foregoing misconduct to occur, and failed to implement the controls required to prevent such abuses, because they were making tens of millions of dollars churning out securitizations replete with loans that never should have been made, and that were only made because Bear Stearns provided the means to convert those loans into securities for sale to investors. Because Bear Stearns was a public company, and they were "playing with other people's money," the Bear Stearns executives disregarded the long-term implications of their conduct to generate the short-term earnings that funded their extraordinary compensation packages. This textbook example of unmitigated and realized "moral hazard" risk has wreaked unprecedented harm on (i) the

---

[34] Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities, Inc. Executive Director, Securitized Products), who was responsible for the "re-review" of Bear Stearns prior breach designations, dated May 05, 2008, EMC-AMB 007173918-919.

[35] *See, e.g.*, Letter from Alison Malkin (J.P. Morgan Securities, Inc. Executive Director, Securitized Products), on behalf of EMC to GreenPoint Mortgage, which is discussed in further detail at Section III.F, below.

borrowers that have defaulted in droves and lost their homes because they were put into loans they could not afford, (ii) the investors that purchased the securities issued in the Bear Stearns transactions, (iii) Ambac as a financial guarantor of the payments due to the investors, (iv) Bear Stearns' own shareholders, and (v) the national, and indeed global, economy.

28.    Bear Stearns' derogatory characterization of the loan pools it securitized is consistent with Ambac's on-going analyses of the loans in the Transactions. After conducting the initial review noted above, Ambac reviewed a random sample of 1482 loans, with an aggregate principal balance of approximately $88.2 million, selected across all four Transactions. The results of that review are remarkable. Of these 1,482 loans, 1,351, or over 91%, breached one or more of the representations and warranties that EMC had made to Ambac. As of June 2010, Ambac's loan-level review consisted of 6,309 loans, of which it identified 5,724 loans across the Transactions that breached one or more of EMC's representations and warranties. Bear Stearns (now JP Morgan) – acting with authority to perform EMC's obligations under the Transactions – has to date "agreed" to repurchase only 52 loans, or less than 1%, of those breaching loans, but has in fact not repurchased a single one.[36]

29.    The most prevalent breaches identified by Ambac are also the most troubling and involve: (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (ii) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines. The pervasiveness of these breaches has subsequently been confirmed by EMC's

---

[36] *See* Section VI.A, below.

recent disclosures of its internal quality control and claims documentation and data, as well as the dramatic testimony of the borrowers of those loans.[37]

30.     Loss and delinquency patterns experienced by the Transactions have also been consistent with these revelations. The loans that Bear Stearns securitized have defaulted at an extraordinary rate, depriving the Transactions of the cash flows required to pay down the respective securities and, thereby, requiring Ambac to make enormous payments with respect to its insurance policies. The four Transactions have together suffered more than $1.2 billion in losses, resulting in more than $641 million in total claims paid by Ambac to date.

31.     Bear Stearns' material misrepresentations, omissions and breaches of the parties' agreements fundamentally altered and essentially gutted the parties' bargain, the nature of the Transactions, and the value of and interests in the securitized loans. Bear Stearns has thereby inflicted and is inflicting tremendous harm on Ambac and the investors Ambac insures. Plaintiffs are entitled to be made whole and to be placed in the position that Ambac would have been in had it never entered into any of the Transactions.

---

[37] *See* Sections VI.B, & C, respectively, below.

4106355v.1

## I.    THE PARTIES

### A.    PLAINTIFFS

32.    Ambac is a Wisconsin corporation with its principal place of business at One State Street Plaza, New York, New York 10004.

33.    The Segregated Account of Ambac Assurance Corporation is a segregated account established on March 24, 2010 pursuant to Wisconsin Statute Section 611.24, with the approval of the Office of the Commissioner of Insurance of the State of Wisconsin (the "Commissioner").

34.    Upon the Verified Petition of the Commissioner, the Circuit Court for Dane County, Wisconsin, placed the Segregated Account into statutory rehabilitation under Wisconsin Statute Sections 645.31 and 645.32 on March 24, 2010. Pursuant to Wisconsin Statute Section 611.24(3)(e), the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right. Ambac allocated the policies and claims at issue in this action to the Segregated Account pursuant to the Plan of Operation for the Segregated Account attached to the Commissioner's Verified Petition (the "Plan of Operation").

35.    The Commissioner is the court-appointed Rehabilitator of the Segregated Account. As Rehabilitator, the Commissioner has the authority to prosecute the claims in this action on behalf of the Segregated Account. Management, control, and operational oversight of the Segregated Account is based in Dane County, Wisconsin, which is the location of the rehabilitation court and the place where both the court-appointed Rehabilitator and Special Deputy Commissioner reside and are employed.[38]

---

[38] Pursuant to the March 24, 2010 Order for Rehabilitation, the Dane County Circuit Court in the State of Wisconsin affirmed the Commissioner's authority by holding "that sufficient grounds and good cause exist for the relief requested by the Commissioner," placing the Segregated Account in Rehabilitation,

**18**

36.     Under the Plan of Operation, Ambac performs specified management services for the Segregated Account and retains the right to receive the recoveries relating to the policies and claims that were allocated to the Segregated Account, including the policies and claims at issue in this action.

B.     THE "BEAR STEARNS" DEFENDANTS

37.     Upon information and belief, EMC is organized under the laws of the State of Delaware and its principal place of business is at 2780 Lake Vista Drive, Lewisville, Texas 75067. At the time the Transactions were effectuated, EMC was a wholly owned subsidiary corporation of The Bear Stearns Companies Inc. ("The Bear Stearns Companies") and an affiliate of the depositor and underwriter in the Transactions. Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase & Co. acquired the assets and operations of The Bear Stearns Companies Inc., including Bear, Stearns & Co. and EMC, for nominal consideration in a transaction that was financed in part by a $29 billion non-recourse loan made by taxpayers (the "Merger"). Upon information and belief, after the Merger, EMC is wholly owned by The Bear Stearns Companies, LLC, which in turn is wholly owned by JPMorgan Chase & Co.[39]

38.     Upon information and belief, Bear, Stearns & Co. was an SEC-registered broker-dealer and a wholly-owned subsidiary of The Bear Stearns Companies principally located at 383 Madison Avenue, New York, NY 10179. Bear, Stearns & Co. served as the underwriter for all of the Transactions. Following the Merger, on or about October 1, 2008, Bear, Stearns & Co. merged with an existing subsidiary of JPMorgan Chase & Co. known as J.P. Morgan Securities Inc., and the resulting entity was renamed and is now doing business as J.P. Morgan Securities

_____

and naming the Commissioner as Rehabilitator of the Segregated Account with all powers granted under Wis. Stat. §§ 645.33–645.35.

[39] EMC's 7.1 Disclosure Statement filed January 20, 2009.

19

Inc. Accordingly, all allegations against Bear, Stearns & Co. are made against its successor-in-interest J.P. Morgan Securities Inc. (defined earlier, and referred to herein, as "JP Morgan" unless further clarification is required).

39.     JP Morgan is a wholly owned subsidiary of JPMorgan Chase & Co. and is the successor-in-interest to Bear Stearns.  JPMorgan Chase & Co. is an investment banking holding company incorporated in Delaware and principally located at 270 Park Avenue, New York, NY, 10016.

## C.     THE INDIVIDUAL DEFENDANTS

40.     Defendant James E. Cayne ("Cayne") was, at all relevant times, the Chairman of the Board of Directors and, until January 2008, Chief Executive Officer of Bear, Stearns & Co. Upon information and belief, Cayne operated and performed his official duties on behalf of Bear Stearns from New York, New York.

41.     Defendant Alan C. Greenberg ("Greenberg") was, at all relevant times, Chairman of the Executive Committee of Bear, Stearns & Co.  Upon information and belief, Greenberg operated and performed his official duties on behalf of Bear Stearns from New York, New York.

42.     Defendant Warren J. Spector ("Spector") was, through 2007, President and Co-Chief Operating Officer of Bear, Stearns & Co.  Upon information and belief, Spector operated and performed his official duties on behalf of Bear Stearns from New York, New York.

43.     Defendant Alan D. Schwartz ("Schwartz") was, at all relevant times, President, Co-Chief Operating Officer, or Chief Executive Officer of Bear, Stearns & Co.  Upon information and belief, Schwartz operated and performed his official duties on behalf of Bear Stearns from New York, New York.

44.     Defendant Thomas Marano ("Marano") was, at all relevant times, a Bear, Stearns & Co. Senior Managing Director, and head of the Mortgage-Backed Securities ("MBS"), Asset-

20

Backed Securities ("ABS"), and Commercial Mortgaged-Backed Securities ("CMBS") departments in Bear, Stearns & Co. Upon information and belief, Marano operated and performed his official duties on behalf of Bear Stearns from New York, New York.

45.     Defendant Jeffrey Mayer ("Mayer") was, at all relevant times, a Bear, Stearns & Co. Senior Managing Director and Co-head of Fixed Income at Bear, Stearns & Co. Upon information and belief, Mayer operated and performed his official duties on behalf of Bear Stearns from New York, New York.

46.     Defendant Michael Nierenberg ("Nierenberg") was, at all relevant times, a Bear, Stearns & Co. Senior Managing Director and head of the Adjustable Rate Mortgage ("ARM") and Collateralized Debt Obligation ("CDO") Desk at Bear, Stearns & Co. Upon information and belief, Nierenberg operated and performed his official duties on behalf of Bear Stearns from New York, New York.

47.     Defendant Jeffrey L. Verschleiser ("Verschleiser") was, at all relevant times, a Bear, Stearns & Co. Senior Managing Director  and head of the ABS and Wholeloan Desk at Bear, Stearns & Co. Upon information and belief, Verschleiser operated and performed his official duties on behalf of Bear Stearns from New York, New York.

48.     Defendant Mary Haggerty ("Haggerty") was, at all relevant times, a Senior Managing Director and Co-head of Mortgage Finance at Bear, Stearns & Co. Haggerty also served as Acting President and Chief Executive Officer ("CEO") of EMC. Following the merger with JPMorgan Chase & Co., Haggerty assumed the position of managing director in the Securitized Products Group at JP Morgan. Upon information and belief, Haggerty operated and performed her official duties on behalf of Bear Stearns from New York, New York.

49.     Defendant Baron Silverstein ("Silverstein") was, at all relevant times, a Senior
Managing Director and Co-head of Mortgage Finance at Bear, Stearns & Co. Following the
merger with JPMorgan Chase & Co., Silverstein assumed the position of Managing Director of
Mortgage Finance at JP Morgan. Upon information and belief, Silverstein operated and
performed his official duties on behalf of Bear Stearns from New York, New York.

## II.     JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331 (action arising under the laws of the United States) and § 1367 (supplemental jurisdiction).
Subject matter jurisdiction is likewise proper pursuant to 15 U.S.C. § 77v for violations of the
Securities Act of 1933, and pursuant to 15 U.S.C. § 78aa, which confers exclusive jurisdiction on
the district courts of the United States for violations of the Securities Exchange Act of 1934.

51.     This Court has personal jurisdiction over defendants in this judicial district
pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise
to Ambac's claims occurred, and defendants currently are subject to personal jurisdiction, in the
Southern District of New York. Personal jurisdiction is likewise proper pursuant to 15 U.S.C. §
78aa (jurisdiction over offenses and violations of the Securities Exchange Act of 1934 in districts
where the defendant is found, transacts business, or where an offer or sale took place).

52.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a), governing
venue in the federal courts, and 15 U.S.C. § 78aa, governing jurisdiction and venue of suits
under the Securities Exchange Act of 1934, as Bear Stearns' principal place of business is
located within the jurisdiction of the Southern District of New York and a substantial part of the
events giving rise to Plaintiffs' claims occurred within the Southern District of New York as
well.

22

53.   Further, in its Insurance and Indemnity Agreement ("I&I Agreement") with Ambac for each Transaction, EMC irrevocably submitted to the "non-exclusive jurisdiction of the United States District Court for the Southern District of New York."[40]  In addition, in each I&I Agreement, EMC "waive[d] and agree[d] not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts."[41]

## III.   **BACKGROUND**

### A.   THE BEAR STEARNS MORTGAGE LOAN SECURITIZATION "MACHINE"

54.   This action arises from the materially false and misleading disclosures and representations and warranties made by Bear Stearns in connection with the securitization of mortgage loans in four Transactions executed in December 2005, January 2006, September 2006, and April 2007.  Each Transaction involved the pooling and sale of mortgage loans to a trust.  The trusts issued debt securities of varying seniority, whose payments to investors were dependent on, or "backed" by, the cash flow received from the mortgage payments on the pooled loans.  The four Transactions were among hundreds that the Bear Stearns securitization machine churned out from 2005 to 2007.

---

[40] *See, e.g.,* I&I Agreement § 6.05(a) (for each Transaction).

[41] *Id.*

23

### *1.    Bear Stearns Controlled Every Aspect of the Securitization Process*

55.     Through its well-engineered network of affiliates, Bear Stearns controlled every link in the mortgage-loan-securitization chain, including (i) the origination, and financing of the origination, of loans that provided the cash flow for the mortgage-backed securities, (ii) the "warehousing" or temporary financing of large pools of loans pending their pooling and securitization into mortgage-backed securities, (iii) the underwriting, offering, and sale of the mortgage-backed securities, and (iv) the servicing of loan pools to ensure the continued payment of principal and interest needed to make payments under the mortgage-backed securities. As Bear Stearns' parent, The Bear Stearns Companies, reported in its 2006 Annual Report, this "vertically integrated franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing."[42] Bear Stearns and the affiliates that implemented each of these components or the mortgage-securitization process were directed and controlled by the Individual Defendants sitting in New York, and shared common board members, executives, systems, and resources.[43]

56.     Bear Stearns used the offices of EMC in Texas to house its mortgage-loan "conduit" that generated the flow of loans into the securitization pipeline from which the mortgaged-backed securities issued.[44] Defendant Haggerty, who was the Senior Managing Director responsible for the conduit's creation in 2001, explained that the EMC conduit acquired

---

[42] The Bear Stearns Companies Inc., 2006 Annual Report, at 11 (2007).

[43] 4/26/2010 Golden Deposition Tr. at 12-13, 52-53 (stating that the "reporting relationship was to New York" and noting that approximately 50 to 60 individuals had dual titles at Bear Stearns and an EMC entity); 12/11/ 2009 Durden Rule 30(b)(6) Deposition Tr. at 45; 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 71-73; 4/15/2010 Gray Deposition Tr. at 48; 5/28/2010 Sears Deposition Tr. at 247-48.

[44] 4/19/2010 Glory Deposition Tr. at 93-95 (Bear Stearns Managing Director testified that references to the "Bear Stearns Subprime Mortgage Conduit" meant the conduit housed at EMC); EMC Investor Presentation dated July 26, 2006, EMC-AMB 010838314-413 at 315(EMC's conduit operations were headquartered in Dallas, Texas).

mortgage loans for securitization and not to hold in inventory: "[I]f you think of a pipe, water comes in and water goes out as opposed to a pipe leading to a reservoir that's going to be held."[45] EMC thus supplied the Bear Stearns securitization machine with mortgage loans that Bear Stearns had no intention of ever holding, and indeed was loathe to hold, in its own inventory.

57.     EMC guided the flow of loans through the pipeline by (i) acquiring and aggregating the mortgage loans to be securitized, (ii) sponsoring the securitizations by selling loan pools to the trusts that issued the securities, and (iii) acting as "servicer" for a large number of the securitized loans, with, among other things, the obligation to collect amounts from the borrowers for the benefit of the trusts. Moreover, as discussed in detail below, EMC also purported to undertake pre- and post-acquisitions reviews and implement other controls to ensure the quality of the loans acquired.

58.     The majority of loans EMC acquired for securitization were purchased from large third-party originators, such as American Home Mortgage Investment Corp., SouthStar Funding, LLC ("SouthStar"), SunTrust Mortgage, Inc., Impac Funding Corporation, Just Mortgage, Inc. ("Just Mortgage"), and GreenPoint Mortgage Funding, Inc. ("GreenPoint"). Bear Stearns and its affiliates extended financing within its originator network,[46] which offered an advance line of funds available to originators to maintain the constant stream of loans acquired by EMC for securitization.[47] Indeed, in the same correspondence offering financing, Bear Stearns reminded

---

[45] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 21.

[46] Bear Stearns Mortgage Capital Corporation was the warehouse financing facility for Bear Stearns' bulk acquisition channel; EMC Residential housed the warehouse financing facility for loans acquired through the flow acquisition channel. 6/4/2010 Silverstein Deposition Tr. at 93-94; *see also* 4/15/2010 Gray Deposition Tr. at 11-14 (EMC Residential was a warehouse lender that provided funds to correspondent lenders of mortgage loans).

[47] For example, internal EMC documents show that as of May 2005, SouthStar's credit limit with EMC Residential Warehouse Group was increased to $375 million on May 19, 2005 (EMC-AMB 010940606-47, at 631), and remained a "warehouse client" through March 2007 (EMC-AMB 006783646-48).

4106335v.1

the originators that it would pay premium pricing on any loans originated and sold to EMC.[48]
Because the originators were not lending their own funds, Bear Stearns encouraged and enabled
them to originate a continuous flow of defective loans. Bear Stearns provided the means by
which these originators approved and generated scores of mortgages in total disregard of
borrowers' ability to repay their debts and which it knew – from due diligence, conducted by
third-party firms such as Clayton, and its quality control – violated state laws, including
deceptive trade practices and anti-predatory lending laws, such as those requiring that the loan or
refinancing must be in the borrowers' best interests.[49]

   59. EMC also obtained loans for securitization from its originator affiliates Bear
Stearns Residential Mortgage Corporation and EMC Residential Corporation.[50] Bear Stearns
thus generated, for EMC, an enormous volume of residential mortgage loans that it financed,
purchased and originated, "with the ultimate strategy of securitization into an array of Bear
Stearns' securitizations."[51] Bear Stearns leveraged its multiple roles and affiliates to dictate
loan-origination standards for the loans it securitized, either by requiring that loans be originated

---

Similarly, Bear Stearns extended credit to Just Mortgage exceeding $65 million between September 28, 2005 and December 22, 2006 (EMC-AMB 010940606-47 at 626). *See also* 6/4/2010 Silverstein Deposition Tr. at 90-94 (confirming that American Home and Impac received financing); 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 249-53 (discussing an e-mail that confirms that SouthStar received financing).

[48] Email from Norman Scott (Bear, Stearns & Co. Inc. Vice President and Product Manager) to CPMC, dated April 4, 2005, EMC-AMB 001254436-437 at 437 ("Bear Stearns have [sic] substantially expanded our Alt-A and Sub Prime product offering and are offering premium pricing for product that is sent to the warehouse facility and purchased by EMC.").

[49] In response to an investigation by the Attorney General of Massachusetts, another investment bank which engaged in similar practices as alleged herein agreed to pay the state $102 million. See Assurance of Discontinuance, In re Morgan Stanley & Co. Inc., No. 10-2538 (Super. Ct. Mass. June 24, 2010).

[50] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 41-42 (Bear Stearns Residential Mortgage Corporation was a wholesale lender that commenced operations in 2005; its assets were sold to Loan Star funds in May 2008).

[51] *See* Prospectus Supplement ("ProSupp") for SACO 2006-8 Transaction, dated Sept. 14, 2006 ("SACO 2006-8 ProSupp"), at S-29.

26

to its published guidelines or by approving the guidelines used by its larger originators, with whatever changes Bear Stearns believed were necessary.[52] But, Bear Stearns abandoned the protocols necessary to ensure adherence to those guidelines.

60.     Bear, Stearns & Co., for its part, acted as lead underwriter and designated its employees as the deal managers to broker the EMC-sponsored securities offerings. It solicited the rating agencies to rate, financial guarantors such as Ambac to insure, and investors to purchase these mortgage-backed securities.[53] Thus, Bear, Stearns & Co. (i) worked with EMC to structure the Transactions,[54] (ii) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the Transactions, (iii) purchased the mortgage-backed securities issued in the Transactions (the "Notes") on a firm commitment basis pursuant to written agreements with the Depositor,[55] and (iv) offered and sold the Notes to

---

[52] Bear Stearns Subprime Mortgage Conduit and EMC Servicing Investor Presentation, EMC-AMB 001421565-597 at 572, 576 (noting process to "approve seller underwriting guidelines."). *See also* 4/26/2010 Golden Deposition Tr. at 54-55 ("[O]n the origination side, I guess we set the – the limits and the type of product that sellers could sell to EMC.").

[53] 4/19/2010 Glory Deposition Tr. at 49-55, 57-59 (testimony regarding EMC and Bear Stearns roles).

[54] *See, e.g.*, ProSupp for SACO 2006-2 Transaction, dated January 26, 2006 ("SACO 2006-2 ProSupp"), at S-39 ("Subsequent to purchase by the sponsor, performing loans are pooled together . . . with the assistance of Bear Stearns' Financial Analytics and Structured Transactions group, for distribution into the primary market."); *see also* SACO 2006-8 ProSupp at S-29; ProSupp for BSSLT 2007-1 (Group I) Transaction, dated April 30, 2007 ("BSSLT 2007-1 (Group I) ProSupp"), at S-35, and ProSupp for BSSLT 2007-1 (Groups II & III) Transaction, dated April 30, 2007 ("BSSLT 2007-1 (Groups II & III) ProSupp"), at S-47.

[55] For example, in the SACO 2005-10 Transaction, Bear, Stearns & Co. and the Depositor, Bear Stearns Asset Backed Securities I LLC, entered into an Underwriting Agreement, dated December 12, 2005, and Terms Agreement, dated December 20, 2005, providing that:  "Underwriter agrees, subject to the terms and provisions of the above-referenced Underwriting Agreement, which is incorporated herein in its entirety and made a part hereof, to purchase the respective principal amounts of the Classes of the above-referenced Series of Certificates as set forth herein." Bear, Stearns & Co. and the Depositor entered into similar Underwriting Agreements and Terms Agreements in the SACO 2006-2, SACO 2006-8, and BSSLT 2007-1 Transactions with virtually identical language.

27

investors.[56] The Bear, Stearns & Co. trading organization – reporting to Defendant Marano –
also made the decisions on the volume of securitizations to effectuate, and, likewise, the volume
of loans being acquired by the conduit was "highly controlled by the trading desk."[57] And, as
discussed further below, Bear, Stearns & Co. executives made decisions regarding the due
diligence, quality control, and repurchase protocols to be followed (or not followed) by EMC in
relation to the securitized loans.

     61.    Bear Stearns' affiliates also frequently purchased or retained a financial interest in
a portion of the securities issued in these transactions, which it often repackaged into securities
known as "collateralized debt obligations" ("CDOs"). Finally, Bear Stearns provided financial
research for residential mortgage-backed securities and related structured products that it created
and sold.

     62.    Through Bear Stearns, The Bear Stearns Companies recorded gains and earned
fees at every step in this chain: (i) loan-origination fees, (ii) gains on sale of the mortgages to the
securitization trusts, (iii) fees from underwriting mortgage-backed securities, (iv) fees from
servicing of the securitized loans, (v) fees from CDOs into which these securities were
repackaged, (vi) gains and fees from trading in these securities and interests in the CDOs into
which they were placed, and (vii) management fees and carried interests from hedge funds and
other investment vehicles that invested in the vast array of securities and financial products
structured by Bear Stearns and its affiliates that ultimately were backed by residential mortgage
loans.

---

[56] The Underwriting Agreements further provide: "It is understood that each Underwriter proposes to
offer and/or solicit offers for the Certificates to be purchased by it for sale to the public as set forth in the
Prospectus . . . ."

[57] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 86-87.

4106355v.1

63.     As discussed below, the greatest benefit from these fees flowed to the Individual

Defendants, who obtained obscene compensation by putting at risk Bear Stearns' ongoing

wherewithal. These executives' reckless pursuit of fees without the requisite checks and controls

came at a cost for which they now must account.

### 2.     Bear Stearns Churned Out Securitizations by Sacrificing Loan Quality

64.     At the time the Transactions at issue in this litigation were consummated, The

Bear Stearns Companies had long been a leader in all facets of mortgage-loan securitization, at

or near the top of the charts for issuance and underwriting of mortgage-backed securities for 17

years running.[58] The Bear Stearns Companies built this once-stellar reputation on the

securitization of large, high-quality loans referred to as "jumbo prime," which was the business it

maintained until 2001.[59]

65.     But The Bear Stearns Companies then formed the mortgage-loan conduit at EMC

that effectuated the Transactions at issue. The new conduit initially focused on the securitization

of "Alt-A" loans, which were made to borrowers that were generally considered more risky than

prime borrowers. The profits from the securitizations grew year after year, but really took off in

2003, when Bear Stearns began to securitize "subprime" mortgage loans, which it never squarely

defines, but that generally constitute loans issued to borrowers with limited incomes or relatively

low FICO credit scores due to poor credit history.[60]

---

[58] See, e.g., Asset-Backed Alert, Dec. 31, 2006, available at:

http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725
(ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 The Bear
Stearns Companies Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked
as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's
securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall
U.S. mortgage securities market").

[59] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 28, 30.

[60] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 32-33 (EMC began purchasing subprime loans for
securitization); see also 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 29-30 (unable to provide a

29

66.     From 2003 to 2006, The Bear Stearns Companies' revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization machine.[61]  For 2006, The Bear Stearns Companies' overall securitization volume rose to $113 billion from $95 billion in fiscal 2005, amounting to 11% of the overall U.S. mortgage-securities market.[62]  Consistently, the volume of EMC's securitizations grew markedly over the same period.  In 2003, EMC securitized 86,000 loans valued at approximately $20 billion.  That number nearly tripled in 2004 to 230,000 loans valued at $48 billion.[63]  In 2005, the number jumped to 389,000 loans valued at nearly $75 billion.[64]  And in 2006, EMC securitized over 345,000 loans valued at $69 billion.[65]  All told, from 2003 to 2007, EMC purchased and securitized more than one million mortgage loans originally valued in excess of $212 billion.[66]

67.     Bear Stearns achieved the dramatic growth in its securitization volume by (i) obtaining an ever-increasing supply of mortgage loans for its securitizations, while (ii) maintaining the demand for the securities backed by those loans.

68.     Having already moved from the prime into the Alt A and subprime markets, Bear Stearns further extended the reach of its mortgage portfolio by expanding its use of "reduced documentation" or "no documentation" loan programs.  While these programs bear various

---

definition distinguishing Alt-A loans from subprime); 4/15/2010 Glory Deposition Tr. at 178-79 (testifying she had no knowledge of whether the definition of subprime changed over time); 5/28/2010 Sears Deposition Tr. at 36-37 (defining a subprime loan as one given to a borrower with "less than pristine" credit history); 6/2/2010 Smith Deposition Tr. at 93 ("I don't believe there was a definition [of subprime]").

[61] The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (Nov. 30, 2006); The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

[62] Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006.

[63] SACO 2006-8 ProSupp at S-29.

[64] SACO 2006-8 ProSupp at S-29.

[65] BSSLT 2007-1 (Group I) ProSupp at S-35.

[66] BSSLT 2007-1 (Group I) ProSupp at S-35.

4106355v.1

names (e.g., "Stated Income," "No Ratio," "Stated Income Stated Asset," or "SISA"), they share the common characteristic of requiring less documentation from the borrower than traditional full documentation loan programs. Accordingly, the reduced or no documentation programs were designed to be offered only to certain types of pre-qualified borrowers (e.g., self-employed individuals with very strong credit and substantial equity in the mortgaged property), and the originators supplying the loans were required to use alternative means of assessing the borrowers' ability to repay the loans. However, over time, Bear Stearns and its stable of originators expanded these programs to riskier categories of borrowers in order to increase loan volume.

69.     In addition to the expanded use of the reduced documentation programs, to keep the pipeline full, EMC added second-lien loans and home-equity lines of credit ("HELOCs") to its portfolio of mortgage products. HELOCs, which are among the loans securitized in two of the Transactions, provide borrowers with a revolving line of credit that is generally secured by secondary lien on the property. EMC's HELOC business began in 2005 with over 9,300 HELOCs valued at more than $509 million and grew to more than 18,000 HELOCs valued at over $1.2 billion by the end of 2006.[67] The growth in its second-lien business was meteoric, with volume skyrocketing from approximately 15,000 loans valued at approximately $660 million at the end of 2004 to approximately 116,500 loans valued at approximately $6.7 billion at the end of 2006.[68]

70.     The reduced documentation programs and second-lien products Bear Stearns exploited had been in use in residential mortgage lending for some time, and were not at the time considered problematic in and of themselves. Rather, the programs and products were

---

[67] BSSLT 2007-1 (Group I) ProSupp at S-35.

[68] BSSLT 2007-1 (Group I) ProSupp at S-35.

31

4106355v.1

appropriate sources of loans *so long as* commensurate controls were implemented and followed

to ensure the quality of the securitized loans.

71.    As discussed in detail below, Bear Stearns made extensive representations in

advance of and at the closing of its securitizations to convince investors and financial guarantors,

including Ambac, that it had implemented and was applying the controls required to ensure the

quality of these loans.  The Bear Stearns Companies underscored the commitment to loan quality

to assuage any concerns regarding the pace of its growth:

> [O]ur [origination and] conduit business . . . saw a significant
> increase in origination volume over the course of the year and
> that's important not only because it secures a direct pipeline of
> product for securitization and thereby allows us to maintain and
> increase share, but also it has a lot to do with the quality of the
> product that we're able to put out in the nonagency space.[69]

72.    The Bear Stearns Companies' pitch was persuasive and worked.  Bear Stearns'

representations induced Ambac to insure payments due on securities issued from its

securitization pipeline, and induced investors to purchase those securities.

73.    But what only very recently has come to light is that Bear Stearns' expanded

securitization of these products was *not* accompanied by implementation – but rather by the

abandonment – of controls required to ensure the quality of the securitized loans.

74.    By abandoning appropriate underwriting and due diligence to increase loan

volume, Bear Stearns conveyed to each of the Transactions loan pools that were replete with

loans that did not comply with the requisite underwriting guidelines and were made to borrowers

who did not have the ability to repay their debts.  As a result, Bear Stearns marketed and sold

billions of dollars worth of securities backed by mortgage loans that did not conform with the

representations made.

---

[69] The Bear Stearns Companies Investor Conference Call regarding Q4 2005 Earnings, Dec. 15, 2005.

75.     But, Bear Stearns did not take steps to ensure the "quality of the product." Quite to the contrary, Bear Stearns pushed for increased loan volumes at the expense of underwriting standards.[70] As a consequence, it turns out that, as has recently been learned, EMC's inventory of mortgage loans was replete with loans (i) originated by fraud, material misrepresentations, or omissions and (ii) underwritten without regard to prudent standards or the fundamental principles of mortgage lending, which require a good-faith assessment of the borrower's ability and willingness to repay the loan.

76.     Bear Stearns' securitization machine was a successful and extraordinarily profitable enterprise for The Bear Stearns Companies, which further solidified and enhanced its sterling reputation and tremendous sway in all areas of mortgage finance. This success was short-lived. The undisclosed truth is that Bear Stearns produced and disseminated toxic securities into the marketplace, backed by loans made to borrowers with no ability to pay the amounts as due over the life of the loans. As a result, while Bear Stearns executives reaped enormous profits, their actions caused the company's sudden collapse in 2008, and destroyed the livelihood of millions of Americans (including those individuals that obtained loans that never should have been approved, or whose retirement plans invested in Bear Stearns' securitizations).

### 3.     *The Individual Defendants Drove Bear Stearns' Securitization Machine to Assume Inordinate Risk for Personal Gain*

77.     The Individual Defendants named in this action are the key "decision-makers" who drove the Bear Stearns securitization machine and were responsible for Bear Stearns'

---

[70] *See Bear Naked Lenders*, Wall St. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management, but let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade."); *see also* Michael Corkery, Fraud Seen as Driver in Wave of Foreclosures-Atlanta Ring Scams Bear Stearns, Getting $6.8 Million in Loans, Wall St. J., Dec. 21, 2007, at A1 ("During its first full year of business in 2006, Bear Stearns Residential Mortgage originated 19,715 mortgages for a combined $4.37 billion, according to data compiled by the Federal Reserve and analyzed by The Wall Street Journal. Bear Stearns Residential Mortgage rejected about 13% of applications, compared with an average denial rate of 29% nationally, according to the Fed data.")

