# Exhibit 6

BEAR STEARNS ASSET BACKED SECURITIES I LLC,

Depositor,

EMC MORTGAGE CORPORATION,

Seller and Company,

LASALLE BANK NATIONAL ASSOCIATION,

Master Servicer and Securities Administrator,

and

CITIBANK, N.A.

Trustee

---

POOLING AND SERVICING AGREEMENT

Dated as of December 1, 2005

---

SACO I TRUST 2005-10

MORTGAGE-BACKED CERTIFICATES, SERIES 2005-10

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms. | 7 |
| Section 1.02 | Allocation of Certain Interest Shortfalls. | 65 |

## ARTICLE II

### CONVEYANCE OF TRUST FUND REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 2.01 | Conveyance of Trust Fund. | 67 |
| Section 2.02 | Acceptance of the Mortgage Loans. | 69 |
| Section 2.03 | Representations, Warranties and Covenants of the Company, the Master Servicer, and EMC as a Seller. | 72 |
| Section 2.04 | Representations and Warranties of the Depositor. | 78 |
| Section 2.05 | Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases. | 79 |
| Section 2.06 | Countersignature and Delivery of Certificates. | 80 |
| Section 2.07 | [Reserved] | |

## ARTICLE III

### ADMINISTRATION AND SERVICING OF EMC MORTGAGE LOANS BY THE COMPANY

| | | |
|---|---|---|
| Section 3.01 | The Company. | 82 |
| Section 3.02 | Due-on-Sale Clauses; Assumption Agreements. | 83 |
| Section 3.03 | Subservicers. | 84 |
| Section 3.04 | Documents, Records and Funds in Possession of the Company to Be Held for Trustee. | 85 |
| Section 3.05 | Optional Purchase of Certain Mortgage Loans. | 86 |
| Section 3.06 | Release of Mortgage Files | 86 |
| Section 3.07 | Maintenance of Hazard Insurance. | 87 |
| Section 3.08 | Presentment of Claims and Collection of Proceeds. | 88 |
| Section 3.09 | [Reserved] | |
| Section 3.10 | Custodians to Retain Possession of Certain Insurance Policies and Documents. | 89 |
| Section 3.11 | Fidelity Bond, Errors and Omissions Insurance. | 89 |
| Section 3.12 | Realization Upon Defaulted Mortgage Loans; Determination of Excess Liquidation Proceeds and Realized Losses; Repurchases of Certain Mortgage Loans. | 90 |
| Section 3.13 | Servicing Compensation. | 92 |
| Section 3.14 | REO Property. | 93 |

i

Section 3.15        Liquidation Reports. .................................................................................93
Section 3.16        Annual Statement as to Compliance; Annual Certification. ..........................93
Section 3.17        Annual Independent Certified Public Accountants' Servicing Report. ..........94
Section 3.18        Books and Records. ....................................................................................94

## ARTICLE IV

## MASTER SERVICING OF MORTGAGE LOANS BY MASTER SERVICER

Section 4.01        Master Servicer. .........................................................................................96
Section 4.02        Monitoring of Company and Servicer ...........................................................97
Section 4.03        Fidelity Bond. .............................................................................................98
Section 4.04        Power to Act; Procedures. ...........................................................................98
Section 4.05        Due-on-Sale Clauses; Assumption Agreements. ..........................................99
Section 4.06        Documents, Records and Funds in Possession of Master Servicer,
                    Company and Servicer To Be Held for Trustee..............................................99
Section 4.07        Presentment of Claims and Collection of Proceeds. .....................................99
Section 4.08        Realization Upon Defaulted Mortgage Loans. .............................................100
Section 4.09        Compensation of the Master Servicer..........................................................100
Section 4.10        REO Property. ............................................................................................101
Section 4.11        Annual Officer's Certificate as to Compliance..............................................101
Section 4.12        [Reserved] ..................................................................................................102
Section 4.13        UCC. ..........................................................................................................102
Section 4.14        Reserve Fund. ............................................................................................102
Section 4.15        Reports Filed with Securities and Exchange Commission ............................104

## ARTICLE V

## ACCOUNTS

Section 5.01        Collection of Mortgage Loan Payments; Protected Account. .......................105
Section 5.02        Permitted Withdrawals From the Protected Account. ..................................107
Section 5.03        Reports to Master Servicer...........................................................................109
Section 5.04        Collection of Taxes; Assessments and Similar Items; Escrow
                    Accounts. ....................................................................................................110
Section 5.05        Protected Accounts .....................................................................................110
Section 5.06        Master Servicer Collection Account.............................................................112
Section 5.07        Permitted Withdrawals and Transfers from the Master Servicer
                    Collection Account ......................................................................................113
Section 5.08        Distribution Account....................................................................................114
Section 5.09        Permitted Withdrawals and Transfers from the Distribution Account. ..........114
Section 5.10        [Reserved]

## ARTICLE VI

## DISTRIBUTIONS AND ADVANCES

ii

Section 6.01    Advances.................................................................................117
Section 6.02    Compensating Interest Payments...............................................118
Section 6.03    REMIC Distributions.................................................................118
Section 6.04    Distributions.............................................................................119
Section 6.05    Allocation of Realized Losses. ..................................................127
Section 6.06    Monthly Statements to Certificateholders. ...............................130
Section 6.07    REMIC Designations and REMIC Distributions.......................134
Section 6.08    Class I-A Policy Matters............................................................134

## ARTICLE VII

## THE CERTIFICATES

Section 7.01    The Certificates.......................................................................140
Section 7.02    Certificate Register; Registration of Transfer and Exchange of
                Certificates.............................................................................141
Section 7.03    Mutilated, Destroyed, Lost or Stolen Certificates. ..................148
Section 7.04    Persons Deemed Owners. ........................................................149
Section 7.05    Access to List of Certificateholders' Names and Addresses. ......149
Section 7.06    Book-Entry Certificates. ..........................................................149
Section 7.07    Notices to Depository. .............................................................151
Section 7.08    Definitive Certificates..............................................................151
Section 7.09    Maintenance of Office or Agency.............................................152

## ARTICLE VIII

## THE DEPOSITOR, COMPANY AND THE MASTER SERVICER

Section 8.01    Liabilities of the Depositor, the Company and the Master Servicer.............153
Section 8.02    Merger or Consolidation of the Depositor or the Master Servicer. ...............153
Section 8.03    Indemnification of the Trustee, the Master Servicer and the Securities
                Administrator. ........................................................................153
Section 8.04    Limitations on Liability of the Depositor, the Company, the Master
                Servicer and Others................................................................154
Section 8.05    Master Servicer and Company Not to Resign.............................156
Section 8.06    Successor Master Servicer .......................................................156
Section 8.07    Sale and Assignment of Master Servicing .................................157

## ARTICLE IX

## DEFAULT; TERMINATION OF MASTER SERVICER; TERMINATION OF COMPANY

Section 9.01    Events of Default. ....................................................................158
Section 9.02    Trustee to Act; Appointment of Successor. ...............................160
Section 9.03    Notification to Certificateholders, the Class I-A Insurer and Rating
                Agencies.................................................................................161

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

Section 9.04    Waiver of Defaults. ........................................................................161
Section 9.05    Company Default. ...........................................................................162
Section 9.06    Waiver of Company Defaults. ........................................................164

# ARTICLE X

## CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 10.01   Duties of Trustee and the Securities Administrator. ......................165
Section 10.02   Certain Matters Affecting the Trustee and the Securities
                Administrator. ................................................................................167
Section 10.03   Trustee and Securities Administrator Not Liable for Certificates or
                Mortgage Loans. ...........................................................................169
Section 10.04   Trustee and Securities Administrator May Own Certificates. .......169
Section 10.05   Trustee's and Securities Administrator's Fees and Expenses. ........170
Section 10.06   Eligibility Requirements for Trustee and Securities Administrator. ...........170
Section 10.07   Insurance. .....................................................................................171
Section 10.08   Resignation and Removal of Trustee and Securities Administrator. ............171
Section 10.09   Successor Trustee or Securities Administrator. .............................172
Section 10.10   Merger or Consolidation of Trustee or Securities Administrator. ...........172
Section 10.11   Appointment of Co-Trustee or Separate Trustee. .........................173
Section 10.12   Tax Matters. ..................................................................................174
Section 10.13   REMIC-Related Covenants. .........................................................178

# ARTICLE XI

## TERMINATION

Section 11.01   Termination upon Liquidation or Repurchase of all Mortgage Loans. .........179
Section 11.02   Final Distribution on the Group I Certificates and Group II
                Certificates. ..................................................................................180
Section 11.03   Additional Termination Requirements. .........................................181

# ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.01   Amendment. ...................................................................................183
Section 12.02   Recordation of Agreement; Counterparts. .....................................184
Section 12.03   Governing Law. .............................................................................185
Section 12.04   Intention of Parties. ......................................................................185
Section 12.05   Notices. .........................................................................................185
Section 12.06   Severability of Provisions. ............................................................186
Section 12.07   Assignment. ...................................................................................187
Section 12.08   Limitation on Rights of Certificateholders. ...................................187
Section 12.09   Inspection and Audit Rights. .........................................................187
Section 12.10   Certificates Nonassessable and Fully Paid. ...................................188

iv

## Exhibits

| | |
|---|---|
| Exhibit A-1 | Form of Class A Certificates |
| Exhibit A-2 | Form of Class M Certificates |
| Exhibit A-3 | Form of Class B Certificates |
| Exhibit A-4 | Form of Class C Certificates |
| Exhibit A-5 | Form of Class R Certificates |
| Exhibit B | Mortgage Loan Schedule |
| Exhibit C | Form of Transfer Affidavit |
| Exhibit D | Form of Transferor Certificate |
| Exhibit E | Form of Investment Letter (Non-Rule 144A) |
| Exhibit F | Form of Rule 144A and Related Matters Certificate |
| Exhibit G | Form of Request for Release |
| Exhibit H | DTC Letter of Representations |
| Exhibit I | Schedule of Mortgage Loans with Lost Notes |
| Exhibit J | Form of LaSalle Custodial Agreement |
| Exhibit K | Form of Wells Fargo Custodial Agreement |
| Exhibit L | Form of Mortgage Loan Purchase Agreement |
| Exhibit M | Form of Company Certification |
| Exhibit N | Form of Class I-A Policy |

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

POOLING AND SERVICING AGREEMENT, dated as of December 1, 2005, among BEAR STEARNS ASSET BACKED SECURITIES I LLC, a Delaware limited liability company, as depositor (the "Depositor"), EMC MORTGAGE CORPORATION, a Delaware corporation, as seller (in such capacity, a "Seller") and as company (in such capacity, the "Company"), LASALLE BANK NATIONAL ASSOCIATION, a national banking association, as master servicer (in such capacity, the "Master Servicer") and as securities administrator (in such capacity, the "Securities Administrator") and CITIBANK, N.A., a national banking association, as trustee (the "Trustee").

## PRELIMINARY STATEMENT

The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. On or prior to the Closing Date, the Depositor acquired the Mortgage Loans from the Seller. On the Closing Date, the Depositor will sell the Mortgage Loans and certain other property to the Trust Fund and receive in consideration therefor Certificates evidencing the entire beneficial ownership interest in the Trust Fund.

## REMIC I

As provided herein, the Securities Administrator, on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Group I Mortgage Loans and certain other related assets subject to this Agreement (other than the Group I Reserve Fund and any Prepayment Charge Waiver Amounts) as a REMIC (as defined herein) for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I". The Class I-R-I Certificates will represent the sole class of Residual Interests (as defined herein) in REMIC I for purposes of the REMIC Provisions (as defined herein). The following table irrevocably sets forth the designation, the Uncertificated REMIC I Pass-Through Rate, the initial Uncertificated Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC I Regular Interests (as defined herein). None of the REMIC I Regular Interests will be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated Principal Balance | | Latest Possible Maturity Date [1] |
|---|---|---|---|---|
| AA | Variable[2] | $ | 331,882,308.51 | June 25, 2036 |
| I-A | Variable[2] | $ | 2,846,400.00 | June 25, 2036 |
| I-M | Variable[2] | $ | 55,880.00 | June 25, 2036 |
| I-B-1 | Variable[2] | $ | 76,200.00 | June 25, 2036 |
| I-B-2 | Variable[2] | $ | 54,180.00 | June 25, 2036 |
| I-B-3 | Variable[2] | $ | 47,410.00 | June 25, 2036 |
| I-B-4 | Variable[2] | $ | 54,180.00 | June 25, 2036 |
| ZZ | Variable[2] | $ | 3,638,858.34 | June 25, 2036 |

[1]  For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Group I Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC I Regular Interest.

[2]  Calculated in accordance with the definition of "Uncertificated REMIC I Pass-Through Rate" herein.

## REMIC II

As provided herein, the Securities Administrator, on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Group II Mortgage Loans and certain other related assets subject to this Agreement (other than the Group II Reserve Fund and any Prepayment Charge Waiver Amounts) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II". The Class II-R-1 Certificates will represent the sole class of Residual Interests in REMIC II for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the Uncertificated REMIC II Pass-Through Rate, the initial Uncertificated Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC II Regular Interests (as defined herein). None of the REMIC II Regular Interests will be certificated

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated Principal Balance | | Latest Possible Maturity Date [1] |
|---|---|---|---|---|
| AA | Variable[2] | $ | 282,314,169.44 | January 25, 2036 |
| II-A-1 | Variable[2] | $ | 972,260.00 | January 25, 2036 |
| II-A-2 | Variable[2] | $ | 538,030.00 | January 25, 2036 |
| II-A-3 | Variable[2] | $ | 434,230.00 | January 25, 2036 |
| II-M-1 | Variable[2] | $ | 158,440.00 | January 25, 2036 |
| II-M-2 | Variable[2] | $ | 146,920.00 | January 25, 2036 |
| II-M-3 | Variable[2] | $ | 63,370.00 | January 25, 2036 |
| II-M-4 | Variable[2] | $ | 90,740.00 | January 25, 2036 |

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

| | | | | |
|---|---|---|---|---|
| II-M-5 | Variable[2] | $ | 64,820.00 | January 25, 2036 |
| II-M-6 | Variable[2] | $ | 48,970.00 | January 25, 2036 |
| II-B-1 | Variable[2] | $ | 60,490.00 | January 25, 2036 |
| II-B-2 | Variable[2] | $ | 41,770.00 | January 25, 2036 |
| II-B-3 | Variable[2] | $ | 40,330.00 | January 25, 2036 |
| II-B-4 | Variable[2] | $ | 41,770.00 | January 25, 2036 |
| ZZ | Variable[2] | $ | 3,059,373.66 | January 25, 2036 |

[1]   For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Group II Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC II Regular Interest.

[2]   Calculated in accordance with the definition of "Uncertificated REMIC II Pass-Through Rate" herein

## REMIC III

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests and REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC III". The Class I-R-2 Certificates will represent the sole class of Residual Interests in REMIC III for purposes of the REMIC Provisions.

The following table irrevocably sets forth the designation, Pass-Through Rate, Initial Certificate Principal Balance (or initial Uncertificated Principal Balance, in the case of the Class I-C Interest or Class II-C Interest) and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each class of Certificates or interests that represents ownership of one or more of the Regular Interests in REMIC III created hereunder:

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

| Designation | Pass-Through Rate | Initial Certificate or Uncertificated Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| I-A | Variable[2] | $ 284,640,000.00 | June 25, 2036 |
| I-M | Variable[2] | $ 5,588,000.00 | June 25, 2036 |
| I-B-1 | Variable[2] | $ 7,620,000.00 | June 25, 2036 |
| I-B-2 | Variable[2] | $ 5,418,000.00 | June 25, 2036 |
| I-B-3 | Variable[2] | $ 4,741,000.00 | June 25, 2036 |
| I-B-4 | Variable[2] | $ 5,418,000.00 | June 25, 2036 |
| I-C Interest | Variable[2][3] | $ 25,230,416.85 | June 25, 2036 |
| II-A-1 | Variable[2] | $ 97,226,000.00 | January 25, 2036 |
| II-A-2 | Variable[2] | $ 53,803,000.00 | January 25, 2036 |
| II-A-3 | Variable[2] | $ 43,423,000.00 | January 25, 2036 |
| II-M-1 | Variable[2] | $ 15,844,000.00 | January 25, 2036 |
| II-M-2 | Variable[2] | $ 14,692,000.00 | January 25, 2036 |
| II-M-3 | Variable[2] | $ 6,337,000.00 | January 25, 2036 |
| II-M-4 | Variable[2] | $ 9,074,000.00 | January 25, 2036 |
| II-M-5 | Variable[2] | $ 6,482,000.00 | January 25, 2036 |
| II-M-6 | Variable[2] | $ 4,897,000.00 | January 25, 2036 |
| II-B-1 | Variable[2] | $ 6,049,000.00 | January 25, 2036 |
| II-B-2 | Variable[2] | $ 4,177,000.00 | January 25, 2036 |
| II-B-3 | Variable[2] | $ 4,033,000.00 | January 25, 2036 |
| II-B-4 | Variable[2] | $ 4,177,000.00 | January 25, 2036 |
| II-C Interest | Variable[2][3] | $ 17,861,683.10 | January 25, 2036 |

---

[1]   For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Group I Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for the Class I-A, Class I-M and Class I-B Certificates and the Class I-C Interest, and the Distribution Date immediately following the maturity date for the Group II Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for the Class II-A, Class II-M and Class II-B Certificates and the Class II-C Interest.

[2]   Calculated in accordance with the definition of "Pass-Through Rate" herein.

[3]   The Class I-C Interest and Class II-C Interest will not accrue interest on their Uncertificated Principal Balances, but will accrue interest on their respective Uncertificated Notional Amounts as described herein.

4

## REMIC IV

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Class I-C Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC IV". The Class I-RX Certificates represent the sole class of Residual Interests in REMIC IV for purposes of the REMIC Provisions.

The following table sets forth the Class designation, Pass-Through Rate, Initial Certificate Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Class of Certificates that represents a Regular Interest in REMIC IV created hereunder:

| Class Designation | Pass-Through Rate | Initial Certificate Principal Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| I-C | Variable[2] | $      25,230,416.85 | June 25, 2036 |

---

[1]   For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Group I Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for the Class I-C Certificates.

[2]   The Class I-C Certificates will not accrue interest on their uncertificated principal balance, but will receive 100% of amounts received in respect of the Class I-C Interest.

## REMIC V

As provided herein, the Securities Administrator on behalf of the Trustee will elect to treat the segregated pool of assets consisting of the Class II-C Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC V". The Class II-RX Certificates represent the sole class of Residual Interests in REMIC V for purposes of the REMIC Provisions.

The following table sets forth the Class designation, Pass-Through Rate, Initial Certificate Principal Balance and, for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Class of Certificates that represents a Regular Interest in REMIC V created hereunder:

[TPW: NYLEGAL:409898.8] 17297-00382  02/23/2007 09.01 PM

| Class Designation | Pass-Through Rate | Initial Certificate Principal Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| II-C | Variable[2] | $ 17,861,683.10 | January 25, 2036 |

---

[1]    For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Group II Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for the Class II-C Certificates.

[2]    The Class II-C Certificates will not accrue interest on their uncertificated principal balance, but will receive 100% of amounts received in respect of the Class II-C Interest.

The Trust Fund shall be named, and may be referred to as, the "SACO I Trust 2005-10." The Certificates issued hereunder may be referred to as "Mortgage-Backed Certificates, Series 2005-10" (including for purposes of any endorsement or assignment of a Mortgage Note or Mortgage).

In consideration of the mutual agreements herein contained, the Depositor, the Master Servicer, the Securities Administrator, the Seller, the Company and the Trustee agree as follows:

6

# ARTICLE I

## DEFINITIONS

### Section 1.01   Defined Terms.

Whenever used in this Agreement, the following words and phrases, unless otherwise expressly provided or unless the context otherwise requires, shall have the meanings specified in this Article.

Accepted Master Servicing Practices: With respect to any Mortgage Loan those customary mortgage master servicing practices of prudent mortgage master servicing institutions that master service mortgage loans, of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, to the extent applicable to the Master Servicer (except in its capacity as successor to the Company or a Servicer).

Accepted Servicing Practices: With respect to each EMC Mortgage Loan, those customary mortgage servicing practices (including collection procedures) that are in accordance with all applicable statutes, regulations and prudent mortgage banking practices for mortgage loans of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

Account: The Distribution Account, the Master Servicer Collection Account, the Group I Reserve, the Group II Reserve Fund and the Protected Account.

Accrual Period: With respect to the Certificates (other than the Class C Certificates and the Residual Certificates) and any Distribution Date, the period from and including the immediately preceding Distribution Date (or with respect to the first Accrual Period, the Closing Date) to and including the day prior to such Distribution Date. With respect to the Class C Certificates and Class C Interests and any Distribution Date, the calendar month immediately preceding such Distribution Date. All calculations of interest on the Certificates (other than the Class C Certificates and the Residual Certificates) will be made on the basis of the actual number of days elapsed in the related Accrual Period. All calculations of interest on the Class C Certificates and Class C Interests will be made on the basis of a 360-day year consisting of twelve 30-day months.

Advance: An advance of delinquent payments of principal or interest in respect of a Mortgage Loan required to be made by the Company as provided in Section 6.01(a) hereof or by the related Servicer and Master Servicer as provided in Section 6.01(b) hereof.

Agreement: This Pooling and Servicing Agreement and any and all amendments or supplements hereto made in accordance with the terms herein.

Amount Held for Future Distribution: As to any Distribution Date and the EMC Mortgage Loans, the aggregate amount held in the Company's Protected Account at the close of business on the immediately preceding Determination Date on account of (i) all Scheduled Payments or portions thereof received in respect of the EMC Mortgage Loans due after the related Due Period and (ii) Principal Prepayments, Liquidation Proceeds, Subsequent Recoveries

7

and Insurance Proceeds received in respect of such Mortgage Loans after the last day of the related Prepayment Period. As to any Distribution Date and the Mortgage Loans serviced by any Servicer other than EMC, the aggregate amount held in the Servicer's Protected Account at the close of business on the immediately preceding Business Day on account of (i) all principal payments or portions thereof received in respect of such Mortgage Loans serviced by it due after the related Due Period and (ii) Principal Prepayments, Liquidation Proceeds, Subsequent Recoveries and Insurance Proceeds received in respect of such Mortgage Loans after the last day of the related Prepayment Period.

Applied Realized Loss Amount: With respect to any Distribution Date and any Class of Class A, Class M and Class B Certificates, the sum of the Realized Losses with respect to the Mortgage Loans that have been applied in reduction of the Certificate Principal Balance of a Class of Certificates pursuant to Section 6.05 of this Agreement which have not previously been reimbursed or reduced by any Subsequent Recoveries applied to such Applied Realized Loss Amount.

Appraised Value: With respect to any Mortgage Loan originated in connection with a refinancing, the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing or, with respect to any other Mortgage Loan, the lesser of (x) the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan, and (y) the sales price of the Mortgaged Property at the time of such origination.

Assignment Agreement: Shall mean the First Horizon Assignment Agreement, the Nexstar Assignment Agreement, the US Mortgage Assignment Agreement and the Washington Mutual Assignment Agreement.

Basis Risk Shortfall Carry Forward Amount: The Group I Basis Risk Shortfall Carry Forward Amount and Group II Basis Risk Shortfall Carry Forward Amount.

Bankruptcy Code: Title 11 of the United States Code.

Book-Entry Certificates: Any of the Certificates that shall be registered in the name of the Depository or its nominee, the ownership of which is reflected on the books of the Depository or on the books of a Person maintaining an account with the Depository (directly, as a "Depository Participant", or indirectly, as an indirect participant in accordance with the rules of the Depository and as described in Section 7.06). As of the Closing Date, each Class of Regular Certificates (other than the Class B-4 Certificates and Class C Certificates) constitutes a Class of Book-Entry Certificates.

Business Day: Any day other than (i) a Saturday or a Sunday, or (ii) a day on which banking institutions in The City of New York, New York, Chicago, Illinois, Minneapolis, Minnesota or the city in which the Corporate Trust Office of the Trustee or the Securities Administrator or the principal office of the Company or the Master Servicer is located are authorized or obligated by law or executive order to be closed.

Certificate: Any one of the certificates of any Class executed and authenticated by the Securities Administrator in substantially the forms attached hereto as Exhibits A-1 through A-5.

8

Certificate Margin: With respect to the Class I-A Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-A, 0.260% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.520% per annum in the case of each Distribution Date thereafter.

With respect to the Class I-M Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-M, 1.000% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.500% per annum in the case of each Distribution Date thereafter.

With respect to the Class I-B-1 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-B-1, 2.000% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.000% per annum in the case of each Distribution Date thereafter.

With respect to the Class I-B-2 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-B-2, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class I-B-3 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-B-3, 3.300% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 4.950% per annum in the case of each Distribution Date thereafter.

With respect to the Class I-B-4 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC I Regular Interest I-B-4, 3.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 5.250% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-A-1 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-A-1, 0.260% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.520% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-A-2 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-A-2, 0.100% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.200% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-A-3 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-A-3, 0.330% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.660% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-1 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-1, 0.500% per annum in the case of each

Distribution Date through and including the first possible Optional Termination Date and 0.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-2 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-2, 0.550% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.825% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-3 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-3, 0.600% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 0.900% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-4 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-4, 0.900% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.350% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-5 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-5, 0.950% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.425% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-M-6 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-M-6, 1.000% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 1.500% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-B-1 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-B-1, 2.000% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.000% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-B-2 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-B-2, 2.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 3.750% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-B-3 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-B-3, 3.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 5.250% per annum in the case of each Distribution Date thereafter.

With respect to the Class II-B-4 Certificates and, for purposes of the definition of "Pass-Through Rate", REMIC II Regular Interest II-B-4, 3.500% per annum in the case of each Distribution Date through and including the first possible Optional Termination Date and 5.250% per annum in the case of each Distribution Date thereafter.

Certificate Notional Amount:   With respect to the Class I-C Certificates and any Distribution Date, an amount equal to the Stated Principal Balance of the Mortgage Loans as of the beginning of the related Due Period. The initial Certificate Notional Amount of the Class I-C Certificates shall be $338,655,416.85.   With respect to the Class II-C Certificates and any Distribution Date, an amount equal to the Stated Principal Balance of the Mortgage Loans as of the beginning of the related Due Period. The initial Certificate Notional Amount of the Class II-C Certificates shall be $288,075,683.10.   For federal income tax purposes, the Certificate Notional Amount for the Class I-C Certificates and any Distribution Date shall be an amount equal to the Uncertificated Notional Amount for the Class I-C Interest for such Distribution Date.   For federal income tax purposes, the Certificate Notional Amount for the Class II-C Certificates and any Distribution Date shall be an amount equal to the Uncertificated Notional Amount for the Class II-C Interest for such Distribution Date.

Certificate Owner: With respect to a Book-Entry Certificate, the Person that is the beneficial owner of such Book-Entry Certificate.

Certificate Principal Balance: As to any Certificate (other than any Class C Certificate and any Class R Certificate) and as of any Distribution Date, the Initial Certificate Principal Balance of such Certificate plus, in the case of a Class A, Class M or Class B Certificate, any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate pursuant to Section 6.04(b), less the sum of (i) all amounts distributed with respect to such Certificate in reduction of the Certificate Principal Balance thereof on previous Distribution Dates pursuant to Section 6.04, and (ii) any Applied Realized Loss Amounts allocated to such Certificate on previous Distribution Dates. As to any Class I-C Certificates and as of any Distribution Date, an amount equal to the Uncertificated Principal Balance of the Class I-C Interest. As to any Class II-C Certificates and as of any Distribution Date, an amount equal to the Uncertificated Principal Balance of the Class II-C Interest.

Certificate Register: The register maintained pursuant to Section 7.02 hereof.

Certificateholder or Holder: The Person in whose name a Certificate is registered in the Certificate Register (initially, Cede & Co., as nominee for the Depository, in the case of any Book-Entry Certificates).

Class: All Certificates bearing the same Class designation as set forth in Section 7.01 hereof.

Class A Certificates: Any of the Class I-A Certificates or Class II-A Certificates.

Class B Certificates: Any of the Class I-B Certificates or Class II-B Certificates.

Class B-4 Certificates: Any of the Class I-B-4 Certificates and Class II-B-4 Certificates

Class C Certificate: Any of the Class I-C Certificates or Class II-C Certificates.

Class C Interest: Any of the Class I-C Interest or Class II-C Interest.

11

Class I-A Certificate: Any Certificate designated as a "Class I-A Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class I-A Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-A Deficiency: A deficiency amount as defined in the Class I-A Policy.

Class I-A Insurance Agreement: The Insurance and Indemnity Agreement dated as of December 30, 2005 among the Class I-A Insurer, the Seller, the Depositor, the Securities Administrator, the Master Servicer and the Trustee.

Class I-A Insurer: Ambac Assurance Corporation, a stock insurance corporation organized and created under the laws of the State of Wisconsin, or any successor thereto.

Class I-A Insurer Default: The existence and continuance of any of the following: (a) The Class I-A Insurer fails to make a payment required under the Class I-A Policy in accordance with its terms; or (b)(i) the Class I-A Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code, the New York Insurance Law or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code, the New York Insurance Law or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization that is final and nonappealable; or (ii) a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Class I-A Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Class I-A Insurer (or the taking of possession of all or any material portion of the property of the Class I-A Insurer).

Class I-A Insurer Premium Amount: With respect to the Class I-A Policy and each Distribution Date, an amount equal to the product of the applicable Class I-A Insurer Premium Rate and the Certificate Principal Balance of the Class I-A Certificates immediately prior to such Distribution Date.

Class I-A Insurer Premium Rate: A percentage equal to one-twelfth (1/12) of the related "premium percentage" for the Class I-A Certificates as set forth in the Class I-A Insurance Agreement.

Class I-A Notice of Nonpayment: Written notice in the form of Exhibit A to the Class I-A Insurance Agreement.

Class I-A Policy: The certificate guaranty insurance policy, policy number ABO961BE, including any endorsements thereto, issued by the Class I-A Insurer with respect to the Class I-A Certificates, in the form attached hereto as Exhibit N.

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09:01 PM

Class I-A Policy Payments Account: The separate Eligible Account (as defined by clause (iii) of the definition) created and maintained by the Securities Administrator pursuant to Section 6.10(c) in the name of the Securities Administrator on behalf of the Trustee for the benefit of the Class I-A Certificateholders and designated "LaSalle Bank National Association, as Securities Administrator on behalf of Citibank, N.A. as Trustee for the benefit of holders of Bear Stearns Asset Backed Securities I LLC, Mortgage-Backed Certificates, Class I-A." Funds in the Class I-A Policy Payments Account shall be held in trust for the Class I-A Certificateholders for the uses and purposes set forth in this Agreement.

Class I-A Principal Distribution Amount: For any Distribution Date an amount equal to the lesser of (I) the Group I Principal Distribution Amount for such Distribution Date and (II) an amount equal to the excess (if any) of (A) the Certificate Principal Balance of the Class I-A Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 68.10% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class I-A Reimbursement Amount: The sum of (a) the aggregate unreimbursed amount of any payments made by the Class I-A Insurer under the Class I-A Policy, together with interest on such amount from the date of payment by the Class I-A Insurer until paid in full at the Late Payment Rate (as defined in the Class I-A Insurance Agreement) and (b) any other amounts owed to the Class I-A Insurer under the Class I-A Insurance Agreement or pursuant to Section 6.10 together with interest accrued thereon at the Late Payment Rate, as defined in the Class I-A Insurance Agreement.

Class I-B Certificates: Any of the Class I-B-1, Class I-B-2, Class I-B-3 or Class I-B-4 Certificates.

Class I-B-1 Certificate: Any Certificate designated as a "Class I-B-1 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-B-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-B-1 Principal Distribution Amount: For any Distribution Date, an amount equal to, the lesser of (I) the Group I Principal Distribution Amount remaining after distribution of the Class I-A Principal Distribution Amount and the Class I-M Principal Distribution Amount and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class I-A Certificates and Class I-M Certificates (after taking into account the payment of the Class I-A Principal Distribution Amount and the Class I-M Principal Distribution

13

Amount) and (2) the Certificate Principal Balance of the Class I-B-1 Certificates immediately prior to that Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 75.90% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class I-B-2 Certificate: Any Certificate designated as a "Class I-B-2 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-B-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-B-2 Principal Distribution Amount: For any Distribution Date an amount equal to, the lesser of (I) the Group I Principal Distribution Amount remaining after distribution of the Class I-A Principal Distribution Amount, the Class I-M Principal Distribution Amount and the Class I-B-1 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class I-A, Class I-M and Class I-B-1 Certificates (after taking into account the payment of the Class I-A Principal Distribution Amount, Class I-M Principal Distribution Amount and the Class I-B-1 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class I-B-2 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 79.10% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class I-B-3 Certificate: Any Certificate designated as a "Class I-B-3 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-B-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-B-3 Principal Distribution Amount: For any Distribution Date an amount equal to the lesser of (I) the Group I Principal Distribution Amount remaining after distribution of the

14

Class I-A Principal Distribution Amount, the Class I-M Principal Distribution Amount, the Class I-B-1 Principal Distribution Amount and the Class I-B-2 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class I-A, Class I-M, Class I-B-1 and Class I-B-2 Certificates (after taking into account the payment of the Class I-A Principal Distribution Amount, Class I-M Principal Distribution Amount, Class I-B-1 Principal Distribution Amount and the Class I-B-2 Principal Distribution Amount for that for that Distribution Date) and (2) the Certificate Principal Balance of the Class I-B-3 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group I Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 81.90% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class I-B-4 Certificate: Any Certificate designated as a "Class I-B-4 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-B-4 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-B-4 Principal Distribution Amount: For any Distribution Date an amount equal to the lesser of (I) the Group I Principal Distribution Amount remaining after distribution of the Class I-A Principal Distribution Amount, the Class I-M Principal Distribution Amount, the Class I-B-1 Principal Distribution Amount, the Class I-B-2 Principal Distribution Amount and the Class I-B-3 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class I-A, Class I-M, Class I-B-1, Class I-B-2 and Class I-B-3 Certificates (after taking into account the payment of the Class I-A Principal Distribution Amount, the Class I-M-1 Principal Distribution Amount, the Class I-B-1 Principal Distribution Amount, the Class I-B-2 Principal Distribution Amount and the Class I-B-3 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class I-B-4 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) approximately 85.10% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

Class I-C Certificate: Any Certificate designated as a "Class I-C Certificate" on the face thereof, in the form of Exhibit A-4 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-C Certificates herein and evidencing (i) a Regular Interest in REMIC IV, (ii) the obligation to pay the Group I Basis Risk Shortfall Carry Forward Amount and (iii) the right to receive Prepayment Charge Waiver Amounts related to any Group I Mortgage Loans.

Class I-C Distribution Amount: With respect to any Distribution Date, the sum of (i) the Current Interest for the Class I-C Interest for such Distribution Date, (ii) any Group I Overcollateralization Release Amount for such Distribution Date and (iii) without duplication, any Subsequent Recoveries not distributed to the Class I-A, Class I-M and Class I-B Certificates on such Distribution Date; provided, however, on any Distribution Date after the Distribution Date on which the Certificate Principal Balances of the Class I-A, Class I-M and Class I-B Certificates have been reduced to zero, the Class I-C Distribution Amount shall include the Group I Overcollateralization Amount.

Class I-C Interest: An uncertificated interest in the Trust Fund held by the Trustee on behalf of the Holders of the Class I-C Certificates, evidencing a Regular Interest in REMIC III for purposes of the REMIC Provisions.

Class I-M Certificates: Any Certificate designated as a "Class I-M Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class I-M-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group I Basis Risk Shortfall Carry Forward Amount.

Class I-M Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group I Principal Distribution Amount for such Distribution Date after distribution of the Class I-A Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balance of the Class I-A Certificates (after taking into account the distribution of the Class I-A Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class I-M-1 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 71.40% and (y) (1) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class I-R Certificate: Any of the Class I-R-1, Class I-R-2 and Class I-RX Certificates.

16

Class I-R-1 Certificate: Any Certificate designated a "Class I-R-1 Certificate" on the face thereof, in substantially the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC I and representing the right to the Percentage Interest of distributions provided for the Class I-R-1 Certificates as set forth herein.

Class I-R-2 Certificate: Any Certificate designated a "Class I-R-2 Certificate" on the face thereof, in substantially the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC III and representing the right to the Percentage Interest of distributions provided for the Class I-R-2 Certificates as set forth herein.

Class I-RX Certificate: Any Certificate designated a "Class I-RX Certificate" on the face thereof, in substantially the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC IV and representing the right to the Percentage Interest of distributions provided for the Class I-RX Certificates as set forth herein.

Class II-A Certificates:   Any of the Class II-A-1, Class II-A-2 and Class II-A-3 Certificates.

Class II-A-1 Certificate: Any Certificate designated as a "Class II-A-1 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class II-A-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-A-2 Certificate: Any Certificate designated as a "Class II-A-2 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class II-A-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-A-3 Certificate: Any Certificate designated as a "Class II-A-3 Certificate" on the face thereof, in the form of Exhibit A-1 hereto, representing the right to the Percentage Interest of distributions provided for the Class II-A-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-A Principal Distribution Amount: For any Distribution Date an amount equal to the lesser of (I) the Group II Principal Distribution Amount for such Distribution Date and (II) an amount equal to the excess (if any) of (A) the Certificate Principal Balance of the Class II-A Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for related Realized Losses incurred during the related Due Period) and (2) 35.00% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent

17

received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-B Certificates: Any of the Class II-B-1, Class II-B-2, Class II-B-3 or Class II-B-4 Certificates.

Class II-B-1 Certificate: Any Certificate designated as a "Class II-B-1 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-B-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.--

Class II-B-1 Principal Distribution Amount: For any Distribution Date an amount equal to, the lesser of (I) the Group II Principal Distribution Amount remaining after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount and the Class II-M-6 Principal Distribution Amount and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5 and Class II-M-6 Certificates (after taking into account the payment of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount and the Class II-M-6 Principal Distribution Amount) and (2) the Certificate Principal Balance of the Class II-B-1 Certificates immediately for that Distribution Date, over (B) the lesser of (x) the product of (I) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 79.00% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) Group II Overcollateralization Floor.

Class II-B-2 Certificate: Any Certificate designated as a "Class II-B-2 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-B-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-B-2 Principal Distribution Amount: For any Distribution Date an amount equal to, the lesser of (I) the Group II Principal Distribution Amount remaining after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the

18

Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount and the Class II-B-1 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6 and Class II-B-1 Certificates (after taking into account the payment of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount and the Class II-B-1 Principal Distribution Amount) and (2) the Certificate Principal Balance of the Class II-B-3 Certificates immediately for that Distribution Date and (2) the Certificate Principal Balance of the Class II-B-2 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 81.90% and (y) (I) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-B-3 Certificate: Any Certificate designated as a "Class II-B-3 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-B-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-B-3 Principal Distribution Amount: For any Distribution Date an amount equal to, the lesser of (I) the Group II Principal Distribution Amount remaining after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount, the Class II-B-1 Principal Distribution Amount and the Class II-B-2 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1 and Class II-B-2 Certificates (after taking into account the payment of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount, Class II-B-1 Principal Distribution Amount and the Class II-B-2 Principal Distribution Amount for that for that Distribution Date) and (2) the Certificate Principal Balance of the Class II-B-3 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Loans as of the last day of the related Due Period (after giving effect to scheduled payments

of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 84.70% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-B-4 Certificate: Any Certificate designated as a "Class II-B-4 Certificate" on the face thereof, in the form of Exhibit A-3 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-B-4 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-B-4 Principal Distribution Amount: For any Distribution Date an amount equal to, the lesser of (I) the Group II Principal Distribution Amount remaining after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount, the Class II-B-1 Principal Distribution Amount, the Class II-B-2 Principal Distribution Amount and the Class II-B-3 Principal Distribution Amount on such Distribution Date and (II) an amount equal to the excess (if any) of (A) the sum of (I) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1, Class II-B-2 and Class II-B-3 Certificates (after taking into account the payment of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount, the Class II-M-5 Principal Distribution Amount, the Class II-M-6 Principal Distribution Amount, the Class II-B-1 Principal Distribution Amount, the Class II-B-2 Principal Distribution Amount and the Class II-B-3 Principal Distribution Amount for that Distribution Date) and (2) the Certificate Principal Balance of the Class II-B-4 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 87.60% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group I Overcollateralization Floor.

Class II-C Certificate: Any Certificate designated as a "Class II-C Certificate" on the face thereof, in the form of Exhibit A-4 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-C Certificates herein and evidencing (i) a Regular Interest in REMIC V, (ii) the obligation to pay the Group II Basis Risk Shortfall Carry Forward Amounts

20

and (iii) the right to receive Prepayment Charge Waiver Amounts related to any Group II Mortgage Loans.

Class II-C Distribution Amount:  With respect to any Distribution Date, the sum of (i) the Current Interest for the Class II-C Interest for such Distribution Date, (ii) any Group II Overcollateralization Release Amount for such Distribution Date and (iii) without duplication, any Subsequent Recoveries not distributed to the Class II-A, Class II-M and Class II-B Certificates on such Distribution Date; provided, however, on any Distribution Date after the Distribution Date on which the Certificate Principal Balances of the Class II-A, Class II-M and Class II-B Certificates have been reduced to zero, the Class II-C Distribution Amount shall include the Group II Overcollateralization Amount.

Class II-C Interest:  An uncertificated interest in the Trust Fund held by the Trustee on behalf of the Holders of the Class II-C Certificates, evidencing a Regular Interest in REMIC III for purposes of the REMIC Provisions.

Class II-M-1 Certificates: Any Certificate designated as a "Class II-M-1 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-1 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-M-1 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balance of the Class II-A Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-1 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 46.00% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-M-2 Certificate: Any Certificate designated as a "Class II-M-2 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-2 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

21

Class II-M-2 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount and the Class II-M-1 Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balances of the Class II-A Certificates and Class II-M-1 Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount and the Class II-M-1 Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-2 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 56.20% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-M-3 Certificate: Any Certificate designated as a "Class II-M-3 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-3 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-M-3 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount and the Class II-M-2 Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1 and Class II-M-2 Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount and the Class II-M-2 Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-3 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 60.60% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-M-4 Certificate: Any Certificate designated as a "Class II-M-4 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-4 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-M-4 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount and the Class II-M-3 Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2 and Class II-M-3 Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount and the Class II-M-3 Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-4 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 66.90% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-M-5 Certificate: Any Certificate designated as a "Class II-M-5 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-5 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-M-5 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount and the Class II-M-4 Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3 and Class II-M-4 Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount and the Class II-M-4 Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-5 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the

23

related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 71.40% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-M-6 Certificate: Any Certificate designated as a "Class II-M-6 Certificate" on the face thereof, in the form of Exhibit A-2 hereto, representing the right to its Percentage Interest of distributions provided for the Class II-M-6 Certificates as set forth herein and evidencing (i) a Regular Interest in REMIC III and (ii) the right to receive the related Group II Basis Risk Shortfall Carry Forward Amount.

Class II-M-6 Principal Distribution Amount: For any Distribution Date, an amount equal to the lesser of (I) the remaining Group II Principal Distribution Amount for such Distribution Date after distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount, the Class II-M-4 Principal Distribution Amount and the Class II-M-5 Principal Distribution Amount and (II) an amount equal to the excess, (if any), of (A) the sum of (1) the Certificate Principal Balances of the Class II-A, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4 and Class II-M-5 Certificates (after taking into account the distribution of the Class II-A Principal Distribution Amount, the Class II-M-1 Principal Distribution Amount, the Class II-M-2 Principal Distribution Amount, the Class II-M-3 Principal Distribution Amount the Class II-M-4 Principal Distribution Amount and the Class II-M-5 Principal Distribution Amount on such Distribution Date) and (2) the Certificate Principal Balance of the Class II-M-6 Certificates immediately prior to such Distribution Date, over (B) the lesser of (x) the product of (I) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (2) 74.80% and (y) (1) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period), less (2) the Group II Overcollateralization Floor.

Class II-R Certificate: Any of the Class II-R-I Certificates and Class II-RX Certificates.

Class II-R-1 Certificate: Any Certificate designated a "Class II-R-1 Certificate" on the face thereof, in substantially the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC II and representing the right to the Percentage Interest of distributions provided for the Class II-R-1 Certificates as set forth herein.

Class II-RX Certificate: Any Certificate designated a "Class II-RX Certificate" on the face thereof, in substantially the form set forth in Exhibit A-5 hereto, evidencing the Residual Interest in REMIC V and representing the right to the Percentage Interest of distributions provided for the Class II-RX Certificates as set forth herein.

Class M Certificates: Any of the Class I-M Certificates and Class II-M Certificates.

Class R Certificate: Any of the Class I-R Certificates and Class II-R Certificates.

Closing Date: December 30, 2005.

Code: The Internal Revenue Code of 1986, including any successor or amendatory provisions.

Combined Loan-to-Value Ratio: With respect to any Mortgage Loan and as of any date of determination, the fraction (expressed as a percentage) the numerator of which is the sum of (i) original principal balance of the related Mortgage Loan at such date of determination and (ii) the unpaid principal balance of the related first lien Mortgage Loan as of the date of origination of that Mortgage Loan and the denominator of which is the applicable Appraised Value of the related Mortgaged Property at origination.

Company: EMC.

Compensating Interest: With respect to any Distribution Date, (i) in the case of any Servicer, an amount, not to exceed the Servicing Fee, to be deposited in the Protected Account by such Servicer with respect to the payment of a Prepayment Interest Shortfall on an Mortgage Loan subject to this Agreement and (ii) in the case of the Master Servicer, an amount not to exceed that portion of the Master Servicing Fee payable to the Master Servicer. If the a Servicer fails to make such payment, the Master Servicer shall be obligated to do so to the extent provided in Section 6.02(b) hereof.

Corporate Trust Office: (i) With respect to the Trustee, the designated corporate trust office of the Trustee, currently located at Citibank, N.A., 388 Greenwich Street, 14th Floor, New York, New York 10013, and (ii) with respect to the Securities Administrator, the designated office of the Securities Administrator currently located at 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603 Attention: Global Securities and Trust Services Group — SACO 2005-10 or at such other address as the Trustee or Securities Administrator, as applicable, may designate from time to time by notice to the Certificateholders, the Depositor, the Trustee, the Master Servicer, the Securities Administrator and EMC or at the principal corporate trust office of any successor Trustee.

Corresponding Certificate: With respect to each REMIC I Regular Interest (other than REMIC I Regular Interests AA and ZZ) and each REMIC II Regular Interest (other than REMIC II Regular Interests AA and ZZ), the Certificate with the corresponding designation.

Cumulative Realized Loss Percentage: With respect to the Certificates and any Distribution Date, the percentage obtained by dividing (x) the aggregate Realized Losses on the Mortgage Loans incurred since the related Cut-off Date through the end of the related Due

25

Period by (y) the aggregate  Stated Principal Balance of the Mortgage Loans as of the related Cut-off Date.

Current Interest: As of any Distribution Date, with respect to the Certificates and interests of each class (other than the Residual Certificates), (i) the interest accrued on the Certificate Principal Balance or Uncertificated Notional Amount, as applicable, during the related Accrual Period at the applicable Pass-Through Rate, or the interest otherwise payable thereto, plus any amount previously distributed with respect to interest for such Certificate or Interest that has been recovered as a voidable preference by a trustee in bankruptcy minus (ii) the sum of (a) any Prepayment Interest Shortfall for such Distribution Date, to the extent not covered by Compensating Interest and (b) any Relief Act Interest Shortfalls during the related Due Period, provided, however, that for purposes of calculating Current Interest for any such class, amounts specified in clause (ii) hereof for any such Distribution Date shall be allocated first to the related Class C Certificates, Class C Interests and Residual Certificates in reduction of amounts otherwise distributable to such Certificates and interests on such Distribution Date and then any excess shall be allocated to each Class of related Class A, Class M and Class B Certificates *pro rata* based on the respective amounts of interest accrued pursuant to clause (i) hereof for each such Class on such Distribution Date.

Custodial Agreements: Any of the LaSalle Custodial Agreement or Wells Fargo Custodial Agreement, as applicable.

Custodians: (i) Wells Fargo Bank, National Association, or any successor custodian appointed pursuant to the provisions hereof and the Wells Fargo Custodial Agreement and (ii) LaSalle Bank National Association, or any successor custodian appointed pursuant to the provisions hereof and the LaSalle Custodial Agreement.

Cut-off Date: The close of business on December 1, 2005.

Cut-off Date Principal Balance: As to any Mortgage Loan, the unpaid principal balance thereof as of the close of business on the Cut-off Date after application of all Principal Prepayments received prior to the Cut-off Date and scheduled payments of principal due on or before the Cut-off Date, whether or not received, but without giving effect to any installments of principal received in respect of Due Dates after the Cut-off Date. The Cut-off Date Principal Balance of the Group I Mortgage Loans and Group II Mortgage Loans is, 338,655,416.85 and 288,075,683.10, respectively, and the aggregate Cut-off Date Principal Balance of the Mortgage Loans is $626,731,099.95.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for such Mortgage Loan that became final and non-appealable, except such a reduction resulting from a Deficient Valuation or any other reduction that results in a permanent forgiveness of principal.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under such Mortgage Loan, or any reduction in the amount of principal to be paid

26

in connection with any Scheduled Payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court that is final and non-appealable in a proceeding under the Bankruptcy Code.

Definitive Certificates: As defined in Section 7.06.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced by a Replacement Mortgage Loan.

Delinquent: A Mortgage Loan is "delinquent" if any payment due thereon is not made pursuant to the terms of such Mortgage Loan by the close of business on the day such payment is scheduled to be due. A Mortgage Loan is "30 days delinquent" if such payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such payment was due, or, if there is no such corresponding day (e.g., as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month), then on the last day of such immediately succeeding month. Similarly for "60 days delinquent," "90 days delinquent" and so on.

Denomination: With respect to each Certificate, the amount set forth on the face thereof as the "Initial Principal Balance or Initial Notional Amount of this Certificate".

Depositor: Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company, or its successor in interest.

Depository: The initial Depository shall be The Depository Trust Company ("DTC"), the nominee of which is Cede & Co., or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended. The Depository shall initially be the registered Holder of the Book-Entry Certificates. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York.

Depository Agreement: With respect to the Class of Book-Entry Certificates, the agreement among the Depositor, the Securities Administrator and the initial Depository, dated as of the Closing Date, substantially in the form of Exhibit H.

Depository Participant: A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Designated Depository Institution: A depository institution (commercial bank, federal savings bank, mutual savings bank or savings and loan association) or trust company (which may include the Trustee, the Securities Administrator and the Master Servicer), the deposits of which are fully insured by the FDIC to the extent provided by law.

Determination Date: With respect to any Distribution Date, the 15th day of the month of such Distribution Date or, if such 15th day is not a Business Day, the immediately preceding Business Day.

27

Distribution Account: The segregated trust account or accounts created and maintained by the Securities Administrator pursuant to Section 5.08 in the name of the Trustee for the benefit of the Certificateholders and the Class I-A Insurer, which shall be entitled "LaSalle Bank National Association, as Securities Administrator, on behalf of Citibank, N.A., as Trustee, in trust for the registered holders of Bear Stearns Asset Backed Securities I LLC, SACO I Trust 2005-10, Mortgage-Backed Certificates, Series 2005-10." The Distribution Account must be an Eligible Account.

Distribution Account Deposit Date: Two Business Days prior to each Distribution Date.

Distribution Date: The 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day, commencing in January 2006.

Due Date: As to any Mortgage Loan, the date in each month on which the related Scheduled Payment is due, as set forth in the related Mortgage Note.

Due Period: With respect to any Distribution Date, the period from the second day of the calendar month preceding the calendar month in which such Distribution Date occurs through close of business on the first day of the calendar month in which such Distribution Date occurs.

Eligible Account: Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company, the long-term unsecured debt obligations and short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company, so long as Moody's is not a Rating Agency) are rated by each Rating Agency in one of its two highest long-term and its highest short-term rating categories, respectively, at the time any amounts are held on deposit therein, or (ii) an account or accounts in a depository institution or trust company in which such accounts are insured by the FDIC (to the limits established by the FDIC) and the uninsured deposits in which accounts are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to and satisfactory to the Trustee, the Securities Administrator, Class I-A Insurer and to each Rating Agency, the Certificateholders have a claim with respect to the funds in such account or a perfected first priority security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution or trust company in which such account is maintained, or (iii) a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company having capital and surplus of not less than $50,000,000, acting in its fiduciary capacity or (iv) any other account acceptable to each Rating Agency and the Class I-A Insurer, as evidenced in writing. Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the Trustee and the Securities Administrator.

EMC: EMC Mortgage Corporation, a Delaware corporation, and its successors and assigns, in its capacity as a seller of the Mortgage Loans to the Depositor.

28

EMC Mortgage Loans: The Mortgage Loans serviced by the Company pursuant to the terms of this Agreement and identified as such on the Mortgage Loan Schedule for which EMC is the applicable Seller.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

ERISA Restricted Certificates: Any of the Class C Certificates and Residual Certificates.

Event of Default: As defined in Section 9.01 hereof.

Excess Cashflow: The Group I Excess Cashflow or Group II Excess Cashflow.

Excess Liquidation Proceeds: To the extent not required by law to be paid to the related Mortgagor, the excess, if any, of any Liquidation Proceeds with respect to a Mortgage Loan over the Stated Principal Balance of such Mortgage Loan and accrued and unpaid interest at the related Mortgage Rate through the last day of the month in which the Mortgage Loan has been liquidated.

Excess Spread: The Group I Excess Spread and Group I Excess Spread.

Exemption: Prohibited Transaction Exemption 90-30, as amended from time to time.

Extraordinary Trust Fund Expenses: Any amounts reimbursable to the Trustee, or any director, officer, employee or agent of the Trustee, from the Trust Fund, and any amounts reimbursable, (other than Advances and Servicing Advances), to the Depositor, the Securities Administrator, the Master Servicer, any Custodian, or any director, officer, employee or agent thereof, and any other amounts payable or reimbursable from the Trust Fund as Extraordinary Trust Fund Expenses pursuant to the terms of the Pooling and Servicing Agreement and/or the Custodial Agreements, including Extraordinary Trust Fund Expenses that are not reimbursed in any calendar year as a result of the Extraordinary Trust Fund Expenses Cap. Extraordinary Trust Fund Expenses for any calendar year, to the extent they may exceed the Extraordinary Trust Fund Expenses Cap, shall be paid pro rata from the amounts available therefore.

Extraordinary Trust Fund Expenses Cap: $250,000 for each calendar year; provided, however, that such cap will not apply to any costs and expenses (i) of the Trustee incurred in connection with the termination of the Securities Administrator or the Master Servicer, the transfer of master servicing to a successor Master Servicer and any costs incurred with the replacement of either Custodian or (ii) of the Master Servicer incurred in connection with the termination of the Company or a Servicer and the transfer of servicing to a successor servicer.

Extra Principal Distribution Amount: The Group I Extra Principal Distribution Amount and Group II Extra Principal Distribution Amount.

Fannie Mae: Fannie Mae (formerly, Federal National Mortgage Association), or any successor thereto.

FDIC: The Federal Deposit Insurance Corporation, or any successor thereto.

29

Final Certification: The certification by a Custodian substantially in the form of Exhibit Three to the related Custodial Agreement.

Final Recovery Determination: With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by EMC (on its own behalf as a seller and on behalf of Master Funding) pursuant to or as contemplated by Section 2.04(d) or Section 11.01), a determination made by the Company pursuant to this Agreement or the Servicer pursuant to the Servicing Agreements that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which the Company or such Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered. The Master Servicer shall maintain records, based solely on information provided by the Company and the Servicer, of each Final Recovery Determination made thereby.

First Horizon: First Horizon Home Loan Corporation and any successor thereto.

First Horizon Assignment Agreement: The Assignment, Assumption and Recognition Agreement, dated as of December 30, 2005, among EMC, the Trustee, and First Tennessee evidencing the assignment of the First Horizon Servicing Agreement to the Trust.

First Horizon Loans: Those Mortgage Loans subject to this Agreement which were purchased by EMC from First Horizon pursuant to the First Horizon Servicing Agreement.

First Horizon Servicing Agreement: the Purchase, Warranties and Servicing Agreement, dated as of September 1, 2003, as amended on May 14, 2004, and that certain term sheet dated as of June 30, 2005, among EMC Mortgage Corporation, First Tennessee and First Horizon Home Loan Corporation.

First Tennessee: First Tennessee Mortgage Services, Inc.

Fiscal Quarter: December 1 to February 29 (or the last day in such month), March 1 to May 31, June 1 to August 31, or September 1 to November 30, as applicable.

Fitch: Fitch, Inc., and any successor thereto.

Freddie Mac: Federal Home Loan Mortgage Corporation, or any successor thereto.

Global Certificate: Any Certificate registered in the name of the Depository or its nominee, beneficial interests in which are reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly or as an indirect participant in accordance with the rules of such depository).

Group I Basis Risk Shortfall Carry Forward Amount: With respect to any Distribution Date and any Class of Class I-A, Class I-M and Class I-B Certificates, an amount equal to the sum of (A) the excess, if any, of (a) the amount of Current Interest that such Class would have been entitled to receive on such Distribution Date had the Pass-Though Rate applicable to such Class been calculated at a per annum rate equal to the lesser of (x) One-Month LIBOR plus the related Certificate Margin and (y) 11.00% per annum, over (b) the amount of Current Interest that such Class received on such Distribution Date if the Pass-Through Rate is limited to the

30

Group I Net Rate Cap and (B) the amount in clause (A) for all previous Distribution Dates not previously paid, together with interest thereon at a rate equal to the related Pass-Through Rate for each such Distribution Date.

Group I Certificates: The Group I Offered Certificates and the Class I-B-4, Class I-C and Class I-R Certificates.

Group I Current Specified Enhancement Percentage: With respect to any Distribution Date, the percentage obtained by dividing (x) the sum of (i) the aggregate Certificate Principal Balance of the Class I-M Certificates and Class I-B Certificates and (ii) the Group I Overcollateralization Amount, in each case prior to the distribution of the Group I Principal Distribution Amount on such Distribution Date, by (y) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the end of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period).

Group I Excess Cashflow: With respect to any Distribution Date, an amount, if any, equal to the sum of (a) the Group I Remaining Excess Spread for such Distribution Date and (b) the Group I Overcollateralization Release Amount for such Distribution Date.

Group I Excess Spread: With respect to any Distribution Date, the excess, if any, of (i) the Interest Funds for Loan Group I for such Distribution Date over (ii) the sum of the related Current Interest on the Class I-A, Class I-M and Class I-B Certificates and Interest Carry Forward Amounts on the Class I-A Certificates (other than Interest Carry Forward Amounts paid pursuant to Section 6.04(a)(3)(A)) and the Class I-A Insurer Premium Amount, in each case for such Distribution Date.

Group I Extra Principal Distribution Amount: With respect to any Distribution Date, the lesser of (i) the excess, if any, of the Group I Overcollateralization Target Amount for such Distribution Date over the Group I Overcollateralization Amount for such Distribution Date (after giving effect to distributions of principal on the Group I Certificates other than any Group I Extra Principal Distribution Amount) and (ii) the Group I Excess Spread for such Distribution Date.

Group I Mortgage Loan: A Group I Mortgage Loan transferred and assigned to the Trustee on the Closing Date pursuant to Section 2.01 and held as a part of the Trust, as identified in the Mortgage Loan Schedule.

Group I Net Rate Cap: With respect to any Distribution Date and any Class of Group I Certificates (other than the Class I-C Certificates and Class I-R Certificates), a per annum rate equal to the weighted average of the Net Mortgage Rates on the then outstanding Group I Mortgage Loans, weighted based on their Stated Principal Balances as of the related Due Date prior to giving effect to any reduction in the Stated Principal Balances of such Group I Mortgage Loans on such Due Date. The Group I Net Rate Cap for such Classes of Group I Certificate, will be calculated based on a 360-day year and the actual number of days elapsed in the related Accrual Period. For federal income tax purposes, however, the equivalent of the foregoing,

31

expressed as the weighted average of the Uncertificated REMIC I Pass-Through Rates on the REMIC I Regular Interests, weighted on the basis of the Uncertificated Principal Balances of each such REMIC I Regular Interest (adjusted for the actual number of days elapsed in the related Accrual Period).

Group I Remaining Excess Spread: With respect to any Distribution Date, the Group I Excess Spread less any Group I Extra Principal Distribution Amount, in each case for such Distribution Date.

Group I Offered Certificates: Any of the Class I-A, Class I-M, Class I-B-1, Class I-B-2 and Class I-B-3 Certificates.

Group I Optional Termination: The termination of the Group I Sub-Trust created hereunder as a result of the purchase of all of the Group I Mortgage Loans and any REO Property pursuant to the last sentence of Section 11.01 hereof.

Group I Optional Termination Date: The Distribution Date on which the Stated Principal Balance of all of the Group I Mortgage Loans is equal to or less than 20% of the Stated Principal Balance of all of the Group I Mortgage Loans as of the Cut-off Date.

Group I Overcollateralization Amount: With respect to any Distribution Date, the excess, if any, of the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for related Realized Losses incurred during the related Due Period) over the aggregate Certificate Principal Balance of the Group I Certificates (other than the Class I-C Certificates) on such Distribution Date (after taking into account the payment of principal other than any Group I Extra Principal Distribution Amount on such Certificates).

Group I Overcollateralization Floor: With respect to the Group I Certificates, an amount equal to 0.50% of the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the Cut-off Date.

Group I Overcollateralization Release Amount: With respect to any Distribution Date, the lesser of (x) the Group I Principal Remittance Amount for such Distribution Date and (y) the excess, if any, of (i) the Group I Overcollateralization Amount for such Distribution Date (assuming that 100% of the Group I Principal Remittance Amount is applied as a principal payment on such Distribution Date) over (ii) the Group I Overcollateralization Target Amount for such Distribution Date (with the amount pursuant to clause (y) deemed to be $0 if the Group I Overcollateralization Amount is less than or equal to the Group I Overcollateralization Target Amount on that Distribution Date).

Group I Overcollateralization Target Amount: With respect to any Distribution Date (a) prior to the Stepdown Date, 7.45% of the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the Cut-off Date, (b) on or after the Stepdown Date and if a Group I Trigger Event is not in effect, the greater of (i) the lesser of (1) 7.45% of the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the Cut-off Date and (2) 14.90% of the

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

then current aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (ii) the Group I Overcollateralization Floor or (c) on or after the Group I Stepdown Date and if a Group I Trigger Event is in effect, the Group I Overcollateralization Target Amount for the immediately preceding Distribution Date.

Group I Principal Distribution Amount:  With respect to any Distribution Date, an amount equal to (x) the sum of (1) the Group I Principal Remittance Amount for such Distribution Date and (2) any Group I Extra Principal Distribution Amount for such Distribution Date minus (y) the amount of any Group I Overcollateralization Release Amount for such Distribution Date.

Group I Principal Funds:  With respect to any Distribution Date and Loan Group I, (i) the sum, without duplication, of (a) all scheduled principal collected during the related Due Period, (b) all Advances relating to principal made on or before the Distribution Account Deposit Date with respect to the Group I Mortgage Loans, (c) Principal Prepayments with respect to the Group I Mortgage Loans exclusive of prepayment charges or penalties collected during the related Prepayment Period, (d) the Stated Principal Balance of each Group I Mortgage Loan that was repurchased by EMC on its own behalf as a Seller and on behalf of Master Funding) pursuant to Sections 2.02 and 2.03, (e) the aggregate of all Substitution Adjustment Amounts for the related Determination Date in connection with the substitution of any Group I Mortgage Loans pursuant to Section 2.03(d), (f) all Liquidation Proceeds and Subsequent Recoveries with respect to the Group I Mortgage Loans collected during the related Prepayment Period (to the extent such Liquidation Proceeds and Subsequent Recoveries relate to principal), in each case to the extent remitted by the Master Servicer to the Distribution Account pursuant to this Agreement and (g) amounts in respect of principal paid by the Majority Class I-C Certificateholder or the Master Servicer, as applicable, pursuant to Section 11.01, minus (ii) all amounts required to be reimbursed pursuant to Sections 5.02 and 5.09 or as otherwise set forth in this Agreement.

Group I Principal Remittance Amount:  With respect to each Distribution Date, the sum of the amounts listed in clauses (i)(a) through (i)(g) of the definition of Group I Principal Funds.

Group I Reserve Fund:  Shall mean the separate trust account created and maintained by the Securities Administrator pursuant to Section 4.14 hereof.

Group I Reserve Fund Deposit:  With respect to the Group I Reserve Fund, an amount equal to $5,000, which the Depositor shall initially deposit into the Group I Reserve Fund pursuant to Section 4.14 hereof.

Group I Senior Certificates:  Any of the Class I-A Certificates.

Group I Sixty-Day Plus Delinquency Percentage:  With respect to any Distribution Date, is the arithmetic average for each of the three successive Distribution Dates ending with the applicable Distribution Date of the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Group I Mortgage Loans that are 60 or more days

delinquent in the payment of principal or interest for the relevant Distribution Date, including any Group I Mortgage Loans in foreclosure, REO and Group I Mortgage Loans with a related Mortgagor subject to bankruptcy proceedings, and the denominator of which is the aggregate Stated Principal Balance of all of the Group I Mortgage Loans immediately preceding such Distribution Date.

Group I Stepdown Date: The later to occur of (a) the Distribution Date in January 2009 and (b) the first Distribution Date on which the Group I Current Specified Enhancement Percentage is greater than or equal to 31.90%.

Group I Sub-Trust: The portion of the Trust Fund allocated to Loan Group I.

Group I Trigger Event: With respect to any Distribution Date, a "Group I Trigger Event" shall have occurred if any of the following tests is not satisfied: (i) the Group I Sixty-Day Plus Delinquency Percentage is less than 7.00%, or (ii)(A) for any Distribution Date from and including the Distribution Date in January 2009 to and including the Distribution Date in December 2009, the Group I Cumulative Realized Loss Percentage for such Distribution Date is less than 5.05%, (B) for any Distribution Date from and including the Distribution Date in January 2010 to and including the Distribution Date in December 2010, the Cumulative Realized Loss Percentage for such Distribution Date is less than 7.85%, (C) for any Distribution Date from and including the Distribution Date in January 2011 to and including the Distribution Date in December 2011, the Group I Cumulative Realized Loss Percentage for such Distribution Date is less than 10.05%, and (D) for any Distribution Date thereafter, the Group I Cumulative Realized Loss Percentage for such Distribution Date is less than 10.50%.

Group II Basis Risk Shortfall Carry Forward Amount: With respect to any Distribution Date and any Class of Class II-A, Class II-M and Class II-B Certificates, an amount equal to the sum of (A) the excess, if any, of (a) the amount of Current Interest that such Class would have been entitled to receive on such Distribution Date had the Pass-Though Rate applicable to such Class been calculated at a per annum rate equal to the lesser of (x) One-Month LIBOR plus the related Certificate Margin and (y) 11.00% per annum, over (b) the amount of Current Interest that such Class received on such Distribution Date if the Pass-Through Rate is limited to the Group II Net Rate Cap and (B) the amount in clause (A) for all previous Distribution Dates not previously paid, together with interest thereon at a rate equal to the related Pass-Through Rate for each such Distribution Date.

Group II Certificates: The Group II Offered Certificates and the Class II-B-4, Class II-C and Class II-R Certificates.

Group II Current Specified Enhancement Percentage: With respect to any Distribution Date, the percentage obtained by dividing (x) the sum of (i) the aggregate Certificate Principal Balance of the Class II-M Certificates and Class II-B Certificates and (ii) the Group II Overcollateralization Amount, in each case prior to the distribution of the Group II Principal Distribution Amount on such Distribution Date, by (y) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the end of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or

34

advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period).

Group II Excess Cashflow: With respect to any Distribution Date, an amount, if any, equal to the sum of (a) the Group II Remaining Excess Spread for such Distribution Date and (b) the Group II Overcollateralization Release Amount for such Distribution Date.

Group II Excess Spread: With respect to any Distribution Date, the excess, if any, of (i) the Interest Funds for Loan Group II for such Distribution Date over (ii) the sum of the related Current Interest on the Class II-A, Class II-M and Class II-B Certificates and Interest Carry Forward Amounts on the Class II-A Certificates (other than related Interest Carry Forward Amounts paid pursuant to Section 6.04(b)(3)(A)), in each case for such Distribution Date.

Group II Extra Principal Distribution Amount: With respect to any Distribution Date, the lesser of (i) the excess, if any, of the Group II Overcollateralization Target Amount for such Distribution Date over the Group II Overcollateralization Amount for such Distribution Date (after giving effect to distributions of principal on the Group II Certificates other than any Group I Extra Principal Distribution Amount) and (ii) Group II the Excess Spread for such Distribution Date.

Group II Mortgage Loan: Any of the Mortgage Loans included as part of Loan Group II on the Mortgage Loan Schedule.

Group II Mortgage Loan: A Group II Mortgage Loan transferred and assigned to the Trustee on the Closing Date pursuant to Section 2.01 and held as a part of the Trust, as identified in the Mortgage Loan Schedule.

Group II Net Rate Cap: With respect to any Distribution Date and any Class of Group II Certificates (other than the Class II-C Certificates and Class II-R Certificates), a per annum rate equal to the weighted average of the Net Mortgage Rates on the then outstanding Group II Mortgage Loans, weighted based on their Stated Principal Balances as of the related Due Date prior to giving effect to any reduction in the Stated Principal Balances of such Group II Mortgage Loans on such Due Date. The Group II Net Rate Cap for such Classes of Group II Certificates, will be calculated based on a 360-day year and the actual number of days elapsed in the related Accrual Period. For federal income tax purposes, however, the equivalent of the foregoing, expressed as the weighted average of the Uncertificated REMIC II Pass-Through Rates on the REMIC II Regular Interests, weighted on the basis of the Uncertificated Principal Balances of each such REMIC II Regular Interest (adjusted for the actual number of days elapsed in the related Accrual Period).

Group II Offered Certificates: Any of the Class II-A-1, Class II-A-2, Class A-3, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Group II-M-6, Class II-B-1, Class II-B-2 and Class II-B-3 Certificates.

Group II Optional Termination: The termination of the Group II Sub-Trust created hereunder as a result of the purchase of all of the Group II Mortgage Loans and any REO Property pursuant to the last sentence of Section 11.01 hereof.

35

Group II Optional Termination Date: The Distribution Date on which the Stated Principal Balance of all of the Group II Mortgage Loans is equal to or less than 20% of the Stated Principal Balance of all of the Group II Mortgage Loans as of the Cut-off Date.

Group II Overcollateralization Amount: With respect to any Distribution Date, the excess, if any, of the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for related Realized Losses incurred during the related Due Period) over the aggregate Certificate Principal Balance of the Group II Certificates (other than the Class II-C Certificates) on such Distribution Date (after taking into account the payment of principal other than any Group II Extra Principal Distribution Amount on such Certificates).

Group II Overcollateralization Floor:  With respect to the Group II Certificates, an amount equal to 0.50% of the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the Cut-off Date.

Group II Overcollateralization Release Amount:  With respect to any Distribution Date, the lesser of (x) the Group II Principal Remittance Amount for such Distribution Date and (y) the excess, if any, of (i) the Group II Overcollateralization Amount for such Distribution Date (assuming that 100% of the Group II Principal Remittance Amount is applied as a principal payment on such Distribution Date) over (ii) the Group II Overcollateralization Target Amount for such Distribution Date (with the amount pursuant to clause (y) deemed to be $0 if the Group II Overcollateralization Amount is less than or equal to the Group II Overcollateralization Target Amount on that Distribution Date).

Group II Overcollateralization Target Amount:  With respect to any Distribution Date (a) prior to the Stepdown Date, 6.20% of the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the Cut-off Date, (b) on or after the Stepdown Date and if a Group II Trigger Event is not in effect, the greater of (i) the lesser of (1) 6.20% of the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the Cut-off Date and (2) 12.40% of the then current aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Due Period) and (ii) the Group II Overcollateralization Floor and (c) on or after the Group II Stepdown Date and if a Group II Trigger Event is in effect, the Group II Overcollateralization Target Amount for the immediately preceding Distribution Date.

Group II Principal Distribution Amount:  With respect to any Distribution Date, an amount equal to (x) the sum of (1) the Group II Principal Remittance Amount for such Distribution Date and (2) any Group II Extra Principal Distribution Amount for such Distribution Date, minus (y) the amount of any Group II Overcollateralization Release Amount for such Distribution Date.

36

Group II Principal Funds: With respect to any Distribution Date and Loan Group II, (i) the sum, without duplication, of (a) all scheduled principal collected during the related Due Period, (b) all Advances relating to principal made on or before the Distribution Account Deposit Date with respect to the Group II Mortgage Loans, (c) Principal Prepayments with respect to the Group II Mortgage Loans exclusive of prepayment charges or penalties collected during the related Prepayment Period, (d) the Stated Principal Balance of each Group II Mortgage Loan that was repurchased by EMC on its own behalf as a Seller and on behalf of Master Funding) pursuant to Sections 2.02 and 2.03, (e) the aggregate of all Substitution Adjustment Amounts for the related Determination Date in connection with the substitution of Group II Mortgage Loans pursuant to Section 2.03(d), (f) all Liquidation Proceeds and Subsequent Recoveries with respect to the Group II Mortgage Loans collected during the related Prepayment Period (to the extent such Liquidation Proceeds and Subsequent Recoveries relate to principal), in each case to the extent remitted by the Master Servicer to the Distribution Account pursuant to this Agreement and (g) amounts in respect of principal paid by the Majority Class II-C Certificateholder or the Master Servicer, as applicable, pursuant to Section 11.01, minus (ii) all amounts required to be reimbursed pursuant to Sections 5.02 and 5.09 or as otherwise set forth in this Agreement.

Group II Principal Remittance Amount: With respect to each Distribution Date, the sum of the amounts listed in clauses (i)(a) through (i)(g) of the definition of Group II Principal Funds.

Group II Remaining Excess Spread: With respect to any Distribution Date, the Group II Excess Spread less any Group II Extra Principal Distribution Amount, in each case for such Distribution Date.

Group II Reserve Fund: Shall mean the separate trust account created and maintained by the Securities Administrator pursuant to Section 4.14 hereof.

Group II Reserve Fund Deposit: With respect to the Group II Reserve Fund, an amount equal to $5,000, which the Depositor shall initially deposit into the Group II Reserve Fund pursuant to Section 4.14 hereof.

Group II Senior Certificates: Any of the Class II-A-1, Class II-A-2 and Class II-A-3 Certificates.

Group II Sixty-Day Plus Delinquency Percentage: With respect to any Distribution Date, is the arithmetic average for each of the three successive Distribution Dates ending with the applicable Distribution Date of the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans that are 60 or more days delinquent in the payment of principal or interest for the relevant Distribution Date, including Group II Mortgage Loans in foreclosure, REO and Group II Mortgage Loans with a related Mortgagor subject to bankruptcy proceedings, and the denominator of which is the aggregate Stated Principal Balance of all of the Group II Mortgage Loans immediately preceding the relevant Distribution Date.

Group II Stepdown Date: The later to occur of (a) the Distribution Date in January 2009 and (b) the first Distribution Date on which the Group II Current Specified Enhancement Percentage is greater than or equal to 65.00%.

37

Group II Sub-Trust: The portion of the Trust Fund allocated to Loan Group II.

Group II Trigger Event: With respect to any Distribution Date, a "Group II Trigger Event" shall have occurred if any of the following tests is not satisfied: (i) the Group II Sixty-Day Plus Delinquency Percentage is less than 7.00%, or (ii)(A) for any Distribution Date from and including the Distribution Date in January 2009 to and including the Distribution Date in December 2009, the Group II-Cumulative Realized Loss Percentage for such Distribution Date is less than 5.05%, (B) for any Distribution Date from and including the Distribution Date in January 2010 to and including the Distribution Date in December 2010, the Cumulative Realized Loss Percentage for such Distribution Date is less than 7.85%, (C) for any Distribution Date from and including the Distribution Date in January 2011 to and including the Distribution Date in December 2011, the Group II Cumulative Realized Loss Percentage for such Distribution Date is less than 10.05%, and (D) for any Distribution Date thereafter, the Group II Cumulative Realized Loss Percentage for such Distribution Date is less than 10.50%.

Indemnified Persons: The Trustee, the Master Servicer, the Company, the Trust Fund, the Class I-A Insurer and the Securities Administrator and their respective officers, directors, agents and employees and, with respect to the Trustee, any separate co-trustee and its officers, directors, agents and employees.

Individual Certificate: Any Certificate registered in the name of a Holder other than the Depository or its nominee.

Initial Certification: The certification by a Custodian substantially in the form of Exhibit One to the related Custodial Agreement.

Initial Certificate Principal Balance: With respect to any Certificate, the Certificate Principal Balance of such Certificate or any predecessor Certificate on the Closing Date.

Institutional Accredited Investor: Any Person meeting the requirements of Rule 501(a)(l), (2), (3) or (7) of Regulation D under the Securities Act or any entity all of the equity holders in which come within such paragraphs.

Insurance Policy: With respect to any Mortgage Loan included in the Trust Fund, any insurance policy, including all riders and endorsements thereto in effect with respect to such Mortgage Loan, including any replacement policy or policies for any Insurance Policies.

Insurance Proceeds: Proceeds paid in respect of the Mortgage Loans pursuant to any Insurance Policy and any other insurance policy covering a Mortgage Loan, to the extent such proceeds are payable to the mortgagee under the Mortgage, the Company, the Servicer or the trustee under the deed of trust and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Company or the Servicer would follow in servicing mortgage loans held for its own account, in each case other than any amount included in such Insurance Proceeds in respect of Insured Expenses.

Insured Expenses: Expenses covered by any insurance policy with respect to the Mortgage Loans.

38

Interest Carry Forward Amount: As of any Distribution Date and with respect to each Class of Certificates (other than the Class C Certificates and the Residual Certificates), the sum of (i) the excess of (a) the Current Interest for such Class with respect to such Distribution Date and any prior Distribution Dates over (b) the amount actually distributed to such Class of Certificates with respect to interest on such Distribution Dates and (ii) interest thereon (to the extent permitted by applicable law) at the applicable Pass-Through Rate for such Class for the related Accrual Period including the Accrual Period relating to such Distribution Date.

Interest Determination Date: Shall mean the second LIBOR Business Day preceding the commencement of each Accrual Period.

Interest Funds:  With respect to any Distribution Date and each Loan Group (i) the sum, without duplication, of (a) all scheduled interest during the related Due Period with respect to the related Mortgage Loans less the related Servicing Fee and the Master Servicing Fee, if any, (b) all Advances relating to interest with respect to the related Mortgage Loans made on or prior to the related Distribution Account Deposit Date, (c) all Compensating Interest with respect to the related Mortgage Loans and required to be remitted by the Servicer or the Master Servicer pursuant to this Agreement with respect to such Distribution Date, (d) Liquidation Proceeds and Subsequent Recoveries with respect to the related Mortgage Loans collected during the related Prepayment Period (to the extent such Liquidation Proceeds and Subsequent Recoveries relate to interest), (e) all amounts relating to interest with respect to each Mortgage Loan in the related Loan Group repurchased by EMC (on its own behalf as a Seller and on behalf of Master Funding) pursuant to Sections 2.02 and 2.03 and by the Master Servicer pursuant to Section 3.05, in each case to the extent remitted by the Master Servicer to the Distribution Account pursuant to this Agreement and (f) the interest portion of any proceed received from the exercise of a Group I Optional Termination or Group II Optional Termination minus (ii) all amounts relating to interest required to be reimbursed pursuant to Sections  5.02 and 5.09 or as otherwise set forth in this Agreement.

Interim Certification: The certification by a Custodian substantially in the form of Exhibit Two to the related Custodial Agreement.

LaSalle: LaSalle Bank National Association, and any successor thereto.

LaSalle Custodial Agreement: The Custodial Agreement, dated as of December 30, 2005, among the Depositor, EMC, as a seller, Master Funding, as a seller, the Master Servicer, the Trustee and LaSalle Bank National Association as Custodian relating to the Mortgage Loans identified in such Custodial Agreement.

Last Scheduled Distribution Date: Solely for purposes of the face of the Certificates as follows: with respect to the Group I Certificates, the Distribution Date in June 2036 and with respect to the Group II Certificates, the Distribution Date in January 2036.

Latest Possible Maturity Date: For purposes of the Treasury regulations under Sections 860A through 860G of the Code, the latest possible maturity date of each Regular Interest issued by REMIC I and each Regular Interest issued by REMIC III the ownership of which is represented by the Group I Certificates shall be the Distribution Date in the month following the

39

final scheduled maturity date of the Group I Mortgage Loan in the Trust Fund having the latest scheduled maturity date as of the Cut-off Date, and the latest possible maturity date of each Regular Interest issued by REMIC II and each Regular Interest issued by REMIC III the ownership of which is represented by the Group II Certificates shall be the Distribution Date in the month following the final scheduled maturity date of the Group II Mortgage Loan in the Trust Fund having the latest scheduled maturity date as of the Cut-off Date.

LIBOR Business Day: Shall mean a day on which banks are open for dealing in foreign currency and exchange in London and New York City.

Liquidated Loan: With respect to any Distribution Date, a defaulted Mortgage Loan that has been liquidated through deed-in-lieu of foreclosure, foreclosure sale, trustee's sale or other realization as provided by applicable law governing the real property subject to the related Mortgage and any security agreements and as to which the Company or the Servicer has made a Final Recovery Determination with respect thereto.

Liquidation Proceeds: Amounts, other than Insurance Proceeds, received in connection with the partial or complete liquidation of a Mortgage Loan, whether through trustee's sale, foreclosure sale or otherwise, or in connection with any condemnation or partial release of a Mortgaged Property and any other proceeds received with respect to an REO Property, less the sum of related unreimbursed Advances, Servicing Fees and Servicing Advances and all expenses of liquidation, including property protection expenses and foreclosure and sale costs, including court and reasonable attorneys fees.

Loan Group: Any of Loan Group I or Loan Group II.

Loan Group I: The Mortgage Loans included as part of Loan Group I on the Mortgage Loan Schedule.

Loan Group II: The Mortgage Loans included as part of Loan Group II on the Mortgage Loan Schedule.

Majority Class I-C Certificateholder: The Holder of a 50.01% or greater Percentage Interest in the Class I-C Certificates.

Majority Class II-C Certificateholder: The Holder of a 50.01% or greater Percentage Interest in the Class II-C Certificates.

Master Funding: Master Funding LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as the seller of the Master Funding Mortgage Loans to the Depositor.

Master Funding Mortgage Loans: The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Master Funding is the applicable Seller.

Master Servicer: LaSalle Bank National Association, in its capacity as master servicer, and its successors and assigns or any successor master servicer appointed as herein provided.

40

Master Servicer Certification: A written certification signed by a Master Servicing Officer that complies with (i) the Sarbanes-Oxley Act of 2002, as amended from time to time, and (ii) the February 21, 2003 Statement by the Staff of the Division of Corporation Finance of the Securities and Exchange Commission Regarding Compliance by Asset Backed Issuers with Exchange Act Rules 13a-14 and 15d-14, as in effect from time to time; provided that if, after the Closing Date (a) the Sarbanes Oxley Act of 2002 is amended, (b) the Statement referred to in clause (ii) is modified or superceded by any subsequent statement, rule or regulation of the Securities and Exchange Commission or any statement of a division thereof, or (c) any future releases, rules and regulations are published by the Securities and Exchange Commission from time to time pursuant to the Sarbanes Oxley Act of 2002, which in any such case affects the form or substance of the required certification and results in the required certification being, in the reasonable judgment of the Master Servicer, materially more onerous than the form of the required certification as of the Closing Date, the Master Servicer Certification shall be as agreed to by the Master Servicer, the Depositor and EMC following a negotiation in good faith to determine how to comply with any such new requirements.

Master Servicer Collection Account: The trust accounts or accounts created and maintained pursuant to Section 5.06 hereof, which shall be entitled "LaSalle Bank National Association, as master servicer, on behalf of Citibank, N.A., as Trustee f/b/o holders of Bear Stearns Asset Backed Securities I LLC, Mortgage-Backed Certificates, Series 2005-10 - Master Servicer Collection Account". The Master Servicer Collection Account may be a sub-account of the Distribution Account.

Master Servicing Compensation: For any Distribution Date, the Master Servicing Fee for such Distribution Date.

Master Servicing Fee: As to each Mortgage Loan and any Distribution Date, an amount equal to 1/12th of the Master Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the Due Date in the month preceding the month in which such Distribution Date occurs.

Master Servicing Fee Rate: 0.0200% per annum.

Master Servicing Officer: Any officer of the Master Servicer responsible for the master servicing of the Mortgage Loans.

Maximum Mortgage Rate: With respect to each Adjustable Rate Mortgage Loan, the percentage set forth in the related Mortgage Note as the maximum Mortgage Rate thereunder.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System: The system of recording transfers of Mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

41

Minimum Mortgage Rate: With respect to each Adjustable Rate Mortgage Loan, the percentage set forth in the related Mortgage Note as the minimum Mortgage Rate thereunder.

MOM Loan: With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Statement: The statement prepared and delivered by the Securities Administrator pursuant to Section 6.06.

Moody's: Moody's Investors Service, Inc., and any successor thereto.

Mortgage: The mortgage, deed of trust or other instrument creating a second lien on or second priority ownership interest in an estate in fee simple in real property securing a Mortgage Note.

Mortgage File: The mortgage documents listed in Section 2.01 hereof pertaining to a particular Mortgage Loan and any additional documents delivered to the related Custodian to be added to the Mortgage File pursuant to this Agreement and the related Custodial Agreement.

Mortgage Loan Purchase Agreement: The Mortgage Loan Purchase Agreement, dated as of December 30, 2005, among EMC, as a seller, Master Funding, as a seller, and the Depositor, as purchaser, in the form attached hereto as Exhibit L.

Mortgage Loan Purchase Price: The price, calculated as set forth in Section 11.01, to be paid in connection with the repurchase of the Mortgage Loans pursuant to Section 11.01.

Mortgage Loans: Such of the mortgage loans transferred and assigned to the Trustee pursuant to the provisions hereof, as from time to time are held as a part of the Trust Fund (including any REO Property), the mortgage loans so held being identified in the Mortgage Loan Schedule and separated into Group I Mortgage Loans and Group II Mortgage Loans, notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property.

Mortgage Loan Schedule: The list of Mortgage Loans (as from time to time amended by the Company or the Master Servicer to reflect the deletion of Deleted Mortgage Loans and the addition of Replacement Mortgage Loans pursuant to the provisions of this Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, the Mortgage Loan Schedule being attached hereto as Exhibit B, with respect to the Mortgage Loans and as amended from time to time to reflect the repurchase or substitution of Mortgage Loans pursuant to this Agreement or the Mortgage Loan Purchase Agreement, as the case may be, setting forth the following information with respect to each Mortgage Loan:

> (i)     the Mortgage Loan identifying number;
>
> (ii)    the current mortgage rate;
>
> (iii)   the Master Servicing Fee and Servicing Fee;

42

(iv)   the Master Servicing Fee Rate, if applicable;

(v)   the lender paid primary mortgage insurance fee, if any;

(vi)   the current net mortgage rate;

(vii)   the stated maturity date;

(viii)   the original principal balance;

(ix)   the current principal balance;

(x)   the stated original term to maturity;

(xi)   the stated remaining term to maturity;

(xii)   the property type;

(xiii)   the MIN with respect to each MOM Loan;

(xiv)   with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Rate;

(xv)   with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Rate;

(xvi)   with respect to each Adjustable Rate Mortgage Loan, the Gross Margin;

(xvii)   with respect to each Adjustable Rate Mortgage Loan, the next Adjustment Date;

(xviii)   the Custodian;

(xix)   a code indicating whether the Mortgage Loan is an EMC Mortgage Corporation Loan or a Master Funding Mortgage Loan; and

(xx)   such other information as the Master Servicer reasonably deems necessary to be included on the Mortgage Loan Schedule for the master servicing of the Mortgage Loans.

Such schedule shall also set forth the aggregate Cut-off Date Principal Balance for all of the Mortgage Loans.

Mortgage Note: The original executed note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan.

Mortgage Rate: With respect to each Mortgage Loan, the rate set forth in the related Mortgage Note. With respect to each Mortgage Loan that becomes an REO Property, as of any

43

date of determination, the annual rate determined in accordance with the immediately preceding sentence as of the date such Mortgage Loan became an REO Property.

Mortgaged Property: The underlying property securing a Mortgage Loan.

Mortgagor: The obligors on a Mortgage Note.

Nexstar Assignment Agreement: The Assignment, Assumption and Recognition Agreement dated as of December 30, 2005 among EMC, the Trustee and Nexstar Financial Corporation.

Net Mortgage Rate: As to each Mortgage Loan, and at any time, the per annum rate equal to the related Mortgage Rate less the sum of (i) the Servicing Fee Rate, (ii) the Master Servicing Fee Rate and (with repect to the Group I Mortgage Loans) (iii) the "premium percentage" (as defined in the Class I-A Insurance Agreement); provided that, for this calculation, the Premium Percentage shall be multiplied by a fraction equal to (x) the aggregate Certificate Principal Balance of the Group I Certificates, over (y) the Aggregate Stated Principal Balance of the Group I Mortgage Loans.

Net Rate Cap: The Group I Net Rate Cap and Group II Net Rate Cap.

Nexstar: Nexstar Financial Corporation and any successor thereto.

Nexstar Assignment Agreement: The Assignment, Assumption and Recognition Agreement, dated as of December 30, 2005, among EMC and the Trustee evidencing the assignment of the Nexstar Servicing Agreement to the Trust.

Nexstar Loans: Those Mortgage Loans subject to this Agreement which were purchased by EMC from Nexstar pursuant to the Nexstar Servicing Agreement.

Nexstar Servicing Agreement: The Master Sale and Servicing Agreement, dated as of May 18, 2002, among EMC Mortgage Corporation and Nexstar Home Loan Corporation.

Non-Book-Entry Certificate: Any Certificate other than a Book-Entry Certificate.

Nonrecoverable Advance: Any portion of an Advance previously made or proposed to be made by the Company or the Master Servicer pursuant to this Agreement that, in the good faith judgment of the Company or the Master Servicer, will not or, in the case of a proposed advance, would not, be ultimately recoverable by it from the related Mortgagor, related Liquidation Proceeds, Insurance Proceeds or otherwise.

Offered Certificates: Any of the Group I Offered Certificates and Group II Offered Certificates.

Officer's Certificate: A certificate (i) signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Vice President (however denominated), an Assistant Vice President, the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of the Depositor, the Seller or the Master Servicer (or any other officer customarily

44

performing functions similar to those performed by any of the above designated officers and also to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with a particular subject) or (ii), if provided for in this Agreement, signed by a Servicing Officer, as the case may be, and delivered to the Depositor, the Sellers, the Securities Administrator, the Master Servicer and/or the Trustee, as the case may be, as required by this Agreement.

One-Month LIBOR: With respect to any Accrual Period, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the rate for U.S. dollar deposits for one month that appears on Telerate Screen Page 3750 as of 11:00 a.m. (London time) on such Interest Determination Date; provided that the parties hereto acknowledge that One-Month LIBOR for the first Accrual Period shall equal 4.500% per annum. If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying One-Month LIBOR or comparable rates as may be reasonably selected by the Securities Administrator), One-Month LIBOR for the applicable Accrual Period will be the Reference Bank Rate. If no such quotations can be obtained by the Securities Administrator and no Reference Bank Rate is available, One-Month LIBOR will be One-Month LIBOR applicable to the preceding Accrual Period. The establishment of One-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator's calculation of the rate of interest applicable to the Class A, Class M and Class B Certificates for the related Accrual Period shall, in the absence of manifest error, be final and binding.

Opinion of Counsel: A written opinion of counsel, who may be counsel for EMC, the Depositor, the Company or the Master Servicer, reasonably acceptable to each addressee of such opinion; provided that with respect to Section 2.05, 8.05, 8.07 or 12.01, or the interpretation or application of the REMIC Provisions, such counsel must (i) in fact be independent of EMC, Depositor, the Company and the Master Servicer, (ii) not have any direct financial interest in EMC, the Depositor, the Company or the Master Servicer or in any affiliate of either, and (iii) not be connected with EMC, the Depositor, the Company or the Master Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Original Value: The value of the property underlying a Mortgage Loan based, in the case of the purchase of the underlying Mortgaged Property, on the lower of an appraisal or the sales price of such property or, in the case of a refinancing, on an appraisal.

Outstanding: With respect to the Certificates as of any date of determination, all Certificates theretofore executed and authenticated under this Agreement except:

(a)     Certificates theretofore canceled by the Securities Administrator or delivered to the Securities Administrator for cancellation; and

(b)     Certificates in exchange for which or in lieu of which other Certificates have been executed and delivered by the Securities Administrator pursuant to this Agreement.

Outstanding Mortgage Loan: As of any date of determination, a Mortgage Loan with a Stated Principal Balance greater than zero that was not the subject of a Principal Prepayment in full, and that did not become a Liquidated Loan, prior to the end of the related Prepayment Period.

Ownership Interest: As to any Certificate, any ownership interest in such Certificate including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

Pass-Through Rate: With respect to any Class A, Class M and Class B Certificate and, for purposes of the definition of "REMIC I Marker Rate" and "REMIC I Maximum Uncertificated Accrued Interest Deferral Amount", each REMIC I Regular Interest for which such Certificate is the Corresponding Certificate, and, for purposes of the definition of "REMIC II Marker Rate" and "REMIC II Maximum Uncertificated Accrued Interest Deferral Amount", each REMIC II Regular Interest (other than REMIC II Regular Interests AA and ZZ) for which such Certificate is the Corresponding Certificate, and any Distribution Date, a rate per annum equal to the least of (i) One-Month LIBOR plus the related Certificate Margin, (ii) 11.00% per annum and (iii) the Group I Net Rate Cap or Group II Net Cap Rate, as applicable, for such Distribution Date.

With respect to the Class I-C Interest and any Distribution Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is (x) the sum of the amount determined for each REMIC I Regular Interest equal to the product of (a) the excess, if any, of the Uncertificated REMIC I Pass-Through Rate for such REMIC I Regular Interest over the REMIC I Marker Rate and (b) a notional amount equal to the Uncertificated Principal Balance of such REMIC I Regular Interest, and the denominator of which is (y) the aggregate Uncertificated Principal Balance of such REMIC I Regular Interests.

With respect to the Class II-C Interest and any Distribution Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is (x) the sum of the amount determined for each REMIC II Regular Interest equal to the product of (a) the excess, if any, of the Uncertificated REMIC II Pass-Through Rate for such REMIC II Regular Interest over the REMIC II Marker Rate and (b) a notional amount equal to the Uncertificated Principal Balance of such REMIC II Regular Interest, and the denominator of which is (y) the aggregate Uncertificated Principal Balance of such REMIC II Regular Interests.

With respect to the Class I-C Certificate, the Class I-C Certificate shall not have a Pass-Through Rate, but the Class I-C Distribution Amount for such Certificate and each Distribution Date shall be an amount equal to 100% of the amount distributable to the Class I-C Interest for such Distribution Date.

With respect to the Class II-C Certificate, the Class II-C Certificate shall not have a Pass-Through Rate, but the Class I-C Distribution Amount for such Certificate and each Distribution Date shall be an amount equal to 100% of the amount distributable to the Class II-C Interest for such Distribution Date.

46

Percentage Interest: With respect to any Certificate of a specified Class, the Percentage Interest set forth on the face thereof or the percentage obtained by dividing the Denomination of such Certificate by the aggregate of the Denominations of all Certificates of such Class.

Permitted Investments: At any time, any one or more of the following obligations and securities:

(i)    obligations of the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency, as evidenced in writing;

(iii)    commercial or finance company paper which is then receiving the highest commercial or finance company paper rating of each Rating Agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency, as evidenced in writing;

(iv)    certificates of deposit, demand or time deposits, or bankers' acceptances issued by any depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state banking authorities (including the Trustee, the Master Servicer and the Securities Administrator in its commercial banking capacity), provided that the commercial paper and/or long term unsecured debt obligations of such depository institution or trust company are then rated one of the two highest long-term and the highest short-term ratings of each Rating Agency for such securities, or such lower ratings as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency, as evidenced in writing;

(v)    guaranteed reinvestment agreements issued by any bank, insurance company or other corporation containing, at the time of the issuance of such agreements, such terms and conditions as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency, as evidenced in writing;

(vi)    repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a depository institution or trust company (acting as principal) described in clause (v) above;

(vii)    securities (other than stripped bonds, stripped coupons or instruments sold at a purchase price in excess of 115% of the face amount thereof) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof which, at the time of such

47

investment, have one of the two highest short term ratings of each Rating Agency (except if the Rating Agency is Moody's, such rating shall be the highest commercial paper rating of Moody's for any such securities), or such lower rating as will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by any Rating Agency, as evidenced by a signed writing delivered by each Rating Agency;

(viii)   interests in any money market fund (including any such fund managed or advised by the Master Servicer and the Securities Administrator or any affiliate thereof) which at the date of acquisition of the interests in such fund and throughout the time such interests are held in such fund has the highest applicable short term rating by each Rating Agency rating such fund or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency, as evidenced in writing;

(ix)   short term investment funds sponsored by any trust company or banking association incorporated under the laws of the United States or any state thereof (including any such fund managed or advised by the Trustee or the Master Servicer or the Securities Administrator or any affiliate thereof) which on the date of acquisition has been rated by each Rating Agency in their highest applicable rating category or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the Certificates by each Rating Agency, as evidenced in writing; and

(x)   such other investments having a specified stated maturity and bearing interest or sold at a discount acceptable to each Rating Agency and will not result in the downgrading or withdrawal of the rating then assigned to the Certificates by each Rating Agency, as evidenced by a signed writing delivered by each Rating Agency;

provided, that no such instrument shall be a Permitted Investment if such instrument (i) evidences the right to receive interest only payments with respect to the obligations underlying such instrument, (ii) is purchased at a premium or (iii) is purchased at a deep discount; provided further that no such instrument shall be a Permitted Investment (A) if such instrument evidences principal and interest payments derived from obligations underlying such instrument and the interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations, or (B) if it may be redeemed at a price below the purchase price (the foregoing clause (B) not to apply to investments in units of money market funds pursuant to clause (viii) above); provided further that no amount beneficially owned by any REMIC may be invested in investments (other than money market funds) treated as equity interests for federal income tax purposes, unless the Securities Administrator shall receive an Opinion of Counsel, at the expense of the Securities Administrator, to the effect that such investment will not adversely affect the status of any such REMIC as a REMIC under the Code or result in the imposition of a tax on any such REMIC. Permitted Investments that are subject to prepayment or call may not be purchased at a price in excess of par.

48

Permitted Transferee: Any person (x) other than (i) the United States, any State or political subdivision thereof, any possession of the United States or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in section 521 of the Code) that is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by section 511 of the Code on unrelated business taxable income) on any excess inclusions (as defined in section 860E(e)(1) of the Code) with respect to any Residual Certificate, (iv) rural electric and telephone cooperatives described in section 1381(a)(2)(C) of the Code or (v) an electing large partnership within the meaning of Section 775(a) of the Code, (y) that is a citizen or resident of the United States, a corporation, partnership (other than a partnership that has any direct or indirect foreign partners) or other entity (treated as a corporation or a partnership for federal income tax purposes), created or organized in or under the laws of the United States, any State thereof or the District of Columbia, an estate whose income from sources without the United States is includible in gross income for United States federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust or if it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person and (z) other than any other Person so designated by the Securities Administrator based upon an Opinion of Counsel addressed to the Securities Administrator and the Trustee (which shall not be an expense of the Trustee or the Securities Administrator) that states that the Transfer of an Ownership Interest in a Residual Certificate to such Person may cause REMIC I, REMIC II or REMIC III to fail to qualify as a REMIC at any time that any Certificates are Outstanding. The terms "United States," "State" and "International Organization" shall have the meanings set forth in section 7701 of the Code or successor provisions. A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof for these purposes if all of its activities are subject to tax and, with the exception of Freddie Mac, a majority of its board of directors is not selected by such government unit.

Person: Any individual, corporation, partnership, joint venture, association, joint- stock company, limited liability company, trust, unincorporated organization or government, or any agency or political subdivision thereof.

Prepayment Assumption: A prepayment rate for the Mortgage Loans of 35% CPR.

Prepayment Charge: Any prepayment premium, penalty or charge payable by a Mortgagor in connection with any Principal Prepayment on a Mortgage Loan pursuant to the terms of the related Mortgage Note.

Prepayment Charge Waiver Amount: Any amount paid by the Company to the Master Servicer in respect of a waived Prepayment Charge pursuant to Section 5.01(a).

Prepayment Interest Excess: With respect to any Distribution Date, for each EMC Mortgage Loan that was the subject of a Principal Prepayment in full or in part during the portion of the related Prepayment Period occurring between the first day of the calendar month in which such Distribution Date occurs and the Determination Date of the calendar month in

49

which such Distribution Date occurs, an amount equal to interest (to the extent received) at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the first day of the calendar month in which such Distribution Date occurs and ending on the last date through which interest is collected from the related Mortgagor.

Prepayment Interest Shortfall: With respect to any Distribution Date and any Mortgage Loan, for each Mortgage Loan that was the subject of a partial Principal Prepayment, a Principal Prepayment in full, or that became a Liquidated Loan during the related Prepayment Period, (other than a Principal Prepayment in full resulting from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03, 3.05 or 11.01 hereof), the amount, if any, by which (i) one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such Mortgage Loan immediately prior to such Principal Prepayment (or liquidation) or in the case of a partial Principal Prepayment on the amount of such prepayment (or liquidation proceeds) exceeds (ii) the amount of interest paid or collected in connection with such Principal Prepayment or such liquidation proceeds less the sum of (a) the Master Servicing Fee, (b) the Servicing Fee and (c) the Class I-A Insurer Premium.

Prepayment Period: As to any Distribution Date (except the first Distribution Date) and (i) each EMC Mortgage Loan, the period commencing on the 16th day of the month prior to the month in which the related Distribution Date occurs and ending on the 15th day of the month in which such Distribution Date occurs (as to the first Distribution Date and any EMC Mortgage Loan, the period commencing on the Closing Date and ending on the 15th day of the month in which such Distribution Date occurs) and (ii) any other Mortgage Loan, the period set forth in the related Servicing Agreement.

Principal Prepayment: Any Mortgagor payment or other recovery of (or proceeds with respect to) principal on a Mortgage Loan (including loans purchased or repurchased under Sections 2.02, 2.03, 3.05 and 11.01 hereof) that is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment. Partial Principal Prepayments shall be applied by the Company or the Servicer, as appropriate, in accordance with the terms of the related Mortgage Note.

Private Certificates: Any of the Class B-4, Class C and Residual Certificates.

Prospectus Supplement: The Prospectus Supplement dated December 28, 2005 relating to the public offering of the Class I-A, Class I-M, Class I-B-1, Class I-B-2, Class I-B-3, Class II-A-1, Class II-A-2, Class II-A-3, Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, II-M-6, Class II-B-1, Class II-B-2 and Class II-B-3 Certificates.

Protected Account: Each account established with respect to receipts on the Mortgage Loans and REO Property in accordance with Section 5.01 hereof or by a Servicer in accordance with the related Servicing Agreement. Each Protected Account shall be an Eligible Account.

PUD: A Planned Unit Development.

Purchase Price: With respect to any Mortgage Loan (x) required to be repurchased by EMC pursuant to Section 2.02 or 2.03 hereof or (y) that EMC has a right to purchase pursuant to

50

Section 3.05 hereof, an amount equal to the sum of (i) 100% of the outstanding principal balance of the Mortgage Loan as of the date of such purchase (or if the related Mortgaged Property was acquired with respect thereto, 100% of the outstanding principal balance at the date of the acquisition), plus (ii) accrued interest thereon at the applicable Mortgage Rate through the first day of the month in which the Purchase Price is to be distributed to Certificateholders, reduced by any portion of the Servicing Fee, Servicing Advances and Advances payable to the purchaser of the Mortgage Loan plus and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of such Mortgage Loan of any anti-predatory lending laws.

QIB: A Qualified Institutional Buyer as defined in Rule 144A promulgated under the Securities Act.

Rating Agency: Each of S&P, Moody's and Fitch. If any such organization or its successor is no longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization, or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Trustee, Securities Administrator and the Class I-A Insurer. References herein to a given rating category of each Rating Agency shall mean such rating category without giving effect to any modifiers.

Realized Loss: With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, minus (iii) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the Company pursuant to this Agreement or the related Servicer pursuant to the related Servicing Agreement. In addition, to the extent the Company, the Servicer or the Master Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are distributed to any Class of Certificates or applied to increase the Group I Excess Spread or Group II Excess Spread, as applicable, on any Distribution Date.

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of the related Mortgage Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Mortgage Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Mortgage Loan as of the close of business on the

51

Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, minus (iv) the aggregate of all unreimbursed Advances and Servicing Advances.

With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.

With respect to each Mortgage Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

Record Date: With respect to any Distribution Date and the Certificates (other than the Class B-4, Class C and Residual Certificates), so long as such Classes of Certificates are Book-Entry Certificates, the Business Day preceding such Distribution Date, and otherwise, the close of business on the last Business Day of the month preceding the month in which such Distribution Date occurs. With respect to the Class B-4, Class C and Residual Certificates, the close of business on the last Business Day of the month preceding the month in which such Distribution Date occurs.

Reference Banks: Shall mean leading banks selected by the Securities Administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) which have been designated as such by the Securities Administrator and (iii) which are not controlling, controlled by, or under common control with, the Depositor, the Sellers or the Master Servicer.

Reference Bank Rate: With respect to any Accrual Period shall mean the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks as of 11:00 a.m., New York City time, on the related Interest Determination Date to prime banks in the London interbank market for a period of one month in an amount approximately equal to the aggregate Certificate Principal Balance of the Class A, Class M and Class B Certificates for such Accrual Period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the Securities Administrator, as of 11:00 a.m., New York City time, on such date for loans in United States dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Class A, Class M and Class B Certificates for such Accrual Period.

Regular Certificate: Any Certificate other than a Residual Certificate.

[TPW: NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

Regular Interest: A "regular interest" in a REMIC within the meaning of Section 860G(a)(1) of the Code.

Relief Act: The Servicemembers Civil Relief Act, as amended, or similar state law.

Relief Act Interest Shortfall: With respect to any Distribution Date and any Mortgage Loan, any reduction in the amount of interest collectible on such Mortgage Loan for the most recently ended Due Period as a result of the application of the Relief Act.

REMIC: A "real estate mortgage investment conduit" within the meaning of section 860D of the Code.

REMIC I: The segregated pool of assets described in the Preliminary Statement and Section 5.07(a).

REMIC I Interest Loss Allocation Amount: With respect to any Distribution Date, an amount (subject to adjustment based on the actual number of days elapsed in the respective Accrual Period) equal to (a) the product of (i) the aggregate Stated Principal Balance of the Group I Mortgage Loans and REO Properties related to any Group I Mortgage Loans then outstanding and (ii) the Uncertificated REMIC I Pass-Through Rate for REMIC I Regular Interest AA minus the REMIC I Marker Rate, divided by (b) 12.

REMIC I Marker Rate: With respect to the Class I-C Interest and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC I Pass-Through Rates for the REMIC I Regular Interests (other than REMIC I Regular Interest AA), with the rate on each such REMIC I Regular Interest (other than REMIC I Regular Interest ZZ) subject to a cap equal to the Pass-Through Rate for the Corresponding Certificates for the purpose of this calculation for such Distribution Date, and with the rate on REMIC I Regular Interest ZZ subject to a cap of zero for the purpose of this calculation for such Distribution Date; provided, however, that for this purpose, the Pass-Through Rate used to determine the cap with respect to each REMIC I Regular Interest other than REMIC I Regular Interests AA and ZZ shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the Accrual Period for the Corresponding Certificates.

REMIC I Maximum Uncertificated Accrued Interest Deferral Amount: With respect to any Distribution Date, the excess of (i) accrued interest at the Uncertificated REMIC I Pass-Through Rate applicable to REMIC I Regular Interest ZZ for such Distribution Date on a balance equal to the Uncertificated Principal Balance of REMIC I Regular Interest ZZ minus the REMIC I Overcollateralized Amount, in each case for such Distribution Date, over (ii) the aggregate amount of Uncertificated Accrued Interest for such Distribution Date on the REMIC I Regular Interests (other than REMIC I Regular Interests AA and ZZ), with the rate on each such REMIC I Regular Interest subject to a cap equal to the Pass-Through Rate for the Corresponding Certificates for the purpose of this calculation for such Distribution Date; provided, however, that for this purpose, the Pass-Through Rate used to determine the cap with respect to each REMIC I Regular Interest other than REMIC I Regular Interests AA and ZZ shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the Accrual Period for the Corresponding Certificates.

[TPW. NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

REMIC 1 Overcollateralization Amount: With respect to any date of determination, (i) 1.00% of the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests minus (ii) the aggregate Uncertificated Principal Balance of each REMIC I Regular Interest for which a Class I-A Certificate, Class I-M Certificate or Class I-B Certificate is the Corresponding Certificate, in each case, as of such date of determination.

REMIC I Principal Loss Allocation Amount: With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Stated Principal Balance of the Group I Mortgage Loans and REO Properties related to any Group I Mortgage Loans then outstanding and (ii) 1 minus a fraction, the numerator of which is two (2) times the aggregate Uncertificated Principal Balance of each REMIC I Regular Interest for which a Class I-A Certificate, Class I-M Certificate or Class I-B Certificate is the Corresponding Certificate and the denominator of which is the aggregate Uncertificated Principal Balance of each REMIC I Regular Interest for which a Class I-A Certificate, Class I-M Certificate or Class I-B Certificate is the Corresponding Certificate and REMIC I Regular Interest ZZ.

REMIC I Regular Interest AA: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest AA shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-A: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-A shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-B-1: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-B-1 shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-B-2: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-B-2 shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-B-3: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-B-3 shall accrue interest at the related Uncertificated REMIC I

54

Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-B-4: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-B-4 shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest I-M: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest I-M shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Regular Interest ZZ: One of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a Regular Interest in REMIC I. REMIC I Regular Interest ZZ shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC I Required Overcollateralization Amount: 1.00% of the Group I Overcollateralization Target Amount.

REMIC II: The segregated pool of assets described in the Preliminary Statement and Section 5.07(a).

REMIC II Interest Loss Allocation Amount: With respect to any Distribution Date, an amount (subject to adjustment based on the actual number of days elapsed in the respective Accrual Period) equal to (a) the product of (i) the aggregate Stated Principal Balance of the Group II Mortgage Loans and REO Properties related to any Group II Mortgage Loans then outstanding and (ii) the Uncertificated REMIC II Pass-Through Rate for REMIC II Regular Interest AA minus the REMIC II Marker Rate, divided by (b) 12.

REMIC II Marker Rate: With respect to the Class II-C Interest and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC II Pass-Through Rates for the REMIC II Regular Interests (other than REMIC II Regular Interest AA), with the rate on each such REMIC II Regular Interest (other than REMIC II Regular Interest ZZ) subject to a cap equal to the Pass-Through Rate for the Corresponding Certificates for the purpose of this calculation for such Distribution Date, and with the rate on REMIC II Regular Interest ZZ subject to a cap of zero for the purpose of this calculation for such Distribution Date; provided, however, that for this purpose, the Pass-Through Rate used to determine the cap with respect to each REMIC II Regular Interest other than REMIC II Regular

55

Interests AA and ZZ shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the Accrual Period for the Corresponding Certificates.

REMIC II Maximum Uncertificated Accrued Interest Deferral Amount: With respect to any Distribution Date, the excess of (i) accrued interest at the Uncertificated REMIC II Pass-Through Rate applicable to REMIC II Regular Interest ZZ for such Distribution Date on a balance equal to the Uncertificated Principal Balance of REMIC II Regular Interest ZZ minus the REMIC II Overcollateralized Amount, in each case for such Distribution Date, over (ii) the aggregate amount of Uncertificated Accrued Interest for such Distribution Date on the REMIC II Regular Interests (other than REMIC II Regular Interests AA and ZZ), with the rate on each such REMIC II Regular Interest subject to a cap equal to the Pass-Through Rate for the Corresponding Certificates for the purpose of this calculation for such Distribution Date; provided, however, that for this purpose, the Pass-Through Rate used to determine the cap with respect to each REMIC II Regular Interest other than REMIC II Regular Interests AA and ZZ shall be multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the Accrual Period for the Corresponding Certificates.

REMIC II Overcollateralization Amount: With respect to any date of determination, (i) 1.00% of the aggregate Uncertificated Principal Balance of the REMIC II Regular Interests minus (ii) the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class II-A Certificate, Class II-M Certificate or Class II-B Certificate is the Corresponding Certificate, in each case, as of such date of determination.

REMIC II Principal Loss Allocation Amount: With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Stated Principal Balance of the Group II Mortgage Loans and REO Properties related to any Group II Mortgage Loans then outstanding and (ii) 1 minus a fraction, the numerator of which is two (2) times the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class II-A Certificate, Class II-M Certificate or Class II-B Certificate is the Corresponding Certificate, and the denominator of which is the aggregate Uncertificated Principal Balance of each REMIC II Regular Interest for which a Class II-A Certificate, Class II-M Certificate or Class II-B Certificate is the Corresponding Certificate and REMIC II Regular Interest ZZ.

REMIC II Regular Interest AA: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest AA shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-A-1: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-A-1 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

56

REMIC II Regular Interest II-A-2: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-A-2 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-A-3: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-A-3 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-B-1: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-B-1 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-B-2: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-B-2 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-B-3: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-B-3 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-B-4: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-B-4 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-1: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-1 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of

57

principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-2: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-2 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-3: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-3 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-4: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-4 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-5: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-5 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest II-M-6: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-M-6 shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest ZZ: One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest ZZ shall accrue interest at the related Uncertificated REMIC II Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

REMIC II Required Overcollateralization Amount: 1.00% of the Group II Overcollateralization Target Amount.

REMIC III:  The segregated pool of assets described in the Preliminary Statement and Section 5.07(a).

REMIC IV:  The segregated pool of assets consisting of the Class I-C Interest conveyed in trust to the Trustee, for the benefit of the Holders of the Class I-C Certificates and the Class I-RX Certificate, with respect to which a separate REMIC election is to be made.

REMIC V:  The segregated pool of assets consisting of the Class II-C Interest conveyed in trust to the Trustee, for the benefit of the Holders of the Class II-C Certificates and the Class II-RX Certificate, with respect to which a separate REMIC election is to be made.

REMIC Opinion: Shall mean an Opinion of Counsel to the effect that the proposed action will not cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are outstanding.

REMIC Provisions: Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of the Code, and related provisions, and proposed, temporary and final regulations and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time as well as provisions of applicable state laws.

Remittance Date: Shall mean (i) with respect to the Company, the Distribution Account Deposit Date and (ii) with respect to each Servicer, each Business Day as specified in the related Servicing Agreement.

Remittance Report: Shall mean a report to the Securities Administrator in an electronic format (or by such other means as the Master Servicer and the Securities Administrator may agree from time to time) containing such data and information, as agreed to by the Master Servicer and the Securities Administrator such as to permit the Securities Administrator to prepare the Monthly Statement to Certificateholders.

REO Imputed Interest: As to any REO Property, for any calendar month during which such REO Property was at any time part of REMIC I, one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan, if appropriate) as of the close of business on the Distribution Date in such calendar month.

REO Property: A Mortgaged Property acquired by the Company or the Servicer on behalf of the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan.

Replacement Mortgage Loan: A Mortgage Loan or Mortgage Loans in the aggregate substituted by EMC for a Deleted Mortgage Loan, which must, on the date of such substitution, as confirmed in a Request for Release, (i) have a Stated Principal Balance, after deduction of the principal portion of the Scheduled Payment due in the month of substitution, not in excess of, and not less than 90% of, the Stated Principal Balance of the Deleted Mortgage Loan; (ii) have a fixed Mortgage Rate not less than or more than 1% per annum higher than the Mortgage Rate of the Deleted Mortgage Loan; (iii) have the same or higher credit quality characteristics than that

59

of the Deleted Mortgage Loan; (iv) have a Combined Loan-to-Value Ratio no higher than that of the Deleted Mortgage Loan; (v) have a remaining term to maturity no greater than (and not more than one year less than) that of the Deleted Mortgage Loan; (vi) not permit conversion of the Mortgage Rate from a fixed rate to a variable rate; (vii) have the same lien priority as the Deleted Mortgage Loan; (viii) constitute the same occupancy type as the Deleted Mortgage Loan or be owner occupied; (ix) comply with each representation and warranty set forth in Section 7 of the Mortgage Loan Purchase Agreement; (x) the related Custodian has delivered a Final Certification noting no defects or exceptions.

Repurchase Price: With respect to each Mortgage Loan, a price equal to (i) the outstanding principal balance of such Mortgage Loan, plus (ii) interest on such outstanding principal balance at the Mortgage Rate (net of the Servicing Fee Rate) from the last date through which interest has been paid-to-the end of the month of repurchase, less (iii) amounts advanced by the Company, the Servicer or the Master Servicer in respect of such repurchased Mortgage Loan which are being held in the Master Servicer Collection Account for remittance to the Securities Administrator plus (iv) any costs and damages (if any) incurred by the Trust in connection with any violation of such Mortgage Loan of any anti-predatory lending laws.

Request for Release: The Request for Release to be submitted by the Sellers, the Company, the Servicer or the Master Servicer to the respective Custodian substantially in the form of Exhibit G hereto or other form attached as an exhibit to the related Custodial Agreement. Each Request for Release furnished to the respective Custodian by the Sellers, the Company, the Servicer or the Master Servicer shall be in duplicate and shall be executed by an officer of such Person or a Servicing Officer (or, if furnished electronically to the respective Custodian, shall be deemed to have been sent and executed by an officer of such Person or a Servicing Officer) of the Sellers, the Company, the Servicer or the Master Servicer, as applicable.

Required Insurance Policy: With respect to any Mortgage Loan, any insurance policy that is required to be maintained from time to time under this Agreement or the Servicing Agreements.

Reserve Funds: The Group I Reserve Fund and the Group II Reserve Fund, as applicable, each of which will be a separate trust account created and maintained by the Securities Administrator pursuant to Section 4.14 hereof.

Residual Certificates: The Class I-R-1, Class I-R-2, Class I-RX, Class II-R-1 and Class II-RX Certificates, each evidencing the Residual Interest in the related REMIC.

Residual Interest: The sole class of Residual Interests in a REMIC within the meaning of Section 860G(a)(2) of the Code. —

Responsible Officer: With respect to the Trustee and the Securities Administrator, any Vice President, any Assistant Vice President, the Secretary, any Assistant Secretary, or any Trust Officer in its respective Corporate Trust Office with specific responsibility for the transactions contemplated hereby, any other officer customarily performing functions similar to those performed by any of the above designated officers or other officers of the Trustee or the Securities Administrator as specified by the Trustee or the Securities Administrator, respectively,

60

as to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

S&P: Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

Scheduled Payment: The scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan.

Securities Act: The Securities Act of 1933, as amended.

Securities Administrator: LaSalle Bank National Association, in its capacity as securities administrator hereunder, and its successors and assigns.

Seller: EMC or Master Funding, in each case in such capacity under the Mortgage Loan Purchase Agreement.

Senior Certificates: The Class I-A Certificates and Class II-A Certificates.

Servicer: Any of EMC, First Horizon, Nexstar , US Mortgage and Washington Mutual.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable legal fees) incurred in the performance by the Servicers or the Company of their servicing obligations hereunder or under the related Servicing Agreement, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, and including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered in the MERS® System, (iii) the management and liquidation of any REO Property (including, without limitation, realtor's commissions) and (iv) compliance with any obligations under Section 3.07 hereof to cause insurance to be maintained.

Servicing Agreement: The First Horizon Servicing Agreement, Nexstar Servicing Agreement, US Mortgage Servicing Agreement or Washington Mutual Servicing Agreement, as applicable.

Servicing Fee: As to each EMC Mortgage Loan and any Distribution Date, an amount equal to $1/12^{th}$ of the Servicing Fee Rate multiplied by the Stated Principal Balance of such EMC Mortgage Loan payable solely from interest collections as of the Due Date in the month preceding the month in which such Distribution Date occurs.  As to each Mortgage Loan serviced by the Servicer and any Distribution Date, an amount equal to $1/12^{th}$ of the Servicing Fee multiplied by the unpaid principal balance of each such mortgage loan payable solely from interest collections, as of the Due Date in the month preceding the month in which such Distribution Date occurs.

Servicing Fee Rate: 0.500% per annum.

Servicing Officer: Any officer of the Company or the Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans (i) in the case of the Company,

whose name and facsimile signature appear on a list of servicing officers furnished to the Master Servicer by the Company on the Closing Date pursuant to this Agreement, as such list may from time to time be amended and (ii) in the case of the Servicer, as to which evidence reasonably acceptable to the Master Servicer, as applicable, of due authorization, by such party has been furnished from time to time to the Master Servicer.

Startup Day: The Startup Day for each REMIC formed hereunder shall be the Closing Date.

Stated Principal Balance: With respect to any Mortgage Loan or related REO Property and any Distribution Date, the Cut-off Date Principal Balance thereof minus the sum of (i) the principal portion of the Scheduled Payments due with respect to such Mortgage Loan during each Due Period ending prior to such Distribution Date (and irrespective of any delinquency in their payment), (ii) all Principal Prepayments with respect to such Mortgage Loan received prior to or during the related Prepayment Period, and all Liquidation Proceeds to the extent applied by the Company or the related Servicer as recoveries of principal in accordance with Section 3.12 or the related Servicing Agreement with respect to such Mortgage Loan, that were received by the Company or the Servicer as of the close of business on the last day of the Prepayment Period related to such Distribution Date and (iii) any Realized Losses on such Mortgage Loan incurred during the related Prepayment Period. The Stated Principal Balance of a Liquidated Loan equals zero.

Subordinated Certificates: The Class M, Class B, Class C and Residual Certificates.

Sub-Trust: Each of the Group I Sub-Trust and the Group II Sub-Trust..

Subsequent Recoveries: As of any Distribution Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 4.02) or surplus amounts held by the Master Servicer, Company and the Servicer to cover estimated expenses (including, but not limited to, recoveries in respect of the representations and warranties made by EMC pursuant to the Mortgage Loan Purchase Agreement) specifically related to a Mortgage Loan that was the subject of a liquidation or final disposition of any REO Property prior to the related Prepayment Period that resulted in a Realized Loss.

Subservicing Agreement: Any agreement entered into between the Company and a subservicer with respect to the subservicing of any Mortgage Loan hereunder by such subservicer.

Substitution Adjustment Amount: The meaning ascribed to such term pursuant to Section 2.03(d).

Successor Master Servicer: The meaning ascribed to such term pursuant to Section 8.06.

Tax Matters Person: The person designated as "tax matters person" in the manner provided under Treasury Regulation Sections 1.860F-4(d) and 301.6231(a)(7)-1T. The holder of the greatest Percentage Interest in a Class of Residual Certificates shall be the Tax Matters Person for the related REMIC. The Securities Administrator, or any successor thereto or assignee

thereof, shall serve as tax administrator hereunder and as agent for the related Tax Matters Person.

Transfer: Any direct or indirect transfer or sale of any Ownership Interest in a Certificate.

Transfer Affidavit: As defined in Section 7.02(c)(ii).

Trigger Event: The Group I Trigger Event or Group II Trigger Event, as applicable.

Trust Fund: The corpus of the trust created hereunder consisting of (i) the Mortgage Loans and all interest accruing and principal due with respect thereto after the Cut-off Date to the extent not applied in computing the Cut-off Date Principal Balance thereof; (ii) the Distribution Account, the Reserve Funds, the Master Servicer Collection Account maintained by the Master Servicer and the Protected Accounts maintained by the Company and the Servicers and all amounts deposited therein pursuant to the applicable provisions of this Agreement and the Servicing Agreements; (iii) property that secured a Mortgage Loan and has been acquired by foreclosure, deed in lieu of foreclosure or otherwise; (iv) the mortgagee's rights under the Insurance Policies with respect to the Mortgage Loans; (v) the Servicing Agreements and the Assignment Agreements; (vi) the rights under the Mortgage Loan Purchase Agreement; and (vii) all proceeds of the foregoing, including proceeds of conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property. The Reserve Funds shall constitute assets of the Trust Fund but will not be included in REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V.

Trustee: Citibank, N.A., a national banking association, not in its individual capacity, but solely in its capacity as trustee for the benefit of the Certificateholders under this Agreement, and any successor thereto, and any corporation or national banking association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee as may from time to time be serving as successor trustee hereunder.

Uncertificated Accrued Interest: With respect to each REMIC I Regular Interest or REMIC II Regular Interest on each Distribution Date, an amount equal to one month's interest at the related Uncertificated REMIC I Pass-Through Rate or Uncertificated REMIC II Pass-Through Rate, as applicable, on the Uncertificated Principal Balance of such REMIC I Regular Interest or REMIC II Regular Interest. In each case, Uncertificated Accrued Interest will be reduced by any Prepayment Interest Shortfalls and Relief Act Interest Shortfalls (allocated to such REMIC I Regular Interests as set forth in Section 1.02).

Uncertificated Notional Amount: With respect to the Class I-C Interest and any Distribution Date, an amount equal to the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests for such Distribution Date, and with respect to the Class II-C Interest and any Distribution Date, an amount equal to the aggregate Uncertificated Principal Balance of the REMIC II Regular Interests for such Distribution Date.

Uncertificated Principal Balance: With respect to each REMIC I Regular Interest, REMIC II Regular Interest, Class I-C Interest and Class II-C Interest, the principal amount of such REMIC I Regular, REMIC II Regular Interest, Class I-C Interest or Class II-C Interest outstanding as of any date of determination. As of the Closing Date, the Uncertificated Principal

63

Balance of each REMIC I Regular Interest, REMIC II Regular Interest, Class I-C Interest and Class II-C Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial Uncertificated Principal Balance, and on any date of determination thereafter, the Uncertificated Principal Balance of the Class I-C Interest shall be an amount equal to the excess, if any, of (A) the then aggregate Uncertificated Principal Balance of the REMIC I Regular Interests over (B) the aggregate Certificate Principal Balance of the Class I-A, Class I-M and Class I-B Certificates then outstanding, and the Uncertificated Principal Balance of the Class II-C Interest shall be an amount equal to the excess, if any, of (A) the then aggregate Uncertificated Principal Balance of the REMIC II Regular Interests over (B) the aggregate Certificate Principal Balance of the Class II-A, Class II-M and Class II-B Certificates then outstanding. On each Distribution Date, the Uncertificated Principal Balance of each REMIC I Regular Interest, REMIC II Regular Interest, Class I-C Interest and Class II-C Interest shall be reduced by all distributions of principal made on such Regular Interests on such Distribution Date pursuant to Section 6.07 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses as provided in Section 6.05, and the Uncertificated Principal Balance of REMIC I Regular Interest ZZ and REMIC II Regular Interest ZZ shall be increased by interest deferrals as provided in Section 6.07(b)(i) and Section 6.07(c)(i), respectively. The Uncertificated Principal Balance of each REMIC I Regular Interest, REMIC II Regular Interest, Class I-C Interest and Class II-C Interest shall never be less than zero.

Uncertificated REMIC I Pass-Through Rate: With respect to any REMIC I Regular Interest and any Distribution Date, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans as of the first day of the related Due Period, weighted on the basis of the Stated Principal Balances of such Mortgage Loans as of the first day of the related Due Period.

Uncertificated REMIC II Pass-Through Rate: With respect to any REMIC II Regular Interest and any Distribution Date, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans as of the first day of the related Due Period, weighted on the basis of the Stated Principal Balances of such Mortgage Loans as of the first day of the related Due Period.

Unpaid Realized Loss Amount: With respect to the Class A Certificates and as to any Distribution Date is the excess of Applied Realized Loss Amounts with respect to such class over the sum of all distributions in reduction of the Applied Realized Loss Amounts on all previous Distribution Dates. Any amounts distributed to the Class A Certificates in respect of any Unpaid Realized Loss Amount will not be applied to reduce the Certificate Principal Balance of such class.

US Mortgage: US Mortgage and any successor thereto.

US Mortgage Assignment Agreement: The Assignment, Assumption and Recognition Agreement, dated as of December 30, 2005, among EMC and the Trustee evidencing the assignment of the US Mortgage Servicing Agreement to the Trust.

US Mortgage Loans: Those Mortgage Loans subject to this Agreement which were purchased by EMC from US Mortgage pursuant to the US Mortgage Servicing Agreement.

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

US Mortgage Servicing Agreement: the Mortgage Loan Servicing Agreement, dated as of July 1, 2002, between UBS Warburg Real Estate Securities Inc. and US Mortgage

Voting Rights: The portion of the voting rights of all the Certificates that is allocated to any Certificate for purposes of the voting provisions hereunder. Voting Rights shall be allocated, with respect to matters solely involving the Group I Certificates, (i) 94% to the Class I-A, Class I-M and Class I-B Certificates, (ii) 3% to the Class I-C Certificates until paid in full, and (iii) 1% to each Class I-R Certificate and, with respect to matters solely involving the Group II Certificates, (i) 95% to the Class II-A, Class II-M and Class II-B Certificates, (ii) 3% to the Class II-C Certificates until paid in full, and (iii) 1% to each Class I-R Certificate. The allocation among the Certificates (other than the Class C Certificates and Residual Certificates) will be in proportion to the Certificate-Principal Balance of each such Class relative to the Certificate Principal Balance of all other such Classes. Voting Rights will be allocated among the Certificates of each such Class in accordance with their respective Percentage Interests. For so long as there is no Class I-A Insurer Default, each Holder of a Class I-A Certificate agrees that the Class I-A Insurer shall be treated by the Depositor, the Master Servicer and the Trustee as if the Class I-A Insurer were the Holder of all Class I-A Certificates for the purpose (and solely for the purpose) of the giving of any consent, the making of any direction or the exercise of any voting or other control rights otherwise given the Holders of the Class I-A Certificates hereunder without any further consent of the Holders of the Class I-A Certificates and such holders shall not exercise such rights without the prior written consent of the Class I-A Insurer. Voting rights will be allocated among the Certificates of each such Class in accordance with their respective Percentage Interests. Matters which solely affect the Group I Certificates or Group II Certificates will be voted on solely by the related Classes.

Washington Mutual: Washington Mutual Bank, N.A. and any successor thereto.

Washington Mutual Assignment Agreement: The Assignment, Assumption and Recognition Agreement, dated as of December 30, 2005, among EMC and the Trustee evidencing the assignment of the Washington Mutual Servicing Agreement to the Trust.

Washington Mutual Loans: Those Mortgage Loans subject to this Agreement which were purchased by EMC from Washington Mutual pursuant to the Washington Mutual Servicing Agreement.

Washington Mutual Servicing Agreement: the Amended and Restated Servicing Agreement, dated as of April 1, 2005, and amended and restated as of December 1, 2005 between EMC and Washington Mutual.

Wells Fargo: Wells Fargo Bank, National Association, and any successor thereto.

Wells Fargo Custodial Agreement: The Custodial Agreement, dated as of December 30, 2005, among the Depositor, EMC, as a seller, Master Funding, as a seller, the Master Servicer, the Trustee and Wells Fargo Bank, National Association as Custodian relating to the Mortgage Loans identified in such Custodial Agreement.

Section 1.02   Allocation of Certain Interest Shortfalls.

65

For purposes of calculating the amount of Current Interest for the Class A, Class M, Class B, Class C Certificates and Class C Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Company or the Master Servicer pursuant to Section 6.02) and any Relief Act Interest Shortfalls incurred in respect of the related Mortgage Loans for any Distribution Date shall be allocated first, to the related Class C Interest based on, and to the extent of, one month's interest at the then applicable Pass-Through Rate on the Uncertificated Notional Amount thereof and, thereafter, among the related Class A, Class M and Class B Certificates, in each case on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rates on the respective Certificate Principal Balances of each such Certificate.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Company or the Master Servicer) and any Relief Act Interest Shortfalls incurred in respect of the Group I Mortgage Loans for any Distribution Date shall be allocated first, to Uncertificated Accrued Interest payable to REMIC I Regular Interest AA and REMIC-I Regular Interest ZZ up to an aggregate amount equal to the REMIC I Interest Loss Allocation Amount, 98% and 2%, respectively, and thereafter among the REMIC I Regular Interests, pro rata based on, and to the extent of, one month's interest at the then applicable Uncertificated REMIC I Pass-Through Rates on the Uncertificated Principal Balances of each such REMIC I Regular Interest.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC II Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Company or the Master Servicer) and any Relief Act Interest Shortfalls incurred in respect of the Group II Mortgage Loans for any Distribution Date shall be allocated first, to Uncertificated Accrued Interest payable to REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Interest Loss Allocation Amount, 98% and 2%, respectively, and thereafter among the REMIC II Regular Interests, pro rata based on, and to the extent of, one month's interest at the then applicable Uncertificated REMIC II Pass-Through Rates on the Uncertificated Principal Balances of each such REMIC II Regular Interest.

66

## ARTICLE II

### CONVEYANCE OF TRUST FUND
### REPRESENTATIONS AND WARRANTIES

#### Section 2.01   Conveyance of Trust Fund.

Pursuant to the Mortgage Loan Purchase Agreement, each Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of such Seller in and to the assets sold by it in the Trust Fund.

EMC has entered into this Agreement in consideration for the purchase of the Mortgage Loans by the Depositor pursuant to the Mortgage Loan Purchase Agreement and has agreed to take the actions specified herein.

The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the use and benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund.

The Depositor, EMC, the Master Servicer, the Securities Administrator and the Trustee agree that it is not intended that any mortgage loan be included in the Trust that is either (i) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Security Act effective November 27, 2003, (ii) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a "High Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004, (iv) a "High-Cost Home Loan" as defined in the Indiana Home Loan Practices Act, effective as of January 1, 2005, (v) a "High-Cost Home Loan" as defined in the Illinois High Risk Home Loan Act effective January 1, 2004 or (vi) a "High-Cost Home Loan" as defined in the Kentucky High Cost Home Loan Act effective June 24, 2003.

In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the related Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse in blank or to order of "Citibank, N.A., as Trustee for certificateholders of SACO I Trust 2005-10, Mortgage-Backed Certificates, Series 2005-10," and showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee, (ii) the original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon (or if clause (x) in the proviso below applies, shall be in recordable form), (iii) unless the Mortgage Loan is a MOM Loan, the assignment (either an original or a copy, which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to the Trustee of the Mortgage with respect to each Mortgage Loan in the name of "Citibank, N.A., as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Mortgage-Backed Certificates, Series 2005-10," which shall have been recorded (or if clause (x) in the proviso below applies, shall be in

67

recordable form), (iv) an original or a copy of all intervening assignments of the Mortgage, if any, with evidence of recording thereon, (v) the original policy of title insurance or mortgagee's certificate of title insurance or commitment or binder for title insurance, if available, or a copy thereof, or, in the event that such original title insurance policy is unavailable, a photocopy thereof, or in lieu thereof, a current lien search on the related Mortgaged Property and (vi) originals or copies of all available assumption, modification or substitution agreements, if any; provided, however, that in lieu of the foregoing, the related Seller may deliver the following documents, under the circumstances set forth below: (x) if any Mortgage, assignment thereof to the Trustee or intervening assignments thereof have been delivered or are being delivered to recording offices for recording and have not been returned in time to permit their delivery as specified above, the Depositor may deliver a true copy thereof with a certification by such Seller or the title company issuing the commitment for title insurance, on the face of such copy, substantially as follows: "Certified to be a true and correct copy of the original, which has been transmitted for recording"; and (y) in lieu of the Mortgage Notes relating to the Mortgage Loans identified in the list set forth in Exhibit I, the Depositor may deliver a lost note affidavit and indemnity and a copy of the original note, if available; and provided, further, however, that in the case of Mortgage Loans which have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, may deliver to the Trustee and the related Custodian a certification of a Servicing Officer to such effect and in such case shall deposit all amounts paid in respect of such Mortgage Loans, in the Master Servicer Collection Account or in the Distribution Account on the Closing Date. In the case of the documents referred to in clause (x) above, the Depositor shall deliver such documents to the Trustee or the related Custodian promptly after they are received. EMC (on its own behalf as a Seller and on behalf of Master Funding) shall cause, at its expense, the Mortgage and intervening assignments, if any, and to the extent required in accordance with the foregoing, the assignment of the Mortgage to the Trustee to be submitted for recording promptly after the Closing Date; provided that EMC need not cause to be recorded (a) any assignment in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel addressed to the Trustee delivered by EMC (on its own behalf as a Seller and on behalf of Master Funding) to the Trustee, the Custodians and each Rating Agency, the recordation of such assignment is not necessary to protect the Trustee's interest in the related Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record solely as nominee for the related Seller and its successors and assigns. In the event that either Seller, the Depositor or the Master Servicer or the Securities Administrator gives written notice to the Trustee that a court has recharacterized the sale of the Mortgage Loans as a financing, EMC (on its own behalf as a Seller and on behalf of Master Funding) shall submit or cause to be submitted for recording as specified above each such previously unrecorded assignment to be submitted for recording as specified above at the expense of the Trust. In the event a Mortgage File is released to the Company or the Servicer as a result of such Person having completed a Request for Release, the related Custodian shall, if not so completed, complete the assignment of the related Mortgage in the manner specified in clause (iii) above.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, EMC (on its own behalf as a Seller and on behalf of Master Funding) further agrees that it will cause, at EMC's own expense, within 30 days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by EMC (on its own behalf as a Seller and on behalf of Master Funding) to the Depositor and by the Depositor to the Trustee in

accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. EMC (on its own behalf as a Seller and on behalf of Master Funding) further agrees that it will not, and will not permit the Company or the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement or the Mortgage Loan Purchase Agreement.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee or the related Custodian on its behalf are and shall be held by or on behalf of the Sellers or the Depositor, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee or the related Custodian on its behalf. Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Custodian on the Trustee's behalf.

Whenever it is provided for in this Agreement that any document, evidence or information relating to a Mortgage Loan to be included in a Mortgage File be delivered or supplied to the Trustee, such delivery or supply shall be made to the appropriate Custodian pursuant to the related Custodial Agreement.

Section 2.02   Acceptance of the Mortgage Loans.

(a)      Based on the Initial Certification received by it from the related Custodian, the Trustee acknowledges receipt of, subject to the further review and exceptions reported by the related Custodian pursuant to the procedures described below, the documents (or certified copies thereof) delivered to the Trustee or the related Custodian on its behalf pursuant to Section 2.01 and declares that it holds and will continue to hold directly or through a custodian those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it in trust for the use and benefit of all present and future Holders of the Certificates. On the Closing Date, the Trustee or the related Custodian on its behalf will deliver one or more Initial Certifications, each in the form of Exhibit One to the related Custodial Agreement, confirming whether or not it has received the Mortgage File for each Mortgage Loan, but without review of such Mortgage File, except to the extent necessary to confirm whether such Mortgage File contains the original Mortgage Note or a lost note affidavit and indemnity in lieu thereof. No later than 90 days after the Closing Date, Trustee or the related Custodian on its behalf shall, for the benefit of the Certificateholders and the Class I-A Insurer, review each Mortgage File delivered to it and execute and deliver to EMC (on its own behalf as a Seller and on behalf of Master Funding), the Class I-A Insurer and the Master Servicer and, if reviewed by the related Custodian, to the Trustee, one or more Interim Certifications, each substantially in the form of Exhibit Two to the related Custodial Agreement. In conducting such review, the Trustee or the related Custodian on its behalf will ascertain whether all required documents have been executed and received and whether those documents relate, determined on

69

the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B to this Agreement, as supplemented (provided, however, that with respect to those documents described in subclauses (iv) and (vi) of Section 2.01, such obligations shall extend only to documents actually delivered pursuant to such subclauses). In performing any such review, the Trustee and the related Custodian may conclusively rely on the purported due execution and genuineness of any such document and on the purported genuineness of any signature thereon. If the Trustee or the related Custodian on its behalf finds any document constituting part of the Mortgage File not to have been executed or received, or to be unrelated to the Mortgage Loans identified in Exhibit B or to appear to be defective on its face, the Trustee or the related Custodian on its behalf shall include such information in the exception report attached to the Interim Certification. EMC·(on its own behalf as a Seller and on behalf of Master Funding) shall correct or cure any such defect or, if prior to the end of the second anniversary of the Closing Date, EMC (on its own behalf as a Seller and on behalf of Master Funding) may substitute for the related Mortgage Loan a Replacement Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 or shall deliver to the Trustee and the Class I-A Insurer an Opinion of Counsel addressed to the Trustee and the Class I-A Insurer to the effect that such defect does not materially or adversely affect the interests of the Certificateholders or the Class I-A Insurer in such Mortgage Loan within 60 days from the date of notice from the Trustee of the defect and if EMC (on its own behalf as a Seller and on behalf of Master Funding) fails to correct or cure the defect or deliver such opinion within such period, EMC (on its own behalf as a Seller and on behalf of Master Funding) will, subject to Section 2.03, within 90 days from the notification of the Trustee purchase such Mortgage Loan at the Purchase Price; provided, however, that if such defect relates solely to the inability of EMC (on its own behalf as a Seller and on behalf of Master Funding) to deliver the Mortgage, assignment thereof to the Trustee, or intervening assignments thereof with evidence of recording thereon because such documents have been submitted for recording and have not been returned by the applicable jurisdiction, EMC (on its own behalf as a Seller and on behalf of Master Funding) shall not be required to purchase such Mortgage Loan if EMC delivers such documents promptly upon receipt, but in no event later than 360 days after the Closing Date.

(b)     No later than 180 days after the Closing Date, the Trustee or the related Custodian on its behalf will review, for the benefit of the Certificateholders and the Class I-A Insurer, the Mortgage Files and will execute and deliver or cause to be executed and delivered to EMC (on its own behalf as a Seller and on behalf of Master Funding), the Class I-A Insurer and the Master Servicer and, if reviewed by the related Custodian, to the Trustee, one or more Final Certifications, each substantially in the form of Exhibit Three to the related Custodial Agreement. In conducting such review, the Trustee or the related Custodian on its behalf will ascertain whether each document required to be recorded has been returned from the recording office with evidence of recording thereon and the Trustee or the related Custodian on its behalf has received either an original or a copy thereof, as required in Section 2.01 (provided, however, that with respect to those documents described in subclauses (iv) and (vi) of Section 2.01, such obligations shall extend only to documents actually delivered pursuant to such subclauses). If the Trustee or the related Custodian on its behalf finds any document with respect to a Mortgage Loan has not been received, or to be unrelated, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B or to appear defective on its face, the Trustee or the related Custodian on its behalf shall note such defect in the exception report attached to the Final Certification and shall promptly notify EMC

70

(on its own behalf as a Seller and on behalf of Master Funding).  EMC (on its own behalf as a Seller and on behalf of Master Funding) shall correct or cure any such defect or, if prior to the end of the second anniversary of the Closing Date, EMC (on its own behalf as a Seller and on behalf of Master Funding) may substitute for the related Mortgage Loan a Replacement Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 or shall deliver to the Trustee, the Class I-A Insurer and the Securities Administrator an Opinion of Counsel addressed to the Trustee, the Class I-A Insurer and the Securities Administrator to the effect that such defect does not materially or adversely affect the interests of Certificateholders or the Class I-A Insurer in such Mortgage Loan within 60 days from the date of notice from the Trustee of the defect and if EMC (on its own behalf as a Seller and on behalf of Master Funding) is unable within such period to correct or cure such defect, or to substitute the related Mortgage Loan with a Replacement Mortgage Loan or to deliver such opinion, EMC (on its own behalf as a Seller and on behalf of Master Funding) shall, subject to Section 2.03, within 90 days from the notification of the Trustee, purchase such Mortgage Loan at the Purchase Price; provided, however, that if such defect relates solely to the inability of EMC (on its own behalf as a Seller and on behalf of Master Funding) to deliver the Mortgage, assignment thereof to the Trustee or intervening assignments thereof with evidence of recording thereon, because such documents have not been returned by the applicable jurisdiction, EMC (on its own behalf as a Seller and on behalf of Master Funding) shall not be required to purchase such Mortgage Loan, if EMC delivers such documents promptly upon receipt, but in no event later than 360 days after the Closing Date. Notwithstanding anything to the contrary, the Trustee shall have no responsibility with respect to the custody or review of Mortgage Files, all of which shall be performed by the related Custodian pursuant to the related Custodial Agreement, and the Trustee is hereby authorized and directed to enter into each such Custodial Agreement. Performance by the Custodians of their obligations under the respective Custodial Agreement shall satisfy all responsibilities for custody and review of Mortgage Files hereunder. The Trustee shall have no liability for the failure of the Custodians to perform their respective obligations under the related Custodial Agreement.

(c)     In the event that a Mortgage Loan is repurchased by EMC (on its own behalf as a Seller and on behalf of Master Funding) in accordance with subsections 2.02(a) or (b) above or Section 2.03, EMC (on its own behalf as a Seller and on behalf of Master Funding) shall remit the applicable Purchase Price to the Master Servicer for deposit in the Master Servicer Collection Account and shall provide written notice to the Securities Administrator and the Trustee detailing the components of the Purchase Price, signed by a Servicing Officer. Upon deposit of the Purchase Price in the Master Servicer Collection Account and upon receipt of a Request for Release with respect to such Mortgage Loan, the related Custodian will release to EMC (on its own behalf as a Seller and on behalf of Master Funding) the related Mortgage File and the Trustee shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty furnished to it by the related Seller, as are necessary to vest in EMC (on its own behalf as a Seller and on behalf of Master Funding) title to and rights under the Mortgage Loan. Such purchase shall be deemed to have occurred on the date on which the deposit into the Master Servicer Collection Account was made. The Securities Administrator shall promptly use its best efforts to notify each Rating Agency and the Class I-A Insurer of such repurchase in accordance with Section 12.05. The obligation of EMC (on its own behalf as a Seller and on behalf of Master Funding) to cure, repurchase or substitute for any Mortgage Loan

as to which a defect in a constituent document exists shall be the sole remedies respecting such defect available to the Certificateholders or to the Trustee on their behalf.

(d)     EMC (on its own behalf as a Seller and on behalf of Master Funding) shall deliver to the Trustee or the related Custodian on its behalf, and Trustee agrees to accept the Mortgage Note and other documents constituting the Mortgage File with respect to any Replacement Mortgage Loan, which the Trustee or the related Custodian will review as provided in subsections 2.02(a) and 2.02(b), provided, that the Closing Date referred to therein shall instead be the date of delivery of the Mortgage File with respect to each Replacement Mortgage Loan.

Section 2.03   Representations,   Warranties   and   Covenants   of   the Company, the Master Servicer, and EMC as a Seller.

(a)     The Company hereby represents and warrants to the Master Servicer, the Depositor, the Securities Administrator, the Class I-A Insurer and the Trustee as follows, as of the Closing Date:

(i)     It is duly organized and is validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by it in any state in which a Mortgaged Property related to an EMC Mortgage Loan is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each EMC Mortgage Loan, to service the EMC Mortgage Loans in accordance with the terms of the Mortgage Loan Purchase Agreement and this Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof or thereof.

(ii)     It has the full corporate power and authority to service each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary corporate action on its part the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto or thereto, as applicable, constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)     The execution and delivery of this Agreement, the servicing of the Mortgage Loans by it under this Agreement, the consummation of any other of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof and thereof are in its ordinary course of

72

business and will not (A) result in a breach of any term or provision of its charter or by-laws or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which it is a party or by which it may be bound, or (C) constitute a violation of any statute, order or regulation applicable to it of any court, regulatory body, administrative agency or governmental body having jurisdiction over it; and it is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair its ability to perform or meet any of its obligations under this Agreement.

(iv)    It is an approved servicer of conventional mortgage loans for Fannie Mae and Freddie Mac and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act.

(v)    No litigation is pending or, to the best of its knowledge, threatened, against it that would materially and adversely affect (a) the execution, delivery or enforceability of this Agreement (b) its ability to service the EMC Mortgage Loans, (c) to perform any of its other obligations under this Agreement in accordance with the terms hereof, (d) its business operations, financial conditions, or properties or assets owned by it, or (e) its ability to carry on its business as now conducted.

(vi)    No consent, approval, authorization or order of any court or governmental agency or body is required for its execution, delivery and performance of, or compliance with, this Agreement or the consummation of the transactions contemplated hereby or thereby, or if any such consent, approval, authorization or order is required, it has obtained the same.

(vii)    The servicing practices used by the Company in respect of each Mortgage Loan have been, and will continue to be, compliant in all material respects with applicable laws and regulations.

(b)    LaSalle Bank National Association, in its capacity as Master Servicer and Securities Administrator hereby represents and warrants to the Seller, the Depositor, the Class I-A Insurer and the Trustee as follows, as of the Closing Date:

(i)    It is a national banking association duly formed, validly existing and in good standing under the laws of the United States of America and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Master Servicer and the Securities Administrator and, is in compliance with the doing business laws of any state, to the extent necessary to ensure its ability to perform any of its other obligations under this Agreement in accordance with the terms hereof;

73

(ii)     It has the full corporate power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary corporate action on its part the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)     The execution and delivery of this Agreement by it, the consummation of any other of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof are in its ordinary course of business and will not (A) result in a material breach of any term or provision of its charter or by-laws or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which it is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to it of any court, regulatory body, administrative agency or governmental body having jurisdiction over it; and it is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair its ability to perform or meet any of its obligations under this Agreement.

(iv)     No litigation is pending or, to the best of its knowledge, threatened, against it that would materially and adversely affect the execution, delivery or enforceability of this Agreement or its ability to perform any of its other obligations under this Agreement in accordance with the terms hereof.

(v)     No consent, approval, authorization or order of any court or governmental agency or body is required for its execution, delivery and performance of, or compliance with, this Agreement or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, it has obtained the same.

(c)     EMC (in its capacity as a Seller) hereby represents and warrants to the Depositor, the Class I-A Insurer and the Trustee as follows, as of the Closing Date:

(i)     EMC is duly organized as a Delaware corporation and is validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by EMC in any state in which a Mortgaged Property

is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each Mortgage Loan, to sell the Mortgage Loans in accordance with the terms of the Mortgage Loan Purchase Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof.

(ii)    EMC has the full corporate power and authority to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary corporate action on the part of EMC the execution, delivery and performance of this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto or thereto, as applicable, constitutes a legal, valid and binding obligation of EMC, enforceable against EMC in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)    The execution and delivery of this Agreement by EMC, the sale of the Mortgage Loans by EMC under the Mortgage Loan Purchase Agreement, the consummation of any other of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof and thereof are in the ordinary course of business of EMC and will not (A) result in a material breach of any term or provision of the charter or by-laws of EMC or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which EMC is a party or by which it may be bound, or (C) constitute a violation of any statute, order or regulation applicable to EMC of any court, regulatory body, administrative agency or governmental body having jurisdiction over EMC; and EMC is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair EMC's ability to perform or meet any of its obligations under this Agreement.

(iv)    EMC is an approved seller of conventional mortgage loans for Fannie Mae and Freddie Mac and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act.

(v)    No litigation is pending or, to the best of EMC's knowledge, threatened, against EMC that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of EMC to sell the

75

Mortgage Loans or to perform any of its other obligations under this Agreement in accordance with the terms hereof or thereof.

(vi)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by EMC of, or compliance by EMC with, this Agreement or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, EMC has obtained the same.

(vii)    With respect to each Mortgage Loan as of the Closing Date (or such other date as may be specified in Section 7 of the Mortgage Loan Purchase Agreement), EMC hereby remakes and restates each of the representations and warranties set forth in Section 7 of the Mortgage Loan Purchase Agreement to the Depositor and the Trustee to the same extent as if fully set forth herein.

(d)    Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt written notice thereof to the other parties. EMC, in its capacity as a Seller, hereby covenants with respect to the representations and warranties set forth in the Mortgage Loan Purchase Agreement with respect to the Mortgage Loans, that within 90 days of the discovery of a breach of any representation or warranty set forth therein that materially and adversely affects the interests of the Certificateholders or the Class I-A Insurer in any Mortgage Loan, it shall cure such breach in all material respects and, if such breach is not so cured, (i) if such 90 day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Replacement Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below; provided that any such substitution pursuant to (i) above or repurchase pursuant to (ii) above shall not be effected prior to the delivery to the Trustee and the Class I-A Insurer of an Opinion of Counsel if required by Section 2.05 hereof and any such substitution pursuant to (i) above shall not be effected prior to the additional delivery to the applicable Custodian of a Request for Release. The Trustee shall give prompt written notice to the parties hereto and the Class I-A Insurer of EMC's failure to cure such breach as set forth in the preceding sentence. EMC shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. To enable the Master Servicer to amend the Mortgage Loan Schedule, EMC shall, unless it cures such breach in a timely fashion pursuant to this Section 2.03, promptly notify the Master Servicer whether it intends either to repurchase, or to substitute for, the Mortgage Loan affected by such breach. With respect to the representations and warranties with respect to the Mortgage Loans that are made to the best of EMC's knowledge, if it is discovered by any of the Depositor, the Master Servicer, EMC, the Securities Administrator or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, notwithstanding EMC's lack of knowledge with respect to the substance of such representation or warranty, EMC (in its capacity as a Seller) shall

nevertheless be required to cure, substitute for or repurchase the affected Mortgage Loan in accordance with the foregoing.

With respect to any Replacement Mortgage Loan or Loans, EMC (in its capacity as a Seller) shall deliver to the Trustee or the related Custodian on its behalf for the benefit of the Certificateholders and the Class I-A Insurer such documents and agreements as are required by Section 2.01. No substitution will be made in any calendar month after the Determination Date for such month. Notwithstanding the foregoing, such substitution must be done within two years of the Closing Date. Scheduled Payments due with respect to Replacement Mortgage Loans in the Due Period related to the Distribution Date on which such proceeds are to be distributed shall not be part of the Trust Fund and will be retained by EMC (in its capacity as a Seller). For the month of substitution, distributions to Certificateholders will include the Scheduled Payment due on any Deleted Mortgage Loan for the related Due Period and thereafter EMC (in its capacity as a Seller) shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Master Servicer shall amend the Mortgage Loan Schedule for the benefit of the Certificateholders and the Class I-A Insurer to reflect the removal of such Deleted Mortgage Loan and the substitution of the Replacement Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Securities Administrator, the Trustee , the Class I-A Insurer and the related Custodian. Upon such substitution, the Replacement Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and EMC shall be deemed to have made with respect to such Replacement Mortgage Loan or Loans, as of the date of substitution, the representations and warranties set forth in Section 7 or Section 8 of the Mortgage Loan Purchase Agreement with respect to such Mortgage Loan. Upon any such substitution and the deposit into the Master Servicer Collection Account of the amount required to be deposited therein in connection with such substitution as described in the following paragraph and receipt by the related Custodian of a Request for Release for such Mortgage Loan, the related Custodian shall release to EMC the Mortgage File relating to such Deleted Mortgage Loan and held for the benefit of the Certificateholders and the Trustee shall execute and deliver at EMC's direction such instruments of transfer or assignment as have been prepared by EMC, in each case without recourse, representation or warranty as shall be necessary to vest in EMC, or its respective designee, title to the Trustee's interest in any Deleted Mortgage Loan substituted for pursuant to this Section 2.03.

For any month in which EMC substitutes one or more Replacement Mortgage Loans for a Deleted Mortgage Loan, the Master Servicer will determine the amount (if any) by which the aggregate principal balance of all the Replacement Mortgage Loans as of the date of substitution is less than the Stated Principal Balance (after application of the principal portion of the Scheduled Payment due in the month of substitution) of such Deleted Mortgage Loan. An amount equal to the aggregate of such deficiencies, described in the preceding sentence for any Distribution Date (such amount, the "Substitution Adjustment Amount") shall be deposited into the Master Servicer Collection Account, by EMC delivering such Replacement Mortgage Loan on the Determination Date for the Distribution Date relating to the Prepayment Period during which the related Mortgage Loan became required to be purchased or replaced hereunder.

In the event that EMC (in its capacity as a Seller) shall have repurchased a Mortgage Loan, the Purchase Price therefor shall be deposited into the Master Servicer Collection Account maintained by the Master Servicer, on the Determination Date for the Distribution Date in the

77

month following the month during which EMC became obligated to repurchase or replace such Mortgage Loan and upon such deposit of the Purchase Price, the delivery of an Opinion of Counsel if required by Section 2.05 and the receipt of a Request for Release, the related Custodian shall release the related Mortgage File held for the benefit of the Certificateholders to EMC, and the Trustee shall execute and deliver at such Person's direction the related instruments of transfer or assignment prepared by EMC, in each case without recourse, representation or warranty, as shall be necessary to transfer title from the Trustee for the benefit of the Certificateholders and transfer the Trustee's interest to EMC (on its own behalf as a Seller and on behalf of Master Funding) to any Mortgage Loan purchased pursuant to this Section 2.03. It is understood and agreed that the obligation under this Agreement of EMC to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies against EMC (in its capacity as a Seller) respecting such breach available to the Certificateholders, the Depositor or the Trustee.

(e)     The representations and warranties set forth in this Section 2.03 hereof shall survive delivery of the respective Mortgage Loans and Mortgage Files to the Trustee or the related Custodian for the benefit of the Certificateholders.

Section 2.04   Representations and Warranties of the Depositor.

The Depositor hereby represents and warrants to the Master Servicer, the Securities Administrator, the Class I-A Insurer and the Trustee as follows, as of the date hereof and as of the Closing Date:

(i)     The Depositor is duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware and has full power and authority necessary to own or hold its properties and to conduct its business as now conducted by it and to enter into and perform its obligations under this Agreement.

(ii)     The Depositor has the full power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by, this Agreement and has duly authorized, by all necessary corporate action on its part, the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, subject, as to enforceability, to (i) bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally and (ii) general principles of equity, regardless of whether enforcement is sought in a proceeding in equity or at law.

(iii)     The execution and delivery of this Agreement by the Depositor, the consummation of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof and thereof are in the ordinary course of business of the Depositor and will not (A) result in a material breach of any term or provision of the certificate of formation or limited liability company

78

agreement of the Depositor or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which the Depositor is a party or by which it may be bound or (C) constitute a material violation of any statute, order or regulation applicable to the Depositor of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Depositor; and the Depositor is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair the Depositor's ability to perform or meet any of its obligations under this Agreement.

(iv)     No litigation is pending, or, to the best of the Depositor's knowledge, threatened, against the Depositor that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Depositor to perform its obligations under this Agreement in accordance with the terms hereof or thereof.

(v)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Depositor of, or compliance by the Depositor with this Agreement or the consummation of the transactions contemplated hereby or thereby, or if any such consent, approval, authorization or order is required, the Depositor has obtained the same.

The Depositor hereby represents and warrants to the Trustee as of the Closing Date, following the transfer of the Mortgage Loans to it by the Sellers, the Depositor had good title to the Mortgage Loans and the related Mortgage Notes were subject to no offsets, claims, defenses or counterclaims.

It is understood and agreed that the representations and warranties set forth in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee or the related Custodian for the benefit of the Certificateholders and the Class I-A Insurer. Upon discovery by the Depositor or the Trustee of a breach of such representations and warranties, the party discovering such breach shall give prompt written notice to the others, to each Rating Agency.

Section 2.05   Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases.

(a)     Notwithstanding any contrary provision of this Agreement, with respect to any Mortgage Loan that is not in default or as to which default is not imminent, no repurchase or substitution pursuant to Sections 2.02 or 2.03 shall be made unless EMC delivers to the Trustee, the Class I-A Insurer and the Securities Administrator an Opinion of Counsel, addressed to the Trustee, the Class I-A Insurer and the Securities Administrator, to the effect that such repurchase or substitution would not (i) result in the imposition of the tax on "prohibited transactions" of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V or contributions after the Closing

79

Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively, or (ii) cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are outstanding. Any Mortgage Loan as to which repurchase or substitution was delayed pursuant to this paragraph shall be repurchased or the substitution therefor shall occur (subject to compliance with Sections 2.02 or 2.03) upon the earlier of (a) the occurrence of a default or imminent default with respect to such Mortgage Loan and (b) receipt by the Trustee of an Opinion of Counsel addressed to the Trustee and the Securities Administrator to the effect that such repurchase or substitution, as applicable, will not result in the events described in clause (i) or clause (ii) of the preceding sentence.

(b)     Upon discovery by the Depositor, EMC or the Master Servicer that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within 5 Business Days of discovery) give written notice thereof to the other parties and the Trustee, the Class I-A Insurer and the Securities Administrator. In connection therewith, EMC (in its capacity as a Seller and on behalf of Master Funding) shall either (i) substitute, if the conditions in Section 2.03 with respect to substitutions are satisfied, a Replacement Mortgage Loan for the affected Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of such discovery in the same manner as it would a Mortgage Loan for a breach of representation or warranty in accordance with Section 2.03. The Trustee shall reconvey to EMC (in its capacity as a Seller and on behalf of Master Funding) the Mortgage Loan to be released pursuant hereto (and the related Custodian shall deliver the related Mortgage File) in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty in accordance with Section 2.03.

Section 2.06   Countersignature and Delivery of Certificates.

(a)     The Trustee acknowledges the sale, transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, the Securities Administrator has executed, countersigned and delivered, to or upon the order of the Depositor, the Certificates in authorized denominations evidencing the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and the Class I-A Insurer and to perform the duties set forth in this Agreement in accordance with its terms.

(b)     The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests and REMIC II Regular Interests and the other assets of REMIC III for the benefit of the holders of the Regular Certificates (other than the Class C Certificates), the Class C Interests and the Class I-R-2 Certificates. The Trustee acknowledges receipt of the REMIC I Regular Interests (which are uncertificated), the REMIC II Regular Interests (which are uncertificated) and the other assets of REMIC III and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Regular Certificates (other than the Class C Certificates), the Class C Interests and the Class I-R-2 Certificates.

80

(c)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the Class I-C Interest for the benefit of the Holders of the Class I-C Certificates and Class I-RX Certificates. The Trustee acknowledges receipt of the Class I-C Interest (which is uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the Holders of the Class I-C Certificates and Class I-RX Certificates.

(d)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the Class II-C Interest for the benefit of the Holders of the Class II-C Certificates and Class II-RX Certificates. The Trustee acknowledges receipt of the Class II-C Interest (which is uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the Holders of the Class II-C Certificates and Class II-RX Certificates.

Section 2.07    [Reserved]

[TPW. NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

## ARTICLE III

## ADMINISTRATION AND SERVICING OF EMC MORTGAGE LOANS BY THE COMPANY

### Section 3.01   The Company.

The Company shall service and administer the EMC Mortgage Loans in accordance with this Agreement and with customary and usual standards of practice of prudent mortgage loan servicers in the respective states in which the related Mortgaged Properties are located. In connection with such servicing and administration, the Company shall have full power and authority, acting alone and/or through subservicers as provided in Section 3.03, to do or cause to be done any and all things that it may deem necessary or desirable and consistent with the terms of this Agreement and customary servicing practices in connection with such servicing and administration, including but not limited to, the power and authority, subject to the terms hereof (i) to execute and deliver, on behalf of the Certificateholders,  the Trustee and the Class I-A Insurer, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any related Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages (but only in the manner provided herein), (iii) to collect any Insurance Proceeds and other Liquidation Proceeds or Subsequent Recoveries, and (iv) subject to Section 3.12, to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any EMC Mortgage Loan; provided that the Company shall take no action that is inconsistent with or prejudices the interests of the Trust Fund , the Class I-A Insurer or the Certificateholders or this Agreement in any EMC Mortgage Loan or the rights and interests of the Depositor, the Master Servicer, the Class I-A Insurer or the Trustee under this Agreement.

Without limiting the generality of the foregoing, the Company, in its own name or in the name of the Trust, the Depositor or the Trustee, is hereby authorized and empowered by the Trust, the Depositor and the Trustee, when the Company believes it appropriate in its reasonable judgment, to execute and deliver, on behalf of the Trustee, the Depositor, the Certificateholders or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge and all other comparable instruments, with respect to the EMC Mortgage Loans, and with respect to the related Mortgaged Properties held for the benefit of the Certificateholders. The Company shall prepare and deliver to the Depositor and/or the Trustee such documents requiring execution and delivery by any or all of them as are necessary or appropriate to enable the Company to service and administer the EMC Mortgage Loans. Upon receipt of such documents, the Depositor and/or the Trustee shall execute such documents and deliver them to the Company.

In accordance with the standards of the first paragraph of this Section 3.01, the Company shall advance or cause to be advanced funds as necessary for the purpose of effecting the payment of taxes and assessments on the Mortgaged Properties relating to the EMC Mortgage Loans, which advances shall be reimbursable in the first instance from related collections from the Mortgagors pursuant to Section 5.04, and further as provided in Section 5.02. All costs incurred by the Company, if any, in effecting the timely payments of taxes and assessments on the Mortgaged Properties relating to the EMC Mortgage Loans and related insurance premiums shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added

82

to the Stated Principal Balance under the related EMC Mortgage Loans, notwithstanding that the terms of such Mortgage Loans so permit.

If the Mortgage relating to a Mortgage Loan had a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Company may consent to the refinancing of the prior senior lien, provided that the following requirements are met:

>        (i)      the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; and

>        (ii)     the interest rate, or, in the case of an adjustable rate existing senior lien, the maximum interest rate, for the loan evidencing the refinanced senior lien is no more than 2.0% higher than the interest rate or the maximum interest rate, as the case may be, on the loan evidencing the existing senior lien immediately prior to the date of such refinancing; and

>        (iii)    the loan evidencing the refinanced senior lien is not subject to negative amortization.

The Trustee shall furnish the Company and the Servicer with any powers of attorney and other documents in form as provided to it necessary or appropriate to enable the Company and the Servicer to service and administer the related Mortgage Loans and REO Property, to execute and deliver instruments of satisfaction or cancellation, or of partial or full release or discharge, and to foreclose upon or otherwise liquidate Mortgaged Property, and to appeal, prosecute or defend in any court action relating to the Mortgage Loans or the Mortgaged Property, in accordance with the related Servicing Agreement and this Agreement.

### Section 3.02    Due-on-Sale Clauses; Assumption Agreements.

(a)      Except as otherwise provided in this Section 3.02, when any property subject to a Mortgage has been or is about to be conveyed by the Mortgagor, the Company shall to the extent that it has knowledge of such conveyance, enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing, the Company is not required to exercise such rights with respect to an EMC Mortgage Loan if the Person to whom the related Mortgaged Property has been conveyed or is proposed to be conveyed satisfies the terms and conditions contained in the Mortgage Note and Mortgage related thereto and the consent of the mortgagee under such Mortgage Note or Mortgage is not otherwise so required under such Mortgage Note or Mortgage as a condition to such transfer. In the event that the Company is prohibited by law from enforcing any such due-on-sale clause, or if coverage under any Required Insurance Policy would be adversely affected, or if nonenforcement is otherwise permitted hereunder, the Company is authorized, subject to Section 3.02(b), to take or enter into an assumption and modification agreement from or with the person to whom such property has been or is about to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, unless prohibited by applicable state law, the Mortgagor remains liable

83

thereon, provided that the Mortgage Loan shall continue to be covered (if so covered before the Company enters such agreement) by the applicable Required Insurance Policies. The Company, subject to Section 3.02(b), is also authorized with the prior approval of the insurers under any Required Insurance Policies to enter into a substitution of liability agreement with such Person, pursuant to which the original Mortgagor is released from liability and such Person is substituted as Mortgagor and becomes liable under the Mortgage Note. Notwithstanding the foregoing, the Company shall not be deemed to be in default under this Section 3.02(a) by reason of any transfer or assumption that the Company reasonably believes it is restricted by law from preventing.

(b)    Subject to the Company's duty to enforce any due-on-sale clause to the extent set forth in Section 3.02(a), in any case in which a Mortgaged Property has been conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption agreement or modification agreement or supplement to the Mortgage Note or Mortgage that requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the related EMC Mortgage Loan, the Company shall prepare and deliver or cause to be prepared and delivered to the Trustee for signature and shall direct, in writing, the Trustee to execute the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person. In connection with any such assumption, no material term of the Mortgage Note (including, but not limited to, the Mortgage Rate, the amount of the Scheduled Payment and any other term affecting the amount or timing of payment on the EMC Mortgage Loan) may be changed. In addition, the substitute Mortgagor and the Mortgaged Property must be acceptable to the Company in accordance with its servicing standards as then in effect. The Company shall notify the Trustee that any such substitution or assumption agreement has been completed by forwarding to the Trustee the original of such substitution or assumption agreement, which in the case of the original shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof. Any fee collected by the Company for entering into an assumption or substitution of liability agreement will be retained by the Company as additional servicing compensation.

Section 3.03    Subservicers.

The Company shall perform all of its servicing responsibilities hereunder or may cause a subservicer to perform any such servicing responsibilities on its behalf, but the use by the Company of a subservicer shall not release the Company from any of its obligations hereunder and the Company shall remain responsible hereunder for all acts and omissions of each subservicer as fully as if such acts and omissions were those of the Company. The Company shall pay all fees of each subservicer from its own funds, and a subservicer's fee shall not exceed the Servicing Fee payable to the Company hereunder.

At the cost and expense of the Company, without any right of reimbursement from its Protected Account, the Company shall be entitled to terminate the rights and responsibilities of a subservicer and arrange for any servicing responsibilities to be performed by a successor

84

subservicer; provided, however, that nothing contained herein shall be deemed to prevent or prohibit the Company, at the Company's option, from electing to service the related Mortgage Loans itself. In the event that the Company's responsibilities and duties under this Agreement are terminated pursuant to Section 9.01, the Company shall at its own cost and expense terminate the rights and responsibilities of each subservicer effective as of the date of termination of the Company. The Company shall pay all fees, expenses or penalties necessary in order to terminate the rights and responsibilities of each subservicer from the Company's own funds without reimbursement from the Trust Fund.

Notwithstanding the foregoing, the Company shall not be relieved of its obligations hereunder and shall be obligated to the same extent and under the same terms and conditions as if it alone were servicing and administering the EMC Mortgage Loans. The Company shall be entitled to enter into an agreement with a subservicer for indemnification of the Company by the subservicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Any subservicing agreement and any other transactions or services relating to the EMC Mortgage Loans involving a subservicer shall be deemed to be between such subservicer and the Company alone, and neither the Master Servicer nor the Trustee shall have any obligations, duties or liabilities with respect to such subservicer including any obligation, duty or liability of either the Master Servicer or the Trustee to pay such subservicer's fees and expenses. For purposes of remittances to the Securities Administrator pursuant to this Agreement, the Company shall be deemed to have received a payment on an EMC Mortgage Loan when a subservicer has received such payment.

Section 3.04   Documents, Records and Funds in Possession of the Company to Be Held for Trustee.

Notwithstanding any other provisions of this Agreement, the Company shall transmit to the Trustee or the related Custodian on behalf of the Trustee as required by this Agreement all documents and instruments in respect of an EMC Mortgage Loan coming into the possession of the Company from time to time and shall account fully to the Master Servicer for any funds received by the Company or that otherwise are collected by the Company as Liquidation Proceeds, Insurance Proceeds or Subsequent Recoveries in respect of any such Mortgage Loan. All Mortgage Files and funds collected or held by, or under the control of, the Company in respect of any EMC Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Subsequent Recoveries, including but not limited to, any funds on deposit in the Protected Account maintained by the Company, shall be held by the Company for and on behalf of the Trustee and shall be and remain the sole and exclusive property of the Trustee, subject to the applicable provisions of this Agreement. The Company also agrees that it shall not create, incur or subject any Mortgage File or any funds that are deposited in the Protected Account maintained by the Company or in any Escrow Account, or any funds that otherwise are or may become due or payable to the Trustee for the benefit of the Certificateholders and the Class I-A Insurer, to any claim, lien, security interest, judgment, levy, writ of attachment or other encumbrance, or assert by legal action or otherwise any claim or right of set off against any Mortgage File or any funds collected on, or in connection with, an EMC Mortgage Loan, except, however, that the Company shall be entitled to set off against and deduct

85

from any such funds any amounts that are properly due and payable to the Company under this Agreement.

All funds collected or held by, or under the control of, the Company, in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be held by the Company for and on behalf of the Trustee and the Certificateholders and shall be and remain the sole and exclusive property of the Trustee; provided, however, that the Company shall be entitled to setoff against, and deduct from, any such funds any amounts that are properly due and payable to the Company under this Agreement.

Section 3.05   Optional Purchase of Certain Mortgage Loans.

With respect to any Mortgage Loans which as of the first day of a Fiscal Quarter is delinquent in payment by 90 days or more or is an REO Property, EMC shall have the right to purchase any Mortgage Loan from the Trust which becomes 90 days or more delinquent or becomes an REO Property at a price equal to the Purchase Price; provided however (i) that such Mortgage Loan is still 90 days or more delinquent or is an REO Property as of the date of such purchase and (ii) this purchase option, if not theretofore exercised, shall terminate on the date prior to the last day of the related Fiscal Quarter. This purchase option, if not exercised, shall not be thereafter reinstated unless the delinquency is cured and the Mortgage Loan thereafter again becomes 90 days or more delinquent or becomes an REO Property, in which case the option shall again become exercisable as of the first day of the related Fiscal Quarter.

In addition, EMC shall, at its option, purchase any Mortgage Loan from the Trust if the first Due Date for such Mortgage Loan is subsequent to the Cut-off Date and the initial Scheduled Payment is not made within thirty (30) days of such Due Date. Such purchase shall be made at a price equal to the Purchase Price.

If at any time EMC remits to the Master Servicer a payment for deposit in the Master Servicer Collection Account covering the amount of the Purchase Price for such a Mortgage Loan, and EMC provides to the Master Servicer and Trustee an Officer's Certificate stating that the amount of such payment has been deposited in the Master Servicer Collection Account, then the Trustee shall execute the assignment of such Mortgage Loan prepared and delivered to the Trustee, at the request of EMC, without recourse, representation or warranty, to EMC which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. EMC will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

> Section 3.06   Release of Mortgage Files.  (a)  Upon becoming aware of the payment in full of any Mortgage Loan, or the receipt by the Company or the Servicer of a notification that payment in full has been escrowed in a manner customary for such purposes for payment to Certificateholders on the next Distribution Date, the Company or a Servicer (pursuant to the related Servicing Agreement), as applicable, will (or if the Company or the Servicer does not, the Master Servicer may), promptly furnish to the Custodian, on behalf of the

86

Trustee, two copies of a certification substantially in the form of Exhibit G hereto signed by a Servicing Officer or Master Servicing Officer or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer or Master Servicing Officer (which certification shall include a statement to the effect that all amounts received in connection with such payment that are required to be deposited in the Protected Account maintained by the Company pursuant to Article V or by the related Servicer pursuant to the related Servicing Agreement have been or will be so deposited) and shall request that the Custodian, on behalf of the Trustee, deliver to the Company or the Servicer or the Master Servicer the related Mortgage File. Upon receipt of such certification and request, the Custodian, on behalf of the Trustee, shall promptly release the related Mortgage File to the Company or the Servicer or the Master Servicer and the Trustee and Custodian shall have no further responsibility with regard to such Mortgage File. Upon any such payment in full, the Company or the Servicer is authorized, to give, as agent for the Trustee as the mortgagee under the Mortgage that secured the Mortgage Loan, an instrument of satisfaction (or assignment of mortgage without recourse, representation or warranty) regarding the Mortgaged Property subject to the Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of such payment, it being understood and agreed that no expenses incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the Protected Account.

(b)   From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan and in accordance with this Agreement and the related Servicing Agreement, as applicable, the Trustee shall execute such documents as shall be prepared and furnished to the Trustee by the Company, the Servicer or the Master Servicer (in form reasonably acceptable to the Trustee) and as are necessary to the prosecution of any such proceedings. The related Custodian, on behalf of the Trustee, shall, pursuant to the related Custodial Agreement, upon the request of the Company, the Servicer or the Master Servicer, and delivery to the related Custodian, on behalf of the Trustee, of two copies of a request for release signed by a Servicing Officer or Master Servicing Officer, as applicable, substantially in the form of Exhibit G (or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer or Master Servicing Officer, as applicable), release the related Mortgage File held in its possession or control to the Company, the Servicer or the Master Servicer, as applicable. Such trust receipt shall obligate the Company, the Servicer or the Master Servicer to return the Mortgage File to the Custodian on behalf of the Trustee, when the need therefor by such Person no longer exists unless the Mortgage Loan shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer or Master Servicing Officer, as applicable similar to that hereinabove specified, the Mortgage File shall be released by the Custodian, on behalf of the Trustee, to the Company, the Servicer or the Master Servicer.

Section 3.07   Maintenance of Hazard Insurance.

The Company shall cause to be maintained, for each EMC Mortgage Loan, hazard insurance on buildings upon, or comprising part of, the Mortgaged Property against loss by fire,

87

hazards of extended coverage and such other hazards as are customary in the area where the related Mortgaged Property is located with an insurer which is licensed to do business in the state where the related Mortgaged Property is located. Each such policy of standard hazard insurance shall contain, or have an accompanying endorsement that contains, a standard mortgagee clause. The Company shall also cause flood insurance to be maintained on property acquired upon foreclosure or deed in lieu of foreclosure of any EMC Mortgage Loan, to the extent described below. Pursuant to Section 5.01, any amounts collected by the Company under any such policies (other than the amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Company's normal servicing procedures) shall be deposited in the Protected Account maintained by the Company. Any cost incurred by the Company in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders or remittances to the Securities Administrator for their benefit, be added to the principal balance of the Mortgage Loan, notwithstanding that the terms of the EMC Mortgage Loan so permit. Such costs shall be recoverable by the Company out of late payments by the related Mortgagor or out of Liquidation Proceeds to the extent permitted by Section 5.02. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property is located at the time of origination of the related EMC Mortgage Loan in a federally designated special flood hazard area and such area is participating in the national flood insurance program, the Company shall cause flood insurance to be maintained with respect to such EMC Mortgage Loan. Such flood insurance shall be in an amount equal to the least of (i) the Stated Principal Balance of the related EMC Mortgage Loan, (ii) minimum amount required to compensate for damage or loss on a replacement cost basis or (iii) the maximum amount of such insurance available for the related Mortgaged Property under the Flood Disaster Protection Act of 1973, as amended.

In the event that the Company shall obtain and maintain a blanket policy insuring against hazard losses on all of the EMC Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.07, it being understood and agreed that such policy may contain a deductible clause on terms substantially equivalent to those commercially available and maintained by comparable servicers. If such policy contains a deductible clause, the Company shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.07, and there shall have been a loss that would have been covered by such policy, deposit in the Protected Account maintained by the Company the amount not otherwise payable under the blanket policy because of such deductible clause. Such deposit shall be from the Company's own funds without reimbursement therefor. In connection with its activities as administrator and servicer of the EMC Mortgage Loans, the Company agrees to present, on behalf of itself and the Trustee for the benefit of the Certificateholders claims under any such blanket policy.

Section 3.08   Presentment of Claims and Collection of Proceeds.

The Company shall prepare and present on behalf of the Trustee and the Certificateholders and the Class I-A Insurer all claims under the Required Insurance Policies relating to the EMC Mortgage Loans and take such actions (including the negotiation,

88

settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such Required Insurance Policies. Any proceeds disbursed to the Company in respect of such Required Insurance Policies shall be promptly deposited in the Protected Account maintained by the Company upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related EMC Mortgage Loan to the insurer under any applicable Insurance Policy need not be so deposited (or remitted).

Section 3.09   [Reserved]

Section 3.10   Custodians to Retain Possession of Certain Insurance Policies and Documents.

The related Custodian on behalf of the Trustee, shall retain possession and custody of the originals (to the extent available) of any certificate of insurance if applicable, and any certificates of renewal as to the foregoing as may be issued from time to time as contemplated by this Agreement. Until all amounts distributable in respect of the Certificates have been distributed in full and the Company or the Servicer, as applicable otherwise has fulfilled its obligations under this Agreement or the related Servicing Agreement, as applicable, the related Custodian on behalf of the Trustee shall also retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions of this Agreement. The Company shall promptly deliver or cause to be delivered to the related Custodian on behalf of the Trustee, upon the execution or receipt thereof the originals of any certificates of renewal, and such other documents or instruments that constitute portions of the Mortgage File that come into the possession of the Company from time to time.

Section 3.11   Fidelity Bond, Errors and Omissions Insurance.

The Company shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage with responsible companies on all officers, employees or other persons acting in any capacity with regard to the EMC Mortgage Loans and who handle funds, money, documents and papers relating to the EMC Mortgage Loans. The fidelity bond and errors and omissions insurance shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Company against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such persons. Such fidelity bond shall also protect and insure the Company against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of an EMC Mortgage Loan which is not in accordance with Accepted Servicing Practices. No provision of this Section 3.11 requiring the fidelity bond and errors and omissions insurance shall diminish or relieve the Company from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Accepted Servicing Practices. The Company shall deliver to the Master Servicer a certificate from the surety and the insurer as to the existence of the fidelity bond and errors and omissions insurance policy and shall obtain a statement from the surety and the insurer that such fidelity bond or insurance policy shall in no event be terminated or materially modified without thirty days prior written notice to the Master Servicer and the Trustee. The Company shall notify the Master Servicer, the Securities

89

Administrator, the Class I-A Insurer and the Trustee in writing within five business days of receipt of notice that such fidelity bond or insurance policy will be, or has been, materially modified or terminated. The Trustee for the benefit of the Certificateholders and the Class I-A Insurer must be named as loss payees on the fidelity bond and as additional insured on the errors and omissions policy.

> Section 3.12  Realization  Upon  Defaulted  Mortgage  Loans;
> Determination of Excess Liquidation Proceeds and Realized Losses; Repurchases
> of Certain Mortgage Loans.

(a)    The Company shall use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the EMC Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In connection with such foreclosure or other conversion, the Company shall follow such practices and procedures as it shall deem necessary or advisable and as shall be normal and usual in its general mortgage servicing activities and the requirements of the insurer under any Required Insurance Policy; provided that the Company shall not be required to expend its own funds in connection with any foreclosure or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the EMC Mortgage Loan after reimbursement to itself of such expenses and (ii) that such expenses will be recoverable to it through Insurance Proceeds or Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Protected Account maintained by the Company pursuant to Section 5.02). If the Company reasonably believes that Liquidation Proceeds with respect to any such EMC Mortgage Loan would not be increased as a result of such foreclosure or other action, such EMC Mortgage Loan will be charged-off and will become a Liquidated Loan. The Company will give notice of any such charge-off to the Trustee, the Class I-A Insurer and the Master Servicer.  The Company shall be responsible for all other costs and expenses incurred by it in any such proceedings; provided that such costs and expenses shall be Servicing Advances and that it shall be entitled to reimbursement thereof from the proceeds of liquidation of the related Mortgaged Property, as contemplated in Section 5.02. If the Company has knowledge that a Mortgaged Property that the Company is contemplating acquiring in foreclosure or by deed- in-lieu of foreclosure is located within a one-mile radius of any site with environmental or hazardous waste risks known to the Company, the Company will, prior to acquiring the related Mortgaged Property, consider such risks and only take action in accordance with its established environmental review procedures. If the Company is aware of any environmental or hazardous waste risk on a Mortgage Property relating to a Group I Mortgage Loan, it will not foreclose on such property without the prior written consent of the Class I-A Insurer, unless required by applicable state or federal law.

With respect to any REO Property relating to an EMC Mortgage Loan, the deed or certificate of sale shall be taken in the name of the Trustee for the benefit of the Certificateholders and the Class I-A Insurer (or the Trustee's nominee on behalf of the Certificateholders and the Class I-A Insurer). The Trustee's name shall be placed on the title to such REO Property solely as the Trustee hereunder and not in its individual capacity. The Company shall ensure that the title to such REO Property references this Agreement and the Trustee's capacity hereunder. Pursuant to its efforts to sell such REO Property, the Company shall either itself or through an agent selected by the Company protect and conserve such REO

[TPW: NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

Property in the same manner and to such extent as is customary in the locality where such REO Property is located and may, incident to its conservation and protection of the interests of the Certificateholders and the Class I-A Insurer, rent the same, or any part thereof, as the Company deems to be in the best interest of the Company and the Certificateholders and the Class I-A Insurer for the period prior to the sale of such REO Property. The Company shall prepare for and deliver to the Trustee, the Master Servicer and the Securities Administrator a statement with respect to each such REO Property that has been rented showing the aggregate rental income received and all expenses incurred in connection with the management and maintenance of such REO Property at such times as is necessary to enable the Securities Administrator to comply with the reporting requirements of the REMIC Provisions. The net monthly rental income, if any, from such REO Property shall be deposited in the Protected Account maintained by the Company with respect to the applicable loan group no later than the close of business on each Determination Date.  The Company shall perform the tax reporting and withholding related to foreclosures, abandonments and cancellation of indebtedness income as specified by Sections 1445, 6050J and 6050P of the Code by preparing and filing such tax and information returns, as may be required.

In the event that the Trust Fund acquires any Mortgaged Property as aforesaid or otherwise in connection with a default or imminent default on an EMC Mortgage Loan, the Company shall dispose of such Mortgaged Property prior to three years after its acquisition by the Trust Fund or, at the expense of the Trust Fund, request more than 60 days prior to the day on which such three-year period would otherwise expire, an extension of the three-year grace period unless the Trustee, the Class I-A Insurer and the Securities Administrator shall have been supplied with an Opinion of Counsel addressed to the Trustee, the Class I-A Insurer and the Securities Administrator (such opinion not to be an expense of the Trustee, the Class I-A Insurer or the Securities Administrator) to the effect that the holding by the Trust Fund of such Mortgaged Property subsequent to such three-year period will not result in the imposition of taxes on "prohibited transactions" of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V as defined in Section 860F of the Code or cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such Mortgaged Property (subject to any conditions contained in such Opinion of Counsel). Notwithstanding any other provision of this Agreement, no Mortgaged Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used for the production of income by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such Mortgaged Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or (ii) subject any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to the imposition of any federal, state or local income taxes on the income earned from such Mortgaged Property under Section 860G(c) of the Code or otherwise, unless the Company has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

The decision of the Company to foreclose on a defaulted EMC Mortgage Loan shall be subject to a determination by the Company that the proceeds of such foreclosure would exceed the costs and expenses of bringing such a proceeding. The income earned from the management of any Mortgaged Properties acquired through foreclosure or other judicial proceeding, net of reimbursement to the Company for expenses incurred (including any property or other taxes) in

connection with such management and net of unreimbursed Servicing Fees, Advances, Servicing Advances and any management fee paid or to be paid with respect to the management of such Mortgaged Property, shall be applied to the payment of principal of, and interest on, the related defaulted EMC Mortgage Loans (with interest accruing as though such Mortgage Loans were still current) and all such income shall be deemed, for all purposes in the Agreement, to be payments on account of principal and interest on the related Mortgage Notes and shall be deposited into the Protected Account maintained by the Company. To the extent the income received during a Prepayment Period is in excess of the amount attributable to amortizing principal and accrued interest at the related Mortgage Rate on the related EMC Mortgage Loan, such excess shall be considered to be a partial Principal Prepayment for all purposes hereof.

The Liquidation Proceeds with the respect to each Loan Group from any liquidation of a related EMC Mortgage Loan, net of any payment to the Company as provided above, shall be deposited in the related Protected Account for such Loan Group maintained by the Company upon receipt and made available on the next succeeding Determination Date following receipt thereof for distribution on the related Distribution Date, except that any Excess Liquidation Proceeds shall be retained by the Company as additional servicing compensation.

The proceeds of any Liquidated Loan, from each Loan Group as well as any recovery resulting from a partial collection of related Liquidation Proceeds or any income from a related REO Property, will be applied in the following order of priority: first, to reimburse the Company and the Master Servicer for any related unreimbursed Servicing Advances and Servicing Fees, pursuant to Section 5.02 or this Section 3.12; second, to reimburse the Company and the Master Servicer for any unreimbursed Advances with respect to such Loan Group, pursuant to Section 5.02 or this Section 3.12; third, to accrued and unpaid interest (to the extent no Advance has been made for such amount) on the EMC Mortgage Loan or related REO Property, at the Net Mortgage Rate to the first day of the month in which such amounts are required to be distributed; and fourth, as a recovery of principal of the EMC Mortgage Loan.

(b)     On each Determination Date, the Company shall determine the respective aggregate amounts of Excess Liquidation Proceeds and Realized Losses, if any, for the related Prepayment Period.

(c)     The Company has no intent to foreclose on any EMC Mortgage Loan based on the delinquency characteristics as of the Closing Date; provided, that the foregoing does not prevent the Company from initiating foreclosure proceedings on any date hereafter if the facts and circumstances of such EMC Mortgage Loans including delinquency characteristics in the Company's discretion so warrant such action.

Section 3.13   Servicing Compensation.

As compensation for its activities hereunder, the Company shall be entitled to retain or withdraw from the Protected Account out of each payment of interest on an EMC Mortgage Loan included in the Trust Fund an amount equal to the Servicing Fee.

Additional servicing compensation in the form of any Excess Liquidation Proceeds, assumption fees, other ancillary income, late payment charges, all Prepayment Interest Excess on

92

any EMC Mortgage Loan, all income and gain net of any losses realized from Permitted Investments with respect to funds in or credited to the Protected Account maintained by the Company shall be retained by the Company to the extent not required to be deposited in the Protected Account maintained by the Company pursuant to Section 5.02. The Company shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including payment of any premiums for hazard insurance, as required by Section 3.07 and maintenance of the other forms of insurance coverage required by Section 3.09) and shall not be entitled to reimbursement therefor except as specifically provided in Section 5.02.

Section 3.14   REO Property.

(a)     In the event the Trust Fund acquires ownership of any REO Property in respect of any related EMC Mortgage Loan, the deed or certificate of sale shall be issued to the Trustee, or to its nominee, on behalf of the related Certificateholders and the Class I-A Insurer. The Company shall sell any such REO Property as expeditiously as possible and in accordance with the provisions of this Agreement. Pursuant to its efforts to sell such REO Property, the Company shall protect and conserve such REO Property in the manner and to the extent required herein, in accordance with the REMIC Provisions.

(b)     The Company shall deposit all funds collected and received in connection with the operation of any REO Property in respect of any EMC Mortgage Loan into the Protected Account maintained by the Company.

(c)     The Company and the Master Servicer, upon the final disposition of any REO Property in respect of any EMC Mortgage Loan, shall be entitled to reimbursement for any related unreimbursed Advances, unreimbursed Servicing Advances, Servicing Fees and Master Servicing Fees from Liquidation Proceeds received in connection with the final disposition of such REO Property; provided, that any such unreimbursed Advances, Servicing Fees or Master Servicing Fees as well as any unpaid Servicing Fees and Master Servicing Fees may be reimbursed or paid, as the case may be, prior to final disposition, out of any net rental income or other net amounts derived from such REO Property.

Section 3.15   Liquidation Reports.

Upon the foreclosure of any Mortgaged Property relating to an EMC Mortgage Loan or the acquisition thereof by the Trust Fund pursuant to a deed-in-lieu of foreclosure, the Company shall submit a liquidation report to the Master Servicer containing such information as shall be mutually acceptable to the Company and the Master Servicer with respect to such Mortgaged Property.

Section 3.16   Annual Statement as to Compliance; Annual Certification.

The Company will deliver to the Master Servicer not later than March 1, 2006 and not later than March 1 of each year thereafter, a certificate of a Servicing Officer substantially in the form of Exhibit M, stating, as to each signatory thereof, that (i) a review of the activities of the Company during the preceding calendar year or portion thereof and of its performance under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Company has fulfilled all of its obligations under this

Agreement in all material respects throughout such year or portion thereof, or, if there has been a default in the fulfillment of any such obligation in any material respect, specifying each such default known to such officer and the nature and status thereof. The Master Servicer will deliver a copy of such certificate of a Servicing Officer to the Rating Agencies, the Securities Administrator and the Trustee and the Class I-A Insurer.

Section 3.17   Annual   Independent   Certified   Public   Accountants' Servicing Report.

Not later than March 1, 2006 and not later than March 1 of each year thereafter, the Company at its expense shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement, in a form acceptable for filing with the Commission on an Exhibit to Form 10-K, to the Master Servicer, the Securities Administrator, the Class I-A Insurer and the Trustee to the effect that, with respect to the preceding calendar year, such firm has examined certain documents and records relating to the Company's servicing of mortgage loans of the same type as the EMC Mortgage Loans pursuant to servicing agreements substantially similar to this Agreement, which agreements may include this Agreement, and that, on the basis of such an examination, conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Company's servicing has been conducted in compliance with the agreements examined pursuant to this Section 3.17, except for (i) such exceptions as such firm shall believe to be immaterial, (ii) such other exceptions as shall be set forth in such statement and (iii) such exceptions that the Uniform Single Attestation Program for Mortgage Bankers requires it to report.

Section 3.18   Books and Records.

The Company shall be responsible for maintaining, and shall maintain, a complete set of books and records for the EMC Mortgage Loans which shall be appropriately identified in the Company's computer system to clearly reflect the ownership of the EMC Mortgage Loans by the Trust. In particular, the Company shall maintain in its possession, available for inspection by the Master Servicer, the Securities Administrator, the Class I-A Insurer and the Trustee and shall deliver to the Master Servicer, the Securities Administrator, the Class I-A Insurer and the Trustee upon demand, evidence of compliance with all federal, state and local laws, rules and regulations. The Trustee, the Securities Administrator, the Class I-A Insurer and the Master Servicer, and any governmental or regulatory agency with jurisdiction over the Trustee, the Securities Administrator, the Class I-A Insurer or the Master Servicer, as applicable, shall have the right, upon reasonable advance notice to the Company, to inspect and examine the books and records of the Company. To the extent that original documents are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Company may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including, but not limited to, optical imagery techniques so long as the Company complies with the requirements of Accepted Servicing Practices. During the term of this Agreement, the Company shall, upon reasonable advance notice, make available a Servicing Officer to the Master Servicer for answering questions and responding to inquiries.

94

The Company shall maintain with respect to each EMC Mortgage Loan and shall make available for inspection by the Master Servicer, the Class I-A Insurer and the Trustee the related servicing file during the time such EMC Mortgage Loan is subject to this Agreement and thereafter in accordance with applicable law.

[TPW: NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

ARTICLE IV

MASTER SERVICING OF MORTGAGE LOANS BY MASTER SERVICER

Section 4.01    Master Servicer.

The Master Servicer shall, beginning on the Closing Date, supervise, monitor and oversee the obligation of the Company and the related Servicer to service and administer their respective Mortgage Loans in accordance with the terms of this Agreement and the related Servicing Agreement, respectively and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with the Company and the related Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive and review certain reports, information and other data provided to the Master Servicer by the Company and the related Servicer and shall enforce the obligations, conditions and covenants of the Company and related Servicer to the extent set forth in this Agreement and the related Servicing Agreement, respectively. The Master Servicer shall monitor the Company and the related Servicer's servicing activities with respect to each related Mortgage Loan, reconcile the results of such monitoring with such information described in the previous sentence and received by the Master Servicer on a monthly basis and coordinate corrective adjustments to the Company's, the Servicer's and Master Servicer's records, and based on such reconciled and corrected information, the Master Servicer shall provide such information to the Securities Administrator as shall be necessary in order for it to prepare the statements specified in Section 6.08 and any other information and statements required hereunder. The Master Servicer shall reconcile the results of its Mortgage Loan monitoring with the actual remittances of the Company and each Servicer pursuant to this Agreement and the related Servicing Agreement, respectively. The Master Servicer shall be entitled to conclusively rely on the Mortgage Loan data provided by the Company and the Servicer and shall have no liability for any errors in such Mortgage Loan data.

The Master Servicer, the Trustee and the Securities Administrator shall provide access to the records and documentation in possession of the Master Servicer, the Trustee or the Securities Administrator regarding the related Mortgage Loans and REO Property to the Class I-A Insurer, Certificateholders, the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Master Servicer, the Trustee or the Securities Administrator; provided, however, that, unless otherwise required by law, neither the Master Servicer, the Trustee nor the Securities Administrator shall be required to provide access to such records and documentation if the provision thereof would violate the legal right to privacy of any Mortgagor. The Master Servicer, the Trustee and the Securities Administrator shall allow representatives of the above entities to photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Master Servicer's, the Trustee's or the Securities Administrator's actual costs.

The Trustee shall execute and deliver to the Company, the related Servicer or the Master Servicer, as applicable, any court pleadings, requests for trustee's sale or other documents

96

necessary or desirable to (i) the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or security instrument; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or security instrument or otherwise available at law or equity.

Section 4.02    Monitoring of Company and Servicer.

(a)    In the review of the Company's and the related Servicer's activities, the Master Servicer may rely upon an Officer's Certificate of the Company and the related Servicer with regard to such Person's compliance with the terms of this Agreement or the related Servicing Agreement; provided that no such reliance will relieve the Master Servicer of its obligations pursuant to this Agreement. In the event that the Master Servicer, in its judgment, determines that the Company or the related Servicer should be terminated in accordance with this Agreement or the related Servicing Agreement, or that a notice should be sent pursuant to this Agreement or the related Servicing Agreement with respect to the occurrence of an event that, unless cured, would constitute grounds for such termination, the Master Servicer shall notify the Seller , the Class I-A Insurer and the Trustee thereof and the Master Servicer shall issue such notice or take such other action as it deems appropriate.

(b)    The Master Servicer, for the benefit of the Trustee, the Certificateholders and the Class I-A Insurer, shall enforce the obligations of the Company under this Agreement and of the related Servicer under the related Servicing Agreement, and shall, in the event that the Company or the related Servicer fails to perform its obligations in accordance with this Agreement or the related Servicing Agreement, subject to the preceding paragraph, terminate the rights and obligations of such Person thereunder and act as servicer of the related Mortgage Loans or to instruct the Trustee to enter into a new Servicing Agreement with a successor Servicer selected by the Master Servicer with the consent of the Class I-A Insurer, which consent shall not be unreasonably withheld; provided, however, it is understood and acknowledged by the parties hereto that there shall be a period of transition (not to exceed 90 days) before the actual servicing functions can be fully transferred to such successor Servicer. Such enforcement, including, without limitation, the legal prosecution of claims, termination of the related Servicing Agreement and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, subject to its right of reimbursement pursuant to the provisions of this Agreement or the related Servicing Agreement, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action.

(c)    To the extent that the costs and expenses of the Master Servicer related to any termination of the Company or the related Servicer, appointment of a successor Servicer or the transfer and assumption of servicing by the Master Servicer with respect to this Agreement or the related Servicing Agreement (including, without limitation, (i) all legal costs and expenses and all due diligence costs and expenses associated with an evaluation of the potential termination of the Company or the related Servicer as a result of an alleged or actual breach of

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

contract or an event of default by such Person and (ii) all costs and expenses associated with the complete transfer of servicing, including all servicing files and all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor servicer to service the Mortgage Loans in accordance with this Agreement or the related Servicing Agreement) are not fully and timely reimbursed by the Company or the terminated Servicer, the Master Servicer shall be entitled to reimbursement of such costs and expenses from the Master Servicer Collection Account.

(d)     The Master Servicer shall require the Company and the related Servicer to comply with the remittance requirements and other obligations set forth in this Agreement or the related Servicing Agreement, as applicable.

(e)     If the Master Servicer acts as a servicer, it will not assume liability for the representations and warranties of the Company or the related Servicer, if any, that it replaces.

### Section 4.03   Fidelity Bond.

The Master Servicer, at its expense, shall (i) maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and omissions in the performance of the Master Servicer's obligations hereunder or (ii) self insure if LaSalle Bank National Association maintains with any Rating Agency the equivalent of a long term unsecured debt rating of "A". The errors and omissions insurance policy and the fidelity bond referred to in (i) above shall be in such form and amount generally acceptable for entities serving as master servicers.

### Section 4.04   Power to Act; Procedures.

The Master Servicer shall master service the Mortgage Loans and shall have full power and authority, subject to the REMIC Provisions and the provisions of Article XI hereof, to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the Mortgage Loans, including but not limited to the power and authority (i) to execute and deliver, on behalf of the Certificateholders, the Trustee and the Securities Administrator, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan, in each case, in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable; provided, however, that the Master Servicer shall not (and, consistent with its responsibilities under Section 4.02, shall not permit the Company or the Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the

98

tax on contributions to a REMIC set forth in Section 860G(d) of the Code) unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action will not cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to fail to qualify as a REMIC or result in the imposition of a tax upon REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as the case may be.

The Trustee shall execute and deliver such other documents, as the Master Servicer may request, to enable the Master Servicer to master service and administer the Mortgage Loans and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Trustee shall have no liability for misuse of any such powers of attorney by the Master Servicer, the Company or the Servicer). If the Master Servicer or the Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Trustee or that the Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Trustee in the appointment of a co-trustee pursuant to Section 10.11 hereof. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and shall not, except in those instances where it is taking action in the name of the Trustee, be deemed to be the agent of the Trustee.

Section 4.05   Due-on-Sale Clauses; Assumption Agreements.

To the extent provided in this Agreement or the related Servicing Agreement, to the extent Mortgage Loans contain enforceable due-on-sale clauses, the Master Servicer shall enforce the obligation of the Company and the related Servicer to enforce such clauses in accordance with this Agreement or the related Servicing Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with this Agreement or the related Servicing Agreement, and, as a consequence, a Mortgage Loan is assumed, the original Mortgagor may be released from liability in accordance with this Agreement or the related Servicing Agreement.

Section 4.06   Documents, Records and Funds in Possession of Master Servicer, Company and Servicer To Be Held for Trustee.

(a)      The Master Servicer shall transmit and the Company or the related Servicer (to the extent required by this Agreement or the related Servicing Agreement) shall transmit to the Trustee or Custodian such documents and instruments coming into the possession of such Person from time to time as are required by the terms hereof, or in the case of the related Servicer, the related Servicing Agreement, to be delivered to the Trustee or Custodian. Any funds received by the Master Servicer, the Company or by the related Servicer in respect of any Mortgage Loan or which otherwise are collected by the Master Servicer, the Company or by the related Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan shall be held for the benefit of the Trustee, the Certificateholders and the Class I-A Insurer subject to the Master Servicer's right to retain or withdraw from the Master Servicer Collection Account, the Master Servicing Compensation and other amounts provided in this Agreement, and to the right of the Company and the related Servicer to retain its Servicing Fee and other amounts as provided in this Agreement or the related Servicing Agreement. The Master Servicer shall, and (to the extent provided in this Agreement or the related Servicing Agreement) shall

99

enforce the obligation of the Company and the related Servicer to, provide access to information and documentation regarding the Mortgage Loans to the Trustee and, regarding the Mortgage Loans in Loan Group 1 to the Class 1-A Insurer, and their respective agents and accountants at any time upon reasonable request and during normal business hours, and to Certificateholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b)     All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be held by the Master Servicer for and on behalf of the Trustee, the Class 1-A Insurer and the Certificateholders and shall be and remain the sole and exclusive property of the Trustee; provided, however, that the Master Servicer, the Company and the related Servicer shall be entitled to setoff against, and deduct from, any such funds any amounts that are properly due and payable to the Master Servicer or such Servicer under this Agreement or the related Servicing Agreement.

### Section 4.07   Presentment of Claims and Collection of Proceeds.

The Master Servicer shall (to the extent provided in this Agreement and the Servicing Agreement) enforce the obligation of the Company or the Servicer to, prepare and present on behalf of the Trustee and the Certificateholders all claims under the Insurance Policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies. Any proceeds disbursed to the Master Servicer (or disbursed to the Company or the related Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Master Servicer Collection Account upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related Mortgage Loan to the insurer under any applicable Insurance Policy need not be so deposited (or remitted).

### Section 4.08   Realization Upon Defaulted Mortgage Loans.

The Master Servicer shall enforce any obligation of the Company and the Servicer (to the extent set forth under this Agreement and the related Servicing Agreement, as applicable) to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with this Agreement or the related Servicing Agreement, as applicable.

### Section 4.09   Compensation of the Master Servicer.

100

The Master Servicer shall be entitled to the Master Servicing Fee on each Distribution Date as compensation for the performance of its obligations hereunder.  The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as provided in this Agreement.

Section 4.10   REO Property.

(a)    In the event the Trust Fund acquires ownership of any REO Property in respect of any related Mortgage Loan, the deed or certificate of sale shall be issued to the Trustee, or to its nominee, on behalf of the related Certificateholders. The Master Servicer shall, to the extent provided in this Agreement and the Servicing Agreements, as applicable, cause the Company and the Servicer to sell any REO Property as expeditiously as possible and in accordance with the provisions of this Agreement and the related Servicing Agreement, as applicable. The Master Servicer shall enforce any obligations of the Company or the Servicer to protect and conserve, such REO Property in the manner and to the extent required by this Agreement or the related Servicing Agreement, in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b)    The Master Servicer shall, to the extent required by this Agreement and the related Servicing Agreement, as applicable, enforce the obligation of the Company and the Servicer, as applicable, to deposit all funds collected and received in connection with the operation of any REO Property in the related Protected Account.

Section 4.11   Annual Officer's Certificate as to Compliance.

(a)    The Master Servicer shall deliver to the Securities Administrator, the Trustee, the Class I-A Insurer and the Rating Agencies on or before March 20 of each year, commencing on March 20, 2006, an Officer's Certificate, certifying that with respect to the period ending December 31 of the prior year: (i) such Master Servicing Officer has reviewed the activities of the Master Servicer during the preceding calendar year or portion thereof and its performance under this Agreement, (ii) to the best of such Master Servicing Officer's knowledge, based on such review, the Master Servicer has performed and fulfilled its duties, responsibilities and obligations under this Agreement in all material respects throughout such year, or, if there has been a default in the fulfillment of any such duties, responsibilities or obligations, specifying each such default known to such Master Servicing Officer and the nature and status thereof, (iii) nothing has come to the attention of such Master Servicing Officer to lead such Master Servicing Officer to believe that the Master Servicer has failed to perform any of its respective duties, responsibilities and obligations under this Agreement in all material respects throughout such year, or, if there has been a material default in the performance or fulfillment of any such duties, responsibilities or obligations, specifying each such default known to such Master Servicing Officer and the nature and status thereof.

(b)    Copies of such statements shall be provided to any Certificateholder upon request, by the Master Servicer or by the Securities Administrator at the Master Servicer's expense if the Master Servicer failed to provide such copies.  The Master Servicer shall forward to the Rating

101

Agencies copies of any annual compliance certificates delivered by the Company to the Master Servicer pursuant to Section 3.16.

Section 4.12    [Reserved]

Section 4.13    UCC.

The Securities Administrator agrees to file continuation statements for any Uniform Commercial Code financing statements which the Sellers have informed the Securities Administrator were filed on the Closing Date in connection with the Trust. EMC shall file any financing statements or amendments thereto required by any change in the Uniform Commercial Code.

Section 4.14    Reserve Funds.

(a)    On or before the Closing Date, the Securities Administrator shall establish a Group I Reserve Fund on behalf of the Holders of the Group I Certificates. On the Closing Date, the Depositor shall cause an amount equal to the Group I Reserve Fund Deposit to be deposited in the Group I Reserve Fund. The Group I Reserve Fund shall be an Eligible Account. The Group I Reserve Fund shall be entitled "Group I Reserve Fund, LaSalle Bank National Association, as Securities Administrator on behalf of Citibank, N.A. as Trustee for the benefit of holders of Bear Stearns Asset Backed Securities I LLC, SACO I Trust 2005-10, Mortgage-Backed Certificates, Series 2005-10, Group I Certificates". On each Distribution Date as to which there is a Group I Basis Risk Shortfall Carry Forward Amount payable to any Class of Class I-A, Class I-M or Class I-B Certificates, the Securities Administrator shall deposit the amounts distributable pursuant to clauses (C) and (D) of Section 6.04(a)(3) into the Group I Reserve Fund, and the Securities Administrator has been directed by the Class I-C Certificateholder to distribute any amounts then on deposit in the Group I Reserve Fund to the Holders of the Class I-A, Class I-M or Class I-B Certificates in respect of the Group I Basis Risk Shortfall Carry Forward Amounts for each such Class in the priorities set forth in clauses (C) and (D) of Section 6.04(a)(3). Any amount paid to the Holders of Class I-A, Class I-M or Class I-B Certificates from amounts distributable pursuant to clauses (C) and (D) of Section 6.04(a)(3) pursuant to the preceding sentence in respect of Group I Basis Risk Shortfall Carry Forward Amounts shall be treated as distributed to the Class I-C Certificateholder in respect of the Class I-C Certificates and paid by the Class I-C Certificateholder to the Holders of the Class I-A, Class I-M and Class I-B Certificates, as applicable. Any payments to the Holders of the Class I-A, Class I-M and Class I-B Certificates in respect of Group I Basis Risk Shortfall Carry Forward Amounts pursuant to the second preceding sentence shall not be payments with respect to a "regular interest" in a REMIC within the meaning of Section 860(G)(a)(1) of the Code.

(b)    The Group I Reserve Fund is an "outside Group I Reserve Fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall be an asset of the Trust Fund but not an asset of any REMIC. The Trustee on behalf of the Trust shall be the nominal owner of the Group I Reserve Fund. The Class I-C Certificateholder shall be the beneficial owner of the Group I Reserve Fund, subject to the power of the Securities Administrator on behalf of the Trustee to transfer amounts under Section 6.04. Amounts in the Group I Reserve Fund shall, at the written direction of the Class I-C Certificateholder to the Securities Administrator, be

invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Group I Reserve Fund shall remain uninvested. All net income and gain from such investments shall be distributed to the Class I-C Certificateholders, not as a distribution in respect of any interest in any REMIC, at such time as they shall direct. All amounts earned on amounts on deposit in the Group I Reserve Fund shall be taxable to the Class I-C Certificateholder. Any losses on such investments shall be deposited in the Group I Reserve Fund by the Class I-C Certificateholder out of its own funds immediately as realized.

(c)     On or before the Closing Date, the Securities Administrator shall establish a Group II Reserve Fund on behalf of the Holders of the Group II Certificates. On the Closing Date, the Depositor shall cause an amount equal to the Group II Reserve Fund Deposit to be deposited in the Group II Reserve Fund. The Group II Reserve Fund shall be an Eligible Account. The Group II Reserve Fund shall be entitled "Group II Reserve Fund, LaSalle Bank National Association, as Securities Administrator on behalf of Citibank, N.A. as Trustee for the benefit of holders of Bear Stearns Asset Backed Securities I LLC, SACO I Trust 2005-10, Mortgage-Backed Certificates, Series 2005-10, Group II Certificates". On each Distribution Date as to which there is a Group II Basis Risk Shortfall Carry Forward Amount payable to any Class of Class II-A, Class II-M or Class II-B Certificates, the Securities Administrator shall deposit the amounts distributable pursuant to clauses (C) and (D) of Section 6.04(b)(3) into the Group II Reserve Fund, and the Securities Administrator has been directed by the Class II-C Certificateholder to distribute any amounts then on deposit in the Group II Reserve Fund to the Holders of the Class II-A, Class II-M or Class II-B Certificates in respect of the Group II Basis Risk Shortfall Carry Forward Amounts for each such Class in the priorities set forth in clauses (C) and (D) of Section 6.04(b)(3). Any amount paid to the Holders of Class II-A, Class II-M or Class II-B Certificates from amounts distributable pursuant to clauses (C) and (D) of Section 6.04(b)(3) pursuant to the preceding sentence in respect of Group II Basis Risk Shortfall Carry Forward Amounts shall be treated as distributed to the Class II-C Certificateholder in respect of the Class II-C Certificates and paid by the Class II-C Certificateholder to the Holders of the Class II-A, Class II-M and Class II-B Certificates, as applicable. Any payments to the Holders of the Class II-A, Class II-M and Class II-B Certificates in respect of Group II Basis Risk Shortfall Carry Forward Amounts pursuant to the second preceding sentence shall not be payments with respect to a "regular interest" in a REMIC within the meaning of Section 860(G)(a)(1) of the Code.

(d)     The Group II Reserve Fund is an "outside Group II Reserve Fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall be an asset of the Trust Fund but not an asset of any REMIC. The Trustee on behalf of the Trust shall be the nominal owner of the Group II Reserve Fund. The Class II-C Certificateholder shall be the beneficial owner of the Group II Reserve Fund, subject to the power of the Securities Administrator on behalf of the Trustee to transfer amounts under Section 6.04. Amounts in the Group II Reserve Fund shall, at the written direction of the Class II-C Certificateholder to the Securities Administrator, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Group II Reserve Fund shall remain uninvested. All net income and gain from such investments shall be distributed to the Class II-C Certificateholders,

103

not as a distribution in respect of any interest in any REMIC, at such time as they shall direct. All amounts earned on amounts on deposit in the Group II Reserve Fund shall be taxable to the Class II-C Certificateholder. Any losses on such investments shall be deposited in the Group II Reserve Fund by the Class II-C Certificateholder out of its own funds immediately as realized.

Section 4.15   Reports Filed with Securities and Exchange Commission.

Within 15 days after each Distribution Date, the Securities Administrator shall, in accordance with industry standards, file with the Commission via the Electronic Data Gathering and Retrieval System ("EDGAR"), a Form 8-K (or other comparable Form containing the same or comparable information or other information mutually agreed upon) with a copy of the statement to the Certificateholders for such Distribution Date as an exhibit thereto. Prior to January 30 in each year, the Securities Administrator shall, in accordance with industry standards and unless instructed otherwise by the Depositor, file a Form 15 Suspension Notice with respect to the Trust Fund, if applicable. Prior to (i) March 15, 2006 and (ii) unless and until a Form 15 Suspension Notice shall have been filed, prior to March 15 of each year thereafter, the Master Servicer shall provide the Securities Administrator with a Master Servicer Certification, together with a copy of the annual independent accountant's servicing report and annual statement of compliance of the Company to be delivered pursuant to this Agreement and each Servicer, in each case, required to be delivered pursuant to the related Servicing Agreement, and, if applicable, the annual independent accountant's servicing report and annual statement of compliance to be delivered by the Master Servicer pursuant to Sections 4.11. On or prior to (i) March 31, 2006 and (ii) unless and until a Form 15 Suspension Notice shall have been filed, March 31 of each year thereafter, the Securities Administrator shall file a Form 10-K, in substance conforming to industry standards, with respect to the Trust. Such Form 10-K shall include the Master Servicer Certification and other documentation provided by the Master Servicer pursuant to the second preceding sentence. The Depositor hereby grants to the Securities Administrator a limited power of attorney to execute and file each such document on behalf of the Depositor. Such power of attorney shall continue until either the earlier of (i) receipt by the Securities Administrator from the Depositor of written termination of such power of attorney and (ii) the termination of the Trust Fund. The Depositor agrees to promptly furnish to the Securities Administrator, from time to time upon request, such further information, reports and financial statements within its control, in EDGAR format, related to this Agreement and the Mortgage Loans as the Securities Administrator reasonably deems appropriate to prepare and file all necessary reports with the Commission. The Securities Administrator shall have no responsibility to file any items other than those specified in this Section 4.15; provided, however, the Securities Administrator will cooperate with the Depositor in connection with any additional filings with respect to the Trust Fund as the Depositor deems necessary under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Copies of all reports filed by the Securities Administrator under the Exchange Act shall be sent to: the Depositor c/o Bear, Stearns & Co. Inc., Attn: Managing Director-Analysis and Control, One Metrotech Center North, Brooklyn, New York 11202-3859. Fees and expenses incurred by the Securities Administrator in connection with this Section 4.15 shall not be reimbursable from the Trust Fund.

# ARTICLE V

# ACCOUNTS

Section 5.01   Collection of Mortgage Loan Payments; Protected Account.

(a)      The Company shall make reasonable efforts in accordance with customary and usual standards of practice of prudent mortgage lenders in the respective states in which the Mortgaged Properties related to the EMC Mortgage Loans are located to collect all payments called for under the terms and provisions of the EMC Mortgage Loans to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Required Insurance Policy. Consistent with the foregoing, the Company may in its discretion (i) waive any late payment charge and (ii) extend the Due Dates for payments due on a Mortgage Note related to an EMC Mortgage Loan for a period not greater than 125 days, provided that, EMC shall not extend the payment date of any Mortgage Loan beyond the date of its final maturity date. In the event of any such arrangement, the Company shall make Advances on the related EMC Mortgage Loan during the scheduled period in accordance with the amortization schedule of such EMC Mortgage Loan without modification thereof by reason of such arrangements, and shall be entitled to reimbursement therefor in accordance with Section 6.01. The Company shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law. In addition, if (x) an EMC Mortgage Loan is in default or default is imminent or (y) the Company delivers to the Trustee, Securities Administrator, the Class I-A Insurer and Master Servicer a certification addressed to the Trustee, the Securities Administrator and the Class I-A Insurer, based on the advice of counsel or certified public accountants, in either case, that have a national reputation with respect to taxation of REMICs, that a modification of such EMC Mortgage Loan will not result in the imposition of taxes on or disqualify any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, the Company may if it reasonably believes that undertaking such actions would be in the best interest of the Certificateholders and the Class I-A Insurer, (A) amend the related Mortgage Note to reduce the Mortgage Rate applicable thereto, provided that such reduced Mortgage Rate shall in no event be lower than 5.00% with respect to any EMC Mortgage Loan and (B) amend any Mortgage Note related to an EMC Mortgage Loan to extend to the maturity thereof; provided that, EMC shall not extend the payment date of any Mortgage Loan beyond its final maturity date.

In accordance with the standards of the first paragraph of Section 3.01, the Company shall not waive (or permit a sub-servicer to waive) any Prepayment Charge related to an EMC Mortgage Loan unless: (i) the enforceability thereof shall have been limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally, (ii) the enforcement thereof is illegal, or any local, state or federal agency has threatened legal action if the prepayment penalty is enforced, (iii) the collectability thereof shall have been limited due to acceleration in connection with a foreclosure or other involuntary payment or (iv) such waiver is standard and customary in servicing similar Mortgage Loans and relates to a default or a reasonably foreseeable default and would, in the reasonable judgment of

the Company, maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related EMC Mortgage Loan. If a Prepayment Charge is waived, but does not meet the standards described above, then the Company is required to pay the amount of such waived Prepayment Charge, for the benefit of the related Class C Certificates, by remitting such amount to the Master Servicer by the Remittance Date. Payments of such waived charges shall not be payments in respect of any Regular Interest.

(b)    The Company shall establish and maintain a Protected Account (which shall at all times be an Eligible Account) with a depository institution in the name of the Company for the benefit of the Trustee on behalf of the Certificateholders and the Class I-A Insurer and designated "EMC Mortgage Corporation, as servicer on behalf of Citibank, N.A., as Trustee, for the benefit of the certificateholders, in trust for registered holders of Bear Stearns Asset Backed Securities I LLC, Mortgage-Backed Certificates, Series 2005-10". The Company shall deposit or cause to be deposited into the Protected Account on a daily basis within one Business Day of receipt, except as otherwise specifically provided herein, the following payments and collections remitted by subservicers or received by it in respect of the EMC Mortgage Loans subsequent to the Cut-off Date (other than in respect of principal and interest due on the EMC Mortgage Loans on or before the Cut-off Date) and the following amounts required to be deposited hereunder:

(i)    all payments on account of principal, including Principal Prepayments, on the EMC Mortgage Loans;

(ii)    all payments on account of interest on the EMC Mortgage Loans net of the related Servicing Fee permitted under Section 3.13, if any;

(iii)    all Liquidation Proceeds, Subsequent Recoveries and Insurance Proceeds with respect to any EMC Mortgage Loans, other than proceeds to be applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Company's normal servicing procedures;

(iv)    any amount required to be deposited by the Company pursuant to Section 5.01(c) in connection with any losses on Permitted Investments;

(v)    any amounts required to be deposited by the Company pursuant to Section 3.07;

(vi)    any Prepayment Charges collected on the EMC Mortgage Loans; and

(vii)    any other amounts required to be deposited hereunder.

The foregoing requirements for deposit by the Company into the Protected Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges or assumption fees, if collected, need not be deposited by the Company. In the event that the Company shall deposit any amount not required to be deposited and not otherwise subject to withdrawal pursuant to Section 5.02, it may at any time withdraw or direct the institution maintaining the Protected Account, to withdraw such amount from the Protected Account, any provision herein to the contrary notwithstanding.

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

Such withdrawal or direction may be accomplished by delivering written notice thereof to the institution maintaining the Protected Account, that describes the amounts deposited in error in the Protected Account. The Company shall maintain adequate records with respect to all withdrawals made pursuant to this Section. All funds deposited in the Protected Account shall be held in trust for the Certificateholders until withdrawn in accordance with Section 5.02.

(c)     The institution that maintains the Protected Account shall invest the funds in the Protected Account, in the manner directed by the Company, in Permitted Investments which shall mature not later than the Business Day immediately preceding the Remittance Date and shall not be sold or disposed of prior to its maturity. All such Permitted Investments shall be made in the name of the Trustee, for the benefit of the Certificateholders and the Class 1-A Insurer. All income and gain net of any losses realized from any such investment shall be for the benefit of the Company as servicing compensation and shall be remitted to it monthly as provided herein. The amount of any losses incurred in the Protected Account in respect of any such investments shall be deposited by the Company into the Protected Account, out of the Company's own funds.

(d)     The Company shall give at least 30 days advance notice to the Trustee, the Securities Administrator, the Sellers, the Master Servicer, each Rating Agency, the Class 1-A Insurer and the Depositor of any proposed change of location of the Protected Account prior to any change thereof.

Section 5.02     Permitted Withdrawals From the Protected Account.

(a)     The Company may from time to time make withdrawals from the Protected Account for the following purposes:

(i)     to pay itself (to the extent not previously paid to or withheld by the Company), as servicing compensation in accordance with Section 3.13, that portion of any payment of interest that equals the Servicing Fee for the period with respect to which such interest payment was made, and, as additional servicing compensation, those other amounts set forth in Section 3.13;

(ii)     to reimburse the Company for Advances made by it with respect to the Mortgage Loans, provided, however, that the Company's right of reimbursement pursuant to this subclause (ii) shall be limited to amounts received on particular EMC Mortgage Loan(s) (including, for this purpose, Liquidation Proceeds and Insurance Proceeds and Subsequent Recoveries) that represent late recoveries of payments of principal and/or interest on such particular EMC Mortgage Loan(s) in the related Loan Group in respect of which any such Advance was made;

(iii)     to reimburse the Company for any previously made portion of a Servicing Advance or an Advance made by the Company that, in the good faith judgment of the Company, will not be ultimately recoverable by it from the related Mortgagor, any related Liquidation Proceeds, Insurance Proceeds or otherwise (a "Nonrecoverable Advance"), to the extent not reimbursed pursuant

to clause (ii) or clause (v); provided that such reimbursement pursuant to this subclause shall be limited amount received from EMC Mortgage Loans in the related Loan Group from with such Servicing Advance was made;

(iv)    to reimburse the Company from Insurance Proceeds for Insured Expenses covered by the related Insurance Policy;

(v)    to pay the Company any unpaid Servicing Fees and to reimburse it for any unreimbursed Servicing Advances, provided, however, that the Company's right to reimbursement for Servicing Advances pursuant to this subclause (v) with respect to any Mortgage Loan shall be limited to amounts received on particular Mortgage Loan(s) (including, for this purpose, Liquidation Proceeds, Insurance Proceeds, Subsequent Recoveries and purchase and repurchase proceeds) that represent late recoveries of the payments for which such Servicing Advances were made;

(vi)    to pay to EMC (in its capacity as a Seller), the Depositor or itself, as applicable, with respect to each EMC Mortgage Loan or property acquired in respect thereof that has been purchased pursuant to Section 2.02, 2.03 or 3.05 of this Agreement, all amounts received thereon and not taken into account in determining the related Stated Principal Balance of such repurchased EMC Mortgage Loan;

(vii)    to pay any expenses recoverable by the Company pursuant to Section 8.04 of this Agreement;

(viii)    to withdraw pursuant to Section 5.01 any amount deposited in the Protected Account and not required to be deposited therein; and

(ix)    to clear and terminate the Protected Account upon termination of this Agreement pursuant to Section 11.01 hereof.

In addition, no later than 1:00 p.m. New York City time on the Remittance Date, the Company shall withdraw from the Protected Account and remit to the Master Servicer, for deposit in the Master Servicer Collection Account the amount required to be withdrawn therefrom pursuant to Section 5.05 hereof.

With respect to any remittance received by the Master Servicer from EMC after the date on which such remittance was due, EMC shall pay to the Master Servicer interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus two percentage points, but in no event greater that the maximum amount permitted by applicable law. Such interest shall be remitted to the Master Servicer on the date such late payment is made and shall cover the period commencing with the day following the date on which such remittance was due and ending with the Business Day on which such remittance is made, both inclusive. The payment by EMC of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default with respect to EMC.

{TPW: NYLEGAL:409898.8} 17297-00382 02/23/2007 09.01 PM

The Company shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Protected Account pursuant to subclauses (i), (ii), (iv), (v) and (vi) above. Prior to making any withdrawal from the Protected Account pursuant to subclause (iii), the Company shall deliver to the Master Servicer an Officer's Certificate of a Servicing Officer indicating the amount of any previous Advance or Servicing Advance determined by the Company to be a Nonrecoverable Advance and identifying the related EMC Mortgage Loan(s), and their respective portions of such Nonrecoverable Advance.

Section 5.03   Reports to the Master Servicer.

On or before the tenth calendar day of each month, the Company shall furnish to the Master Servicer electronically in a format acceptable to the Master Servicer loan accounting reports in the investor's assigned loan number order to document the payment activity on each EMC Mortgage Loan on an individual mortgage loan basis.  With respect to each month, such loan accounting reports shall be in the format agreed to by the Company and the Master Servicer, including but not limited to the following information with respect to each EMC Mortgage Loan:

(i)      with respect to each Scheduled Payment and each Loan Group (on both an actual and scheduled basis with respect to Mortgage Loan balances and on an actual basis with respect to paid-through dates), the amount of such remittance allocable to principal (including a separate breakdown of any Principal Prepayment, including the amount of any Prepayment Interest Shortfall);

(ii)     with respect to each Monthly Payment and each Loan Group, the amount of such remittance allocable to scheduled interest;

(iii)    the amount of servicing compensation received by the Company during the prior calendar month;

(iv)     with respect to each Loan Group, the aggregate stated principal balance of the EMC Mortgage Loans;

(v)      with respect to each Loan Group, the aggregate amount of Advances made by the Company pursuant to Section 6.01;

(vi)     with respect to each Loan Group, the aggregate of any expenses reimbursed to the Company during the prior calendar month pursuant to Section 5.02;

(vii)    with respect to each Loan Group, the number and aggregate Stated Principal Balance of the Mortgage Loans (A) Delinquent (exclusive of Mortgage Loans in foreclosure and bankruptcy) (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, (B) in foreclosure and delinquent and (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent (C) in bankruptcy and delinquent (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, in each case as of the close of business on the last day of the calendar month preceding such Distribution Date

109

and separately identifying such information for the (1) second lien Mortgage Loans, and (3) Adjustable Rate Mortgage Loans; and

(viii)   with respect to each Loan Group, the amount of any Prepayment Charges collected by the Company and the amount of Prepayment Charges paid by the Company in connection with a waiver that is not permitted under this Agreement.

The Master Servicer shall be entitled to rely conclusively on the Mortgage Loan data provided by the Company and the Servicer and shall have no liability for any errors in such Mortgage Loan data.

Section 5.04   Collection of Taxes; Assessments and Similar Items; Escrow Accounts.

With respect to each EMC Mortgage Loan, to the extent required by the related Mortgage Note, the Company shall establish and maintain one or more accounts (each, an "Escrow Account") and deposit and retain therein all collections from the Mortgagors (or Servicing Advances by the Company) for the payment of taxes, assessments, hazard insurance premiums or comparable items for the account of the Mortgagors. Nothing herein shall require the Company to compel a Mortgagor to establish an Escrow Account in violation of applicable law.

Withdrawals of amounts so collected from the Escrow Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, condominium or PUD association dues, or comparable items, to reimburse the Company out of related collections for any payments made with respect to each EMC Mortgage Loan pursuant to Section 3.01 (with respect to taxes and assessments and insurance premiums) and Section 3.07 (with respect to hazard insurance), to refund to any Mortgagors for any EMC Mortgage Loans any sums as may be determined to be overages, to pay interest, if required by law or the terms of the related Mortgage or Mortgage Note, to such Mortgagors on balances in the Escrow Account or to clear and terminate the Escrow Account at the termination of this Agreement in accordance with Section 11.01 thereof. The Escrow Account shall not be a part of the Trust Fund.

Section 5.05   Protected Accounts.

(a)   The Master Servicer shall enforce the obligation of the Company and the Servicers to establish and maintain a Protected Account in accordance with this Agreement and the Servicing Agreements, with records to be kept with respect thereto on a Mortgage Loan by Mortgage Loan basis, into which accounts shall be deposited within one Business Day (or as of such other time specified in the Servicing Agreements) of receipt all collections of principal and interest on any Mortgage Loan and with respect to any REO Property received by the Company or the related Servicer, including Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, Subsequent Recoveries, and advances made from the Company's or such Servicer's own funds (less servicing compensation as permitted by this Agreement or the related Servicing Agreement) and all other amounts to be deposited in the Protected Accounts. Each of the Company and the Servicers is hereby authorized to make withdrawals from and deposits to the related Protected Account for purposes required or permitted by this Agreement. To the extent

110

provided in this Agreement or any Servicing Agreement, the Protected Account shall be held in a Designated Depository Institution and segregated on the books of such institution in the name of the Company or Servicer, as applicable on behalf of the Trustee for the benefit of Certificateholders and the Class I-A Insurer.

(b)     To the extent provided in this Agreement or any Servicing Agreement, amounts on deposit in a Protected Account may be invested in Permitted Investments in the name of the Trustee for the benefit of Certificateholders and the Class I-A Insurer and, except as provided in the preceding paragraph, not commingled with any other funds, such Permitted Investments to mature, or to be subject to redemption or withdrawal, no later than the date on which such funds are required to be withdrawn for deposit in the Master Servicer Collection Account, and shall be held until required for such deposit. The income earned from Permitted Investments made pursuant to this Section 5.05 shall be paid to the Company or the related Servicer under this Agreement or the related Servicing Agreement, and the risk of loss of moneys required to be distributed to the Certificateholders resulting from such investments shall be borne by and be the risk of the Company or the related Servicer, as the case may be. The Company or the related Servicer (to the extent provided in this Agreement or the related Servicing Agreement) shall deposit the amount of any such loss in the Protected Account within two Business Days of receipt of notification of such loss but not later than the second Business Day prior to the Distribution Date on which the moneys so invested are required to be distributed to the Certificateholders.

(c)     To the extent provided in this Agreement or the related Servicing Agreement and subject to this Article V, on or before 1:00 p.m. New York City time on each Remittance Date, the Company or the related Servicer shall withdraw or shall cause to be withdrawn from its Protected Account and shall immediately deposit or cause to be deposited in the Master Servicer Collection Account amounts representing the following collections and payments (other than with respect to principal of or interest on the Mortgage Loans due on or before the Cut-off Date):

(i)     With respect to each Loan Group, scheduled Payments on the Mortgage Loans received or any related portion thereof advanced by the Company or the related Servicer pursuant to the related Servicing Agreement which were due on or before the related Due Date, net of the amount thereof comprising the Servicing Fees;

(ii)     with respect to each Loan Group, full Principal Prepayments and any Liquidation Proceeds received by the Company or the related Servicer with respect to such Mortgage Loans in the related Prepayment Period, with interest to the date of prepayment or liquidation, net of the amount thereof comprising the Servicing Fees;

(iii)     With respect to each Loan Group, partial Principal Prepayments received by the Company or the related Servicer for such Mortgage Loans in the related Prepayment Period;

(iv)     With respect to each Loan Group, any amount to be used as an Advance; and

111

(v)     With respect to each Loan Group, the amount of any Prepayment Charges collected with respect to the Mortgage Loans and the amount of any Prepayment Charges paid by the Company or the related Servicer in connection with the waiver of a Prepayment Charge in a manner that is not permitted under this Agreement or the related Servicing Agreement.

(d)     with respect to each Loan Group, withdrawals may be made from a Protected Account by the Company as described in Section 5.02 hereof and by the Master Servicer or the related Servicer only to make remittances as provided in Section 5.05(c), 5.06 and 5.07; to reimburse the Master Servicer or the Servicer for Advances which have been recovered by subsequent collection from the related Mortgagor; to remove amounts deposited in error; to remove fees, charges or other such amounts deposited on a temporary basis; or to clear and terminate the account at the termination of this Agreement in accordance with Section 11.01. As provided in Sections 5.05(c) and 5.06(b) certain amounts otherwise due to the related Servicer may be retained by the related Servicer and need not be deposited in the Master Servicer Collection Account.

Section 5.06   Master Servicer Collection Account.

(a)     The Master Servicer shall establish and maintain in the name of LaSalle Bank National Association, as Master Servicer, on behalf of the Trustee, for the benefit of the Certificateholders, the Master Servicer Collection Account which shall be an Eligible Account. The Master Servicer will deposit in the Master Servicer Collection Account as identified by the Master Servicer and as received by the Master Servicer, the following amounts:

(i)     with respect to each Loan Group, any Advance and any Compensating Interest Payments;

(ii)     with respect to each Loan Group, any Insurance Proceeds, Liquidation Proceeds or Subsequent Recoveries received by the Master Servicer;

(iii)     with respect to each Loan Group, the Repurchase Price with respect to any Mortgage Loans purchased by the Seller or Section 2.02 or 2.03, the Repurchase Price with respect to any Mortgage Loans purchased by EMC pursuant to Section 3.05, and all proceeds of any Mortgage Loans or property acquired with respect thereto repurchased by the Seller or its designee pursuant to Section 11.01;

(iv)     with respect to each Loan Group, any amounts required to be deposited with respect to losses on investments of deposits in the Master Servicer Collection Account; and

(v)     with respect to each Loan Group, any other amounts received by or on behalf of the Master Servicer or the Trustee and required to be deposited in the Master Servicer Collection Account pursuant to this Agreement.

(b)     All amounts deposited to the Master Servicer Collection Account shall be held by the Master Servicer in the name of the Trustee in trust for the benefit of the Certificateholders

112

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

and the Class I-A Insurer in accordance with the terms and provisions of this Agreement. The requirements for crediting the Master Servicer Collection Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges or assumption, tax service, statement account or payoff, substitution, satisfaction, release and other like fees and charges, need not be credited by the Master Servicer to the Master Servicer Collection Account.

(c)     The amount at any time credited to the Master Servicer Collection Account may be invested, in the name of the Trustee, or its nominee, for the benefit of the Certificateholders and the Class I-A Insurer, in Permitted Investments or be held in cash as directed by the Securities Administrator. All Permitted Investments shall mature or be subject to redemption or withdrawal on or before, and shall be held until, the next succeeding Distribution Account Deposit Date. Any and all investment earnings from the Master Servicer Collection Account shall be paid to the Securities Administrator. The risk of loss of moneys required to be distributed to the Certificateholders resulting from such investments shall be borne by and be the risk of the Securities Administrator. The Securities Administrator shall deposit the amount of any such loss in the Master Servicer Collection Account within two Business Days of receipt of notification of such loss but not later than the second Business Day prior to the Distribution Date on which the moneys so invested are required to be distributed to the Certificateholders.

Section 5.07   Permitted Withdrawals and Transfers from the Master Servicer Collection Account.

(a)     The Master Servicer will make such withdrawals or transfers from the Master Servicer Collection Account as the Master Servicer has designated for such transfer or withdrawal pursuant to this Agreement. The Master Servicer may clear and terminate the Master Servicer Collection Account pursuant to Section 11.01 and from time to time remove amounts deposited in error.

(b)     On an ongoing basis, the Master Servicer shall withdraw from the Master Servicer Collection Account to pay itself as provided in Section 4.09 and to pay any expenses, costs and liabilities recoverable by the Trustee, the Master Servicer, each Custodian or the Securities Administrator pursuant to Sections 4.02, 8.03, 8.04 (subject in each case to the Extraordinary Trust Fund Expenses Cap), 9.05 and 10.05; provided however, that the Master Servicer shall be obligated to pay from its own funds any amounts which it is required to pay under Section 8.03(a).

(c)     In addition, on or before each Distribution Account Deposit Date, the Master Servicer shall remit to the Securities Administrator for deposit in the Distribution Account any Advances required to be made by the Master Servicer with respect to the Mortgage Loans.

(d)     No later than 3:00 p.m. New York time on each Distribution Account Deposit Date, the Master Servicer will transfer all available funds on deposit in the Master Servicer Collection Account with respect to the related Distribution Date to the Securities Administrator for deposit in the Distribution Account. In the event that the Master Servicer shall deposit or cause to be deposited to the Distribution Account any amount not required to be credited thereto, the Securities Administrator, upon receipt of a written request therefor signed by a Master

113

Servicing Officer of the Master Servicer, shall promptly transfer such amount to the Master Servicer, any provision herein to the contrary notwithstanding.

Section 5.08    Distribution Account.

(a)    The Securities Administrator shall establish and maintain in the name of the Securities Administrator, on behalf of the Trustee, for the benefit of the Certificateholders and the Class I-A Insurer, the Distribution Account as a segregated trust account or accounts.

(b)    All amounts deposited to the Distribution Account shall be held by the Securities Administrator in the name of the Trustee in trust for the benefit of the Certificateholders and the Class I-A Insurer in accordance with the terms and provisions of this Agreement.

(c)    The Distribution Account shall constitute an Eligible Account of the Trust Fund segregated on the books of the Securities Administrator and held by the Securities Administrator, and the Distribution Account and the funds deposited therein shall not be subject to, and shall be protected from, all claims, liens, and encumbrances of any creditors or depositors of the Securities Administrator (whether made directly, or indirectly through a liquidator or receiver of the Securities Administrator). The amount at any time credited to the Distribution Account may be, as directed by the Securities Administrator, held either uninvested or invested in the name of the Trustee, in such Permitted Investments as may be selected by the Securities Administrator on such direction which mature not later than the Business Day next preceding the succeeding Distribution Date. Permitted Investments in respect of the Distribution Account shall not be sold or disposed of prior to their maturity. All investment earnings on amounts on deposit in the Distribution Account or benefit from funds uninvested therein from time to time shall be for the account of the Securities Administrator. The Securities Administrator shall be permitted to receive distribution of any and all investment earnings from the Distribution Account on each Distribution Date. If there is any loss on a Permitted Investment or demand deposit, the Securities Administrator shall deposit the amount of the loss in the Distribution Account from its own funds. With respect to the Distribution Account and the funds deposited therein, the Securities Administrator shall take such action as may be necessary to ensure that the Certificateholders and the Class I-A Insurer shall be entitled to the priorities afforded to such a trust account (in addition to a claim against the estate of the Trustee) as provided by 12 U.S.C. § 92a(e), and applicable regulations pursuant thereto, if applicable.

Section 5.09    Permitted Withdrawals and Transfers from the Distribution Account.

(a)    The Securities Administrator will from time to time make or cause to be made such withdrawals or transfers from the Distribution Account as are designated for such transfer or withdrawal pursuant to this Agreement any the Servicing Agreement (limited in the case of amounts due the Master Servicer to those not withdrawn from the Master Servicer Collection Account in accordance with the terms of this Agreement):

(i)    to reimburse the Master Servicer, the Company or the related Servicer for any unreimbursed Advance or Servicing Advance of its own funds pursuant to this Agreement or the related Servicing Agreement, such right of the

114

Master Servicer, the Company or the Servicer to reimbursement pursuant to this subclause (i) being limited to amounts received on a particular Mortgage Loan (including, for this purpose, the Repurchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late payments or recoveries of the principal of or interest on such Mortgage Loan respecting which such Advance or Servicing Advance was made;

(ii)    to reimburse the Master Servicer, the Company or the related Servicer from Insurance Proceeds or Liquidation Proceeds relating to a particular Mortgage Loan for unreimbursed amounts expended by the Master Servicer, the Company or the Servicer in good faith in connection with the restoration of the related Mortgaged Property which was damaged by an uninsured cause or in connection with the liquidation of such Mortgage Loan; provided, however, that such reimbursement pursuant to this clause shall be limited to amounts recovered from Mortgage Loans in the related Loan Group from which such expenditures were made;

(iii)    to reimburse the Master Servicer, the Company or the related Servicer from Insurance Proceeds relating to a particular Mortgage Loan for unreimbursed expenses incurred with respect to such Mortgage Loan and to reimburse the Master Servicer, the Company or the related Servicer from Liquidation Proceeds from a particular Mortgage Loan for Liquidation Expenses incurred with respect to such Mortgage Loan; provided that the Master Servicer shall not be entitled to reimbursement for Liquidation Expenses with respect to a Mortgage Loan to the extent that (i) any amounts with respect to such Mortgage Loan were paid as Excess Liquidation Proceeds pursuant to clause (x) of this Subsection (a) to the Master Servicer; and (ii) such Liquidation Expenses were not included in the computation of such Excess Liquidation Proceeds;

(iv)    to reimburse the Master Servicer, the Company or a Servicer for any Advance or Servicing Advance, after a Realized Loss has been allocated with respect to the related Mortgage Loan if the Advance or Servicing Advance has not been reimbursed pursuant to clauses (i) through (iii); provided, however, that such reimbursement pursuant to this clause shall be limited to amounts recovered from Mortgage Loans in the related Loan Group from which such Advance was made;

(v)    to pay the Master Servicer as set forth in Section 4.09;

(vi)    to reimburse the Master Servicer for expenses, costs and liabilities incurred by and reimbursable to it pursuant to Sections 4.02, 8.04(c) and (d) and 12.02 or otherwise reimbursable to it pursuant to this Agreement;

(vii)    to pay to the Master Servicer, as additional master servicing compensation, any Excess Liquidation Proceeds to the extent not retained by the Company or the Servicer;

[TPW: NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

(viii)   to reimburse or pay the Company or the related Servicer any such amounts as are due thereto under this Agreement or the related Servicing Agreement and have not been retained by or paid to the Company or the related Servicer, to the extent provided herein and in the related Servicing Agreement;

(ix)   to reimburse the Trustee, the Custodian or the Securities Administrator for expenses, costs and liabilities incurred by or reimbursable to it pursuant to this Agreement (to the extent not reimbursed from the Master Servicer Collection Account in accordance with Section 5.07), subject to the Extraordinary Trust Fund Expenses Cap;

(x)   to remove amounts deposited in error; and

(xi)   to clear and terminate the Distribution Account pursuant to Section 11.01.

(b)   The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of accounting for any reimbursement from the Distribution Account pursuant to subclauses (i) through (iv), inclusive, and (vi) or with respect to any such amounts which would have been covered by such subclauses had the amounts not been retained by the Master Servicer without being deposited in the Distribution Account under Section 5.08.

(c)   On each Distribution Date, the Securities Administrator shall distribute the related Interest Remittance Amount, Group I Principal Distribution Amount and Group II Principal Distribution Amount to the extent of funds on deposit in the Distribution Account to the holders of the related Certificates and the Class I-A Insurer in accordance with Section 6.04.

116

## ARTICLE VI

## DISTRIBUTIONS AND ADVANCES

### Section 6.01    Advances.

(a)    The Company shall make an Advance with respect to any EMC Mortgage Loan and deposit such Advance in the Master Servicer Collection Account no later than 1:00 p.m. Eastern time on the Remittance Date in immediately available funds. The Company or the related Servicer, as applicable, shall be obligated to make any such Advance only to the extent that such advance would not be a Nonrecoverable Advance. If the Company or the related Servicer shall have determined that it has made a Nonrecoverable Advance or that a proposed Advance or a lesser portion of such Advance would constitute a Nonrecoverable Advance, the Company or the related Servicer, as the case may be, shall deliver (i) to the Securities Administrator for the benefit of the Certificateholders and the Class I-A Insurer funds constituting the remaining portion of such Advance, if applicable, and (ii) to the Depositor, the Master Servicer, each Rating Agency, the Class I-A Insurer and the Trustee an Officer's Certificate setting forth the basis for such determination.

In lieu of making all or a portion of such Advance from its own funds, the Company may (i) cause to be made an appropriate entry in its records relating to the Protected Account that any Amounts Held for Future Distribution has been used by the Company in discharge of its obligation to make any such Advance and (ii) transfer such funds from the Protected Account to the Distribution Account. Any funds so applied and transferred shall be replaced by the Company by deposit in the Distribution Account, no later than the close of business on the Remittance Date immediately preceding the Distribution Account Deposit Date on which such funds are required to be distributed pursuant to this Agreement.

Each Servicer will discontinue such Advances with respect to any Mortgage Loan that becomes 90 days Delinquent; provided, however, if a Servicer reasonably determines that a significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgaged Property on a Mortgage Loan that becomes 90 days delinquent, such Servicer may continue making advances on such Mortgage Loan. Subject to Section 3.12, a Servicer must effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan at such time that the Mortgage Loan becomes 180 days Delinquent. Once a Servicer has commenced such proceedings, such Servicer will not be entitled to any additional Servicing Fee for such Mortgage Loan, except to the extent of any unreimbursed Servicing Fees and expenses which will be reimbursable from any Liquidation Proceeds.

The Company shall be entitled to be reimbursed from the Protected Account for all Advances of its own funds made pursuant to this Section as provided in Section 5.02; provided, however, such reimbursement shall be limited to funds received from Mortgage Loans in the related Loan Group for which such Advance was made. The obligation to make Advances with respect to any EMC Mortgage Loan shall continue until such EMC Mortgage Loan is paid in full or the related Mortgaged Property or related REO Property has been liquidated or until the purchase or repurchase thereof (or substitution therefor) from the Trust Fund pursuant to any applicable provision of this Agreement, except as otherwise provided in this Section 6.01.

117

(b)     If the Scheduled Payment on a Mortgage Loan that was due on a related Due Date and is delinquent other than as a result of application of the Relief Act and for which the Company or the related Servicer was required to make an Advance pursuant to this Agreement or the related Servicing Agreement exceeds the amount deposited in the Master Servicer Collection Account which shall be used for an Advance with respect to such Mortgage Loan, the Master Servicer will deposit in the Master Servicer Collection Account not later than the Distribution Account Deposit Date immediately preceding the related Distribution Date an amount equal to such deficiency, net of the Master Servicing Fee and the Servicing Fee for such Mortgage Loan except to the extent the Master Servicer determines any such Advance to be nonrecoverable from Liquidation Proceeds, Insurance Proceeds or future payments on the Mortgage Loan for which such Advance was made. Subject to the foregoing, the Master Servicer shall continue to make such Advances through the date that the Company or the related Servicer is required to do so under this Agreement or the related Servicing Agreement, as applicable. If applicable, on the Distribution Account Deposit Date, the Master Servicer shall present an Officer's Certificate to the Trustee (i) stating that the Master Servicer elects not to make an Advance in a stated amount and (ii) detailing the reason it deems the advance to be nonrecoverable. The Master Servicer may rely on any non-recoverability determination of the Company or any Servicer.

Subject to and in accordance with the provisions of Article IX hereof, in the event the Master Servicer fails to make such Advance, then the Trustee, as Successor Master Servicer, shall be obligated to make such Advance, subject to the provisions of this Section 6.01.

### Section 6.02   Compensating Interest Payments.

(a)     In the event that there is a Prepayment Interest Shortfall arising from a voluntary Principal Prepayment in part or in full by the Mortgagor with respect to any EMC Mortgage Loan, the Company shall, to the extent of the Servicing Fee for such Distribution Date, remit to the Master Servicer for deposit into the Master Servicer Collection Account, as a reduction of the Servicing Fee for such Distribution Date, no later than the close of business on the Remittance Date immediately preceding such Distribution Date, an amount equal to the Prepayment Interest Shortfall; and in case of such deposit, the Company shall not be entitled to any recovery or reimbursement from the Depositor, the Trustee, the Sellers, the Master Servicer, the Securities Administrator, the Trust Fund or the Certificateholders.

(b)     The Master Servicer shall enforce the obligation of each Servicer under the related Servicing Agreement to remit any required Compensating Interest Payments to the Master Servicer Collection Account on the Remittance Date.

(c)     The Master Servicer shall be required to remit to the Securities Administrator for deposit in the Distribution Account the amount of any Prepayment Interest Shortfalls, to the extent of the Master Servicing Compensation for such Distribution Date, in the event the Company or the related Servicer is required to make such payment but fails to do so.

### Section 6.03   REMIC Distributions.

118

On each Distribution Date, the Securities Administrator shall be deemed to have allocated distributions to the REMIC I Regular Interests, the REMIC II Regular Interests, Class I-C Interest and Class II-C Interest in accordance with Section 6.07 hereof.

Section 6.04   Distributions.

(a)   On each Distribution Date, an amount equal to the related Interest Funds and Group I Principal Funds for such Distribution Date shall be withdrawn by the Securities Administrator to the extent of any such funds in the Distribution Account and distributed in the following order of priority:

(1)   Interest Funds in respect of Loan Group I shall be distributed in the following manner and order of priority:

(A)   To the Class I-A Insurer, the Class I-A Insurer Premium Amount for such Distribution Date;

(B)   to the Class I-A Certificates, the Current Interest and any Interest Carry Forward Amount for such Distribution Date and such Class;

(C)   To the Class I-A Insurer, any Class I-A Reimbursement Amount; and

(D)   From remaining Interest Funds in respect to Loan Group I, sequentially, to the Class I-M Class I-B-1, Class I-B-2, Class I-B-3 and Class I-B-4 Certificates, in that order, the Current Interest for each such Class.

Any Group I Excess Spread to the extent necessary to meet a level of overcollateralization equal to the Group I Overcollateralization Target Amount will be the Group I Extra Principal Distribution Amount and will be included as part of the Group I Principal Distribution Amount. Any Group I Remaining Excess Spread together with any Group I Overcollateralization Release Amount will be applied as Group I Excess Cashflow and distributed pursuant to clauses (a)(3)(A) through (F) below.

On any Distribution Date, any related Relief Act Interest Shortfalls and any related Prepayment Interest Shortfalls allocated to the Group I Certificates to the extent not covered by Compensating Interest will be allocated as set forth in the definition of "Current Interest" herein.

(2)   Group I Principal Funds, including any Group I Extra Principal Distribution Amount, shall be distributed in the following manner and order of priority:

(A)   For each Distribution Date (i) prior to the Group I Stepdown Date or (ii) on which a Group I Trigger Event is in effect:

(i)   To the Class I-A Insurer, the Class I-A Insurer Premium Amount for such Distribution Date remaining unpaid after distributions made pursuant to Section 6.04(a)(1)(A) above;

119

(ii)     To the Class I-A Certificates, the Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iii)    To the Class I-A Insurer, any Class I-A Reimbursement Amount remaining unpaid after distributions made pursuant to Section 6.04(a)(1)(C) above;

(iv)     To the Class I-M Certificates, the remaining Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(v)      To the Class I-B-1 Certificates, the remaining Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vi)     To the Class I-B-2 Certificates, the remaining Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vii)    To the Class I-B-3 Certificates, the remaining Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero; and

(viii)   To the Class I-B-4 Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero.

(B)     For each Distribution Date on or after the Stepdown Date, so long as a Group I Trigger Event is not in effect:

(i)      To the Class I-A Insurer, the Class I-A Insurer Premium Amount for such Distribution Date remaining unpaid after distributions made pursuant to Section 6.04(a)(1)(A) above;

(ii)     To the Class I-A Certificates, the Class I-A Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iii)    To the Class I-A Insurer, any Class I-A Reimbursement Amount remaining unpaid after distributions made pursuant to Sections 6.04(a)(1)(C) and 6.04(a)(2)(A)(iii) above;

(iv)     To the Class I-M Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, the Class I-M Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

120

(v)     To the Class I-B-1 Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, the Class I-B-1 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vi)     To the Class I-B-2 Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, the Class I-B-2 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vii)     To the Class I-B-3 Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, the Class I-B-3 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero; and

(viii)     To the Class I-B-4 Certificates, from any remaining Group I Principal Distribution Amount for such Distribution Date, the Class B-4 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero.

(3)     Any Group I Excess Cashflow shall be distributed in the following manner and order of priority; provided, however, any such Group I Excess Spread that would otherwise be distributed to the Class I-A Certificates to pay the Group I Extra Principal Distribution Amount for any Distribution Date shall be used to pay the Class I-A Insurer any Class I-A Reimbursement Amount, if any, which was not previously paid to the Class I-A Insurer pursuant to clauses (a)(1)(C) and (a)(2) above prior to paying such Group I Extra Principal Distribution Amount to the Class I-A Certificates:

(A)     from any remaining Group I Excess Cashflow, to the Class I-A Certificates, (a) *first*, any remaining Interest Carry Forward Amount for such Class to the extent not fully paid pursuant to clause (a)(1)(B) above and (b) *second*, any Unpaid Realized Loss Amount for such Class for such Distribution Date in accordance with the Applied Realized Loss Amount allocated to each such Class;

(B)     from any remaining Group I Excess Cashflow, sequentially, to the Class I-M, Class I-B-1, Class I-B-2, Class I-B-3 and Class I-B-4 Certificates, in that order, an amount equal to the related Interest Carry Forward Amount, if any, for each such Class for such Distribution Date;

(C)     from any remaining Group I Excess Cashflow otherwise distributable to the Class I-C Interest and Class I-C Certificates, to the Group I Reserve Fund, (i) *first*, to pay the Class I-A Certificates any Group I Basis Risk Shortfall Carry Forward Amount for such Class for such Distribution Date and (ii) *second*, to maintain a balance in the Group I Reserve Fund equal to the Group I Reserve Fund Deposit;

121

(D)     from any remaining Group I Excess Cashflow otherwise distributable to the Class I-C Interest and Class I-C Certificates, to the Group I Reserve Fund, (i) *first,* sequentially to pay the Class I-M, Class I-B-1, Class I-B-2, Class I-B-3 and Class I-B-4 Certificates, in that order, any Group I Basis Risk Shortfall Carry Forward Amount for each such Class for such Distribution Date, if any, to the extent such amount exceeds the amounts then on deposit in the Group I Reserve Fund, and (ii) *second,* to maintain a balance in the Group I Reserve Fund equal to the Group I Reserve Fund Deposit;

(E)     from any remaining Group I Excess Cashflow, sequentially to pay to the Class I-A, Class I-M, Class I-B-1, Class I-B-2, Class I-B-3 and Class I-B-4 Certificates, in that order, the amount of Relief Act Shortfalls and any Prepayment Interest Shortfalls allocated to such Classes of Certificates, to the extent not previously reimbursed;

(F)     from any remaining Group I Excess Cashflow, to the Class I-C Interest and Class I-C Certificates an amount equal to the Class I-C Distribution Amount reduced by amounts distributed in clauses (C) and (D) above; and

(G)     from any remaining Group I Excess Cashflow (i) to each of the Class I-R-1, Class I-R-2 and Class I-R-X Certificates, based on the related REMIC in which such cashflow remains.

On each Distribution Date, all amounts in respect of Prepayment Charges related to the Group I Mortgage Loans shall be distributed to the Holders of the Class I-C Certificates, provided that such distributions shall not be in reduction of the principal balance thereof.

In addition, notwithstanding the foregoing, on any Distribution Date after the Distribution Date on which the Certificate Principal Balance of a Class of Class I-A, Class I-M or Class I-B Certificates has been reduced to zero, that Class of Certificates will be retired and will no longer be entitled to distributions, including distributions in respect of related Prepayment Interest Shortfalls or Group I Basis Risk Shortfall Carry Forward Amounts.

(b)     On each Distribution Date, an amount equal to the related Interest Funds and Group II Principal Funds for such Distribution Date shall be withdrawn by the Securities Administrator to the extent of any such funds in the Distribution Account and distributed in the following order of priority:

(1)     Interest Funds with respect to Loan Group II shall be distributed in the following manner and order of priority:

(A)     to the Class II-A-1, Class II-A-2 and Class II-A-3 Certificates, the Current Interest and any Interest Carry Forward Amount for such Distribution Date and such Classes, pro rata, in accordance with the amount of accrued interest due thereon; and

122

(B)    From remaining related Interest Funds, sequentially, to the Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1, Class II-B-2, Class II-B-3 and Class II-B-4 Certificates, in that order, the Current Interest for each such Class.

Any Group II Excess Spread to the extent necessary to meet a level of overcollateralization equal to the Group II Overcollateralization Target Amount will be the Group II Extra Principal Distribution Amount and will be included as part of the Group II Principal Distribution Amount. Any Group II Remaining Excess Spread together with any Group II Overcollateralization Release Amount will be applied as Group II Excess Cashflow and distributed pursuant to clauses (b)(3)(A) through (F) below.

On any Distribution Date, any related Relief Act Interest Shortfalls and any related Prepayment Interest Shortfalls allocated to the Group II Certificates to the extent not covered by Compensating Interest will be allocated as set forth in the definition of "Current Interest" herein.

(2)    Group II Principal Funds, including any Group II Extra Principal Distribution Amount, shall be distributed in the following manner and order of priority:

(A)    For each Distribution Date (i) prior to the Group II Stepdown Date or (ii) on which a Group II Trigger Event is in effect:

(i)    To the Class II-A Certificates, the Group II Principal Distribution Amount for such Distribution Date, concurrently, on a pro rata basis, based on their respective Certificate Principal Balances, as follows (a) to the Class II-A-1 Certificates, until the Certificate Principal Balance thereof is reduced to zero, and (b) sequentially, to the Class II-A-2 Certificates and Class II-A-3 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero;

(ii)    To the Class II-M-1 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iii)    To the Class II-M-2 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iv)    To the Class II-M-3 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(v)    To the Class II-M-4 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

123

(vi)     To the Class II-M-5 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vii)    To the Class II-M-6 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(viii)   To the Class II-B-1 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(ix)     To the Class II-B-2 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(x)      To the Class II-B-3 Certificates, the remaining Group II Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero; and

(xi)     To the Class II-B-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero.

(B)      For each Distribution Date on or after the Group II Stepdown Date, so long as a Group II Trigger Event is not in effect:

(i)      To the Class II-A Certificates, the Class II-A Principal Distribution Amount for such Distribution Date, concurrently, on a pro rata basis, based on their respective Certificate Principal Balances, as follows: (a) to the Class II-A-1 Certificates, until the Certificate Principal Balance thereof is reduced to zero, and (b) sequentially, to the Class II-A-2 Certificates and Class II-A-3 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero;

(ii)     To the Class II-M-1 Certificates, the from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-1 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iii)    To the Class II-M-2 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-2 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iv)     To the Class II-M-3 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-3

124

Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(v)     To the Class II-M-4 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-4 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vi)     To the Class II-M-5 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-5 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vii)     To the Class II-M-6 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-M-6 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(viii)     To the Class II-B-1 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-B-1 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(ix)     To the Class II-B-2 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-B-2 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(x)     To the Class II-B-3 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-B-3 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero; and

(xi)     To the Class II-B-4 Certificates, from any remaining Group II Principal Distribution Amount for such Distribution Date, the Class II-B-4 Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero.

(3)     Any Group II Excess Cashflow shall be distributed in the following manner and order of priority:

(A)     to the Classes of Class II-A Certificates, (a) *first*, any remaining Interest Carry Forward Amount for each such Class to the extent not fully paid pursuant to clause (b) (1) (A) above, on a pro rata basis, and (b) *second*, any Unpaid Realized Loss Amount for each such Class for such Distribution Date, on a pro rata basis, based on their respective Certificate Principal Balances;

[TPW. NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

(B)      from any remaining Group II Excess Cashflow, sequentially, to the Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1, Class II-B-2, Class II-B-3 and Class II-B-4 Certificates, in that order, an amount equal to the Interest Carry Forward Amount, in any, for each such Class for such Distribution Date;

(C)      from any remaining Group II Excess Cashflow otherwise distributable to the Class II-C Interest and Class II-C Certificates, to the Group II Reserve Fund, (i) *first,* to pay the Class II-A Certificates, any Group II Basis Risk Shortfall Carry Forward Amount for each such Class for such Distribution Date, pro rata, based on the amount of Group II Basis Risk Shortfall Carry Forward Amount payable to each such Class, if any, to the extent such amount exceeds the amounts then on deposit in the Group II Reserve Fund, and (ii) *second,* to maintain a balance in the Group II Reserve Fund equal to the Group II Reserve Fund Deposit;

(D)      from any remaining Group II Excess Cashflow otherwise distributable to the Class II-C Interest and Class II-C Certificates, to the Group II Reserve Fund, (i) *first,* sequentially to pay to the Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1, Class II-B-2, Class II-B-3 and Class II-B-4 Certificates, in that order, any Group II Basis Risk Shortfall Carry Forward Amount for each such Class for such Distribution Date, if any, to the extent such amount exceeds the amounts then on deposit in the Group II Reserve Fund, and (ii) *second,* to maintain a balance in the Group II Reserve Fund equal to the Group II Reserve Fund Deposit;

(E)      from any remaining Group II Excess Cashflow, to pay the Class II-A Certificates, on a pro rata basis, based on the entitlement of each such Class, and then sequentially to the Class II-M-1, Class II-M-2, Class II-M-3, Class II-M-4, Class II-M-5, Class II-M-6, Class II-B-1, Class II-B-2, Class II-B-3 and Class II-B-4 Certificates, in that order, the amount of Relief Act Shortfalls and any Prepayment Interest Shortfalls allocated to such Classes of Certificates, to the extent not previously reimbursed;

(F)      from any remaining Group II Excess Cashflow, to the Class II-C Interest and the Class II-C Certificates, an amount equal to the Class II-C Distribution Amount reduced by amounts distributed in clauses (C) and (D) above; and

(G)      from any remaining Group II Excess Cashflow (i) to each of the Class II-R-1 and Class II-RX Certificates, based on the related REMIC in which such amounts remain.

On each Distribution Date, all amounts in respect of Prepayment Charges related to the Group II Mortgage Loans shall be distributed to the Holders of the Class II-C Certificates, provided that such distributions shall not be in reduction of the principal balance thereof.

126

In addition, notwithstanding the foregoing, on any Distribution Date after the Distribution Date on which the Certificate Principal Balance of a Class of Class II-A, Class II-M or Class II-B Certificates has been reduced to zero, that Class of Certificates will be retired and will no longer be entitled to distributions, including distributions in respect of related Prepayment Interest Shortfalls or Group II Basis Risk Shortfall Carry Forward Amounts.

(c)     In addition to the foregoing distributions, with respect to any Subsequent Recoveries and each Loan Group, the Company or the Servicer, as applicable, shall deposit such funds into the Protected Account pursuant to Section 5.01(b)(iii). If, after taking into account such Subsequent Recoveries from a related Loan Group, the amount of a related Realized Loss is reduced, the amount of such Subsequent Recoveries from a related Loan Group will be applied to increase the Certificate Principal Balance of the related Class of Certificates with the highest payment priority to which related Realized Losses have been allocated, but not by more than the amount of related Realized Losses previously allocated to that Class of Certificates pursuant to Section 6.05; provided, however, to the extent that no reductions to a Certificate Principal Balance of any Class of Certificates currently exists as the result of a prior allocation of a related Realized Loss, such Subsequent Recoveries from a related Loan Group will be applied as Group I Excess Cashflow or Group II Excess Cashflow, as applicable. The amount of any remaining Subsequent Recoveries from a related Loan Group will be applied to increase the Certificate Principal Balance of the related Class of Certificates with the next highest payment priority, up to the amount of such related Realized Losses previously allocated to that Class of Certificates pursuant to Section 6.05, and so on. Holders of such Certificates will not be entitled to any payment in respect of Current Interest on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied to the Certificate Principal Balance of each Certificate of such Class in accordance with its respective Percentage Interest.

(d)     Subject to Section 11.02 hereof respecting the final distribution, on each Distribution Date the Securities Administrator shall make distributions to each Certificateholder of record on the preceding Record Date either by wire transfer in immediately available funds to the account of such Holder at a bank or other entity having appropriate facilities therefor, if such Holder has so notified the Securities Administrator at least 5 Business Days prior to the related Record Date, or, if not, by check mailed by first class mail to such Certificateholder at the address of such Holder appearing in the Certificate Register. Notwithstanding the foregoing, but subject to Section 11.02 hereof respecting the final distribution, distributions with respect to Certificates registered in the name of a Depository shall be made to such Depository in immediately available funds.

(e)     On or before 5:00 p.m. Eastern time on the fifth Business Day immediately preceding each Distribution Date, the Master Servicer shall deliver the Remittance Report.

Section 6.05     Allocation of Realized Losses.

(a)     On or prior to each Determination Date, the Securities Administrator shall determine the amount of any Realized Loss in respect of each Loan Group in respect of each related Mortgage Loan that occurred during the immediately preceding calendar month.

(b)     Any Realized Losses on the Group I Mortgage Loans will be applied on any Distribution Date as follows: first, to Group I Excess Spread through payment of the Group I Extra Principal Distribution Amount, second, to the Class I-C Interest and Class I-C Certificates, until the Certificate Principal Balance and Uncertificated Principal Balance thereof have been reduced to zero, third, to the Class I-B-4 Certificates until the Certificate Principal Balance thereof has been reduced to zero, fourth, to the Class I-B-3 Certificates until the Certificate Principal Balance thereof has been reduced to zero, fifth, to the Class I-B-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero, sixth, to the Class I-B-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero, seventh, to the Class I-M Certificates until the Certificate Principal Balance thereof has been reduced to zero, and eighth, to the Class I-A Certificates until the Certificate Principal Balance thereof has been reduced to zero.

(c)     Any related Realized Losses on the Group II Mortgage Loans will be applied on any Distribution Date as follows: first, to Group II Excess Spread through payment of the Group II Extra Principal Distribution Amount, second, to the Class II-C Interest and Class II-C Certificates, until the Certificate Principal Balance and Uncertificated Principal Balance thereof have been reduced to zero, third, to the Class II-B-4 Certificates until the Certificate Principal Balance thereof has been reduced to zero, fourth, to the Class II-B-3 Certificates until the Certificate Principal Balance thereof has been reduced to zero, fifth, to the Class II-B-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero, sixth, to the Class II-B-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero, seventh, to the Class II-M-6 Certificates until the Certificate Principal Balance thereof has been reduced to zero, eighth, to the Class II-M-5 Certificates until the Certificate Principal Balance thereof has been reduced to zero, ninth, to the Class II-M-4 Certificates until the Certificate Principal Balance thereof has been reduced to zero, tenth, to the Class II-M-3 Certificates until the Certificate Principal Balance thereof has been reduced to zero, eleventh, to the Class II-M-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero, twelfth, to the Class II-M-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero and thirteenth, to the Class II-A Certificates, on a pro rata basis, among the Class II-A-1 Certificates on the one hand and the Class II-A-2 Certificates and Class II-A-3 Certificates on the other hand, until the Certificate Principal Balances thereof have been reduced to zero; provided, however, any Realized Losses allocable to the Class II-A-2 Certificates will be allocated first to the Class II-A-3 Certificates, until the Certificate Principal Balance of that Class has been reduced to zero, and then to the Class II-A-2 Certificates.

(d)     Any allocation of Realized Losses to a Class of Certificates or interest on any Distribution Date shall be made by reducing the Certificate Principal Balance or Uncertificated Principal Balance thereof by the amount so allocated; any allocation of Realized Losses to the Group I Excess Spread or Group II Excess Spread, as applicable, shall be made by reducing the amount otherwise payable in respect thereof pursuant to clause (F) of Section 6.04(a)(3) or clause (F) of Section 6.04(b)(3), respectively.

Once Realized Losses have been allocated to a Class of Class A, Class M or Class B Certificates, such amounts with respect to such Certificates will no longer accrue interest nor will such amounts in respect of interest be reinstated thereafter.

128

As used herein, an allocation of a Realized Loss on a "pro rata basis" among two or more specified Classes of Certificates means an allocation on a pro rata basis, among the various Classes so specified, to each such Class of Certificates on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date. All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

Any Realized Losses on the Group I Mortgage Loans shall be allocated on each Distribution Date to the following REMIC I Regular Interests in the specified percentages, as follows: first, to Uncertificated Accrued Interest payable to REMIC I Regular Interest AA and REMIC I Regular Interest ZZ up to an aggregate amount equal to the REMIC I Interest Loss Allocation Amount (without duplication of shortfalls allocated pursuant to Section 1.02), 98.00% and 2.00%, respectively; second, to the Uncertificated Principal Balances of REMIC I Regular Interest AA and REMIC I Regular Interest ZZ up to an aggregate amount equal to the REMIC I Principal Loss Allocation Amount, 98.00% and 2.00%, respectively; third, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-B-4 and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-B-4 has been reduced to zero; fourth, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-B-3 and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-B-3 has been reduced to zero; fifth, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-B-2 and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-B-2 has been reduced to zero; sixth, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-B-1 and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-B-1 has been reduced to zero; seventh, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-M and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-M has been reduced to zero; and eighth, to the Uncertificated Principal Balances of REMIC I Regular Interest AA, REMIC I Regular Interest I-A and REMIC I Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest I-A has been reduced to zero.

Any Realized Losses on the Group II Mortgage Loans shall be allocated on each Distribution Date to the following REMIC II Regular Interests in the specified percentages, as follows: first, to Uncertificated Accrued Interest payable to REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Interest Loss Allocation Amount (without duplication of shortfalls allocated pursuant to Section 1.02), 98.00% and 2.00%, respectively; second, to the Uncertificated Principal Balances of REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Principal Loss Allocation Amount, 98.00% and 2.00%, respectively; third, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-B-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-B-4 has been reduced to zero; fourth, to the

129

Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-B-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-B-3 has been reduced to zero; fifth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-B-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-B-2 has been reduced to zero; sixth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-B-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-B-1 has been reduced to zero; seventh, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-6 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-6 has been reduced to zero; eighth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-5 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-5 has been reduced to zero; ninth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-4 has been reduced to zero; tenth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-3 has been reduced to zero; eleventh, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-2 has been reduced to zero; twelfth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest II-M-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest II-M-1 has been reduced to zero; thirteenth, to the Uncertificated Principal Balance of REMIC II Regular Interest AA, 98.00%, to the Uncertificated Principal Balances of the REMIC II Regular Interests II-A-1, II-A-2 and II-A-3, 1.00%, on a pro rata basis among REMIC II Regular Interest II-A-1 on the one hand and REMIC II Regular Interests II-A-2 and II-A-3 on the other hand, and to the Uncertificated Principal Balance of REMIC II Regular Interest ZZ, 1.00%, until the Uncertificated Principal Balances of REMIC II Regular Interests II-A-1, II-A-2 and II-A-3 have been reduced to zero; provided, however, any Realized Losses allocable to REMIC II Regular Interest II-A-2 will be allocated first to REMIC II Regular Interest II-A-3, until the Uncertificated Principal Balance of such REMIC II Regular Interest has been reduced to zero, and then to REMIC II Regular Interest II-A-2.

### Section 6.06   Monthly Statements to Certificateholders.

(a)     Not later than each Distribution Date, the Securities Administrator shall prepare and make available to each Holder of Certificates, the Trustee, the Class I-A Insurer, the Master Servicer and the Depositor a statement setting forth for the Certificates:

(i)     With respect to each Loan Group, the amount of the related distribution to Holders of each related Class allocable to principal, separately

130

identifying (A) the aggregate amount of any Principal Prepayments included therein, (B) the aggregate of all scheduled payments of principal included therein and (C) Group I Extra Principal Distribution Amount and Group II Extra Principal Distribution Amount (if any);

(ii)      With respect to each Loan Group, the Interest Carry Forward Amount and any Basis Risk Shortfall Carry Forward Amount for each Class of Certificates;

(iii)      With respect to each Loan Group, the Certificate Principal Balance or Notional Amount of each related Class after giving effect (i) to all distributions allocable to principal on such Distribution Date and (ii) the allocation of any Applied Realized Loss Amounts with respect to such Loan Group, for such Distribution Date;

(iv)      With respect to each Loan Group, the aggregate of the Stated Principal Balances of all of the Mortgage Loans;

(v)      the related amount of the Master Servicing Fee paid to or retained by the Master Servicer for the related Due Period;

(vi)      with respect to each Loan Group, the Pass-Through Rate for each related Class of Class A, Class M and Class B Certificates with respect to the current Accrual Period, and, if applicable, whether such Pass-Through Rate was limited by the applicable Net Rate Cap;

(vii)      with respect to each Loan Group, the amount of Advances included in the distribution on such Distribution Date;

(viii)      with respect to each Loan Group, the cumulative amount of Applied Realized Loss Amounts to date;

(ix)      with respect to each Loan Group, the number and aggregate Stated Principal Balance of the Mortgage Loans (A) Delinquent (exclusive of Mortgage Loans in foreclosure and bankruptcy) (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, (B) in foreclosure and delinquent and (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent (C) in bankruptcy and delinquent(1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, in each case as of the close of business on the last day of the calendar month preceding such Distribution Date and separately identifying such information for the (1) second lien Mortgage Loans, and (2) Adjustable Rate Mortgage Loans;

(x)      with respect to each Loan Group and any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and Stated Principal Balance of, and Realized Loss on, such Mortgage Loan as of the close of business on the Determination Date preceding such Distribution Date;

131

(xi)   with respect to each Loan Group, the total number and principal balance of any real estate owned or REO Properties as of the close of business on the Determination Date preceding such Distribution Date;

(xii)   with respect to each Loan Group, the three month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO Properties, and the denominator of which is the aggregate Stated Principal Balance of all of the Mortgage Loans as of the last day of such Distribution;

(xiii)   with respect to each Loan Group, the Realized Losses during the related Due Period and the cumulative Realized Losses through the end of the preceding month;

(xiv)   the aggregate amount of Extraordinary Trust Fund Expenses withdrawn from the Protected Account or the Distribution Account for such Distribution Date;

(xv)   the Class I-A Insurer Premium Amount;

(xvi)   the Class I-A Reimbursement Amount, separately indicating the amount related to (a) interest draws on the Class I-A Policy, (b) principal draws on the Class I-A Policy and (c) all other amounts representing such Class I-A Reimbursement Amount; and

The foregoing information and reports shall be prepared and determined by the Securities Administrator based solely on Mortgage Loan data provided to the Securities Administrator by the Master Servicer (in a format agreed to by the Securities Administrator and the Master Servicer) no later than five (5) Business Days prior to the Distribution Date. In preparing or furnishing the foregoing information, the Securities Administrator shall be entitled to rely conclusively on the accuracy of the information or data regarding the Mortgage Loans and the related REO Property that has been provided to the Securities Administrator by the Master Servicer, and the Securities Administrator shall not be obligated to verify, recompute, reconcile or recalculate any such information or data. The Securities Administrator shall be entitled to conclusively rely on the Mortgage Loan data provided by the Master Servicer and shall have no liability for any errors in such Mortgage Loan data.

The Securities Administrator will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to the parties hereto, the Certificateholders and each Rating Agency and the Class I-A Insurer via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially by located at www.etrustee.net. Assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at (312) 904-4373. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator shall have the right to change the way such statements are distributed in order to

132

make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes.

As a condition to access the Securities Administrator's internet website, the Securities Administrator may require registration and the acceptance of a disclaimer. The Securities Administrator will not be liable for the dissemination of information in accordance with this Agreement.

(b)     The Securities Administrator's responsibility for making the above information available to the Certificateholders is limited to the availability, timeliness and accuracy of the information derived from the Master Servicer, the Company and the Servicers. The Securities Administrator will make available a copy of each statement provided pursuant to this Section 6.06 to each Rating Agency.

(c)     Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall cause to be furnished upon written request to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information set forth in clauses (a)(i) and (a)(ii) of this Section 6.06 aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Securities Administrator shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Securities Administrator pursuant to any requirements of the Code as from time to time in effect.

(d)     The Securities Administrator shall furnish quarterly to the Holders of the Residual Certificates each applicable Form 1066Q and shall respond promptly to written requests made not more frequently than quarterly by any Holder of a Residual Certificate with respect to the following matters:

(i)     The original projected principal and interest cash flows on the Closing Date on each class of Regular Interests and Residual Interests created hereunder and on the related Mortgage Loans, based on the Prepayment Assumption;

(ii)     The projected remaining principal and interest cash flows as of the end of any calendar quarter with respect to each class of Regular Interests and Residual Interests created hereunder and the related Mortgage Loans, based on the Prepayment Assumption;

(iii)     The applicable Prepayment Assumption and any interest rate assumptions used in determining the projected principal and interest cash flows described above;

(iv)     The original issue discount (or, in the case of the Mortgage Loans, market discount) or premium accrued or amortized through the end of such calendar quarter with respect to each class of Regular Interests or Residual Interests created hereunder and to the related Mortgage Loans, together with each constant yield to maturity used in computing the same;

(v)     The treatment of losses realized with respect to the related Mortgage Loans or the Regular Interests created hereunder, including the timing and amount of any

133

cancellation of indebtedness income of a REMIC with respect to such Regular Interests or bad debt deductions claimed with respect to the related Mortgage Loans;

(vi)     The amount and timing of any non-interest expenses of a REMIC; and

(vii)     Any taxes (including penalties and interest) imposed on the REMIC, including, without limitation, taxes on "prohibited transactions," "contributions" or "net income from foreclosure property" or state or local income or franchise taxes.

The information pursuant to clauses (i), (ii), (iii) and (iv) above shall be provided by the Depositor pursuant to Section 10.12.

Section 6.07    REMIC Designations and REMIC Distributions.

(a)     The Securities Administrator on behalf of the Trustee shall elect that each of REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V shall be treated as a REMIC under Section 860D of the Code. Any inconsistencies or ambiguities in this Agreement or in the administration of this Agreement shall be resolved in a manner that preserves the validity of such REMIC elections. The assets of REMIC I shall include the Group I Mortgage Loans and all interest owing in respect of and principal due thereon, the assets in the Distribution Account related to the Group I Mortgage Loans, the assets in the Master Servicer Collection Account related to the Group I Mortgage Loans, the assets in the Protected Accounts related to the Group I Mortgage Loans maintained by the Company and the Servicer, any REO Property related to the Group I Mortgage Loans, any proceeds of the foregoing and any other assets related to the Group I Mortgage Loans subject to this Agreement (other than the Group I Reserve Fund and any related Prepayment Charge Waiver Amounts). The assets of REMIC II shall include the Group II Mortgage Loans and all interest owing in respect of and principal due thereon, the assets in the Distribution Account related to the Group II Mortgage Loans, the assets in the Master Servicer Collection Account related to the Group II Mortgage Loans, the assets in the Protected Accounts related to the Group II Mortgage Loans maintained by the Company and the Servicer, any REO Property related to the Group II Mortgage Loans, any proceeds of the foregoing and any other assets related to the Group II Mortgage Loans subject to this Agreement (other than the Group II Reserve Fund and any related Prepayment Charge Waiver Amounts). The REMIC I Regular Interests and REMIC II Regular Interests shall constitute the assets of REMIC III. The Class I-C Interest shall constitute the assets of REMIC IV. The Class II-C Interest shall constitute the assets of REMIC V.

(b)     On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC III on account of the REMIC I Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class I-R-1 Certificates, as the case may be:

(i)     to the holders of each REMIC I Regular Interest, *pro rata*, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC I Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC I Regular Interest ZZ shall

134

be reduced when the REMIC I Overcollateralization Amount is less than the REMIC I Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the REMIC I Maximum Uncertificated Accrued Interest Deferral Amount, and such amount will be payable to the holders of each REMIC I Regular Interest for which a Class I-A Certificate, Class I-M Certificate or Class I-B Certificate is the Corresponding Certificate in the same proportion as the Group I Extra Principal Distribution Amount is allocated to the Corresponding Certificates for each such REMIC I Regular Interest, and the Uncertificated Principal Balance of REMIC I Regular Interest ZZ shall be increased by such amount;

(ii)     to the holders of REMIC I Regular Interests in an amount equal to the remainder of the Interest Funds related to the Group I Mortgage Loans and Group I Principal Funds for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(A)     98% of such remainder to the holders of REMIC I Regular Interest AA, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero;

(B)     2% of such remainder, first, to the holders of each REMIC I Regular Interest for which a Class I-A Certificate, Class I-M Certificate or Class I-B Certificate is the Corresponding Certificate, in an aggregate amount equal to 1% of and in the same proportion as principal payments are allocated to the Corresponding Certificates for each such REMIC I Regular Interest, until the Uncertificated Principal Balances of such REMIC I Regular Interests are reduced to zero; and second, to the holders of REMIC I Regular Interest ZZ, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; and

(C)     any remaining amount to the Holders of the Class I-R-1 Certificates.

(c)     On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC II to REMIC III on account of the REMIC II Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class II-R-1 Certificates, as the case may be:

(i)     to the holders of each REMIC II Regular Interest, *pro rata*, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC II Regular Interest ZZ shall be reduced when the REMIC II Overcollateralization Amount is less than the REMIC II Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the REMIC II Maximum Uncertificated Accrued Interest Deferral Amount, and such amount will be payable to the holders of each REMIC II Regular Interest for which a Class II-A Certificate, Class II-M

135

Certificate or Class II-B Certificate is the Corresponding Certificate in the same proportion as the Group II Extra Principal Distribution Amount is allocated to the Corresponding Certificates for each such REMIC II Regular Interest, and the Uncertificated Principal Balance of REMIC II Regular Interest ZZ shall be increased by such amount;

(ii)     to the holders of REMIC II Regular Interests in an amount equal to the remainder of the Interest Funds related to the Group II Mortgage Loans and Group II Principal Funds for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(A)     98% of such remainder to the holders of REMIC II Regular Interest AA, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero;

(B)     2% of such remainder, first, to the holders of each REMIC II Regular Interest for which a Class II-A Certificate, Class II-M Certificate or Class II-B Certificate is the Corresponding Certificate, in an aggregate amount equal to 1% of and in the same proportion as principal payments are allocated to the Corresponding Certificates for each such REMIC II Regular Interest, until the Uncertificated Principal Balances of such REMIC II Regular Interests are reduced to zero; and second, to the holders of REMIC II Regular Interest ZZ, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero; and

(C)     any remaining amount to the Holders of the Class II-R-1 Certificates.

(d)     On each Distribution Date, an amount equal to the amounts distributed pursuant to Sections 6.04(a)(3)(C), (D) and (F) on such date shall be deemed distributed from REMIC III to REMIC IV in respect of the Class I-C Distribution Amount distributable to the Class I-C Interest.

(e)     On each Distribution Date, an amount equal to the amounts distributed pursuant to Sections 6.04(b)(3)(C), (D) and (F) on such date shall be deemed distributed from REMIC III to REMIC V in respect of the Class II-C Distribution Amount distributable to the Class II-C Interest.

Section 6.08     Class I-A Policy Matters.

(a)     If, on the second Business Day before any Distribution Date, the Securities Administrator, on behalf of the Trustee, determines that a Class I-A Deficiency Amount is required to be paid by the Class I-A Insurer on such Distribution Date, the Securities Administrator shall determine the amount of any such Class I-A Deficiency Amount and shall prepare a Class I-A Notice of Nonpayment in the form of Exhibit A to the Class I-A Policy and deliver such notice to the Trustee, which shall be executed by the Trustee, and submit such Class I-A Notice of Nonpayment to the Class I-A Insurer by 12:00 noon, New York City time on the second Business Day before such Distribution Date as a claim for a Class I-A Deficiency

136

Amount. The Securities Administrator's responsibility for delivering a Class I-A Notice of Nonpayment to the Class I-A Insurer, as provided in the preceding sentence, is limited to the availability, timeliness and accuracy of the information required to be provided hereunder by the Master Servicer to the Securities Administrator. The Trustee shall have no obligation to determine whether there exists a Class I-A Deficiency Amount or to calculate such amount so long as no Event of Default has occurred and has not been cured or waived with respect to the Securities Administrator. The Trustee shall be entitled to rely upon the Securities Administrator's determination that a Class I-A Deficiency Amount is required to be paid under the Class I-A Policy, and shall execute a Class I-A Notice of Non-Payment at the direction of, and in reliance upon, the Securities Administrator.

(b)     In the event the Securities Administrator receives a certified copy, with a copy to the Trustee, of an order of the appropriate court that any payment of principal or interest on a Class I-A Certificate has been voided in whole or in part as a preference payment under applicable bankruptcy law, the Securities Administrator on behalf of the Trustee shall promptly notify the Class I-A Insurer in writing and the fiscal agent, if any, and the Securities Administrator shall prepare and the Trustee shall execute a Notice, which the Securities Administrator will deliver to the Insurer in addition to any other required documents pursuant to the Class I-A Policy, a claim on the Class I-A Policy in accordance with the provisions thereof to obtain payment by the Class I-A Insurer of such voided scheduled payment. In addition, the Securities Administrator shall mail notice to all Holders of the Class I-A Certificates, as applicable, so affected that, in the event that any such Holder's scheduled payment is so recovered, such Holder will be entitled to payment pursuant to the terms of the Class I-A Policy, a copy of which shall be made available to such Holders by the Securities Administrator. The Securities Administrator shall furnish to the Class I-A Insurer and the appropriate fiscal agent, if any, its records listing the payments on the affected Class I-A Certificates, if any, that have been made by the Securities Administrator and subsequently recovered from the affected Holders, and the dates on which such payments were made by the Securities Administrator.

(c)     At the time of the execution hereof, and for purposes hereof, the Securities Administrator shall establish a separate special purpose trust account in the name of the Trustee for the benefit of the Holders of the Class I-A Certificates and the Class I-A Insurer (the "Class I-A Policy Payments Account") over which the Securities Administrator, on behalf of the Trustee, shall have exclusive control and sole right of withdrawal. The Class I-A Policy Payments Account shall be an Eligible Account. The Securities Administrator shall deposit any amount received by it and paid under the Class I-A Policy into the Class I-A Policy Payments Account and distribute such amount only for the purposes of making payments to the Holders of the Class I-A Certificates, in respect of related Class I-A Insured Amounts (or other amounts payable pursuant to paragraph (b) above on the Class I-A Certificates, as applicable, by the Class I-A Insurer pursuant to the Class I-A Policy) for which the related claim was made under the Class I-A Policy. Such amounts shall be allocated by the Securities Administrator to Holders of the Class I-A Certificates, entitled to such payments in the same manner as principal and interest distributions are to be allocated with respect to such Certificates pursuant to Section 6.04. It shall not be necessary for such payments to be made by checks or by wire transfers separate from the checks or wire transfers used to make regular payments hereunder with funds withdrawn from the Distribution Account. However, any payments made on the Class I-A Certificates from funds in the Class I-A Policy Payments Account shall be noted as provided in subsection (e)

137

below. Funds held in the Class I-A Policy Payments Account shall not be invested by the Securities Administrator.

(d)     Any funds received by the Securities Administrator from the Class I-A Insurer for deposit into the Class I-A Policy Payments Account pursuant to the Class I-A Policy in respect of a Distribution Date or otherwise as a result of any claim under such Class I-A Policy shall be applied by the Securities Administrator directly to the payment in full of the Class I-A Insured Amounts due on such Distribution Date on the Class I-A Certificates. Funds received by the Securities Administrator as a result of any claim under the Class I-A Policy shall be used solely for payment to the Holders of the Class I-A Certificates and may not be applied for any purpose, including, without limitation, satisfaction of any costs, expenses or liabilities of the Trustee, the Securities Administrator, the Master Servicer, any Servicer, the Depositor or the Trust Fund. Any funds remaining in the Class I-A Policy Payments Account on the first Business Day after each Distribution Date (other than the Final Scheduled Distribution Date to the extent of funds remaining in the Class I-A Policy Payments Account required to be paid to Holders of the Class I-A Certificates) shall be remitted promptly by the Securities Administrator to the Class I-A Insurer pursuant to written instructions of the Class I-A Insurer.

(e)     The Securities Administrator shall keep complete and accurate records in respect of (i) all funds remitted to the Securities Administrator by the Class I-A Insurer and deposited into the Class I-A Policy Payments Account and (ii) the allocation of such funds to (A) payments of interest on and principal in respect of any Class I-A Certificates and (B) payments in respect of Class I-A Preference Amounts. The Class I-A Insurer shall have the right to inspect such records at reasonable times during normal business hours upon three Business Days' prior written notice to the Securities Administrator. Any Class I-A Insured Amounts disbursed by the Securities Administrator from proceeds of the Class I-A Policy shall be considered payment by the Class I-A Insurer and not by the Trust Fund with respect to the Class I-A Certificates, as applicable, and Class I-A Insurer will be entitled to receive the Class I-A Reimbursement Amount pursuant to Section 6.04.

(f)     The Securities Administrator and the Trustee acknowledge, and each Holder of a Class I-A Certificate by its acceptance of such Certificate agrees that, without the need for any further action on the part of the Class I-A Insurer or the Securities Administrator, to the extent the Class I-A Insurer pays Class I-A Insured Amounts, directly or indirectly, on account of principal of interest on any Class I-A Certificates, the Class I-A Insurer shall be fully subrogated to the rights of the Holders of such Class I-A Certificates to receive the Class I-A Reimbursement Amount pursuant to Section 6.04. The Class I-A Certificateholders, by acceptance of such Certificates, assign to the Class I-A Insurer their rights as Holders of the Class I-A Certificates, to the extent of the Class I-A Insurer's interest with respect to amounts paid under the Class I-A Policy. Each of the Depositor and the Securities Administrator and the Trustee agrees to such subrogation and, further agrees to execute such instruments and to take such reasonable actions at the expense of the Trust Fund as, in the sole judgment of the Class I-A Insurer, are necessary to evidence and, subject to the priority of payment provisions of this Agreement, to perfect the rights of the Class I-A Insurer to receive any moneys paid or payable in respect of the Class I-A Certificates under this Agreement or otherwise. Anything herein to the contrary notwithstanding, solely for purposes of determining the Class I-A Insurer's voting or control rights as subrogee for payments distributable pursuant to Section 6.04, any payment with

138

respect to distributions to the Class I-A Policy shall not be considered payment of the Class I-A Certificates from the Trust Fund and shall not result in the distribution or the provision for the distribution in reduction of the Certificate Principal Balances of the Class I-A Certificates or Accrued Certificate Interest thereon.

(g)     The Trustee shall promptly notify the Class I-A Insurer of either of the following as to which a Responsible Officer has actual knowledge: (A) the commencement of any proceeding by or against the Depositor commenced under the United States bankruptcy code or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "Insolvency Proceeding") and (B) the making of any claim in connection with any Insolvency Proceeding seeking the avoidance as a preferential transfer (a "Preference Claim") of any distribution made with respect to the Class I-A Certificates.  Each Holder of a Class I-A Certificate, by its purchase of such Certificate, and the Trustee hereby agree that the Class I-A Insurer (so long as no Class I-A Insurer Default exists) may at any time during the continuation of any proceeding relating to a Preference Claim direct all matters relating to such Preference Claim, including, without limitation, (i) the direction of any appeal of any order relating to any Preference Claim and (ii) the posting of any surety, supersedeas or performance bond pending any such appeal.  In addition and without limitation of the foregoing, the Class I-A Insurer shall be subrogated to the rights of the Trustee and each Holder of a Class I-A Certificate, in the conduct of any Preference Claim, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Preference Claim.

(h)     The Trustee shall surrender the Class I-A Policy to the Class I-A Insurer for cancellation upon the termination of the Trust Fund pursuant to Article IX hereof.

(i)     The Trustee shall, upon retirement of the Class I-A Certificates, furnish to the Class I-A Insurer a notice of such retirement, and, upon retirement of the Class I-A Certificates and the expiration of the Class I-A Policy, surrender the Class I-A Policy to the Class I-A Insurer for cancellation.

(j)     The Trustee shall hold the Class I-A Policy in trust as agent for the Holders of the Class I-A Certificates for purposes of making claims thereon and distributing the proceeds thereof.  Neither the Class I-A Policy nor the amounts paid on the Class I-A Policy shall constitute part of the Trust Fund by this Agreement.  Each Holder of Class I-A Certificates, by accepting its Class I-A Certificate, as applicable, appoints the Trustee as attorney in fact for the purpose of making claims on the Class I-A Policy.

(k)     The Class I-A Insurer Premium Amount to be paid pursuant to Section 6.04(b) shall be paid by the Securities Administrator on behalf of the Trustee to the Class I-A Insurer in accordance with the Class I-A Insurance Agreement and this Agreement.

139

ARTICLE VII

THE CERTIFICATES

Section 7.01   The Certificates.

The Certificates shall be substantially in the forms attached hereto as Exhibits A-1 through A-5. The Certificates shall be issuable in registered form, in the minimum dollar denominations, integral dollar multiples in excess thereof (except that one Certificate of each Class may be issued in a different amount which must be in excess of the applicable minimum dollar denomination) and aggregate dollar denominations as set forth in the following table:

| Class | Minimum Denomination | | Integral Multiple in Excess of Minimum | | Original Certificate Principal Balance | |
|---|---|---|---|---|---|---|
| I-A | $ | 100,000 | $ | 1.00 | $ | 284,640,000.00 |
| I-M | $ | 100,000 | $ | 1.00 | $ | 5,588,000.00 |
| I-B-1 | $ | 100,000 | $ | 1.00 | $ | 7,620,000.00 |
| I-B-2 | $ | 100,000 | $ | 1.00 | $ | 5,418,000.00 |
| I-B-3 | $ | 100,000 | $ | 1.00 | $ | 4,741,000.00 |
| I-B-4 | $ | 100,000 | $ | 1.00 | $ | 5,418,000.00 |
| I-C | $ | 10% | $ | 1% | $ | 338,6555,416.85 |
| I-R-1 | $ | 100% | $ | N/A | $ | N/A |
| I-R-2 | $ | 100% | $ | N/A | $ | N/A |
| II-A-1 | $ | 100,000 | $ | 1.00 | $ | 97,226,000.00 |
| II-A-2 | $ | 100,000 | $ | 1.00 | $ | 53,803,000.00 |
| II-A-3 | $ | 100,000 | $ | 1.00 | $ | 43,423,000.00 |
| II-M-1 | $ | 100,000 | $ | 1.00 | $ | 15,844,000.00 |
| II-M-2 | $ | 100,000 | $ | 1.00 | $ | 14,692,000.00 |
| II-M-3 | $ | 100,000 | $ | 1.00 | $ | 6,337,000.00 |
| II-M-4 | $ | 100,000 | $ | 1.00 | $ | 9,074,000.00 |
| II-M-5 | $ | 100,000 | $ | 1.00 | $ | 6,482,000.00 |
| II-M-6 | $ | 100,000 | $ | 1.00 | $ | 4,897,000 |
| II-B-1 | $ | 100,000 | $ | 1.00 | $ | 6,049,000.00 |
| II-B-2 | $ | 100,000 | $ | 1.00 | $ | 4,177,000.00 |
| II-B-3 | $ | 100,000 | $ | 1.00 | $ | 4,033,000.00 |
| II-B-4 | $ | 100,000 | $ | 1.00 | $ | 4,177,000.00 |
| II-C | $ | 10% | $ | 1% | $ | 288,075,683.10 |
| II-R-1 | $ | 100% | $ | N/A | $ | N/A |

The Certificates shall be executed by manual or facsimile signature on behalf of the Securities Administrator by an authorized officer. Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures were affixed, authorized to sign on behalf of the Securities Administrator shall bind the Securities Administrator, notwithstanding that such individuals or any of them have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such authentication and delivery. No Certificate shall be entitled to any benefit under this Agreement,

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

or be valid for any purpose, unless there appears on such Certificate the countersignature of the Securities Administrator by manual signature, and such countersignature upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly countersigned and delivered hereunder. All Certificates shall be dated the date of their countersignature. On the Closing Date, the Securities Administrator shall authenticate the Certificates to be issued at the written direction of the Depositor, or any affiliate thereof.

The Depositor shall provide, or cause to be provided, to the Securities Administrator on a continuous basis, an adequate inventory of Certificates to facilitate transfers.

Section 7.02   Certificate Register; Registration of Transfer and Exchange of Certificates.

(a)   The Securities Administrator shall maintain, or cause to be maintained in accordance with the provisions of Section 7.09 hereof, a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Securities Administrator shall provide for the registration of Certificates and of Transfers and exchanges of Certificates as herein provided. Upon surrender for registration of Transfer of any Certificate, the Securities Administrator shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of the same Class and of like aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Securities Administrator. Whenever any Certificates are so surrendered for exchange, the Securities Administrator shall execute, authenticate, and deliver the Certificates that the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of Transfer or exchange shall be accompanied by a written instrument of Transfer in form satisfactory to the Securities Administrator duly executed by the holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of Transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any Transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of Transfer or exchange shall be canceled and subsequently destroyed by the Securities Administrator in accordance with the Securities Administrator's customary procedures.

(b)   Subject to Subsection 7.07 and, in the case of any Global Certificate or Private Certificate upon the satisfaction of the conditions set forth below, upon surrender for registration of transfer of any Certificate at any office or agency of the Securities Administrator maintained for such purpose, the Securities Administrator shall sign, countersign and shall deliver, in the name of the designated transferee or transferees, a new Certificate of a like Class and aggregate Percentage Interest, but bearing a different number.

141

(c)    Subject to Subsection 7.02(g), so long as a Global Certificate of such Class is outstanding and is held by or on behalf of the Depository, transfers of beneficial interests in such Global Certificate, or transfers by Holders of Individual Certificates of such Class to transferees that take delivery in the form of beneficial interests in the Global Certificate, may be made only in accordance with this Subsection 7.02(c) and in accordance with the rules of the Depository:

(i)    In the case of a beneficial interest in the Global Certificate being transferred to an Institutional Accredited Investor, such transferee shall be required to take delivery in the form of an Individual Certificate or Certificates and the Securities Administrator shall register such transfer only upon compliance with the provisions of Subsection 7.02(h).

(ii)    In the case of a beneficial interest in a Class of Global Certificates being transferred to a transferee that takes delivery in the form of an Individual Certificate or Certificates of such Class, except as set forth in clause (i) above, the Securities Administrator shall register such transfer only upon compliance with the provisions of Subsection 7.02(h).

(iii)    In the case of an Individual Certificate of a Class being transferred to a transferee that takes delivery in the form of a beneficial interest in a Global Certificate of such Class, the Securities Administrator shall register such transfer if the transferee has provided the Securities Administrator with a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iv)    No restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in the Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in a Global Certificate of such Class; provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB.

(d)    Subject to Subsection 7.02(g), an exchange of a beneficial interest in a Global Certificate of a Class for an Individual Certificate or Certificates of such Class, an exchange of an Individual Certificate or Certificates of a Class for a beneficial interest in the Global Certificate of such Class and an exchange of an Individual Certificate or Certificates of a Class for another Individual Certificate or Certificates of such Class (in each case, whether or not such exchange is made in anticipation of subsequent transfer, and, in the case of the Global Certificate of such Class, so long as such Certificate is outstanding and is held by or on behalf of the Depository) may be made only in accordance with this Subsection 7.02(d) and in accordance with the rules of the Depository:

(i)    A Holder of a beneficial interest in a Global Certificate of a Class may at any time exchange such beneficial interest for an Individual Certificate or Certificates of such Class.

(ii)    A Holder of an Individual Certificate or Certificates of a Class may exchange such Certificate or Certificates for a beneficial interest in the Global Certificate

142

of such Class if such holder furnishes to the Securities Administrator a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iii)   A Holder of an Individual Certificate of a Class may exchange such Certificate for an equal aggregate principal amount of Individual Certificates of such Class in different authorized denominations without any certification.

(e)   (i)   Upon acceptance for exchange or transfer of an Individual Certificate of a Class for a beneficial interest in a Global Certificate of such Class as provided herein, the Securities Administrator shall cancel such Individual Certificate and shall (or shall request the Depository to) endorse on the schedule affixed to the applicable Global Certificate (or on a continuation of such schedule affixed to the Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and an increase in the certificate balance of the Global Certificate equal to the certificate balance of such Individual Certificate exchanged or transferred therefor.

(ii)   Upon acceptance for exchange or transfer of a beneficial interest in a Global Certificate of a Class for an Individual Certificate of such Class as provided herein, the Securities Administrator shall (or shall request the Depository to) endorse on the schedule affixed to such Global Certificate (or on a continuation of such schedule affixed to such Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and a decrease in the certificate balance of such Global Certificate equal to the certificate balance of such Individual Certificate issued in exchange therefor or upon transfer thereof.

(f)   Any Individual Certificate issued in exchange for or upon transfer of another Individual Certificate or of a beneficial interest in a Global Certificate shall bear the applicable legends set forth in Exhibit A-2.

(g)   Subject to the restrictions on transfer and exchange set forth in this Section 7.02, the Holder of any Individual Certificate may transfer or exchange the same in whole or in part (in an initial certificate balance equal to the minimum authorized denomination set forth in Section 7.01 above or any integral multiple of $1.00 in excess thereof) by surrendering such Certificate at the Corporate Trust Office, or at the office of any transfer agent, together with an executed instrument of assignment and transfer satisfactory in form and substance to the Securities Administrator in the case of transfer and a written request for exchange in the case of exchange. The Holder of a beneficial interest in a Global Certificate may, subject to the rules and procedures of the Depository, cause the Depository (or its nominee) to notify the Securities Administrator in writing of a request for transfer or exchange of such beneficial interest for an Individual Certificate or Certificates. Following a proper request for transfer or exchange, the Securities Administrator shall, within five Business Days of such request made at the Corporate Trust Office, sign, countersign and deliver at the Corporate Trust Office, to the transferee (in the case of transfer) or Holder (in the case of exchange) or send by first class mail at the risk of the transferee (in the case of transfer) or Holder (in the case of exchange) to such address as the transferee or Holder, as applicable, may request, an Individual Certificate or Certificates, as the case may require, for a like aggregate Percentage Interest and in such authorized denomination

143

or denominations as may be requested. The presentation for transfer or exchange of any Individual Certificate shall not be valid unless made at the Corporate Trust Office by the registered Holder in person, or by a duly authorized attorney-in-fact.

(h)     No Transfer of a Private Certificate shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under the Securities Act and such state securities laws. In the event that a Transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such Transfer and such Certificateholder's prospective transferee shall each certify to the Trustee and the Securities Administrator in writing the facts (or shall be deemed to certify in the case of a Book-Entry Certificate) surrounding the Transfer by (x)(i) the delivery to the Securities Administrator by the Certificateholder desiring to effect such transfer of a certificate substantially in the form set forth in Exhibit D (the "Transferor Certificate") and (ii) the delivery by the Certificateholder's prospective transferee of (A) a letter in substantially the form of Exhibit E (the "Investment Letter") if the prospective transferee is an Institutional Accredited Investor or (B) a letter in substantially the form of Exhibit F (the "Rule 144A and Related Matters Certificate") if the prospective transferee is a QIB or (y) there shall be delivered to the Trustee, the Class I-A Insurer and the Securities Administrator an Opinion of Counsel addressed to the Trustee and the Securities Administrator that such Transfer may be made pursuant to an exemption from the Securities Act, which Opinion of Counsel shall not be an expense of the Depositor, the Sellers, the Master Servicer, the Securities Administrator, the Class I-A Insurer or the Trustee. Notwithstanding the provisions of the immediately preceding sentence, no restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in any Certificate that is a Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in the Global Certificate of such Class provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for Transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Trustee, the Securities Administrator and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans and other matters regarding the Trust Fund as the Depositor shall reasonably request to meet its obligation under the preceding sentence. Each Holder of a Private Certificate desiring to effect such Transfer shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Sellers, the Securities Administrator, the Class I-A Insurer and the Master Servicer against any liability that may result if the Transfer is not so exempt or is not made in accordance with such federal and state laws.

The Securities Administrator shall be entitled to rely conclusively on any certificate required by this Section 7.02 to be executed in connection with the transfer of any Certificate, and shall be entitled to presume conclusively the continuing accuracy thereof from time to time, in each case without further inquiry or investigation.

The Securities Administrator shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the 1933 Act, applicable state securities laws, ERISA or the Code; except that if a Certificate is required by the terms of this Section 7.02 to be provided to the Securities Administrator by a prospective transferor or transferee, the Securities Administrator shall examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 7.02 and that if an opinion of counsel is provided, the Securities Administrator shall examine the same to determine whether it meets the requirements hereof.

No Transfer of an ERISA Restricted Certificate or a Class B-4 Certificate shall be made unless either (i) the Securities Administrator shall have received a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Securities Administrator, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code (either a "Plan"), or a Person acting on behalf of any such Plan or using the assets of any such plan, or (ii) the transferee provides a representation, or is deemed to represent in the case of the Global Certificate that the proposed transfer or holding of such Certificate are eligible for exemptive relief under an individual or class prohibited transaction exemption, including, but not limited to, Prohibited Transaction Exemption ("PTE") 84-14, PTE 91-38, PTE 90-1, PTE 95-60 or PTE 96-23 or (b) the transferee provides an opinion of counsel which establishes to the satisfaction of the Trustee and the Securities Administrator that the purchase and holding of such ERISA Restricted Certificate or a Class B-4 Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under ERISA or section 4975 of the Code and will not subject the Depositor, the Sellers, the Master Servicer, Securities Administrator, the Underwriter, the Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or section 4975 of the Code), which opinion of counsel will not be an expense of any of such persons and on which such persons may rely.

Each beneficial owner of a Class A, Class M, Class B Certificate (other than a Class B-4 Certificate) or any interest therein shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not a Plan or investing with "Plan Assets", (ii) it has acquired and is holding such certificate in reliance on the Exemption, and that it understands that there are certain conditions to the availability of the Exemption, including that the certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by S&P, Fitch or Moody's, and the certificate is so rated or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTE 95-60, and (3) the conditions in Sections I and III of PTE 95-60 have been satisfied.

Neither the Trustee, the Securities Administrator nor the Master Servicer will be required to monitor, determine or inquire as to compliance with the transfer restrictions with respect to the Global Certificates. Any attempted or purported transfer of any Certificate in violation of the provisions of this Section 6.01 shall be void ab initio and such Certificate shall be considered to have been held continuously by the prior permitted Certificateholder. Any transferor of any Certificate in violation of such provisions, shall indemnify and hold harmless the Trustee, the Securities Administrator and the Master Servicer from and against any and all liabilities, claims, costs or expenses incurred by the Trustee, the Securities Administrator or the Master Servicer as

145

a result of such attempted or purported transfer. Neither the Securities Administrator shall have any liability for transfer of any such Global Certificates in or through book-entry facilities of any Depository or between or among Depository Participants or Certificate Owners made in violation of the transfer restrictions set forth herein. The Securities Administrator shall be entitled, but not obligated, to recover from any Holder of any ERISA Restricted Certificate that was in fact a Plan or a Person acting on behalf of a Plan at the time it became a Holder or, at such subsequent time as it became a Plan or Person acting on behalf of a Plan, all payments made on such ERISA Restricted Certificate at and after either such time. Any such payments so recovered by the Securities Administrator shall be paid and delivered by the Securities Administrator to the last preceding Holder of such Certificate that is not a Plan or Person acting on behalf of a Plan.

No Transfer of a Class C Certificate, Residual Certificate or Class B-4 Certificate shall be made at any time unless either (i) the transferee of such Certificate provides a representation, or is deemed to represent in the case of a Global Certificate, to the Trustee, the Securities Administrator and the Master Servicer acceptable to and in form and substance satisfactory to the Securities Administrator to the effect that such transferee is not a Plan, or a Person acting on behalf of a Plan or using the assets of a Plan, or (ii) in the case of any such Certificate presented for registration in the name of a Plan, or a trustee of a Plan or any other person acting on behalf of a Plan, the Securities Administrator shall have received an Opinion of Counsel for the benefit of the Trustee, the Securities Administrator and the Master Servicer and on which they may rely, satisfactory to the Securities Administrator, to the effect that the purchase and holding of such Certificate are permissible under applicable law, will not result in any prohibited transactions under ERISA or Section 4975 of the Code and will not subject the Trustee, the Securities Administrator, the Master Servicer or the Depositor to any obligation in addition to those expressly undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Securities Administrator, the Master Servicer or the Depositor, or (iii) in the case of a Class B-4 Certificate, the transferee provides a representation, or is deemed to represent in the case of the Global Certificate, or an opinion of counsel to the effect that the proposed transfer or holding of such Class B-4 Certificate and the servicing, management and operation of the Trust and its assets:  (I) will not result in any prohibited transaction which is not covered under PTE 84-14, PTE 91-38, PTE 90-1, PTE 95-60 or PTE 96-23 and (II) will not give rise to any obligation on the part of the Depositor, the Master Servicer, the Securities Administrator or the Trustee in addition to those expressly undertaken in this Agreement. Notwithstanding anything else to the contrary herein, any purported transfer of an ERISA Restricted Certificate to or on behalf of a Plan without the delivery of the Opinion of Counsel as described above shall be void and of no effect; provided that the restriction set forth in this sentence shall not be applicable if there has been delivered to the Trustee and the Securities Administrator an Opinion of Counsel meeting the requirements of clause (ii) of the first sentence of this paragraph. Neither the Trustee, the Securities Administrator nor the Master Servicer shall be required to monitor, determine or inquire as to compliance with the transfer restrictions with respect to any ERISA Restricted Certificate that is a Book-Entry Certificate, and neither the Trustee nor the Master Servicer shall have any liability for transfers of any such Book-Entry Certificates made through the book-entry facilities of any Depository or between or among participants of the Depository or Certificate Owners made in violation of the transfer restrictions set forth herein. Neither the Trustee, the Securities Administrator nor the Master Servicer shall be under any liability to any Person for any registration of transfer of any ERISA Restricted Certificate that is in fact not permitted by this Section 7.02(h) or for making any payments due on such Certificate to the

146

Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement.

(i)     Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Securities Administrator of any change or impending change in its status as a Permitted Transferee.

(ii)     No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Securities Administrator shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Securities Administrator under subparagraph (b) above, the Securities Administrator shall have been furnished with an affidavit (a "Transfer Affidavit") of the initial owner or the proposed transferee in the form attached hereto as Exhibit C.

(iii)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transfer Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transfer Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee.

(iv)     Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 7.02(i) shall be absolutely null and void and shall vest no rights in the purported Transferee. If any purported transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 7.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate. Neither the Securities Administrator nor the Trustee shall be under liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 7.02(b) and this Section 7.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the related Transfer Affidavit. The Securities Administrator shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted

147

Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Securities Administrator shall be paid and delivered by the Securities Administrator to the last preceding Permitted Transferee of such Certificate.

(v)     The Master Servicer shall make available within 60 days of written request from the Securities Administrator, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 7.02(c) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Securities Administrator of an Opinion of Counsel addressed to the Securities Administrator, which Opinion of Counsel shall not be an expense of the Trustee, the Securities Administrator, the Sellers or the Master Servicer to the effect that the elimination of such restrictions, or any Transfer of a Residual Certificate allowed by such elimination, will not cause REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as applicable, to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person. Each Person holding or acquiring any Ownership Interest in a Residual Certificate hereby consents to any amendment of this Agreement that, based on an Opinion of Counsel addressed to the Securities Administrator and furnished to the Securities Administrator, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate that is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

(j)     The preparation and delivery of all certificates and opinions referred to above in this Section 7.02 shall not be an expense of the Trust Fund, the Trustee, the Depositor, the Sellers, the Securities Administrator or the Master Servicer.

### Section 7.03   Mutilated, Destroyed, Lost or Stolen Certificates.

If (a) any mutilated Certificate is surrendered to the Securities Administrator, or the Securities Administrator receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and of the ownership thereof and (b) there is delivered to the Securities Administrator (and with respect to any Class I-A Certificates to the Class I-A Insurer) such security or indemnity as may be required by them to save the Securities Administrator and the Trustee harmless, then, in the absence of notice to the Securities Administrator that such Certificate has been acquired by a bona fide purchaser, the Securities Administrator shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor and Percentage Interest. In connection with the issuance of any new Certificate under this Section 7.03, the Securities Administrator may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Securities Administrator) connected therewith. Any replacement Certificate issued pursuant

148

to this Section 7.03 shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time. All Certificates surrendered to the Securities Administrator under the terms of this Section 7.03 shall be canceled and destroyed by the Securities Administrator in accordance with its standard procedures without liability on its part.

### Section 7.04   Persons Deemed Owners.

The Securities Administrator, the Trustee, the Class I-A Insurer and any agent of the Securities Administrator, the Trustee or the Class I-A Insurer may treat the person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Securities Administrator, the Trustee, the Class I-A Insurer nor any agent of the Securities Administrator , the Trustee or the Class I-A Insurer shall be affected by any notice to the contrary.

### Section 7.05   Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders, or in the case of Book-Entry Certificates, Certificate Owners (a) request such information in writing from the Securities Administrator, (b) state that such Certificateholders or Certificate Owners desire to communicate with other Certificateholders or Certificate Owners with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the communication that such Certificateholders or Certificate Owners propose to transmit or if the Depositor, the Class I-A Insurer or the Master Servicer shall request such information in writing from the Securities Administrator, then the Securities Administrator shall, within ten Business Days after the receipt of such request, provide the Depositor, the Class I-A Insurer, the Master Servicer or such Certificateholders or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of the Trust Fund held by the Securities Administrator, if any. The Depositor and every Certificateholder and Certificate Owner, by receiving and holding a Certificate, agree that the Securities Administrator shall not be held accountable by reason of the disclosure of any such information as to the list of the Certificateholders hereunder, regardless of the source from which such information was derived.

### Section 7.06   Book-Entry Certificates.

The Regular Certificates (other than the Class B-4 Certificates and Class C Certificates), upon original issuance, shall be issued in the form of one or more typewritten Certificates representing the Book-Entry Certificates, to be delivered to the Depository by or on behalf of the Depositor. Such Certificates shall initially be registered on the Certificate Register in the name of the Depository or its nominee, and no Certificate Owner of such Certificates will receive a definitive certificate representing such Certificate Owner's interest in such Certificates, except as provided in Section 7.08. Unless and until definitive, fully registered Certificates ("Definitive Certificates") have been issued to the Certificate Owners of such Certificates pursuant to Section 7.08:

(a)    the provisions of this Section shall be in full force and effect;

149

(b)     the Depositor, the Securities Administrator and the Trustee may deal with the Depository and the Depository Participants for all purposes (including the making of distributions) as the authorized representative of the respective Certificate Owners of such Certificates;

(c)     registration of the Book-Entry Certificates may not be transferred by the Securities Administrator except to another Depository;

(d)     the rights of the respective Certificate Owners of such Certificates shall be exercised only through the Depository and the Depository Participants and shall be limited to those established by law and agreements between the Owners of such Certificates and the Depository and/or the Depository Participants. Pursuant to the Depository Agreement, unless and until Definitive Certificates are issued pursuant to Section 7.08, the Depository will make book-entry transfers among the Depository Participants and receive and transmit distributions of principal and interest on the related Certificates to such Depository Participants;

(e)     the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants;

(f)     the Securities Administrator may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants; and

(g)     to the extent that the provisions of this Section conflict with any other provisions of this Agreement, the provisions of this Section shall control.

For purposes of any provision of this Agreement requiring or permitting actions with the consent of, or at the direction of, Certificateholders evidencing a specified percentage of the aggregate unpaid principal amount of any Class of Certificates, such direction or consent may be given by Certificate Owners (acting through the Depository and the Depository Participants) owning Book-Entry Certificates evidencing the requisite percentage of principal amount of such Class of Certificates.

The Private Certificates shall initially be held in fully registered certificated form. If at any time the Holders of all of the Certificates of one or more such Classes request that the Securities Administrator cause such Class to become Global Certificates, the Depositor (with the assistance of the Securities Administrator) will take such action as may be reasonably required to cause the Depository to accept such Class or Classes for trading if it may legally be so traded. If at anytime there are to be Global Certificates, the Global Certificates shall be delivered to the Depository by the Depositor or deposited with the Securities Administrator as custodian for the Depository.

All transfers by Certificate Owners of such respective Classes of Book-Entry Certificates and any Global Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owners. Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

150

## Section 7.07  Notices to Depository.

Whenever any notice or other communication is required to be given to Certificateholders of a Class with respect to which Book-Entry Certificates have been issued, unless and until Definitive Certificates shall have been issued to the related Certificate Owners, the Securities Administrator shall give all such notices and communications to the Depository.

## Section 7.08  Definitive Certificates.

If, after Book-Entry Certificates have been issued with respect to any Certificates, (a) the Depositor or the Depository advises the Securities Administrator that the Depository is no longer willing or able to discharge properly its responsibilities under the Depository Agreement with respect to such Certificates and the Depositor is unable to locate a qualified successor or (b) the Depositor, at its sole option, advises the Securities Administrator that it elects to terminate the book-entry system with respect to such Certificates through the Depository or (c) after the occurrence and continuation of an Event of Default, Certificate Owners of such Book-Entry Certificates having not less than 51% of the Voting Rights evidenced by any Class of Book-Entry Certificates advise the Securities Administrator and the Depository in writing through the Depository Participants that the continuation of a book-entry system with respect to Certificates of such Class through the Depository (or its successor) is no longer in the best interests of the Certificate Owners of such Class, then the Securities Administrator shall notify all Certificate Owners of such Certificates, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to applicable Certificate Owners requesting the same. The Depositor shall provide the Securities Administrator with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates. Upon surrender to the Securities Administrator of any such Certificates by the Depository, accompanied by registration instructions from the Depository for registration, the Securities Administrator shall execute and countersign and deliver such Definitive Certificates. Neither the Depositor nor the Securities Administrator shall be liable for any delay in delivery of such instructions and each may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of such Definitive Certificates, all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Securities Administrator, to the extent applicable with respect to such Definitive Certificates and the Securities Administrator shall recognize the Holders of such Definitive Certificates as Certificateholders hereunder.

In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Voting Rights in the related Class of Certificates. In order to make such request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Securities Administrator to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Voting Right in fully registered definitive form. Upon receipt by the Securities Administrator of instructions from the Depository directing the Securities Administrator to effect such exchange (such instructions to contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and

delivery instructions for the definitive Certificate, and any other information reasonably required by the Trustee), (i) the Securities Administrator shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the definitive Certificate, (ii) the Securities Administrator shall execute, authenticate and deliver, in accordance with the registration and delivery instructions provided by the Depository, a definitive Certificate evidencing such Certificate Owner's Voting Rights in such Class of Certificates and (iii) the Securities Administrator shall execute and authenticate a new Book-Entry Certificate reflecting the reduction in the Certificate Principal Balance of such Class of Certificates by the amount of the definitive Certificates.

Section 7.09   <u>Maintenance of Office or Agency.</u>

The Securities Administrator will maintain or cause to be maintained at its expense an office or offices or agency or agencies located at LaSalle Bank National Association, 135 South LaSalle Street, Suite 1625, Chicago, IL 60603, Attn: Global Securities and Trust Services Group – SACO 2005-10, where Certificates may be surrendered for registration of transfer or exchange. The Securities Administrator initially designates its Corporate Trust Office, as the office for such purposes. The Securities Administrator will give prompt written notice to the Certificateholders and the Class I-A Insurer of any change in such location of any such office or agency.

[TPW: NYLEGAL:409898.8] 17297-00382 02/23/2007 09.01 PM

ARTICLE VIII

THE DEPOSITOR, COMPANY AND THE MASTER SERVICER

Section 8.01   Liabilities of the Depositor, the Company and the Master Servicer.

Each of the Depositor, the Company and the Master Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by it herein.

Section 8.02   Merger or Consolidation of the Depositor or the Master Servicer.

(a)   Each of the Depositor, the Company and the Master Servicer will keep in full force and effect its existence, rights and franchises as a limited liability company under the laws of the state of its formation, a corporation under the laws of the state of its incorporation or as a national banking association under federal law, as applicable, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its duties under this Agreement.

(b)   Any Person into which the Depositor, the Company or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Depositor, the Company or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor, the Company or the Master Servicer, shall be the successor of the Depositor, the Company or the Master Servicer hereunder, without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.03   Indemnification of the Trustee, the Master Servicer and the Securities Administrator.

(a)   The Master Servicer agrees to indemnify the Indemnified Persons for, and to hold them harmless against, any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, any claim or legal action (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), the affected Indemnified Person shall have given the Master Servicer and EMC written notice thereof promptly after such Person shall have with respect to such claim or legal action knowledge thereof; provided, however that the failure to give such notice shall not relieve the Master Servicer of its indemnification obligations hereunder except to the extent the Master Servicer is prejudiced thereby. This indemnity shall survive the resignation

153

or removal of the Trustee, Master Servicer or the Securities Administrator and the termination of this Agreement.

(b)     The Company agrees to indemnify the Indemnified Persons and to hold them harmless from and against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Indemnified Persons may sustain in any way related to the failure of the Company to perform in any way its duties and service the EMC Mortgage Loans in strict compliance with the terms of this Agreement and for breach of any representation or warranty of the Company contained herein. The Company shall immediately notify the Master Servicer and the Trustee if a claim is made by a third party with respect to this Agreement or the EMC Mortgage Loans, assume (with the consent of the Master Servicer and the Trustee and with counsel reasonably satisfactory to the Master Servicer and the Trustee) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or any Indemnified Person in respect of such claim but failure to so notify the Company shall not limit its obligations hereunder.   The Company agrees that it will not enter into any settlement of any such claim without the consent of the Indemnified Persons unless such settlement includes an unconditional release of such Indemnified Persons from all liability that is the subject matter of such claim.  The provisions of this Section 8.03(b) shall survive termination of this Agreement.

(c)     EMC will indemnify any Indemnified Person for any loss, liability or expense of any Indemnified Person not otherwise paid or covered pursuant to Subsection (b) above. Such indemnification shall survive termination of this Agreement.

Section 8.04   Limitations on Liability of the Depositor, the Company, the Master Servicer and Others.

(a)     Subject to the obligation of the Seller, the Company and the Master Servicer to indemnify the Indemnified Persons pursuant to Section 8.03, neither the Depositor, the Company, the Master Servicer nor any of the directors, officers, employees or agents of the Depositor, the Company and the Master Servicer shall be under any liability to the Indemnified Persons, the Trust Fund or the Certificateholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Company, the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of such Person's willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

(b)     The Depositor, the Company, the Master Servicer and any director, officer, employee or agent of the Depositor, the Company and the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

(c)     The Depositor, the Company, the Master Servicer, the Class I-A Insurer, the Securities Administrator, the Trustee, each Custodian and any director, officer, employee or

[TPW: NYLEGAL:409898 8] 17297-00382 02/23/2007 09.01 PM

agent of the Depositor, the Company, the Master Servicer, the Class I-A Insurer, the Securities Administrator, the Trustee, each Custodian shall be indemnified by the Trust and held harmless thereby against any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or related to, any claim or legal action (including any pending or threatened claim or legal action) relating to, or the performance of its obligations under, this Agreement, the Assignment Agreement, the Custodial Agreements, the Certificates or Servicing Agreements, other than (i) in the case of the Company, the Master Servicer or the Securities Administrator, any such loss, liability or expense related to the Company's or the Master Servicer's or Securities Administrator's failure to perform its respective duties in compliance with this Agreement or (ii) in the case of the Company, the Master Servicer or the Securities Administrator, any such loss, liability or expense incurred by reason of the Company's or the Master Servicer's or the Securities Administrator's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder, or by reason of reckless disregard of obligations and duties hereunder or under the Custodial Agreement, as applicable, (iii) in the case of the Trustee, any such loss, liability or expense incurred by reason of the Trustee's willful misfeasance, bad faith or negligence in the performance of its duties hereunder, or by reason of its reckless disregard of obligations and duties hereunder and (iv) in the case of either Custodian, any such loss, liability or expense incurred by reason of such Custodian's willful misfeasance, bad faith or negligence in the performance of its duties under the related Custodial Agreement, or by reason of its reckless disregard of obligations and duties thereunder. Such indemnification shall survive termination of this Agreement.

(d)     Neither the Depositor, the Company nor the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and that in its opinion may involve it in any expense or liability; provided, however, the Master Servicer may in its discretion, undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders and the Class I-A Insurer hereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom (except any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder) shall be expenses, costs and liabilities of the Trust Fund, and the Master Servicer shall be entitled to be reimbursed therefor out of the Master Servicer Collection Account as provided by Section 5.02. Nothing in this Subsection 8.04(d) shall affect the Master Servicer's obligation to master service the Mortgage Loans pursuant to Section 4.01.

(e)     In taking or recommending any course of action pursuant to this Agreement, unless specifically required to do so pursuant to this Agreement, the Master Servicer shall not be required to investigate or make recommendations concerning potential liabilities which the Trust might incur as a result of such course of action by reason of the condition of the Mortgaged Properties but shall give notice to the Trustee if it has notice of such potential liabilities.

(f)     The Master Servicer shall not be liable for any acts or omissions of the Company or the Servicers.

155

(g)     The Master Servicer may perform any of its duties hereunder or exercise its rights hereunder either directly of through Affiliates, agents or attorneys.

## Section 8.05   Master Servicer and Company Not to Resign.

(a)     Except as provided in Section 8.07, the Master Servicer shall not resign from the obligations and duties hereby imposed on it except (i) with the prior consent of the Trustee (which consent shall not be unreasonably withheld or delayed) and the Class I-A Insurer or (ii) upon a determination that any such duties hereunder are no longer permissible under applicable law and such impermissibility cannot be cured. Any such determination permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel, addressed to and delivered to, the Trustee and the Class I-A Insurer. No such resignation by the Master Servicer shall become effective until the Trustee or a successor to the Master Servicer reasonably satisfactory to the Trustee shall have assumed the responsibilities and obligations of the Master Servicer in accordance with Section 9.02 hereof. The Trustee shall notify each Rating Agency and the Class I-A Insurer of the resignation of the Master Servicer.

(b)     The Company shall not resign from the obligations and duties hereby imposed on it except (i) upon the assignment of its servicing duties with respect to all or a portion of the EMC Mortgage Loans to an institution that is a Fannie Mae and Freddie Mac approved seller/servicer in good standing that has a net worth of not less than $10,000,000 and with the prior written consent of the Master Servicer (which consent shall not be unreasonably withheld or delayed) or (ii) upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Company. Any determination permitting the resignation of the Company shall be evidenced by an Opinion of Counsel to such effect addressed to and delivered, to the Master Servicer, the Class I-A Insurer and the Trustee which Opinion of Counsel shall be in form and substance acceptable to the Master Servicer, the Class I-A Insurer and the Trustee. No appointment of a successor to the Company shall be effective hereunder unless (a) the Rating Agencies have confirmed in writing that such appointment will not result in a downgrade, qualification or withdrawal of the then current ratings assigned to the Certificates, (b) such successor shall have represented that it is meets the eligibility criteria set forth in clause (i) above and (c) such successor has agreed to assume the obligations of the Company hereunder to the extent of the EMC Mortgage Loans to be serviced by such successor. The Company shall provide a copy of the written confirmation of the Rating Agencies and the Class I-A Insurer and the agreement executed by such successor to the Master Servicer and the Trustee. No such resignation shall become effective until a qualified successor or the Master Servicer shall have assumed the Company's responsibilities and obligations hereunder. The Company shall notify the Master Servicer, the Trustee, the Class I-A Insurer and the Rating Agencies of the resignation of the Company or the assignment of all or a portion of its servicing duties hereunder in accordance with this Section 8.05.

## Section 8.06   Successor Master Servicer.

In connection with the appointment of any successor Master Servicer or the assumption of the duties of the Master Servicer, EMC or the Trustee may make such arrangements for the compensation of such successor master servicer out of payments on the Mortgage Loans as EMC or the Trustee and such successor master servicer shall agree. If the successor master servicer

156

does not agree that such market value is a fair price, such successor master servicer shall obtain two quotations of market value from third parties actively engaged in the servicing of single-family mortgage loans. In no event shall the compensation of any successor master servicer exceed that permitted the Master Servicer hereunder without the consent of all of the Certificateholders.

Section 8.07   Sale and Assignment of Master Servicing.

The Master Servicer may sell and assign its rights and delegate its duties and obligations in their entirety as Master Servicer under this Agreement and EMC may terminate the Master Servicer without cause and select a new Master Servicer with the prior written consent of the Class I-A Issuer; provided, however, that: (i) the purchaser or transferee accepting such assignment and delegation (a) shall be a Person which shall be qualified to service mortgage loans for Fannie Mae or Freddie Mac; (b) shall have a net worth of not less than $15,000,000 (unless otherwise approved by each Rating Agency pursuant to clause (ii) below) and meets the eligibility requirements herein to serve as Master Servicer and Securities Administrator; (c) shall be reasonably satisfactory to the Trustee and the Class I-A Insurer (as evidenced in a writing signed by the Trustee and the Class I-A Insurer); and (d) shall execute and deliver to the Trustee an agreement, in form and substance reasonably satisfactory to the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each responsibility, covenant and condition of the Master Servicer and the Securities Administrator under this Agreement and each Custodial Agreement from and after the effective date of such assumption agreement; (ii) each Rating Agency and the Class I-A Insurer shall be given prior written notice of the identity of the proposed successor to the Master Servicer and each Rating Agency's rating of the Certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the Master Servicer, the Trustee and the Class I-A Insurer; and (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Trustee and the Class I-A Insurer an Officer's Certificate and an Opinion of Counsel addressed to the Trustee and the Class I-A Insurer, each stating that all conditions precedent to such action under this Agreement have been satisfied and such action is permitted by and complies with the terms of this Agreement.

157

## ARTICLE IX

## DEFAULT; TERMINATION OF MASTER SERVICER; TERMINATION OF COMPANY

Section 9.01    Events of Default.

"Event of Default," wherever used herein, means any one of the following events:

(i)    any failure by the Master Servicer to remit to the Securities Administrator any amounts received or collected by the Master Servicer in respect of the Mortgage Loans and required to be remitted by it hereunder (other than any Advance), which failure shall continue unremedied for one Business Day after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates or by the Class I-A Insurer; or

(ii)    any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement or any breach of a representation or warranty by the Master Servicer, which failure or breach shall continue unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates or by the Class I-A Insurer; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

(iv)    the Master Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

(v)    the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

158

(vi)    the Master Servicer assigns or delegates its duties or rights under this Agreement in contravention of the provisions permitting such assignment or delegation under Sections 8.05 or 8.07; or

(vii)   The Master Servicer fails to deposit or cause to be deposited in the Distribution Account any Advance (other than a Nonrecoverable Advance) by 5:00 p.m. New York City time on the first Business Day preceding the Distribution Date.

If an Event of Default shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, and at the written direction of the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates or at the written direction of the Class I-A Insurer, the Trustee shall in the case of any Event of Default described in clauses (i) through (vii) above, by notice in writing to the Master Servicer, with a copy to each Rating Agency and the Class I-A Insurer may, terminate all of the rights and obligations (but not the liabilities) of the Master Servicer (and the Securities Administrator if the Master Servicer and the Securities Administrator are the same entity) under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder. On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer (and, if applicable, the Securities Administrator) hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee, or any successor Master Servicer appointed pursuant to Section 9.02 (a "Successor Master Servicer" and, if applicable, "Successor Securities Administrator"). Such Successor Master Servicer shall thereupon if such Successor Master Servicer is a successor to the Master Servicer, make any Advance required by Article IV, subject, in the case of the Trustee, to Section 9.02. The Trustee is hereby authorized and empowered to execute and deliver, on behalf of the terminated Master Servicer and, if applicable, the terminated Securities Administrator, as attorney- in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of any Mortgage Loans and related documents, or otherwise. Unless expressly provided in such written notice, no such termination shall affect any obligation of the Master Servicer to pay amounts owed pursuant to Article VIII or Article X. The Master Servicer and, if applicable, the Securities Administrator agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's and, if applicable, the Securities Administrator's responsibilities and rights hereunder, including, without limitation, the transfer to the applicable Successor Master Servicer of all cash amounts which shall at the time be credited to the Master Servicer Collection Account maintained pursuant to Section 5.05, or thereafter be received with respect to the applicable Mortgage Loans. The Trustee shall promptly notify each Rating Agency and the Class I-A Insurer of the occurrence of an Event of Default actually known to a Responsible Officer of the Trustee.

Notwithstanding any termination of the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to receive, out of any late collection of a Scheduled Payment on a Mortgage Loan that was due prior to the notice terminating the Master Servicer's rights and obligations as Master Servicer hereunder and received after such notice, that portion thereof to which the Master Servicer would have been entitled pursuant to Section 5.02 and to receive any

159

other amounts payable to the Master Servicer hereunder the entitlement to which arose prior to the termination of its activities hereunder.

Notwithstanding the foregoing, if an Event of Default described in clause (vii) of this Section 9.01 shall occur, the Trustee shall, with the prior written consent of the Class I-A Insurer, by notice in writing to the Master Servicer, with a copy to the Class I-A Insurer, which may be delivered by telecopy, immediately terminate all of the rights and obligations of the Master Servicer thereafter arising under this Agreement, but without prejudice to any rights it may have as a Holder of the Certificates or to reimbursement of Monthly Advances and other advances of its own funds, and the Trustee shall act as provided in Section 9.02 to carry out the duties of the Master Servicer, including the obligation to make any Monthly Advance the nonpayment of which was an Event of Default described in clause (vii) of this Section 9.01. Any such action taken by the Trustee must be prior to the distribution on the relevant Distribution Date.

### Section 9.02   Trustee to Act; Appointment of Successor.

On and after the time the Master Servicer receives a notice of termination pursuant to Section 9.01 hereof the Trustee shall automatically become the successor to the Master Servicer with respect to the transactions set forth or provided for herein and after a transition period (not to exceed 90 days), shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer by the terms and provisions hereof; provided, however, that the Company shall have the right to either (a) immediately assume the duties of the Master Servicer or (b) select a successor Master Servicer; provided, further, however that, pursuant to Article V hereof, the Trustee in its capacity as successor Master Servicer shall be responsible for making any Advances required to be made by the Master Servicer immediately upon the termination of the Master Servicer and any such Advance shall be made on the Distribution Date on which such Advance was required to be made by the predecessor Master Servicer. Effective on the date of such notice of termination, as compensation therefor, the Trustee shall be entitled to all compensation, reimbursement of expenses and indemnification that the Master Servicer would have been entitled to if it had continued to act hereunder, provided, however, that the Trustee shall not be (i) liable for any acts or omissions of the Master Servicer, (ii) obligated to make Advances if it is prohibited from doing so under applicable law, (iii) responsible for expenses of the Master Servicer pursuant to Section 2.03 or (iv) obligated to deposit losses on any Permitted Investment directed by the Master Servicer. Notwithstanding the foregoing, the Trustee may, if it shall be unwilling to so act, or shall, if it is prohibited by applicable law from making Advances pursuant to Article VI or if it is otherwise unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution the appointment of which does not adversely affect the then current rating of the Certificates by each Rating Agency as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Any Successor Master Servicer shall (i) be an institution that is a Fannie Mae and Freddie Mac approved seller/servicer in good standing, that has a net worth of at least $15,000,000, (ii) be acceptable to the Class I-A Insurer (which consent shall not be unreasonably withheld) and (iii) be willing to act as successor servicer of any Mortgage Loans under this Agreement or the related Servicing Agreement with respect to which the Company or the original Servicer has been terminated as servicer, and shall have executed and delivered to the Depositor, the Class I-A Insurer and the Trustee an agreement accepting such delegation and assignment, that contains

160

an assumption by such Person of the rights, powers, duties, responsibilities, obligations and liabilities of the Master Servicer (other than any liabilities of the Master Servicer hereof incurred prior to termination of the Master Servicer under Section 9.01 or as otherwise set forth herein), with like effect as if originally named as a party to this Agreement, provided that each Rating Agency shall have acknowledged in writing that its rating of the Certificates in effect immediately prior to such assignment and delegation will not be qualified or reduced as a result of such assignment and delegation. If the Trustee assumes the duties and responsibilities of the Master Servicer in accordance with this Section 9.02, the Trustee shall not resign as Master Servicer until a Successor Master Servicer has been appointed and has accepted such appointment. Pending appointment of a successor to the Master Servicer hereunder, the Trustee, unless the Trustee is prohibited by law from so acting, shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans or otherwise as it and such successor shall agree; provided that no such compensation unless agreed to by the Certificateholders shall be in excess of that permitted the Master Servicer hereunder. The Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Neither the Trustee nor any other Successor Master Servicer shall be deemed to be in default hereunder by reason of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the Master Servicer and the Securities Administrator to deliver or provide, or any delay in delivering or providing, any monies, information, documents or records to it.

The costs and expenses of the Trustee in connection with the termination of the Master Servicer, appointment of a Successor Master Servicer and, if applicable, any transfer of master servicing, including, without limitation, all costs and expenses associated with the complete transfer of all master servicing data and the completion, correction or manipulation of such master servicing data as may be required by the Trustee to correct any errors or insufficiencies in the master servicing data or otherwise to enable the Trustee or the Successor Master Servicer to master service the Mortgage Loans properly and effectively, to the extent not previously paid by the terminated Master Servicer, shall be payable to the Trustee pursuant to Section 10.05 and shall not be subject to the cap on Extraordinary Trust Fund Expenses.

Section 9.03   Notification to Certificateholders.

(a)   Upon any termination of or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to Certificateholders, the Class I-A Insurer and to each Rating Agency.

(b)   Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders and the Class I-A Insurer notice of each such Event of Default hereunder actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured or waived.

Section 9.04   Waiver of Defaults.

161

The Trustee shall transmit by mail to all Certificateholders and the Class 1-A Insurer, within 60 days after the occurrence of any Event of Default actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured, notice of each such Event of Default hereunder known to the Trustee. The Class 1-A Insurer and Holders of Certificates evidencing not less than 51% of the Voting Rights (with the consent of the Class 1-A Insurer) may, on behalf of all Certificateholders, waive any default by the Master Servicer in the performance of its obligations hereunder and the consequences thereof, except a default in the making of or the causing to be made of any required remittances to the Securities Administrator. Upon any such waiver of a past default, such default shall be deemed to cease to exist, and any Event of Default arising therefrom shall be deemed to have been timely remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived. The Trustee shall give notice of any such waiver to each Rating Agency and the Class 1-A Insurer.

Section 9.05   Company Default.

In case one or more of the following events of default by the Company (each, a "Company Default") shall occur and be continuing, that is to say:

> (i)   any failure by the Company to remit to the Master Servicer any payment required to be made under the terms of this Agreement on any Remittance Date; or

> (ii)   failure on the part of the Company duly to observe or perform in any material respect any other of the covenants or agreements (other than Sections 3.16 or 3.17) on the part of the Company set forth in this Agreement, the breach of which has a material adverse effect and which continue unremedied for a period of sixty days (except that such number of days shall be fifteen in the case of a failure to pay any premium for any insurance policy required to be maintained under this Agreement and such failure shall be deemed to have a material adverse effect) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by the Master Servicer; or

> (iii)   a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Company and such decree or order shall have remained in force undischarged or unstayed for a period of sixty days; or

> (iv)   the Company shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Company or of or relating to all or substantially all of its property; or

162

(v)     the Company shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Company attempts to assign its right to servicing compensation hereunder or the Company attempts to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof except as otherwise permitted herein; or

(vii)   the Company ceases to be qualified to transact business in any jurisdiction where it is currently so qualified, but only to the extent such non-qualification materially and adversely affects the Company's ability to perform its obligations hereunder; or

(viii)  failure by the Company to duly perform, within the required time period, its obligations under Section 3.16 or Section 3.17 which failure continues unremedied for a period of fifteen (15) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by the Master Servicer;

then, and in each and every such case, so long as a Company Default shall not have been remedied, the Master Servicer or the Class I-A Insurer, by notice in writing to the Company may, in addition to whatever rights the Master Servicer and the Trustee on behalf of the Certificateholders and the Class I-A Insurer may have under Section 8.03 and at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Company under this Agreement and in and to the EMC Mortgage Loans and the proceeds thereof without compensating the Company for the same. On or after the receipt by the Company of such written notice, all authority and power of Company under this Agreement, whether with respect to the EMC Mortgage Loans or otherwise, shall pass to and be vested in the Master Servicer after a transition period (not to exceed 90 days). Upon written request from the Master Servicer or the Class I-A Insurer, the Company shall prepare, execute and deliver, any and all documents and other instruments, place in the Master Servicer's possession all Mortgage Files relating to the EMC Mortgage Loans, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the EMC Mortgage Loans and related documents, or otherwise, at the Company's sole expense. The Company agrees to cooperate with the Master Servicer and the Class I-A Insurer in effecting the termination of the Company's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Company to its Protected Account or Escrow Account or thereafter received with respect to the EMC Mortgage Loans or any related REO Property.

The costs and expenses of the Master Servicer in connection with the termination of the Company, appointment of a successor to the Company, and, if applicable, any transfer of servicing, including, without limitation, all costs and expenses associated with the complete

163

transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Master Servicer or other successor to the Company to correct any errors or insufficiencies in the servicing data or otherwise to enable the Master Servicer or such successor to service the related Mortgage Loans properly and effectively, to the extent not previously paid by the terminated Company, shall be payable to the Master Servicer or such successor pursuant to Section 5.07 and shall not be subject to the cap on Extraordinary Trust Fund Expenses.

Section 9.06   <u>Waiver of Company Defaults.</u>

The Master Servicer, with the consent of the Class I-A Insurer, may waive only by written notice any default by the Company in the performance of its obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Company Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived in writing.

[TPW: NYLEGAL.409898.8] 17297-00382 02/23/2007 09.01 PM

!

## ARTICLE X

### CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 10.01  Duties of Trustee and the Securities Administrator.

(a)     The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default which may have occurred, and the Securities Administrator each undertake to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee and the Securities Administrator, respectively. If an Event of Default has occurred and has not been cured or waived, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of such Person's own affairs.

(b)     Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the Trustee or the Securities Administrator pursuant to any provision of this Agreement, the Trustee or the Securities Administrator, respectively, shall examine them to determine whether they are in the form required by this Agreement; provided, however, that neither the Trustee or the Securities Administrator shall be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Master Servicer or pursuant to any provision of this Agreement; provided, further, that neither the Trustee nor the Securities Administrator shall be responsible for the accuracy or verification of any calculation provided to it pursuant to this Agreement.

(c)     On each Distribution Date, the Securities Administrator shall make monthly distributions and the final distribution to the related Certificateholders from related funds in the Distribution Account as provided in Sections 6.04 and 11.02 herein.

(d)     No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)     Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, the duties and obligations of the Trustee and the Securities Administrator shall be determined solely by the express provisions of this Agreement, neither the Trustee nor the Securities Administrator shall be liable except for the performance of their respective duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee or the Securities Administrator and, in the absence of bad faith on the part of the Trustee or the Securities Administrator, respectively, the Trustee or the Securities Administrator, respectively, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any

165

certificates or opinions furnished to the Trustee or the Securities Administrator, respectively, and conforming to the requirements of this Agreement;

(ii)     Neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator, respectively, was negligent in ascertaining the pertinent facts;

(iii)    Neither the Trustee nor the Securities Administrator shall be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the directions of the Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates (or such other percentage as specifically set forth herein), if such action or non-action relates to the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Securities Administrator, respectively, or exercising any trust or other power conferred upon the Trustee or the Securities Administrator, respectively, under this Agreement;

(iv)    The Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default unless a Responsible Officer of the Trustee shall have actual knowledge thereof. In the absence of such knowledge, the Trustee may conclusively assume there is no such default or Event of Default;

(v)     Neither the Trustee nor the Securities Administrator shall in any way be liable by reason of any insufficiency in any Account held by or in the name of Trustee or Securities Administrator unless it is determined by a court of competent jurisdiction in a non-appealable judgment that the Trustee's or Securities Administrator's negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Trustee or Securities Administrator is obligor and has defaulted thereon);

(vi)    Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee or the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee or the Securities Administrator, respectively, has been advised of the likelihood of such loss or damage and regardless of the form of action; and

(vii)   None of the Securities Administrator, the Master Servicer, the Sellers, the Depositor, the Trustee or the Custodians shall be responsible for the acts or omissions of the other, it being understood that this Agreement shall not be construed to render them partners, joint venturers or agents of one another.

166

Neither the Trustee nor the Securities Administrator shall be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, and none of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer or the Company hereunder or the Servicer under the related Servicing Agreement. The Trustee is here by authorized and directed to enter into the Assignment Agreements.

(c)     All funds received by the Securities Administrator and required to be deposited in the Distribution Account pursuant to this Agreement will be promptly so deposited by the Securities Administrator.

Section 10.02 Certain Matters Affecting the Trustee and the Securities Administrator.

(a)     Except as otherwise provided in Section 10.01:

(i)     The Trustee and the Securities Administrator may rely and shall be protected in acting or refraining from acting in reliance on any resolution or certificate of the Depositor, the Sellers, the Company or the Master Servicer or the related Servicer, any certificates of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)     The Trustee and the Securities Administrator may consult with counsel and any advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(iii)     Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement, other than its obligation to give notices pursuant to this Agreement, or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the Class I-A Insurer pursuant to the provisions of this Agreement, unless such Certificateholders or the Class I-A Insurer shall have offered to the Trustee or the Securities Administrator, as applicable, security or indemnity reasonable to it against the costs, expenses and liabilities which may be incurred therein or thereby. Nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default of which a Responsible Officer of the Trustee has actual knowledge (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and

167

skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs;

(iv)    Neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Neither the Trustee nor the Securities Administrator shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates or the Class I-A Insurer and provided that the payment within a reasonable time to the Trustee or the Securities Administrator, as applicable, of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee or the Securities Administrator, as applicable, reasonably assured to the Trustee or the Securities Administrator, as applicable, by the security afforded to it by the terms of this Agreement. The Trustee or the Securities Administrator may require reasonable indemnity against such expense or liability as a condition to taking any such action. The reasonable expense of every such examination shall be paid by the Certificateholders requesting the investigation;

(vi)    The Trustee and the Securities Administrator may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or through Affiliates, agents or attorneys; provided, however, that the Trustee may not appoint any paying agent other than the Securities Administrator to perform any paying agent functions under this Agreement without the express written consent of the Master Servicer and the Class I-A Insurer, which consents will not be unreasonably withheld. Neither the Trustee nor the Securities Administrator shall be liable or responsible for the misconduct or negligence of any of the Trustee's or the Securities Administrator's agents or attorneys or paying agent appointed hereunder by the Trustee or the Securities Administrator with due care and, when required, with the consent of the Master Servicer;

(vii)    Should the Trustee or the Securities Administrator deem the nature of any action required on its part to be unclear or ambiguous, the Trustee or the Securities Administrator, respectively, may require prior to such action that it be provided by the Depositor with the consent of the Class I-A Insurer with reasonable further instructions; the right of the Trustee or the Securities Administrator to perform any discretionary act enumerated in this Agreement shall not be construed as a duty, and neither the Trustee nor the Securities Administrator shall not accountable for other than its negligence or willful misconduct in the performance of any such act;

168

(viii)   Neither the Trustee nor the Securities Administrator shall be required to give any bond or surety with respect to the execution of the trust created hereby or the powers granted hereunder, except as provided in Subsection 10.07; and

(ix)   Neither the Trustee nor the Securities Administrator shall have any duty to conduct any affirmative investigation as to the occurrence of any condition requiring the repurchase of any Mortgage Loan by any Person pursuant to this Agreement, or the eligibility of any Mortgage Loan for purposes of this Agreement.

Section 10.03   Trustee and Securities Administrator Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates) shall be taken as the statements of the Depositor, and neither the Trustee nor the Securities Administrator shall have any responsibility for their correctness. Neither the Trustee nor the Securities Administrator makes any representation as to the validity or sufficiency of, the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates), any Custodial Agreement or of any Mortgage Loan. The Securities Administrator's signature and countersignature (or countersignature of its agent) on the Certificates shall be solely in its capacity as Securities Administrator and shall not constitute the Certificates an obligation of the Securities Administrator in any other capacity. Neither the Trustee nor the Securities Administrator shall be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor with respect to the Mortgage Loans. Subject to Section 2.06, neither the Trustee nor the Securities Administrator shall be responsible for the legality or validity of this Agreement, any Custodial Agreement or any document or instrument relating to this Agreement, the validity of the execution of this Agreement or of any supplement hereto or instrument of further assurance, or the validity, priority, perfection or sufficiency of the security for the Certificates issued hereunder or intended to be issued hereunder. Neither the Trustee nor the Securities Administrator shall at any time have any responsibility or liability for or with respect to the legality, validity and enforceability of any Mortgage or any Mortgage Loan, or the perfection and priority of any Mortgage or the maintenance of any such perfection and priority, or for or with respect to the sufficiency of the Trust Fund or its ability to generate the payments to be distributed to Certificateholders, under this Agreement. The Trustee shall not be responsible for filing any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien granted to the Trustee hereunder or to record this Agreement.

Section 10.04   Trustee and Securities Administrator May Own Certificates.

Each of the Trustee and the Securities Administrator in its individual capacity or in any capacity other than as Trustee or the Securities Administrator hereunder may become the owner

169

or pledge of any Certificates with the same rights it would have if it were not the Trustee or the Securities Administrator, as applicable, and may otherwise deal with the parties hereto.

Section 10.05 <u>Trustee's and Securities Administrator's Fees and Expenses.</u>

The fees and expenses of the Trustee and the Securities Administrator shall be paid in accordance with a side letter agreement with the Master Servicer and at the expense of the Master Servicer. In addition, the Securities Administrator shall be entitled to any investment income on amounts on deposit in the Master Servicer Collection Account and the Distribution Account. In addition, the Trustee and the Securities Administrator will be entitled to recover from the Master Servicer Collection Account pursuant to Section 5.07 all reasonable out-of-pocket expenses, disbursements and advances and the expenses of the Trustee and the Securities Administrator, respectively, in connection with any Event of Default, any breach of this Agreement or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Trustee or the Securities Administrator, respectively, in the administration of the trusts hereunder (including the reasonable compensation, expenses and disbursements of its counsel) except any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Certificateholders hereunder. If funds in the Master Servicer Collection Account are insufficient therefor, the Trustee and the Securities Administrator shall recover such expenses, disbursements or advances from EMC and EMC hereby agrees to pay such expenses, disbursements or advances upon demand. Such compensation and reimbursement obligation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust.

Section 10.06 <u>Eligibility Requirements for Trustee and Securities Administrator.</u>

The Trustee and any successor Trustee and the Securities Administrator and any successor Securities Administrator shall during the entire duration of this Agreement be a state bank or trust company or a national banking association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus and undivided profits of at least $50,000,000, subject to supervision or examination by federal or state authority and rated "Baa2" or higher by Moody's with respect to any outstanding long-term unsecured unsubordinated debt, and, in the case of a successor Trustee or successor Securities Administrator other than pursuant to Section 10.10, rated in one of the two highest long-term debt categories by each Rating Agency or otherwise acceptable to each Rating Agency and the Class I-A Insurer. The Trustee shall not be an Affiliate of the Master Servicer. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 10.06 the combined capital and surplus of such corporation shall be deemed to be its total equity capital (combined capital and surplus) as set forth in its most recent report of condition so published. In case at any time the Trustee or the Securities Administrator, as applicable, shall cease to be eligible in accordance with the provisions of this Section 10.06, the Trustee or the Securities Administrator shall resign immediately in the manner and with the effect specified in Section 10.08.

170

Section 10.07 Insurance.

The Trustee and the Securities Administrator, at their own expense, shall at all times (A) maintain and keep in full force and effect: (i) fidelity insurance, (ii) theft of documents insurance and (iii) forgery insurance (which may be collectively satisfied by a "Financial Institution Bond" and/or a "Bankers' Blanket Bond") or (B) in the case of the Securities Administrator, self insure if LaSalle Bank National Association maintains with any Rating Agency the equivalent of a long term unsecured debt rating of "A". All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks or their affiliates which act as custodians for investor-owned mortgage pools. A certificate of an officer of the Trustee or the Securities Administrator as to the Trustee's or the Securities Administrator's, respectively, compliance with this Section 10.07 shall be furnished to any Certificateholder upon reasonable written request.

Section 10.08 Resignation and Removal of Trustee and Securities Administrator.

The Trustee and the Securities Administrator may at any time resign (including, in the case of the Securities Administrator, in connection with the resignation or termination of the Master Servicer) and be discharged from the Trust hereby created by giving written notice thereof to the Depositor, the Sellers, the Securities Administrator (or the Trustee, if the Securities Administrator resigns) and the Master Servicer, with a copy to each Rating Agency and the Class I-A Insurer. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee or successor securities administrator, as applicable, (and in the case of the Securities Administrator's removal, the Trustee may appoint a successor securities administrator with the consent of the Class I-A Insurer) by written instrument, in triplicate, one copy of which instrument shall be delivered to each of the resigning trustee or securities administrator, as applicable, and the successor trustee or securities administrator, as applicable. If no successor trustee or successor securities administrator shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee or Securities Administrator may petition any court of competent jurisdiction for the appointment of a successor trustee or securities administrator.

If at any time (i) the Trustee or the Securities Administrator shall cease to be eligible in accordance with the provisions of Section 10.06 hereof and shall fail to resign after written request thereto by the Depositor, (ii) the Trustee or the Securities Administrator shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Trustee or the Securities Administrator or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or the Securities Administrator or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or (iii)(A) a tax is imposed with respect to the Trust Fund by any state in which the Trustee or the Securities Administrator or the Trust Fund is located, (B) the imposition of such tax would be avoided by the appointment of a different trustee or securities administrator and (C) the Trustee or the Securities Administrator, as applicable, fails to indemnify the Trust Fund against such tax, then the Depositor or the Master Servicer may remove the Trustee or the Securities Administrator , as applicable, (and in the case of the Securities Administrator's ineligibility, the Trustee may appoint a successor securities administrator with the consent of the Class I-A Insurer) and appoint a successor trustee or

171

successor securities administrator, as applicable, by written instrument, in multiple copies, a copy of which instrument shall be delivered to the Trustee, the Securities Administrator, the Master Servicer and the successor trustee or successor securities administrator, as applicable.

The Holders evidencing at least 51% of the Voting Rights of each Class of Certificates (with the prior written consent of the Class 1-A Insurer, which consent shall not be unreasonably withheld) may at any time remove the Trustee or Securities Administrator and appoint a successor trustee or securities administrator by written instrument or instruments, in multiple copies, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered by the successor trustee or successor securities administrator to each of the Master Servicer, the Trustee or Securities Administrator so removed and the successor trustee or securities administrator so appointed. Notice of any removal of the Trustee or Securities Administrator shall be given to each Rating Agency and the Class I-A Insurer by the related successor.

Any resignation or removal of the Trustee or the Securities Administrator and appointment of a successor trustee or securities administrator pursuant to any of the provisions of this Section 10.08 shall become effective upon acceptance of appointment by the successor trustee or securities administrator as provided in Section 10.09 hereof.

### Section 10.09 Successor Trustee or Securities Administrator.

Any successor trustee or securities administrator appointed as provided in Section 10.08 hereof shall execute, acknowledge and deliver to the Depositor, to its predecessor trustee or predecessor securities administrator, as applicable, and the Master Servicer and the Class I-A Insurer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee or securities administrator shall become effective and such successor trustee or securities administrator without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee or securities administrator herein.

No successor trustee or securities administrator shall accept appointment as provided in this Section 10.09 unless at the time of such acceptance such successor trustee or securities administrator shall be eligible under the provisions of Section 10.06 hereof and its appointment shall not adversely affect the then current rating of the Certificates.

Upon acceptance of appointment by a successor trustee or securities administrator as provided in this Section 10.09, the successor trustee or securities administrator shall mail notice of the succession of such trustee or securities administrator hereunder to all Holders of Certificates and the Class I-A Insurer. If the successor trustee or securities administrator fails to mail such notice within ten days after acceptance of appointment, the Depositor shall cause such notice to be mailed at the expense of the Trust Fund.

### Section 10.10 Merger or Consolidation of Trustee or Securities Administrator.

Any corporation, state bank or national banking association into which the Trustee or the Securities Administrator may be merged or converted or with which it may be consolidated or

172

any corporation, state bank or national banking association resulting from any merger, conversion or consolidation to which the Trustee or the Securities Administrator shall be a party, or any corporation, state bank or national banking association succeeding to substantially all of the corporate trust business of the Trustee or of the business of the Securities Administrator, shall be the successor of the Trustee or the Securities Administrator hereunder, provided that such corporation shall be eligible under the provisions of Section 10.06 hereof without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 10.11 <u>Appointment of Co-Trustee or Separate Trustee.</u>

Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing any Mortgage Note may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity and for the benefit of the Certificateholders and the Class I-A Insurer, such title to the Trust Fund or any part thereof, whichever is applicable, and, subject to the other provisions of this Section 10.11, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable. If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request to do so, or in the case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 10.06 and no notice to Certificateholders of the appointment of any co-trustee or separate trustee shall be required under Section 10.09.

Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

> (i) All rights, powers, duties and obligations conferred or imposed upon the Trustee, except for the obligation of the Trustee under this Agreement to advance funds on behalf of the Master Servicer, shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether a Trustee hereunder or as a Successor Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

> (ii) No trustee hereunder shall be held personally liable by reason of any act or omission of any other trustee hereunder; and

173

        (iii)    The Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article X. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co- trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

## Section 10.12  Tax Matters.

It is intended that the Trust Fund shall constitute, and that the affairs of the Trust Fund shall be conducted so that each REMIC formed hereunder qualifies as, a "real estate mortgage investment conduit" as defined in and in accordance with the REMIC Provisions. In furtherance of such intention, the Securities Administrator covenants and agrees that it shall act as agent (and the Securities Administrator is hereby appointed to act as agent) on behalf of the Trust Fund. The Securities Administrator, as agent on behalf of the Trust Fund, shall do or refrain from doing, as applicable, the following: (a) the Securities Administrator shall prepare and file, or cause to be prepared and filed, in a timely manner, U.S. Real Estate Mortgage Investment Conduit Income Tax Returns (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to each such REMIC containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish, or cause to be furnished, to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby; (b) the Securities Administrator shall apply for an employer identification number with the Internal Revenue Service via a Form SS-4 or other comparable method for each REMIC that is or becomes a taxable entity, and within thirty days of the Closing Date, furnish or cause to be furnished to the Internal Revenue Service, on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the Person that the Holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such Form, and update such information at the time or times in the manner required by the Code for the Trust Fund; (c) the Securities Administrator on behalf of the Trustee shall make, or cause to be made elections, on behalf of each REMIC formed hereunder to be treated as a REMIC on

174

the federal tax return of such REMIC for its first taxable year (and, if necessary, under applicable state law); (d) the Securities Administrator shall prepare and forward, or cause to be prepared and forwarded, to the Certificateholders and to the Internal Revenue Service and, if necessary, state tax authorities, all information returns and reports as and when required to be provided to them in accordance with the REMIC Provisions, including without limitation, the calculation of any original issue discount using the Prepayment Assumption; (e) the Securities Administrator shall provide information necessary for the computation of tax imposed on the transfer of a Residual Certificate to a Person that is not a Permitted Transferee, or an agent (including a broker, nominee or other middleman) of a Person that is not a Permitted Transferee, or a pass-through entity in which a Person that is not a Permitted Transferee is the record holder of an interest (the reasonable cost of computing and furnishing such information may be charged to the Person liable for such tax); (f) each of the Securities Administrator and the Trustee shall, to the extent under its control, conduct the affairs of the Trust Fund at all times that any Certificates are outstanding so as to maintain the status of each REMIC formed hereunder as a REMIC under the REMIC Provisions; (g) neither the Trustee nor the Securities Administrator shall knowingly or intentionally take any action or omit to take any action that would cause the termination of the REMIC status of any REMIC formed hereunder; (h) the Securities Administrator shall pay, from the sources specified in the penultimate paragraph of this Section 10.12, the amount of any federal, state and local taxes, including prohibited transaction taxes as described below, imposed on any REMIC formed hereunder prior to the termination of the Trust Fund when and as the same shall be due and payable (but such obligation shall not prevent the Securities Administrator or any other appropriate Person from contesting any such tax in appropriate proceedings and shall not prevent the Securities Administrator from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings); (i) the Trustee shall sign or cause to be signed federal, state or local income tax or information returns or any other document prepared by the Securities Administrator pursuant to this Section 10.12 requiring a signature thereon by the Trustee; (j) the Securities Administrator shall maintain records relating to each REMIC formed hereunder including but not limited to the income, expenses, assets and liabilities of each such REMIC and adjusted basis of the Trust Fund property determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns, schedules, statements or information; (k) the Securities Administrator shall, for federal income tax purposes, maintain books and records with respect to the REMICs on a calendar year and on an accrual basis; (l) none of the Trustee, the Master Servicer or the Securities Administrator shall enter into any arrangement not otherwise provided for in this Agreement by which the REMICs will receive a fee or other compensation for services nor permit the REMICs to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code; and (l) as and when necessary and appropriate, the Securities Administrator, at the expense of the Trust Fund, shall represent the Trust Fund in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any REMIC formed hereunder, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of the Trust Fund, and otherwise act on behalf of each REMIC formed hereunder in relation to any tax matter involving any such REMIC.

In order to enable each of the Trustee and the Securities Administrator to perform its duties as set forth herein, the Depositor shall provide, or cause to be provided, to the Trustee or

the Securities Administrator within 10 days after the Closing Date all information or data that the Trustee or the Securities Administrator requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flows of the Certificates and the Mortgage Loans. Thereafter, the Depositor shall provide to the Trustee or the Securities Administrator promptly upon written request therefor, any such additional information or data that the Trustee or the Securities Administrator may, from time to time, request in order to enable the Trustee or the Securities Administrator to perform its duties as set forth herein. The Depositor hereby indemnifies each of the Trustee and the Securities Administrator for any losses, liabilities, damages, claims or expenses of the Trustee or the Securities Administrator arising from any errors or miscalculations of the Trustee or the Securities Administrator that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee or the Securities Administrator, as applicable, on a timely basis.

In the event that any tax is imposed on "prohibited transactions" of any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V as defined in Section 860F(a)(2) of the Code, on the "net income from foreclosure property" of the Trust Fund as defined in Section 860G(c) of the Code, on any contribution to any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V after the Startup Day pursuant to Section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any federal, state or local tax or minimum tax imposed upon any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, and is, in each case, attributable to the activities of REMIC I or Loan Group I and is not paid as otherwise provided for herein, such tax shall be paid by (i) the Master Servicer or the Securities Administrator, if any such tax arises out of or results from a breach by the Master Servicer or the Securities Administrator of any of its obligations under this Agreement, provided, however, in no event shall the Master Servicer or the Securities Administrator have any liability (1) for any action or omission that is taken in accordance with and compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any losses other than arising out of a negligent performance by the Master Servicer or the Securities Administrator of its duties and obligations set forth herein, or (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates), (ii) any party hereto (other than the Master Servicer or the Securities Administrator) to the extent any such tax arises out of or results from a breach by such other party of any of its obligations under this Agreement or (iii) in all other cases, or in the event that any liable party hereto fails to honor its obligations under the preceding clauses (i) or (ii), the Group I Certificateholders in the following manner: any such tax will be paid first with amounts otherwise to be distributed to the Class I-R Certificateholders (pro rata) and second, with amounts otherwise to be distributed to the Holders of the following other Group I Certificates in the following order of priority: first, to the Class I-B-4 Certificates, second, to the Class I-B-3 Certificates, third, to the Class I-B-2 Certificates, fourth, to the Class I-B-1 Certificates, fifth, to the Class I-M Certificates, and sixth, to the Class I-A Certificates.

In the event that any tax is imposed on "prohibited transactions" of any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V as defined in Section 860F(a)(2) of the Code, on the "net income from foreclosure property" of the Trust Fund as defined in Section 860G(c) of the Code, on any contribution to any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V after the Startup Day pursuant to Section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any federal, state or local tax or minimum tax imposed

176

upon any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, and is, in each case, attributable to the activities of REMIC II or Loan Group II and is not paid as otherwise provided for herein, such tax shall be paid by (i) the Master Servicer or the Securities Administrator, if any such tax arises out of or results from a breach by the Master Servicer or the Securities Administrator of any of its obligations under this Agreement, provided, however, in no event shall the Master Servicer or the Securities Administrator have any liability (1) for any action or omission that is taken in accordance with and compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any losses other than arising out of a negligent performance by the Master Servicer or the Securities Administrator of its duties and obligations set forth herein, or (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates), (ii) any party hereto (other than the Master Servicer or the Securities Administrator) to the extent any such tax arises out of or results from a breach by such other party of any of its obligations under this Agreement or (iii) in all other cases, or in the event that any liable party hereto fails to honor its obligations under the preceding clauses (i) or (ii), the Group II Certificateholders in the following manner: any such tax will be paid first with amounts otherwise to be distributed to the Class II-R Certificateholders (pro rata) and second, with amounts otherwise to be distributed to the Holders of the following other Group II Certificates in the following order of priority: first, to the Class II-B-4 Certificates, second, to the Class II-B-3 Certificates, third, to the Class II-B-2 Certificates, fourth, to the Class II-B-1 Certificates, fifth, to the Class II-M-6 Certificates, sixth, to the Class II-M-5 Certificates, seventh, to the Class II-M-4 Certificates, eighth, to the Class II-M-3 Certificates, ninth, to the Class II-M-2 Certificates, tenth, to the Class II-M-1 Certificates, and eleventh, to the Class II-A Certificates (pro rata).

Notwithstanding anything to the contrary contained herein, to the extent that any taxes described in the preceding two paragraphs is payable by the Holder of any Certificates, the Securities Administrator is hereby authorized to retain on any Distribution Date from the Holders of the related Class R Certificates (and, if necessary, second, from the Holders of the other related Certificates in the priority specified in the preceding paragraphs), funds otherwise distributable to such Holders in an amount sufficient to pay such taxes. The Securities Administrator shall promptly notify in writing the party liable for any such tax of the amount thereof and the Due Date for the payment thereof.

The Trustee, the Master Servicer and the Securities Administrator each agree that, in the event it should obtain any information necessary for the other party to perform its obligations pursuant to this Section 10.12, it will promptly notify and provide such information to such other party.

Notwithstanding the foregoing, with respect to the preparation and filing of tax returns in the event that the right to receive payments in respect of Group I Basis Risk Shortfall Carry Forward Amounts could be treated as a partnership among the Holders of the Class I-A, Class I-M, Class I-B and Class I-C Certificates or the right to receive payments in respect of Group II Basis Risk Shortfall Carry Forward Amounts could be treated as a partnership among the Holders of the Class II-A, Class II-M, Class II-B and Class II-C Certificates, the Securities Administrator shall not be required to prepare and file partnership tax returns on behalf of the Trust Fund or portion thereof unless it receives additional reasonable compensation for the

177

preparation of such filings and written notification from either an officer or tax counsel for the Depositor recognizing the creation of a partnership for federal income tax purposes.

### Section 10.13  REMIC-Related Covenants.

For as long as each REMIC shall exist, the Trustee and the Securities Administrator shall act in accordance herewith to assure continuing treatment of such REMIC as a REMIC, and the Trustee and the Securities Administrator shall comply with any directions of the Seller, the Company, the Servicer or the Master Servicer to assure such continuing treatment. In particular, neither the Trustee nor the Securities Administrator shall (a) sell or permit the sale of all or any portion of the Mortgage Loans or of any investment of deposits in an Account unless such sale is as a result of a repurchase of the Mortgage Loans pursuant to this Agreement or the Trustee and the Securities Administrator has received a REMIC Opinion addressed to the Securities Administrator and the Trustee and the Securities Administrator prepared at the expense of the Trust Fund; and (b) other than with respect to a substitution pursuant to the Mortgage Loan Purchase Agreement or Section 2.03 of this Agreement, as applicable, accept any contribution to any REMIC after the Startup Day without receipt of a REMIC Opinion.

ARTICLE XI

TERMINATION

Section 11.01 <u>Termination upon Liquidation or Repurchase of all Mortgage Loans.</u>

Subject to Section 11.03, the obligations and responsibilities of the Depositor, the Master Servicer, the Securities Administrator, the Seller and the Trustee created hereby with respect to the related Sub-Trust shall terminate, with respect to Loan Group I, upon the earlier of (a) the purchase by the Majority Class I-C Certificateholder of all of the Group I Mortgage Loans (and related REO Properties) remaining in the Trust Fund at a price (the "Group I Mortgage Loan Purchase Price") equal to the sum of (i) 100% of the Stated Principal Balance of each related Mortgage Loan (other than in respect of related REO Property), (ii) accrued interest thereon at the applicable Mortgage Rate to, but not including, the first day of the month of such purchase, (iii) the appraised value of any REO Property in the Group I Sub-Trust (up to the Stated Principal Balance of the related Mortgage Loan), such appraisal to be conducted by an appraiser mutually agreed upon by the related servicer and the Trustee and (iv) unreimbursed out-of pocket costs of the Company, the Servicers or the Master Servicer, including unreimbursed servicing advances and the principal portion of any unreimbursed Advances made on Loan Group I prior to the exercise of such repurchase right, (v) any Class I-A Reimbursement Amount due the Class I-A Insurer and (vi) such Loan Group's pro rata share (based on the then outstanding aggregate Stated Principal Balance thereof) of any unreimbursed costs and expenses of the Trustee and the Securities Administrator payable pursuant to Section 10.05; provided, however, that no such purchase will be permitted if such purchase would result in a draw on the Class I-A Policy and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Group I Sub-Trust and the disposition of all related REO Property and (ii) the distribution to Group I Certificateholders and the Class I-A Insurer of all amounts required to be distributed to them pursuant to this Agreement or the Class I-A Insurance Agreement, as applicable. Subject to Section 11.03, the obligations and responsibilities of the Depositor, the Master Servicer, the Securities Administrator, the Seller and the Trustee created hereby with respect to the related Sub-Trust shall terminate, with respect to Loan Group II, upon the earlier of (a) the purchase by the Majority Class II-C Certificateholder of all of the Group II Mortgage Loans (and related REO Properties) remaining in the Trust Fund at a price (the "Group II Mortgage Loan Purchase Price") equal to the sum of (i) 100% of the Stated Principal Balance of each related Mortgage Loan (other than in respect of related REO Property), (ii) accrued interest thereon at the applicable Mortgage Rate to, but not including, the first day of the month of such purchase, (iii) the appraised value of any REO Property in the Group II Sub-Trust (up to the Stated Principal Balance of the related Mortgage Loan), such appraisal to be conducted by an appraiser mutually agreed upon by the related servicer and the Trustee and (iv) unreimbursed out-of pocket costs of the Company, the Servicers or the Master Servicer, including unreimbursed servicing advances and the principal portion of any unreimbursed Advances made on Loan Group II prior to the exercise of such repurchase right, (v) any unreimbursed costs and expenses of the Trustee and the Securities Administrator payable pursuant to Section 10.05 and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Group II Sub-Trust and the disposition of all related REO

179

Property and (ii) the distribution to Group II Certificateholders of all amounts required to be distributed to them pursuant to this Agreement, as applicable.

In no event shall the Sub-Trusts created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James, living on the date hereof and (ii) the related Latest Possible Maturity Date.

The right to repurchase all Group I Mortgage Loans and related REO Properties by the Majority Class I-C Certificateholder pursuant to clause (a) in the preceding paragraph shall be conditioned upon the Stated Principal Balance of all of the Group I Mortgage Loans in the related Sub-Trust, at the time of any such repurchase, aggregating 20% or less of the aggregate Cut-off Date Principal Balance of all of the Group I Mortgage Loans. The right to repurchase all Group II Mortgage Loans and related REO Properties by the Majority Class II-C Certificateholder pursuant to clause (a) in the preceding paragraph shall be conditioned upon the Stated Principal Balance of all of the Group II Mortgage Loans in the related Sub-Trust, at the time of any such repurchase, aggregating 20% or less of the aggregate Cut-off Date Principal Balance of all of the Group II Mortgage Loans.

Notwithstanding anything to the contrary herein, the Class I-R-2 Certificates will not be retired until the later of (i) the retirement of all the Group II Certificates and (ii) the retirement of all the Group I Certificates (other than the Class I-R-2 Certificates).

Section 11.02  Final Distribution on the Group I Certificates and Group II Certificates.

If on any Determination Date, (i) the Master Servicer determines that there are no related Outstanding Mortgage Loans and no other funds or assets in the related Sub-Trust other than the funds in the Master Servicer Collection Account, the Master Servicer shall direct the Securities Administrator to send a final distribution notice promptly to each related Certificateholder and the related Class I-A Insurer or (ii) the Securities Administrator determines that a Class of Certificates shall be retired after a final distribution on such Class, the Securities Administrator shall notify the related Certificateholders and the related Class I-A Insurer within five (5) Business Days after such Determination Date that the final distribution in retirement of such Class of Certificates is scheduled to be made on the immediately following Distribution Date. Any final distribution made pursuant to the immediately preceding sentence shall be made only upon presentation and surrender of the related Certificates at the Corporate Office of the Securities Administrator. If the Majority Class I-C Certificateholder or Majority Class II-C Certificateholder, as applicable, elects to terminate the related Sub-Trust pursuant to Section 11.01, at least 20 days prior to the date notice is to be mailed to the related Certificateholders, the Majority Class I-C Certificateholder or Majority Class II-C Certificateholder, as applicable, shall notify the Depositor, the related Class I-A Insurer, the Securities Administrator, the Trustee of the date the Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable, intends to terminate the related Sub-Trust. The Master Servicer shall remit the related Mortgage Loan Purchase Price to the Securities Administrator on the Business Day prior to the Distribution Date for such Group I Optional Termination or Group II Optional Termination by the Majority Class I-C Certificateholder or Majority Class I-C Certificateholder, as applicable.

Notice of any termination of the related Sub-Trust, specifying the Distribution Date on which related Certificateholders may surrender their Certificates for payment of the final distribution and cancellation, shall be given promptly by the Securities Administrator by letter to related Certificateholders and the Class I-A Insurer mailed not later than two Business Days after the Determination Date in the month of such final distribution. Any such notice shall specify (a) the Distribution Date upon which final distribution on the related Certificates shall be made upon presentation and surrender of related Certificates at the office therein designated, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made and (d) that the Record Date otherwise applicable to such Distribution Date is not applicable, distributions being made only upon presentation and surrender of the related Certificates at the office therein specified. The Securities Administrator will give such notice to each Rating Agency at the time such notice is given to related Certificateholders.

In the event such notice is given, the Master Servicer shall cause all related funds in the Master Servicer Collection Account to be remitted to the Securities Administrator for deposit in the Distribution Account on the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the related Certificates and, with respect to Loan Group I, any Reimbursement Amounts due to the Class I-A Insurer. Upon such final deposit with respect to the Sub-Trust and the receipt by related Custodian of a Request for Release therefor, the related Custodian shall promptly release to the Master Servicer, as applicable the Mortgage Files for the related Mortgage Loans and the Trustee shall execute and deliver any documents prepared and delivered to it which are necessary to transfer any REO Property.

Upon presentation and surrender of the related Certificates, the Securities Administrator shall cause to be distributed to related Certificateholders of each Class and to the Class I-A Insurer in accordance with the Remittance Report the amounts allocable to such Certificates and such Class I-A Insurer held in the Distribution Account in the order and priority set forth in Section 6.04 hereof on the final Distribution Date and in proportion to their respective Percentage Interests.

In the event that any affected Certificateholders shall not surrender Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Securities Administrator shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice all the applicable Certificates shall not have been surrendered for cancellation, the Securities Administrator may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets that remain a part of the related Sub-Trusts. If within one year after the second notice all related Certificates shall not have been surrendered for cancellation, the related Residual Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund that remain subject hereto.

Section 11.03 Additional Termination Requirements.

181

(a)     Upon exercise by the Majority Class I-C Certificateholder or Majority Class II-C Certificateholder, as applicable, of its purchase option as provided in Section 11.01, the related Sub-Trust shall be terminated in accordance with the following additional requirements, unless each of the Trustee, the Class I-A Insurer and the Securities Administrator have been supplied with an Opinion of Counsel addressed to the Trustee, the Securities Administrator and the Class I-A Insurer, at the expense of the Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable, to the effect that the failure of the related Sub-Trust to comply with the requirements of this Section 11.03 will not (i) result in the imposition of taxes on "prohibited transactions" of a REMIC, or (ii) cause a REMIC to fail to qualify as a REMIC at any time that any related Certificates are outstanding:

(1)     The Majority Class I-C Certificateholder or Majority Class II-C Certificateholder, as applicable, shall establish a 90-day liquidation period for REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as applicable, and notify the Trustee and Securities Administrator thereof, and the Securities Administrator shall in turn specify the first day of such period in a statement attached to the tax return for REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as applicable, pursuant to Treasury Regulation Section 1.860F-1. The Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable, shall satisfy all the requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder with respect to each REMIC related to the terminated Sub-Trust, as evidenced by an Opinion of Counsel addressed to the Securities Administrator and the Trustee obtained at the expense of the Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable;

(2)     During such 90-day liquidation period, and at or prior to the time of making the final payment on the related Certificates, the Securities Administrator on behalf of the Trustee shall sell all of the assets of REMIC I or REMIC II, as applicable, for cash; and

(3)     At the time of the making of the final payment on the related Certificates, the Securities Administrator shall distribute or credit, or cause to be distributed or credited, to the Holders of the related Residual Certificates all cash on hand (other than cash retained to meet claims), and REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V, as applicable, shall terminate at that time.

(4)     By their acceptance of the related Certificates, the Holders thereof hereby authorize the adoption of a 90-day liquidation period and plan of liquidation for the related REMIC, which authorization shall be binding upon all successor related Certificateholders.

(5)     The Securities Administrator, as agent for each related REMIC, hereby agrees to adopt and sign such a plan of complete liquidation upon the written request of the Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable, and the receipt of the Opinion of Counsel referred to in Section 11.03(a)(1), and to take such other action in connection therewith as may be reasonably requested by the Majority Class I-C Certificateholder or the Majority Class II-C Certificateholder, as applicable.

ARTICLE XII

MISCELLANEOUS PROVISIONS

Section 12.01  Amendment.

This Agreement may be amended from time to time by parties hereto and with the consent of the Class I-A Insurer without the consent of any of the Certificateholders to cure any ambiguity, to correct or supplement any provisions herein (including to give effect to the expectations of investors), to change the manner in which the Master Servicer Collection Account maintained by the Master Servicer or the Protected Account maintained by the Company is maintained or to make such other provisions with respect to matters or questions arising under this Agreement as shall not be inconsistent with any other provisions herein if such action shall not, as evidenced by an Opinion of Counsel addressed to the Trustee (which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee), adversely affect in any material respect the interests of any Certificateholder; provided that any such amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders and no such Opinion of Counsel shall be required if the Person requesting such amendment obtains a letter from each Rating Agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates.

Notwithstanding the foregoing, without the consent of the Certificateholders, the parties hereto may at any time and from time to time amend this Agreement to modify, eliminate or add to any of its provisions to such extent as shall be necessary or appropriate to maintain the qualification of any of REMIC I, REMIC II, REMIC III, REMIC IV and REMIC V as a REMIC under the Code or to avoid or minimize the risk of the imposition of any tax on any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V pursuant to the Code that would be a claim against any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V at any time prior to the final redemption of the Certificates, provided that the Trustee, the Securities Administrator and the Class I-A Insurer have been provided an Opinion of Counsel addressed to the Trustee, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee, the Securities Administrator or the Trust Fund, to the effect that such action is necessary or appropriate to maintain such qualification or to avoid or minimize the risk of the imposition of such a tax.

This Agreement may also be amended from time to time by the parties hereto with the consent of the Class I-A Insurer and the Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to cease to qualify as a REMIC or (iii) reduce the aforesaid percentages of Certificates of each Class the Holders of which are required to consent to any such amendment without the consent of the Holders of all Certificates of such Class then outstanding.

183

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it shall have first received an Opinion of Counsel addressed to the Trustee and the Securities Administrator (a copy of which shall be addressed to and delivered to the Class I-A Insurer), which opinion shall be an expense of the party requesting such amendment but in any case shall not be an expense of the Trustee or the Securities Administrator, to the effect that such amendment will not (other than an amendment pursuant to clause (ii) of, and in accordance with, the preceding paragraph) cause the imposition of any tax on any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V or the Certificateholders or cause any of REMIC I, REMIC II, REMIC III, REMIC IV or REMIC V to cease to qualify as a REMIC at any time that any Certificates are outstanding. Further, nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel (a copy of which shall be addressed to and delivered to the Class I-A Insurer), satisfactory to the Trustee (i) that such amendment is permitted and is not prohibited by this Agreement and (ii) that all requirements for amending this Agreement (including any consent of the applicable Certificateholders) have been complied with.

Notwithstanding any contrary provision of this Agreement, the Class I-A Insurer shall have the right to consent to any amendment which materially affects its rights and obligations under this Agreement or the rights of any Holder of the Class I-A Certificates. So long as there is not a continuing default by the Class I-A Insurer of its obligations under the Class I-A Policy, the Class I-A Insurer has, and may exercise without the consent of the Holders of the Class I-A Certificates, all of the rights of the Holders of the Class I-A Certificates under this Agreement.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Trustee shall furnish written notification of the substance of such amendment to each Certificateholder and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Section 12.02 Recordation of Agreement; Counterparts.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere. The Master Servicer shall effect such recordation at the Trust's expense upon the request in writing of a Certificateholder, but only if such direction is accompanied by an Opinion of Counsel (provided at the expense of the Certificateholder requesting recordation) to the effect that such recordation would materially and beneficially affect the interests of the Certificateholders or is required by law.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of

counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 12.03  Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAWS).

Section 12.04  Intention of Parties.

It is the express intent of the parties hereto that the conveyance of the Mortgage Notes, Mortgages, assignments of Mortgages, title insurance policies and any modifications, extensions and/or assumption agreements and private mortgage insurance policies relating to the Mortgage Loans by the Sellers to the Depositor, and by the Depositor to the Trustee be, and be construed as, an absolute sale thereof to the Depositor or the Trustee, as applicable. It is, further, not the intention of the parties that such conveyance be deemed a pledge thereof by each Seller to the Depositor, or by the Depositor to the Trustee. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of the Sellers or the Depositor, as applicable, or if for any other reason the Mortgage Loan Purchase Agreement or this Agreement is held or deemed to create a security interest in such assets, then (i) the Mortgage Loan Purchase Agreement and this Agreement shall each be deemed to be a security agreement within the meaning of the Uniform Commercial Code of the State of New York and (ii) the conveyance provided for in the Mortgage Loan Purchase Agreement from the Sellers to the Depositor, and the conveyance provided for in this Agreement from the Depositor to the Trustee, shall be deemed to be an assignment and a grant by the Sellers or the Depositor, as applicable, for the benefit of the Certificateholders of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired.

The Depositor for the benefit of the Certificateholders and the Class I-A Insurer shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the assets of the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement.

Section 12.05  Notices.

(a)     The Securities Administrator shall use its best efforts to promptly provide notice to each Rating Agency and the Class I-A Insurer with respect to each of the following of which a Responsible Officer of the Trustee has actual knowledge:

(i)     Any material change or amendment to this Agreement;

185

    (ii)     The occurrence of any Event of Default that has not been cured;

    (iii)    The resignation or termination of the Master Servicer, the Securities Administrator or the Trustee and the appointment of any successor;

    (iv)    With respect to each Loan Group, the repurchase or substitution of Mortgage Loans pursuant to Sections 2.02, 2.03, 3.05 and 11.01; and

    (v)    With respect to each Loan Group, the final payment to Certificateholders.

    (b)    All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when delivered at or mailed by registered mail, return receipt requested, postage prepaid, or by recognized overnight courier, or by facsimile transmission to a number provided by the appropriate party if receipt of such transmission is confirmed to (i) in the case of the Depositor, Bear Stearns Asset Backed Securities I LLC, 383 Madison Avenue, New York, New York 10179, Attention: Chief Counsel); (ii) in the case of EMC or the Company, EMC Mortgage Corporation, 909 Hidden Ridge Drive, Irving, Texas 75038, Attention: Ralene Ruyle or such other address as may be hereafter furnished to the other parties hereto by the Master Servicer in writing; (iii) in the case of the Trustee, at its Corporate Trust Office or such other address as the Trustee may hereafter furnish to the other parties hereto, (iv) in the case of the Master Servicer or the Securities Administrator, 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603, Attention: Global Securities and Trust Services Group-SACO 2005-10 or such other address as may be hereafter furnished to the other parties hereto by the Securities Administrator in writing, (v) in the case of Moody's, 99 Church Street, New York, New York 10007, Attention: Home Equity Monitoring, or such other address as may be hereafter furnished to the other parties hereto by Moody's in writing, (vi) in the case of Standard & Poor's, a division of The McGraw-Hill Companies, Inc., 55 Water Street, 41st Floor, New York, New York 10041 or such other address as may be hereafter furnished to the other parties hereto by Standard & Poor's in writing, (vii) in the case of Fitch, One State Street Plaza -- 32nd Floor, New York, New York 10004, Attention: RMBS, or such other address as may be hereafter furnished to the other parties hereto by Fitch in writing and (viii) in case of the Class I-A Insurer, Ambac Assurance Corporation, One State Street Plaza, New York, New York 10004. Any notice delivered to EMC (on its own behalf as a Seller and on behalf of Master Funding), the Master Servicer, the Securities Administrator, the Class I-A Insurer or the Trustee under this Agreement shall be effective only upon receipt. Any notice required or permitted to be mailed to a Certificateholder, unless otherwise provided herein, shall be given by first-class mail, postage prepaid, at the address of such Certificateholder as shown in the Certificate Register; any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

### Section 12.06 Severability of Provisions.

    If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms

[TPW NYLEGAL.409898 8] 17297-00382 02/23/2007 09.01 PM

of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

### Section 12.07 Assignment.

Notwithstanding anything to the contrary contained herein, except as provided pursuant to Section 7.02, this Agreement may not be assigned by the Master Servicer, EMC (on its own behalf as a Seller and on behalf of Master Funding) or the Depositor.

### Section 12.08 Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representative or heirs to claim an accounting or to take any action or commence any proceeding in any court for a petition or winding up of the Trust Fund, or otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Certificateholder shall have any right to vote (except as provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third party by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as hereinbefore provided, the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section 12.08, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

### Section 12.09 Inspection and Audit Rights.

The Master Servicer agrees that, on reasonable prior notice, it will permit any representative of the Depositor, the Class I-A Insurer or the Trustee during the Master Servicer's

187

normal business hours, to examine all the books of account, records, reports and other papers of the Master Servicer relating to the Mortgage Loans, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Depositor, the Class I-A Insurer and the Trustee and to discuss its affairs, finances and accounts relating to such Mortgage Loans with its officers, employees and independent public accountants (and by this provision the Master Servicer hereby authorizes such accountants to discuss with such representative such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested. Any out-of-pocket expense incident to the exercise by the Depositor or the Trustee of any right under this Section 12.09 shall be borne by the party requesting such inspection, subject to such party's right to reimbursement hereunder (in the case of the Trustee, pursuant to Section 10.05 hereof.

Section 12.10  Certificates Nonassessable and Fully Paid.

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Securities Administrator pursuant to this Agreement, are and shall be deemed fully paid.

Section 12.11  Class I-A Insurer Rights.

All notices, statements, reports, certificates, lists or opinions required by this Agreement to be sent to the parties hereto, the Rating Agencies or the Certificateholders shall also be sent at such time to the Class I-A Insurer at the notice addresses set forth in Section 12.05.

The Class I-A Insurer shall be an express third party beneficiary of this Agreement for the purpose of enforcing the provisions hereof to the extent of the Class I-A Insurer's or any Certificateholder's rights explicitly specified herein as if a party hereto.

The Trustee (subject to its rights under this Agreement), the Depositor, the Securities Administrator and the Master Servicer shall cooperate in all respects with any reasonable request by the Class I-A Insurer for action to preserve or enforce the Class I-A Insurer's rights or interests hereunder without limiting the rights or affecting the interests of the Certificateholders as otherwise set forth herein.

The Class I-A Insurer will have the right to exercise all rights, including voting rights, which the Holders of the Class I-A Certificates are entitled to exercise under this Agreement, under the Mortgage Loan Purchase Agreement or any other instrument, document or agreement relating to the foregoing. In addition, the Class I-A Insurer shall have the right to participate in, any action, proceeding or investigation for any remedy available to the Trustee and to the Securities Administrator with respect to any matter that could adversely affect the Class I-A Certificates.

The Trustee and the Securities Administrator hereby agrees to provide to the Class I-A Insurer prompt written notice of any action, proceeding or investigation of which it has actual knowledge that names the Trust or the Trustee as a party and that could adversely affect the Class I-A Certificates.

188

Notwithstanding anything contained herein or in any of the other Transaction Documents to the contrary, the Trustee and the Securities Administrator shall not, without the Class I-A Insurer's prior written consent or unless directed in writing by the Class I-A Insurer, undertake or join any litigation or agree to any settlement of any action, proceeding or investigation affecting the Trust or the Trust Fund to the extent any such settlement, action, proceeding or investigation could reasonably be expected to have a material adverse affect on the rights or obligations of the Class I-A Insurer hereunder or under the Class I-A Policy or the Transaction Documents.

Each Holder of a Certificate, by acceptance of its Certificate, the Securities Administrator and the Trustee agree that Class I-A Insurer shall have such rights as set forth in this Section, which are in addition to any rights of the Class I-A Insurer pursuant to the other provisions of the Transaction Documents, that the rights set forth in this Section may be exercised by the Class I-A Insurer, in its sole discretion, without the need for the consent or approval of any Certificateholder or the Trustee, notwithstanding any other provision contained herein or in any of the other Transaction Documents, and that nothing contained in this Section shall be deemed to be an obligation of the Class I-A Insurer to exercise any of the rights provided for herein.

\* \* \*

189

IN WITNESS WHEREOF, the Depositor, the Seller, the Company, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written..

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name:  Joseph T. Jurkowski, Jr.
Title:    Vice President


EMC MORTGAGE CORPORATION,
as Seller and Company


By: _____
Name:
Title:


LASALLE BANK NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator


By: _____
Name:
Title:


CITIBANK, N.A.,
as Trustee


By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Company, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written..

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name:   Joseph T. Jurkowski, Jr.
Title:    Vice President

EMC MORTGAGE CORPORATION,
as Seller and Company

By:   _Sue Stepanek_
Name:  Sue Stepanek
Title:  Executive Vice President

LASALLE BANK NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:

CITIBANK, N.A.,
as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Company, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written..

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name:    Joseph T. Jurkowski, Jr.
Title:    Vice President

EMC MORTGAGE CORPORATION,
as Seller and Company

By: _____
Name:
Title:

LASALLE BANK NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator

By:    _Sandra B. Brooks_
Name:    SANDRA L. BROOKS
Title:    FIRST VICE PRESIDENT

CITIBANK, N.A.,
as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Depositor, the Seller, the Company, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written..

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name:    Joseph T. Jurkowski, Jr.
Title:    Vice President


EMC MORTGAGE CORPORATION,
as Seller and Company

By: _____
Name:
Title:


LASALLE BANK NATIONAL
ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:


CITIBANK, N.A.,
as Trustee

By: _____
Name:
Title:
                    JOHN HANNON, AVP
                    Citibank Agency & Trust
                  388 Greenwich Street/14th Floor
                      New York, NY 10013
                        212-816-5693

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK  )

      On this 30th day of December, 2005, before me, a notary public in and for said State, appeared Joseph T. Jurkowski, Jr., personally known to me on the basis of satisfactory evidence to be an authorized representative of Bear Stearns Asset Backed Securities I LLC, one of the companies that executed the within instrument, and also known to me to be the person who executed it on behalf of such limited liability company and acknowledged to me that such limited liability company executed the within instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]

MERVIN E. HORST
Notary Public, State of New York
No. 31-5032585
Qualified In New York County
Commission expires August 29, 20 06

STATE OF TEXAS                    )
                                 ) ss.:
COUNTY OF DALLAS                 )


      On this 30th day of December, 2005, before me, a notary public in and for said State, appeared , personally known to me on the basis of satisfactory evidence to be an authorized representative of EMC Mortgage Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of such corporation and acknowledged to me that such corporation executed the within instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                             _____
                             Notary Public


[Notarial Seal]

MICKIE S. GILMORE
Notary Public, State of Texas
My Commission Expires 06-09-07

STATE OF ILLINIOS          )
                           ) ss:
COUNTY OF                  )

        On the 30th day of December 2005 before me, a notary public in and for said State, personally appeared Sandra L. Brooks, known to me to be a(n) First Vice President of LaSalle Bank National Association, one of the parties that executed the within instrument, and also known to me to be the person who executed it on behalf of said party, and acknowledged to me that such party executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

"OFFICIAL SEAL"
A C HELLYER
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 09/21/2009

[Notarial Seal]

_____
Notary Public

STATE OF NEW YORK     )
                               ) ss.:
COUNTY OF NEW YORK   )

On this 30th day of December, 2005, before me, a notary public in and for said State, appeared _____, personally known to me on the basis of satisfactory evidence to be an authorized representative of Citibank, N.A. that executed the within instrument, and also known to me to be the person who executed it on behalf of such national banking association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

NANETTE MURPHY
Notary Public, State of New York
No. 01MU6086415
Qualified in Kings County
Commission Expires _1/21/07_