UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

AMBAC ASSURANCE CORPORATION,

                              *Plaintiff*,

                              v.

EMC MORTGAGE CORPORATION,

                              *Defendant*.

Index No. 08 Civ. 9464 (RMB) (THK)

**DECLARATION OF ERIK HAAS IN SUPPORT OF AMBAC'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIK HAAS declares as follows:

    1.    I am a partner in the law firm of Patterson Belknap Webb & Tyler LLP, counsel for Plaintiff Ambac Assurance Corp. ("Ambac"). I am admitted to practice before the courts of this District and remain in good standing.

    2.    I submit this Declaration in support of Ambac's Motion for Leave to File Amended Complaint. Ambac's proposed Amended Complaint is attached hereto as **Exhibit 1**.

    3.    I state the following information on the basis of personal knowledge except, where stated, upon information and belief.

## CASE STATUS AND DISCOVERY

**Case Schedule History**

    4.    Ambac filed its Complaint on November 5, 2008.

    5.    On December 19, 2008, the Court entered a Case Management Plan providing for the joinder of additional parties and amended pleadings by January 30, 2009 and completion of fact and expert discovery by June 1, 2009. *See* Docket #6. The parties had proposed that fact discovery end in December 2009 and that the deadline to amend pleadings fall

a month beforehand, in November 2009. Instead, by choosing the January 30, 2009 date, Judge Berman provided that the deadline for adding parties and amending pleadings would arrive before or virtually at the start of discovery.

6. Since the initial schedule was set, the Court has extended the discovery deadlines four times, primarily to account for EMC's failure to produce critical documents to Ambac. For the same reason, the Court has repeatedly set interim deadlines for EMC to produce certain materials or designate witnesses for depositions, including those necessary for Ambac to begin deposition discovery. *See* Order, August 5, 2009, Docket #37 (setting interim deadlines for certain EMC documents); Order, November 23, 2009, Docket #53 (setting interim deadlines for EMC to identify and schedule 30(b)(6) deposition witnesses).

7. Most recently, on March 9, 2010, the Court set the deadlines to August 6, 2010 for fact discovery and December 3, 2010 for expert discovery. *See* Order, March 9, 2010, Docket #55.

8. During a conference before Magistrate Judge Katz on August 5, 2009, EMC's counsel told the Court that EMC was unable to meet the then-applicable discovery deadlines because the parties were not "merely here on a breach of contract case," but rather a case alleging damages "essentially on the basis of fraud." Counsel explained that his client needed more time to conduct searches for documents related to fraud, which (he claimed) were broader than those searches EMC would have needed to conduct for breach-of-contract claims alone. A true and correct copy of the relevant portions of the August 5, 2009 conference transcript is attached hereto as **Exhibit 2** (see page 12).

**Document Discovery**

9. Ambac served its First Request for Production of Documents on EMC on January 5, 2009. A true and correct copy of that Request is attached hereto as **Exhibit 3**. In this

request, Ambac sought documents relating to its pleaded breach-of-contract claims, but also documents that could bear on EMC's and Bear Stearns' scienter and other aspects of common-law and securities fraud. *See, e.g.,* Request No. 17 (seeking Defendants' instructions concerning due diligence); Request No. 19 (seeking documents concerning the occurrence of early payment default, breaches of representations and warranties, and fraud in relation to Mortgage Loans); and Request Nos. 42, 43, and 46 (seeking documents concerning Defendants' efforts to identify fraud concerning any Mortgage Loan and Defendants' knowledge as to the existence of any fraud concerning any Mortgage Loan). The First Request for Production of Documents also sought documents concerning JP Morgan's polices concerning, among other things, quality control, fraud control, and detection or risk assessment concerning the Mortgage Loans. *See* Request Nos. 61 and 62. Ambac has followed up this First Request for Production of Documents with three additional sets of requests.

10. In April 2009, after several months had passed with only *de minimis* document production from EMC, Ambac moved to compel the documents most critically needed for its fact investigation, including EMC's loan servicing records and e-mails. Magistrate Judge Dolinger granted Ambac's motion, and noted at the hearing that the servicing records were "crucial." A true and correct copy of the relevant portions of the May 5, 2009 conference transcript is attached hereto as **Exhibit 4** (see p. 12).

