# EXHIBIT 33

**Silverstein, Baron - CONFIDENTIAL**
6/4/2010

6/4/2010

### Page 74

SILVERSTEIN - CONFIDENTIAL

something along those lines?

    MR. WHITNEY: Objection, form.

A. No, definitely not. Definitely not, but I don't recall the reason why I would otherwise receive it. I know there were transactions that I would have received it.

Q. Do you know if Ms. Haggerty received it?

A. I do not know.

Q. Was there a group at Bear Stearns or any of its affiliate that had the responsibility for assessing whether or not Bear Stearns was taking excessive risk with respect to any of its securitizations?

    MR. WHITNEY: Objection, form.

A. What do you mean by group?

Q. Just trying to get a sense of who was responsible for risk management with respect to the Bear Stearns securitizations.

A. There was a risk group.

Q. Who was the head of it?

A. I know that there were multiple heads, but I believe that was Mike Alex, at least towards the end, and the person that

### Page 75

SILVERSTEIN - CONFIDENTIAL

evaluated our risk was Wayne Buchan.

Q. What processes and protocols, to the best of your knowledge, did he utilize in order to assess your risk?

    MR. WHITNEY: Objection to form.

A. I think you would need to talk to Wayne Buchan.

Q. Did he provide you any reports with respect to his conclusions or findings?

A. He may have on particular transactions, but I don't recall.

Q. Did he provide you with any analysis of the potential loss to Bear Stearns as a holder of any residual pieces in the securitizations?

A. I do not recall.

Q. Have you ever seen that sort of analysis?

A. Which analysis are you referring to?

Q. An analysis of the potential loss to Bear Stearns from holding any residual interest in any of its securitizations.

A. I do not recall.

Q. Did you have any interaction with

### Page 76

SILVERSTEIN - CONFIDENTIAL

sellers of the mortgage loans that were securitized through your group in order to negotiate or persuade the sellers to provide loans to EMC or Bear Stearns for the securitizations?

    MR. WHITNEY: Objection, form.

A. I had frequent dialogue with sellers, or otherwise known as mortgage loan originators, but predominantly, I would talk to the larger bulk sellers.

Q. What was the context in which you would be talking with the larger bulk sellers?

A. I would talk to the larger bulk sellers in order to negotiate transactions based upon mutually agreed upon terms.

Q. So you actually were involved in the negotiation of the acquisition of loans from these sellers; is that correct?

A. Certain sellers.

Q. The large bulk sellers in particular?

A. Yes, but not all large bulk sellers, and only certain large bulk sellers.

Q. Which large bulk sellers did you

### Page 77

SILVERSTEIN - CONFIDENTIAL

have a dialogue with?

A. Wells Fargo, GMAC, Countrywide, Greenpoint, to name a few.

Q. Just Mortgage?

A. Excuse me?

Q. Just Mortgage?

A. No.

Q. American Home?

A. Yes.

Q. Impac?

A. Yes.

Q. SouthStar?

A. SouthStar was covered by a lot of different people and I participated in some of the discussions.

Q. Did these large bulk sellers also provide loans to Bear Stearns or EMC through a flow channel?

A. Every transaction would be different, and it's possible, depending upon the asset class or the transaction or the situation.

Q. What was your purpose in having a dialogue with these sellers? Were you

**Page 78**

SILVERSTEIN - CONFIDENTIAL

2  attempting to persuade these sellers to sell
3  you mortgage loans in competition -- was it
4  your understanding that you were competing
5  against other purchasers of mortgage loans for
6  the mortgage loans of the sellers that you
7  identified?
8      A.   I was aware it was a competitive
9  marketplace to purchase mortgage loans.
10     Q.   What was it that Bear Stearns did in
11 order to compete for the loans of these sellers
12 you identified?
13          MR. WHITNEY: Objection to form.
14     A.   In what context?
15     Q.   In the context of acquiring loans
16 for the purposes of your securitizations,
17 either through the bulk or flow channel.
18     A.   Sellers all had differing
19 requirements, and, you know, the bulk channel,
20 in respect to when a seller puts out a
21 portfolio of loans for a bid, we would
22 typically -- they would either stipulate the
23 terms of the transaction up front, for which we
24 would have to provide our bid in accordance
25 with or provide any amendments thereto, or we

