UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMBAC ASSURANCE CORPORATION,

                              Plaintiff,

            -against-                              Index No. 08 Civ. 9464 (RMB) (THK)

EMC MORTGAGE CORPORATION,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF AMBAC ASSURANCE CORPORATION'S
<u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>**


Philip R. Forlenza
Erik Haas
Carrie A. Syme
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
prforlenza@pbwt.com
ehaas@pbwt.com
casyme@pbwt.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

PROCEDURAL HISTORY.......................................................................................3

DISCOVERY OF FACTS ESSENTIAL TO THE NEW CLAIMS ...........................5

      A.    Bear Stearns Knew that Its Due Diligence Was Inadequate and
Weakened It to Increase Profit.................................................................6

      B.    Bear Stearns Intentionally Misrepresented Its Quality-Control,
Seller-Monitoring, and Repurchase Policies...............................................9

      C.    The Results of Bear Stearns' Failures Were Pools of Loans Rife
with Underwriting Failures and Fraud.......................................................10

      D.    Interference by JP Morgan.......................................................................11

REGULATORY ACTION BY THE STATE OF WISCONSIN ................................13

ARGUMENT........................................................................................................14

    I.    Federal Rule of Civil Procedure 16 ......................................................14

      A.    "Good Cause" Is the Standard ...............................................................14

      B.    Ambac's Diligence In Bringing the New Claims ......................................15

      C.    Ambac's Diligence Regarding the Segregated Account............................19

    II.    Federal Rules of Civil Procedure 15 and 21 .........................................19

      A.    Courts Grant Leave to Amend Liberally Under Rules 15 and 21..............19

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbatiello v. Monsanto Co.*,
  571 F. Supp. 2d 548 (S.D.N.Y. 2008)................................................................20

*Bay Harbour Mgmt. LLC v. Carothers*,
  282 Fed. Appx. 71 (2d Cir. 2008).......................................................................16

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................24

*Bridgeport Music, Inc. v. Universal Music Group, Inc.*,
  248 F.R.D. 408 (S.D.N.Y. 2008) ..............................................................15, 16, 17

*Carnrite v. Granada Hosp. Group, Inc.*,
  175 F.R.D. 439 (W.D.N.Y. 1997)........................................................................23

*Dluhos v. Floating & Abandoned Vessel*,
  162 F.3d 63 (2d Cir. 1998)...................................................................................24

*Estate of Ratcliffe v. Pradera Realty Co.*,
  No. 05 Civ. 10272(JFK), 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007) ............15, 17

*Evans v. Syracuse City School Dist.*,
  704 F.2d 44 (2d Cir. 1983)...................................................................................20

*Holt v. Katy Indus.*,
  71 F.R.D. 424 (S.D.N.Y. 1976) ...........................................................................18

*Kalnit v. Eichler*,
  264 F. 3d 131 (2d Cir. 2001) (dismissing securities fraud claims for failure to meet
  Rule 9(b) standard and heightened pleading requirements imposed by the Private
  Securities Litigation Reform Act of 1995) ...........................................................16

*Kassner v. 2nd Avenue Delicatessen Inc.*,
  496 F. 3d 229 (2d Cir. 2007)................................................................................14

*Lincoln v. Potter*,
  418 F. Supp. 2d 443 (S.D.N.Y. 2006)..................................................................19

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007).................................................................................20

*Messier v. Southbury Training Sch.*,
  No. 3:94-CV-1706 (EBB), 1999 U.S. Dist. LEXIS 6992 (D. Conn. Jan. 5, 1999) ................21

*Monahan v. New York City Dep't of Corrections,*
  214 F.3d 275 (2d Cir. 2000)................................................................21

*Nairobi Holdings Ltd. v. Brown Brothers Harriman & Co.,*
  02 Civ. 01230, 2006 WL 617977 (S.D.N.Y. Mar. 10, 2006) ...................15

*New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.,*
  07 Civ. 8304, 2009 WL 1515696 (S.D.N.Y. June 1, 2009)......................14

*Parker v. Columbia Pictures Indus.,*
  204 F.3d 326 (2d Cir. 2000)............................................................14, 15

*Rachman Bag Co. v. Liberty Mut. Ins. Co.,*
  46 F.3d 230 (2d Cir. 1995)..............................................................19, 20

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,*
  748 F.2d 774 (2d Cir. 1984)................................................................24

*S.S. Silberblatt, Inc. v. East Harlem Pilot Block Building,*
  608 F.2d 28 (2d Cir. 1979)..................................................................19

*State Teachers Retirement Bd. v. Fluor Corp.,*
  654 F.2d 843 (2d Cir. 1981)............................................................20, 23

*Stonewell Corp. v. Conestoga Title Ins.,*
  No. 04 CV 9867 (KMW) (GWG), 2010 WL 647531 (S.D.N.Y. Feb. 18, 2010) ..............21, 23

*United States v. Continental Ill. Nat'l Bank & Trust of Chicago,*
  889 F.2d 1248 (2d Cir. 1989)................................................................21

**Statutes**

Securities Exchange Act of 1934 ..............................................................1

Wis. Stat. §611.24(3)(e)........................................................................14

Wis. Stat. §§ 645.31(1) and 645.41(4).....................................................13

Wis. Stat. §§ 645.31 and 645.32 .............................................................13

**Other Authorities**

Federal Rules of Civil Procedure 15 ................................................................................3, 19, 20

Federal Rule of Civil Procedure 16 .................................................................................3, 14, 21

Federal Rule of Civil Procedure 21 .................................................................................3, 19, 20

Plaintiff Ambac Assurance Corporation ("Ambac") seeks leave to file an Amended Complaint, submitted herewith as Exhibit 1 to the Declaration of Erik Haas. The proposed Amended Complaint will (1) add Bear, Stearns & Co. Inc. ("Bear, Stearns & Co.," now known as JP Morgan Securities Inc. ("JP Morgan")) and the individual members of the Controlling Person Group as defendants ("Individual Defendants"), (2) state additional causes of action against the new defendants as well as original defendant EMC Mortgage Corporation ("EMC"), for fraudulent inducement, violation of the Securities Exchange Act of 1934 (including by means of fraud), and (against JP Morgan) tortious interference with contract, and (3) add as a plaintiff the Segregated Account of Ambac Assurance Corporation (the "Segregated Account").

