UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                     :

AMBAC ASSURANCE CORPORATION,     :   Index No. 08 Civ. 9464 (RMB) (THK)
                                       :

                 Plaintiff,     :

                                       :   **DECLARATION OF ERIC N.**
                                       :   **WHITNEY IN SUPPORT OF**
        -against-                   :   **DEFENDANT EMC**
                                       :   **MORTGAGE CORPORATION'S**
EMC MORTGAGE CORPORATION,     :   **OPPOSITION TO PLAINTIFF**
                                       :   **AMBAC ASSURANCE**
                 Defendants.    :   **CORPORATION'S MOTION FOR**
                                         :   **LEAVE TO**
                                         :   <u>**AMEND THE COMPLAINT**</u>
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      I, ERIC N. WHITNEY, hereby declare as follows:

      1.    I am a Shareholder in the law firm Greenberg Traurig LLP, counsel to EMC Mortgage Corporation ("EMC"), the named defendant in the above-styled matter.  I submit this declaration in support of Defendant EMC Mortgage Corporation's Opposition to Plaintiff Ambac Assurance Corporation's Motion for Leave to File Amended Complaint (EMC's "Opposition").

      2.    In my capacity as counsel for EMC, I, along with other attorneys from my firm, have participated in numerous discovery conferences with counsel for Ambac, both in person and via teleconference.  On multiple occasions, counsel for Ambac characterized their election to pursue only contract claims against EMC as a strategic decision based, in part, on a desire to avoid discovery or inquiry into Ambac's knowledge regarding, among other things, EMC's and Bear Stearns' business practices, the Mortgage Loans, the sellers and originators from whom EMC purchased loans, including those that are included in the Transactions, and other loans and transactions.

3.     To date, EMC has incurred at least $7 million in outside legal fees solely in respect of offensive and defensive document and deposition discovery.   This figure omits millions of dollars paid to third-party contractors, data hosting providers, e-discovery vendors, and copy services as well as the thousands of hours spent by internal JP Morgan and EMC employees collecting and reviewing documents.   As much as 70% of that expense was incurred after December 2009.

4.     EMC's and Ambac's productions alone contain over 25 million pages of documents.   In addition, numerous third parties have produced approximately 5 million pages of documents.   In my opinion, if the Court were to grant Ambac's motion, EMC would be required to *re-review* and *re-code* for fraud, tortious interference and related defensive theories **all** previously reviewed and produced documents based on the allegations of the Proposed Amended Complaint.   If the amendment is permitted EMC will also have to reevaluate the sufficiency of its document production to determine whether it has produced all documents responsive to requests targeted at Ambac's new claims and parties or to additional requests for production from Ambac.

5.     I am familiar with and have reviewed certain of the contracts and other "deal documents" associated with each of the Transactions.   True and correct copies of the following documents from the SACO 2006-8 transaction are attached  hereto as Exhibits 1-5, respectively: (i) September 5, 2006 Prospectus, September 7, 2006 Free Writing Prospectus, September 14, 2006 Prospectus Supplement (collectively, the "ProSupp"); (ii) September 15, 2006 Indenture; (iii) September 15, 2006 Mortgage Loan Purchase Agreement ("MLPA"); (iv) September 15, 2006 Insurance and Indemnity Agreement ("I&I Agreement"); and (v) September 15, 2006 Ambac Certificate Guaranty Insurance Policy, number AB1020BE ("Policy").   Additionally,

attached hereto as <u>Exhibit 6</u> is a true and correct copy of the April 30, 2007 Indenture, which was executed in connection with the BSSLT 2007-1 transaction. The I&I Agreements, MLPAs and Policies executed in each of the Transactions are substantially similar. Indentures were not executed in connection with the SACO 2005-10 and SACO 2006-2 transactions; instead, Pooling and Servicing Agreements ("PSA") were utilized.

## I.     The Haas Declaration.

6.     I have reviewed the "Declaration of Erik Haas in Support of Ambac's Motion for Leave to Amend The Complaint," including the documents and excerpts attached thereto (collectively, the "Haas Decl." or "Haas Declaration"). The statements contained herein are based on my experience, familiarity with, review, and analysis of documents (including e-mail, correspondence and non-email) produced or otherwise provided by both parties and their counsel, and deposition testimony.

7.     The following documents used as exhibits to the Haas Declaration were also used as exhibits to the Rule 30(b)(6) depositions of Mary Haggerty, Robert Durden, and Joanna Megha: Haas Ex. 7 (Durden Ex. 6; Haggerty Ex. 10); Haas Ex. 8 (Haggerty Ex. 19); Haas Ex. 9 (Haggerty Ex. 37); Haas Ex. 11 (Durden Ex. 7; Haggerty Ex. 26); Haas Ex. 12 (Haggerty Ex. 27); Haas Ex. 19 (Haggerty Ex. 40); Haas Ex. 22 (Durden Ex. 17); Haas Ex. 23 (Durden Ex. 16); Haas Ex. 25 (Megha Ex. 3); Haas Ex. 26 (Megha Ex. 12). In some instances a duplicate or near duplicate version of a document was used at deposition, meaning that the document may have a different Bates number but in all other regards it is identical or nearly identical to the version attached to the Haas Declaration

## Case Schedule History

8.      In Paragraphs 4-8, the Haas Declaration purports to summarize the "Case Schedule History" of this lawsuit.   As set forth below, this particular portion of the Haas Declaration contains a number of inaccuracies.