33

fraudulent scheme and failure to implement the requisite controls relating to its securitizations.
In the marketing materials disseminated to Ambac and investors to induce their participation in
the Transactions, Bear Stearns identified the Individual Defendants, in their official capacities, as
the senior executives within Bear Stearns' Residential Mortgage Backed Securities Team as
follows:[71]

**Bear Stearns's Residential Mortgage Team**



78.   From their respective positions in the upper echelons of Bear, Stearns & Co.'s
executive management, Defendants Cayne, Greenberg, Spector, and Sehwartz directed or
encouraged the very policies and procedures undertaken to expand securitization volume for the
sake of maximizing short-term profitability, with intentional or reckless disregard to the
fraudulent disclosures used to market and sell the securities issued in connection with Bear
Stearns' residential mortgage-backed securitization transactions.  For example, Defendants
Cayne, Marano, Mayer, Spector and Schwartz received internal audit reports specifying the need

---

[71] *See* June 2005 Bear Stearns RMBS Platform, www.emcmortgagecorp.com (ABK-EMC01515471-561
at p.5).

4106355v.1

to establish and enhance controls relating Bear Stearns' quality control and claims operations, which resulted in the massive, undisclosed profits from the securitization of patently defective loans.[72] But those operations were not implemented, and specifically, the senior executives did not establish compliance protocols to ensure Bear Stearns was not securitizing pools replete with loans made to borrowers with no ability to repay. This upper management of Bear, Stearns & Co. thus enabled and encouraged the remaining Individual Defendants to implement and perpetuate Bear Stearns' fraudulent scheme.

79.    Defendant Mayer met with Ambac's then-CEO, and Managing Director of Consumer Asset-Backed Securities Department, in advance of the Transactions and represented Bear Stearns in soliciting Ambac's executives to induce Ambac's participation in Bear Stearns' securitizations.[73] Defendant Mayer also supervised various aspects of the mortgage-finance business, oversaw Bear Stearns' purported loan underwriting guidelines, and received, among other things, internal audit reports and memoranda regarding reserves.[74]

80.    In the words of a former Bear Stearns executive, Defendants Marano, Nierenberg and Verschleiser acted as the "decision-makers" during the relevant time frame who "were actively involved in running the mortgage business, which included servicing conduit, trading,

---

[72] Email from Stephanie Paduano (Bear, Stearns & Co. Internal Audit Department) dated March 7, 2006, forwarding EMC Reps & Warrants Internal Audit Report dated Feb. 28, 2006, EMC-AMB 001496304-311.

[73] Email from Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side) to, among others, Defendants Nierenberg and Silverstein, dated August 29, 2005, EMC-AMB 003372069-070; Email from Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side) to, among others, Defendants Nierenberg and Verschleiser, dated March 23, 2007, EMC-AMB 002290230.

[74] *See, e.g.*, email from Stephanie Paduano (Bear, Stearns & Co. Internal Audit Department), *supra* note 72; *see also* email from Defendant Marano to, among others, Defendant Mayer, dated January 25, 2008, EMC-AMB 005486312-327 (attaching MBS reserve memo).

35

etc."[75] As the Senior Managing Director and Global Head of Mortgage-Back Securities and Asset-Backed Securities, "[d]ecisions about how much risk to put on would have been made by the trading organization, which reported up to [Defendant] Marano" and he "would have been well aware of the amount of risk that was being taken on in terms of acquiring assets and . . . the activities with respect to securitization[.]"[76] Defendant Marano reported directly to Defendant Mayer.[77]

81.     As the Co-heads of Mortgage Trading, Defendants Nierenberg and Verschleiser directly supervised Defendants Haggerty and Silverstein in Bear Stearns' Mortgage Finance Department, and had oversight in all aspects of Bear Stearns' mortgage-finance operations. For example, the traders responsible for determining which loans to package and securitize in the Transactions would report to Defendant Verschleiser.[78] Defendants Nierenberg and Verschleiser each reported to Defendant Marano.

82.     As the Co-heads of Bear, Stearns & Co.'s Mortgage Finance Department, Defendants Haggerty and Silverstein each had oversight responsibilities that allowed for, and encouraged, the acquisition of defective mortgage loans to be pooled into the Transactions, and the management of the purported review of the loans before they were securitized. Starting in 2001, Haggerty's responsibilities were to "build," and then manage, "all aspects" of "creating a business where we could buy [loans] and securitize them."[79] She was also the signatory for Bear, Stearns & Co. in the Transaction documents, including the Underwriting Agreements for SACO 2006-2, SACO 2006-8 and BSSLT 2007-1. Between 2000 and 2007, Silverstein was also

---

[75] 4/26/2010 Golden Deposition Tr. at 252.

[76] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 84-85, 91-92.

[77] 4/26/2010 Golden Deposition Tr. at 252.

[78] 6/2/2010 Smith Deposition Tr. at 122-23.

[79] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 35-36.

36

in charge of "taking a pool of mortgage loans and completing and executing the securitization process," including presentations to the rating agencies, coordinating with the trading desk for the securities to be issued, preparing the Registration Statements, Free Writing Prospectuses ("FWPs"), Prospectuses, and Prospectus Supplements ("ProSupps") (collectively, "Offering Documents") that were publicly filed with the U.S. Securities and Exchange Commission ("SEC") and used to market the securities, reviewing the due diligence performed for the securitized loan pool, and then coordinating the settlement and closing of the securitization transaction.[80]  When asked what his specific role was in the process, Silverstein was resolute: *"I would not manage – I would be responsible for each of these processes in relation to a securitization."*[81]

83.  After their securitization, Defendants Haggerty and Silverstein continued to oversee and manage the quality control process and, after Ambac submitted demands for repurchase of defective loans, participated in the decisions of whether to honor those demands. In connection with Bear Stearns' acquisition by JPMorgan Chase & Co., JP Morgan hired Defendants Haggerty and Silverstein to serve as two of the three Co-heads of the transaction management group responsible for activities "in connection with sale, purchase, securitization, [and] servicing" of mortgage loans.[82]  Defendant Haggerty currently works at JP Morgan as a Managing Director in the Securitized Products Group.  Defendant Silverstein was a Managing Director in Mortgage Finance at JP Morgan until December 2008.

---

[80] 6/4/2010 Silverstein Deposition Tr. at 36-37; *see also* 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 37-38 (stating that Silverstein was responsible for "the process by which pools of mortgages are sent to a rating agency for analysis and the . . . preparation of the offering documents in connection with a securitization and then the closing and settlement of that securitization").

[81] 6/4/2010 Silverstein Deposition Tr. at 38 (emphasis added).

[82] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 43.  Defendant Haggerty admitted that she is also responsible for assisting Bear Stearns in defending litigations such as this one. *Id.* at 46.

37

84.     The Individual Defendants adopted and succumbed to a compensation structure that created perverse incentives for Bear Stearns to purchase and securitize loans regardless of their quality in order to secure obscene payouts. Indeed, based on publicly available information, Defendants Cayne, Greenberg, Schwartzc and Spector alone earned over *$1 billion* in total salary, bonus and stock benefits during the years preceding Bear Stearns' collapse in 2008. Even after accounting for the drop in stock value resulting from Bear Stearns' colossal failure, these defendants made an aggregate *net payoff exceeding $650 million*. Meanwhile, the firm disintegrated, its shareholders' investments evaporated, and the loans it funded and securitized – and the mortgage-backed securities and other financial products linked to them – have wreaked unpreeedented harm on borrowers, investors, and the economy as a whole.

85.     These defendants' compensation packages are analyzed in a forthcoming Harvard Law School article discussing the "moral hazard" risk resulting from the perverse incentives these executives had to enhance their individual wealth by taking excessive risks with other peoples' money. The article concludes that paying out enormous performance-based salaries and bonuses created incentives to seek short-term profits by taking excessive risks, including the decision to become heavily involved in the securitized asset markets, that ultimately led to Bear Stearns' failure in 2008:

> [T]he design provided executives with substantial opportunities (of which they made considerable use) to take large amounts of compensation based on short-term gains off the table and retain it even after the drastic reversal of [Bear Stearns'] fortune[]. *Such a design provides executives with incentives to seek improvements in short-term results even at the cost of maintaining an excessively elevated risk of an implosion at some point down the road.*[83]

---

[83] *See* Lucian A. Bebchuk, Alma Cohen & Holger Spamann, *The Wages of Failure: Executive Compensation at Bear Stearns and Lehman 2000-2008* (2010) at 24-25 (emphasis added).

4106355v.1

86.     Similarly, Bear Stearns awarded the remaining Individual Defendants with

extraordinarily high compensation tied to the performance of Bear Stearns' securitization

machine.  Bear Stearns also handsomely compensated its trading desks for increasing the

volume and pace at which loans were fed into the securitization pipeline.

87.     The means and the motivation were the same – money, and lots of it – to churn

out securitizations from the Bear Stearns machine regardless of the consequences.[84]

## B.      BEAR STEARNS MADE MATERIALLY FALSE AND MISLEADING DISCLOSURES TO INDUCE PARTICIPATION IN ITS SECURITIZATIONS

88.     In advance of closing a contemplated securitization deal, Bear Stearns made

myriad false and misleading representations directly to investors, insurers, and rating agencies to

induce their participation and complete the intended transaction.

89.     Bear Stearns followed virtually the same routine in communicating its false and

misleading representations to effectuate its securitizations, including the Transactions at issue

here.  First, Bear Stearns made presentations and disclosures to investors and financial

guarantors concerning its securitization operations and the particular transaction contemplated.

Second, Bear Stearns provided to the financial guarantors and rating agencies mortgage loan

"tapes" (data files with key information for each loan proposed for securitization) that were

supposed to contain the true and accurate loan attributes critical to assess the risks associated

with the loans to be securitized.  Third, Bear Stearns sent financial guarantors information

---

[84] The moral hazard is evidenced by the Individual Defendants' conduct that was inconsistent with the interests of the shareholders of The Bear Stearns Companies.  For instance, Bear Stearns represented to the SEC and the shareholders that it would sell its positions in the Transactions. *See, e.g.*, Email from Michael Sinapi (Bear Stearns & Co.) to Defendants Nierenberg and Verschleiser, among others, dated October 5, 2006, EMC-AMB 001496565-567 ("Bear told the SEC that our intent is to sell, not hold, our securities after securitization.").  Bear Stearns failed to do so through 2006, and in 2007, shortly after the last Transaction, it rushed to do so, knowing but failing to disclose that its securitizations were doomed to fail. *See, e.g.*, Email from Defendant Marano to Defendants Nierenberg and Verschleiser, among others, dated May 11, 2007, EMC-AMB 003501771-772 ("You guys need to get a hit team on blowing the retained interest bonds out asap. This is the biggest source of balance sheet problems.").  It was too late.

39

pertaining to the historical performance of loans that Bear Stearns had previously securitized. Fourth, Bear Stearns secured ratings on various classes of securities to be issued in the contemplated transaction from the rating agencies. Fifth, Bear Stearns disseminated draft and final Offering Documents to financial guarantors and investors purporting to describe the transaction and its associated risks.

### I.   Bear Stearns Made Materially False and Misleading Statements in Its Marketing Presentations and Deal Correspondence

90.     Throughout the relevant period, from 2005 to April 2007, Bear Stearns routinely made presentations to investors and financial guarantors to induce their participation in Bear Stearns' securitizations.[85] The presentations were made at Bear Stearns "Investor Days," and were supplemented by direct communications with securitization participants in advance of particular transactions. Bear Stearns' investor relations department and the deal managers responsible for particular transactions disseminated these presentations, which were based on information assembled by, and in conjunction with, employees from its mortgage-loan conduit.[86] As part of the presentations, Bear Stearns provided investors and financial guarantors with information (e.g., PowerPoint presentations known as "marketing decks") concerning the Bear Stearns mortgage-loan conduit and its purported securitization practices.[87]

91.     At Bear Stearns' invitation, Ambac attended a number Investor Day presentations. Bear Stearns provided Ambac with the marketing decks and other documentation regarding the Bear Stearns mortgage-loan conduit. And, in advance of the Transactions, Bear Stearns reinforced the disclosures made at the Investor Day and in the marketing decks.

---

[85] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 121.

[86] 4/19/2010 Glory Deposition Tr. at 69-71.

[87] 4/19/2010 Glory Deposition Tr. at 166-67 (testifying that it was Bear Stearns' practice to provide marketing packages in advance of securitizations).

40

92.     By way of example, Bear Stearns gave Ambac a marketing deck in advance of

and to induce Ambac's participation in the SACO 2005-10 and 2006-2 Transactions, dated as of

June 2005,[88] in advance of and to induce Ambac's participation in the SACO 2006-8

Transaction, dated as of May 11, 2006,[89] and in advance of and to induce Ambac's participation

in the BSSLT 2007-1 Transaction, dated as of March 13, 2007.[90]  The presentations followed a

standardized format, and the 2005 deck is illustrative as to the representations made:

- Integrated Entities: Bear Stearns first emphasized the integrated nature of its
  securitizations operations.  Indeed, the front cover of the presentation is titled
  "Bear Stearns RMBS Platform," lists an EMC website, and includes Bear, Stearns
  & Co. Inc.'s name and address.  The presentation then provides an organization
  chart of the "Bear Stearns' Residential Mortgage Team" that shows a seamless
  reporting line from EMC up to the Bear Stearns Chairman and CEO.  Then, to
  make explicit the interrelation of the affiliates in the mortgage loan conduit, the
  next slide asks "Why purchase RMBS from Bear Stearns?" and answers by
  referencing the "Integral role played by Bears affiliate, EMC Mortgage
  Corporation (EMC)."

- Seller Approval and Monitoring:  Bear Stearns next lauded its purported
  processes for screening and monitoring the originators from which it purchased
  loans for its securitizations.  Among other things, Bear Stearns contended that it
  tracked metrics regarding the sellers' loans that were predictors of loan quality,
  including the level of loan EPDs, delinquencies, quality control findings, and
  repurchases.

- Due Diligence:  Bear Stearns then described the "due diligence" protocols it
  purported to have implemented to prevent defective mortgage loans from entering
  the securitizations.  For instance, the deck asserted that Bear Stearns conducted
  due diligence for "100%" of the subprime loans it securitized from its two
  primary means of acquiring loans, the so-called "flow" and "bulk" channels.  To
  add a false veneer of integrity to the process, Bear Stearns emphasized that it

---

[88] Investor Presentation, dated June 2005, ABK-EMC01515471-561.

[89] Investor Presentation, dated May 11, 2006, ABK-EMC01519818-949; see also Investor Presentation,
undated, attached to the email from Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) to
Ervin Pilku (Ambac Assistant Vice President, MBS Department of Structured Finance), dated September
13, 2006, ABK-EMC01533424 - 446

[90] Investor Presentation, dated March 13, 2007, attached to the email from Soung Ho Park (Bear, Stearns
& Co. Analyst, Mortgage Finance) to Hartmut Ott (Ambac Vice President, MBS Department of
Structured Finance), dated March 22, 2007, ABK-EMC01555076-269 ("I have attached the Investor Day
Presentation that will give you a better idea of who EMC is and our processes.").

retained the third party due diligence firms Clayton Holdings, LLC. ("Clayton")
and Watterson-Prime Consulting LLC ("Watterson Prime") to conduct its pre-
acquisition review of the loans.

- Quality Control: Bear Stearns next touted the quality control processes that it
  purportedly conducted after the securitizations closed to identify any defective
  loans that may have circumvented its due diligence protocols. As with the due
  diligence representations, Bear Stearns emphasized the broad scope of its quality
  control (including random and targeted sampling, referrals from the servicing
  department and other departments of EMC, and "100%" review of new sellers'
  loans), the extensive re-verification of loan information purportedly undertaken,
  and the third party consultants it retained to conduct the analysis.

- Repurchase Processes: Bear Stearns then conveyed that it had an entire "conduit
  team" devoted to asserting breach-of-representation-and-warranty claims, on
  behalf of the securitization participants, for the repurchase of loans identified as
  defective by the quality control process.

- Historical Performance: Finally, Bear Stearns provided appendices with
  extensive data purporting to reflect the performance of its prior securitizations and
  the loans therein.

93.     Cheryl Glory – the Bear, Stearns & Co. Managing Director for United States

Residential Mortgage Backed Securities ("RMBS") Investor Relations – acknowledged that the

representations were intended to convey to investors and financial guarantors that (i) Bear

Stearns implemented stringent protocols, (ii) to ensure the securitizations contained quality

loans, and (iii) for the benefit of the investors and financial guarantors.[91] Defendant Haggerty

also confirmed that Bear Stearns made these presentations understanding that the information

"would contribute to the investor's decision to invest in the securitizations," and in order to

"solicit their participation in transactions."[92]

94.     In advance of each deal, Bear Stearns reinforced the disclosures made at the

Investor Days and in the marketing decks through email and oral communications. For example,

---

[91] 4/19/2010 Glory Deposition Tr. at 109-10 (Bear Stearns intended investors and financial guarantors to
believe they benefited from the quality control processes), 110-119 (Bear Stearns intended investors and
financial guarantors to rely on the benefits from the seller approval and monitoring processes).

[92] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 113, 121.

42

to underscore the information that Bear Stearns conveyed before the SACO 2005-10 Transaction

regarding the purported due diligence conducted on loans, Cheryl Glory sent an email to Ambac

titled "Follow-up questions on SACO 2005-10," stating:

> For the SACO 2005-10 deal, Group I is our bulk purchases and
> Group II is the flow. Our diligence for flow is generally 100%,
> with a minimum of 20% for a repeat well known seller such as
> SunTrust. As provided in the presentation materials for Investor
> Day, flow diligence includes credit, appraisal and compliance for
> the sample size. Bulk diligence is 100% for subprime and Alt B
> with a minimum 20% for prime Alt A. Bulk diligence would also
> include credit, appraisal and compliance for the sample.[93]

95.     Similarly, in advance of and to induce Ambac to participate in the BSSLT 2007-1

Transaction, on March 22, 2007, Bear, Stearns & Co. analyst Soung Ho Park provided Ambac

with (i) EMC's most recent investor presentation designed to offer a "better idea of who EMC is

and our processes," and (ii) newly-implemented underwriting guidelines and matrices,

purportedly put in place to originate a large portion of the loans in the BSSLT 2007-1

Transaction.[94] Four days later, Cheryl Glory sent Ambac an email dated March 26, 2007 to (i)

lock in a date for a visit by Ambac to EMC's headquarters in Texas, (ii) confirm that Bear

Stearns would provide a representation and warranty concerning the truth of the mortgage-loan

data it provided, and (iii) confirm that Bear Stearns would provide to Ambac results of due

diligence purportedly conducted on the securitized loan pools:

> I have attached the "Save the Date" for a visit to EMC in April or
> May. In addition some clarification on the earlier email from

---

[93] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Ervin Pilku
(Ambac Associate, MBS Department of Structured Finance), dated December 13, 2005, ABK-
EMC01534777. The SACO 2005-10 ProSupp stated that the loans were subprime, and thus purportedly
subjected to 100% due diligence review. *See* SACO 2005-10 ProSupp, at S-4.

[94] Email from Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) to Hartmut Ott (Ambac
Vice President, MBS Department of Structured Finance), dated March 22, 2007, ABK-EMC01555076-
077 ("I have attached the Investor Day Presentation that will give you a better idea of who EMC is and
our processes. In addition, I have also attached the guideline updates that were effective as of 1/12/07.").

43

> Soung: . . . [W]e do provide a rep and warranty that "the
> information set forth in the Mortgage Loan Schedule hereto is true
> and correct in all material respects[.]" Jeff will . . . provide you
> with the due diligence results for all three deals once complete.[95]

96.     These communications, which Bear Stearns intended to provide additional

assurances to investors and Ambac regarding the quality of the loans and the integrity of Bear

Stearns' protocols, were materially false and misleading in several ways. Contrary to its

affirmative representations, Bear Stearns knew full well that (i) its due diligence protocols were

inadequate to screen out defective loans,[96] (ii) its seller monitoring controls were a farce,[97] (iii)

its quality control and repurchase processes were designed to secure recoveries for Bear Stearns

to the exclusion of, and without notice to, the securitizations,[98] and, as a result, (iv) the historical

performance data did not reflect the true level of defective loans in the securitized pools. Ambac

would not have entered into the Transactions had it known Bear Stearns' disclosures were false

and misleading.

---

[95] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Gary Gal
(Ambac Vice President, MBS Department of Structured Finance), Patrick McCormick (Ambac First Vice
President, MBS Department of Structured Finance) and Hartmut Ott (Ambac Vice President, MBS
Department of Structured Finance), dated March 26, 2007, ABK-EMC03206645.

[96] *See* Section III.C.1, below.

[97] As early as October 2005, Bear Stearns eliminated its reports that tracked defective loans, and when it
downgraded a seller to terminated or suspended status, Bear Stearns stopped conducting quality control of
the sellers so it could move the loans into securitizations. *See* Sections III.C.3 and III.C.7, below.

[98] *See* Section III.C.3, below.

### 2. Bear Stearns Disseminated Materially False and Misleading Mortgage-Loan Tapes

97.     As part of its initial solicitation to participants in a contemplated securitization,

Bear Stearns sent by email certain information concerning the contemplated transaction structure

and the loans proposed for securitization. Bear Stearns included in *all* these initial distributions

to the financial guarantors and rating agencies the mortgage-loan tape that it asserted contained

true, accurate, and complete information pertaining to critical attributes of the loans to be

securitized. More specifically, the tapes listed for each loan the data metrics that insurers and

rating agencies used as fixed inputs for their cash flow and risk modeling.

98.     Consistent with this general practice, Bear Stearns sent loan tapes directly to

Ambac in the days leading up to the closing date of each Transaction – on December 28, 2005,[99]

January 3, 2006,[100] September 13, 2006,[101] and April 10, 2007.[102]

99.     Ambac required and relied on these tapes as a critical component in its decision of

whether to provide insurance for the deal, and rating agencies relied on the tapes as a critical

component in determining the ratings to be assigned to each class of securities being issued.

---

[99] Email from Audrey Kingsley (Bear, Stearns & Co. Inc, Vice President) to, among others, Ervin Pilku (Ambac Associate, MBS Department of Structured Finance) and Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated December 28, 2005, ABK-EMC01525295-296 (SACO 2005-10).

[100] Email from Audrey Kingsley (Bear, Stearns & Co. Inc, Vice President) to, among others, Ervin Pilku (Ambac Associate, MBS Department of Structured Finance) and Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated January 3, 2006, ABK-EMC03004619-620 (SACO 2006-2).

[101] Email from Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager on SACO 2006-8) to Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated September 13, 2006, ABK-EMC01536245 (SACO 2006-8); *see also* email from Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager for SACO 2006-8) to Ervin Pilku (Ambac Assistant Vice President, MBS Department of Structured Finance), dated June 18, 2006, ABK-EMC01532035 (sending prior version of SACO 2006-8 tape).

[102] Email from Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) to Hartmut Ott (Ambac Vice President, MBS Department of Structured Finance), dated April 10, 2007, ABK-EMC01555428 (BSSLT 2007-1).

45

4106355v.1

Ambac used the data on the tapes as fixed inputs to its models, and analyzed the loan metrics, which were central to assessing the risk associated with the loan pool and predicting the expected rates and severity of defaults by the borrowers. The following were some of the key metrics included on the tapes:

- the combined loan-to-value ratio ("CLTV") for each loan, which measures the total amount of mortgage debt that encumbers a property against the value of the property;

- the FICO (or credit) score for each borrower;

- the debt-to-income ratio ("DTI") for each borrower, which compared payments due on a borrower's monthly debts to a borrower's income;

- the occupancy status of the property, which listed whether the property was the borrower's primary or secondary residence, or an investment property; and

- the "doc-type" of each loan, which described the program pursuant to which the loan was originated, and which specified the information borrowers were required to disclose concerning their income, employment, and assets, and how such information would be verified.

100.   Bear Stearns knew that Ambac and the rating agencies would rely, and intended that they rely, on the veracity of the tape data to evaluate the Transactions and assess the "market risks" pertaining to the loans.[103] In light of the revelations about Bear Stearns' due diligence and quality control practices, it is clear that it fully understood the inadequacy of those controls, and, therefore, knew the tapes contained false and misleading data – or recklessly disregarded the veracity of the disclosures. Indeed, Ambac's loan-level review (conducted at enormous effort and expense after the losses in the Transactions began to mount) has confirmed that those loan tapes contain materially false and misleading data.

101.   Moreover, a former Bear Stearns analyst who provided trading support to EMC between 2004 and 2006 recently confirmed Bear Stearns' abuses, revealing that Bear Stearns

---

[103] 6/2/2010 Smith Deposition Tr. at 67-72, 83; 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 213-15; 4/19/2010 Glory Deposition Tr. at 65.

intentionally falsified critical information on the loan tapes (*e.g.*, FICO scores and the loan documentation programs) to make the loans appear less risky and induce participation in its securitizations.[104]

### 3. *Bear Stearns Disseminated Materially False and Misleading Data Concerning the Historical Performance of Its Earlier Securitizations*

102. As part of its representations to induce participation in a contemplated securitization, Bear Stearns disseminated historical data showing the performance of previously securitized loans bearing similar attributes to the loans proposed for securitization.

103. Consistent with its general practices, in advance of the Transactions, Bear Stearns included historical performance data in its investor presentations and marketing decks disseminated to Ambac to induce its participation. Bear Stearns also disclosed more detailed historical data in its solicitations leading up to two of the Transactions – the SACO 2006-8 and BSSLT 2007-1 transactions.[105]

104. Bear Stearns knew that these disclosures were critical to Ambac's assessments of the risks and, ultimately, Ambac's decision to issue its insurance policies in each of the Transactions. Specifically, it knew that Ambac considered and evaluated the performance of comparable loans in previous Bear Stearns securitizations to assess the risks and expected future

---

[104] *See* Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010 (quoting analyst Matthew Van Leeuwen as stating that "they were encouraged to just make up data like FICO scores" and "instead of spending time to go back to the lender and demand clarification, like if verification of income actually backed these loans, the executives at Bear would just make the loan type fit"); *see also* Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Dylan Hoyt (EMC Mortgage Corporation, Due Diligence Underwriter), dated May 16, 2005, EMC-AMB 001718661-663 (confirming that the EMC analyst was instructed to revise the loan type to a less risky classification).

[105] 6/2/2010 Smith Deposition Tr. 158; Email from Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) to Hartmut Ott (Ambac Vice President, MBS Department of Structured Finance), dated March 19, 2007, ABK-EMC01554766-768. *See also* E-mail from Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance) to Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager on SACO 2006-8), dated August 8, 2006, EMC-AMB 004311998-999.

47

performance (and, thus, structural protections needed for its financial guaranty insurance) of the
loans intended for the contemplated transaction.[106]

105.    The historical performance data was materially misleading in that Bear Stearns
failed to disclose that it intentionally adopted practices and policies (e.g., its due diligence,
quality control, and EPD policies) that it knew had resulted in the securitization of defective
loans – loans that were prevented from defaulting solely by virtue of the ability of the borrowers
to refinance or sell their homes due to easy credit fueled by an artificially inflated real estate
market. Bear Stearns thus knew that prior performance of the loans, including those in earlier
Transactions, was not in any way indicative of their quality or the likely performance of the
similarly defective loans in the Transactions. Rather, Bear Stearns knew and actively concealed
that it was building a house of cards, waiting to collapse as soon as borrowers lost the ability to
refinance or "flip" their way out of loans they could not afford to pay. By concealing the true
quality of its collateral, Bear Stearns deliberately misled Ambac and other investors into
participating in Bear Stearns' securitizations.

### 4.    *Bear Stearns Knowingly Supplied Materially False and Misleading Information to Secure Rating Agency Ratings*

106.    Bear Stearns provided false and misleading information to rating agencies
Standard & Poor's, Moody's, and Fitch to secure "shadow ratings" and "final ratings" required
to induce financial guarantors to insure and investors to purchase the securities issued in
connection with its securitizations, including in the Transactions at issue. A shadow rating is an
assessment of the value or risk of a mortgage-backed security without consideration of the

---

[106] Email from Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side) to Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated March 30, 2007, ABK-EMC01536369-370.

48

protection afforded by a financial guaranty insurance policy.[107] A final rating is an assessment of the value or risk of the security taking into consideration the financial guaranty policy.

107.    Bear Stearns knew full well that Ambac used the shadow ratings in deciding whether to participate in the Transactions. In fact, Ambac expressly conditioned the issuance of its financial guaranty insurance policies on the ability to secure a specified shadow rating and a final rating for each Transaction. For example, in connection with the SACO 2005-10 Transaction, Ambac "agreed to issue the Policy . . . subject to satisfaction of the conditions precedent," including that Ambac "shall have received confirmation that the risk insured by the Policy constitutes at least a 'A' risk by S&P, a 'A' risk by Fitch, and a 'A2' risk by Moody's, and that the [insured] certificates when issued, will be rated 'AAA' by S&P, 'AAA' by Fitch and 'Aaa' by Moody's."[108] Likewise, in advance of the BSSLT 2007-1 Transaction, Ambac expressly informed Bear Stearns' representative negotiating the Transaction that its bid "should map to S&P AA rating loss coverage levels, which was a **requirement** when we presented the deal internally."[109]

108.    Bear Stearns similarly knew that investors relied, and intended that they rely, on the rating agency ratings in deciding whether to purchase the securities issued in the Transactions. It was for that reason that the Offering Documents used to market the Notes

---

[107] 4/19/2010 Glory Deposition Tr. at 55-56 ("It's only upon wrapped transactions where the wrapper does not necessarily need to have a rating issued for it to be sold because you're relying on the wrapper's rating."); 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 204. ("A shadow rating is a rating which is not necessarily published . . . it is an expected rating given that certain set of criteria or circumstances are met.").

[108] SACO 2005-10 I&I Agreement § 3.01(x). The I&I for the SACO 2006-2, 2006-8 and BSSLT transactions contain virtually identical language, and differ only in the specific ratings assigned by each agency for the particular Transaction.

[109] E-mail from Hartmut Ott (Ambac Vice President, MBS Department of Structured Finance) to Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side), dated March 21, 2007, ABK-EMC01551116 (emphasis in original).

expressly stated that a final rating was a condition precedent to Bear Stearns' offering of the securities.[110]

109.    For each of the Transactions, Ambac received shadow ratings that were derived from information supplied to the rating agencies by Bear Stearns. For example, in connection with Ambac's participation in the SACO 2006-2 Transaction, Standard & Poor's issued a "private credit assessment" (*i.e.*, shadow rating) to Ambac stating:

> Pursuant to your request we have reviewed the information presented to us and . . . have assigned a private credit assessment of "A" to these obligations without the benefit of the surety bond. . . . Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the private credit assessment.[111]

110.    Bear Stearns also solicited and obtained from the rating agencies *final* ratings of the certificates issued in the Transactions, which took into account Ambac's financial guaranty insurance policies.[112] For example, in connection with the SACO 2005-10 Transaction, Standard & Poor's issued a rating letter to Bear, Stearns & Co. stating:

> Pursuant to your request for a Standard and Poor's rating on the above-referenced obligations, we have reviewed the information submitted to us and, subject to the enclosed *Terms and Conditions*, have assigned a rating of 'AAA.' . . . The rating is based on information supplied to us by you or by your agents . . . . Standard and Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with rating.[113]

---

[110] *See* Section III.B.5, below.

[111] Letter from Standard & Poor's Ratings Services to Ervin Pilku (Ambac Associate, MBS Department of Structured Finance) regarding SACO I Trust 2006-2, dated January 30, 2006, ABK-EMC01620782-785 at 782 (emphasis added).

[112] 4/19/2010 Glory Deposition Tr. at 55.

[113] Letter from Standard & Poor's to Bear, Stearns & Co. and Ambac, dated December 30, 2005, EMC-AMB 000008015-023 at 8015 (emphasis added). For each of the Transactions, one or more of the rating agencies issued rating letters.

50

111.     To secure the shadow ratings and, thus the final ratings, Bear Stearns

disseminated the same false and misleading data to the rating agencies that it provided to insurers

like Ambac, including marketing presentations, loan tapes, and Offering Documents. As a Bear

Stearns Managing Director characterized the process:

> So there is a process when you request a rating agency to look at or
> engage in a specific transaction. You provide them a pool of
> collateral and you provide them structure. As a result of them
> providing you [get] back ratings and a rating agency gets picked
> for a transaction, you will then go down the path of providing to
> them marketing materials, such as the term sheet and a pro supp,
> for them to sign off and understand and then there is a PSA that
> they will review and provide comments on.[114]

112.     The "pool of collateral" that Bear Stearns disclosed to the rating agencies was the

same mortgage-loan data provided to Ambac.[115] According to Bear Stearns, the rating agencies

used the loan data to model the risk and generate the ratings for the securitizations. The rating

agencies would develop models to evaluate "the expected loss or expected probabilities of

default for various rating standards," which "took as a given the veracity of the attributes and

metrics on the mortgage loan file provided to them."[116] Bear Stearns also gave the rating

agencies marketing presentations that included the same false and misleading disclosures made

in the marketing decks provided to Ambac and investors.[117] Thus, just as Ambac, in assessing

---

[114] 4/19/2010 Glory Deposition Tr. at 61-62; *see also id.* at 40-55; *see also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 195-97 (same).