11. Later, during an August 5, 2009 conference, Ambac also successfully urged Magistrate Judge Katz (who had recently been assigned to the case) to place EMC on a strict schedule of interim production deadlines, which included expedited production of certain databases and expedited e-mail production for custodians that Ambac deemed priority in order to

enable Ambac to begin preparing for the most important depositions. *See* Order, August 5, 2009, Docket #37.

12. EMC's first major production of e-mails – including the first e-mails from the Individual Defendants named in Ambac's proposed Amended Complaint – came on September 22, 2009, in an enormous block of 730,000 pages. EMC's production of the priority custodians' e-mail was not completed until at least December 2009, and others may have been included in EMC's continuing e-mail productions through May 2010.

13. EMC's productions have included internal communications, memoranda, and reports written and received by personnel not only at EMC, but also Bear, Stearns & Co. and J.P. Morgan.

14. When Ambac began receiving EMC's first substantial productions, it quickly assembled a large team of attorneys – at significant cost – to review and categorize the documents and identify those that could be most useful for future depositions or to develop additional claims. Beginning in early 2009 Ambac has contracted a large number of temporary attorneys (reaching a high of 39) to perform these tasks. In addition, over a dozen other attorneys and many Ambac employees have been involved in organizing and analyzing the most important documents identified by the reviewers to gain a better understanding of Bear Stearns' fraudulent activities and the individuals involved in those activities.

15. In addition to the significant task of reviewing and analyzing EMC's expansive e-mail and other document productions, in the past several months, Ambac has also undertaken the task of decoding the fraud-prevention, quality-control, and diligence data stored in EMC's recently produced databases. This has required Ambac to match that data with the

4

corresponding loans and underwriting guidelines to determine the nature and reasons for EMC's breaches, which has required an enormous amount of detailed work.

16. Ambac has continually monitored EMC's productions to identify missing documents, including by alerting EMC to particular documents that appeared to exist and appeared to be relevant to the issue of fraud, but which EMC had not yet produced. For example, in November 2009, Ambac provided EMC with a list of specific documents missing from EMC's productions, including "problem loan worksheets" and "suspicious activity reports," which indicate EMC's knowledge of fraud, and "Important Announcements" regarding EMC's changes in underwriting procedures. A true and correct copy of Ambac's letter to EMC on these issues is attached hereto as **Exhibit 5**.

17. All told, EMC has produced almost two million records, consisting of over 22 million pages, including a half-million pages after the April 30, 2010 document production deadline. Getting this information has required Ambac to file six motions to compel since April 2009.

18. Discovery is not complete. Ambac is still waiting for certain financial and executive compensation information as well as a complete production from EMC's COGENT database, which the Court initially ordered EMC to produce in 2009, and again just last week. *See* Order, July 22, 2010, Docket #77. (The COGENT database records quality-control reviews conducted by EMC's specialized fraud and securitization breach employees, who review certain mortgage loans selected based on "red flags" or delinquency triggers – information highly relevant to both breach of contract and fraud.) In addition, Ambac has identified a number of other deficiencies in EMC's productions and, having informed EMC of

5

these deficiencies, awaits a full response from EMC regarding the supplemental materials it intends to provide.

19.     Ambac has agreed to produce documents from its own files relating to its knowledge and understanding of the veracity of EMC's representations, which is discovery that EMC would undoubtedly claim is relevant to its defense of fraud-based claims.

**Depositions**

20.     On September 23, 2009, once Ambac had sufficient documents to identify the key individuals and subject matters for depositions, Ambac issued its first notice of deposition of EMC. By urging EMC to begin identifying its company witnesses (and, eventually, moving to compel), Ambac was able to start EMC's 30(b)(6) depositions in December 2009 and complete them in less than two months.