**Page 79**

SILVERSTEIN - CONFIDENTIAL

2  would provide our stipulations up front if they
3  did not provide it as to how we would be
4  comfortable to purchase a transaction. And
5  that's typically how these bulk transactions
6  got done.
7           At times, depending upon the
8  institution or the need, we were able to
9  negotiate flow purchases which would be much
10 more of a negotiated transaction as opposed to
11 a much broader bid scenario, where we would
12 compete against multiple institutions looking
13 to buy the pool.
14     Q.   Did Bear Stearns ever agree to
15 reduce the level of due diligence it conducted
16 on any seller's sales as an accommodation to
17 compete for the sales?
18          MR. WHITNEY: Objection to form.
19     A.   Bear Stearns evaluated when bidders
20 were bidding a portfolio -- could you repeat
21 the question, please?
22     Q.   Sure. Did Bear Stearns ever agree
23 to reduce the level of due diligence it
24 conducted on the seller's loans as an
25 accommodation to compete for the sales from

**Page 80**

SILVERSTEIN - CONFIDENTIAL

2  that seller?
3           MR. WHITNEY: Objection, form.
4      A.   Sellers typically would stipulate
5  the terms of a portfolio which would include
6  the due diligence strategy. Bear Stearns would
7  evaluate the due diligence that was being
8  stipulated by the seller in order to determine
9  whether or not we were comfortable to purchase
10 a pool of mortgage loans based upon that
11 strategy.
12     Q.   With that said, was it your
13 understanding that Bear Stearns ever reduced
14 the level of due diligence it otherwise would
15 have provided in order to compete for the sales
16 of a particular originator?
17          MR. WHITNEY: Objection, form.
18     A.   Bear Stearns would evaluate our due
19 diligence strategy, depending upon who the
20 seller was, how the loans were originated and
21 other parameters of the -- our due diligence
22 plan, and we would make that determination as
23 to whether or not we were comfortable with the
24 due diligence approach as presented to us by
25 the seller.

**Page 81**

SILVERSTEIN - CONFIDENTIAL

2      Q.   Bear Stearns had certain standards,
3  typical diligence levels that it applied,
4  right?
5           MR. WHITNEY: Objection, form.
6      A.   Bear Stearns' due diligence strategy
7  continually changed based upon the marketplace,
8  transactions and sellers. So we did not
9  accommodate sellers as part of our due
10 diligence strategy. We evaluated our due
11 diligence strategy to get comfortable with our
12 risk.
13     Q.   So you evaluated on a
14 seller-by-seller basis, and you adjusted the
15 due diligence that you were willing to accept
16 for any particular seller based upon what you
17 viewed as the appropriate considerations for
18 that seller or for a particular trade; is that
19 your testimony?
20     A.   Can you repeat the question?
21     Q.   I don't know.
22          So is it your testimony that Bear
23 Stearns did not have any set protocols with
24 respect to the level of due diligence applied,
25 but rather, negotiated the level of due

Page 174

```
 1      SILVERSTEIN - CONFIDENTIAL
 2   loans that went into EPD?
 3          MR. WHITNEY: Objection, form.
 4      A.  I don't recall.
 5      Q.  That's always the safe answer.
 6          MR. WHITNEY: Let me just object to
 7   the comment on the answer.
 8          (Silverstein Exhibit 13, E-mail
 9   chain, Bates stamped EMC-AMB 007011832,
10   marked for identification.)
11          MR. WHITNEY: Can I see that one for
12   a second?
13          THE WITNESS: (Handing.)
14          MR. WHITNEY: On my copy, you can't
15   read the Bates number. I just want to
16   make sure on the actual exhibit you can.
17      Q.  Before you turn to the exhibit
18   that's before you, Mr. Silverstein, do you
19   recall receiving, in the fall, late fall of
20   2006 and early 2007, defective loan reports
21   prepared by Mr. Fernando Serrano?
22      A.  No.
23      Q.  Do you recall who Mr. Fernando
24   Serrano was?
25      A.  I recall the name. I don't recall
```