## PRELIMINARY STATEMENT

This case began in November 2008 as a legally straightforward, if factually complicated, breach-of-contract case. But discovery has revealed extraordinary facts regarding both the fraudulent conduct and fraudulent scienter of EMC, its corporate affiliate, Bear, Stearns & Co., and the Individual Defendants. The evidence – obtained for the first time through discovery – demonstrates that EMC not only materially breached its agreements with Ambac, but that EMC acted in conjunction with Bear, Stearns & Co. (collectively with EMC, "Bear Stearns") in an audacious, multi-billion dollar, fraudulent scheme to churn toxic mortgages into securities and securities into profits, all while falsely assuring Ambac and investors that Bear Stearns' carefully crafted policies and practices would ensure the quality of its product. Documents from Bear Stearns' files and deposition admissions from its executives show that Bear Stearns *knew* its representations that the mortgage loans would be actively vetted and monitored to ensure quality were false. Indeed, Bear Stearns knew that the mortgage loans were rife with fraud and largely doomed – in the words of one Bear Stearns manager, a "SACK OF

SHIT."  Significantly, discovery has revealed that Bear Stearns deliberately altered its due

diligence and quality-control policies and neglected its controls *for the purpose* of increasing the

volume of mortgage loans available for its ever-hungry securitization machine, despite the

dramatically increased risk of loss this posed for investors and Ambac.  Then, when the

mortgage loans began failing, Bear, Stearns & Co. (by then renamed JP Morgan) intentionally

interfered with Ambac's attempts to enforce its contractual remedy regarding EMC's repurchase

of breaching loans.

       Ambac's Complaint contained five causes of action, all based on breach of

contract against its sole contractual counter-party, EMC.  At the time Ambac filed its Complaint,

Ambac had a strong factual basis for asserting claims for breach of EMC's contractual

representations and warranties regarding, *inter alia*:  the characteristics of the individual loans in

the securitization pools; and EMC's due diligence and quality control processes pertaining to the

loans at issue.

       At the time it filed the Complaint, Ambac anticipated that breach of contract may

not be the end of the story.  More than a whiff of fraud existed in the "Bear Stearns securitization

machine," the overarching mechanism by which Bear Stearns Companies used EMC and its

other affiliates to finance and buy large groups of mortgages of dubious quality and turn them

over into marketable securities as quickly as possible to guarantee increasingly large payoffs to

the Bear Stearns family.  *See* Complaint, Docket #1 ("Compl.") ¶¶ 16-27.  The Bear Stearns

business model, as well as the sheer number of failed mortgages and breaches of representations

and warranties found by Ambac, certainly *implied* that EMC, Bear, Stearns & Co., or both knew

about the loans' deficiencies or that their alleged quality controls were not as represented.

However, prior to obtaining discovery of the internal policies, practices and decisions of EMC

and its corporate affiliate, Ambac lacked the essential facts regarding the fraudulent conduct of

EMC and Bear, Stearns & Co. and their fraudulent scienter.  As shown below, discovery has

been enormously fruitful in uncovering Bear Stearns' fraudulent scheme, and Ambac now has

more than adequate factual basis to amend its Complaint.

To justify its motion to amend its Complaint subsequent to the deadline in the

Case Management Plan for doing so, Ambac must establish "good cause" under Federal Rule of

Civil Procedure 16(b).  The Second Circuit has made clear that the primary consideration in

determining good cause under Rule 16(b) is the moving party's diligence; and, courts in this

Circuit have consistently found that Rule 16(b)'s "good cause" standard has been met where a

plaintiff learns for the first time through discovery information essential to its proposed new

claims.  As demonstrated below, Ambac learned for the first time through extensive discovery in

this action – which it pursued aggressively and expeditiously – the essential facts necessary to

plead with the requisite particularly its fraud claims (as well as its tortious interference claim).

Finally, each of the factual inquiries made by the Second Circuit to determine whether a party

may amend a pleading pursuant to Rules 15(a) and 21 are resolved in Ambac's favor.

## PROCEDURAL HISTORY

Ambac commenced this action by filing a complaint against EMC on November

5, 2008.  The Complaint related to four securitization transactions (each a "Transaction," and,

collectively, "Transactions") sponsored by EMC that closed between 2005 and 2007.  The

Transactions began with the purchase of over 49,500 residential mortgage loans ("Mortgage

Loans") which, in turn, served as collateral for the issuance of approximately $2.7 billion in

publicly offered, mortgage-backed securities ("Notes").  EMC, acting at the behest and under the

control of its affiliate, Bear, Stearns & Co., aggregated the Mortgage Loans, sold the loan pools

3

to entities that issued the Notes, and contracted with Ambac to provide financial-guaranty insurance policies protecting the Note investors. Ambac alleged five, contract-based causes of actions against EMC, including breach of representations and warranties relating to the Mortgage Loans, and sought to be made whole for EMC's material breaches. *See* Compl. ¶¶ 89-107.

On January 30, 2009, EMC moved to strike or dismiss certain allegations and damage claims within the Complaint. EMC's motion was denied on March 16, 2009. *See* Order, March 16, 2009 (Docket #27).

On December 19, 2008, the Court entered a Case Management Plan providing for the joinder of additional parties and amended pleadings by January 30, 2009, and completion of fact and expert discovery by June 1, 2009.[1] *See* Docket #6. The Court extended the discovery deadlines four times (most recently, to August 6, 2010 for fact discovery and December 3, 2010 for expert discovery) primarily to account for EMC's failure to produce critical documents to Ambac and, for the same reason, set interim deadlines for EMC to produce certain materials necessary for Ambac to begin deposition discovery. *See* Declaration of Erik Haas ("Haas Decl."), filed herewith, ¶ 6.