9.      <u>Paragraphs 6 & 7</u>:   Ambac's statement in Paragraph 6 that discovery deadline extensions have been "[granted] primarily to account for EMC's failure to produce critical documents to Ambac" is gratuitous and ignores the extensive and reasoned explanations set forth by EMC to justify the pace of its extensive production.[1]   Nowhere in the Orders of August 5, 2009 (Docket No. 37), November 23, 2009 (Docket No. 52) or March 9, 2010 (Docket No. 55) does the Court reprimand, single out or suggest that EMC is responsible for any delay in discovery.   In addition, Ambac neglects to mention the significant amount of time and resources EMC devoted to the issue of clawback and replacement production because Ambac, by its own mistake, produced in excess of 6,000 privileged documents.

10.      <u>Paragraph 8</u>:   During the August 5, 2009 conference before Magistrate Judge Katz, EMC did not argue, as Ambac states in the Haas Declaration, that it needed additional time specifically in order to "search for documents related to fraud."   Rather, EMC noted that in general, the process of restoring and reviewing custodians was extremely time-consuming, could only be conducted in a certain order,[2] and was hindered by the departure of approximately 75% of EMC's former employees.[3]   During that hearing, EMC also pointed to the discrepancy in the

---

[1] *See, e.g.,* Letter from E. Whitney to Judge Katz dated November 6, 2009, responding to Ambac's request for a pre-trial conference with respect to various discovery issues raised in its November 3, 2009 status report.   A true and correct of copy of the November 6 letter is attached hereto as <u>Exhibit 7</u>.

[2] *See generally* August 5, 2009 Hearing Transcript at 13.   A true and correct copy of the August 5 Transcript is attached hereto as <u>Exhibit 8</u>.

[3] *See id.* at 15:11.

number of custodians between EMC and Ambac and the fact that Ambac itself only produced the large amount of e-mails it held up to the Court as proof of its exemplary pace of production the week of the hearing in question.[4]   Notably, the Court **declined to adopt** Ambac's repeated requests for an order imposing interim discovery deadlines, instead requiring the parties to submit monthly status updates.[5]

### Document Discovery

11.   In Paragraphs 9-19, the Haas Declaration purports to describe and summarize the parties' "Document Discovery" thus far in the litigation.  However, like the portion of the Haas Declaration addressing the history of the case, this section also contains a number of inaccuracies.

12.   Paragraph 10:  Ambac claims that EMC's production as of April 2009 was "*de minimis.*"  However, by that time, EMC had produced the following types and categories of documents:

    a.  Closing Binders for each of the Transactions;

    b.  Trustee, Bond Holder and Disbursement Reports for each of the Transactions;

    c.  Extensive Due Diligence Reports and Summaries for the underlying transactions in which EMC acquired certain of the Mortgage Loans;

    d.  Third Party underwriting guidelines used to originate the Mortgage Loans;

    e.  Settlements and Confirmations for the hundreds of whole loan acquisitions underlying the Transactions;

    f.  Claims correspondence and rebuttal support data and information exchanged between EMC and Ambac;

---

[4] *See id.* at 16:23.

[5] *See id.* at 28:14.

g.  Copies and drafts of EMC's Seller's Guide, which contains EMC's stated underwriting guidelines and several practices and procedures utilized by entities from whom EMC purchased certain of the Mortgage Loans;

h.  Files collected from EMC's Fastrieve Imaging systems for certain of the Mortgage Loans, including some of those serviced by other entities (i.e., not serviced by EMC or any of its affiliates);

i.  Investor Presentations and other related marketing documents used to provide a general overview of EMC's various business functions;

j.  "Term Sheets" for each of the Transactions which are typically circulated to potential investors; and

k.  Third party vendor contracts between EMC and, for example, Clayton Services, Adfitech and Watterson Prime.

13.    By the beginning of May 2009, EMC had produced millions of pages, covering numerous categories of documents.  On May 5, 2009, EMC produced, in addition to the categories of documents listed above, loan origination and collateral files collected from Fastrieve for more than 35,000 of the nearly 50,000 Mortgage Loans, a production that exceeded 11 million pages.  On May 1, 2009, EMC produced several hundred Term Sheets, Mortgage Loan Purchase Agreements, and Assignments related to its bulk acquisition of certain of the Mortgage Loans through numerous individual transactions (so-called "Sub-Deals").  Thereafter, on May 14 and 18, 2009, EMC produced non-privileged e-mail and stand-alone documents collected from EMC's deal counsel for each of the Transactions, Thacher, Proffitt and Wood ("TPW"), which reflected the negotiation and closing of the Transactions.  On May 15 and 18, 2009, EMC produced tens-of-thousands of pages collected from its hard copy seller approval

files, which consist of, among other things, many of the documents and data submitted by loan originators in the approval process as well as documents reflecting EMC's review and analysis of those materials and issues.