[115] Email from Ervin Pilku (Ambae Assistant Vice President, MBS Department of Structured Finance) to Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager for SACO 2006-8), dated September 13, 2006, ABK-EMC01524131-132 (in connection with the SACO 2006-8 transaction, "Nick- please let me know if the rating agencies looked at the refreshed tape and the outcome.").

[116] 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 196, 200. Defendant Haggerty also confirmed that the "[r]ating agencies typically received collateral information on the individual pools that they were being asked to rate in connection with a transaction and there would be discussion with the rating agencies about the overall platform in general." 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 117-18.

[117] 4/19/2010 Glory Deposition Tr. at 63-64

the risk of the Transactions, relied on the truth and accuracy of the loan data Bear Stearns supplied and the representations Bear Stearns made, so too did the rating agencies.[118]

113.    EMC generally gathered this requisite information and Bear, Stearns & Co. in turn conveyed it to the ratings agencies.[119] Cheryl Glory, a Bear Stearns Managing Director, who was lured away from her position at the Fitch rating agency in 2005 to join Bear Stearns & Co., was responsible for preparing and disseminating the information to the rating agencies.[120] Bear, Stearns & Co. deal managers also provided information to rating agencies for the transactions they worked on.[121] This included Nick Smith, Bear, Stearns & Co.'s deal manager for the SACO 2006-8 Transaction and wordsmith of the Transaction's "SACK OF SHIT" appellation.[122]

114.    Because they were based on the same false and misleading information provided to Ambac and investors, the shadow ratings were false and misleading. The final ratings, in turn, were false and misleading because they were given in reliance on Ambac's insurance policies, which were obtained by virtue of the fraudulently obtained shadow ratings. These ratings therefore added another critical layer of false assurances as to the quality of the securitized loan pools.

---

[118] *See* Section III.B.2, above.

[119] 4/19/2010 Glory Deposition Tr. at 69-70; *see also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 200-201 (loan level characteristics and data would be provided to the rating agencies by "an employee of Bear Stearns as the underwriter").

[120] 4/19/2006 Glory Deposition Tr. at 15-16, 20 (Bear, Stearns & Co. Managing Director, Cheryl Glory, had worked at Fitch for 8 years prior to her retention), 50 ("I provided the information that I felt would be appropriate to provide to the rating agencies.").

[121] 4/19/2010 Glory Deposition Tr. at 63-64 ("Pitches . . . [c]ould have been provided by the deal management team. So the deal manager responsible for a given transaction.").

[122] Email from Ervin Pilku (Ambac Assistant Vice President, MBS Department of Structured Finance) to Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager for SACO 2006-8), dated September 13, 2006, ABK-EMC01524131-132 ("Nick, please let me know if the rating agencies looked at the refreshed tape and the outcome.").

4106355v.1

### 5.     *Bear Stearns Made Materially False and Misleading Representations and Disclosures in the Offering Documents to Market and Sell the Notes*

115.    Bear Stearns marketed the securities issued in its securitizations, including the

Transactions, pursuant to Offering Documents[123] that were publicly filed with the SEC pursuant

to the Securities Act of 1933. As a matter of law, the Offering Documents were required to

disclose all material facts concerning the securities offered; not contain any untrue statement of

material fact concerning the securities; not omit to disclose any material fact concerning the

securities; and not omit to state a material fact necessary to make the statements made therein, in

light of the circumstances in which they were made, not misleading.

116.    The Registration Statements and FWPs were filed with the SEC several days in

advance of the contemplated closing date for a securitization; the ProSupps were then filed with

the SEC at or around the closing date. The ProSupps filed in connection with the Transactions

each state that "Bear, Stearns & Co. Inc., as the underwriter, will offer the certificates listed

above at varying prices to be determined at the time of sale."[124]

117.    In advance of the closing date for each Transaction, Bear Stearns also prepared

and sent to Ambac drafts of the FWPs and the ProSupps to induce its participation in the

Transactions. For instance, fifteen days before the December 30, 2005 closing of the SACO

2005-10 Transaction, Bear Stearns' counsel sent Ambac a draft of the FWP.[125] A "preview" of

the ProSupp followed eight days later.[126] Indeed, Bear Stearns disseminated updated drafts of

---

[123] The Offering Documents are defined above to include the Registration Statements, Free Writing Prospectuses, Prospectuses, and Prospectus Supplements.

[124] SACO 2005-10 ProSupp at S-1; SACO 2006-2 ProSupp at S-1; SACO 2006-8 ProSupp at S-1; BSSLT 2007-1 ProSupp (Group I) at S-1; BSSLT 2007-1 ProSupp (Group II & III) at S-1.

[125] Email from Musa Abdul-Basser (Thacher Profitt & Wood, counsel for Bear Stearns) to Ambac, among others, dated December 15, 2005, ABK-EMC02729306-309.

[126] Email from Musa Abdul-Basser (Thacher Profitt & Wood, counsel for Bear Stearns) to Ambac, among others, dated December 23, 2005, ABK-EMC01528037-8038.

4106355v.1

the Offering Documents on at least twenty separate occasions prior to closing that Transaction. Similarly, Bear Stearns sent Ambac draft FWPs and ProSupps before the closing date for each of the other three Transactions.[127] The draft FWPs and ProSupps contained false and misleading statements and omissions similar to those made in the Offering Documents eventually filed with the SEC.

118.    Bear Stearns knew and intended that Ambac and investors would rely on these draft and final Offering Documents in assessing whether to participate in the Transactions. That was the very purpose for which the documents were created and disseminated. Through those disclosures, Bear Stearns deliberately misled investors and induced Ambac to provide financial guaranty insurance for securitizations plagued by defective loans that did not comport with the characteristics represented in the Offering Documents.

119.    The disclosures in the Offering Documents of the risks associated with the securitization were false and misleading in that they (i) mischaracterized the origination and underwriting practices, (ii) presented false data metrics pertaining to the securitized loan pools, (iii) provided false and misleading ratings, and (iv) failed to disclose Bear Stearns' complete abdication of its due diligence and quality control processes, which it knew resulted in the securitization of pools replete with defective loans.

120.    *Origination and underwriting practices:*  The Offering Documents sent by Bear Stearns to Ambac and filed with the SEC in connection with each Transaction contained numerous statements purporting to describe the underwriting standards that were applied to

---

[127] Bear Stearns sent Ambac an initial draft of the FWP fifteen days prior to the January 30, 2006 closing date of the SACO 2006-2 transaction, EMC-AMB 006607559-560; sixteen days prior to the September 15, 2006 closing date of the SACO 2006-8, ABK-EMC03077662-663; and nineteen days prior to the April 30, 2007 closing date of the BSSLT transaction, ABK-EMC02865923-924.

54

assess borrowers' creditworthiness and ensure the quality of the loans in the Transactions. For example, the ProSupp in the BSSLT 2007-1 Transaction (Group I) disclosed that the loans (which consisted of HELOCs) were originated pursuant to underwriting standards designed to "evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral," which it also represented were "consistent with those utilized by mortgage lenders generally" at the time.[128]

121. The ProSupps for the Transactions also specifically describe the underwriting guidelines purportedly used by the largest originators of the loans in the Transactions. The ProSupp for the SACO 2006-2 Transaction disclosed that American Home Mortgage Investment Corp., which originated the greatest number of loans for that Transaction and the second-greatest number of loans across all four Transactions, "underwrites a borrower's creditworthiness base[d] solely on information that the Originator believes is indicative of the applicant's *willingness and ability to pay the debt they would be incurring*."[129] This originator's "underwriting philosophy" is described as "weigh[ing] all risk factors inherent in the loan file, giving consideration of the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debit."[130] The ProSupps for the BSSLT 2007-1 (Groups I, II, and III)

---

[128] BSSLT 2007-1 (Group I) ProSupp, at S-28 – S-29; *see also* BSSLT 2007-1 (Groups II & III) ProSupp, at S-41-S-44. *See also* SACO 2006-2 ProSupp at S-34 ("The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring."); SACO 2006-8 ProSupp at S-26 (noting that the originator "underwrites a borrower's creditworthiness based solely on information that [it] believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.").

[129] SACO 2006-2 ProSupp, at S-34 (emphasis added). *See also* SACO 2006-8 Transaction ProSupp at S-25 – S-26 (describing in similar fashion American Home Mortgage Corp.'s underwriting guidelines with respect to HELOCs).

[130] SACO 2006-2 ProSupp, at S-34.

55

Transaction similarly discuss the underwriting guidelines employed by GreenPoint[131] and Bear Stearns Residential Mortgage Corporation (a Bear Stearns affiliate), which originated a significant number of loans in that Transaction.[132]

122.    The Offering Documents also explain that the underwriting guidelines allow for *exceptions* to be made on a case-by-case basis for borrowers that meet specific criteria described as "compensating factors." For example, the ProSupp for the SACO 2006-2 Transaction notes that "there may be some acceptable quality loans that fall outside published guidelines."[133] The ProSupp asserted that, for these loans, "*common sense*" factors were used to weigh each case individually on its own merits and "exceptions to . . . underwriting guidelines are allowed *if sufficient compensating factors exist to offset any additional risk due to the exception.*"[134]

123.    The Offering Documents also disclosed that reduced documentation loan programs, which accounted for a significant number of the loans in the Transactions, were used for those borrowers that demonstrated their creditworthiness through other compensating factors.

___

[131] GreenPoint has been faced with a wave of litigation arising from its origination of defective mortgage loans. *See U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.*, No. 600352-2009 (N.Y. Sup. Ct. April 14, 2010); *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. June 11, 2008); *Ferguson v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-60854 (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc.*, No. 1:08-CV-567 (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc..*, No. 3:08-CV-2201 (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc..*, No. 5:08-CV-1972 (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. 3:08-CV-369 (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc.*, No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc.*, No. 07-CV-1851 (E.D. Pa. May 7, 2007).

[132] BSSLT 2007-1 ProSupp (Group I) at S-31 – S-33; BSSLT 2007-1 ProSupp (Groups II & III) at S-41 – S-44.

[133] SACO 2006-2 ProSupp, at S-36. *See also* SACO 2006-8 ProSupp at S-26; BSSLT 2007-1 (Group I) ProSupp at S-31; BSSLT 2007-1 (Group II) ProSupp at S-41 & S-44.

[134] SACO 2006-2 ProSupp, at S-36 (emphasis added); *see also* SACO 2005-10 ProSupp, at S-31 ("The approval process generally requires that the applicant have good credit history and a total debt-to-income . . . that generally does not exceed 38%; however, this limit may be raised if the borrower demonstrates satisfactory disposable income and/or other mitigating factors are present."); SACO 2006-8 ProSupp, at S-26; BSSLT 2007-1 (Group I) ProSupp, at S-31; BSSLT 2007-1 (Groups II & III) ProSupp, at S-41, S-44.

For instance, the BSSLT 2007-1 (Group 1) ProSupp states that "[e]xceptions to documentation requirements are reviewed on a case-by-case basis, provided that sound and prudent underwriting practices are followed."[135]

124.    Contrary to its representations, Bear Stearns did not exercise any appropriate or meaningful oversight to ensure compliance with the basic risk criteria for prudent and responsible lending. As has now been revealed, based on its own due diligence and quality control results, Bear Stearns knew prior to consummating the respective Transactions that its underwriting standards were abandoned and borrowers' ability to repay the loans was ignored in order to produce as many loans as possible. This was accomplished, in large part, by turning a blind eye to the systematic inflation of borrowers' patently unreasonable stated incomes, by failing to apply the income reasonableness analysis required by the underwriting guidelines, or by placing clearly ineligible borrowers into loan products like so called "no ratio" or "no doc" loans that did not even require them to state their income to obtain a loan. What the Offering Documents also did not disclose is that exceptions to underwriting standards became the rule and originators routinely deviated from the stated guidelines without establishing any of the compensating factors, which were intended specifically to limit exceptions to qualified borrowers.

125.    *Loan data:* The Offering Documents also contained detailed appendices purporting to represent critical statistical data for stratified segments of the loan pools, including CLTV ratios, DTI ratios, credit scores, property ownership characteristics, and document-

---

[135] BSSLT 2007-1 (Group I) ProSupp, at S-29 – S-30; *see also* BSSLT 2007-1 (Groups II & III) ProSupp, at S-41, S-44; SACO 2006-S2 ProSupp, at S-34 – S-35; SACO 2006-8 ProSupp, at S-26.

57

types.[136]  These characteristics were used by Ambac and potential investors to evaluate the risks
· and expected performance of the underlying loan pools for the securities issued in each
Transaction.  As discussed below, based on its due diligence and quality control, Bear Stearns
knew that these loan characteristics, as disclosed in the Offering Documents, were materially
false and misleading in that they significantly understated the credit risk of the securitized loans.

    126.   *Ratings:*  The Offering Documents provided that "[i]t is a condition to the
issuance of the Offered Notes that each class of the Offered Notes be assigned at least the ratings
designated" in the ProSupps.[137]  For the SACO 2005-10 Transaction, the rating agencies
assigned ratings of "AAA" (Standard & Poor's), "AAA" (Fitch), and "Aaa" (Moody's) for the
Notes that had the benefit of Ambac's Policy.[138]  And for the SACO 2006-2, SACO 2006-8, and
BSSLT 2007-1 (Groups 1, II, and III) Transactions, the rating agencies assigned ratings of
"AAA" (Standard & Poor's) and "Aaa" (Moody's) for the Notes that had the benefit of Ambac's
Policies.[139]  These ratings were given in reliance on Ambac's insurance policies, which were
obtained by virtue of the fraudulently obtained "shadow ratings" for the Transactions.  As
discussed above, the represented credit ratings were, thus, materially misleading in that they
were fraudulently obtained from the rating agencies on the basis of Bear Stearns' false and
misleading representations concerning the characteristics of the securitized loans and Bear
Stearns' omissions of material facts regarding its securitization operations and practices.  Had

---

[136] *See* SACO 2005-10 ProSupp, at Schedule A; SACO 2006-2 ProSupp, at Schedule A; SACO 2006-8
ProSupp, at Schedule A; BSSLT 2007-1 (Group I) ProSupp, at Schedule A; BSSLT 2007-1 (Groups II &
III) ProSupp, at Schedule A.

[137] SACO 2005-10 ProSupp at S-119; SACO 2006-2 ProSupp at S-128; SACO 2006-8 ProSupp at S-88;
BSSLT 2007-1 (Group I) ProSupp at S-108; BSSLT 2007-1 (Group II & III) ProSupp at S-164.

[138] *See* SACO 2005-10 ProSupp at S-119.

[139] *See* SACO 2006-2 ProSupp at S-128; SACO 2006-8 ProSupp at S-88; BSSLT 2007-1 ProSupp (Group
I) at S-108; BSSLT 2007-1 ProSupp (Groups II & III) at S-164.

4106355v.1

Bear Stearns made truthful and complete disclosures to the rating agencies, the shadow ratings, and thus the final ratings, would not have been obtained and the securities backed by the underlying loans could not have been issued, sold, or insured.

127.    ***Controls:*** Bear Stearns' statements in the Offering Documents were also false and misleading because they failed to adequately disclose key risks – that the due diligence, quality control, and repurchase protocols touted in its investor presentations and communications with Ambac and investors were severely flawed and that the Transactions were thus replete with defective loans. In the FWP and ProSupp for the SACO 2005-10 Transaction, Bear Stearns assured Ambac and the Note Purchasers (defined below) that EMC's operations "resemble those of most mortgage-banking companies, except that ***significant emphasis*** is placed on the collection and ***due diligence*** areas, due to the nature of the mortgage portfolios purchased."[140] Nowhere in these documents did Bear Stearns disclose that EMC's due diligence and quality control "operations" were frequently circumvented and insufficient to protect Ambac and investors from the risk posed by inherently defective loans conveyed to the securitizations.

128.    The Offering Documents for the SACO 2006-2, SACO 2006-8, and BSSLT 2007-1 Transactions were equally false and misleading. In each FWP and ProSupp, Bear Stearns represented that "[p]ortfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws" and that "[p]erforming loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor."[141] Bear Stearns concealed that, in

---

[140] SACO 2005-10 ProSupp, at S-33 (emphasis added).

[141] SACO 2006-2 ProSupp at S-39; SACO 2006-8 ProSupp at S-29; BSSLT 2007-1 (Group I) ProSupp at S-35; BSSLT 2007-1 (Groups II & III) ProSupp at S-47.

fact, its portfolio review inadequately captured defective loans in the securitization, failing to disclose the utter calamity of its due diligence operations as described below.

### C. BEAR STEARNS FAILED TO DISCLOSE AND AFFIRMATIVELY CONCEALED MATERIAL FACTS TO INDUCE PARTICIPATION IN ITS SECURITIZATIONS

129. The representations Bear Stearns made concerning its operations and securitizations to induce investors and insurers to participate in its securitizations markedly diverged from Bear Stearns' actual practices. In addition to its materially false and misleading representations regarding the purported securitization policies, Bear Stearns induced Ambac and investors to participate in each of the Transactions by failing to disclose, and affirmatively concealing, that it implemented policies and abandoned controls to churn out securitizations that it knew, or recklessly disregarded, were replete with loans that did not conform with the represented attributes, were originated in total disregard of actual or prudent underwriting standards, and were made without regard to borrowers' ability to repay.

#### 1. Bear Stearns Knowingly Conducted and Concealed "Bad Due Diligence"

130. Bear Stearns intentionally adopted certain due diligence protocols and deliberately rejected others to ensure the uninterrupted flow of loans into its securitizations regardless of the quality of loans securitized. In doing so, Bear Stearns breached the representations and commitments it made to Ambac and investors concerning its due diligence protocols. Bear Stearns contravened its representations and disclosures knowing – and indeed contemporaneously acknowledging – that investors and insurers relied on Bear Stearns' due diligence disclosures because they did not have sufficient time or ability to re-underwrite the loans given the rapid pace of Bear Stearns' securitizations.[142]

---

[142] Email from Ernest Calabrese, Jr. (Bear, Stearns & Co. Managing Director, Mortgage Finance) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) among others, dated September 14,

60

131. Bear Stearns' public disclosures and representations regarding its due diligence were materially false and misleading because Bear Stearns did not disclose, among other things, that it (i) knew its internal protocols were flawed, and rejected repeated recommendations to address the flaws, (ii) knew the due diligence firms it retained were not screening out defective loans but did not replace the firms, despite recommendations that it do so, (iii) routinely overrode the defective loan findings of the due diligence firms and, instead of tracking those overrides as was proposed by the head of its due diligence department, deleted the audit trail relating to those override decisions, (iv) knowingly falsified mortgage loan data to avoid defective loan findings, and (v) reduced the amount of due diligence conducted to accommodate its suppliers, thereby securing additional loans. Bear Stearns abandoned its due diligence controls to appease its trading desk's demands for increased loan volume for its securitizations, thereby "trading" loan quality for loan volume – which was lucrative for its executives but greatly detrimental to those who relied on its representations.

132. Starting as early as April 2005, well before the close of the earliest Transaction, the head of Bear Stearns' due diligence department (John Mongelluzzo) made repeated entreaties to the co-heads of its mortgage finance department in charge the EMC mortgage-loan conduit (Defendants Haggerty and Silverstein) to revise its due diligence protocols.[143] Recognizing that the existing protocols allowed the purchase and securitization of defective loans, Mongelluzzo proposed to rank loans slotted for due diligence by risk criteria and apply incremental resources

---

2005, EMC-AMB 001699864-865 ("These parties have been either performing there [sic] own due diligence (usually not enough time) or piggybacking off of the Clayton/Price results."). Defendant Haggerty also confirmed that securitization participants relied on Bear Stearns' disclosures as to the scope of due diligence that was performed. 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 155.

[143] *See, e.g.*, Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Defendants Haggerty and Silverstein, dated April 26, 2005, EMC-AMB 001597507-508 (Proposing "New Due Diligence Processes" including "Identify higher risk loans within sample to DD firms so that more seasoned UW's are reviewing the loans.").

4106355v.1

to the review of each successive gradation of loan.[144] As Defendant Silverstein conceded, this proposed change was "significant" and not mere "incremental Darwinian creep" in the evolution of a diligence process.[145] But, Bear Stearns elected *not* to implement this "significant" change to its due diligence protocols in 2005 or in 2006 (when the first three Transactions were closed). Then, in March 2007, Mongelluzzo renewed what he admitted was the *same* proposal made in 2005, underscoring its import by stating "I think we need to completely revamp how we do due diligence."[146] Mongelluzzo urged the due diligence protocols to be "completely revamped" because it was well known *within* Bear Stearns that the existing diligence protocols were not screening defective loans from the securitizations. As Mongelluzzo and other Bear Stearns executives testified, however, this significant and necessary change to its due diligence protocol – initially proposed in 2005 and renewed in March 2007 – was *not* implemented before the final Transaction in this matter closed on April 30, 2007.[147]

133.    Mongelluzzo's proposal to identify and apply increased resources to the review of riskier loans was just one of the many significant due diligence improvements he recommended that were rejected by Bear Stearns' management. In early 2006, Mongelluzzo also proposed that the entire due diligence process be taken away from the due diligence firms used by Bear Stearns

---

[144] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Defendants Haggerty and Silverstein, dated May 11, 2005, EMC-AMB 001597504 ("We should also identify the top 25% of loans with the sample that we feel pose the largest risk potential. Both Clayton and PWC upon having those loans tagged/identified can place their most seasoned underwriters to review the loans and also perform additional QC on the loans. Both of these processes are ones that we can use to market our process to investors and the rating agencies going forward.").

[145] 6/4/2010 Silverstein Deposition Tr. at 178; 4/21/2010 Mongelluzzo Deposition Tr. at 172.

[146] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Defendants Haggerty and Silverstein, among others, dated March 6, 2007, EMC-AMB 001431086 ("Based on that risk score we would determine the type of diligence to be done. The highest level of risk would get the most comprehensive review."); 4/21/2010 Mongelluzzo Deposition Tr. at 174-75.

[147] 4/21/2010 Mongelluzzo Deposition Tr. at 175. In fact, the proposal was never fully implemented, but only on a test-case basis later that year.

62

(*i.e.*, Clayton and Watterson Prime) and be brought in-house.[148] Mongelluzzo proposed to move the due diligence process in-house because he knew that the diligence firms were not screening out defective loans from the pools purchased for securitization.[149] That was a view shared by Bear Stearns senior executives.

134.    In March 2006, following Mongelluzo's recitation of the failings of the due diligence firms, Defendant Verschleiser stated in no uncertain terms that "*we are wasting way too much money on Bad Due Diligence*" conducted by Clayton.[150] Bear Stearns nonetheless rejected Mongelluzzo's proposal and kept the due diligence firms in place. Not surprisingly, therefore, a year later in March 2007, Defendant Verschleiser echoed almost verbatim his prior conclusion regarding Clayton Holding's failings, stating "*[w]e are just burning money hiring them*," a sentiment with whichDefendant Nierenberg "agree[d]."[151]

135.    The issue, as Bear Stearns fully recognized, was that the due diligence firms did not adequately re-underwrite the loans proposed for securitization to assess the borrowers' ability

---

[148] Email from Defendant Verschleiser to, among others, Defendant Nierenberg, dated March 23, 2006, EMC-AMB 001542438-439 (responding to Mongelluzzo's proposal); 4/21/2010 Mongelluzzo Deposition Tr. at 195-96.

[149] As early of May 2005, Mongelluzzo proposed to move the due diligence business away from Clayton because its performance had not been good. *See* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Defendant Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finanace), among others, dated May 31, 2005, EMC-AMB 005107100-101 ( "We should look to direct business to Mortgage Ramp from Clayton starting with smaller jobs most preferably (since this is Claytons most expensive job to do for us). Also jobs that are shipped to Clayton might be a good target *since the performance in their central location has not been as good as we like.*"). By the third quarter of 2005, the third party due diligence firms' performance was so bad as to inspire Defendant Verschleiser to request EMC to track the material issues they missed. *See* email from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated November 1, 2005, EMC-AMB 003500070 ("JV has asked us to start logging loans that we believe Clayton or PWC missed material issues on . . . Linda please start the list with the loans from yesterday and let's keep it on the shared drive.").

[150] Email from Defendant Verschleiser to, among others, Defendant Nierenberg, dated March 23, 2006, EMC-AMB 001542438-439.

[151] Email from Defendant Verschleiser to, among others, Defendant Nierenberg, dated March 15, 2007, EMC-AMB 005446200.

4106355v.1

to repay, which was and is a fundamental inquiry under all underwriting guidelines. Indeed,

Defendant Verschleiser's berating of Clayton in March 2007 – a month before the closing of the

BSSLT 2007-1 Transaction – was a direct reaction to a report Mongelluzzo provided that

showed the deficiencies of Clayton's findings. The report showed that in 2006 Clayton had

reviewed a total of 58,643 loans, but that only 2,078 – or less than 3.5% – were "kicked in the

[due] diligence process" for defects.[152] As Defendant Verschleiser's comment reflects, Bear

Stearns knew that the level of defective loans in its pools far exceeded 3.5%. Significantly, the

same summary revealed that of those loans rejected, only 310 loans – or just *0.05%* of the total

loans Clayton reviewed – were identified as having unreasonably stated income. Defendants

Verschleiser and Nirenberg, as well as the other Bear Stearns executives involved in the

exchange, knew that a prevalent defect in its loan pools pertained to borrowers who falsely and

unreasonably stated their incomes, but that Clayton had failed to adequately evaluate the

reasonableness of the borrowers' incomes. Mongelluzzo admitted as much in an August 2007

email responding to an inquiry of whether Clayton assessed the reasonableness of income

between 2004 and 2006, when he explained that Clayton "*looked at it back then but not as*

*hard.*"[153]

    136.    Bear Stearns had an equally low regard for the adequacy of the review conducted

by Watterson Prime.[154] Thus, Mongelluzzo's proposal to bring the due diligence function in-

---

[152] *Id.*

[153] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance), dated August 30, 2007, EMC-AMB 001433099-100.

[154] *See, e.g.,* Email from Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager) to, among others, Defendant Haggerty, Defendant Silverstein, Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated December 19, 2006, EMC-AMB 005434366 ("Due to a back log on receiving reports and failure to meet deadlines until further notice, *do not assign any new trades to Watterson-Prime* without my prior approval.") (emphasis added).

house encompassed the work performed by Watterson Prime.[155] By April 2007, moreover, the

problems with Watterson Prime had become so severe that Mongelluzzo advised his team that

Bear Stearns "will temporarily cease using them for due diligence services."[156] Rather than

disclose these issues in advance of the BSSLT Transaction, which was scheduled to close two

days later, an EMC manager directed the diligence department to "make sure this stays within

EMC only."[157] When asked her view of Watterson Prime, the manager who was the point of

contact with Watterson Prime recommended that the firm not be hired in the future because

"*Watterson~Prime . . . does not always deliver.*"[158] And in the words of a former Watterson

Prime consultant that conducted due diligence on Bear Stearns loans, "*[a]bout 75 percent of the*

*time, loans that should have been rejected were still put in the pool and sold.*"[159]

137.    Bear Stearns did not disclose to Ambac or the other securitization participants its

deep-rooted concerns regarding the failings of its due diligence firms; nor did Bear Stearns adopt

Mongelluzzo's proposal to bring the due diligence function in-house to address the failings. At

his deposition, Defendant Silverstein contended that Bear Stearns rejected the significant change

---

[155] 6/4/2010 Silverstein Deposition Tr. at 116-17 ("evaluating bringing in-house our due diligence efforts versus outsourcing to Clayton and Prime and other due diligence firms").

[156] E-mail from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to, among others, Pattie Sears (EMC Mortgage Corporation, Due Diligence Manager) and Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager), dated April 13, 2007, EMC-AMB 001747707-708

[157] E-mail from Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager) to, among others, Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations) and Pattie Sears (EMC Mortgage Corporation, Due Diligence Manager), dated April 13, 2007, EMC-AMB 001747707-708.

[158] Email from Pattie Sears (EMC Mortgage Corporation, Due Diligence Manager) to Debbie Rich (EMC Mortgage Corporation, Quality Control), dated July 16, 2008, EMC-AMB 006177517-518 ("Our major issues, ARM issues, prepayment penalty issues, etc., were always WP."); 5/28/2010 Sears Deposition Tr. at 181-188.

[159] Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio, dated May 27, 2008, http://www.npr.org/templates/story/story.php?storyId=90840958; Email from Anthony Neske (Watterson Prime LLC) to John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence), dated May 29, 2008, EMC-AMB 005964024-025 (discussing the Waterson Prime employee's public admissions).

to its diligence structure "because there weren't significant cost savings associated with bringing it in-house."[160] But Bear Stearns' own internal analysis showed a potential cost savings in the year of implementation, $3.6 million in savings in the second year, and $6.7 million annual savings by the fifth year.[161] These escalating cost *savings* were not "significant" enough for Bear Stearns to move away from the *internally*-berated but *publicly*-praised due diligence firms? The truth is that Bear Stearns rejected Mongelluzzo's proposal to bring the due diligence function in-house because the third party due diligence firms provided the false veneer of credibility to the process that Bear Stearns marketed to Ambac and other securitization participants.

138.    Revealing of its actual motivation, *i.e.*, to allow the free flow of loans into its securitizations regardless of quality, Bear Stearns also rejected Mongelluzzo's proposal to track the extent and reasons for Bear Stearns' "overrides" of the due diligence firms' findings that loans were defective and should not be purchased.  In May 2005, before any of the Transactions at issue had closed, Mongelluzzo requested that Defendants Haggerty and Silverstein approve his request "to track loans that are overridden by our due diligence managers and track the performance of those loans."[162] Defendant Haggerty previously had been advised by the due diligence department that maintaining the documentation of the due diligence firms' analysis would allow Bear Stearns to track "trends in the reasons for rejection" and for "trades that actually turn into deals determine how different credit performance is for loans that had been

---

[160] 6/4/2010 Silverstein Deposition Tr. at 120-21.

[161] Due Diligence – "Build Initiative" Presentation, dated May 1, 2006, EMC-SYN 00597826-828. *See also* Email from Mongelluzzo to Defendants Verschleiser and Nierenberg, among others, dated February 15, 2006, EMC-AMB 001542438-439 ("I ultimately think if we brought all of the DO in house we would run savings of about $6MM annually based on our current DO spend.").

[162] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Defendants Haggerty and Silverstein, dated May 11, 2005, EMC-AMB 001597504.

flagged as 'exceptions' vs. those that were not."[163]  But the particular reasons for its overrides

and the "exceptions" it made to underwriting guidelines to allow defective loans to be purchased

were exactly what Bear Stearns did *not* want to be tracked.

139.    Thus, Bear Stearns did not implement Mongelluzzo's proposal; instead, it did the

exact opposite, implementing and maintaining throughout the relevant period a policy that

directed its underwriting managers communicating with the due diligence firms to "purg[e] all of

the older reports on the trade leaving only the final reports."[164]  A Bear Stearns due diligence

manager confirmed that, pursuant to this policy, she did not retain copies of the "daily reports"

submitted by the due diligence firms.[165]  Bear Stearns' policy therefore destroyed evidence and

impaired the audit trails concerning the high incidence of Bear Stearns' overrides and waivers

leading up to its final purchase decisions.[166]

140.    What Bear Stearns could not prevent, however, was that one of its due diligence

firms – Clayton – would attempt to shield itself from criticism by internally tracking the override

decisions made by Bear Stearns.  Consequently, Clayton's president had prepared a report that

showed that Bear Stearns waived Clayton's findings that defective loans should not be purchased

*up to 65% of the time* in the third quarter of 2006 alone.[167]

---

[163] Email from Defendant Haggerty, dated April 25, 2005, EMC-AMB 001699079-080.

[164] *See* Email from Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager) to Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated May 17, 2006, EMC-AMB 004416519-525, at 524 (attaching the EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005).

[165] *See* Email from Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager) to Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated May 17, 2006, EMC-AMB 004416519-525 at 524 (attaching the EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005); 5/28/2010 Sears Deposition Tr. at 101-03.

[166] *Id.*

[167] Internal Report produced by Clayton Holdings, Inc., CLAY-AMBACE 0001770-780 at 1777 (showing a 65% override rate for EMC and 56% rate for Bear Stearns in the third quarter of 2006).