21.     In the meantime, as Ambac's understanding of the facts grew, Ambac also began noticing and taking fact depositions of former EMC or Bear, Stearns & Co. employees. Ambac deposed these witnesses as fast as EMC would schedule them (beginning April 1, 2010). However, in some cases, that meant a significant delay in Ambac's ability to question the most important witnesses. For example, proposed defendant Baron Silverstein (Bear, Stearns & Co. Vice President, Due Diligence) was a central figure in the faulty due diligence being conducted by third parties on behalf of Bear Stearns and EMC as well as the securitization process itself, as can be seen by the number of times his deposition is cited in the proposed Amended Complaint. But EMC would not schedule Mr. Silverstein's deposition until June 4, 2010, *four months* after Ambac's subpoena. It was only after Mr. Silverstein was deposed that Ambac learned the trading desk – manned by proposed Individual Defendants Verschleiser and Nierenberg – had the ultimate say in the due diligence that would be performed on loans. *See* Exhibit 33 hereto, listed at ¶ 55 below (Silverstein Tr. at 44-45).

22. To date, the parties have taken a total of 15 party depositions (two of Ambac witnesses and 13 of EMC witnesses).

23. Ambac has examined EMC's witnesses on topics relating to fraud and tortious interference without objection from EMC. For example, attached hereto as **Exhibit 6** is a true and correct copy of portions of the January 22, 2010 deposition transcript of Joanna Megha (a J.P. Morgan Vice President with responsibility for repurchase claims), wherein Ambac's counsel inquired of the intrusive and fraudulent behavior by Alison Malkin, who reversed findings of securitization breaches by EMC within a month of J.P. Morgan's takeover of the Bear, Stearns & Co. repurchase process (see pp. 190-192). As another example, Ambac's counsel inquired of Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President) into the policy not to extend the Early Payment Default period for loans in Bear Stearns' inventory because loans having experienced an Early Payment Default were riskier – and Bear Stearns desired to hide this information from potential parties to securitizations. *See* Exhibit 29 hereto, listed at ¶ 51 below (Golden Tr. at 152-53).

**Third-Party Discovery**

24. While Ambac was waiting for substantial productions from EMC to start, Ambac initiated substantial discovery of relevant third parties. Third-party discovery began in January 2009, when Ambac received EMC's initial disclosures. Within the next few weeks, Ambac issued third-party subpoenas to the Transactions' due diligence and quality-control providers, legal counsel involved in the Transactions, ratings agencies, and originators and servicers of the Mortgage Loans.

25. Beginning in July 2009, Ambac also sent over 2,500 subpoenas to mortgage borrowers and their employers seeking documents relating to the Mortgage Loans, and then conducted 30 deposition examinations of borrowers and related parties. This discovery

7

greatly helped reveal the glaring problems with the origination, underwriting, due diligence, and quality control of the Mortgage Loans, as well as Bear Stearns' knowledge thereof. For instance, hundreds of borrowers and employers produced tax returns and other documents showing that the borrower did not earn the income indicated on the loan application, was never employed by the company listed, or never occupied the property represented as his or her primary residence. A number of borrowers also produced documents that they had sent to EMC when seeking loan modifications that revealed the borrowers' incomes at the time of origination were less than those stated on their loan applications. Each of the borrower-related depositions confirmed these findings.

26. Ambac has also reviewed documents produced in response to several subpoenas issued to Bear Stearns' due-diligence and quality-control providers and has taken three depositions of witnesses representing Clayton Holdings, Inc., and Adfitech, Inc., two of these providers. This discovery revealed that Bear Stearns' due-diligence and quality-control providers found widespread breaches and defects in the loans that Bear Stearns securitized, but which Bear Stearns never revealed. Further, these depositions revealed that EMC specifically requested that its quality-control provider review loans under a limited protocol that did not conform to industry standards, again, contrary to Bear Stearns' representations and warranties.

27. To date, Ambac has received a total of approximately 527,000 records from 909 third parties, consisting of 4.6 million pages.

**EVIDENCE OBTAINED THROUGH DISCOVERY SUPPORTING AMBAC'S AMENDMENT**

28. As described in more detail in the accompanying memorandum of law supporting Ambac's Motion for Leave to File Amended Complaint and the proposed Amended Complaint, Ambac has already obtained a significant amount of evidence supporting its

8

proposed new claims of fraudulent inducement, violation of section 10(b) of the Securities Act, liability of the Individual Defendants under section 20 of the Securities Exchange Act, and tortious interference. The documents listed below and attached to this declaration are just some of the key pieces of evidence that Ambac will use to pursue these claims if leave is granted.