Page 175

```
 1      SILVERSTEIN - CONFIDENTIAL
 2   the role.
 3      Q.  Do you recall that he was a member
 4   of a securitization breach team that was formed
 5   in late 2006?
 6          MR. WHITNEY: Objection, assumes
 7      facts.
 8      A.  No, but if it was, that would be
 9   Steve Golden.
10      Q.  Okay. We will get to this next.
11          Turning to what's before you that
12   has been marked as Deposition Exhibit Number
13   13, it's an e-mail from Mr. John Mongelluzzo to
14   Mr. Steve Golden and Jo-Karen Whitlock, as the
15   most current e-mail on the chain, Bates Stamped
16   EMC-AMB 007011832.
17          And the second e-mail in the chain
18   is from John Mongelluzzo, dated March 6, 2007,
19   more than two years or almost two years after
20   the prior Mongelluzzo e-mail we looked at about
21   due diligence.
22          This one is copying you as well,
23   Mr. Silverstein. And Mr. Mongelluzzo starts by
24   saying, "I think we need to completely revamp
25   how we do diligence." And midway through the
```

Page 176

```
 1      SILVERSTEIN - CONFIDENTIAL
 2   paragraph he says, and I will read for the
 3   record, "Based on the risk score, we should
 4   determine the type of diligence to be done.
 5   The highest level of risk would get the most
 6   comprehensive review."
 7          Right? Do you see that?
 8      A.  Uh-huh.
 9      Q.  Do you recall, in March 2007,
10   Mr. Mongelluzzo reiterating his request, his
11   plea, his entreaty that Bear Stearns completely
12   revamp how it does due diligence in order to
13   rank loans that are being proposed for
14   acquisition based upon their riskiness and
15   having the most risky loans subject to the
16   highest and most comprehensive loan?
17          MR. WHITNEY: Objection,
18      mischaracterizes the testimony.
19      A.  This is a proposal from John on how
20   he was proposing that we would otherwise move
21   forward to perform diligence.
22      Q.  As a matter of course, did people
23   disregard Mr. Mongelluzzo's recommendations?
24      A.  Not at all.
25      Q.  In fact, he was the head of due
```

Page 177

```
 1      SILVERSTEIN - CONFIDENTIAL
 2   diligence to the extent there was anyone in
 3   charge of due diligence at Bear Stearns and
 4   EMC, right?
 5          MR. WHITNEY: Objection, form.
 6      A.  John was our due diligence manager
 7   within the mortgage finance group.
 8      Q.  And in March of 2007, when he says,
 9   "We need to completely revamp how we do
10   diligence," did you discuss that with him at
11   the time?
12      A.  Did I discuss what?
13      Q.  The need to completely revamp how
14   Bear Stearns does its due diligence.
15          MR. WHITNEY: Objection, form.
16      A.  These discussions would have been
17   done as a group to come up with a strategy for
18   us to re-evaluate our due diligence procedures.
19      Q.  And with respect to an evolutionary
20   step, at least in the views of John
21   Mongelluzzo, to completely revamp would have
22   been a huge magnanimous jump, right?
23          MR. WHITNEY: Objection, calls for
24      speculation.
25      A.  You need to talk to John about what
```

## Page 178

```
 1    SILVERSTEIN - CONFIDENTIAL
 2    he meant in his wording.
 3        Q.   Well, I mean, from your perspective,
 4    at the time, was this an incremental Darwinian
 5    creep, or was this a significant change in due
 6    diligence that he is proposing?
 7        A.   John -- my recollection of this is
 8    this would be a significant change in our due
 9    diligence approach, not all of which was
10    implemented.
11        Q.   Well, let's go on to see if anybody
12    else agreed that this should, in fact, finally
13    be implemented.
14            MR. WHITNEY:  I just object to that
15    as not being a question, and just
16    commenting.
17            MR. HAAS:  It's called a segue.
18            MR. WHITNEY:  I just object to the
19    segue then.
20            (Silverstein Exhibit 14, E-mail from
21    Jeff Verschleiser to Baron Silverstein and
22    others, dated March 16, 2007, Bates
23    stamped EMC-AMB 005446615 to 616, marked
24    for identification.)
25        Q.   We have marked as Deposition Exhibit
```