By mid-June, Ambac had deposed thirteen EMC witnesses, EMC had begun deposing Ambac witnesses, and the parties were discussing dates for the completion of fact depositions. The parties agreed to seek court approval of an extension of the deadline for completing fact discovery from August 6 to September 30, 2010. *See* Declaration of Philip R. Forlenza, filed herewith ("Forlenza Decl.") ¶¶ 4, 7.

---

[1] The parties had proposed that fact discovery end in December 2009 and that the deadline to amend pleadings fall a month beforehand, in November 2009. Instead, Judge Berman provided that the deadline for adding parties and amending pleadings would pass before or virtually at the start of discovery. *See* Haas Decl. ¶ 5.

4

On June 9, 2010, Ambac advised EMC that (subject to consultation with the Office of the Commissioner of Insurance of the State of Wisconsin), Ambac intended to move to amend its Complaint. *Id.* ¶ 5.

On June 13, 2010, Ambac asked EMC if it preferred to continue or suspend depositions in view of Ambac's planned motion to amend. *Id.* ¶ 6. EMC indicated it wanted to finish the depositions of both EMC's and Ambac's witnesses. Ambac agreed. *Id.* ¶ 7. However, after further consideration, Ambac and EMC agreed that it made sense to suspend all depositions until the parties could discuss the matter with Magistrate Judge Katz. *Id.* ¶ 8. On July 7, counsel conferred with Judge Katz, during which EMC took the position that all depositions should be suspended until Ambac's motion was decided. *Id.* ¶ 8.

## DISCOVERY OF FACTS ESSENTIAL TO THE NEW CLAIMS

Discovery was the only means by which Ambac could become privy to the inner workings of the Bear Stearns securitization machine and the private communications among those that kept it running. Since January 2009, the parties have engaged in extensive discovery, including production of nearly *two million* documents (over *22 million* pages) from EMC, over half a million records from third parties, and depositions of fifteen party witnesses (plus over 30 additional depositions of individual borrowers and other third-parties). *See* Haas Decl. ¶¶ 17, 22, 27. EMC's productions have included internal communications, memoranda, and reports written and received by personnel not only at EMC, but also Bear, Stearns & Co. and JP Morgan. *Id.* ¶ 13.

The discovery has revealed for the first time in any litigation or otherwise, that, at the same time it was making its representations to Ambac, Bear Stearns knew, but failed to disclose that: (i) its due diligence protocols were inadequate to screen out defective loans, (ii) its

seller monitoring controls were a farce, and (iii) its quality control and repurchase processes were designed to secure recoveries for Bear Stearns to the exclusion of, and without notice to, Ambac.  Discovery has also revealed the active participation in this fraud by several Bear Stearns executives, who directed or encouraged the very policies and procedures undertaken to expand securitization volume for the sake of maximizing short-term profitability.  In sum, Ambac has developed facts through discovery that EMC, Bear, Stearns & Co., and the Individual Defendants worked in concert, using the ample resources and brand power of the Bear Stearns family, to fraudulently induce the Note investors to invest in, and Ambac to insure, mortgage-backed securities transactions.

The factual basis for Ambac's proposed new claims is summarized below, with more detail in the Proposed Amended Complaint ("Am. Compl.") (Haas Decl., Exhibit 1).

A. **Bear Stearns Knew that It Due Diligence Was Inadequate and Weakened It to Increase Profit**

Discovery shows that while Bear Stearns was touting its buttoned-up due-diligence policies and procedures to induce Ambac to insure the Transactions, *internally,* Bear Stearns was weakening or even dispensing with those same policies and procedures and disregarding loan quality to appease its trading desk's ever-increasing demand for a finite supply of loans to securitize.

To keep its machine running, Bear Stearns needed to retain tight control over the entire loan pipeline from origination to securitization and maximize the number of loans that survived underwriting and due diligence.  This became more difficult as Bear Stearns began to rely less on high-quality, "jumbo prime" loans, and more heavily on subprime, reduced-

6

document, and second-lien loans.[2]  In February 2005 – well before each of the Transactions closed – Bear, Stearns & Co. Senior Managing Director Mary Haggerty issued a directive to deviate from existing policy by reducing the scope of the required due diligence "in order to make us more competitive on bids with larger sub-prime sellers" (*see* Haas Decl. ¶ 29) – that is, to maximize the number of loans that could be purchased and securitized.  From 2005 to 2007, Bear Stearns also rejected proposals, including from its top due-diligence executive, to implement significant changes to its due diligence protocols designed to detect and reject risky loans. *See id.* ¶ 55 (Silverstein Tr. at 178).[3]  Eventually, Bear Stearns simply stopped doing certain types of due diligence altogether.  Contrary to Bear Stearns' representation to Ambac during the negotiation of the SACO 2005-10 Transaction that "diligence for flow is generally 100%,"[4] a Bear Stearns deal manager observed in March 2006, three months earlier, that Bear Stearns had completely abandoned doing *any* due diligence for flow loans that it had securitized. *See id.* ¶ 30.

With its due diligence protocols weakened, Bear Stearns' trading desk decided it needed to quickly transfer the defective loans from its inventory to securitizations before the loans defaulted.  Accordingly, as early as 2005, Bear Stearns dropped its "Early Payment Default" ("EPD") policy.  The EPD policy provided that Bear Stearns wait to securitize a loan until after the first 30 to 90 days after its acquisition of the loan, during which time certain fraudulent loans frequently revealed themselves through missed payments.[5]  Bear Stearns relaxed

---

[2] *See* Am. Compl. ¶¶ 63-69.

[3] Deposition transcripts cited herein will be designated by the witnesses' names and "Tr."

[4] "Flow" loans refer to loans that Bear Stearns purchased on a loan-by-loan basis at a price set by Bear Stearns' trading desk, as opposed to loans it acquired in bulk through bidding.  *See* Haas Decl. ¶ 52. (Haggerty Tr. at 86:9-21, 87:5-9) ¶ 50 (Glory Tr. at 133:19-24), and ¶ 55 (Silverstein Tr. at 78:19-21).