14.     <u>Servicing Records</u>:   EMC completed its production of servicing and collection notes and histories to Ambac on or before May 26, 2009.   Therefore, Ambac had in its possession, these so-called "critical" documents approximately 14 months before it sought leave to amend its Complaint.  As detailed in a series of affidavits submitted by EMC to the Court on or about May 19, 2009, EMC went to extensive efforts to produce servicing and collection notes and histories for the loans for which EMC was the designated servicer–approximately 36,000 individual mortgage loans.[6]   And even though some technical exceptions occurred, EMC completed its production of servicing and collection notes and histories by May 26, 2009.

15.     <u>Paragraph 11</u>:   Generally, Ambac's statements in Paragraph 11 of the Haas Declaration are incorrect.  During the August 5, 2009 conference, the Court expressly declined to impose a strict schedule of interim production deadlines.[7]  The remainder of the scheduling order pertains to deadlines applicable to ***both parties***.[8]   In complete contradiction to the claim in Paragraph 11 of the Haas Declaration that "Ambac successfully urged . . . Magistrate Judge Katz . . . to place EMC on a strict schedule of interim production deadlines," the Court specifically declined to do so during the hearing, stating "I'm prepared to let you proceed along those lines [with respect to the production of e-mails and prioritization of custodians] without having to

---

[6] A true and correct copy of the Affidavit of Marc D. McPeak, submitted to the Court on May 19, 2009, is attached hereto as <u>Exhibit 9</u>.

[7] *See* August 5, 2009 Scheduling Order at 4 (Docket No. 37).

[8] *See id.*

<u>DECLARATION OF ERIC N. WHITNEY</u>                                                    PAGE 7

actually have specific dates and if you run into a problem, you let me know."[9]  As previously noted, rather than impose a set of interim deadlines, Magistrate Judge Katz requires the parties to submit monthly status updates going forward.[10]

16.    Paragraph 12 & EMC's Early E-mail Production:    Paragraph 12 of the Haas Declaration alleges that EMC did not produce e-mail of any consequence or volume until September 2009.  Not so.  EMC made the following e-mail productions prior to September 2009:

a.    On May 22, 2009 EMC produced over 1,000 e-mail messages and attachments, totaling just under 20,000 pages;

b.    On June 5, 2009 EMC produced over 10,600 e-mail messages and attachments, totaling approximately 154,000 pages;

c.    On June 30, 2009 EMC produced over 22,000 e-mail messages and attachments, totaling almost 305,000 pages;

d.    On August 15, 2009 EMC produced nearly 23,000 e-mail messages and attachments, totaling approximately 379,000 pages;

e.    On August 31, 2009 EMC produced nearly 24,000 e-mail messages and attachments, totaling approximately 205,000 pages.

Therefore, by September 1, 2009, in addition to the substantial volume and scope of EMC's non-e-mail production, EMC had produced approximately 78,500 e-mail message and attachments, totaling more than 1,000,000 pages.  Moreover, the "enormous block" of e-mail referenced in Paragraph 12 of the Haas Declaration, while large in page count, consisted of approximately 24,000 e-mail messages and attachments, making it, in that respect, unremarkable and comparable to any one of EMC's e-mail productions of June 30, August 15 or August 31.

---

[9] See Aug. 5, 2009 Hr. Tr. Ex. 8 at 28:14-28:16.

[10] See id. at 30:14-30:20.

17.     In Paragraph 12 Ambac further complains that EMC did not produce any e-mail for the individuals Ambac seeks to add as Defendants prior to September 2009.  This is simply not the case, as described below.  Moreover, in addition to the proposed Individual Defendants, EMC produced e-mail for numerous other individuals whose roles or departments are directly or indirectly implicated by Ambac's proposed amendment.  It is also important to note that the vast majority of the e-mail messages produced by EMC and cited by Ambac reflect multiple recipients, such that substantial volumes of e-mail for non-priority custodians were in fact produced well in advance of the "official" production dates for those individuals.

Proposed Additional Defendants:

a.   Prior to September 1, 2009 EMC produced over 100 e-mail messages that were either sent by, received by or refer to Mr. Mayer.   This accounts for approximately 25% of all e-mail produced by EMC that was sent by, received by or refers to Mr. Mayer.

b.   Prior to September 1, 2009 EMC produced over 325 e-mail messages that were either sent by, received by or refer to Mr. Marano.

c.   Prior to September 1, 2009 EMC produced approximately 2,100 e-mail messages that were either sent by, received by or refer to Mr. Verschleiser.

d.   Prior to September 1, 2009 EMC produced over 1,000 e-mail messages that were either sent by, received by or refer to Mr. Nierenberg.

e.   Prior to September 1, 2009 EMC produced over 3,200 e-mail messages that were either sent by, received by or refer to Mr. Silverstein.

f.   Prior to September 1, 2009 EMC produced over 4,100 e-mail messages that were either sent by, received by or refer to Ms. Haggerty.