67

4106355v.1

141.    The common rationale pervading Bear Stearns' due diligence decisions was to

ensure that the diligence protocols did not impede but rather facilitated the free flow of loans for

securitization. This directive was set early and enforced firmly. Thus, as early as February

2005, Defendant Haggerty issued the strong directive to *reduce* the due diligence Bear Stearns

conducted "in order to make us more competitive on bids with larger sub-prime sellers."[168]  As

she conceded, reducing due diligence was an accommodation to the suppliers that ensured the

flow of mortgage loans that Bear Stearns securitized.[169]  Pursuant to Defendant Haggerty's

directive, Bear Stearns reduced the size of the loan samples it subjected to due diligence and

agreed to conduct due diligence *after* the loans were purchased, *i.e.*, "post-closing" due

diligence. Both changes reduced the effectiveness of the diligence, and neither was disclosed to

Ambac or investors.[170]

142.    Consistent with its response to Mongelluzzo's other recommendations, Bear

Stearns paid no heed to the warnings by the head of its quality control department regarding the

adverse consequences that would result from such limitations. For example, to increase the flow

of loans from high-volume originators such as American Home Mortgage (whose lending

operations Bear Stearns also helped finance through its warehouse lines of credit), Bear Stearns'

trading desk agreed to conduct "post close due diligence" for two loan pools purchased in March

---

[168] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) conveying
instructions from Defendant Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head
Mortgage Finance) to reduce due diligence, dated February 11, 2005, EMC-AMB 001718713-714..

[169] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 194.

[170] As Bear Stearns' internal audit department noted, it did not have any "documented process for
determining loan sample selections that deviate from the due diligence guidelines," let alone any process
for communicating those deviations to securitization participants. Internal Audit Report, dated June 22,
2006, EMC-AMB 010858558-561.

and June 2006.[171] When Mongelluzzo learned of this decision in March, he advised the trading desk and Defendant Silverstein that "I would strongly discourage doing post close for any trade with [American Home Mortgage]. You will end up with a lot of repurchases" for defective loans in the securitized pools.[172] Bear Stearns disregarded that advice. Instead, it purchased the two loan pools and quickly packaged over 1,600 loans in the SACO 2006-8 Transaction, making American Home Mortgage the principal originator in the Transaction.[173]

143.    Similarly, in February 2007, Mongeluzzo warned Defendant Silverstein that "we need to let the desk know and seriously change our sampling percentages."[174] Mongelluzzo's concern stemmed from the large number of defective loans that Bear Stearns' quality control department identified in the securitized loan pools. Again the warning was disregarded, and

---

[171] Email from David Elliott (EMC Mortgage Corporation Deal Manager) to Keith Lind (Bear Stearns & Co. Managing Director, Trading), dated June 23, 2006, EMC-AMB 002314578-579 (describing American Home Mortgage "as turning out to be a post close due diligence"); E-mail from Keith Lind (Bear Stearns & Co. Managing Director, Trading) to John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) and David Elliott (EMC Mortgage Corporation Deal Manager), among several others, dated March 28, 2006, EMC-AMB 001751435-436 ("We will be doing 100% (Credit/Compliance) post closing due diligence on this pool.").

[172] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Keith Lind (Bear Stearns & Co. Managing Director, Trading), David Elliott (EMC Mortgage Corporation Deal Manager), and Defendant Silverstein (Bear Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), dated March 28, 2006, EMC-AMB 001751435 (emphasis added). See also Silverstein Deposition Tr. at 127-29.

[173] This was not an isolated problem. In March 2006, one of its deal managers observed that Bear Stearns completely abandoned doing any due diligence for flow loans that it had securitized, stating that "on the flow side we had no idea until yesterday that there was post close dd going on. . . . I agree that flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared. I think the ball was dropped big time on the flow processes involved in the post close dd, from start to finish." Email from Robert Durden (Bear, Stearns & Co. Deal Manager) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated March 24, 2006, EMC-AMB 006802393-395.

[174] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Defendant Silverstein, among others, dated February 22, 2007, EMC-AMB 005469676-677.

4106355v.1

Defendant Silverstein shortly thereafter proposed to reduce the percentage of loans sampled for

GreenPoint, one of the largest originators of defective loans in Bear Stearns' securitizations.[175]

144.    In addition to pushing for reduced due diligence, Bear Stearns' trading desk

pressured the due diligence department to churn through loans at such a rate as to make any

legitimate diligence impossible to attain. For example, on April 4, 2006 – at the behest of

Defendant Verschleiser – EMC's Senior Vice President of Conduit Operations directed her staff

to do "whatever is necessary" to meet Bear Stearns' volume objectives:

> I refuse to receive any more emails from [Defendant Verschleiser]
> (or anyone else) questioning why we're not funding more loans
> each day. I'm holding each of you responsible for making sure we
> fund at least 500 each and every day. . . . [I]f we have 500+ loans
> in this office we MUST find a way to underwrite them and buy
> them. . . . *I was not happy when I saw the funding numbers and*
> *I knew that NY would NOT BE HAPPY. I expect to see 500+*
> *each day. . . . I'll do whatever is necessary to make sure you're*
> *successful in meeting this objective.*[176]

Several months later, on September 26, 2006, the same Senior Vice President again ordered her

staff to "hit the target number" required by Bear Stearns' trading desk, which required EMC to

underwrite and purchase $2 billion in mortgage loans in just one month.[177]

145.    The pressure to increase volume at the expense of quality was confirmed by a

former EMC mortgage analyst, who revealed that, among other due diligence abuses, Bear

Stearns (i) pushed EMC analysts to perform their due diligence of the underlying mortgages in

---

[175] Email from Defendant Silverstein to John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) and others, dated May 29, 2007, EMC-SYN 00416564

[176] Email from Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated April 14, 2006, EMC-SYN 00596927-928 (emphasis added).

[177] Email from Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated September 26, 2006, EMC-SYN 00596855-856 ("I don't understand that with weekend overtime why we didn't purchase more loans today (Monday). . . . *Our funding needs to be $2 billion this month. . . . I expect to see ALL employees working overtime this week to make sure we hit the target number.*") (emphasis added).

70

unreasonably short time frames, (ii) encouraged analysts "to just make up data like FICO scores" and other critical mortgage metrics if that information was missing and the mortgage originators did not respond to requests for that information, and (iii) "instead of spending time to go back to the lender and demand clarification, like if verification of income actually backed these loans, the executives at Bear would just make the loan type fit."[178]

146.    As a result of the foregoing internal practices and policies, Bear Stearns secretly caused large volumes of loans to be pooled into the Transactions without having undergone anything remotely close to the due diligence review protocols publicly touted to Ambac and investors to solicit their participation in the Transactions. The consequences were and continue to be grave.

### 2.    Bear Stearns Covertly Implemented Policies to Securitize Defective Loans

147.    With the knowledge that its due diligence protocols were patently inadequate or simply ignored, Bear Stearns' trading desk devised policies to rid its inventory of the toxic loans EMC had acquired by packaging them into securitizations as quickly as possible – *i.e.*, before a default or delinquency occurred that would render the loans "unsecuritizable." Motivated by the huge short-term gains, Bear Stearns increased its securitization volume and pace by covertly revising its internal policies to securitize those loans before they defaulted, as Bear Stearns fully expected they would. That is, in 2005, Bear Stearns quietly revised its protocols to allow for the securitization of loans before the expiration of the "Early Payment Default," or EPD, period, which it defined as the first 30 to 90 days after the loan is acquired from the originator.

---

[178] *See* Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010 (quoting analyst Matthew Van Leeuwen); *see also* Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Dylan Hoyt (EMC Mortgage Corporation, Due Diligence Underwriter), dated May 16, 2005, EMC-AMB 001718661 (confirming that the EMC analyst was instructed to revise the loan type to a less risky classification).

71

148.    Bear Stearns' prior policy was to keep loans in its inventory and "not securitize those loans until the early payment default period ran."[179] Because it had recourse against the suppliers of loans that experienced a missed or delinquent payment shortly after origination, seasoning the loans through the EPD period allowed Bear Stearns to cull out and prevent the securitization of loans likely to "contain some form of misrepresentations and [that] should not have been made."[180] Defendant Silverstein explained that EPDs (and first payment defaults, or "FPDs") are indicators of fraud or an inability to pay with respect to a loan, suggesting that the loan never should have been granted in the first instance.[181] The former head of Bear Stearns' Fraud Prevention Group concurred, testifying that an "EPD or FPD is an indicator that there could be a possibility of red flags that could eventually be an indicator of misrep[resentation]."[182]

149.    Bear Stearns covertly began securitizing loans before the EPD period ran during 2005,[183] and by the end of 2005, the Bear Stearns' trading desk made that practice the rule. On or about December 2005, Defendant Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in December for the conduit" by

---

[179] 12/11/09 Durden Rule 30(b)(6) Deposition Tr. at 178-79 ( "Q:   And for subprime loan originations and subprime mortgage loans, was it a practice at EMC to not securitize those loans until the early payment default period ran?  A: . . . yes . . . "); *see also id.* at 271 ("I believe that a certain point in time the ordinary target date for securitization for certain assets could have been at the expiration of the EPD protection period as well as additional items that could go into that decision making process.").

[180] Bear Stearns Whole Loan Repurchase Project: Repurchases, Current Processes, dated June 21, 2006, EMC-AMB 004919710-740 at p. 30 ("Loans which become delinquent more than 90+ days in their first year. Although a fraud flag can be raised, many such loans contain some form of misrepresentation and should not have been made.").

[181] 6/4/2007 Silverstein Deposition Tr. at 192. Similarly, the Collateral Analyst for Mortgage Finance at Bear, Stearns & Co. confirmed that the existence of an EPD "is an indicator of a borrower's *unwillingness* to pay their mortgage." 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 275-76 (emphasis added).

[182] 4/15/2007 Gray Deposition Tr. at 113-14.

[183] 12/11/2009 Durden Rule 30(b)(6)  Deposition Tr. at 272-73 ("[I]n the period of time that EMC has held mortgage loans, I am sure that there are instances of mortgage loans being securitized prior to the expiration of the EPD protection period.")

72

January. Because this directive contravened then existing policy to "typically hold the conduit loans through EPD protection period," when asked if Defendant Verschleiser intended to keep this policy in place, a senior managing director from the trading desk immediately confirmed: "No, want to see everything regardless of EPDs."[184]

150.    Bear Stearns strongly enforced the revised policy. On June 13, 2006, Defendant Verschleiser said in no uncertain terms that we need "*to be certain we can securitize the loans with 1 month epd before the epd period expires*."[185] When this directive was not applied, Defendant Verschleiser angrily demanded explanations as to why loans "were dropped from deals and not securitized before their epd period expired."[186]

151.    While recognizing full well that its revised policy materially increased the riskiness of the loans it securitized, Bear Stearns never informed Ambac or any other participant in the securitizations that Bear Stearns "had changed the policy from not securitizing loans before the EPD period had run to securitizing loans while the EPD period had not run."[187]

152.    Because large volumes of securitized loans were beginning to experience delinquencies within the EPD period, Bear Stearns issued repurchase claims against the entities from which it purchased the loans (*i.e.*, the originators). Notably, Bear Stearns did not advise those entities that it no longer owned the securitized loans and that Bear Stearns had yet to incur any loss resulting from the default – to the contrary, it had already generated hefty fees from

---

[184] Email from Chris Scott (Bear, Stearns & Co. Senior Managing Director, Trading) to, among others, Robert Durden (Bear, Stearns & Co. Deal Manager) and Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated January 3, 2006, EMC-AMB 001385832-833.

[185] Email from Defendant Verschleiser to Defendant Haggerty, among others, dated June 13, 2006, EMC-AMB 003993365-367.

[186] Email from Defendant Verschleiser to Defendants Silverstein and Haggerty, among others, dated March 1, 2007, EMC-AMB 006087607-616.

[187] *See, e.g.*, 12/11/09 Durden Rule 30(b)(6) Deposition Tr. at 273-74 ("In what I've reviewed, I'm not aware of EMC ever disclosing either of those positions to party external to the firm.").

73

securitizing the loans. Nor did Bear Stearns assert that it was seeking a recovery on behalf of the securitizations through EMC's role as the loan servicer. Rather, Bear Stearns was silent on the ownership status of the loans. But, rather than require these entities to repurchase a loan that it had already sold, which would necessarily require Bear Stearns to repurchase the loan from the securitization trust, Bear Stearns would "provide alternatives to repurchase of a loan, such as a price adjustment."[188] As discussed below, Bear Stearns presented other alternatives permitting its recovery for EPD claims while accommodating its suppliers such as cash settlements for a fraction of the repurchase price, "downbids," or other credits for future loan purchases.[189]

153.    Bear Stearns' claims activities were not limited to loans experiencing an EPD, but included pursuing and settling claims on securitized loans suffering from other issues, such as fraud or underwriting errors. The significance of these recoveries was underscored as early as August 2005 by a Bear Stearns' representative, who stated:

> "It is very important to try to down bid items rather than have First Horizon buy them back. *That is how we pay for the lights* . . . . . ."[190]

Bear Stearns' revised EPD policy thus provided another opportunity to further its fraudulent scheme and to doubly profit from its increased securitization of defective loans.

154.    Consistent with that view, an internal presentation prepared for and at the request of Defendant Marano for just the one-year period between April 2006 and April 2007, stated that Bear Stearns "resolved claims against sellers pertaining to EPDs in the amount of $1.9 billion,"

---

[188] *See, e.g.* EMC Claim Form, dated April 6, 2006, EMC-AMB 10534096-98 (claim against Plaza Home Mortgage Financial, Inc. for EPD violation stating "EMC may, at its option, provide alternatives to repurchase of a loan, such as a price adjustment. Please contact your Account Manager if interested.").

[189] *See* Section III.C.6, below.

[190] Email from Brent Giese (Bear, Stearns & Co. Managing Director and Producing Manager of Bear/EMC Correspondent Sales Team) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated August 11, 2005, EMC-AMB 007070103-106.

and that the "largest percentage of those resolutions were settlements."[191]  The Managing

Director that oversaw the preparation of the presentation also admitted that "EPDs were the

majority . . . of the volumes of claims that EMC Mortgage Corporation submitted against sellers

in 2005 and 2006," and pertained to loans that were in Bear Stearns securitizations.[192]  He further

confirmed that, through October 31, 2005, Bear Stearns "resolved claims, the majority of which

were EPDs, in the amount of $1.7 billion" and, that in 2006, "$2.5 billion in claims were filed,

the majority of which were EPDs."[193]

     155.    Likewise, when reflecting with hindsight on the success of Bear Stearns' claims

practices in 2007, the same managing director stated that "*filing these claims hasn't won us any*

*popularity contests but it has saved the firm 100's of millions of dollars in the past.*"[194]

Following his departure from Bear Stearns in June 2008, he then touted on his resume that this

process generated $1.25 billion in recoveries.[195]

     156.    Bear Stearns never "disclosed to Ambac or other investors that it was recovering

on EPDs from originators with respect to securitized mortgage loans, pocketing the money and

not putting it into the trust."[196]  The managing director of Bear Stearns' quality control, claims

and representation and warranty departments also could not identify any instance where it

---

[191] "EPD Summary" Report, EMC-AMB 004099954; 4/26/2010 Golden Deposition Tr. at 255-56.

[192] 4/26/2010 Golden Deposition Tr. at 120-21

[193] 4/26/2010 Golden Deposition Tr. at 141.

[194] Email from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President) to, among others, Leslie Rodriguez (EMC Residential Mortgage Managing Director) and Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims), dated September 15, 2007, EMC-AMB 06870106-110.

[195] 4/26/10 Golden Deposition Exh. 1.

[196] 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 269 ("Q. Well, sitting here today, you can't identify any instance in which EMC or Bear Stearns disclosed to Ambac or other investors that it was recovering on EPDs from originators with respect to securitized mortgage loans, pocketing the money and not putting it into the trust, right? . . .  A. Yeah, I'm not aware of a disclosure to Ambac.").

75

"disclosed to Ambac or any other monoline insurer the number of claims with respect to EPDs filed in 2005 and 2006 and thereafter [or] the volume of those claims that were settled in 2006."[197] To the contrary, to perpetuate these recoveries and conceal loans that it knew raised "red flags" of fraud and other defects, the manager of repurchase operations admitted that when Bear Stearns recovered on an EPD claim it "would not evaluate the reps and warranties it gave on that very same loan to securitization participants to assess whether there might be other breaches of reps and warranties other than an EPD breach."[198]

157.    With this motivation and in view of the substantial recoveries it was able to generate, Bear Stearns then devoted its post-securitization efforts to identifying opportunities to generate recoveries and other benefits from the sellers and originators that supplied ever-growing numbers of defective loans backing its securitizations.

### 3.    *Bear Stearns' Quality Control and Repurchase Practices Furthered Its Scheme to the Detriment of the Securitizations*

158.    As discussed above, Bear Stearns represented to Ambac, rating agencies and potential investors that the securitization participants would benefit from Bear Stearns' "quality control" operations, which re-underwrote loans "post settlement" or *after* Bear Stearns purchased and securitized those loans.[199] Bear Stearns' quality control operations comprised a

---

[197] 4/26/2010 Golden Deposition Tr. at 144-45

[198] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 94-95. *See also* 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 455 (noting that prior to 2007 when its counsel directed Bear Stearns to change its wrongful practices, "to the extent that EMC obtained a settlement on an EPD claim, it had not subject[ed] those loans to a separate rep and warranty review").

[199] *See* Marketing Decks distributed to Ambac and other potential participants (stating that quality control is a "Post Settlement" review, which includes a "[c]onduit team dedicated to claims of breaches of reps and warrants discovered by the Quality Control group investigations."), discussed in Section III.B.1, above; *see also* 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 179 (confirming that due diligence "was done prior to the settlement of the purchase of the loans, whereas, the quality control reviews were done after EMC settled the purchase of the – of the loan."); 4/26/2010 Golden Deposition Tr. at 17 (confirming that quality control refers to the "post-purchase review of loans that EMC and Bear Stearns securitized").

4106355v.1

"production" review undertaken on a randomly selected sample of all loans EMC acquired each month, as well as a comprehensive review of loans that Bear Stearns purchased from new sellers and loans that defaulted within the first year.[200]  Bear Stearns reviewed "sample queries of production [to] determine if . . . the underwriter was doing their job and if it was underwritten correctly or there was any defect in the loan."[201]  According to Bear Stearns, its quality control department also was responsible for determining whether defective loans complied with the representations and warranties EMC made to Ambac and other securitization participants in the deal documents (referred to as a "securitization breach review").[202]

159.    Bear Stearns' commitments to review, identify, and flush out defective loans found after securitization were material to Ambac's participation in the Transactions.[203]  Despite marketing its quality control operations for the benefit of Ambac and investors, however, Bear Stearns never disclosed, and deliberately concealed, that its quality control practices were dedicated exclusively to securing for Bear Stearns additional consideration from the entities that

---

[200] 4/26/2010 Golden Deposition Tr. at 208-209.

[201] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 127.  Internal policy documents also establish that Bear Stearns viewed the randomly selected loan samples to provide "the basis for statistical inference (i.e. generalizing from sampled findings to the overall population)," and "[a]s such, they are the most important sample group."  See EMC's Quality Control Review Guidelines attached to the Contractor Services Agreement between EMC and Adfitech, dated January 26, 2005, EMC-AMB 000229896-918 at 910; 5/20/2010 Serrano Deposition Tr. at 25-27 (acknowledging that "the random sample would be representative of the pool that was purchased that month").

[202] 4/26/2010 Golden Deposition Tr. at 59-60 ("[T]he person who were [sic] QC'ing the loans then made a determination on whether or not it was a securitization breach. . . it was actually the individual who reviewed the loan did the original QC."); see also 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 485 (as of December 2005, the department that "reviewed mortgage loans to assess whether or not the loans were in breach of a representation or warranty given by EMC to participants in a securitization," was "done by the quality control department").

[203] March 26, 2007 notes from Gary Gal (Ambac Vice President, MBS Department of Structured Finance) concerning Bear Stearns due diligence call with Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance), Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) and Jamie Moy (Bear, Stearns & Co., Mortgage Finance), ABK-EMC03212692 ("When loans goes [sic] delinquent they have external and internal reviewers do a full re-underwrite").  See also 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 156-57.

4106355v.1

supplied Bear Stearns with the toxic loans – to the detriment of the securitizations that were left with the massive risks and losses on the loans.[204] That is, when a securitized loan defaulted during the EPD period or Bear Stearns identified a breach in a representation made *to* EMC, Bear Stearns would attempt to negotiate a settlement with the supplier of the loan, and would pocket the recovery. Bear Stearns deliberately decided not to review the defaulted or defective loans identified during quality control for breaches of representations made *by* EMC unless the suppliers demanded to repurchase the loans (and tendered the repurchase funds to EMC) in lieu of settling, an approach the suppliers rarely took (and had little incentive to take) as it was the more costly alternative from their perspective.

160.    Reflecting its decision *not* to review defective loans for securitization breaches, Bear Stearns' quality control manager confirmed that there were no "protocols in place to assess securitization breaches with respect to loans acquired through the bulk and flow conduit" until late 2007.[205] Before then, Bear Stearns limited the securitization breach review to circumstances in which "the seller has already agreed to purchase these loans and then we need to find a reason on these loans to purchase it out of security."[206] In other words, Bear Stearns simply ignored EMC's express representations and warranties requiring prompt disclosure of breaching loans irrespective of Bear Stearns's claims against the sellers of those loans.[207]

---

[204] As Defendant Haggerty confirmed, when quality control uncovered defective loans, "the first process is the seller has an opportunity to rebut it, provide additional information, et cetera, to see if it could be cured," and if the defect could not be cured, "the claims department would typically issue a repurchase demand to the seller if there was a breach of the a rep and warranty." 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 464, 476-77. No securitization breach was commenced at that time.

[205] 5/20/2010 Serrano Deposition Tr. at 47; *id.* at 44 (noting that as of September 2006, Bear Stearns' securitization breach review "was not something that was executed correctly").

[206] EMC-AMB 010726678. The policies in place as of January 2007 for "reviewing loans for breaches," also provide "[o]nce the lender has confirmed that the they are going to repurchase the loans, it is necessary to buy the loan out of a security if in a deal," EMC-AMB 009649870-076.

[207] *See* Section V.C.1, below.

78

161.   Consequently, despite the substantial number of EPD claims Bear Stearns asserted against the suppliers of the securitized loans,[208] its quality control operations generally did not review those loans for securitization breaches. A Bear Stearns quality control manager revealed Bear Stearns' reasoning: "I don't think we want to do anything with EPDs separate from the 90 Day DQs that are done in the 90 Day DQ shell because *if we end up keeping the loan we don't want to find a PSA breach*, right?"[209] (The "PSA" is the document in which EMC *made* representations and warranties to the securitizations.) So Bear Stearns deliberately avoided conducting securitization breach reviews for defaulted or defective loans because it did not want to document the breaches it knew existed.

162.   The percentage of defective loans Bear Stearns identified through its quality control sampling review was substantial. Bear Stearns contracted with Adfitech, Inc. ("Adfitech") to perform the quality control reviews on its behalf,[210] and instructed Adfitech that the purpose of quality control is "to review loans to evaluate if they meet investor quality guidelines, if sound underwriting judgment was used, and if the loan is devoid of all misrepresentation or fraud characteristics."[211] With this as its directive, Adfitech conducted

---

[208] *See* Section III.C.2, above.

[209] Email from Tamara Jewell (EMC Residential Mortgage, Project Manager) to Robert Glenny (EMC Residential Mortgage, Analytics Group/Seller Approval) and Randy Deschenes (EMC Residential Mortgage, CEO), dated July 30, 2007, EMC-AMB 009526626-627.

[210] 5/20/2010 Serrano Deposition Tr. at 22-23 ("Adfitech undertook all the monthly sampling quality control review of loans for the bulk and flow channel of EMC.").

[211] Contractor Services Agreement between EMC and Adfitech, dated January 26, 2005, EMC-AMB 000229896-918 at 909. Bear Stearns reinforced these protocols with Adfitech in its "Loan Origination Quality Control Policy as of February 2007, which expressly stated that the purpose of quality control was to, among other things, "assure that all loans . . . comply with insurer and guarantor requirements," and also called for Bear Stearns to "report to the investor or government agency any violation of law or regulation, false statements, material defect or program abuses within 30 days of discovery." Email from Greg Anderson (Adfitech quality control supervisor) to Sherrie Dobbins (EMC Mortgage Corporation Assistant Manager, Quality Control Underwriting and Vendor Management) and Fernando Serrano (EMC

4106355v.1

quality review of samples of loans Bear Stearns acquired. For the period through the end of

2006, Adfitech performed quality control reviews of loans in the Transactions and found that

*38.8%* to be defective based on Bear Stearns' quality control guidelines. Although these findings

revealed material information about the riskiness of loans, and breaches of EMC's

representations and warranties (discussed below),[212] at no time before or after the Transactions

did Bear Stearns disclose these remarkably high defect rates.

     163.    Instead, to further its fraudulent scheme and benefit from the securitization of

defective loans, Bear Stearns relied on its quality control operations to assert repurchase claims

against the entities from which it purchased the loans. Bear Stearns pursued and settled claims

against the loan suppliers on the basis that the loans were "not eligible for delivery" without

disclosing that it already had sold the loans into a securitization.[213] Bear Stearns never disclosed

to Ambac or investors that, as demonstrated by its own conduct, these loan should never have

been purchased.

     164.    By concealing the true nature of its quality control operations and conditioning

the securitization breach process on its ability to first recover repurchase funds for itself, Bear

Stearns deceived the securitization participants and intentionally interfered with and frustrated

---

Mortgage Corp., Quality Control Manager), dated February 2, 2007, EMC-AMB 006975253-267 at 255, 261.

[212] Effectively conceding that the Adfitech quality control findings evidenced securitization breaches, Bear Stearns' senior managing director of the quality control department confirmed that between 2005 through 2006 it applied the same criteria for both of those analyses. 4/26/2010 Golden Deposition Tr. at 104-105.

[213] Bear Stearns' claims correspondence shows that EMC asserted claims against sellers with respect to loans that it had previously securitized in the Transactions on the grounds that "loan was not eligible for delivery to EMC." *See, e.g.*, EMC's claim correspondence to American Home Mortgage, dated November 20, 2006, EMC-AMB 004922387 (claim made with respect to four loans previously sold into the SACO 2006-2 Transaction); EMC's claim correspondence to SunTrust Mortgage, dated April 11, 2008, STM-00004433-434 (claim made with respect to one loan previously sold into the BSSLT Transaction).

4106355v.1

EMC's contractual promises to Ambac and investors that it would "promptly" disclose – and within 90 days, cure, substitute, or repurchase – breaching loans from the securitization trusts.

### 4. The Sheer Magnitude of Defective Loans Bear Stearns Securitized Overwhelmed Its Quality Control and Repurchase Protocols

165.    By at least 2006, Bear Stearns had acquired and securitized so many defective and toxic loans that its quality control and claims departments became so overwhelmed that it was unable to process its claims against the entities from which it purchased the loans feeding into its securitization pipeline.

166.    The Senior Managing Director in charge of these departments confirmed being "overwhelmed" by the sheer magnitude of claims it had to file, which had escalated in parallel with Bear Stearns' "rapid increase in the amount loans being purchased and securitized." [214]

167.    An internal audit report issued on February 28, 2006 and distributed to Defendants Haggerty, Cayne, Marano, Mayer, Schwartz, and Spector[215] also confirms Bear Stearns' inability to process its claims, identifying "a significant backlog for collecting from and submitting claims to sellers" consisting of at least 9,000 outstanding claims worth over $720 million, and concluding that the procedures in place to process, collect, resolve, and monitor such claims were inadequate or simply non-existent.[216]

168.    Despite directing the senior managing director to establish appropriate claims procedures and enhance existing protocols, less than two months later Defendants Verschleiser and Haggerty agreed that the "[c]laims situation continues to be a disaster – hitting crisis," because "our operation cannot support the claims collection methodology we have been trying to

---

[214] 4/26/2010 Golden Deposition Tr. at 119-20.

[215] Email from Stephanie Paduano (Bear, Stearns & Co. Internal Audit Department) dated March 7, 2006, EMC-AMB 001496304.

[216] EMC-AMB 001496305-EMC-AMB 001496311, "Bear Stearns Internal Audit Report – EMC Mortgage Corporation ('EMC') – Review of Representations and Warrants Department."

pursue," and that the senior managing director "clearly continues to be overwhelmed and this is really hurting."[217] Indeed, internal audit reports issued on September 22, 2006 and February 26, 2007 continued to report that many of the issues previously identified in need of correction in early 2006 had yet to be addressed.[218]

169.   No one at Bear Stearns disclosed to Ambac that it had acquired and securitized so many defective loans, requiring vast numbers of claims against originators, or that its internal departments could not handle the workload. The defective loans that Bear Stearns' understaffed departments were able to identify and file claims for represent just a small fraction of the total defective loans that were securitized and would have been identified if the departments had been staffed adequately.

         **5.**     ***Bear Stearns Failed to Disclose That Its Counsel and Outside***
                ***Auditors Found Its Claims Practices Contravened Its Contractual***
                ***Provisions, Investors' Expectations, and Industry Standards***

170.   By mid-2006, the growing backlog of repurchase claims had risen to alarming levels, drawing the attention of its external auditors and counsel, which in no uncertain terms issued stern warnings instructing Bear Stearns to revise its claims practices.

171.   In August 2006, Bear Stearns' external auditor, PriceWaterhouseCoopers ("PWC"), advised Bear Stearns that its failure to promptly review the loans identified as defaulting or defective was a breach of its obligations to the securitizations.[219] PWC advised Bear Stearns to begin the "[i]mmediate processing of the buy-out if there is a clear breach in the PSA agreement to match common industry practices, the expectation of investors and to comply

---

[217] Emails from Defendant Haggerty to Defendant Verschleiser, dated April 18 and April 12, 2006, EMC-AMB 001498898-899.

[218] September 22, 2006 Internal Audit (EMC-AMB 010858575-576) and February 26, 2007 Internal Audit (EMC-AMB 010858610-613), each titled, "Status of Unresolved Audit Report Issues for EMC Mortgage Corporation ("EMC") – Review of Representations and Warrants Department."

[219] *See* EMC-AMB 006803201-277, "UPB Break Repurchase Project – August 31, 2006."

4106355v.1

with the provisions in the PSA agreement."[220]  PWC explained that the effect of its proposal "in the Claims work processing flow, is to effectively reverse the current processing order by first considering whether there is a breach of representations and warranties in the PSA agreement and then pursue the claim against the original seller of the loan."[221]  The auditor further advised Bear Stearns to promptly remedy its "[l]ack of repurchase related policies and procedures in the Claims, G/L Control and Investor Accounting departments" to comply with SEC regulations.[222]

172.    At or around the same time, Bear Stearns' legal counsel reinforced PWC's assessment and advised Bear Stearns that it had to revise its improper practices.  Defendant Haggerty confirmed that, in early 2007, its counsel advised Bear Stearns that it could no longer keep for itself that substantial monetary recoveries obtained on its EPD and other claims relating to securitized loans, and moreover, that it was required to review the loans for which it obtained recoveries to assess whether the loans breached EMC's representations and warranties made in its securitizations.[223]

173.    This legal advice was a recognition, and an admission, that Bear Stearns (i) was not complying with its obligation to review the defaulting or defective loans for which it made claims against suppliers to determine whether they breached representations and warranties EMC extended in the securitization, and (ii) improperly was retaining recoveries on those loans that

---

[220] *Id.* at p. 21.

[221] *Id.* at p. 26.

[222] *See id.* at p. 26 (making reference to Regulation AB, effective January 1, 2006).  PWC also recommended that Bear Stearns stop asserting EPD claims to sellers on securitized loans because "an early payment default would not be sufficient cause to buy-back the loan from the security holder. . . . [and] that [Bear Stearns] is processing put-back request requests for loans that may not be required to be repurchased out of the security trusts."  *See id.* at p. 26.  In other words, PWC recognized the incongruity and impropriety of Bear Stearns submitting repurchase demands to suppliers for loans it did not own (*i.e.*, were in the securitizations), but yet had no intention of repurchasing from the securitizations.

[223] 2/3/2010 Haggerty Deposition Tr. 455-63, 510.

4106355v.1

should be contributed to the securitizations.[224] Indeed, as of August 2006, there were no procedures in place for reviewing the loans subject to settlement agreements or tracking the funds recovered, causing one Bear Stearns employee to admit to "making it up as I go...scary!"[225] Bear Stearns' Executive Director and Assistant General Counsel also confirmed that, before legal intervened in 2007, no documentation existed setting forth the protocol for disclosing securitization breaches to investors or insurers, such as Ambac.[226] Bear Stearns concealed these issues from Ambac and other securitization participants.