**Examples of Evidence of Bear Stearns' Fraudulent Scheme**

29. Attached hereto as **Exhibit 7** is a true and correct copy of an e-mail from John Mongelluzzo, Bear Stearns' Vice President of Due Diligence, conveying Proposed Defendant Mary Haggerty's instructions to reduce due diligence, dated February 11, 2005, (EMC-AMB 001718713-14).

30. Attached hereto as **Exhibit 8** is a true and correct copy of an e-mail from Robert Durden (Bear Stearns deal manager) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated March 24, 2006, EMC-AMB 006802393-95 ("[O]n the flow side we had no idea until yesterday that there was post close dd [due diligence] going on. . . . I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared. I think the ball was dropped big time on the flow processes involved in the post close dd, from start to finish").

31. Attached hereto as **Exhibit 9** is a true and correct copy of a document titled Bear Stearns Whole Loan Repurchase Project: Repurchases, Current Processes, dated June 21, 2006 (EMC-AMB 004919739) ("Loans which become delinquent more than 90+ days in their first year. Although a fraud flag can be raised, many such loans contain some form of misrepresentation and should not have been made") (see page 30).

32. Attached hereto as **Exhibit 10** is a true and correct copy of an internal report produced by Clayton Holdings, Inc. (CLAY-AMBACE-0001770-80) showing a 65%

override rate for EMC and 56% rate for Bear Stearns in the third quarter of 2006 (see CLAY-AMBACE-0001777-78).

33. Attached hereto as **Exhibit 11** is a true and correct copy of an e-mail from Proposed Defendant Jeffrey Verschleiser (Bear Stearns Head of the ABS and Whole Loan Desk), to, among others, Proposed Defendant Michael Nierenberg (Bear Stearns Head of the ARM and CDO Desk), dated March 23, 2006 (EMC-AMB 001542438-39).

34. Attached hereto as **Exhibit 12** is a true and correct copy of an e-mail from Proposed Defendant Jeffrey Verschleiser to (among others) Proposed Defendant Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director), dated March 15, 2007 (EMC-AMB 005446200).

35. Attached as **Exhibit 13** is a true and correct copy of EMC's claim correspondence to American Home Mortgage, dated November 20, 2006 (EMC-AMB 004922387) (claim made with respect to four loans previously sold into the SACO 2006-2 Transaction).

36. Attached as **Exhibit 14** is a true and correct copy of EMC's claim correspondence to SunTrust Mortgage, dated April 11, 2008 (STM-00004433-34) (claim made with respect to one loan previously sold into the BSSLT Transaction).

37. Attached hereto as **Exhibit 15** is a true and correct copy of a Bear Stearns Internal Audit Department Escalation Memorandum titled "Status of Unresolved Audit Report Issues for EMC Mortgage Corporation ("EMC") – Review of Representations and Warrants Department," February 26, 2007 (EMC-AMB 010858610-13).

38. Attached hereto as **Exhibit 16** is a true and correct copy of a document titled "Bear Stearns Internal Audit Report – EMC Mortgage Corporation ('EMC') – Review of

Representations and Warrants Department," February 28, 2006 (EMC-AMB 001496305-EMC-AMB 001496311).

39. Attached hereto as **Exhibit 17** is a true and correct copy of an e-mail dated July 27, 2007 from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage President), dated July 27, 2007 (EMC-AMB 006736165-72) (see EMC-AMB 006736165; offering "amnesty program" to suspended or terminated sellers by "forgiving claims in exchange for loan production" at reduced pricing).

40. Attached hereto as **Exhibit 18** is a true and correct copy of an e-mail from Norman Scott (Bear Stearns Vice President and Product Manager) to CPMC, dated April 4, 2005 ("Bear Stearns have [sic] substantially expanded our Alt-A and Sub Prime product offering and are offering premium pricing for product that is sent to the warehouse facility and purchased by EMC") (EMC-AMB 001254436-7).