## Page 179

```
 1    SILVERSTEIN - CONFIDENTIAL
 2    Number 14 an e-mail from Jeff Verschleiser, the
 3    head chief boss of your area, to you and
 4    others, Bates stamped EMC-AMB 005446615 to 616.
 5    It's dated March 16, 2007, shortly after
 6    Mr. Mongelluzzo's proposal, and not that
 7    Mr. Verschleiser is trying to usurp
 8    Mr. Mongelluzzo's proposal, but it seems he is
 9    proposing a similar tiered approach to due
10    diligence, right?
11            MR. WHITNEY:  Let me just object to
12    some of the characterization prior to the
13    question.
14        A.   (Perusing.)  It looks like Jeff is
15    making a proposal in relation to a portfolio
16    from New Century.
17        Q.   And his proposal, much akin to
18    Mr. Mongelluzzo, is that they, Bear Stearns,
19    assign higher risk scores to certain items in
20    order to be able to apply greater due diligence
21    to that, right?
22            MR. WHITNEY:  Object, form.
23        A.   Jeff is making a proposal for a due
24    diligence standard in relation to this New
25    Century portfolio.
```

## Page 180

```
 1    SILVERSTEIN - CONFIDENTIAL
 2        Q.   Right.  And similarly to
 3    Mr. Mongelluzzo, it involves ranking the loans
 4    based upon a risk profile, correct?
 5        A.   Yes.
 6        Q.   Okay.  To your knowledge, was
 7    Mr. Mongelluzzo's proposal marked as Deposition
 8    Exhibit Number 13 and/or Mr. Verschleiser's
 9    proposal marked as Deposition Exhibit Number 14
10    implemented?
11        A.   Jeff's proposal on Number 14
12    referenced a particular transaction.  John's
13    proposal was with respect to kind of our
14    overall standard.  There -- I don't recall what
15    we ended up with with respect to our updated
16    and due diligence standards.
17        Q.   Do you know when those updated due
18    diligence standards went into effect, if ever?
19        A.   No.
20        Q.   Is it, in fact, true that they did
21    not go into effect in 2007?
22        A.   I don't know, but in 2007, our whole
23    loan purchase volume decreased significantly,
24    given market conditions.
25            (Silverstein Exhibit 15, E-mail
```

## Page 181

```
 1    SILVERSTEIN - CONFIDENTIAL
 2    chain, Bates stamped EMC-AMB 005469106 to
 3    107, marked for identification.)
 4        Q.   We have marked as Deposition Exhibit
 5    Number 15 a chain, the first or most current
 6    e-mail of which is from you, Mr. Silverstein,
 7    dated March 16, 2007, going to Michael
 8    Neirenberg, Jeff Verschleiser, John Mongelluzzo
 9    and Mary Haggerty, the senior management of the
10    mortgage finance group, and their superiors.
11    It's Bates Stamped EMC-AMB 005469106 to 107.
12            It's titled Stated Income Kicks by
13    Clayton 2006, the first e-mail of which is a
14    recitation by Mr. Mongelluzzo regarding the
15    level of unreasonable income kicks found by
16    Clayton in 2006 based upon total files
17    reviewed, a mere 310 out of 58,000, in which
18    Jeff Verschleiser responds, and I will quote
19    for the record, "We are just burning money
20    hiring them."
21            Do you see that?
22        A.   I do.
23            MR. WHITNEY:  Objection to the
24    characterization of the text.
25        Q.   Did you agree with
```