[5] *See* Am. Compl. ¶¶ 148-151.

this standard even though it recognized that a missed payment within the EPD period raises a "red flag" that the loan never should have been issued. *See id.* ¶¶ 31, 55 (Silverstein Tr. at 192). Bear Stearns never disclosed this or any other change in its due diligence policies to investors or financial guarantors such as Ambac.

Bear Stearns also waved away the red flags that arose from due diligence, thereby further limiting its remaining value. And Bear Stearns ignored the advice of its due-diligence firms not to securitize particular loans – up to 65% of the time in the third quarter of 2006, according to one consultant's report. *See id.* ¶ 32. To cover its tracks, Bear Stearns adopted an internal policy that directed its managers to delete communications with its due-diligence firms leading to its final loan purchase decisions, thereby eliminating the audit trail. *See id.* ¶ 53. (Mongelluzzo Tr. at 167-76); ¶ 52 (Haggerty Tr. at 318-19).

By mid-2006, Bear Stearns' directors acknowledged that its weakened due diligence efforts were no longer worth the effort: "We are waisting [sic] way too much money on Bad Due Diligence" (a statement made about Clayton Holdings, the chief due diligence firm identified in Bear Stearns' marketing presentations). *See id.* at 33. Almost exactly one year later, nothing had changed. The same director noted with respect to the *same* due diligence firm that "[w]e are just burning money hiring them." *See id.* at 34.

This is strong evidence that Bear Stearns knew that its pre-Transaction representations to Ambac and others concerning its due diligence were materially misleading when made. Moreover, Bear Stearns knew that potential insurers and investors reasonably relied on its representations about the type and extent of its due diligence and its results. *See* Am. Compl. ¶¶ 131-132.

8

**B.**     **Bear Stearns Intentionally Misrepresented Its Quality-Control, Seller-Monitoring, and Repurchase Policies**

When negotiating the insurance policies for the Transactions, Bear Stearns represented to Ambac that it followed certain quality-control and repurchase processes as a means of discovering and removing breaching loans from the securitized pools. Discovery shows that Bear Stearns concealed the truth: its touted "quality control" and "repurchase" processes had nothing to do with ferreting out fraud and protecting Ambac and investors from defective loans. Instead, the quality-control and repurchase departments were devoted almost exclusively to identifying problems with loans that could lead to claims *by Bear Stearns* against the loan originators, even if those problems – such as proof that material information about the loan was inaccurate – also indicated that the loans were in breach of EMC's representations and warranties to the Note investors and Ambac. *See* Haas Decl. ¶ 35.

Bear Stearns demanded that originators repurchase thousands of loans, at an increasing pace as more loans showed signs of trouble. According to Bear Stearns' audit department, through October 2006, Bear Stearns had resolved "$1.7 billion of claims, an increase of over 227% from the previous year," and "filed an additional new $2.5 billion of the claims." *See id.* ¶¶ 37. According to Bear Stearns' documents, the basis of most of these claims was the EPD "red flag" that it had routinely ignored in the pre-securitization period. *See id.* ¶¶ 51 (Golden Tr. at 120-21).[6]

Bear Stearns compounded this wrong by deliberately concealing evidence of it. When Bear Stearns made claims against the loan originators, it never reported the breaches to the

---

[6] Ironically, Bear Stearns' scheme worked so well that its quality-control and repurchase processes were soon overwhelmed. *See id.* ¶¶ 51 (Golden Tr. at 119). By late 2005, Bear Stearns' internal audit department caught wind of the "significant backlog for collecting from and submitting claims to sellers," and concluded that the procedures in place to process, collect, resolve, and monitor such claims in a comprehensive manner were inadequate or simply non-existent. *See id.* ¶ 38.

securitization trusts or Ambac. Instead, it simply pocketed any monetary recovery from the originator and let the defective loans languish in the securitization Trusts. *See id.* ¶ 52 (Haggerty Tr. at 455-63, 510); ¶ 50 (Glory Tr. at 125). This process not only kept the loan breaches a secret from Ambac, but also encouraged rapid and reckless origination. *See id.* ¶¶ 39, 40, 54 (Serrano Tr. at 180-184).

Bear Stearns' audit firm PriceWaterhouseCoopers ("PWC") found this behavior to be insupportable. In an August 2006 report, PWC stated that Bear Stearns' failure to review the loans for breaches of the representations and warranties made to Ambac or notify the Transaction parties of the information it uncovered through its "quality-control" efforts violated "common industry practices, the expectation of investors and ... the provisions in the [deal documents]." *See id.* ¶ 41. In-house counsel at Bear Stearns reached the same conclusion. *See id.* ¶ 52 (Haggerty Tr. at 456-57); ¶ 51 (Golden Tr. at 39-40). However, the practice remained unchanged until too late. Bear Stearns' efforts to improve its quality-control efforts were demonstrably ineffective and came months or years after each of the Transactions had closed.[7]

## C.   The Results of Bear Stearns' Failures Were Pools of Loans Rife with Underwriting Failures and Fraud

Bear Stearns' calculated decision to weaken or erase the due-diligence, quality-control, and repurchase procedures that it represented to Ambac it would follow had the inevitable effect:  pools of loans rife with underwriting failures and fraud that had been issued to borrowers who had no ability to make their payments. Not surprisingly, the loans began defaulting at an alarming rate. The result was a chain reaction of losses that forced Ambac to pay ever-increasing amounts in insurance payments to investors whose investments otherwise would have been wiped out.

Bear Stearns was fully aware of the underlying problem – bad loans, based on bad information. In fact, some of the bad information came directly from Bear Stearns. According to a recent exposé, a former Bear Stearns analyst who provided support to EMC has admitted that Bear Stearns intentionally falsified critical information, such as FICO scores and the type of loan documentation program, on the loan "tapes" provided to insurers prior to the closing of transactions to make the loans appear less risky and induce participation in its securitizations. *See* Haas Decl. ¶ 42. Internal documents from Bear Stearns confirm this practice. *See id.* ¶ 43.