<u>Other EMC Employees</u>:

g.  Prior to September 1, 2009 EMC produced over 15,200 e-mail messages that were either sent by, received by or refer to the following employees that worked on the trading desks and which are either senior executives and/or are the subject of certain of the new allegations in Ambac's Proposed Amended Complaint: Matt Perkins (1,115); Chris Scott (4,437); Scott Eichel (1,563); Keith Lind (7,241); and Charles Mehl (888).

h.  Prior to September 1, 2009 EMC produced over 7,000 e-mail messages that were either sent by, received by or refer to the following individuals, each of whom were deal managers for one or more of the Transactions: Nicholas "Nick" Smith (2,329); Jeff Maggard (2,753); and Josephine Musso (1,951).

i.  Prior to September 1, 2009 EMC produced over 3,300 and 4,500 e-mail messages that were either sent by, received by or refer to John Mongelluzzo and Pattie Sears, respectively.  These individuals were the two primary due diligence managers for Bear Stearns' Mortgage Finance department.

j.  Prior to September 1, 2009 EMC produced over 5,200 e-mail messages that were either sent by, received by or refer to the following diligence managers that reported to either Mr. Mongelluzzo or Ms. Sears: Maria Hargis (1,609); Joe Carrion (217); Dylan Hoyt (518); Faith Hodan (1,190); and Jacqueline Donohue (1,746).

18.  <u>Paragraph 16</u>:  While it is true that Ambac has seemingly devoted a substantial volume of resources to its letter writing campaigns, it does not follow that these letters and e-mails are proof of deficiencies in EMC's productions.  In response to many of Ambac's so-called

"deficiency" letters, EMC confirmed that it had in fact produced the documents about which Ambac inquired.  In a particularly egregious example, EMC devoted a substantial amount of time and resources simply to confirm that nearly 40 categories of documents were already present in EMC's production—a process that Ambac was equally capable of performing.[11]

19.     Paragraph 18:  Ambac's description of the nature, substance and scope of EMC's production of information stored in certain databases is misleading.  EMC produced consolidated information from several systems (Fidelity, Unifi, WITS and HALO, to name a few) but those productions are not the only instances in which that data was produced to Ambac.  Indeed, information from all of these systems and databases was utilized in the normal course of EMC's business and was regularly transmitted by and among EMC and Bear Stearns employees.  As such, Ambac has had since early in the document production the vast majority of this data *in the form that it was used by EMC* for internal reporting and monitoring.  Ambac's recent demand amounts to a "data dump" from Cogent that should not yield any significant information used by EMC in the day-to-day operation of its business that was not previously produced.

20.     Paragraph 18 also misstates the function and purpose of the Cogent database— presumably to inflate its significance and relevance to this lawsuit.  Ambac's insinuation that the only documents reviewed in Cogent are those that are selected based on "red flags or delinquency triggers" is incorrect.  Loans were selected for review in Cogent for defects (as opposed to breaches) as follows: (i) random sample; (ii) adverse sample; (iii) internal or external referral; (iv) 90 day delinquency trigger; and/or (v) loan acquired from new sellers/originators.

---

[11] *See* June 12, 2010 Letter from M. McPeak to N. Parekh, a true and correct copy of which is attached hereto as Exhibit 10.

21.     Ambac also alleges in Paragraph 18 that it has notified EMC of other "deficiencies" and is awaiting a full response.  EMC is unaware of any such correspondence from Ambac and has requested clarification from its counsel.

22.     Paragraph 19:  Ambac's suggestion that it has unequivocally agreed to produce documents from its own files relating to its knowledge and understanding of the veracity of EMC's representations is deceiving.  Over EMC's protests, Ambac has expressly limited that discovery to documents that relate to either the Mortgage Loans or the Transactions.[12]  While EMC agrees that this evidence is germane to a fraud claim, it is also directly relevant to EMC's defense of contract-based claims as well.  Moreover, the universe of documents relevant to EMC's defense of fraud and tort claims far exceeds the nature and scope of Ambac's "agreement" to produce certain documents.  To date, Ambac has not agreed to produce any documents that do not relate specifically to the Mortgage Loans or the Transactions despite the fact that Ambac acquired direct knowledge about EMC and/or the entities that originated or sold to EMC the Mortgage Loans through other deals and in circumstances beyond just the Transactions.

### Depositions

23.     In Paragraphs 20-23, the Haas Declaration purports to describe and summarize the depositions that have occurred.  The Court is capable of review itself to determine the nature and substance of the testimony and some limited excerpts clarifying certain key aspects of that testimony are attached.  This section of the Haas Declaration also contains many inaccuracies.