174.    Contrary to its own counsel's advise, Bear Stearns did not implement a policy to review promptly defective or defaulted loans for securitization breaches until at least September 2007, long after the last Transaction and only after the defaults on its securities began to rise sharply.[227] According to its employees, moreover, Bear Stearns still has not fully implemented its counsel's advice to the contribute to the securitizations the recoveries it obtained on the securitized loans.[228]

---

[224] 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. 510; 4/19/2010 Glory Deposition Tr. 125.

[225] Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated August 12, 2006, EMC-AMB 010787527-31.

[226] 1/7/2010 Mesuk Rule 30(b)(6) Deposition Tr. at 115-18.

[227] *See* Section III.D., below. *See also* E-mail from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to, among others, Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President) and Leslie Rodriguez (EMC Residential Mortgage Managing Director), dated September 13, 2007, EMC-AMB 007176791-800 at 793-94.

[228] 4/19/2010 Glory Deposition Tr. 41 (process not complete as of her departure in Spring 2009); 4/26/2010 Golden Deposition Tr. 142-43 (the policy not fully implemented before he left in Spring 2008). *See also* Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Defendant Haggerty and John Horner (J.P. Morgan Managing Director, Co-Head of Agency and Non-Agency Trading), dated November 20, 2008, EMC-AMB 011045262-266 at 265 (discussing "*phase I* of the settlement funds allocation methodology" as part of the Investor Relations Group's ongoing projects) (emphasis added).

4106355v.1

175.   Instead of promptly making the requisite disclosures and undertaking the appropriate cures, Bear Stearns disregarded the advice given to it and continued to conceal the true nature of its internal operations to induce participation in subsequent transactions, including the SACO 2006-8 and BSSLT 2007-1 Transactions. Bear Stearns also developed ongoing measures to obscure the magnitude of defective loans in its securitizations, and continued to offer concessions designed to maintain its flow of loans from the suppliers of the defective loans.

### 6.   Bear Stearns Made Accommodations to Sellers to Conceal the Volume of Defective Loans and Maintain the Flow of Loans from Those Sellers

176.   To perpetuate its fraudulent scheme, Bear Stearns quickly moved to reduce the outstanding claims against the entities from which it purchased the securitized loans by offering them substantial concessions and other accommodations as an alternative to repurchase, which would keep its suppliers happy and ensure the continued flow of loans from these entities available for Bear Stearns to package and bundle in future securitization deals. At the same time, Bear Stearns still managed to secure for itself massive cash recoveries and other benefits on account of toxic loans that it long ago packaged into a securitization.

177.   Although these entities were contractually obligated to buy back defective loans at an agreed-upon repurchase price, by extending more favorable alternatives Bear Stearns could recover an economic benefit from these entities without having to first repurchase defective loans out of a securitization. Moreover, the managing director responsible for the claims department recently confirmed that before offering alternatives to repurchase of loan that had been securitized, Bear Stearns did not seek the approval or consent of the securitization trust.[229] Indeed, had it done so, Bear Stearns would have alerted the securitization participants to the

---

[229] 4/26/2010 Golden Deposition Tr. at 148.

steadily growing number of loans plagued by material underwriting failures and other fraudulent

activities.

178.    Accordingly, through EMC, Bear Stearns entered into confidential settlement

agreements resolving EPD and other claims in exchange for cash payments at a fraction of the

repurchase price *"in lieu of repurchasing the defective loans."*[230]  In other instances, Bear

Stearns accommodated originators by agreeing to (i) cancel or waive the claims entirely,[231] or (ii)

create "reserve programs" that allowed it to use funds from these entities for EPDs violations and

other defects by applying them toward future loan purchases. [232]  Each of these alternatives

afforded incremental consideration to Bear Stearns for toxic loans it had already sold to and that

remained in the securitization, while at the same time keeping its suppliers happy so as to

maintain loan production for inclusion in subsequent securitizations.

179.    As an accommodation to its suppliers, and to reduce the outstanding claims, Bear

Stearns also agreed to allow loans that defaulted during the EPD period, then starting paying

again, to remain in its securitization by extending the EPD period.[233]  Notably, Bear Stearns'

---

[230] *See* Section VI.C.2, below.

[231] *See* Emails from Defendant Haggerty, dated April 18 and April 12, 2006, EMC-AMB 001498898-899
(Defendant Haggerty recommends the "immediate cancel of EPD claims for loans that are in deals and
are current" after "First Horizon traded a deal away that [EMC] had a 2 tic better bid because [EMC's]
EPD claims with them is significantly more than market."); *see also* Email from Brent Giese (Bear,
Stearns & Co. Managing Director and Producing Manager of Bear/EMC Correspondent Sales Team),
dated February 17, 2005, EMC-AMB 002551279-282 at 279 (noting that originators were complaining
about the prevalence of EMC's EPD claims and stating that "at some point will penalize Bear/EMC in
terms of not executing business with us if the issues continue.").

[232] *See* Email from Paul Nagai (EMC), dated August 7, 2006, EMC-AMB 003637057-058 (The email
chain concerns a "new seller claims reserve program being instituted to support sellers with outstanding
claims." It states that "This program will allow sellers that have outstanding claims to continue their
production activities with Bear Stearns / EMC . . . ."); *see also* 12/11/2009 Durden Rule 30(b)(6)
Deposition Tr. at 290 ("Q.  Do you recall that this program was put in place as an accommodation to
sellers with large claims so that EMC could continue to collect and obtain mortgage loans from those
originators?  A.  From the language of the Email, it does appear so.")

[233] Bear Stearns' policy for extending claims states that "Only loans filed as EPD claims can be
considered for an extension.  In order for an extension, a loan must be securitized."  Email and

86

policy allowed it to extend EPD claims against originators with respect to only securitized loans, and expressly forbade such extensions for loans in Bear Stearns' inventory. Bear Stearns did not want such loans in its inventory because it knew loans that missed payments within the EPD period were very risky and likely to default.[234] In the words of the head of Bear Stearns' quality control department, "the trading desk didn't want to own loans in inventory that had an EPD." [235] So "if the loan was in inventory, an extension agreement wasn't an option" and "the seller had to either repurchase or settle the claim."[236] The differing treatment of loans subject to an EPD illustrates the full extent of Bear Stearns' duplicitous scheme. Even though EPDs raise "red flags" of fraud or other substantive issues causing a borrower to default on his or her initial mortgage payments, Bear Stearns furthered its scheme by quietly agreeing to extend the EPD claim in exchange for other benefits from the loan originator.

180.   As previewed earlier in connection with its EPD recoveries, Bear Stearns generated billions of dollars in recoveries through these activities, which had steadily improved after the problems identified in 2006. Bear Stearns' internal audit report issued on February 26, 2007 shows that in 2006, Bear Stearns (i) resolved "$1.7 billion of claims, an increase of over 227% from the previous year," and (ii) filed $2.5 billion in claims against the entities originating and selling it defective loans "reflecting an increase of 78% from the prior year."[237]

---

attachments from Pat Moore (EMC Manager, Representations and Warranties Department) to William Glasgow (EMC Executive Vice President, Loan Administrative Division), dated January 7, 2007, EMC-AMB 009650340-359 at 344.

[234] 6/4/2007 Silverstein Deposition Tr. at 192. *See also* Section III.C.2, above.

[235] 4/26/2010 Golden Deposition Tr. at 151-57.

[236] *Id.*

[237] Bear Stearns Internal Audit Department Escalation Memorandum, titled, "Status of Unresolved Audit Report Issues for EMC Mortgage Corporation ("EMC") – Review of Representations and Warrants Department," dated February 26, 2007, EMC-AMB 010858610-613 at 611.

87

181.   By continuing to offer less expensive alternatives in lieu of an actual loan repurchase through 2007, Bear Stearns generated additional recoveries and benefits without having to honor its obligations to review, disclose, or repurchase breaching loans from its securitizations.[238] In 2007 and through the first quarter of 2008, Bear Stearns resolved claims representing $1.3 billion of unpaid principal balance through settlements or other consideration, which provided over $367 million of "economic value that was recovered from the sellers."[239] As importantly, it thus continued to foster and financially reward the same type of abysmal origination practices by its sellers that resulted in these defective loans.

### 7.   Bear Stearns Did Not Disclose that It Was Clearing Out Its Inventory by Securitizing Defective Loans While Concealing Its True Assessment of the Securitized Loans

182.   Bear Stearns employees were well aware of the poor quality of the loans that were being pooled into its securitizations. Indeed, in August 2006 – one month before the closing date – the deal manager responsible for SACO 2006-8 referred to the Transaction as a "SACK OF SHIT."[240] Likewise, in earlier correspondence with the managing director of the trading desk, this same deal manager characterized the SACO 2006-8 Transaction as a "shitbreather."[241] Not

---

[238] *See* Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated July 27, 2007, EMC-AMB 006736165-172 (offering "amnesty program" to suspended or terminated sellers by "forgiving claims in exchange for loan production" at reduced pricing); Email from Sharrell Atkins (EMC Mortgage Corp. Assistant Manager, Specialized Fraud Review ) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated August 27, 2007, EMC-AMB 006870833 – 834 (extending claim concerning fraud because "SunTrust is an active seller . . . we have issued a 12 month extension").

[239] 4/26/2010 Golden Deposition Tr. at 63-65 (explaining Bear Stearns' Risk Management Division Report, EMC-AMB 010775342-407).

[240] Email from Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager of the SACO 2006-8 Transaction) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated August 12, 2006, EMC-AMB 004377399-400.

[241] Email from Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager of the SACO 2006-8 Transaction) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated July 11, 2006, EMC-AMB 002326075-077. In an attempt to explain Smith's characterization of the deal, on direct

88

surprisingly, Bear Stearns did not disclose this widespread internal acknowledgment of the poor quality of the loans it was securitizing to investors or Ambac.

183. Moreover, no one at Bear Stearns responded to Nick Smith to correct his characterization of the Bear Stearns' collateral – nor could they, given that they knew the true magnitude of defective loans it intended to securitize. For example, less than two months earlier, an internal review of the loans acquired from American Home Mortgage revealed that less than 22.85% of the loans were current, while up to 60% of the loans had experienced delinquencies of 30 days or greater (13% were delinquent for longer than 120 days).[242] Rather than disclose this remarkably poor performance, Bear Stearns funneled over 1,600 American Home Mortgage loans into the SACO 2006-8 Transaction, making it the principal originator in the Transaction responsible for the origination of over 30% of the loan pool. Also in advance of the SACO 2006-8 Transaction, Nick Smith and the managing director of the trading desk joked about the poor quality of the loans acquired from Just Mortgage, another originator whose operations Bear Stearns financed.[243] Instead of disclosing its true perspective on the loans, Bear Stearns

---

examination at the June 2, 2010 deposition, Smith incredulously testified that he uses the term "shitbreather" as a "term of endearment." 6/2/2010 Smith Deposition Tr. 211.

[242] Email from Judy Duffek (EMC Mortgage Corporation Associate Vice President, Seller Review & Approval) to Randy Deschenes (EMC Residential Mortgage CEO and Managing Director), EMC-AMB 006740876-877 at 877 (recommending that Bear Stearns "discontinue purchase of 2nd liens from this client or bid to miss since this seems to be the product that they have the most problem with which are not returning value.").

[243] Email from Nicholas Smith (Bear, Stearns & Co. Vice President, Deal Manager for SACO 2006-8) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated June 30 2006, EMC-AMB 002319215-216 (sarcastically asserting that "Everyone loves their loans"). *See also* Email from Nicholas Smith to Keith Lind, dated June 29 2006, EMC-AMB 002317084-085 (noting that another will not participate "even if we pull the Just Mtg. Population").

4106355v.1

packaged and sold over 1,000 Just Mortgage loans – or just over 19% of the SACO 2006-8 loan pool – when the deal closed a few months later in September.[244]

184.    By the start of 2007, to downplay the impact of the deteriorating performance of its prior securitizations in order to keep issuing new ones, Bear Stearns began publicly touting its efforts to improve the quality of the loans it was securitizing by (i) "tightening" underwriting standards, in many respects to "emphasize" the controls that it should have had in place all along (e.g., adequately assessing the borrowers' ability to pay) and (ii) "downgrading' originators within its network consistently selling the worst performing loans to "suspended" or "terminated" status as a means to prevent and limit the securitization of loans from those third parties. To this end, in March 2007, Bear Stearns employees informed Ambac that "there has been significant improvement in the collateral pool itself [for BSSLT 2007-1],"[245] and pushed Ambac's credit underwriters to speak with Defendant Verschleiser to discuss the "originators and correspondents we actually kicked out of the program, which should also be a major difference."[246]

185.    But Bear Stearns knew quite well – and did not disclose – that its inventory still was overridden with defective loans purchased from the worst performing originators in its

---

[244] Reflecting the issues with the Just Mortgage loans, in the email chain in which he referred to the 2006-8 Transaction as a "shit breather", Nick Smith specifically highlighted for Keith Lind and Defendant Silverstein that the pool would be "including the Just Mtg population." Email from Nicholas Smith to Keith Lind, dated July 11, 2006, EMC-AMB 002326075-077 at 075.

[245] Email from Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side) to Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated March 30, 2007, ABK-EMC01536356.

[246] Email from Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side) to Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance), dated March 30, 2007, ABK-EMC01536369-370.

90

network.[247]  Rather than accept the consequences of having already purchased these loans

through its own bad processes and procedures, Bear Stearns unilaterally decided to *stop*

*performing post-purchase quality control on loans purchased from suspended or terminated*

*sellers* to buy time for its trading desk to clear out its pipeline of defective loans.[248]

186.    Bear Stearns changed this policy without informing the participants of its

securitizations.  Although its securitizations, including the SACO Transactions, were filled with

loans purchased from terminated or suspended sellers, Bear Stearns did not disclose its decision

to discontinue the seller monitoring and quality control operations it represented it would

undertake.  Rather, in advance of the BSSLT Transaction, which closed on April 30, 2007, Bear

Stearns disseminated to Ambac marketing decks that continued to tout its seller monitoring and

quality control operations to induce Ambac's participation in the BSSLT Transaction.[249]

187.    Bear Stearns thus rid its inventory of the very loans it knew represented a high

risk of default or other material failing by passing them on to investors and insurers, such as

Ambac, by means of its false and misleading representations.  Bear Stearns knowingly funneled

into the BSSLT Transaction large volumes of loans from originators that it previously had

---

[247] *See, e.g.*, Bear Stearns' seller "Watch List" as of February 27, 2007, EMC-AMB 005042831-839 at
837 (identifying at least 48 sellers with "D" of "F" grades that originated at least 1,680 loans later
securitized in the BSSLT 2007-1 Transaction); Email from Julio Chong (EMC Mortgage Corp.,
Business Information) dated March 28, 2007, EMC-AMB 010346044-045 (identifying over 40 "high
risk" sellers "to be cut off by 3/30/07" based on high loss severity in securitized loans, 20 of which
originated over 2,800 loans later securitized in the BSSLT 2007-1 Transaction).

[248] 5/20/2010 Serrano Deposition Tr. 180-184; E-mail from Norton Wells (EMC Mortgage Corp.
Executive Vice President, Quality Control) to, among others, Defendant Haggerty, Stephen Golden (Bear,
Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), and Fernando
Serrano (EMC Mortgage Corp., Quality Control Manager), dated April 18, 2007, EMC-AMB
006009144-145 ("Loans from these [Terminated, Suspended and "F" rated] Sellers are being excluded
from sampling per instructions ").

[249] Email from Soung Ho Park (Bear, Stearns & Co. Analyst, Mortgage Finance) to Hartmut Ott (Ambac
Vice President, MBS Department of Structured Finance), dated March 22, 2007, ABK-EMC01555076-
269, discussed in Section III.B.1, above.

91

deemed as "high risk" sellers and that it had downgraded to "suspended" or "terminated" status

with "F" or "D" ratings due to "material weakness in credit quality and/or collateral quality."[250]

Consistent with this conduct but contrary to its contemporaneous disclosures to Ambac,

internally Bear Stearns employees more aptly characterized the BSSLT 2007-1 Transaction as a

"going out of business sale."[251] Another called it a "DOG."[252] Both characterizations were

correct, but neither was disclosed.

      188.    The Bear Stearns trading desk placed great pressure on the other departments to

quickly purge its inventory of the loans that it knew represented greater likelihood of not

performing due to serious defects in their origination. If the defective loans were not securitized,

the trading desk would become irate. For example, by March 2007, when Bear Stearns

confirmed that it missed the opportunity to securitize $73 million worth of loans in its inventory

before they experienced an EPD – 74% of which did not comply with Bear Stearns' then-current

guidelines[253] – Defendant Verschleiser demanded to know "why any of these positions were not

securitized," and did "not understand why they were dropped from deals and not securitized

before their epd period."[254] Similarly, in May 2007, the same managing director in trading that

---

[250] Bear Stearns' Seller Monitoring Report as of January 7, 2008 reflects that Bear Stearns downgraded SouthStar as of April 2, 2007, but then pushed through nearly 1,500 loans into the BSSLT 2007-2 Transaction making SouthStar the third largest originator in that deal. *See* EMC-AMB 010909740 (also showing that Bear Stearns securitized over 208 and 158 loans in the BSSLT 2007-1 Transaction that it had acquired from Steward Financial Inc. and First Residential Mortgage Services Corporation, respectively, despite previously downgrading them to "F" ratings).

[251] Email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated April 5, 2007, EMC-AMB 002075468.

[252] Email from John Tokarczyk (Bear, Stearns & Co. Associate Director) to Jeffrey Maggard (Bear, Stearns & Co. Managing Director and Deal Manager on the BSSLT 2007-1 Transaction), dated April 30, 2007, EMC-AMB 001469603-604.

[253] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Defendants Verschleiser, Silverstein and Haggerty, among others, dated March 21, 2007, EMC-AMB 006798661.

[254] Email from Defendant Verschleiser to Defendants Silverstein and Haggerty, among others, dated March 1, 2007, EMC-AMB 006087607-609.

4106355v.1

had first conveyed the EPD policy-change in early 2006 demanded "to know why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????"[255]

### D.   EVEN AS IT REVIEWED BREACHING LOANS IN 2007, BEAR STEARNS STILL FAILED TO GIVE "PROMPT NOTICE" OF THE SECURITIZATION BREACHES

189.   Bear Stearns' practices resulted in the blatant disregard of EMC's contractual commitments to give "prompt written notice" to Ambac and other deal participants of breaching loans found in the securitizations, and cure, substitute or repurchase defective and breaching loans from the securitization trusts within 90 days.[256]

190.   As advised by its outside auditors in mid-2006, and thereafter by its counsel, Bear Stearns was and is obligated to promptly assess whether there is a breach affecting the loans in its securitizations. Contrary to that advice, Bear Stearns failed to establish the requisite policies and practices to review loans for securitization breaches until late 2007. Indeed, Bear Stearns did not even establish a formal "securitization breach team" until Spring 2007.[257] The securitization breach team began its tenure by immediately highlighting Bear Stearns' failings with respect to its contractual obligations to timely review loans for securitization breaches.

191.   In May 2007, the Bear Stearns manager responsible for its newly created securitization breach team reiterated the very failings that PWC had identified in 2006, including that (i) Bear Stearns' "Claims [department] is only addressing repurchase/settlement from the original Seller and the time frames provided to the Seller and Claims exhausts the time frames allowed for Securitization review/buyout," (ii) "Securitization review/buyout must be completed

---

[255] Email from Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated May 5, 2007, EMC-AMB 002283474 – 475.

[256] *See* Section V.C, below.

[257] 4/26/2010 Golden Deposition Tr. at 60-61; Email from Fernando Serrano, dated April 24, 2007, EMC-AMB 010726553-556 at 554 (noting that quality control department "[i]mplemented and established the Securitization Breach Department" in the first quarter of 2007).

93

within 90 days of the Breach being identified," but is not being done within that time frame, and (iii) "Missing compliance with the Securitization time frames creates Reg. AB issues and violations."[258] The manager's findings are consistent with the August 15, 2007 version of Bear Stearns' policy governing the review and repurchase of loans from securitizations, which states that "*No loan(s) will be added to the Conduit Buy out Log . . . without confirmation of repurchase funds received or a firm commitment from the seller to repurchase or the funding of a down-bid.*"[259] (The Conduit Buy-out Log is the file Bear Stearns used to track loans that were to be repurchased from a securitization under its repurchase commitments.) As late as mid-August 2007, therefore, Bear Stearns was directing its employees that the repurchase of loans *from* a securitization was not even to be considered unless and until there was a recovery *by* EMC relating to the loans from the entity from which it purchased the loans.

192.   It was not until September 2007 that Bear Stearns revised its "process flow for determining security breach of loans." As the securitization breach manager explained, "[r]ather than the current process which occurs when the claim results in a repurchase by the Seller or a settlement by the Seller, it will now happen in the front end. . . This will happened [sic] potentially even before you file a claim with the Seller."[260] Four days later, Bear Stearns for the first time "implemented the policy of *fully honoring our obligations* to pro-actively review

---

[258] Email from Amy Adame (EMC Mortgage Corp., Quality Control Supervisor, Securitization Breach Team) to Fernando Serrano (EMC Mortgage Corp., Quality Control Manager), dated May 31, 2007, EMC-AMB 010814501-502.

[259] EMC-AMB 002571130-132 at 131 (emphasis added). A separate internal Bear Stearns policy manual from August 10, 2007 sets out a similar procedure and explains that the Repurchase Log manual explains that, like the "Conduit Buy Out Log," the Repurchase Log is maintained to facilitate the buy-out of loans in securities, but that this process beings only "[w]hen a Seller commits to repurchasing a loan[.]" EMC-AMB1 000001343-1346.

[260] Email from Fernando Serrano (EMC Mortgage Corp., Quality Control Manager) dated September 10, 2007, EMC-AMB 010725797-799 (discussing the "9/5/07 QC Minutes/Overview").

4106355v.1

defective loans for potential PSA breach."[261]  The new policy stated that "going forward all defective loans are reviewed for a securitization breach concurrent with the QC review."[262] Sadly, even as late as May 28, 2008, an internal audit of the representations and warranties department revealed that "loans identified as 'defective' (loans not conforming to contractual agreement) *were still not always being referred for a securitization breach review.*"[263]

193.    At about the same time it formed the securitization breach team in early 2007, Bear Stearns also for the first time directed its outside vendor Adfitech to start conducting limited "securitization breach reviews" on an "as requested" basis.[264]  Reflecting its bad faith and duplicitous approach to its contractual obligations, however, it instructed Adfitech to conduct a very limited review of loans submitted by Bear Stearns for review.  In particular, Bear Stearns directed Adfitech *not* to undertake any reasonable underwriting efforts to verify the information in the loan file, stating (i) "Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS," (ii) not "make phone calls on employment," and (iii) gave the blanket instruction that "occupancy misrep is not a securitization breach."[265]  The head of the securitization breach team testified that he did not

---

[261] Email from Leslie Rodriguez (EMC Residential Mortgage Managing Director), dated September 14, 2007, EMC-AMB 006870106-110 at 108, 107 (emphasis added) (acknowledging that "further discussion as to how Reps and Warrants, Conduit QC and Security Breach QC interact in this manner may definitely be warranted.")..

[262] EMC-AMB 011688248-249, "Securitization Breach Quality Control Review."

[263] "Bear Stearns Internal Audit Report – EMC Mortgage Corporation ('EMC') Limited Review of Representations and Warrants Department," EMC-AMB 010858511- 515.

[264] Email from Sherrie Dobbins (EMC Mortgage Corporation Assistant Manager, Quality Control Underwriting and Vendor Management) to Greg Anderson (Adfitech quality control manager), dated April 5, 2007, ADFITECH_3112_00005402; *see also* Email from Sherrie Dobbins (EMC Mortgage Corporation Assistant Manager, Quality Control Underwriting and Vendor Management) to Greg Anderson (Adfitech quality control manager), dated July 6, 2007, EMC-AMB 006955548.

[265] *Id.*

95

share that restrictive view of an appropriate securitization breach review.[266] Notwithstanding

Bear Stearns' improper and divergent limitations, Adfitech still determined found securitization

breaches in *42.9%* of the loans it reviewed from the Transactions.

194.    Because Bear Stearns only had conducted a limited securitization breach review

starting in 2007 – and had not been conducting securitization breach reviews when loans were

deemed defective by its quality control department or subject to a settlement with a supplier of

the loans – there was a growing backlog of securitized loans that had never been reviewed for a

potential breach of EMC's representations and warranties.  By September 2007, Bear Stearns

acknowledged having to conduct a securitization breach review of at least 1,800 loans included

in a settlement prior to August 2, 2007, as well as a backlog of over "4,000 defective loans that

came out of the QC dept in the last year."[267]  Bear Stearns did not disclose to Ambac or investors

in 2007 the changes in its securitization breach policies, the securitization breaches it identified,

or the backlog in its securitization breach reviews.

195.    Without the benefit of those disclosures, it was not until late 2007 that Ambac

started noticing that the performance of the Transactions was deteriorating, it began investigating

whether the loans in the Transactions complied with EMC's representations and warranties.

Ambac requested loan files for 695 defaulted loans and hired an independent consultant to

review the loans files.  This analysis revealed breaches of representations and warranties in

---

[266] 6/10/2010 Peacock Deposition Tr. at 182-93 (stating that the securitization breach team was directed to "whatever sources that were available," including but not limited to (i) "findings made by quality control," (ii) "reverifications or other information . . . that was provided by the QC group," (iii) "third-party resources," (iv) "phone calls to borrowers," (v) "tax records of the borrower," and (vi) "phone calls to the borrower's employer" to verify employment).  The same manager of the securitization breach team did not identify any instance where the team was "trying to limit our sources." *Id.* at 187-88.

[267] E-mail from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to, among others, Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President) and Leslie Rodriguez (EMC Residential Mortgage Managing Director), dated September 13, 2007, EMC-AMB 007176791-800 at 792.

almost 80% of the loans examined, with an aggregate principal balance of approximately $40.8

million. Ambac asked EMC, in compliance with its contractual obligations, to cure, repurchase,

or provide substitutes for these loans, but EMC refused to do this for all but a few. Bear Stearns

disregarded its contractual obligations regarding these non-compliant loans, even though Bear

Stearns itself had hired a third party consultant to conduct a review of the loans, and the review

identified material breaches throughout the very same sample of loans.

196.    Over a year and a half after Defendant Verschleiser wrote that Bear Stearns was

burning money by hiring them, Bear Stearns hired Clayton to perform the due diligence review

of the loans files that Ambac had requested.  Unbeknownst to Ambac and under Silverstein's

direction, the vice president in charge of Bear Stearns' due diligence led an effort to collect the

loan files so that they could be sent to Clayton for this due diligence review.[268]  The vice

president and a due diligence manager then coordinated and directed Clayton's review of the

loan files.[269]  During the time of the review, Defendant Silverstein reported to Defendants

Nierenberg and Verschleiser that the review was taking place along with other due diligence

audits.[270]

197.    Clayton's review, like Ambac's, found that the sample of loans contained

pervasive material breaches.  Clayton performed a due diligence review of the loans and sent

---

[268] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Defendant
Silverstein, dated October 31, 2007, EMC-AMB 001424875-878 ("We have investors who are asking for
files to review that are at the servicer. I'm going to need to arrange diligence.").

[269] Email from John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence) to Pattie Sears
(EMC Mortgage Corporation, Due Diligence Manager) and Adam Peat (Clayton Client Service
Manager), dated October 31, 2007, EMC-AMB 001728476-483.

[270] E-mail from Defendant Silverstein to, among others, Defendants Verschleiser and Nierenberg, dated
November 12, 2007, EMC-AMB 001422820-821.

97

EMC daily reports showing Clayton's breach findings.[271] The final report produced for this review identified material breaches for *56%* of the loans.[272] Bear Stearns never told Ambac that it hired Clayton to review these loans and did not inform Ambac of Clayton's findings. Nor did Bear Stearns provide Ambac or any other participant with "prompt notice" of the breaches Clayton identified in 2007.

198.     Bear Stearns also did not disclose that, in the same time frame, it implemented a trading strategy to capitalize on the harm resulting from its fraudulent and breaching conduct. That is, Bear Stearns implemented a trading strategy to "short" banks with large exposure to Ambac-insured securities. In his November 2007 self-evaluation, Defendant Verschleiser bragged that at "the end of October, while presenting to the risk committee on our business I told them that a *few financial guarantors were vulnerable* to potential write downs in the CDO and MBS market and *we should be short* a multiple of 10 of the shorts I had put on . . . In less than three weeks we made approximately $55 million on just these two trades."[273]

199.     Bolstered by this success, Bear Stearns carried this trading strategy into 2008. On February 17, 2008, a Bear Stearns trader told colleagues and Defendant Verschleiser, "*I am positive fgic is done and ambac is not far behind.*"[274] The next day, in the same email chain, the trader again wrote to Defendant Verschleiser and others to clarify which banks had large exposures to Ambac, asking "*who else has big fgic or abk [Ambac] exposures besides soc*

---

[271] E-mail from Pattie Sears (EMC Mortgage Corporation, Due Diligence Manager) to, among others, John Mongelluzzo (Bear Stearns & Co. Vice President, Due Diligence), dated November 5, 2007, EMC-AMB 011012036-037.

[272] CLAY-AMBAC 019669, November 16, 2007 Loan Disposition Summary (AMB0710) prepared by Clayton Services, Inc. for Bear Stearns. Clayton reviewed 596 Ambac loans and found "material" issues with 337.

[273] Email from Defendant Verschleiser, dated November 20, 2007, EMC-AMB 009600760-763.

[274] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), dated February 17, 2008, EMC-AMB 012117052-063.

4106355v.1

*gen?*[275] A colleague replied: "I believe the five with the biggest exposures are Barclays, CIBC, Merrill, Soc Gen and UBS. I think ABN, BNP, DB, HSBC and RBS have less."[276] Bear Stearns in fact entered into short positions with respect to those banks.[277]

200.    As it was "shorting" the banks holding Ambac-insured securities, Bear Stearns continued to conceal the defects it discovered and deny Ambac's repurchase demands relating to collateral that back the securities issued in the Transactions.  When JP Morgan took over the reins in 2008, the implemented a strategy to reject wholesale Ambac's and other insurers' and investors' repurchase demands (see below).

E.    BEAR STEARNS THREATENED THE RATING AGENCIES TO AVOID
      DOWNGRADES THAT REFLECTED THE TRUE VALUE OF ITS SECURITIES

201.    The Offering Documents used to market the securities issued in each of the Transactions affirmatively state that the rating agencies "will monitor the ratings it issues on an ongoing basis and may update the rating after conducting its regular review . . . ."[278]

202.    By mid-October 2007, the rating agencies had become increasingly concerned with the accuracy of the disclosures made by Bear Stearns regarding its mortgage-backed securities.  As a consequence, S&P and Moody's downgraded the ratings on Bear Stearns' mortgaged-backed securities.  The reaction by Defendant Marano was immediate and indignant at the gall of the rating agencies to contravene the will of Bear Stearns.  In no uncertain terms, he directed his staff to cut-off all fees due to the rating agencies:

---

[275] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading) to Defendant Verschleiser, among others, dated February 18, 2008, EMC-AMB 012117048-051.

[276] Email from Warren Saft (Bear Stearns & Co. trader), to Defendant Verschleiser, among others, dated February 18, 2008, EMC-AMB 012117048-051.

[277] Email from Beau Paulk (Bear Stearns & Co. employee) to Defendant Marano, Defendant Nierenberg, and Defendant Verschleiser, among others, dated March 17, 2008, EMC 011189682-83 (attaching "Department Hedge Summary" as of March 14, 2008).  Bear Stearns also entered into credit default swaps wherein it stood to profit on Ambac's demise.  *Id.*

[278] SACO 2006-8 ProSupp at S-89; BSSLT 2007-1 (Group I) ProSupp at S-109.

· 99

"My intention is to contact my peer at each firm as well as the investors who bought the deals. From there, we are going to demand a waiver of fees. In the interim, *do not pay a single fee to either rating agency. Hold every fee up.*"[279]

203.   Even the Bear Stearns Managing Director hired from a rating agency to liaise with the agencies conceded such conduct was entirely improper.[280] But Bear Stearns' attempt to the coerce the rating agencies to manipulate their ratings was just one of the many improper measures it took to avoid recognition of its liability arising from its securitizations.

### F.   AFTER THE MERGER WITH JP MORGAN, BEAR STEARNS IMPLEMENTED POLICIES TO REJECT WHOLESALE ITS REPURCHASE OBLIGATIONS TO MANIPULATE ITS ACCOUNTING RESERVES

204.   Bear Stearns' house of cards collapsed in the spring of 2008. Bear Stearns and its affiliates were acquired by JP Morgan Chase & Co. in a fire sale for $10 a share, which also included a $29 billion non-recourse loan from the American taxpayers.