41. Attached hereto as **Exhibit 19** is a true and correct copy of Bear Stearns/EMC UPB Break Repurchase Project Audit Report, August 31, 2006 (EMC-AMB 006803201-3277) (see page 21).

42. Attached hereto as **Exhibit 20** is a true and correct copy of an article appearing in The Atlantic, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, May 14, 2010 (reporting that two EMC analysts stated that "they were encouraged to just make up data like FICO scores" (p. 1) and "instead of spending time to go back to the lender and demand clarification, like if verification of income actually backed these loans, the executives at Bear would just make the loan type fit" (p. 2)).

43. Attached hereto as **Exhibit 21** is a true and correct copy of an e-mail from Matthew Van Leeuwen (analyst at Bear, Stearns & Co. providing Trading Support for EMC) to Dylan Hoyt (Bear, Stearns & Co. Due Diligence Manager), dated May 16, 2005 (EMC-AMB 001718661-663), confirming that the EMC analyst was instructed to revised the loan type to a less risky classification.

44. Attached hereto as **Exhibit 22** is a true and correct copy of an e-mail from Charles Mehl to Keith Lind, April 5, 2007 (EMC-AMB 002075468).

45. Attached hereto as **Exhibit 23** is a true and correct copy of an e-mail from Nick Smith (Bear Stearns Vice President and Deal Manager) to Keith Lind (Managing Director Bear Stearns), dated August 12, 2006 (EMC-AMB004377399-400).

46. Attached hereto as **Exhibit 24** is a true and correct copy of an e-mail from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Ashley Poole (EMC Mortgage Corp. Analyst, Representations and Warranties Department) and Whitney Long (Vice President of Risk Management and Claims), dated May 16, 2008 (EMC-AMB 007165488-90) (see EMC-AMB 007165489).

47. Attached hereto as **Exhibit 25** is a true and correct copy of an e-mail to Alison Malkin, the J.P. Morgan Executive Director responsible for the "re-review" of Bear Stearns prior breach designations, dated May 05, 2008 (EMC-AMB 007173918-19).

48. Attached hereto as **Exhibit 26** is a true and correct copy of a letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Rose Medina (GreenPoint Vice President, Rep & Warranty), dated June 26, 2008 (EMC- SYN 000003048).

49.   Attached hereto as **Exhibit 27** is a true and correct copy of a letter from Amit Pande (SEC Accounting Branch Chief) to Michael J. Cavanaugh (JP Morgan Chase & Co. Chief Financial Officer) dated January 29, 2010.

50.   Attached hereto as **Exhibit 28** is a true and correct copy of portions of the deposition transcript of Cheryl Glory, taken on April 19, 2010.

51.   Attached hereto as **Exhibit 29** is a true and correct copy of portions of the deposition transcript of Stephen Golden, taken on April 26, 2010.

52.   Attached hereto as **Exhibit 30** is a true and correct copy of portions of the deposition transcript of Mary Haggerty, taken on January 29, 2010 and February 3, 2010.

53.   Attached hereto as **Exhibit 31** is a true and correct copy of portions of the deposition transcript of John Mongelluzzo, taken on April 21, 2010.

54.   Attached hereto as **Exhibit 32** is a true and correct copy of portions of the deposition transcript of Fernando Serrano, taken on May 20, 2010.

55.   Attached hereto as **Exhibit 33** is a true and correct copy of portions of the deposition transcript of Baron Silverstein, taken on June 4, 2010.

**Ambac's Discovery of the Key Evidence Concerning Fraud**

56.   As described above, it took Ambac sixteen months to get meaningful discovery from EMC and then find and analyze the essential facts necessary to support its new claims. Below are just a few examples of evidence that Ambac has garnered through discovery that support its Amended Complaint, with a description of when and how the evidence was developed.