6/4/2010

190

SILVERSTEIN - CONFIDENTIAL
1
2  Q.  So, in your view, Greenpoint was a
3  solid counterparty for which it made sense to
4  reduce the due diligence sampled from
5  100 percent to a meager 20; is that right?
6  A.  In my view, given the performance of
7  what we had purchased in the past in relation
8  to Greenpoint and their HELOCs, which it's
9  referencing to, that's what I said.
10  Q.  And, indeed, didn't it turn out that
11  the HELOCs that had previously been purchased
12  and that were put into the BSSLT 2007
13  transaction turned out to be replete with
14  defective loans?
15      MR. WHITNEY:  Objection, assumes
16  facts.
17  Q.  Did you, in fact, determine that?
18  A.  No, I didn't.  So I don't have the
19  information.
20  Q.  Do you think it was a good decision
21  to reduce the due diligence on Greenpoint in
22  hindsight?
23      MR. WHITNEY:  Objection, form.
24  A.  I would need to see the basis for my
25  decision.

191

SILVERSTEIN - CONFIDENTIAL
1
2  Q.  Sitting here today, in hindsight, do
3  you think it was a good decision?
4      MR. WHITNEY:  Objection, form,
5  irrelevant.
6  A.  At the point in time, looking in
7  2007, and looking at historical performance on,
8  one, how their HELOCs were performing, and I
9  don't recall, I assume this is a prime
10  portfolio, which could very well be different
11  from other HELOCs that we purchased from them,
12  and their performance with respect to the due
13  diligence reviews that we've done, I made the
14  determination that I felt reducing the sample
15  was sufficient, and if we ended up reducing the
16  due diligence, which I don't know whether or
17  not we did or not, as a factual statement, if
18  that information otherwise would have shown it,
19  I would stand by that.
20  Q.  Well, let's look at the historical
21  performance of the loans as of that point in
22  time.
23      (Silverstein Exhibit 18, E-mail
24  chain, Bates stamped EMC-AMB 002935561 to
25  562, marked for identification.)

192

SILVERSTEIN - CONFIDENTIAL
1
2  Q.  Take a look at what's been marked as
3  Deposition Exhibit Number 18, which is an
4  e-mail chain, the most current of which is from
5  Michael Cohn to you, dated June 19, 2007, Bates
6  stamped EMC-AMB 002935561 to 562.
7  A.  Uh-huh.
8  Q.  Now, Mr. Silverstein, what does this
9  e-mail chain concern?
10  A.  (Perusing.)  It appears to be on
11  Greenpoint EPDs.
12  Q.  EPDs and FPDs, correct?
13  A.  Yes.
14  Q.  And that's early payment default and
15  first payment default, right?
16  A.  Correct.
17  Q.  Both which are typically viewed as
18  indicators of an inability to pay a loan or a
19  fraud with respect to a loan, suggesting that
20  the loan never should have been granted in the
21  first instance, right?
22      MR. WHITNEY:  Objection, form.
23  Q.  Isn't that the common industry view
24  of an EPD and FPD?
25  A.  That is one way to evaluate it.

193

SILVERSTEIN - CONFIDENTIAL
1
2  Q.  So the e-mail chain is basically
3  saying, in hindsight, with respect to
4  historical performance of these Greenpoint
5  loans, that there is a significant number of
6  EPDs and FPDs, and Mr. Verschleiser states,
7  "Big problem," exclamation point.
8      You reply, "Need help.  See me," to
9  Mr. Cohn.
10      Who was Mr. Cohn and what was his
11  position at the time?
12  A.  Mike Cohn was a data analyst, and he
13  worked in our group.
14  Q.  Do you recall this big problem which
15  you needed help from your data analyst?
16      MR. WHITNEY:  Objection, form.
17  A.  I remember working with Greenpoint
18  on their claims, but I don't remember this
19  e-mail string, or as your -- as it's being
20  described by Jeff Verschleiser as a big
21  problem.
22      So the answer is I don't recall the
23  big problem, but I recall the EPD situation, to
24  some extent, with Greenpoint.
25  Q.  And do you recall that you