The stench of the loans that Bear Stearns was pushing onto investors and Ambac in the Transactions became Bear Stearns' private joke. While Bear Stearns was making a hard sell to Ambac regarding the quality of the final Transaction in April 2007, internally, its analysts described the securitization as a "going out of business sale." *See id.* ¶ 44. A Bear Stearns Vice President who acted as the deal manager for the SACO 2006-8 Transaction more colorfully referred to that deal in correspondence with the trading desk as a "shit breather" and "SACK OF SHIT 2006-8," adding "I hope you['re] making a lot of money off of this trade." *See id.* ¶ 45.

**D.      Interference by JP Morgan**

After Ambac investigated the widespread defaults in the Transaction loans and revealed the numerous breaches of representations and warranties that infected those loans, Ambac invoked its contractual right to demand that EMC cure the problems or repurchase the loans. EMC refused in all but a handful of cases, blatantly disregarding its obligations under the Transaction contracts, and despite Bear Stearns' *own* findings regarding the same deficiencies in the same loans. *See* Compl. ¶¶ 79-84.

---

[7] *See* Am. Compl. ¶¶ 193-197, 206-208.

11

Through discovery, Ambac has found a principal reason for EMC's reluctance to fulfill its contractual duty to repurchase defective loans: deliberate interference by the new owner of its affiliate company. As soon as JP Morgan assumed control, its management barred EMC from honoring any repurchase requests. *See* Haas Decl. ¶ 46. Thereafter, a JP Morgan Executive Director, with no prior knowledge of the deals, cut in half a set of loans that Bear Stearns already had reviewed and determined breached securitization representations and warranties. In one stroke, she eliminated up to $14 million in liabilities and reduced the accounting reserves for those loans by almost 50%. *See id.* ¶ 47. JP Morgan also caused Bear Stearns to take new positions as to circumstances in which loans must be repurchased from a securitization that were inconsistent with, and contravened, the practices in place at Bear Stearns prior to May 2008.[8]

Moreover, at the same time JP Morgan refused to repurchase breaching loans from the trusts involved in its many securitization transactions, it demanded that originators repurchase *from* EMC the *same* loans and for the *same* reasons that financial guarantors had requested EMC to repurchase. *See id.* ¶ 48. By deliberately denying Ambac's and others' legitimate repurchase demands on the one hand, but demanding compensation for those breaching loans on the other, JP Morgan was able to boost its income and artificially reduce its reserves, effectively engaging in accounting fraud. The SEC has recently requested more detail about JP Morgan's reserves for loan repurchases. *See id.* ¶ 49.

\* \* \*

These facts are only *some* of the revelations regarding Bear Stearns that Ambac has uncovered through diligent discovery, and Ambac has every reason to believe more will be

---

[8] *See* Am. Compl. ¶¶ 206-210.

12

found.  To date, Ambac has also developed facts showing that Bear Stearns provided similar false and misleading information to rating agencies to secure the necessary ratings for the Transaction securities (*see* Am. Compl. ¶¶ 107-115) and threatened the ratings agencies to avoid downgrades reflecting the true value of its securities (*id.* ¶¶ 201-203); that Bear Stearns disseminated offering documents containing similarly false and misleading statements to investors who purchased the Notes, which violates federal securities laws (*id.* ¶¶ 116-119); and that the proposed Individual Defendants are the key decision-makers who directed or encouraged Bear Stearns' wrongdoing, incentivized by their extraordinary, performance-based salaries and bonuses (*id.* ¶¶ 76-85).

## **REGULATORY ACTION BY THE STATE OF WISCONSIN**

Ambac's proposed amendment also addresses an important regulatory development.  On March 24, 2010, the Wisconsin Office of the Commissioner of Insurance ("OCI") approved the creation of the Segregated Account of Ambac Assurance Corporation.  *See* Haas. Decl. ¶ 62 (Ex. 35 at ¶ 26).  That same day, at the request of the Commissioner, the State of Wisconsin Circuit Court for Dane County (the "Rehabilitation Court") placed the Segregated Account into rehabilitation under Wis. Stat. §§ 645.31 and 645.32.  *See id.* (Ex. 35 at ¶ 32).  The purpose of a rehabilitation proceeding is to, among other things, protect insurance policyholders when it would be financially hazardous for the insurer to continue transacting business.  *See* Wis. Stat. §§ 645.31(1) and 645.41(4).  A number of Ambac policies that had experienced, or were in danger of experiencing, significant financial losses, including the financial-guaranty insurance

13

policies issued in connection with the Transactions, were allocated to the Segregated Account. *See* Haas Decl. ¶ 62 (Ex. 35 ¶¶ 2, 3).[9]

These events, all of which occurred well after the January 30, 2009 deadline for amendment of pleadings, have altered the identity of the parties who belong on the plaintiff's side of this action. By law, the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right on the claims and policies that were allocated to it. *See* Wis. Stat. §611.24(3)(e). However, under the Plan of Operation governing the operation of the Segregated Account, Ambac retains the right to receive cash recoveries relating to the policies and claims that were allocated to the Segregated Account, including the policies and claims at issue in this action. *See* Haas Decl. ¶ 63 (Ex. 36 at 2). Therefore, both Ambac and the Segregated Account are proper plaintiffs. On May 14, 2010, Ambac notified EMC that it would be required to amend the Complaint to add the Segregated Account as a plaintiff. *See id.* ¶ 65.