24.     Paragraph 20:  Ambac had more than sufficient information to begin taking depositions prior to September 2009 and its statement to the contrary ignores the substantial

---

[12] *See* May 26, 2009 Letter from N. Parekh to E. Whitney and D. Stone, a true and correct copy of which is attached hereto as Exhibit 11.

volume of information produced by EMC prior to that date, as evidenced above, among other places.    As noted in the Haas Declaration, depositions of EMC's designated corporate representatives were complete by February 3, 2010.  Indeed, with a substantial production of EMC documents in hand, in September Ambac issued an extraordinarily broad deposition notice pursuant to Rule 30(b)(6).[13]  In response, EMC provided 4 witnesses who testified over 5 days in December 2009 and January and early February 2010, thoroughly covering all aspects of, *inter alia*, the following of EMC's business departments and functions: (i) corporate and departmental organization and structure; (ii) securitization; (iii) loan acquisition and origination; (iv) pre-securitization due diligence; (v) seller approval and monitoring; (vi) post-securitization quality control review; and (vii) claims asserted by and against EMC.

25.    <u>Paragraph 23</u>:  With respect to Ms. Megha's deposition, the Haas Declaration significantly mischaracterizes her testimony, including portions before, at and after the referenced pages 190-192.  Indeed, Paragraph 23 of the Haas Declaration highlights a mere 3 pages of a large section on the subject of "JPM Security Breach Re-Review" and which related specifically to an e-mail dated May 7, 2008.[14]  The allegation made by Ambac's counsel in Paragraph 23 of the Haas Declaration that Alison Malkin's actions were "intrusive and fraudulent" is not consistent with any of Ms. Megha's testimony.  With respect to Mr. Golden's testimony, he does not testify that Bear or EMC hid or affirmatively attempted to hide this information from potential parties to securitizations and Ambac has not, and cannot, point to any evidence to the contrary

---

[13] A true and correct copy of Ambac's 30(b)(6) Dep. Notice is attached hereto as <u>Exhibit 12</u>.

[14] *See* Megha Dep. Ex. 3, EMC AMB 7173918, a true and correct copy of which is attached hereto as <u>Exhibit 13</u>.

## Due Diligence

26.     In Paragraphs 26, 29, 30, 32, 33 and 34, among others, Ambac alleges that it took sixteen months of discovery to collect "evidence" related to EMC's due diligence practices. This is not correct. EMC produced substantial volumes of diligence reports and summaries in its initial document production on January 16, 2009. Indeed, in that production EMC produced over 140,000 pages of reports, spreadsheets and summaries provided by third-party due diligence firms such as Watterson Prime and Clayton. More specifically, EMC's January 16, 2009 production included documents reflecting the due diligence performed on over 300 sub-deals.

27.     As noted above, Ambac had in its possession early in the case several thousand e-mail messages and attachments from individuals such as Baron Silverstein, Mary Haggerty, John Mongelluzzo and Pattie Sears, each of whom was involved with third-party due diligence conducted on behalf of EMC. Moreover, Ambac deposed Ms. Haggerty, in her capacity as EMC's corporate representative with respect to certain of the noticed topics, extensively regarding EMC's due diligence practices in January and February 2010.[15]

28.     In paragraph 29 (and Exhibit 7), Ambac suggests that it was never informed that EMC may perform reduced diligence on a particular pool of loans (the subject of Exhibit 7) and that the "evidence" contained in the e-mail attached as Exhibit 7 to the Haas Declaration was somehow "new." However, Ambac has been aware of this potential reduction in diligence since February 2005 when Sara Bonesteel (Bear Stearns) sent an e-mail to Christine Lachnicht and Hans Kretschman (Ambac) in which she stated as follows:

> We will still be doing 100% due diligence on compliance and appraisal. 25% applies to credit only. The files selected for review will be both random and adverse. The 25% review would be limited

---

[15] *See e.g.,* Haggerty Dep. Tr., at 60:11-68:24, 173:04-185:23, 306:10-331:17. True and correct copies of excerpts of the transcripts for both days of Ms. Haggerty's testimony are attached hereto as <u>Exhibits 14A and 14B</u>.

to larger packages (say $200m or greater) so the minimum concept doesn't really apply. On a $200m package, 25% would be about 285 loans. The acceptable fail rate would be 6% (that is, 94% of the loans we check are ok). Greater than 10% would lead us to request the seller to substitute different loans. Greater than 20% could result in cancellation of the trade.[16]

Thereafter, Ms. Lachnicht forwarded Ms. Bonesteel's e-mail to Iain Bruce and John Bryan and stated "Here's the e-mail from Sara detailing what they do. I like the fact that they'll fail the deal if too many are rejected. I'm trying to get some time to speak with her about this further."[17] Notably, not only was Ambac aware of those processes but considered them "as good as or better than market standard."[18] Not only were these e-mails taken from Ambac's production but they evidence "actual" (real-time) knowledge by Ambac of EMC's practices with respect to Due Diligence in 2005 and thereafter.[19] Again, not only was notice provided to Ambac but EMC did so within only a few days of Ms. Haggerty's internal e-mail that is attached to the Haas Declaration as Exhibit 7.