205.   After acquiring Bear Stearns for nominal consideration, JP Morgan deliberately frustrated investors' and insurers' rights in the Bear Stearns securitizations to avoid bringing into its consolidated financial statements Bear Stearns' massive exposure related to its securitizations. Most significantly, JP Morgan implemented a bad faith strategy to reject without justification insurers' and investors' demands for the repurchase of breaching loans from the Bear Stearns securitizations.

206.   Shortly after taking control of Bear Stearns' operations in March 2008, JP Morgan implemented a moratorium on the repurchase of breaching loans from securities. On May 16, 2008, the Executive Director of JP Morgan's Securitized Products division (Alison

---

[279] Email from Defendant Marano to Defendant Silverstein, Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance), et al., dated October 17, 2007 , EMC-AMB 001424910-912 (emphasis added)

[280] 4/19/2006 Glory Deposition Tr. at 73. *See also id.* at 82-83 (After being confronted with Defendant Marano's email, Ms. Glory conceded that it is "not normal course of business.").

4106355v.1

Malkin) issued an email alerting Bear Stearns employees "*IMPORTANT: Please do not repurchase any loans*" because "JPM is evaluating processes and has put a temporary hold until they have finished."[281]  On July 14, 2008, Malkin reinforced the absolute nature of JP Morgan's directive, stating that *"[t]he only way a loan can be repurchased from a deal is if I send an email.*"[282]  With the moratorium in place, JP Morgan immediately began (i) cancelling the repurchase of large volumes of loans that Bear Stearns previously determined had to be repurchased, and (ii) arbitrarily denying subsequent demands by investors and insurers to repurchase breaching loans from Bear Stearns' securitizations.

207.    In May 2008, with "less than a month on the job," Malkin told Bear Stearns' that "its own breach determinations with respect to its own loans in its own securitizations are incorrect," and "reversed EMC/Bear's findings of breaches with respect to the very loans that are at issue in this transaction."[283]  In her initial review alone, conducted on or about May 5, Malkin "disagreed with *56%* of EMC/Bear Stearns findings."[284]  The rationale and motivation of Malkin's reversals was not lost on the former Bear Stearns executives, who observed that "[f]rom *a reserves standpoint* . . . the number has dropped from $31M/-$13.9M to $17M/-$7.6M."[285]  Thus, within days of assuming control of the repurchase process, JP Morgan cut by

---

[281] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Ashley Poole (EMC Mortgage Corp. Analyst, Representations and Warranties Department) and Whitney Long (EMC Residential Mortgage Vice President, Risk Management and Claims), dated May 16, 2008, EMC-AMB 007165488-490 at 489 (emphasis added).

[282] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Gary Lyles (Bear Stearns & Co., Internal Audit Department), dated July 14, 2008, EMC-AMB 010858522-524.

[283] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 190-92.

[284] Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products), dated May 5, 2008, EMC-AMB 007173918-919.

[285] *Id.* (emphasis added).

101

over half the breach findings made in order to reduce by a corresponding amount its accounting liability.

208.    In an effort to justify its reversal of the repurchase determinations, JP Morgan caused Bear Stearns to take newfound positions as to circumstances in which loans must be repurchased from a securitization that were inconsistent with, and contravened, Bear Stearns' own interpretation of its obligations prior to May 2008. The employees formerly responsible for Bear Stearns' security breach determinations diplomatically concluded that, with respect to Malkin's reversals, *"[i]t seems that most of the differences are related to Bear's conservatism related to JP's relevant liberal interpretation of the PSAs."*[286]

209.    The truth is that Bear Stearns' securitization breach team knew full well that JP Morgan's "liberal interpretations" were contrived. For instance, Malkin took the position that the following were not breaches warranting the repurchase of loans from the securitization: (i) the absence of key documentation from the loan file (without which the loan could be rescinded) and (ii) a finding that the borrowers' stated income was unreasonable for the loan given. The head of Bear Stearns' securitization breach team was properly baffled by those positions: "The idea that missing certain significant docs is not a security breach issue is a fairly foreign concept that I have just not gotten my mind around yet. The stated income issue is very similar, in that the reasonableness test was a requirement in virtually all the guidelines from the various lenders that we obtained loans from."[287] Nonetheless, there as nothing the former Bear Stearns executive could do, as post-merger the "ultimately the authority to resolve any debate sat with

---

[286] Email from Tamara Jewell (EMC Residential Mortgage, Project Manager) to Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) and Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated May 7, 2008, EMC-AMB 011739718-719.

[287] Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team) to Tamara Jewell (EMC Residential Mortgage, Project Manager), dated May 8, 2008, EMC-AMB 007173931-932.

JPMorgan."[288] Thus, at JP Morgan's directive, on May 14, 2008, the executive canceled the repurchase of loans that "we have previously added to the Repurchase Log, but we need to re-address using our *updated* standards."[289]

210.    Once the pending repurchase determinations had been "adjusted," JP Morgan abandoned any effort to legitimize its determinations and implemented an across-the-board policy of rejecting Ambac's and other insurers' and investors' repurchase demands to manipulate its accounting reserves. Reflecting this bad faith initiative, as it was confronted with an escalating volume of repurchase demands, JP Morgan steadily increased its overall denial rate: JP Morgan denied 83% of all claims reviewed between May and June 2008, and 100% of all claims reviewed between August and September 2008.[290] Ambac's repurchase demands were subjected to the same treatment.

211.    During this same time period, Ambac began making increasing numbers of repurchase demands arising from EMC's breaches of its representations and warranties pertaining to the loans in the Transactions. Among the loans initially submitted for repurchase were the 526 loans that Bear Stearns had re-underwritten with Clayton in the late 2007. Although Ambac provided detailed substantiation for the breaches identified, Bear Stearns arbitrarily approved just 4.9% of the repurchase demands in June 2008, and then progressively and arbitrarily trimmed down its approval rate to 2.2% in September 2008.[291] The duplicity of this artificially low approval rate is evident when compared to the 56% breach rate Bear Stearns

---

[288] 6/10/2010 Peacock Deposition Tr. at 254-56.

[289] Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team), dated May 14, 2008, EMC-AMB 009119930-931 at 931 (emphasis added).

[290] *Compare* Claims Against EMC Exposure Rollforward as of June 18, 2008, EMC-AMB 008922742 *with* Claims Against EMC Exposure Rollforward as of September 5, 2008, EMC-AMB 008923132.

[291] *Compare* Claims Against EMC Liability Calculation as of June 18, 2008, EMC-AMB 008922742 *with* Claims Against Liability Calculation as of September 5, 2008, EMC-AMB 008923132.

and Clayton found before the JP Morgan merger for the 526 loans that comprised the majority of loans in the June 2008 response.

212.   JP Morgan's duplicity also is patent from the repurchase demands it made against the suppliers of the loans in the Bear Stearns securitizations pertaining to the very same loans that were submitted for repurchase from EMC.  For example, on March 4, 2008, another insurer of Bear Stearns securitizations, Syncora Guarantee Inc. ("Syncora"), gave formal notice to EMC of 380 securitized loans that materially and adversely breach one or more of EMC's representations and warranties, and described the breaches affecting each loan with specificity.[292] Within days after receiving Syncora's notice, on March 11, Bear Stearns' managing director of claims issued a repurchase demand on EMC's behalf to GreenPoint, the entity that sold those loans to EMC prior to securitization, asserting that the *same exact breaches* identified by Syncora constitute breaches of GreenPoint's representations and warranties under its agreement with EMC.[293]  (In its notice, EMC even attached Syncora's detailed description of such breaches).  GreenPoint refused to repurchase the loans because, among other things, EMC had not repurchased any of those loans from the securitization and, thus, suffered no loss.[294] Thereafter, on June 26, 2008, JP Morgan's Executive Director Alison Malkin continued to pursue EMC's claims against GreenPoint, adamantly asserting "*that it is EMC's position that*

---

[292] Letter from XL Capital Assurance, Inc. to EMC Mortgage Corp., dated March 4, 2008, EMC-SYN 000002855-58

[293] Letter from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President) to GreenPoint Mortgage Funding, Inc., dated March 11, 2008, EMC-SYN 00283796-99

[294] Letter from Rose Medina (GreenPoint Vice President, Rep & Warranty) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), undated, EMC-SYN 00283794-95 (responding to Stephen Golden's March 11, 2008 letter)

4106355v.1

*these breaches materially and adversely affect the value of the [loans]*."[295] Remarkably,

Malkin took diametrically opposing positions in repeatedly refusing to comply with all but 4% of

Syncora's repurchase demands.[296] That is, JP Morgan advanced Syncora's positions in

attempting recover from GreenPoint, while simultaneously rejecting Syncora's positions in

denying its repurchase demands. In the end, Syncora was left with no alternative but to file suit

against EMC to recover for its breaches.[297] (See Section VI.B., below, for examples of

inconsistent positions Bear Stearns has taken in responding to and making repurchase demands

made concerning loans in the Transactions.)

213.    The conflicting and incompatible positions that JP Morgan asserted on EMC's

behalf exemplifies its bad faith strategy to reject legitimate repurchase demands by financial

guarantors in order to mask any exposure to those claims on its financial statements – while at

the same time attempting to generate recoveries from the entities that originated and sold EMC

---

[295] Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Rose Medina (GreenPoint Vice President, Rep & Warranty), dated June 26, 2008, EMC-SYN 000003048; 1/22/2010 Megha 30(b)(6) Deposition Tr. 257-58 (Q: So there's no ambiguity whatsoever that as of June 26, 2008, EMC was taking the position that the breaches that Syncora identified materially and adversely affected the value of the revolving credit lines, correct? . . . A. (Perusing) This letter reads that, yes. Q. Thank you. And you see no ambiguity whatsoever in that statement, do you? A. No, I don't.").

[296] Letter from Jackie Oliver (EMC Mortgage Corporation Senior Vice President, Chief Servicing Counsel) to XL Capital Assurance, Inc., dated June 4, 2008, EMC-SYN 000002859-2914; Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to XL Capital Assurance, Inc., dated August 4, 2008, EMC-SYN 00620317-343.

[297] *See Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, No. 09-CV-3106 (PAC) (S.D.N.Y.). Two other monoline insurers have filed suit against EMC for substantially similar grounds. *See CIFG Assurance North America, Inc. v. EMC Mortg. Corp.*, No. 2009-30395-211 (Tex. Dist. Denton County); *Assured Guaranty Corp. v. EMC Mortg. Corp.*, No. 10-CV-5367 (S.D.N.Y.). In addition, the Federal Home Loan Bank of Seattle and the Federal Home Loan Bank of San Francisco recently brought actions against Bear, Stearns & Co., among others, alleging that it made numerous untrue statements or omissions of material facts in relation to securitization of loans. *See Federal Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc.*, No. 10-CV-151 (RSM) (W.D. Wa. June 10, 2010); *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et. al.*, No. CGC 10-497839 (Cal. Super. Ct. June 10, 2010); *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et. al.*, No. CGC 10-497840 (Cal. Super. Ct. June 10, 2010).

4106355v.1

the defective loans.[298]  The execution of these two policies in tandem tortiously interfered with Ambac's contractual rights and remedies.

214.   JP Morgan's wholesale denial of the claims made by Ambac and other financial guarantors or private investors also is in stark contrast to the significantly higher approval rates for breaching loans identified by government-sponsored entities such as Fannie Mae and Freddie Mac, which in the same time period enjoyed an estimated management approval rate as high as 95% in August 2008 – six times that of Ambac."[299]  To avoid disqualification of the right to continue to do business with the government sponsored entities, and with the weight of the federal government behind their demands, JP Morgan took markedly divergent positions with respect to the government sponsored entities' loans than it did with respect to similar defects identified by Ambac.

215.   As the extreme positions JP Morgan is taking to avoid its repurchase allegations is being discovered, its reserving practices for repurchase obligations likewise are now attracting the scrutiny of financial regulators.[300]  In January 2010, the SEC issued a comment letter following an 8-K filing by JPMorgan Chase & Co. seeking substantial additional disclosures concerning its repurchase reserves.  The SEC requested a detailed explanation as to how JP

---

[298] Consistent with this strategy, JP Morgan also expressly adopted and reinforced Bear Stearns' practice of requiring a demand to be made against a seller before any funds are remitted to an investor or insurer for repurchase claims.  See JP Morgan Claims Against - Repurchase Claims Processing the Payment of Repurchase Claims Against Policy, revised August 6, 2008, EMC-AMB1 000000965-967 at 966 ("Note: If the claim against that is being funded is related to a loan purchased from a viable seller, DO NOT submit the claim for payment approval until a claim to the seller has been filed or a detailed explanation of why no claim will be filed must be included.").

[299] Ambac claims concurrently enjoyed a mere 15% estimated approval rate from management.  Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Connie Dryden (EMC Mortgage Corp., Quality Control Supervisor) dated August 28, 2008, EMC-AMB 008923111-112. Ambac claims enjoyed a mere 15% estimated approval rate from management.

[300] Menal Mehta, *The SEC Just Demanded More Information on JPMorgan Repurchase Liabilities*, Bus. Insider, June 24, 2010, *available at* http://www.businessinsider.com/sec-jpmorgan-reserves-liabilities-2010-6.

106

Morgan "establish[es] repurchase reserves for various representations and warranties . . . made to . . . GSE's, monoline insurers and any private loan purchasers," including "the specific methodology employed to estimate the allowance related to various representations and warranties, *including any differences that may result depending on the type of counterparty to the contract*."[301] A full inquiry of JP Morgan's repurchase practices and policies necessarily will demonstrate its improper rejection of its repurchase obligations to manipulate its accounting reserves.

### IV.   BEAR STEARNS FRAUDULENTLY INDUCED AMBAC AND INVESTORS TO PARTICIPATE IN THE TRANSACTIONS

216.   Bear Stearns knowingly and with the intent to induce reliance thereon made material misrepresentations to Ambac and investors and actively concealed material information pertaining to the specific Transactions at issue in this litigation.

217.   These misrepresentations and omissions fraudulently induced Ambac to insure and investors to purchase the securities issued in the Transactions.

218.   Ambac and the investors reasonably relied to their detriment on Bear Stearns' false and misleading representations and omissions made in the investor presentations and the Offering Documents. Ambac also reasonably relied to its detriment on Bear Stearns' false and misleading representations and omissions in its other oral and written communications made *in advance of* each of the Transactions. Further, Bear Stearns' false and misleading representations and omissions pertaining to each Transaction fraudulently induced Ambac to enter into each successive Transaction.

---

[301] Letter from Amit Pande (SEC Accounting Branch Chief) to Michael J. Cavanaugh (JPMorgan Chase & Co. Chief Financial Officer) dated January 29, 2010 at pp.1-2 (emphasis added), *available at* http://www.scribd.com/doc/33507476/SEC-Letter-to-JPM-Re-More-Disclosure-on-Buybacks-Jun-17-2010.

107

219.   As particularized in the preceding sections, Bear Stearns made false and

misleading representations and omitted material information concerning, among other things, (i)

its internal operations, including its seller approval, due diligence, quality control, and loan

repurchase protocols, (ii) the actual due diligence purportedly conducted on the loans in the

Transactions, (iii) the mortgage loan data Bear Stearns disseminated for each Transaction, (iv)

the rating agencies' shadow ratings Bear Stearns secured for each Transaction, (iv) the historical

performance of Bear Stearns' securitizations and mortgage loans, and (v) Bears Stearns's

wherewithal and intent to stand behind the representations and warranties EMC made in the

Transaction Documents.

220.   Ambac's reasonable reliance on Bear Stearns' representations and omissions was

contemporaneously documented in the memoranda Ambac prepared to obtain internal approval

from its Credit Committee for each of the Transactions, each referred to as a "Credit

Memorandum," and collectively, the "Credit Memoranda."[302]   To start, the Credit Memorandum

for each Transaction underscored the perceived significance of Bear Stearns as a counterparty,

noting that "Bear, Stearns & Co. Inc. ('Bear Stearns' or 'Bear') has requested that Ambac

insure" the Transactions.[303]   The Credit Memoranda emphasized Ambac's reliance on Bear

Stearns' representations as an "[e]xperienced and established issuer with proven track record,"

---

[302] Email from Patrick McCormick (Ambac First Vice President, MBS Department of Structured Finance)
to Darryl Smith (Bear, Stearns & Co., Fixed Income Structured Credit Sales, Securitization Side), dated
March 16, 2007, ABK-EMC01536345-346 ("Even though we BID on these deals, they have not been
underwritten nor approved by our Credit Committee. As always, we are not committed on a deal, until it
is approved by our Credit Committee . . . ."); Email from Darryl Smith (Bear, Stearns & Co., Fixed
Income Structured Credit Sales, Securitization Side) to Patrick McCormick (Ambac First Vice President,
MBS Department of Structured Finance), dated March 16, 2007, ABK-EMC02414491 (recommending
that Ambac send an email to Bear traders reminding them that Ambac's "committee is more than just
formality . . . that committee is still an important hurdle.").

[303] See SACO 2005-10 Credit Memorandum, dated December 16, 2005, § 2.1;  SACO 2006-02 Credit
Memorandum, dated January 13, 2006, § 2.1;  SACO 2006-08 Credit Memorandum, dated August 10,
2006, § A.6;  BSSLT 2007-1 Credit Memorandum, dated March 27, 2007, § A.6.

108

and a "well established investment bank and issuer."[304]  As the Credit Memoranda demonstrate, Bear Stearns leveraged its reputation to instill in Ambac false assurances regarding the historical performance of the SACO shelf,[305] and Bear Stearns' purported intent to stand behind the representations and warranties it gave through EMC regarding the veracity of the mortgage loan data and the underwriting practices used in making the loans.

221.   Indeed, Ambac specifically noted in its Credit Memoranda the significance of the fact that "EMC Mortgage Corporation as the sponsor of the transaction will provide Reps and Warranties on the loans, specifically they will guarantee that 'the information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects.'"[306]  This commitment to attest to the *truth* of the mortgage loan data Bear Stearns provided was reproduced verbatim from the email sent by the Bear, Stearns & Co. Managing Director for United States Residential Mortgage Backed Securities Investor Relations to Ambac the day before the Credit Memorandum was submitted for the Transaction approval, showing the import of the representation.[307]  Bear Stearns made the same representation to the rating agencies to secure the shadow (and final) ratings, without which Ambac would not have agreed to issue its policies (as evidenced by the reference to the ratings throughout the Credit Memoranda).

222.   The Credit Memoranda could not be clearer, moreover, that Ambac relied on Bear Stearns' representations concerning the due diligence it purportedly conducted on the securitized

---

[304] *See, e.g.*, SACO 2005-10 Credit Memorandum, dated December 16, 2005, § 1; SACO 2006-02 Credit Memorandum, dated January 13, 2006, § 1.

[305] *See, e.g.*, SACO 2005-10 Credit Memorandum, dated December 16, 2005, § 2.22; SACO 2006-02 Credit Memorandum, dated January 13, 2006, § 2.22; BSSLT 2007-1 Credit Memorandum, dated March 27, 2007, § A.6.

[306] BSSLT 2007-1 Credit Memorandum, dated March 27, 2007, § E.

[307] *See* Email from Cheryl Glory (Bear, Stearns & Co. Managing Director, Mortgage Finance) to Ambac, dated March 26, 2007, EMC-AMB 001431663-664 ("we do provide a rep and warranty that 'the information set forth in the Mortgage Loan Schedule hereto is true and correct in a material respects.'").

109

loan pools: "There is no additional diligence done at the time of securitization as *we rely on the EMC bulk and flow diligence process*."[308]  And the Credit Memoranda explicitly reiterate Bear Stearns' representations that it conducted 100% due diligence on the loans in the Transactions: "The HELOCs have been sourced through Bears' bulk acquisition channel and are *100% re-underwritten in terms of credit and legal compliance*."[309]  What Ambac did not know was that Bear Stearns' representations were false and misleading, and in this regard, that Bear Stearns viewed its due diligence to be useless and a "waste of money."

223.    The Credit Memorandum pertaining to the BSSLT Transaction also recites Bear Stearns' disclosures about the so-called benefits of improvements to its underwriting criteria and efforts to limit securitization from "terminated" or "suspended" loan originators and sellers.[310] Bear Stearns did not disclose that it was clearing out its inventory of loans that it had previously purchased from these entities while simultaneously discontinuing quality control over these very loans that it knew represented markedly greater risks, in what its own traders described as a "going out of business sale."[311]

224.    Lacking the accurate depiction of Bear Stearns' practices and perspective, Ambac's reliance on Bear Stearns' representations and warranties was reasonable and consistent with the industry practice and the parties' bargain.  As was the general practice and the parties' agreement, Bear Stearns and Ambac assumed risk and undertook due diligence consistent with their respective roles in the Transactions.

---

[308] *See, e.g.,* 2005-10 Credit Memorandum, dated December 16, 2005, § 10.14;  2006-02 Credit Memorandum, dated January 13, 2006, § 9.3.

[309] *See* 2006-08 Credit Memorandum, dated August 10, 2006, § A.6,  BSSLT Credit Memorandum, dated March 27, 2007, § E.

[310] BSSLT 2007-1 (Group II and III) Credit Memorandum, dated April 13, 2007.

[311] *See* Section III.C.7, above.

4106355v.1

225.    Bear Stearns as the sponsor and seller (through EMC), and as underwriter and deal manager (through Bear, Stearns & Co.), assumed the *risk* and the burden of assessing the validity of the attributes of the mortgage loans that it conveyed to the trusts, including that the loans were originated pursuant to the appropriate underwriting guidelines and were not fraudulently procured. Ambac as the insurer bore the *market risk* and the burden of evaluating whether loans *bearing the attributes represented by Bear, Stearns & Co. Inc. and warranted by EMC* would perform after the closing of the Transactions.

226.    That was a reasoned risk allocation. Bear Stearns was in privity with – and often financed – the originators that sold to Bear Stearns the loans that it conveyed to the securitization trusts. Bear Stearns dictated the underwriting guidelines, owned the loans and held the loan files, which afforded it access and control over information required to evaluate the loans. To the extent Bear Stearns identified any defect in the loans, it had the right to exclude the loan from any transaction with the entity selling Bear Stearns the loans or demand that they repurchase the loans if the defects were discovered after purchase. Bear Stearns thus had the means before the closing of the Transaction to assess the quality of the loans and recourse in the event a defect was discovered. In contrast, Ambac was not in privity with the originators, never owned the loans or the loan files, and lacked recourse against the originators. It therefore made sense for the sophisticated parties to agree that Bear Stearns would bear the loan origination risk, and Ambac would bear the market risk, assuming accurate disclosures by Bear Stearns.

227.    This risk allocation arrangement enabled each party to conduct the appropriate due diligence *consistent and commensurate with* the risk they bore. Bear Stearns purported to carefully vet the originators from which it bought the loans, re-underwrite the loans before it purchased the loans, and conduct further review of the loans after acquisition.

111

4106355v.1

228..   Ambac, in turn, (i) conducted on-site reviews of Bear Stearns' operations, (ii) secured and evaluated Bear Stearns' representations concerning the seller approval, due diligence, quality control, and repurchase protocols Bear Stearns purportedly performed, (iii) conducted extensive modeling of its exposure to interest rate and other market variables using the mortgage loan data represented as true by Bear Stearns, (iv) assessed the adequacy of Bear Stearns' wherewithal to stand behind its representations and warranties, and (v) analyzed the represented performance of Bear Stearns's prior securitizations, and (vi) secured from Bear Stearns its commitment to provide, through EMC, representations and warranties concerning, among other things, the veracity of the mortgage loan data Bear Stearns provided and underwriting practices followed.

229.   The representations and warranties that Bear Stearns provided through EMC, and on which Ambac relied, were the means by which the parties memorialized and effectuated the reasoned risk allocation, and therefore, were the essential inducement for Ambac to participate in the Transactions.[312]

## V.   BEAR STEARNS' EXPRESS REPRESENTATIONS,. WARRANTIES, AND CONTRACTUAL COVENANTS WERE A MATERIAL INDUCEMENT TO AMBAC TO PARTICIPATE IN THE TRANSACTIONS AND ISSUE ITS INSURANCE POLICIES

### A.   THE TRANSACTION DOCUMENTS

#### 1.   The SACO 2005-10 Transaction

230.   As the Sponsor/Seller in the SACO 2005-10 Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear, Stearns & Co. pooled

---

[312] Consistently, when asked whether "EMC deemed it important to make representations and warranties in order to persuade the RMBS investors to purchase from Bear Stearns," Defendant Haggerty testified that "Bear Stearns was marketing the certificates. It was viewed as a positive that EMC was making the reps and warranties." 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 131.

112

and securitized approximately 13,172 residential mortgage loans, which EMC had previously purchased from numerous mortgage-loan originators, with an aggregate principal balance of approximately $626,731,100. These loans served as collateral for the issuance of more than $574 million in publicly offered mortgage-backed securities.[313]

231.    The SACO 2005-10 Transaction closed on December 30, 2005 and was effectuated through the following series of agreements executed by EMC and its affiliates that governed, among other things, the rights and obligations of the various parties with respect to the mortgage loans and the securities that resulted from their securitization.

232.    EMC, acting as Seller, sold and assigned its entire interest in the mortgage loans to its affiliate Bear Stearns Asset Backed Securities I LLC ("BSABS I") pursuant to a MLPA dated as of December 30, 2005 (the "SACO 2005-10 MLPA"). Under the SACO 2005-10 MLPA, EMC made numerous detailed representations and warranties concerning the mortgage loans.

233.    BSABS I, in turn, sold its interest in the mortgage loans to the SACO I Trust 2005-10 (the "SACO 2005-10 Trust") pursuant to a Pooling and Servicing Agreement ("PSA") dated as of December 1, 2005 (the "SACO 2005-10 PSA"). The SACO 2005-10 Trust then issued various classes of mortgage-backed securities, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and ProSupp. In order to enhance the marketability of the securities and its return on the Transaction, EMC sought to obtain a financial-guaranty insurance policy from Ambac.

---

[313] Additional mortgage-backed securities issued in the SACO 2005-10 Transaction were not offered to the public.

4106355v.1

234.   As an inducement to issue the policy, EMC entered into an I&I Agreement with Ambac, dated as of December 30, 2005 (the "SACO 2005-10 I&I Agreement"), whereby, among other things, EMC made numerous representations and warranties to Ambac with respect to the SACO 2005-10 Transaction, including that the representations and warranties that it had made in the SACO 2005-10 MLPA were true and correct in all material respects, and agreed to indemnify Ambac in the event that EMC's representations and warranties proved to be untrue.  The other parties to the SACO 2005-10 I&I Agreement are BSABS I, the SACO 2005-10 Trust, LaSalle Bank National Association ("LaSalle"), as Master Servicer and Securities Administrator, and Citibank N.A. ("Citibank"), as Trustee.

235.   Relying on Bear Stearns' pre-contractual representations detailed above and EMC's representations and warranties, covenants and indemnities contained in and encompassed by the SACO 2005-10 I&I Agreement, SACO 2005-10 MLPA, and SACO 2006-2 PSA, Ambac issued Certificate Guaranty Insurance Policy No. AB0961BE (the "SACO 2005-10 Policy"). Under the SACO 2005-10 Policy, Ambac agreed to insure certain payments of interest and principal with respect to the most senior, or investment-grade, classes of the securities issued in the SACO 2005-10 Transaction (the "SACO 2005-10 Insured Certificates").  The SACO 2005-10 Insured Certificates were underwritten and marketed, and sold to note purchasers ("SACO 2005-10 Note Purchasers"), by Bear, Stearns & Co.

### 2.   The SACO 2006-2 Transaction

236.   Shortly after securing the insurance policy for the SACO 2005-10 Transaction, EMC sought to have Ambac insure the SACO 2006-2 Transaction, which closed on January 30, 2006.

237.   EMC, upon information and belief acting at all times at the direction and under the control of Bear, Stearns & Co., pooled approximately 13,261 mortgage loans, with an

114

aggregate principal balance of approximately $704,481,804, that were secured by junior liens on one-to-four-family residential properties. These loans in turn served as collateral for the issuance of more than $645 million in publicly offered mortgage-backed securities.[314] EMC had previously acquired these loans from numerous originators. The SACO 2006-2 Transaction was effectuated through the following series of agreements.

238.    EMC, acting as Seller, sold and assigned its entire interest in the mortgage loans to BSABS I pursuant to a MLPA dated as of January 30, 2006 ("SACO 2006-2 MLPA"). BSABS I, in turn, sold its interest in the mortgage loans to the SACO I Trust 2006-2 (the "SACO 2006-2 Trust") pursuant to a PSA dated as of January 1, 2006 (the "SACO 2006-2 PSA").[315] The SACO 2006-2 Trust then issued various classes of mortgage-backed securities, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and ProSupp.

239.    As in the case of the SACO 2005-10 Transaction, EMC, to induce Ambac to issue a financial-guaranty insurance policy, entered into an I&I Agreement with Ambac, dated as of January 30, 2006 (the "SACO 2006-2 I&I Agreement"), to which BSABS I, the SACO 2006-2 Trust, LaSalle, and Citibank are also parties, and the terms of which are virtually identical to those of the SACO 2005-10 I&I Agreement.

240.    Relying on Bear Stearns' pre-contractual representations detailed above, EMC's representations and warranties, covenants and indemnities contained in and encompassed by the SACO 2006-2 I&I Agreement, SACO 2006-2 MLPA, and SACO 2006-2 PSA, and having recently received assurances from EMC regarding its due-diligence practices, Ambac issued

---

[314] Additional mortgage-backed securities issued in the SACO 2006-2 Transaction were not offered to the public.

[315] For convenience of reference, the SACO 2005-10 PSA and SACO 2006-2 PSA are hereinafter referred to collectively as the PSAs, and each individually as a PSA.

4106355v.1

Certificate Guaranty Insurance Policy No. AB0971BE and Certificate Guaranty Insurance Policy No. AB0972BE (collectively, the "SACO 2006-2 Policy"). Under the SACO 2006-2 Policy, Ambac agreed to insure certain payments of interest and principal with respect to the most senior, or investment-grade, classes of the securities issued in the SACO 2006-2 Transaction for the benefit of the holders of those securities (the "SACO 2006-2 Insured Certificates"). The SACO 2006-2 Insured Certificates were underwritten and marketed, and sold to note purchasers ("SACO 2006-2 Note Purchasers"), by Bear, Stearns & Co.

### 3.     The SACO 2006-8 Transaction

241.   A few months after securing the insurance policies for the SACO 2006-2 Transaction, Bear Stearns again marketed another of EMC's deals to investors and Ambac in connection with the SACO 2006-8 Transaction, which closed on September 15, 2006.

242.   On September 15, 2006, in consummating the SACO 2006-8 Transaction, EMC pooled 5,282 HELOCs, with an aggregate principal balance of approximately $361,200,413, that were secured primarily by second-lien positions on one-to-four-family residential properties. These loans in turn served as collateral for the issuance of approximately $356 million in publicly offered mortgage-backed securities.[316] In completing the SACO 2006-8 Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear, Stearns & Co., securitized these HELOCs in much the same manner as it securitized the mortgage loans involved in the two previous deals.

243.   EMC, acting as Seller, sold and assigned its entire interest in the Mortgage Loans to BSABS I pursuant to a MLPA dated as of September 15, 2006 (the "SACO 2006-8 MLPA"). BSABS I, in turn, sold its interest in the HELOCs to the SACO I Trust 2006-8 (the "SACO

---

[316] Additional mortgage-backed securities issued in the SACO 2006-8 Transaction were not offered to the public.

2006-8 Trust") pursuant to a Sale and Servicing Agreement ("SSA") dated as of September 15, 2006 (the "SACO 2006-8 SSA").

244.   As part of the 2006-8 Transaction, an Indenture dated as of September 15, 2006, was entered into by and among the SACO 2006-8 Trust, LaSalle, and Citibank, as Indenture Trustee, and provided for, among other things, the issuance of SACO I Trust 2006-8 Mortgage-Backed Notes, Series 2006-8 representing the indebtedness of the SACO 2006-8 Trust, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and ProSupp.

245.   As an inducement to Ambac to issue its insurance policy, EMC, BSABS I, the SACO 2006-8 Trust, LaSalle, and Citibank entered into an I&I Agreement with Ambac, dated as of September 15, 2006 (the "SACO 2006-8 I&I Agreement"), whereby EMC made numerous representations and warranties and undertook certain obligations in consideration for Ambac's issuance of its insurance policy.[317]   The SACO 2006-8 I&I Agreement contains substantially the same terms and conditions as the I&I Agreements in the two previous Transactions.