57.   EMC did not produce or identify any of its internal databases until ordered to do so by Magistrate Judge Katz on August 5, 2009. EMC did not meet the court-ordered deadline for production; instead, it produced the databases in pieces over the next several

13

months, and still has not produced certain databases. However, one database that Ambac did receive (namely, the WITS databases) show, among other things, that Bear Stearns (i) filed a "Problem Loan Worksheet" (which its internal policy documents require to be "created by the QC auditors as loans are reviewed, for those loans with breaches of reps and warrants, fraud, compliance issues, or misrepresentation") with respect to roughly 2950 loans, (ii) filed formal claims against sellers due to EPD violations or other substantive defects on at least 2750 loans, and (iii) resolved those claims on approximately 1750 loans. This information was crucial to Ambac in tracking and understanding Bear Stearns' knowledge regarding loan defects and the misrepresentation of its quality-control and repurchase policies. Yet because of EMC's late production and technical issues that EMC could not resolve for several weeks, Ambac was not able to access and read the entire WITS database until Spring 2010.

58. In a letter dated June 12, 2010, EMC's counsel reviews, in detail, fourteen categories of highly relevant documents concerning Bear Stearns' due-diligence and quality-control processes (including fraud-prevention) and admits that – despite being requested by Ambac in January 2009 – hardly any were produced earlier than Fall 2009, and many were not produced until late Winter or early Spring 2010. Attached hereto as **Exhibit 34** is a true and correct copy of the letter from Marc D. McPeak (of Greenberg Traurig) to Niraj Parekh (of Patterson Belknap), dated June 12, 2010.

59. EMC produced the "SACK OF SHIT" e-mail (**Exhibit 23** hereto; see paragraph 45 above) on October 5, 2009. However, Ambac was unable to depose the author of this document (Nicholas Smith) to explore his actual knowledge of or recklessness indifference toward the poor quality of the loans underlying the Transaction securities for several months due to EMC's delay in scheduling. Fact depositions (including Mr. Smith's) were delayed until

30(b)(6) depositions could be finished, and while Ambac noticed Mr. Smith's deposition for March 18, 2010, EMC would not schedule it until June 2, 2010.

60.  The e-mails of Alison Malkin (J.P. Morgan's Executive Director of Securitized Products, responsible for the "re-review" of Bear Stearns' prior breach designations) were central to Ambac's knowledge regarding Bear, Stearns & Co.'s tortious interference with EMC's contractual responsibilities toward Ambac to honor its repurchase requests. They demonstrate that J.P. Morgan took action upon acquiring control of Bear Stearns' repurchase review process to reverse Bear Stearns' prior determinations of securitization breach while continuing to pursue EMC's own breach claims against the originators with respect to the same loans. Those e-mails were produced between December 14, 2009 and February 23, 2010. Ambac noticed Ms. Malkin's deposition and pushed EMC to schedule. After EMC did schedule a date, June 16, 2010, and Ambac worked to prepare for that deposition, EMC then cancelled it.

61.  Ambac discovered evidence of the personal involvement of each of the proposed Individual Defendants in the misrepresentations and interference by Bear Stearns primarily by reviewing one-by-one, more than half a million e-mails mixed together within the production of 22 million pages. As mentioned above at paragraph 12, EMC's e-mail production, including production of the "priority" witnesses' e-mails, was delayed for months.

### REGULATORY ACTIONS BY THE STATE OF WISCONSIN

62.  Attached hereto as **Exhibit 35** is a true and correct copy of the May 27, 2010 Findings of Fact and Conclusions of Law entered on May 27, 2010 in *In the matter of the Rehabilitation of Segregated Account of Ambac Assurance Corp.*, Case No. 10 CV 1576 (Circuit Ct., Dane Cty., Wisc.) ("Segregated Account Matter").

63. Attached hereto as **Exhibit 36** is a true and correct copy of the Plan of Operation for the Segregated Account of Ambac Assurance Corporation, as submitted by OCI to the court in the Segregated Account Matter. The court approved the Plan of Operation on March 24, 2010.

64. Attached hereto as **Exhibit 37** is a true and correct copy of the Order for Temporary Injunctive Relief entered on March 24, 2010 in the Segregated Account Matter.

65. Ambac notified EMC that it would be required to amend the Complaint to add the Segregated Account as a plaintiff on May 14, 2010.

Executed at New York, New York this 28th day of July, 2010.

_____
Erik Haas