## ARGUMENT

I.   **FEDERAL RULE OF CIVIL PROCEDURE 16**

  A.   **"Good Cause" Is the Standard**

Federal Rule of Civil Procedure 16 governs instances in which a party seeks to amend a pleading beyond the date specified for such amendments in the court's pre-trial scheduling order. In this case, that date was January 30, 2009, just two months after Ambac filed its original Complaint. However, the Federal Rules recognize that the circumstances of a case may change, and amendment may still be proper. Therefore, a plaintiff may still seek to amend

---

[9] By order of the Rehabilitation Court, a temporary moratorium has been placed on the payment of claims to policyholders on policies held by the Segregated Account. When the rehabilitation plan for the Segregated Account is confirmed by the Rehabilitation Court, payments of claims will resume to policyholders pursuant to the terms of the plan. *See* Haas Decl. ¶ 64 (Ex. 37 at ¶ 4).

its complaint after the deadline "for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

In the Second Circuit, the primary consideration in determining "good cause" is the diligence shown by the requesting party. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). Although diligence is the primary consideration under Rule 16(b), "it is not, however, the only consideration"; rather, in the exercise of its broad discretion the district court "may consider other relevant factors . . . ." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F. 3d 229, 244 (2d Cir. 2007); *see also, New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, 07 Civ. 8304, 2009 WL 1515696, at *4 (S.D.N.Y. June 1, 2009); *Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008); *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05 Civ. 10272(JFK), 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007).

**B.    Ambac's Diligence In Bringing the New Claims**

Courts consistently find "good cause" when a plaintiff seeks to amend its complaint after discovering facts essential to its new claims. *See, e.g., New Yuan Fat, supra; Bridgeport Music, supra; Estate of Ratcliffe, supra.*

As discussed above (*see* pp. 5-13), and laid out in far greater detail in the Amended Complaint, the information essential to Ambac's new claims was unknown and unknowable to Ambac prior to its discovery in this action. Specifically, prior to discovery of the inner policies, practices and communications of Bear Stearns & Co. and EMC, Ambac lacked the essential facts regarding their fraudulent conduct and scienter and the tortious interference by Bear Stearns & Co.

In contrast, good cause is lacking when the moving party was previously aware of all the information necessary to support its proposed new claims. *See Parker v. Columbia*

15

*Pictures Indus., supra,* at 31 ("When he commenced this action, therefore, Parker had all the information necessary to support a breach of contract claim, and nothing he learned in discovery or otherwise altered that fact."). A case in point is *Nairobi Holdings Ltd. v. Brown Brothers Harriman & Co.,* 02 Civ. 01230, 2006 WL 617977 (S.D.N.Y. Mar. 10, 2006). There, this court found a lack of diligence where deposition testimony in another action "that provides the link between the alleged fraud and scienter on the part of Defendants," was available to plaintiff three and a half years before its application for leave to amend. *Id.* at *5.

As noted above, at the time Ambac filed its complaint for breach of contract, it anticipated that EMC and Bear Stearns had engaged in fraud in connection with the Transactions, and that they possessed the requisite scienter. However, EMC is incorrect when it states (in an e-mail stating its intent to oppose the motion to amend) that "all of the facts necessary *to identify parties and claims* were well known to [Ambac] at the time the original complaint was filed and nothing new in terms of parties or claims has been uncovered during the deposition testimony. . . ." Forlenza Decl. ¶ 7 (June 14, 2010 e-mail from Richard Edlin to Philip Forlenza (emphasis added)). In order to plead common law and securities fraud claims with the requisite "particularized knowledge" – both as to the fraudulent conduct and scienter – far more is required than simply being able to (as EMC's counsel put it) "identify parties and claims." *See Kalnit v. Eichler*, 264 F. 3d 131 (2d Cir. 2001) (dismissing securities fraud claims for failure to meet Rule 9(b) standard and heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995); *Bay Harbour Mgmt. LLC v. Carothers,* 282 Fed. Appx. 71, 76-77 (2d Cir. 2008) (same as to common law fraud).

16

Ambac's decision to assert fraud claims after expeditiously seeking and obtaining the necessary facts was reasonable and responsible, not dilatory. This conclusion is supported by both the case law and the essential facts Ambac learned for the first time through discovery.

Courts agree that a party is diligent when it waits to develop a sufficient factual basis to amend its pleading, even if the party anticipated the possibility of new claims or parties earlier. For example, in *Bridgeport Music*, *supra* at p. 15, the Court granted leave for the plaintiff to add a new defendant (MusicNet) to its copyright-infringement lawsuit over a year after the court's deadline for amendment of the pleadings. The original defendant (UMG) argued that the plaintiff was not diligent in seeking to add MusicNet because it had long been aware that UMG provided the disputed copyrighted material to MusicNet as evidenced by "cease and desist" letters to MusicNet sent years earlier. *Id.,* 248 F.R.D. at 413. Although the court recognized that the plaintiffs had some knowledge of MusicNet and its relationship to UMG, the Court ruled that it was not until reviewing MusicNet's documents and taking the deposition of a MusicNet employee that the plaintiffs understood MusicNet's unique relationship to the copyrighted works. *Id.,* 248 F.R.D. at 414. In finding good cause, the court held that the plaintiffs *"reasonably waited* until it could inquire further into the extent of MusicNet's activities with respect to [plaintiffs'] compositions before moving to add MusicNet as a defendant." *Id.* (emphasis added).

And, in *Estate of Ratcliffe*, *supra* at p. 16, the Court allowed the plaintiffs, the parents of a young woman who died in an alcohol-related accident, to add a new claim for gross negligence and punitive damages. Defendant argued that plaintiffs could have amended their complaint at an earlier date to include the new claim based on the autopsy report reflecting the young woman's high blood-alcohol content, and noted previous statements by plaintiffs' counsel

17

(in connection with an earlier motion to amend) that findings of gross negligence could be garnered from the autopsy report as well as deposition testimony of the young woman's roommates. Nevertheless, the court found good cause to amend. The Court noted that, although plaintiffs "contemplated" claiming punitive damages earlier, and their counsel had made conclusory statements regarding the defendants' gross negligence in his earlier affirmation, plaintiffs believed they were able to assert the new claim only after "new evidence came to light," sufficient to sustain such a claim. *Id.,* 2007 WL 3084977 at *3.

The essential facts Ambac uncovered during discovery – and its diligence in pursuing that discovery – also demonstrate that Ambac acted reasonably and responsibly.