29. Additionally, Exhibit 7 to the Haas Declaration was produced to Ambac on June 30, 2009 and/or its substance (i.e., a duplicate or near-duplicate) was the subject of inquiry at the depositions of three EMC witnesses, including two (Durden and Haggerty) that were conducted in December 2009 and January 2010.[20]

---

[16] *See* ABK-EMC 1987358, a true and correct copy of which is attached hereto as Exhibit 15.

[17] *Id.*

[18] *See* ABK-EMC 1987410-411, a true and correct copy of which is attached hereto as Exhibit 16.

[19] *See* Exs. 15 and 16. *See also* ABK-EMC 1570336-338, ABK-EMC 1987361, and ABK-EMC 2794183-185, true and correct copies of which are attached hereto as Exhibits 17-19, respectively.

[20] *See* Durden Dep. Tr. at 248:13-254:09, a true and correct copy of which is attached hereto as Exhibit 20. *See also* Smith Dep. Tr., at 138:03-141:17, a true and correct copy of which is attached hereto as Exhibit 21; Haggerty Dep. Tr. Ex. 14A, at 197:03-199:25.

30.     In Paragraph 30 (and Exhibit 8), of the Haas Declaration, Ambac suggests that it did not know that EMC performed, in certain limited circumstances, due diligence after it purchased loans.  However, documents produced by Ambac clearly demonstrate that it was fully aware at the time that EMC conducted post-acquisition due diligence.  For example, in deciding whether to participate in the SACO 2006-2 transaction, Ambac specifically noted that EMC agreed to post-closing diligence with respect to Waterfield, which Ambac also describes as "one of the principal originators of Mortgage Loans bought by EMC."[21]   EMC's post-closing diligence procedures were also explicitly noted in the Credit Committee Memos for both the SACO 2005-10 (December 2005) and SACO 2006-2 (January 2006) transactions.[22]  Therefore, Ambac had actual knowledge of EMC's post-acquisition diligence practices prior to entering any of the Transactions and as early as December 2005.

### Exhibits 13, 14, 24, 25 and 26 to the Haas Declaration

31.     In Exhibits 13, 14, 24, 25 and 26 to the Haas Declaration, Ambac complains about EMC's policies and practices for reviewing loans for securitization breaches, its outgoing repurchase claims to sellers on potentially defective loans, its settlement of repurchase claims against sellers and its analyses and decisions regarding its obligation and ability to remit funds recovered on securitized loans to the trusts and the timing of it doing so.  However, each of these documents was in Ambac's possession by December 2009.  In addition, Ambac questioned EMC's Rule 30(b)(6) witnesses extensively regarding EMC's policies and procedures for

---

[21] *See* ABK-EMC 2664455-457, at true and correct copy of which is attached hereto as <u>Exhibit 22</u>.

[22] *See* SACO 2005-10 Credit Committee Memo, at ABK-EMC 2655716; a true and correct copy of the 2005-10 Credit Committee Memo is attached hereto as <u>Exhibit 23</u>.  *See also* SACO 2006-2 Credit Committee Memo, at ABK-EMC 1609418; a true and correct copy of the 2006-2 Credit Committee Memo is attached hereto as <u>Exhibit 24</u>.

reviewing and responding to repurchase claims prior to and after the merger with JP Morgan.[23] Ambac also questioned several of EMC's witnesses regarding EMC's policies and practices for reviewing loans for securitization breaches, EMC's claims to sellers and EMC's settlement of claims and its allocation of those funds.[24]

### Paragraphs 56-61

32.  <u>Paragraph 57</u>:  EMC produced the WITS database on September 16, 2009. Although it is unnecessary with respect to most of the data in WITS, EMC produced on December 29, 2009 a comprehensive data dictionary for use in reviewing and digesting WITS data.  Ambac's allegation that was unable to access and read WITS until Spring therefore makes no sense.  Notably, no WITS data is cited in the Haas Declaration as supporting Ambac's proposed amendment.

33.  <u>Paragraph 58</u>:  The letter cited by Ambac in Paragraph 58 of the Haas Declaration provides *examples* of nearly 43 types and categories of documents produced by EMC.  As previously noted, there was nothing preventing Ambac from conducting the same analysis given that virtually all documents referenced were already contained in EMC's production.

34.  <u>Paragraph 59</u>:  With respect to Exhibit 23 to the Haas Declaration, the author of this e-mail provided a wholly innocent explanation for his use of crude language in two e-mail chains that relate to the SACO 2006-8 transaction.[25]  Not only did Mr. Smith explain his use of these terms, but he repeatedly stated that these e-mails did not reflect his opinion of the

---

[23] *See* Haggerty Dep. Tr. Ex. 14A, at 73:12-75:09.  *See also* Megha Dep. Tr. at 78:22-82:03, a true and correct copy of which is attached hereto as <u>Exhibit 25</u>.