246.   Relying on Bear Stearns' pre-contractual representations detailed above and EMC's representations and warranties, covenants, and indemnities contained in and encompassed by the SACO 2006-8 I&I Agreement, SACO 2006-8 MLPA, and SACO 2006-8 SSA, Ambac issued Certificate Guaranty Insurance Policy No. AB1020BE (the "SACO 2006-8 Policy"). Under the SACO 2006-8 Policy, Ambac agreed to insure certain interest and principal payments with respect to, and for the benefit of the holders of, the most senior, or investment-grade, class of securities issued in the SACO 2006-8 Transaction (the "SACO 2006-8 Insured

---

[317] *See* 2006-8 I&I Agreement at 2, fourth full recital.

117

Notes"). The SACO 2006-8 Insured Notes were underwritten and marketed, and sold to note purchasers ("SACO 2006-8 Note Purchasers"), by Bear, Stearns & Co.

### 4. *The BSSLT 2007-1 Transaction*

247.    Finally, not long after securing an insurance policy for the SACO 2006-8 Transaction, Bear Stearns sought to obtain an insurance policy from Ambac for the BSSLT 2007-1 Transaction, which closed on April 30, 2007.

248.    In effectuating the BSSLT 2007-1 Transaction, EMC, upon information and belief acting at all times at the direction and under the control of Bear, Stearns & Co., pooled approximately 5,173 HELOCs, with an aggregate principal balance of approximately $351,881,948, that were secured primarily by second-lien positions on residential properties. These loans in turn served as collateral for the issuance of more than $348 million in publicly offered mortgage-backed securities ("Group I Notes").[318]  In addition, EMC, upon information and belief acting at all times at the direction and under the control of Bear, Stearns & Co., pooled approximately 12,621 conventional mortgage loans, with an aggregate principal balance of approximately $838,903,950, that were secured by second-lien mortgages on single-family homes. These loans in turn served as collateral for the issuance of $776,623,000 in publicly offered mortgage-backed securities ("Group II and III Notes"). The BSSLT 2007-1 Transaction was effectuated through the following series of agreements.

249.    EMC, acting as Seller, sold and assigned its entire interest in the Group I HELOCs, Group II Mortgage Loans, and Group III Mortgage Loans to its affiliate BSABS I

---

[318] Additional mortgage-backed securities issued in the BSSLT 2007-1 Transaction were not offered to the public.

pursuant to a MLPA dated as of April 30, 2007 (the "BSSLT 2007-1 MLPA").[319] BSABS I, in turn, sold its interest in the Group I HELOCs, Group II Mortgage Loans, and Group III Mortgage Loans to the BSSLT 2007-1 Trust (the "BSSLT 2007-1 Trust")[320] pursuant to a SSA dated as of April 30, 2007 (the "BSSLT 2007-1 SSA").[321]

250.    As part of the BSSLT 2007-1 Transaction, an Indenture dated as of April 30, 2007 was entered into by and among the BSSLT 2007-1 Trust, LaSalle, and Citibank, as Indenture Trustee, and provided for, among other things, the issuance of BSSLT Trust 2007-1 Mortgage-Backed Notes, Series 2007-1 representing the indebtedness of the BSSLT 2007-1 Trust, the most senior of which were registered with the SEC and underwritten and marketed to investors by Bear, Stearns & Co. by means of the related Prospectus and ProSupp.

251.    As in the case of each of the three prior Transactions, as an inducement to Ambac to issue its insurance policy, EMC, BSABS I, the BSSLT 2007-1 Trust, LaSalle, and Citibank entered into an I&I Agreement with Ambac, dated as of April 30, 2007 (the "BSSLT 2007-1 I&I Agreement"),[322] the terms of which are substantially the same as the I&I Agreements in the prior three Transactions.

252.    Relying on Bear Stearns' pre-contractual representations detailed above and EMC's representations and warranties, covenants and indemnities contained in and encompassed

---

[319] For convenience of reference, the SACO 2005-10 MLPA, SACO 2006-2 MLPA, SACO 2006-8 MLPA, and BSSLT 2007-1 MLPA are hereinafter referred to collectively as the MLPAs, and each individually as an MLPA.

[320] For convenience of reference, the SACO 2005-10 Trust, SACO 2006-2 Trust, SACO 2006-8 Trust, and BSSLT 2007-1 Trust are hereinafter referred to collectively as the Trusts, and each individually as a Trust.

[321] For convenience of reference, the SACO 2006-8 SSA and BSSLT 2007-1 SSA are hereinafter referred to collectively as the SSAs, and each individually as an SSA.

[322] For convenience of reference, the SACO 2005-10 I&I Agreement, SACO 2006-2 I&I Agreement, SACO 2006-8 I&I Agreement, and BSSLT 2007-1 I&I Agreement are hereinafter referred to collectively as the I&I Agreements, and each individually as an I&I Agreement.

119

by the BSSLT 2007-1 I&I Agreement, Ambac issued the Certificate Guaranty Insurance Policy No. AB1075BE (the "BSSLT 2007-1 Policy").[323] Under the BSSLT 2007-1 Policy, Ambac agreed to insure certain payments of interest and principal with respect to, and for the benefit of, the holders of the most senior classes of Notes issued in the BSSLT 2007-1 Transaction (the "BSSLT 2007-1 Insured Notes").[324] The BSSLT 2007-1 Insured Notes were underwritten and marketed, and sold to note purchasers ("BSSLT 2007-1 Note Purchasers"), by Bear, Stearns & Co.[325]

### B. EMC's EXPRESS REPRESENTATIONS AND WARRANTIES THAT EFFECTUATED THE PARTIES' BARGAINED-FOR RISK ALLOCATION

253. Under the Transaction Documents, the principal and interest payments from the loans[326] were to provide the cash flow necessary to make the monthly principal and interest payments due on the Notes. Ambac's insurance policies required it to make payments to insured Note Purchasers to the extent there was a shortfall of cash flow available from the loans, once the protection provided by subordinated classes of securities and other credit enhancement was eroded. Ambac agreed to assume this risk of payment default, which depended upon the truth of the information Bear Stearns provided to Ambac regarding the pedigree of the securitized loans and Bear Stearns' purportedly thorough due diligence practices. Consequently, from the perspective of the Note Purchasers (or the Insurer standing in their shoes), the key provisions of

---

[323] For convenience of reference, the SACO 2005-10 Policy, SACO 2006-2 Policy, SACO 2006-8 Policy, and BSSLT 2007-1 Policy are hereinafter referred to collectively as the Policies, and each individually as a Policy.

[324] For convenience of reference, the SACO 2005-10 Insured Certificates, SACO 2006-2 Insured Certificates, SACO 2006-8 Insured Notes, and BSSLT 2007-1 Insured Notes are hereinafter referred to collectively as the Notes.

[325] For convenience of reference, the SACO 2005-10 Note Purchasers, SACO 2006-2 Note Purchasers, SACO 2006-8 Note Purchasers, and BSSLT 2007-1 Note Purchasers are hereinafter referred to collectively as the Note Purchasers.

[326] For convenience of reference, the HELOCs and conventional mortgage loans, as the case may be, involved in these four Transactions are hereinafter referred to simply as the "loans."

120

the deal documents were those that allocated to EMC the risk of loss due to misrepresentations,

fraud or other failures that EMC was in the position to control.

### 1. *Loan-Level Representations and Warranties*

254. The provisions of the principal Transaction Documents that allocated to EMC

such risk of loss are EMC's representations and warranties regarding, among other things, the

origination (including underwriting) and other key attributes of the loans, and are found in

Section 7 of the respective MLPAs.

255. Among its extensive representations and warranties in the SACO 2005-10 and

SACO 2006-2 Transactions, EMC represented and warranted as to each mortgage loan that:

> MLPA § 7(a): "The information set forth in the Mortgage Loan
> Schedule on the Closing Date is complete, true and correct."
>
> MLPA § 7(b): "Each loan at the time it was made complied in all
> material respects with applicable local, state and federal laws,
> including but not limited to, all applicable anti-predatory lending
> laws."
>
> MLPA § 7(q): ". . . [I]mmediately prior to the Cut-off Date, there
> was no default, breach, violation or event of acceleration existing
> under the Mortgage or the Mortgage Note and there was no event
> which, with the passage of time or with notice and the expiration
> of any grace or cure period, would constitute a default, breach,
> violation or event of acceleration, and the related Mortgage Loan
> Seller has not waived any default, breach, violation or event of
> acceleration."
>
> MLPA § 7(s): "At the time of origination, each Mortgaged
> Property was the subject of an appraisal which conformed to the
> underwriting requirements of the originator of the Mortgage Loan,
> and the appraisal is in a form acceptable to Fannie Mae or Freddie
> Mac."
>
> MLPA § 7(t): "The origination, servicing and collection practices
> with respect to each Mortgage Note and Mortgage including, the
> establishment, maintenance and servicing of the escrow accounts
> and escrow payments, if any, since origination, have been
> conducted in all respects in accordance with the terms of Mortgage
> Note and in compliance with all applicable laws and regulations

121

and, unless otherwise required by law or Fannie Mae/Freddie Mac standards, in accordance with proper, prudent and customary practices in the mortgage origination and servicing business . . . ."

MLPA § 7(dd): "Each Mortgage Loan at the time of origination was underwritten in general in accordance with guidelines not inconsistent with the guidelines set forth in the Prospectus Supplement and generally accepted credit underwriting guidelines."

MLPA § 7(ee): "No error, omission, misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of either Mortgage Loan Seller or the related Originator."

256.    In addition to representations and warranties that are virtually identical to those referenced above, EMC also made the following additional representations and warranties with respect to the loans contained in the SACO 2006-8 Transaction:

MLPA § 7(d): "No HELOC had a Combined Loan to Value Ratio at the time of origination of more than 100%."

MLPA § 7(j): " . . . No fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a HELOC has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the HELOC."

257.    Finally, in the BSSLT 2007-1 Transaction, EMC represented and warranted as to each loan that:

MLPA § 7(a): "[T]he information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects."

MLPA § 7(c): "[E]ach Mortgage Loan at the time it was made complied in all material respects with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable predatory, abusive and fair lending laws; and each Mortgage Loan has been serviced in all material respects in accordance with all applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all applicable anti-

predatory lending laws and the terms of the related Mortgage Note, the Mortgage and other loan documents."

MLPA § 7(d): "[T]here is no monetary default existing under any Mortgage or the related Mortgage Note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration; and neither the Seller, any of its affiliates nor any servicer of any related Mortgage Loan has taken any action to waive any default, breach or event of acceleration . . . ."

MLPA § 7(n): "[A]t the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan and, the appraisal is in a form acceptable to Fannie Mae or FHLMC."

MLPA § 7(r): "[T]he information set forth in Schedule A of the Prospectus Supplement with respect to the Mortgage Loans is true and correct in all material respects."

MLPA § 7(t): "[E]ach Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator."

258.  As demonstrated by their number, scope, and particularity, the foregoing representations and warranties were designed to convey absolute confidence that EMC was standing behind the quality of the loans and, specifically, accepting the risk of loss should any of the loans be found to have been included in the Transactions in violation of any representation or warranty.

### 2.    *Transactional-Level Representations and Warranties*

259.  EMC induced Ambac to issue the Policies by, among other things, extending to Ambac the representations and warranties that EMC had made in the MLPAs, PSAs, and SSAs, providing even broader representations and warranties in the I&I Agreements, and affording Ambac even greater remedies for breaches of EMC's representations and warranties than those that EMC had extended to the Trusts and Note Purchasers in the Transaction Documents. These

additional representations and remedies were consistent with Ambac's central role in the

Transactions as the ultimate backstop for payments due to the Note Purchasers. EMC's

numerous representations and warranties to Ambac, and the broad remedies afforded for their

breach, conveyed EMC's blanket commitment that the loans that EMC had sold to the Trusts

conformed to EMC's representations and warranties and were not tainted by fraud, error,

omission, misrepresentation, negligence, or similar occurrence in their origination or

underwriting. In providing this commitment, Bear Stearns assured Ambac that EMC would bear

the risk of loss in the event that any of its representations and warranties proved inaccurate.

260.    EMC's broad representations and warranties, and its commitment to bear the risk

of their inaccuracy, are clearly and unambiguously stated in the I&I Agreements. First, the I&I

Agreements explicitly extend to Ambac the numerous representations and warranties that EMC

made in the MLPAs:

> I&I Agreement § 2.04(1):  *Company Documents.*  The
> representations and warranties of the Seller [EMC] contained in
> the Company Documents[327] to which it is a party are true and
> correct in all material respects and the Seller [EMC] hereby makes
> each such representation and warranty to, and for the benefit of,
> the Insurer [Ambac] as if the same were set forth in full herein.[328]

261.    Second, the I&I Agreements provide that Ambac is a third-party beneficiary of

the other principal Transaction Documents, with all rights afforded thereunder, including the

representations, warranties, and covenants that EMC made in the key Transaction Documents:

> I&I Agreement § 2.05(j):  *Third-Party Beneficiary.*  The Seller
> [EMC] agrees that the Insurer [Ambac] shall have all rights of a
> third-party beneficiary in respect of the Company Documents and

---

[327] The I&I Agreements for all of the Transactions define "Company Documents" to include, among other things, the I&I, the MLPA, and the SSA or PSA, as applicable.

[328] The language in Section 2.04(1) is identical in each of the I&I Agreements.

124

hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer.[329]

262.     Third, the I&I Agreement for each Transaction adds for Ambac's benefit new

representations and warranties not found in the underlying Transaction Documents, including

EMC's promise as to the truthfulness of the information it provided to Ambac about each of the

Transactions:

> I&I Agreement § 2.04(j):  *Accuracy of Information.*  No
> information supplied by the Seller [EMC] contained in the
> Company Documents to which it is a party nor other material
> information relating to the operations of the Seller or the financial
> condition of the Seller, as amended, supplemented or superseded,
> furnished to the Insurer in writing or in electronic format by the
> Seller contains any statement of material fact which was untrue or
> misleading in any material respect when made.  The Seller does
> not have any knowledge of any circumstances that could
> reasonably be expected to cause a Material Adverse Change with
> respect to the Seller.  Since the furnishing of the Company
> Documents, there has been no change nor any development or
> event involving a prospective change known to the Seller that
> would render any of the Company Documents untrue or
> misleading in any material respect.[330]
>
> I&I Agreement § 2.04 (k):  *Compliance with Securities Laws.* . . .
> The Company Information[331] in the Offering Documents[332] do not
> contain any untrue statement of a material fact and do not omit to
> state a material fact necessary to make the statements made
> therein, in light of the circumstances under which they were made,
> not misleading . . . .[333]

---

[329] SACO 2006-8 I&I Agreement § 2.05(j).  Section 2.05(j) of the I&I Agreements for the other
Transactions includes virtually identical language.

[330] The language in Section 2.04(j) is identical in each of the I&I Agreements for all the Transactions.

[331] The I&I Agreements for all of the Transactions define "Company Information" as "all information
with respect to the Offering Documents other than the Insurer Information and the Underwriter
Information."

[332] The I&I Agreements in all of the Transactions define "Offering Documents" to include the Free
Writing Prospectus, the Prospectus Supplement, the Base Prospectus, and any document with respect to
the insured notes or certificates (as the case may be) that makes reference to the policies approved by
Ambac.

[333] The language in Section 2.04(k) is identical in each of the I&I Agreements.

125

263.   EMC's warranty to Ambac in Section 2.04(k) of the I&I Agreements are significant.  As discussed in detail above, the Offering Documents contained disclosures pertaining to the loan characteristics, the underwriting and due diligence conducted, and the risks associated with an investment in the Notes.  In making this representation about the Offering Documents, which was material and incremental to the representations and warranties made in the MLPAs, EMC sought to provide further comfort to Ambac about the accuracy and completeness of the total mix of information about the Transactions made available by EMC.  In so doing, EMC again assumed the risk that the disclosures misstated or omitted material facts.  In fact, as previously discussed, this representation and warranty was breached because the Offering Documents contained false and misleading information about key loan metrics on a pool-wide basis, and the underwriting and due diligence performed on the loans, and contained material omissions because they failed to disclose the abysmal origination, underwriting and due-diligence practices and procedures that account for the incredible incidence of fraud and gross underwriting failings plaguing these loans.

### C.   EMC's CONTRACTUAL COVENANTS REINFORCING THE PARTIES' BARGAINED-FOR RISK ALLOCATION

#### 1.   EMC's Promise to Give Prompt Notice of Breaches

264.   To reinforce the parties' bargained-for risk allocation and further assure the deal participants that the loans complied with its representations and warranties, the MLPAs provide ongoing obligations on all securitization participants to promptly disclose any loan found to have been included in the Transactions in violation of any of EMC's myriad loan-level representations and warranties.

126

265.    Specifically, Section 7 of the MLPA for the SACO 2006-8 Transaction[334]

provides, in pertinent part, as follows:

> Upon discovery or receipt of notice by the HELOC Seller [EMC],
> the Purchaser [a Bear Stearns affiliate], the Issuer, the Note Insurer
> [Ambac] or the Indenture Trustee of a breach of any representation
> or warranty of the HELOC Seller set forth in this Section 7 which
> materially and adversely affects the value of the interests of the
> Purchaser, the Issuer, the Note Insurer, the Noteholders or the
> Indenture Trustee in any of the HELOCs . . . or which adversely
> affects the interests of the Note Insurer, the party discovering or
> receiving notice of such breach shall give prompt written notice to
> the others.

266.    Section 7 of the MLPAs for the SACO 2005-10 and SACO 2006-2 Transactions

similarly provides, in pertinent part, as follows:

> Upon discovery or receipt of notice by the Sponsor [EMC], the
> Certificate Insurer [Ambac], the Purchaser [a Bear Stearns
> affiliate] or the Trustee of a breach of any representation or
> warranty of the Sponsor set forth in this Section 7 which materially
> and adversely affects the value of the interests of the Purchaser, the
> Certificateholders, the Certificate Insurer or the Trustee in any of
> the Mortgage Loans . . . the party discovering or receiving notice
> of such breach shall give prompt written notice to the others.

267.    The PSAs and SSAs relating to the Transactions, as applicable, contain

corresponding and virtually identical notification provisions.[335]

268.    The notification provisions are absolute; they are in no way conditioned on

EMC's ability to pursue claims against the originators of those loans or ultimately cure the

defects affecting the breaching loans. Instead, they are designed to give prompt notice to the

Transactions' participants of any breaching loan to ensure that EMC -- and not Ambac, the

Transactions, or its investors -- bear the risk of loss associated with defective loans that EMC

should not have securitized.

---

[334] Section 7 of the BSSLT 2007-1 MLPA includes a substantially identical provision.

[335] *See, e.g.*, PSA § 2.03 for the SACO 2005-10 and SACO 2006-2 Transactions.

127

269.     EMC's promise to promptly notify other Transaction participants of breaching

loans subsequently found to have been included in the Transactions was also a material

inducement of Ambac's and investors' participation in the Transactions.

### 2.     EMC's Promise to Repurchase or Cure Breaching Loans Within 90 Days

270.     Disclosing the existence of breaching loans identified in the Transactions was

necessary and essential to enforcing EMC's express contractual obligation to repurchase those

loans or cure the breach in a timely manner (*i.e.*, 90 days) – and, thus, minimize the risk of loss

to the Transactions' investors and insurer in the event Bear Stearns securitized defective loans by

allocating those risks squarely to EMC.

271.     To carry out this bargained-for risk allocation, and to convey absolute confidence

that EMC was standing behind the quality of the securitized loans, EMC agreed in the MLPAs

that, should any of its loan-level representations and warranties prove untrue, it would cure the

breach(es) or remove the breaching loan(s) from the pool. To this end, immediately following

the notification obligations described above, Section 7 of the MLPA for the SACO 2006-8

Transaction[336] provides, in pertinent part, as follows:

> In the case of any such breach of a representation or warranty set
> forth in this Section 7, within 90 days from the date of discovery
> by [EMC], or the date [EMC] is notified by the party discovering
> or receiving notice of such breach (whichever occurs earlier),
> [EMC] will (i) cure such breach in all material respects, (ii)
> purchase the affected HELOC at the applicable Purchase Price, or
> (iii) if within two years of the Closing Date, substitute a qualifying
> Substitute HELOC in exchange for such HELOC.

---

[336] Section 7 of the MLPAs entered into in the three other Transactions include substantially identical
provisions.

4106355v.1

272.    The PSAs and SSAs relating to the Transactions, as applicable, contain

corresponding and virtually identical remedial provisions.[337]

273.    While EMC's cure, repurchase, or substitution obligation (the "Repurchase

Protocol") was a critical Transaction feature and a material inducement for Ambac to insure the

Transactions, the parties intended this remedy to address the inadvertent inclusion in the

Transactions by EMC of the aberrant non-complying loan. Because these provisions do not

adequately address or compensate Ambac for the enormous harm inflicted by Bear Stearns'

fraud or the wholesale failures to comply with the express representations and warranties that

EMC made in the Transaction Documents, the Repurchase Protocol is inadequate and was not

intended in such circumstances. EMC thwarted the intent of the parties embodied in their

contractual agreements by selling to the Trusts predominantly non-compliant loans and

pervasively breaching its representations and warranties by misrepresenting material facts and

omitting material information. Further compounding the harm, EMC, under the direction of

Bear Stearns and subsequently JPMorgan executives, has essentially made a mockery of the

Repurchase Protocol by refusing to repurchase all but a negligible number of defective loans

submitted to it by Ambac.

### D.    THE BROAD LEGAL AND EQUITABLE REMEDIES RESERVED AND AFFORDED TO AMBAC UNDER THE TRANSACTION DOCUMENTS

#### 1.    Ambac's Express Right to Pursue Any and All Remedies at "Law or Equity"

274.    The parties understood that the Repurchase Protocol would not fully address the

quantum of risk and harm borne by Ambac in the event of wholesale misrepresentation of facts

material to its risk assessment. Accordingly, while other parties to the Transactions may be

---

[337] *See* PSAs § 2.03.

limited to the remedies set forth in the MLPA and SSA or PSA, as applicable, Ambac is not.

Section 5.02 of the I&I Agreements provides that any and all remedies at law and in equity –

including those available in the Company Documents – are available to Ambac on a non-

exclusive and cumulative basis.

275.    Pursuant to Section 5.02(a) of the I&I Agreements, EMC agreed that upon the

occurrence of an "Event of Default,"[338] which event includes EMC's breaches of the loan-level

representations and warranties in the MLPA, Ambac may

> take whatever action at law or in equity as may appear necessary or
> desirable in its judgment to collect the amounts, if any, then due
> under this Insurance Agreement . . . or to enforce performance and
> observance of any obligation, agreement or covenant of . . . [EMC]
> under Company Documents.

Section 5.02(b) of the I&I Agreements further provides that any and all remedies at law and in

equity – including those available in the Company Documents – are available to Ambac on a

non-exclusive and cumulative basis.[339]

276.    Pursuant to Section 5.03(a) of the I&I Agreements, EMC expressly agreed that

"[t]he exercise by [Ambac] of any right hereunder shall not preclude the exercise of any other

right, and the remedies provided herein to [Ambac] are declared in every case to be cumulative

and not exclusive of any remedies provided by law or equity."[340]

---

[338] An "Event of Default" is defined under Section 5.01(a) of the I&I Agreements as occurring when,
among other things, "[a]ny representation or warranty made by the Depositor, the Issuing Entity,
the Master Servicer or the Seller hereunder or under the Company Documents, or in any certificate
furnished hereunder or under the Company Documents, shall prove to be untrue or incomplete in any
material respect."

[339] The language in Section 5.02 is identical in each of the I&I Agreements.

[340] The language in Section 5.03 is identical in each of the I&I Agreements.

4106355v.1

### 2. Ambac's Contractual Rights to Indemnification and Reimbursement

277.    Pursuant to Section 3.04 of the I&I Agreements, EMC also agreed to pay and

indemnify Ambac for any and all losses, claims, demands, damages, costs, or expenses by reason

of, among other things,

> the negligence, bad faith, willful misconduct, misfeasance,
> malfeasance or theft committed by any director, officer, employee
> or agent of the . . . Seller [EMC] in connection with any
> Transaction arising from or relating to the Company Documents;
>
> the breach by the . . . Seller [EMC] of any representation, warranty
> or covenant under any of the Company Documents . . . ; or
>
> any untrue statement or alleged untrue statement of a material fact
> contained in any Offering Document or any omission or alleged
> omission to state therein a material fact required to be stated
> therein or necessary to make the statements therein, in light of the
> circumstances under which they were made, not misleading . . .
> "[341]

278.    In Section 3.03(b) of the I&I Agreements, EMC further agreed to reimburse

Ambac for "any and all charges, fees, costs and expenses that the Insurer may reasonably pay or

incur, including reasonable attorneys' and accountants' fees and expenses ("Reimbursable

Expenses") in connection with . . . the enforcement, defense or preservation of any rights in

respect of any of the Company Documents . . . ."[342]

### 3. Ambac's Subrogation Rights

279.    Pursuant to the Transaction documents, Ambac guaranteed the payment to the

Note Purchasers by providing financial guaranty insurance Policies in the Transactions.  Under

the Policy for each Transaction, "Ambac . . , in consideration of the payment of the premium and

subject to the terms of this Policy, . . . agree[d] unconditionally and irrevocably to pay to the

---

[341] The language in Section 3.04(a) is identical in each of the I&I Agreements.

[342] The language in Section 3.03(b) is identical in each of the I&I Agreements.

4106355v.1

Trustee for the benefit of the [Note Purchasers] that portion of the [amount] which shall become Due for Payment but shall be unpaid by reason of Nonpayment."[343]

280. Accordingly, in addition to the extensive rights and remedies under the Transaction Documents that Ambac may exercise directly in its own right, under the I&I Agreements and Policies for each of the Transactions, the Indentures for the SACO 2006-8 and BSSLT Transactions, and by operation of law, Ambac has full rights as subrogee with respect to any payments it has made for the benefit of the Note Purchasers. The Policies for each Transaction provide that "Ambac shall be subrogated to all the [Note Purchasers]' rights to payment on the Insured Obligations to the extent of the insurance disbursements so made."[344] The I&I Agreements also explicitly recognize Ambac's subrogation rights under the agreements and in law and equity.[345]

281. Ambac's subrogation rights are additionally set forth in the "Subrogation and Cooperation" provisions of the Indentures for the SACO 2006-8 and BSSLT Transaction:

> The Issuing Entity and the Indenture Trustee acknowledge that (i) to the extent [Ambac] makes payments under the Policy on account of principal of or interest on the [Note Purchasers], [Ambac] will be fully subrogated to the rights of such [Note Purchasers] to receive such principal and interest from the [Trust], and (ii) [Ambac] shall be paid such principal and interest but only from the sources and in the manner provided herein and in the [I&I Agreement] for the payment of such principal and interest.[346]

---

[343] Transaction Policies at 1.

[344] Transaction Policies at 1.

[345] *See* I&I Agreements § 3.04(a) ("In addition to any and all of [Ambac's] rights of reimbursement, indemnification, *subrogation* and to any other rights of the Insurer pursuant hereto or *under law or in equity* . . . .) (emphasis added); *see also* I&I Agreements § 5.02 (providing that Ambac's rights and remedies are intended to be cumulative to every other right and remedy "existing at law or in equity or otherwise").

[346] Indentures § 4.10(a).

132

282.    Consistent with the provisions set forth in the Transaction Documents, the

ProSupp for each Transaction specifically discusses Ambac's right to full subrogation of the

Note Purchasers' rights to the extent it makes any payments under the Policies.[347]

## VI.    EMC'S PERVASIVE BREACHES OF ITS REPRESENTATIONS AND WARRANTIES

### A.    AMBAC'S LOAN-LEVEL REVIEW UNCOVERED PERVASIVE BREACHES

283.    A loan-level review and analysis undertaken by Ambac's independent consultants

(at enormous effort and expense) has revealed that a significant number loans in the Transactions

breach one or more of EMC's extensive loan-level representations and warranties pertaining to

the underwriting of the loans and the key loan metrics for each Transaction.

284.    To date, Ambac, through its independent consultant, has reviewed a total of 6,309

loans across the Transactions.  The results of Ambac's loan-level analyses revealed that at least

5,724 loans breached one or more of EMC's representations and warranties, evidencing a

staggering 90% breach rate.  These loans contain one or, in most cases, more than one defect that

constitute a breach of one or more of the numerous representations and warranties made by EMC

in the applicable MLPA and materially altered the loans' risk profile.  These defects include:

- rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- inflated and fraudulent appraisals; and,

---

[347] SACO 2005-10 ProSupp at S-82 ("[Ambac] shall be subrogated to the rights of each [Note Purchasers] to receive distributions on the [Notes] to the extent of any payment by [Ambac] under the . . . Policy."); SACO 2006-2 ProSupp at S-98 (same); SACO 2006-8 ProSupp at S-70 (same); BSSLT 2007-1 (Group I) ProSupp at S-82; BSSLT 2007-1 (Groups II&III) ProSupp at S-128.

133

- pervasive violations of the loan originators' own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

285.   Each of these breaches adversely affected Ambac's interests, or materially and adversely affected the value of Ambac's interests in the identified loan. Loans subject to fraud, that were not originated and underwritten pursuant to prudent and proper practices, or the key attributes of which are otherwise misrepresented are markedly more risky and therefore less valuable than loans not suffering from such shortcomings.

286.   In addition to the non-performing loans, Ambac randomly selected 1,562 loans from the Transactions, of which 1,492 loans were available to review, thereby constituting a statistically sound representative sample of the loans in the Transaction. The randomly selected loans from each Transaction included both defaulted loans and loans still current in payments (as well as loans that had already paid in full at the time of Ambac's review). The results of this randomly-generated sample were shocking, and demonstrate with a high degree of certainty that breaches of representations and warranties exist in a comparable percentage of loans *in the total loan pool* in each Transaction.

- Of the sample of 377 randomly selected loans in the SACO 2005-10 Transaction, Ambac identified breaches of representations and warranties in 340 loans, or 90%.

- Of the sample of 378 randomly selected loans in the SACO 2006-2 Transaction, Ambac identified breaches of representations and warranties in 347 loans, or 92%.

- Of the sample of 366 randomly selected loans in the SACO 2006-8 Transaction, Ambac identified breaches of representations and warranties in 338 loans, or 92%.

134

- Of the sample of 361 randomly selected loans in the BSSLT 2007-1 Transaction, Ambac identified breaches of representations and warranties in 325 loans, or 90%.

287.    Pursuant to Section 7 of the MLPAs, through a series several letters between on April 25, 2008 and June 17, 2010, Ambac promptly gave formal notice to EMC and the other deal participants identifying the breaching loans found to have been included in the Transactions, and describing such breach, or breaches, affecting those loans with specificity. Upon receipt of such notices, EMC became obligated under the applicable MLPAs and PSAs/SSAs to repurchase or cure the affected loans within 90 days. Ambac's notices further reserved any and all rights to assert additional claims or demands including with respect to indemnification, reimbursement, breaches, or other claims.

288.    In response to Ambac's breach notices, Bear Stearns (then JP Morgan) – acting with authority to perform EMC's obligations under the Transaction Documents – agreed to repurchase *only 52 loans, or less than 1%, of the 5,724 of breaching loans* that Ambac identified. EMC, at the behest of Bear Stearns and its new management under JP Morgan, refused to repurchase any of the other loans or acknowledge the breaches in what amounts to a deliberate and bad faith frustration of the repurchase protocol further compounding the massive harm inflicted by Bear Stearns on Ambac and the Transactions' investors. And, despite EMC's assurances and follow-up requests by Ambac, Bear Stearns has failed even to repurchase those loans that it committed to repurchase, demonstrating its blatant disregard of its contractual obligations and the bad faith of its representations.[348]

---

[348] Bear Stearns did not respond to Ambac's letters requesting prompt repurchase of the loans that Bear Stearns agreed were in breach and represented would be repurchased. *See* Letter from Ambac to EMC, dated September 16, 2009, ABK-EMC02664451-454 (SACO 2005-10), ABK-EMC02664443-446 (SACO 2006-2), ABK-EMC02664439-442 (SACO 2006-8), and ABK-EMC02664447-450 (BSSLT 2007-1).

4106355v.1

289.    By its wholesale rejection of Ambac's repurchase demands, Bear Stearns has thus made clear that it has no intention of honoring its contractual obligations.  In its detailed responses to Ambac's breach notices, EMC has taken positions in order to fraudulently reduce its reserves that are wholly contrary to the express and unambiguous requirements of the applicable underwriting guidelines that EMC represented were adhered to, EMC's other representations and warranties, its contractual covenants contained in the Transaction Documents and, perhaps most shockingly, *the findings made and conclusions reached by Bear Stearns' own post-acquisition quality control department -- findings that are memorialized in repurchase demands made by EMC to the sellers of these same loans*.