The story of Bear Stearns' wrongdoing revealed itself bit by bit, after tremendous effort. As described in the accompanying Haas Declaration (¶¶ 56-59), it took Ambac sixteen months to find, analyze and weave together the essential facts necessary to support its new claims. Now, although there are undoubtedly other important facts to be found, Ambac has the requisite evidence sufficient to form the basis of its new claims. That evidence includes:

- EMC internal databases containing particular documents (such as "Problem Loan Worksheets") that revealed Bear Stearns' knowledge of breaching and fraudulent loans, which EMC did not produce by the Court's deadline, and which it has been producing in piecemeal fashion since late 2009 (*see* Haas Decl. ¶ 57);

- Many specifically-requested categories of documents concerning Bear Stearns' due-diligence and quality-control processes (including fraud-prevention), hardly any of which were produced earlier than Fall 2009, and many were not produced until late Winter or early Spring 2010 (*see* Haas Decl. ¶ 58);

- Statements by Bear Stearns reflecting its actual knowledge of or recklessness indifference toward the poor quality of the loans underlying the Transaction securities, including the "SACK OF SHIT" e-mail, whose author Ambac was unable to depose for two and a half months due to EMC's delay (*see* Haas Decl. ¶ 59);

18

- Evidence of Bear, Stearns & Co.'s tortious interference with EMC's contractual responsibilities toward Ambac to honor its repurchase requests, including e-mails involving Alison Malkin, an individual who figured prominently in this wrongdoing, which EMC was still producing through late February 2010 (*see* Haas Decl. ¶ 60); and

- Evidence of the personal involvement of each of the proposed Individual Defendants in the misrepresentations and interference by Bear Stearns primarily by reviewing one-by-one, more than half a million e-mails mixed together within the production of 22 million pages (*see* Haas Decl. ¶ 61).

Ambac seeks leave to conform its Complaint to the evidence it discovered so that it may pursue its significant and meritorious new claims. As one court in this District has noted, "Plaintiffs should have the opportunity to employ the discovery devices afforded by the federal courts...and then to amend their complaint to reflect the results of that discovery." *Holt v. Katy Indus.*, 71 F.R.D. 424, 428 (S.D.N.Y. 1976).

### C.   Ambac's Diligence Regarding the Segregated Account

Ambac has unquestionably acted diligently in seeking to amend its Complaint to add the Segregated Account as a plaintiff. The fact that a party could not meet the original amendment deadline because the events giving rise to the new claims or parties occurred after that deadline is classic "good cause." *See, e.g., Lincoln v. Potter,* 418 F. Supp. 2d 443, 454 (S.D.N.Y. 2006).

## II.   FEDERAL RULES OF CIVIL PROCEDURE 15 AND 21

### A.   Courts Grant Leave to Amend Liberally Under Rules 15 and 21

Because Ambac seeks to add both new claims and new parties to its lawsuit, the Court must consider two additional Federal Rules of Civil Procedure: Rule 15, which governs amendments to pleadings generally and states that "[t]he court should freely give [permission to amend]... when justice so requires," and Rule 21, which governs adding or dropping a party and provides that the court may grant a party's request to do so "at any time, on just terms."

The policy in favor of allowing the amendment of complaints under Rules 15 and 21 is extremely liberal. *See Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted.").

As the Second Circuit has made clear, under the admonition in Rule 15(a) that leave to amend a complaint "shall be freely given when justice so requires," if the plaintiff has at least colorable grounds for relief, "justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *S.S. Silberblatt, Inc. v. East Harlem Pilot Block Building,* 608 F.2d 28, 42 (2d Cir. 1979), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citing five-factor test used to determine whether a proposed amendment is appropriate under the Rule 15/Rule 21 standard). As demonstrated below, each of the relevant factors used to determine whether a party may amend a pleading under Rule 15 and Rule 21 are resolved in Ambac's favor.

### 1.     Ambac has not acted in bad faith or with a dilatory motive.

Courts will determine if a plaintiff has shown bad faith or a dilatory motive on the basis of its objective conduct in the litigation, such as opportunistically waiting for the outcome of a pending motion or related case before seeking to amend its complaint. *See Abbatiello v. Monsanto Co.*, 571 F. Supp. 2d 548, 552 (S.D.N.Y. 2008). Ambac's behavior in this case, including in diligently pursuing discovery, objectively manifests good faith. Ambac has not caused any untoward delays. Furthermore, the timing of the instant motion does not give Ambac any advantage in any other motion pending before this Court (in fact, no other motions are pending, and dispositive motions are months away) or any related case. There is no opportunism here and no reason to suggest that Ambac has any dilatory motive.

20

2.     **There has been no undue delay.**

Undue delay in bringing a motion to amend a pleading is measured not simply in length of time.  The key is whether the delay is *undue*, which takes into account the timing of other events in the litigation.  *See, e.g., McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (plaintiff's motion to amend complaint was properly denied where it was sought "after an inordinate delay" of two years after filing the original complaint, after discovery had closed, and after defendants had filed for summary judgment); *Evans v. Syracuse City School Dist.*, 704 F.2d 44 (2d Cir. 1983) (amendment on the eve of trial impermissible due to undue delay).  Further, delay alone, absent an additional basis for denial, does not usually warrant denying a request for leave to amend.  *Rachman*, 46 F.3d at 234; *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

As shown above in the context of the Rule 16(b) "diligence" analysis, Ambac has taken all the necessary steps to move its case forward through discovery, develop its additional claims, and then seek to amend its Complaint.  In addition, fact discovery is ongoing, expert discovery has not even begun, and this motion does not come at a time that will threaten dispositive motions or trial.  Thus, the mere fact that Ambac filed its Complaint a year and a half ago does not mean its motion to amend evidences any "undue delay."