[24] *See* Mesuk Dep. Tr. at 113:11-131:22, a true and correct copy of which is attached hereto as <u>Exhibit 26</u>.  *See also* Megha Dep. Tr. Ex. 25, at 41:20-51:24, 65:23-100:12, 153:09-173:02, 214:11-222:05, 250:09-253:23; Haggerty Dep. Tr. Ex. 14B, at 449:09-478:19 and 482:13-529:04.

[25] *See* Smith Dep. Tr. Ex. 21, at 208:13-213:06.

transaction.[26]  Mr. Smith's explanation for his use of these terms is supported by Mr. Durden, who testified that, with respect to Exhibit 23 to the Haas Declaration, "I don't believe this Email is representative of EMC's sentiment towards this transaction."[27]

35.     <u>Paragraph 61</u>: As set forth above (including the documents and excerpts attached to this declaration), EMC's production was not "delayed for months" and Ambac's allegation in this regard in the Haas Declaration is incorrect.

## II.     <u>Other Documents and Deposition Excerpts Cited in EMC's Opposition.</u>

36.     Attached hereto as <u>Exhibit 27</u> is a true and correct copy of EMC Mortgage Corporation's First Request for Production of Documents dated February 26, 2009

37.     Attached hereto as <u>Exhibit 28</u> is a true and correct copy of EMC Mortgage Corporation's Second Request for Production of Documents dated March 1, 2010.

38.     Attached hereto as <u>Exhibit 29</u> is a true and correct copy of a letter from Erik Haas to The Honorable Richard M. Berman dated April 21, 2009.

39.     Attached hereto as <u>Exhibit 30</u> is a true and correct copy of a chart created by counsel for Defendant EMC entitled "Ambac Statements Regarding Scope of Discovery" and the discovery documents and correspondence cited therein, which are attached as <u>Exhibits 30A-30U</u>. With respect to each of the attachments to Exhibit 30, the quoted language is highlighted for the Court's convenience.

40.     Attached hereto as <u>Exhibit 31</u> is a true and correct copy of relevant transcript excerpts from the Deposition of Cheryl Glory dated April 23, 2010.

---

[26] *See id*. at 154:05-165:03.

[27] *See* Durden Dep. Tr. Ex. 20, at 302:07-302:09.

<u>DECLARATION OF ERIC N. WHITNEY</u>                                                                    PAGE 18

41.     Attached hereto as Exhibit 32 is a true and correct copy of a chart created by counsel for Defendant EMC entitled "Documents Produced by EMC Attached to the Declaration of Erik Haas" which details the date each document was produced.

42.     Attached hereto as Exhibit 33 is a true and correct copy of Ambac's Consumer Asset-Backed Group Financial Guarantee Exposure (as of March 31, 2010), available on Ambac's website at http://www.ambac.com/CABS/CABS.asp.

43.     Attached hereto as Exhibit 34 is a true and correct copy of Ambac Assurance Corporation's Brief in Opposition to Motion by Wells Fargo Bank, N.A., as Trustee for the Benefit and Protection of Certain Bondholders, to Modify Temporary Injunctive Order and to Intervene, filed on June 11, 2010, *In the Matter of the Rehabilitation of: Segregated Account of Ambac Assurance Corp.* (Case No. 10-CV-1576) (Wis. Cir. Ct., Dane County).

### III.   Unpublished Opinions Cited In EMC's Opposition.

44.     Attached hereto as Exhibit 35 is a true and correct copy of *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230 (LMM) (THK), 2006 WL 617977 (S.D.N.Y. Mar. 10, 2006), *aff'd*, 2006 WL 2242596 (S.D.N.Y. Aug. 3, 2006).

45.     Attached hereto as Exhibit 36 is a true and correct copy of *Augustine v. AXA Fin., Inc.*, No. 07 Civ. 8362, 2008 WL 5025017 (S.D.N.Y. Nov. 24, 2008).

46.     Attached hereto as Exhibit 37 is a true and correct copy of *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05 Civ. 3749 (KMW) (DF), 2009 WL 2524611(S.D.N.Y. Aug. 14, 2009).

47.     Attached hereto as Exhibit 38 is a true and correct copy of *Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*, No. 99 Civ. 2952 (LBS), 2002 WL 31812710 (S.D.N.Y. Dec. 12, 2002).

48.    Attached hereto as Exhibit 39 is a true and correct copy of *Trezza v. NRG Energy, Inc.*, No. 06 Civ. 11509 (PKC) (DF), 2008 WL 540094 (S.D.N.Y. Feb. 28, 2008).

49.    Attached hereto as Exhibit 40 is a true and correct copy of *Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02 Civ. 10037 (DLC), 2005 WL 1041141 (S.D.N.Y. May 5, 2005).

50.    Attached hereto as Exhibit 41 is a true and correct copy of *Kant v. Columbia Univ.*, No. 08 Civ. 7476 (PGG), 2010 WL 807442 (S.D.N.Y. Mar. 9, 2010).