**B.    BEAR STEARNS' INTERNAL DOCUMENTS AND ADMISSIONS CONTRADICT ITS REJECTION NOTICES TO AMBAC AND REVEAL BEAR STEARNS' BAD FAITH**

290.    Consistent with Bear Stearns' operational abuses discussed above, Bear Stearns asserted and resolved repurchase claims against the entities from which it acquired securitized loans based on material and adverse defects affecting the loans at issue in the Transactions.

291.    Bear Stearns has only recently disclosed internal databases and documentation reflecting its claims activities and the quality control findings made on the mortgage loans, which reveal pervasive defects in securitized loan pools due to, among other things, rampant misrepresentations or fraud concerning borrowers' ability to repay their debts, and abject underwriting failures that violate proper and prudent mortgage-lending practices, including the actual underwriting guidelines that were supposed to be used to originate the loans.  However, when Ambac uncovered the same defects that Bear Stearns' quality control and claims departments had previously and independently identified, Bear Stearns deliberately and in bad faith rejected Ambac's claims.

136

292.     Bear Stearns' formal claims notices and its supporting quality control
documentation issued to loan originators constitute significant admissions by Bear Stearns that
borrower misrepresentations, fraud, underwriting failures, missing documentation and other
defects "materially and adversely affect" the loans in dispute here.  By its own admission, these
loans "were not eligible for delivery," and thus should never have been securitized.[349]  Although
the defects conclusively establish breaches of EMC's representations and warranties given to
Ambac and other securitization participants, in its deliberate bid to conceal the quality of the
loans, Bear Stearns did not disclose these breaches upon discovery, which constitutes a separate
breach of EMC's express obligation to provide "prompt" notice of its discovery of breaching
loans.

293.     Indeed, in certain instances, after Ambac notified Bear Stearns of breaches it had
uncovered through its independent loan review, Bear Stearns refused to repurchase what it
already knew were breaching loans, having itself previously submitted repurchase claims on
those same loans against the suppliers of the loans.  The following examples gleaned from Bear
Stearns's own files obtained in discovery illustrate this abhorrent conduct:

- *EMC Loan Numbers* ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, *and*
  ▮▮▮▮: After Bear Stearns securitized the loans in one of the Transactions, it
  submitted a repurchase claim against the entities from which it purchased the
  loans on the grounds that the borrower failed to disclose existing liabilities at time
  of origination. Bear Stearns asserted that the loans violated underwriting
  guidelines and/or were originated through fraud, error, negligence,
  misrepresentation or material omission. In response to Ambac's subsequent
  repurchase demands based on the same defect, EMC refused to repurchase the
  loans stating: "There is no documentation in the file reflecting debts existed at the

---

[349] Consistent with the representations and warranties and remedies that EMC extended to Ambac in the
MLPAs, Bear Stearns purchased loans pursuant to a mortgage loan purchase agreements that require the
seller to repurchase or cure any loan defects that "materially and adversely" affect the value of a loan, or
EMC's interests therein. *See* EMC Seller Guide (effective Oct. 3, 2005) § 11.03, EMC-AMB
003378797-883 at p. 66; *see also* Mortgage Loan Purchase and Interim Service Agreement between EMC
and SunTrust Mortgage (dated May 1, 2002) § 7.03,STM-00007246-7250. *See also* Section III.C.3,
above.

137

time of origination but were not considered by the lender. The loan file contains a
credit report conforming to the applicable guidelines and all reported obligations
were used in the underwriting process."

*Bear Stearns did not deny that the undisclosed liabilities did, in fact, exist.
Rather, it intentionally and knowingly concealed its own affirmative
investigation confirming that the borrowers' misrepresentations/fraud
regarding those liabilities caused the loans to violate underwriting guidelines.*

- *EMC Loan Number*      After Bear Stearns securitized the loan in the
  SACO 2005-10 Transaction, it submitted a repurchase claim against the entity
  from which it purchased the loans on the grounds that the verification of rent in
  the credit file was misrepresented because its quality control review confirmed
  that "the borrower *never paid $1,275 in monthly rent*," rather "the monthly rent
  was $750." Accounting for actual rental payment, Bear Stearns asserted that the
  loan violated underwriting guidelines. In response to Ambac's subsequent
  repurchase demand based on the same defect, EMC refused to repurchase the loan ·
  stating the loan complied with underwriting guidelines and asserting the position
  that "the *VOR in file that shows the borrower has been paying rent of $1275 for
  58 months*."

  *Bear Stearns intentionally and knowingly concealed its own affirmative
  investigation confirming that the verification of rent had been misrepresented,
  causing the loan to violate underwriting guidelines, and knowingly cited a
  document that it had already established to be fraudulent.*

- *EMC Loan Number*      After Bear Stearns securitized the loan in the
  SACO 2006-2 Transaction, it submitted a repurchase claim against the entity from
  it purchased the loans on the grounds that misrepresentation of income violated
  underwriting guidelines requiring that "income be reasonable for the position."
  Bear Stearns supported its claim with the borrower's bankruptcy petition filed
  after the origination date of the loan. In response to Ambac's subsequent
  repurchase demand based on the same defect and which also referenced the
  borrowers' bankruptcy petition, EMC refused to repurchase the loan stating that
  the loan complied with underwriting guidelines and asserting the position that
  "Borrower misrepresentation (if any) discovered subsequent to closing is not a
  breach of the representations and warranties stated."

  *Bear Stearns intentionally and knowingly concealed its own affirmative
  investigation confirming that the income was not reasonable for the borrower's
  employment, causing the loan to violate underwriting guidelines.*

294.  To quietly resolve its claims affecting the loans at issue in the Transactions, Bear

Stearns also entered into confidential settlement agreements providing it with a monetary

payment, that it pocketed in lieu of repurchasing the toxic loans from the Trusts. Bear Stearns

did not contemporaneously disclose its practices, or the significant funds it recovered. Instead, those loans remained in the trusts and caused continued losses to Ambac and the Note Purchasers. EMC initially refused to produce those agreements in connection with litigation concerning the very loans in dispute here on the grounds that (i) "payments made by sellers to EMC pursuant to the settlement agreements were on a 'lump-sum' basis, without repurchase of any loans, and without allocation of specific amounts to any loans," and (ii) those agreements did not "provide for admissions of liability or substantive resolution of any repurchase claims, apart from simply settling claims relating to populations of loans."[350] EMC's position confirms that settlements were structured in such a way to obfuscate the basis and amounts of the settlement with respective to the particular loans found to be defective. Thus, having deliberately securitized loans it knew represented a high risk of default or other material failings, Bear Stearns covertly generated significant economic benefits for itself at the expense of Ambac, the Note Purchasers, and other securitization participants.

295.   · To date, EMC has produced over 100 of these confidential settlement agreements many of which concern the very same loans Bear Stearns securitized in one of the Transactions. These settlement agreements further reveal Bear Stearns' knowledge that Ambac's repurchase demands were valid, and its bad faith efforts to reject those demands for illegitimate ends. The following settlements are illustrative:

- EMC's Settlement Agreement with SouthStar Funding LLC, dated January 30, 2007, EMC-AMB 008911066-82: In this agreement, SouthStar "agree[d] to pay $2,604,515.26 *in lieu of repurchasing* the Defective Loans . . . ." The settlement resolved EMC's claim as to at least 12 of the loans in the Transactions. One example, for EMC Loan Number ▆▆▆▆▆ shows that EMC identified a "Problem Request Type" for "OCCU REP." Bear Stearns's internal databases further states that for this loan: "THE BORROWER DID NOT OCCUPY THE SUBJECT PROPERTY AS SOLD TO EMC." Even though Bear Stearns

---

[350] Letter from EMC's counsel to Ambac's counsel, dated November 6, 2009.

securitized this loan on the basis that it was owner occupied, after this settlement agreement was finalized, EMC continued to conceal the defect and rejected Ambac's put-back request – *also based on an occupancy misrepresentation* – claiming that "[t]here is no documentation in the loan file negating the borrower's intent at the time of funding to oceupy the subject property."

- EMC's Settlement Agreement with Plaza Home Mortgage, dated October 1, 2007, EMC-AMB 004729716-33: In this agreement, Plaza Home Mortgage "agree[d] to pay $1,000,000.00 to EMC . . . *in lieu of repurchasing* the Defective Loans . . . ." Of the 33 loans included in the settlement agreement, at least 20 loans are Transaction loans.

- EMC's Settlement Agreement with SunTrust Mortgage, dated December 18, 2007, EMC-AMB 008911045-65: In this agreement, "[w]ith regard to the Defective Loans . . . the Company and EMC agree as follows . . . the Company shall pay to EMC an amount equal to $11,874,031.09 . . . for full payment and satisfaction of the Monetary Claims, and the balance of the Settlement Amount (if any) for settlement of the Defective Loans." Of the 67 loans included for non-EPD reasons, at least 7 loans are Transaction loans.

296.    The internal databases available to and used by Bear Stearns (and then JP

Morgan) irrefutably show the defects observed in a large number of the loans at issue in the

Transactions and establish Bear Stearns' deliberate misrepresentation of its due diligence and

quality control operations while marketing the Transactions and selling the Notes at issue in this

case. In spite of, or potentially because of, the pertinent information contained in such databases,

EMC opposed their production. For example, Bear Stearns' internal databases show, among

other things, the status of securitized loans subject to claims activity and reveal that Bear Stearns

(i) filed a "Problem Loan Worksheet" – which its internal policy documents require to be

"created by the QC auditors as loans are reviewed, for those loans with breaches of reps and

warrants, fraud, compliance issues, or misrepresentation"[351] – with respect to at least 2950 loans,

(ii) filed formal claims against sellers due to EPD violations or other substantive defects on at

least 2750 loans, and (iii) resolved those claims on approximately at least 1750 loans. Similarly,

---

[351] EMC Conduit Manual, Chapter 10 Quality Control Process, dated October 1, 2004, EMC-AMB 004413698-735 at 700.

140

Bear Stearns has made partial disclosures of its internal quality control data, including "Quality Control Management Summaries" and "Loan Review Detail Reports," indicating loans EMC deemed to be "Defective" and the reasons supporting that determination.

### C. AMBAC'S DISCOVERY OF BORROWERS AND OTHER THIRD PARTIES VALIDATES THE BREACHES IDENTIFIED IN ITS REPURCHASE NOTICES

297.    Documents subpoenaed by Ambac and its deposition examinations of many of the borrowers confirm Ambac's initial findings that the mortgage loan pools securitized by Bear Stearns in the Transactions are replete with fraud, misrepresentations, and violations of underwriting guidelines. Following are just some of the examples pertaining to loans that (i) Bear Stearns securitized in the SACO 2006-8 Transaction, (ii) Ambac reviewed as part of its random sample, and (ii) Bear Stearns continues to refuse to repurchase despite Ambac's breach notices:

- *EMC Loan Number* ▮▮▮▮▮ This second-lien loan, with a principal balance of $52,000, was made to a borrower in Palm Coast, Florida for the purchase of a property valued at $260,000. The borrower also obtained a first-lien loan in the amount of $208,000. The borrower's loan application stated that he lived in Monterrey, California, earned $11,500 per month as a manager for the Sherwin Williams Company, had over $7,200 in his bank account, and was purchasing the house in Florida as a second home. Ambac found, among other things, that the loan application misrepresented the borrower's income because an affidavit the borrower filed with his bankruptcy petition in 2007 indicates his average monthly income in 2005 to be approximately $4,300 per month and in 2006 to be $5,715 per month. Ambac also found that the loan application misrepresented the borrower's employment, and its breach notice advised Bear Stearns of these findings and the representations and warranties breached as a result thereof. By deposition dated March 27, 2010, the borrower confirmed these findings at a deposition and also testified that at the time of closing he had approximately $3,100 in his bank account, and not $7,200 as listed on the loan application. The borrower also testified that he was told at the closing that he had only fifteen minutes to sign all the paperwork, which had already been prepared and dated. The borrower complained, stating that he wanted to review the paperwork overnight, but was told by the mortgage broker that if he did not sign everything in fifteen minutes, "the loan was gone and the house was gone." Further, prior to the closing, the borrower had told the mortgage broker via telephone that he wanted a single, adjustable rate mortgage. The borrower discovered for the first

time on his own at the closing that he was taking out two loans instead of one. He was still unaware that the second loan was an "interest only" HELOC which had an initial annual percentage rate of 6.50%. This rate was only applicable for the first three months, at which time it would reset to an adjustable rate mortgage with an annual percentage rate of prime plus 5%. The borrower discovered for the first time that the HELOC was an "interest only" loan when the three month teaser rate expired and his payments on the HELOC almost doubled. The borrower contacted his mortgage broker, who told him "not to worry" and offered to refinance him into a new loan.

- *EMC Loan Number:* ███████ This second-lien loan with a principal balance of $67,000 was made to two ministers (borrower and co-borrower) for the purchase of a property valued at $337,000 in Henderson, Nevada. The couple's loan application indicated the borrower's income to be $11,850 per month as an ad developer for Heath and Associates advertising, Inc. in San Luis Obispo, California and the co-borrower's income as $5,950 per month as a teacher in San Luis Obispo for the State of California. The loan closed as a "primary residence" – *i.e.*, the borrowers were required to occupy the property as their primary residence. Ambac found, among other things, that the couple's stated income was not reasonable, that the couple never occupied the property after closing, and that the loan application did not disclose that the couple had purchased another house in Nevada and had also refinanced their home in Arroyo Grande, California. Ambac advised Bear Stearns of these findings and the representations and warranties breached as result thereof. Deposition examinations of the couple not only corroborated these findings, but also revealed that the borrower was *unemployed* at the time of closing and *never worked for Heath and Associates Advertising.* The deposition also revealed that EMC had notice that the borrowers never occupied the property in Henderson because, immediately upon closing, it began sending the monthly mortgage statement to the borrowers' primary residence in California. In fact, when the borrowers could no longer pay their monthly mortgage payments, they contacted EMC and stated that they needed a deferment because the house in Henderson was a rental which had been vacant for a number of month. In contravention of the parties' agreement, EMC failed to notify Ambac of this breach, and then when notified by Ambac of this and other misrepresentations, refused to repurchase the loan.

- *EMC Loan Number:* ███████ This loan, with a principal balance of $57,000, was made to a borrower in East Bethel, Minnesota for the purchase of a property valued at $385,000. The borrower also obtained a first-lien loan with a balance of $304,000. The borrower's loan application indicated her income to be $10,500 per month and identified her employment as a national visual merchandise coordinator for Kohl's Department Stores. Ambac found that the borrower was employed in a local capacity, which would make her stated income of $10,500 not reasonable. Ambac advised Bear Stearns of these findings and the representations and warranties breached as result thereof. During the March 21, 2010 deposition, the borrower corroborated these findings. She testified that she has never held a

national position at Kohl's and at the time of closing earned approximately $2,700 per month.

- *EMC Loan Number:* ▇▇▇▇▇ This second-lien HELOC in the amount of $104,000 was made to a borrower for the purchase of a property with the purchase price of $520,000. The loan application stated that borrower was employed as a general manager at Foto Mart, paid $2,500 per month in rent, and had almost $13,000 in her bank account – factors which suggest that the borrower had the ability to pay approximately $4,400 per month in housing expenses for the new property. Ambac found that the underwriter demonstrated negligence or misconduct in not verifying the large increase in the borrower's bank balance immediately prior to closing in light of the fact that her average account balance over the past three months was $518. Further, the borrower's credit report did not support her employment as a manager and her average bank balance of $518 did not support an earning potential from a management position. Ambac advised Bear Stearns of these findings and the representations and warranties breached as result thereof. The borrower testified at a deposition on November 19, 2009 that she earned approximately $2,270 per month as a babysitter and has never worked at Foto Mart. The borrower's loan file contained a verification of employment indicating that a loan underwriter called "Jorge," a manager at Foto Mart, and confirmed that the borrower was employed there as a general manager. The borrower testified that Jorge was actually her mortgage broker. The deposition also revealed that the borrower paid approximately $600 per month in rent prior to purchasing the property, and not $2,500 as indicated on the loan application. The borrower testified that twelve cancelled checks which purport to verify that she paid $2,500 per month in rent were forged: She did not sign these checks and the handwriting is someone else's.

298.    For all of these loans, EMC represented and warranted, among other things, that

(i) they complied in all material respects with applicable local, state and federal laws, including

but not limited to, all applicable anti-predatory lending laws; (ii) at the time of closing, there was

no default, breach, violation or event of acceleration existing under the Mortgages or Mortgage

Notes (which the underlying loan documentation specifically states that a material

misrepresentation in connection with obtaining the loan constitutes in a default); (iii) that the

origination and servicing practices with respect to these loans have been conducted in all respects

in accordance with the terms of the Mortgage Note and in compliance with all applicable laws

and regulations and, unless otherwise required by law or Fannie Mae/Freddie Mac standards, in

accordance with proper, prudent and customary practices in the mortgage origination and

143

servicing business; and (iv) no fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to these loans has taken place on the part of any Person, including without limitation, the Mortgagors, or any other party involved in the origination or servicing of these loans.

## VII.   HARM SUFFERED BY AMBAC AND NOTE PURCHASERS

299.   The Transactions that Bear Stearns marketed and effectuated based on its materially false and misleading representations and disclosures have failed miserably. An overwhelming percentage of the loans that Bear Stearns securitized in each of the Transactions either have been written off as total losses or are severely delinquent causing massive shortfalls in the cash-flows of principal and interest needed to pay down the securities. As a result, the Note Purchasers have incurred severe losses that have been passed on to Ambac as the financial guarantor.

300.   As of May 31, 2010, the Transactions have experienced cumulative losses of more than $1.2 billion in the aggregate:

| Transaction | Cumulative Losses | % of Loans Severely Delinquent or Charged Off |
|---|---|---|
| SACO 2005-10 | $114.8 million | 26.91% |
| SACO 2006-2 | $255.4 million | 33.16% |
| SACO 2006-8 | $99.9 million | 33.67% |
| BSSLT 2007-1 | $733.7 million | 41.66% |

301.   The severe losses realized by the Transactions have resulted in Ambac having to make claim payments to insured Note Purchasers. As reflected in the following table, as of June 17, 2010, Ambac has paid claims of more than $641.9 million in the aggregate.

| Transaction | Claims Paid | Date of Ambac's First Claim Payment |
|---|---|---|
| SACO 2005-10 | $30.0 million | October 2008 |

4106355v.1

| SACO 2006-2 | $89.7 million | April 2008 |
| SACO 2006-8 | $100.9 million | September 2007 |
| BSSLT 2007-1 | $421.3 million | July 2008 |

302.    But for Ambac's coverage obligations to fund the shortfalls under the Policies, the Note Purchasers would have been deprived of the principal and interest payments. Ambac, as subrogee of the Note Purchasers, has the right to recover for harm suffered by the Note Purchasers as a result of Defendants' misconduct. Subject to the terms of the Policies, Ambac guaranteed to make payments for the benefit of the Note Purchasers in the event that cash flows received by the trusts became insufficient to pay down the Notes.[352]

303.    Due to the high rate of expected defaults, future claims payments by Plaintiffs are inevitable. Therefore, in addition to the substantial claims payments already made by Ambac under the Policies, Ambac has been forced to set aside hundreds of millions of dollars in reserves based on the expectation of future shortfalls affecting the Transactions.

304.    On or about March 2010, Ambac allocated the Policies to the Segregated Account pursuant to the Plan of Operation submitted by the Commissioner. Pursuant to the order of the Circuit Court for Dane County, Wisconsin, a temporary moratorium has been placed on the payment of claims to policyholders on policies held by the Segregated Account. When the Plan of Operation for the Segregated Account is confirmed by the Circuit Court, payments of claims will

---

[352] In contrast with other types of insurer-insured relationships, in a securitization transaction a monoline insurer such as Ambac generally does not have access to information relating to the identity of the insureds, *i.e.*, the Note Purchasers. Instead, Ambac makes payments to the trusts set up for each Securitization, which, in turn, makes the payment to the Note Purchasers. Further, because Bear Stearns – not Ambac – marketed and sold the Notes to the Note Purchasers upon closing of each Transaction, Bear Stearns and EMC know the identity of the Note Purchasers, which they have withheld from Ambac. By document requests dated March 3, 2010, Ambac demanded that EMC provide Ambac with "Documents sufficient to identify the name, address, phone number and email address as to any investor or purchaser of the securities issued in connection with any of the Transactions." Ambac made clear that this information was needed for it to prosecute this action, conduct discovery, and exercise its rights under the Transaction Documents. EMC refused to comply, and after a motion to compel by Ambac, has recently been ordered to produce communications with those investors.

resume to policyholders pursuant to the terms fo the Plan. Absent the moratorium on claim payments, Ambac would have paid in excess of $48 million in *additional* claims payments to date.

305.    As discussed above, the pervasive breaches of EMC representations and warranties, revealed by the loan-file reviews and Bear Stearns' internal documents, and supported by the dismal loan performance in all four of the Transactions, pierce the very heart of the bargain struck by the parties. As has only recently become clear, EMC did not sell to the Trusts the contemplated portfolio of loans with the represented attributes. Rather, Bear Stearns transferred pools where the overwhelming majority of loans did not bear any resemblance to the loans EMC represented and warranted would comprise the pools. In doing so, Bear Stearns induced Ambac into insuring each successive Transaction based upon materially false and misleading information about that Transaction *and* the ones preceding it.

306.    Contrary to EMC's representations and warranties in Section 2.04(k) of the I&I Agreements, the Offering Documents that Bear Stearns prepared to market the Notes that Ambac insured (and the same documents that it filed with the SEC) contained material misrepresentations and omissions because they did not adequately or accurately disclose the true attributes of the loans (*e.g.*, the weighted average combined loan-to-value ratio, occupancy status, or debt-to-income ratio), the level of fraud and underwriting failings permeating the EMC loan pools, the grossly deficient origination practices of the originators of these loans, EMC's dismal due-diligence practices, the duplicitous role of its quality control department, or its scheme to recover from originators and pocket substantial sums of money that rightfully belonged to the securitization Trusts (*i.e.*, Ambac and the investors). Ambac would never have issued its Policies or agreed to participate in the Transactions had it known the true facts

146

307.    Having pervasively and systematically breached its representations and warranties and wholly eviscerated the Repurchase Protocol, EMC has materially breached each of the I&I Agreements as a whole, which breaches entitle Ambac to be (i) returned to the position it would have been in had it not entered into the I&I Agreements and issued its Policies and (ii) compensated for the incremental harm incurred as a result of its participation in each of the Transactions.

308.    At the very least, this relief requires the payment to Plaintiffs by Bear Stearns of all claim payments made to date and all future claim payments required to be made under the respective Policies.

## FIRST CAUSE OF ACTION

**(Against Defendants Bear, Stearns & Co. and EMC for Fraudulent Inducement)**

309.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 308 of this Complaint.

310.    As set forth above, Defendants Bear, Stearns & Co. and EMC made materially false public statements, and omitted material facts, with the intent to defraud the public and Ambac.

311.    Defendants made materially false statements and omitted material facts with the intent to defraud Ambac in pre-contractual communications between Ambac and Defendants' officers.

312.    Defendants, knowingly and with the intent to defraud, delivered to Ambac materially false and misleading documentation, including investor presentations, loan tapes, and Offering Documents, and fraudulently-induced ratings by the rating agencies.

147

313.   Ambac reasonably relied on Defendants' statements and omissions when it entered into the I&I Agreements and issued its Policies.

314.   As a result of Defendants' statements and omissions, Ambac insured pools of loans that had a risk profile far higher than Defendants led Ambac to understand.

315.   As a result of Defendants' false and misleading statements and omissions, Plaintiffs have suffered, and will continue to suffer, damages.

316.   Because Defendants committed these acts and omissions maliciously, wantonly, oppressively, and with knowledge that they would affect the general public – which they have – Plaintiffs are entitled to punitive damages.

## SECOND CAUSE OF ACTION

### (Against Defendants Bear, Stearns & Co. and EMC for Violations of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j))

317.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 316 of this Complaint.

318.   This cause of action is brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, against Defendants Bear, Stearns & Co. and EMC.

319.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the sale of the securities issued to Note Purchasers in the Transactions, by the use of means of instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

- employed devices, schemes, or artifices to defraud;
- made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

148

- engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

320.    Upon information and belief, the Note Purchasers purchased Notes from Bear, Stearns & Co. in reasonable reliance on these material misrepresentations and omissions. The Note Purchasers did not know of, and could not reasonably have discovered, the misrepresentations and omissions contained in these materials.

321.    But for Bear Stearns's false and misleading communications and/or disclosures in the Offering Documents the Note Purchasers would not have purchased or otherwise acquired the Notes, or would have acquired the Notes at a price less than they actually paid.

322.    Under the I&I Agreements, Policies, and Indentures for each Transaction, and by operation of law and in equity, Ambac is subrogated to the rights of the Note Purchasers and invokes this standing in bringing this suit.

323.    As a result of the Bear, Stearns & Co.'s and EMC's wrongful conduct as alleged herein, each is liable to Plaintiffs for the damages sustained at trial.

## THIRD CAUSE OF ACTION

### (Against Individual Defendants for Violations of Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78t))

324.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 323 of this Complaint.

325.    This Cause of Action is brought pursuant to Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t against the Individual Defendants as controlling persons.

326.    Each of the Individual Defendants, by virtue of their control, ownership, offices, directorship and specific acts, was at the time of the wrongs alleged herein a controlling person of Bear, Stearns & Co. or EMC within the meaning of Section 20 of the Securities Exchange Act

149

of 1934, directly and/or indirectly controlled persons liable for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and was in some sense a culpable participant in this conduct.

327.     As provided for contractually in the I&I Agreements, Policies, and Indentures for each Transaction, and by operation of law and in equity, Ambac is subrogated to the rights of the individual Note Purchasers and invokes this standing in bringing this suit.

328.     As a result of the Individual Defendants' wrongful conduct as alleged herein, each is liable to Plaintiffs for the damages sustained at trial.

## FOURTH CAUSE OF ACTION

### (Against Defendant EMC for Breaches of Representations and Warranties)

329.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 328 of this Complaint.

330.     The I&I Agreement in each Transaction is a valid and binding agreement between Ambac and EMC.

331.     Ambac has performed its obligations under the I&I Agreements.

332.     EMC has materially breached its representations and warranties under Section 7 of the MLPAs and Section 2.04 of the I&I Agreements.

333.     Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Against Defendant EMC for Breaches of Repurchase Obligation)

334.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 333 of this Complaint.

150

335.    EMC has materially breached its obligations under Section 7 of the MLPAs and Section 2.03 of the PSAs or SSAs, as applicable, by refusing to cure, repurchase, or provide substitutes for the loans that breached EMC's representations and warranties and with respect to which (i) EMC had discovered the breach or (ii) notice of breach has been provided by Ambac to EMC.

336.    Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

#### (Against Defendant Bear, Stearns & Co. for Tortious Interference with Contractual Relationship)

337.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 336 of this Complaint.

338.    Under Section 7 of the MLPAs and Section 2.03 of the PSAs or SSAs, as applicable, EMC is required to cure, repurchase, or provide substitutes for loans that breached EMC's representations and warranties.

339.    Bear, Stearns & Co. at all relevant times had notice and knowledge of this contractual relationship between Ambac and EMC.

340.    As a direct and proximate result of Bear, Stearns & Co.'s actions, which are continuing, EMC breached its contractual agreements with Ambac, and will continue to do so in the future.

341.    Bear, Stearns & Co. engaged in these actions with the conscious, malicious, willful, wrongful, tortious, illegal, and wanton intent to injure Ambac in its trade or business. Bear, Stearns & Co.'s actions have no legitimate purpose and are without any privilege, justification, or economic interest.

4106355v.1

342.    As a direct and proximate result of the conduct described herein, Plaintiffs have been damaged, and continues to be damaged, in its trade or business. Plaintiffs have suffered, and will continue to suffer, monetary loss that Plaintiffs would not have suffered but for Bear, Stearns & Co.'s tortious conduct, and are threatened with continuous and irreparable damage and/or loss.

## SEVENTH CAUSE OF ACTION

### (Against Defendant EMC for Material Breaches of Each of the I&I Agreements)

343.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 342 of this Complaint.

344.    EMC induced Ambac to enter into the I&I Agreements and to issue the Policies by making extensive representations and warranties concerning the loans that EMC caused to be sold to the Trusts, and by agreeing to broad remedies for breaches of those representations and warranties.

345.    EMC's representations and warranties were material to Ambac's decision to insure each of the Transactions, and Ambac was induced thereby to enter into each I&I Agreement and perform its obligations thereunder.

346.    EMC has materially breached the I&I Agreements, and the loan-by-loan cure-repurchase-or-substitution remedy is both inadequate to address the magnitude and pervasiveness of the breaches identified and is being frustrated by EMC's wholesale failure to comply with it.

347.    Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

152

## EIGHTH CAUSE OF ACTION

**(Against Defendant EMC for Indemnification)**

348.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 347 of this Complaint.

349.   Pursuant to Section 3.04(a) of the I&I Agreements, Ambac is entitled to be indemnified for any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the transactions contemplated by the Company Documents by reason of, among other things, (i) the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of EMC, (ii) the breach by EMC of any of the representations, warranties, or covenants contained in the Company Documents, and (iii) any untrue statement or alleged untrue statement of material fact contained in any Offering Document or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

350.   By reason of the foregoing, EMC has caused Plaintiffs to pay claims and incur losses, costs, and expenses, and will continue to cause Plaintiffs to pay claims and incur losses, costs, and expenses.

## NINTH CAUSE OF ACTION

**(Against Defendant EMC for Attorneys' fees and costs)**

351.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 350 of this Complaint.

352.   Pursuant to Section 3.03(b) of the I&I Agreements, EMC agreed to reimburse Ambac for any and all charges, fees, costs, and expenses paid or incurred in connection with,

153

among other things, enforcing, defending, or preserving Ambac's rights under the Company

Documents.

353.    Plaintiffs have incurred numerous expenses, including attorneys' fees and expert

fees, in order to enforce, defend, and preserve its rights under the relevant agreements.

4106355v.1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

- For an award of all legal, equitable, and punitive damages, to be proven at trial, against Defendants for their fraudulent inducement of Ambac's participation in the Transactions and issuance of its Policies;

- For an award of damages based on losses incurred by the Note Purchasers in an amount as yet to be determined;

- For an award of compensatory, consequential, and/or rescissory damages, including all of Plaintiffs claims payments made and to be made in the future, and any other present and future damages to be proven at trial, for Defendants' willful, wanton, and malicious material breaches of its contracts with Ambac;

- For an order compelling EMC to comply with its obligations under MLPA § 7, SSA § 2.03, and PSA § 2.03, as applicable, in each Transaction to cure, repurchase, or substitute the loans that breach its representations and warranties;

- For an award of compensatory damages for EMC's material breach of its representations and warranties under MLPA § 7 and I&I Agreement § 2.04 in each Transaction and its obligation to cure, repurchase, or substitute the loans that breach its representations and warranties pursuant to the remedial provisions of MLPA § 7, SSA § 2.03, and PSA § 2.03, as applicable in each Transaction, in an amount to be proven at trial;

- For an order of indemnification for the claim payments and other losses and expenses Plaintiffs have paid or will pay in the future pursuant to I&I Agreement § 3.04(a) in each Transaction;

- For an order awarding reimbursement of Plaintiffs' attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving their rights under the Transaction Documents pursuant to I&I Agreement § 3.03(b) in each Transaction.

- For an order of prejudgment interest; and,

- For an Order awarding Plaintiffs such other and further relief as the Court deems just and proper.

4106355v.1

Dated:          New York, New York
                July 28, 2010

                                        Respectfully Submitted,

                                        *Erik Haas /kg*

                                        Philip R. Forlenza (*prforlenza@pbwt.com*)
                                        Erik Haas (*ehaas@pbwt.com*)
                                        Karla G. Sanchez (*kgsanchez@pbwt.com*)
                                        PATTERSON BELKNAP WEBB & TYLER LLP
                                        1133 Avenue of the Americas
                                        New York, NY 10036-6710
                                        Telephone: (212) 336-2000
                                        Fax: (212) 336-2222

                                        *Of Counsel:*
                                        Kevin J. Doyle
                                        Jean Kim

                                        *Attorneys for Ambac Assurance Corporation and
                                        the Segregated Account of Ambac Assurance
                                        Corporation*

156