3.     **Defendant will not suffer undue prejudice.**

In determining whether a party would be unduly prejudiced by a proposed amendment, the courts consider "whether the assertion of the new claim[s]...would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; or (ii) significantly delay the resolution of the dispute...."  *Monahan v. New York City*

*Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

      The burden of establishing that the proposed amendment would be prejudicial or cause undue delay is on the party opposing the motion for leave to amend. *Stonewell Corp. v. Conestoga Title Ins.*, No. 04 CV 9867 (KMW) (GWG), 2010 WL 647531, at *2 (S.D.N.Y. Feb. 18, 2010). And, as the Second Circuit has made clear, "the adverse party's burden of undertaking [additional] discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989). Indeed, additional discovery is often part and parcel of an amended pleading. *Stonewell*, No. 04-CV-9867, 2010 WL 647531, at *2. The "classic" denial of a motion to amend based on prejudice occurs when a party attempts to amend its pleading after summary judgment has been briefed, a time when discovery has closed and the parties have already solidified their positions on the issues. *Messier v. Southbury Training Sch.*, No. 3:94-CV-1706 (EBB), 1999 U.S. Dist. LEXIS 6992, at *10 (D. Conn. Jan. 5, 1999) (citing *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990)).

      Here, the parties are still several months away from the close of discovery and dispositive motions. Moreover, any new discovery required by the proposed amendment will not be "new"; it will be closely related to the discovery that has already occurred.

      Bear Stearns' conduct bearing on the Mortgage Loans underlying the Transactions forms the factual universe for all Ambac's claims, old and new. The discovery taken by both parties over the past sixteen months concerning the representations and warranties made to Ambac in connection with the Transactions, whether those statements were false, the reasons for their falsity, and Bear Stearns' contemporaneous knowledge of their falsity – shows

that Ambac's previously-pleaded breach of contract claims and its proposed fraud-based claims are, as a factual matter, inextricably linked.

The parties have acted in accordance with this understanding. In fact, EMC's counsel told this Court almost a year ago – August 2009 – that EMC was unable to meet the then-applicable discovery deadlines because the parties were not "merely here on a breach of contract case," but rather a case alleging damages "essentially on the basis of fraud." Counsel explained that his client needed more time to conduct searches for documents related to fraud, which (he claimed) were broader than those searches EMC would have needed to conduct for breach-of-contract claims alone. *See* Haas Decl. ¶ 8. Accordingly, Ambac has examined EMC's witnesses on topics relating to fraud and tortious interference without objection from EMC (*see id.* ¶ 23) and several of Ambac's discovery requests have focused on such issues (*id.* ¶ 9). Ambac has agreed to produce documents from its own files relating to its knowledge and understanding of the veracity of EMC's representations, which is discovery that EMC would undoubtedly claim is relevant to its defense of fraud-based claims. *Id.* ¶ 19. Thus, the new claims will fit seamlessly into the discovery the parties have already been conducting.

When new allegations or claims are "closely related to the original claim and are foreshadowed in earlier pleadings," prejudice is minimal. *Stonewell Corp.* 2010 WL 647531, at *2 (collecting cases). *See also State Teachers Retirement Bd.,* 654 F.2d at 856 (stating policy that amendments should be freely granted when "[t]he amended claim was obviously one of the objects of discovery and related closely to the original claim..."); *Carnrite v. Granada Hosp. Group, Inc.,* 175 F.R.D. 439, 447 (W.D.N.Y. 1997) (no prejudice from filing of amended complaint "as Defendants are well aware of the facts in the case as originally pled by Plaintiff...").

23

Moreover, the addition of Bear, Stearns & Co. and the Individual Defendants does not prejudice EMC. Bear, Stearns & Co. controlled and oversaw EMC in structuring the four mortgage-backed Transactions at issue; negotiating the Transaction contracts; providing or facilitating disclosures to Ambac, investors and rating agencies; and responding to Ambac's claims that thousands of loans backing the Transactions breach EMC's representations and warranties. *See, e.g.,* Am. Compl. ¶¶ 54-62, 206-211. In addition, the proposed new parties have already been involved in discovery. Eleven of the thirteen witnesses Ambac has deposed, including two Individual Defendants and all EMC's 30(b)(6) designees, were Bear, Stearns & Co. or JP Morgan employees. And many documents that EMC produced have come from Bear, Stearns & Co. or JP Morgan's files. *Id.* ¶13.

Finally, Ambac is prepared to continue with discovery during the pendency of its motion to amend and any appeal to Judge Berman from the decision of this Court, including responding to EMC's discovery requests addressed to the new claims in the proposed Amended Complaint. And, if depositions are suspended until the motion is decided, Ambac is committed to fully cooperating with EMC in completing discovery in an expeditious manner.

### 4.   Ambac's proposed amendment is not futile.

When a proposed amendment appears insufficient to withstand a motion to dismiss, it is futile and leave to amend should be denied. *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 74 (2d Cir. 1998). But an amendment is not futile if the moving party shows "at least colorable grounds for relief." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 783 (2d Cir. 1984). "Colorable grounds" is a minimal standard. Even if the movant's ultimate chance for recovery is "very remote and unlikely," a

properly pleaded complaint may nonetheless proceed. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Ambac's new allegations against both EMC and the proposed new defendants more than present colorable grounds for relief. Each new allegation made in the proposed Amended Complaint is firmly rooted in facts discovered through document review or deposition testimony, and the factual basis is set forth in detail. For each of the new claims for relief, Ambac has set forth allegations sufficient to meet each element required by law. And if Ambac is successful in proving these allegations, it will be entitled to judgment in its favor and recover damages.

## CONCLUSION

Given Ambac's diligence in pursuing this amendment, the compelling evidence Ambac has set forth in the proposed Amended Complaint, and the widespread damage caused by the conduct complained of, Ambac respectfully submits it should be given the opportunity to pursue these additional, meritorious claims.

Dated: New York, New York
        July 28, 2010

*Philip R. Forlenza/crs*

Philip R. Forlenza
Erik Haas
Carrie A. Syme
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Plaintiff Ambac Assurance Corp.*

To:     Richard A. Edlin
        Eric N. Whitney
        David J. Stone
        GREENBERG TRAURIG LLP
        200 Park Avenue
        New York, NY 10166

        John M. Callagy
        Nicholas J. Panarella
        William A. Escobar
        KELLEY DRYE & WARREN, LLP
        101 Park Avenue
        New York, NY 10178

        *Attorneys for Defendant EMC Mortgage Corp.*