51.    Attached hereto as Exhibit 42 is a true and correct copy of *Woodworth v. Erie Ins. Co.*, No. 05-CV-6344 (CJS), 2009 WL 3671930 (W.D.N.Y. Oct. 29, 2009).

52.    Attached hereto as Exhibit 43 is a true and correct copy of *In re Wireless Tel. Serv. Antitrust Litig.*, No. 02 Civ. 2637 (DLC), 2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004).

53.    Attached hereto as Exhibit 44 is a true and correct copy of *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05 Civ. 10272 (JFK), 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007).

54.    Attached hereto as Exhibit 45 is a true and correct copy of *Sedona Corp. v. Ladenburg Thalmann*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 2647945 (S.D.N.Y. Oct. 14, 2005).

55.    Attached hereto as Exhibit 46 is a true and correct copy of *MBIA Ins. Corp. v. Spiegel Holdings, Inc.*, No. 03 CV 10097 (GEL), 2004 WL 1944452 (S.D.N.Y. Aug. 31, 2004).

56.    Attached hereto as Exhibit 47 is a true and correct copy of *U.S. v. Castle Const. Co.*, No. 01 C 774, 01 C 2993, 2002 WL 31163668 (N.D. Ill. Sept. 30, 2002).

57.    Attached hereto as Exhibit 48 is a true and correct copy of *Am. Hardware Mut. Ins. Co. v. Fire Equip. Sales & Serv., Inc.*, No. 01CV416, 2004 WL 1563087, (W.D.N.Y. June 9, 2004).

58.     Attached hereto as Exhibit 49 is a true and correct copy of *In re UBS Auction Rate Sec. Litig.*, No. 08 CV 2967(LMM), 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009).

59.     Attached hereto as Exhibit 50 is a true and correct copy of *MBIA Ins. Corp. v. IndyMac ABS, Inc.*, LASC Case No. BC422358 (Cal. Sup. Ct., Aug. 3, 2010).

60.     Attached hereto as Exhibit 51 is a true and correct copy of *Jay Dees Inc. v. Def. Tech. Sys., Inc.*, No. 05 Civ. 6954 (SAS), 2008 WL 4501652 (S.D.N.Y. Sept. 30, 2008).

61.     Attached hereto as Exhibit 52 is a true and correct copy of *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078 (LTS) (AJP), 2009 WL 2033048 (S.D.N.Y. July 13, 2009).

62.     Attached hereto as Exhibit 53 is a true and correct copy of *Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494 (DLC), 2007 WL 2044656 (S.D.N.Y. July 17, 2007).

63.     Attached hereto as Exhibit 54 is a true and correct copy of *LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389 (AGS), 2002 WL 31729632 (S.D.N.Y. Dec. 5, 2002).

64.     Attached hereto as Exhibit 55 is a true and correct copy of *HSH Nordbank, AG v. UBS AG and UBS Sec. LLC*, No. 600562/08, 2008 WL 4819599 (N.Y. Sup. Ct. Oct. 21, 2008).

65.     Attached hereto as Exhibit 56 is a true and correct copy of *Pramco III, LLC v. Partners Trust Bank*, No. 2006/02318, 2007 WL 1574479 (N.Y. Sup. Ct. May 31, 2007).

66.     Attached hereto as Exhibit 57 is a true and correct copy of *In re Enron Corp.*, No. 04 Civ. 1367, 1496, 1498 (NRB), 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005).

67.     Attached hereto as Exhibit 58 is a true and correct copy of *Savasta & Co., Inc. v. Interactive Planet Software Motion, Inc.*, No. 0602425/2005, 2008 WL 2563485 (N.Y. Sup. Ct. June 12, 2008).

68.     Attached hereto as Exhibit 59 is a true and correct copy of *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, No. 1:04-cv-1432 (RLY) (TAB), 2007 WL 2904591 (S.D. Ind. Sept 28, 2007).

69.     Attached hereto as Exhibit 60 is a true and correct copy of *MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 601324/08, 2010 WL 2347014 (N.Y. Sup. Ct. Apr. 9, 2010).

70.     Attached hereto as Exhibit 61 is a true and correct copy of *Metro-Goldwyn-Mayer Studios, Inc. v. Canal Distrib. S.A.S.*, No. 07 Civ. 2918 (DAB), 2010 WL 537583 (S.D.N.Y. Feb. 9, 2010).

71.     Attached hereto as Exhibit 62 is a true and correct copy of *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635 (RPP), 2003 WL 1961636 (S.D.N.Y. Apr. 25, 2003).

72.     Attached hereto as Exhibit 63 is a true and correct copy of *Kargo, Inc. v. Pegaso PCS, S.A.*, No. 05 Civ. 10528 (CSH) (DFE), 2008 WL 2930546 (S.D.N.Y. July 29, 2008).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 23, 2010 in New York, New York.

Executed pursuant to 28 U.S.C. § 1746, this 23rd day of August, 2010.


_____
Eric N. Whitney